**INTERNATIONAL COURT OF ARBITRATION**
**OF THE INTERNATIONAL CHAMBER OF COMMERCE**
**Case No. 18215/GZ/MHM**

In the arbitration between:

**EAST MEDITERRANEAN GAS S.A.E. (Egypt)**

Claimant

vs/

**EGYPTIAN GENERAL PETROLEUM CORPORATION (Egypt)**
**EGYPTIAN NATURAL GAS HOLDING COMPANY (Egypt)**

Respondents 1 and 2

**ISRAEL ELECTRIC CORPORATION LTD. (Israel)**

Respondent 3

---

**FINAL AWARD**

---

**ARBITRAL TRIBUNAL**

Juan Fernández-Armesto (President)
John Marrin QC (Co-arbitrator)
Osman Berat Gürzumar (Co-arbitrator)

**Secretary to the Arbitral Tribunal**

Deva Villanúa

# **TABLE OF CONTENTS**

**I.    PERSONS INVOLVED IN THE ARBITRATION** ......................................... **25**

   **1.    The Parties** ........................................................................................ **25**

        1.1   Claimant.................................................................................... 25

        1.2   Respondents 1 and 2 ............................................................... 26

        1.3   Respondent 3 ........................................................................... 27

   **2.    The Arbitral Tribunal**........................................................................ **28**

   **3.    The ICC Secretariat** .......................................................................... **28**

   **4.    The Administrative Secretary** ........................................................... **29**

**II.   PROCEDURAL HISTORY** ......................................................................... **30**

   **1.    The arbitration clause**........................................................................ **30**

   **2.    Seat of arbitration, language and applicable law** ........................... **33**

   **3.    The commencement of the arbitration** ............................................. **33**

   **4.    PO 1 and the Terms of Reference** .................................................... **36**

   **5.    PO 2** .................................................................................................... **37**

   **6.    First Submissions Jurisdiction and PO 3** ........................................ **37**

   **7.    PO 4** .................................................................................................... **37**

   **8.    Second Submission Jurisdiction and PO 5 and 6** ........................... **38**

   **9.    First Submission Merits and PO 7**................................................... **39**

   **10.   Document production and PO 8** ........................................................ **39**

   **11.   Second Submission Merits and Supplemental Submissions**.......... **40**

   **12.   PO 9** .................................................................................................... **40**

   **13.   PO 10 and Hearing**............................................................................ **41**

   **14.   PO 11: PHB, Second Hearing and costs** .......................................... **41**

   **15.   Post-hearing incidents**...................................................................... **43**

        15.1   Reverse Flow incident........................................................... 43

        15.2   The alleged forgery and exclusion of witness statements.... 45

   **16.   Summary of the evidence**................................................................... **46**

   **17.   Advance on costs** .............................................................................. **48**

|  | 18. | Closing of the proceeding, time period for the issuance of the award | 49 |

| III. | ALLEGED VIOLATIONS OF DUE PROCESS RIGHTS | 50 |
| | 1. | The Parties' positions | 50 |
| | 2. | The Tribunal's view | 50 |
| | | 2.1 | Applicable rules | 51 |
| | | | A. | ICC Rules | 51 |
| | | | B. | IBA Rules | 51 |
| | | | C. | Swiss Law | 52 |
| | | 2.2 | EGAS' allegations of violation of due process | 52 |
| | | | A. | A case against two co-claimants | 53 |
| | | | B. | Time granted during the First Hearing | 54 |
| | | | C. | Document production and submission of evidence | 56 |

| IV. | SUMMARY OF THE FACTS OF THE CASE | 59 |
| | 1. | The Parties and the Contracts | 59 |
| | | 1.1 | The MoU and the "gas for peace deal" | 60 |
| | | 1.2 | GSPA | 61 |
| | | 1.3 | Tripartite Agreement | 62 |
| | | 1.4 | On-Sale Agreement | 63 |
| | 2. | The Pipeline | 64 |
| | 3. | Chronology of main events | 66 |

| V. | RELIEF SOUGHT | 69 |
| | 1. | Claimant | 69 |
| | 2. | Respondents 1 and 2 | 70 |
| | 3. | Respondent 3 | 71 |
| | 4. | Modification of the reliefs sought | 73 |

| VI. | GENERAL OVERVIEW | 75 |
| | 1. | The Parties' claims | 75 |
| | | 1.1 | EMG's claims | 75 |
| | | 1.2 | IEC's Claims | 75 |
| | | 1.3 | EGAS' defence | 75 |

2.  Overview of the Award ................................................................. 76

2.1  Preliminary objections ............................................................ 76

2.2  The merits .............................................................................. 77

A.  *Force majeure defence* ..................................................... 77

B.  *The Tripartite Repudiatory Breach*.................................. 77

C.  *The Tripartite Delivery Breaches* ................................... 78

2.3  Quantum ................................................................................ 79

A.  *EMG's compensation*....................................................... 79

B.  *IEC's compensation*........................................................ 80

VII.  **JURISDICTION AND ADMISSIBILITY** ................................. 81

1.  **The dispute resolution mechanisms**................................. 82

2.  **The parallel arbitration procedures** .............................. 84

3.  **The Parties' positions**....................................................... 85

3.1  Jurisdiction under Art. 14.9 of Annex 1 to the GSPA ............. 85

A.  *Claimant's position*......................................................... 85

a.  Claimant's interpretation ........................................ 86
b.  Validity and enforceability of Art. 14.9 .................. 86
c.  Compliance with all requirements ........................... 87

B.  *Respondents 1 and 2's position* ...................................... 89

a.  Respondents 1 and 2's interpretation of Art. 14.9 ........... 89
b.  Art. 14.9's requirements were not met ..................... 91

3.2  Jurisdiction under the Tripartite Agreement............................ 93

A.  *Claimant's position*......................................................... 93

a.  Comprehensive arbitration clause........................... 93
b.  Diversity of arbitration clauses............................... 94
c.  EMG has rights under the Tripartite Agreement ............ 95
d.  Third party beneficiary ........................................... 96

B.  *Respondents 1 and 2' s position* ..................................... 96

a.  EMG's claims arise solely out of the GSPA.................... 96
b.  The Tripartite Agreement creates no rights in favour of EMG ........ 97
c.  Two contracts ......................................................... 98
d.  GSPA Claims not subject to a Tripartite Agreement arbitration ...... 99
e.  Opinion of Ms. Geraldine Andrews.......................... 100

3.3  Admissibility of claims under the Tripartite Agreement........ 102

A.  *Respondents 1 and 2's position* ....................................... 102

a.  No enforceable rights ............................................. 102
b.  Breach of fundamental rights ................................. 102
c.  Prematurity ........................................................... 103
d.  No breach of the Tripartite Agreement.................... 103

B.    *Respondent 3's position* ................................................................ *104*

          a.    Enforceable rights ............................................................ 104
          b.    Mature claim ..................................................................... 105
          c.    Valid claim ........................................................................ 105

      C.    *Claimant's position* ...................................................................... *106*

4.    **The Tribunal's decision on the jurisdictional objection ............. 107**

      4.1    Jurisdiction for GSPA Claims ................................................. 107

          A.    *Jurisdiction under Art. 14.9 of Annex 1 to the GSPA* ......................... *108*

              a.    The constructions proposed by EMG and EGAS ........................... 108
              b.    The preferred construction ............................................................ 111
              c.    Allegations of breach of due process ............................................ 116

          B.    *Jurisdiction under the Tripartite Agreement* ...................................... *117*

      4.2    Jurisdiction for Tripartite Agreement Claims ......................... 118

          A.    *The literal interpretation of Art. 1* ..................................................... *119*

              a.    Meaning of "guarantee" ............................................................... 120
              b.    The beneficiary of the guarantee/promise ..................................... 120

          B.    *The purpose of Art. 1* ........................................................................ *122*

              a.    The commercial sense of repeat obligations .................................. 123
              b.    EMG's alleged lack of interest .................................................... 124

          C.    *The contractual context* ..................................................................... *127*

              a.    Recitals ......................................................................................... 127
              b.    Art. 5 of the Tripartite Agreement ............................................... 128
              c.    Art. 14.10 of Annex 1 to the GSPA .............................................. 130

          D.    *Scope of EGAS' repeat obligation and available defences* ................. *131*

              a.    Scope of repeat obligation ........................................................... 131
              b.    Defences available to EGAS ........................................................ 132

5.    **The Tribunal's decision on the Admissibility Objections .......... 135**

      5.1    Prematurity of Tripartite Agreement Claims ......................... 135

      5.2    Lack of consideration ............................................................. 137

      5.3    Alleged violation of due process rights .................................. 138

6.    **Conclusion .................................................................................... 139**

7.    **Impact on EMG's request for relief ............................................ 139**

      7.1    Jurisdiction and admissibility ................................................ 140

      7.2    Liability .................................................................................... 140

      7.3    Quantum .................................................................................. 141

**VIII. CORRUPTION ................................................................................ 142**

1.    **The facts .......................................................................................... 142**

1.1   EMG ............................................................................ 142

1.2   The genesis of the GSPA ............................................ 143

1.3   The court proceedings ................................................ 145

    A.   *The administrative court proceedings* ............................ *145*

    B.   *The criminal court proceedings* ...................................... *146*

        a.   Proceedings against Messrs. Fahmy and Tawila ............ 146
        b.   Proceedings against Mr. Mubarak ................................ 147

2.   **The Parties' position** ........................................................ **149**

2.1   EGAS' position ............................................................ 149

    A.   *Additional facts* ................................................................ *149*

    B.   *EMG's burden of proof* .................................................... *151*

    C.   *Unlawfulness under Egyptian law* ................................... *151*

        a.   EGPC's Commercial Activity Regulation ...................... 151
        b.   Egyptian Criminal Code .............................................. 152

    D.   *Unenforceability under English law* ................................ *154*

2.2   Claimant's position ..................................................... 155

    A.   *Burden of proof on EGAS* ................................................ *155*

    B.   *No illegality* ..................................................................... *155*

        a.   EGPC's Commercial Activity Regulation ...................... 155
        b.   Egyptian Criminal Code .............................................. 156

    C.   *English law* ...................................................................... *157*

2.3   IEC's position .............................................................. 158

    A.   *Burden of proof and evidence of corruption* .................... *158*

    B.   *English conflict of laws and the Ralli Bros case* .............. *158*

    C.   *No illegal acts* .................................................................. *159*

        a.   EGPC's Commercial Activity Regulation ...................... 160
        b.   Egyptian Criminal Code .............................................. 161

3.   **The Tribunal's decision** .................................................. **162**

3.1   Applicable law ............................................................. 163

3.2   Burden and standard of proof ................................... 164

3.3   Evidence on the alleged corruption ......................... 167

    A.   *The direct selection of EMG* ............................................ *167*

    B.   *Mr. Fahmy's alleged profiteering* .................................... *167*

    C.   *Mr. Tawila's alleged bribery* ........................................... *170*

IX.   *FORCE MAJEURE* ........................................................ **172**

1.      **Introduction** ................................................................................... **173**

2.      **EGAS' position** ............................................................................... **175**

    2.1     Arguments ................................................................................ 175

        A.    *Occurrence of a force majeure event that impeded gas supply* ........... 175

        B.    *Requirements for force majeure remedy* ............................................ 176

            a.    Acting as a RPPO ................................................................... 176
            b.    Notice ..................................................................................... 179

        C.    *Acceptance of force majeure* ............................................................ 179

        D.    *Alleged godsend* ............................................................................... 180

    2.2     Evidence .................................................................................. 180

        A.    *Expert evidence* ................................................................................ 180

        B.    *Documents* ........................................................................................ 181

3.      **EMG's position** .............................................................................. **182**

    3.1     Arguments ................................................................................ 182

        A.    *Burden of proof* ................................................................................ 183

        B.    *Failure to properly secure the Pipeline* ........................................... 183

        C.    *Failure to report* .............................................................................. 184

        D.    *Failure to repair* .............................................................................. 185

    3.2     Evidence .................................................................................. 186

        A.    *Expert reports* .................................................................................. 186

            a.    Pipeline security ..................................................................... 187
            b.    Pipeline repairs ...................................................................... 189
            c.    *Force majeure* reporting ........................................................ 191

        B.    *Documents* ........................................................................................ 192

            a.    Exhibits to the submissions ................................................... 192
            b.    Annexes to the reports ........................................................... 193

        C.    *Witness statement* ............................................................................ 193

4.      **IEC's position** ................................................................................ **195**

    4.1     Arguments ................................................................................ 195

        A.    *Contractual requirements* ................................................................ 196

            a.    Reasonable and prudent person ............................................. 196
            b.    Reporting ................................................................................ 197

        B.    *Burden of proof and evidence* .......................................................... 197

        C.    *EGAS' failure to act as a RPPO* ...................................................... 197

            a.    Security ................................................................................... 198
            b.    Repairs .................................................................................... 200

        D.    *Inadequate reporting* ....................................................................... 200

E.   *Alleged acceptance of force majeure* ................................................ *200*

4.2   Evidence ............................................................... 201

     A.   *Expert reports* ................................................... *201*

        a.   Expert on Middle East conflicts ................................. 201
        b.   Expert on pipeline security .......................................... 202
        c.   Expert on security in Sinai ........................................... 205

     B.   *Documents* ..................................................... *209*

5.   **Facts** .................................................................... **209**

5.1   The construction of the Pipeline ............................. 209

5.2   Operation of the Pipeline up to the Revolution ...................... 210

5.3   Attacks after the Revolution ................................... 211

     A.   *Attacks on facilities* ............................................... *212*

        a.   Attack no. 1 (and 2) (February – March 2011) ............................ 212
        b.   Subsequent attacks and reactions ................................. 213

     B.   *Attacks on pipe* ................................................ *218*

        a.   Operation Eagle (August 2011) .................................... 218
        b.   Subsequent attacks and reactions ................................. 219

5.4   Attacks on other targets ....................................... 220

5.5   Identity of the attackers ....................................... 221

6.   **Contractual regulation** ................................................... **222**

7.   **Burden of proof** ...................................................... **225**

8.   **The RPPO requirement** ................................................ **226**

8.1   Security plan ................................................. 227

8.2   Structural protection ......................................... 229

8.3   Technological devices ......................................... 231

8.4   Security forces ............................................... 232

9.   **The Avoidance Requirement** ........................................... **237**

9.1   Attacks on facilities ......................................... 239

9.2   Attacks on the pipe .......................................... 240

10.   **EGAS' counter-arguments** .............................................. **241**

10.1   Other targets ................................................. 241

     A.   *Before the Revolution* ........................................ *243*

     B.   *After the Revolution* .......................................... *244*

11.   **Special Case: First Attack** ............................................. **245**

12.   **Alleged waiver of right to challenge *Force majeure*** ...................... **246**

13.  Bad faith ........................................................................... 246

X.  MERITS (I): INTRODUCTION ................................................... 248

XI.  MERITS (II): THE REPUDIATORY BREACH .......................... 250

1.  EMG's and IEC's commmon position ......................... 252

2.  EGAS' Position ................................................................ 252

2.1  Unchallenged invoices become payable ................................. 253

2.2  Wrongful alternative Calculations ......................................... 253

A.  Pass Through Compensation ................................................ 254

B.  Shortfall Compensation ...................................................... 254

C.  Incorrect PNQ ................................................................. 255

2.3  Lawful termination of the GSPA ........................................... 255

2.4  Art. 2.5 is a complete code .................................................. 256

3.  EMG's and IEC's reply ................................................... 256

3.1  Monthly Payment ............................................................. 256

3.2  Deductions ..................................................................... 257

3.3  Termination at common law ................................................ 258

4.  The Parties' position on alternative arguments ......................... 258

4.1  EMG's force majeure ......................................................... 258

4.2  Good faith ...................................................................... 259

4.3  Reliance on one's own wrong ................................................ 259

4.4  Annual Statement and Reconciliation...................................... 260

4.5  January 2012 Payment ........................................................ 260

4.6  Late termination ............................................................... 261

5.  The Tribunal's Decision ................................................. 262

5.1  How is the amount due to be calculated? ................................. 263

A.  Payment provisions............................................................ 263

a.  Art. 9.3............................................................... 263

b.  Art. 9.4.7............................................................ 265

B.  EGAS' Monthly Invoices.................................................... 265

a.  EGAS' position..................................................... 266

b.  EMG's and IEC's position ........................................ 266

C.  The Tribunal's decision...................................................... 267

5.2  Shortfall Compensation and Pass Through Cost ................... 268

| | | |
|---|---|---|
| A. | *Shortfall Compensation provisions* | 268 |
| B. | *Claim for Daily and Monthly Shortfall Compensation* | 270 |
| C. | *Pass Through Costs* | 271 |
| D. | *Waiver of Shortfall Compensation* | 273 |
| E. | *Calculation of the Shortfall Compensation* | 274 |
| | a. Contractual regime | 274 |
| | b. Calculation of the Monetary Compensation | 275 |
| | c. FTI's calculation of the Monetary Compensation | 276 |

**5.3   Failure to pay amounts for four consecutive months ............. 277**

| | | |
|---|---|---|
| A. | *Recurrent deemed nominations* | 278 |
| | a. Relevant contractual provisions | 278 |
| | b. The Tribunal's decision | 278 |
| B. | *Amount of gas deemed to have been nominated by EMG* | 279 |
| C. | *Are deemed nominations subject to a contractual maximum?* | 279 |
| | a. Relevant contractual provisions | 280 |
| | b. The Parties' positions | 282 |
| | c. The Tribunal's decision | 283 |
| D. | *The hypothetical application of a daily maximum* | 285 |
| | a. Relevant contractual provisions | 285 |
| | b. The proposed calculations | 286 |
| | c. The Majority's decision | 286 |
| | d. Daily Maximum | 289 |
| E. | *Shortfall Compensation owed by EGAS for delivery failures* | 290 |
| F. | *Determination of amounts due between EMG and EGAS* | 292 |
| | a. Amounts owed by EMG | 292 |
| | b. Amounts owed by EGAS | 294 |
| G. | *EGAS' improper termination of the GSPA* | 295 |

**5.4   EMG's and IEC's right to terminate at common law ............. 296**

| | | |
|---|---|---|
| A. | *Relevant contractual provisions* | 296 |
| B. | *The Parties' positions* | 298 |
| | a. EMG | 298 |
| | b. IEC | 299 |
| | c. EGAS | 299 |
| C. | *The Tribunal's decision* | 300 |
| | a. EGAS' repudiatory breach | 300 |
| | b. Contractual exclusion of the common law right to terminate | 301 |

**5.5   Alternative arguments ............................................................. 306**

| | | |
|---|---|---|
| A. | *Partial cure* | 306 |
| B. | *No benefit from one's own wrong* | 307 |
| | a. EMG's and IEC's positions: | 307 |

b.   EGAS' position ...................................................................308
c.   The Tribunal's decision .....................................................309

C.   *EGAS' attempt to terminate in bad faith* .................................*310*

a.   IEC's position ....................................................................310
b.   EGAS' position ...................................................................311
c.   The Tribunal's decision .....................................................312

D.   *Timeliness of EGAS' termination letter* ..................................*315*

a.   Relevant contractual provisions.........................................315
b.   IEC's position ....................................................................315
c.   EGAS' position...................................................................316
d.   The Tribunal's decision .....................................................317

6.   **Conclusion**...........................................................................**318**

**XII.  MERITS (III): THE DELIVERY BREACHES**.............................................**319**

1.   **Supply of the contractually agreed quantities of gas** .................**319**

1.1   EMG's Position ......................................................................319

1.2   IEC's Position .........................................................................320

1.3   EGAS' position.......................................................................321

1.4   The Tribunal's decision .........................................................321

A.   *Release of Claims* .................................................................*322*

a.   With respect to EMG .........................................................322
b.   With respect to IEC ...........................................................322

B.   *Estoppel* ...................................................................................*323*

C.   *Abuse argument*......................................................................*323*

2.   **Reasonable endeavours to enable EMG to deliver**.....................**324**

2.1   EMG and IEC's position .......................................................324

2.2   EGAS' position.......................................................................324

2.3   The Tribunal's decision .........................................................324

3.   **Not committing EMG's volumes**.................................................**325**

3.1   EMG's position......................................................................325

3.2   EGAS' Position ......................................................................326

3.3   The Tribunal's decision .........................................................326

4.   **Conclusion**...........................................................................**326**

**XIII. QUANTUM (I): INTRODUCTION** ...................................................**328**

**XIV. QUANTUM (II): EMG'S COMPENSATION** ............................................**330**

1.      **Preliminary issues** ................................................................... **330**

1.1     Claim for Balance of Payments ............................................. 330

1.2     Claim for Off-Specification Gas............................................. 332

2.      **Legal arguments** ....................................................................... **333**

2.1     Shortfall Compensation as a closed regime ........................... 333

        A.    *EGAS' position* ........................................................ *335*

        B.    *EMG's position* ........................................................ *335*

        C.    *The Tribunal's decision*............................................ *336*

              a.    Compensation for delivery shortfalls.............................336
              b.    The Tribunal's interpretation.........................................337

2.2     Exclusion of indirect loss...................................................... 339

        A.    *EGAS' position* ........................................................ *339*

        B.    *EMG's position* ........................................................ *340*

        C.    *The Tribunal's decision*............................................ *340*

2.3     Cap on liability ..................................................................... 341

        A.    *EGAS' position* ........................................................ *341*

        B.    *EMG's position* ........................................................ *341*

        C.    *The Tribunal's decision*............................................ *342*

3.      **Compensation for Tripartite Delivery Breaches** ......................... **343**

3.1     Liquidated Damages ............................................................. 343

        A.    *FTI's expert report* .................................................. *343*

        B.    *The calculations*...................................................... *344*

3.2     Limitation on liability .......................................................... 345

4.      **Compensation for the Tripartite Repudiatory Breach** ............... **346**

4.1     But For Scenario .................................................................. 347

        A.    *Methodology applied by FTI* ..................................... *347*

        B.    *Criticism by JWC (and FTI's reply)* ......................... *347*

              a.    DCF model.....................................................................347
              b.    Assumptions...................................................................348
              c.    Cap at book value..........................................................349

        C.    *The Tribunal's decision*............................................ *350*

              a.    DCF model.....................................................................350
              b.    Assumptions...................................................................351
              c.    Cap at book value..........................................................353

        D.    *Application of the Tribunal's decision to FTI's calculations*.............. *353*

              a.    Gross margins.................................................................353
              b.    Operating expenses........................................................354

|  | | c. | Capital adjustments | 355 |
|  | | E. | *Calculation of the cash flows* | *355* |
|  | | | a. Cash flows | 355 |
|  | | | b. Liability cap | 356 |
|  | | | c. End of term | 357 |
|  | 4.2 | Actual Scenario | | 357 |
|  | | A. | *EGAS' position* | *358* |
|  | | B. | *EMG's position* | *359* |
|  | | C. | *The offer* | *360* |
|  | | D. | *The Tribunal's decision* | *361* |
|  | | | a. Proven facts | 361 |
|  | | | b. EMG's value in the Actual Scenario | 363 |
|  | 4.3 | Discount rate and valuation date | | 364 |
|  | | A. | *The experts' opinion* | *364* |
|  | | B. | *The Tribunal's decision* | *365* |
|  | | | a. Discount rate | 365 |
|  | | | b. Valuation date | 366 |
| **5.** | **Clarification: Shortfall Compensation deduction** | | | **367** |
| **6.** | **Conclusion** | | | **368** |
| **7.** | **Relief regarding taxes** | | | **368** |
|  | 7.1 | The Parties' position | | 369 |
|  | 7.2 | The Tribunal's decision | | 369 |
|  | | A. | *Direct taxes* | *369* |
|  | | B. | *Indirect taxes* | *370* |
| **XV.** | **QUANTUM (III): IEC'S COMPENSATION** | | | **372** |
| **1.** | **Legal arguments** | | | **374** |
|  | 1.1 | Pass through | | 374 |
|  | | A. | *EGAS' position* | *374* |
|  | | B. | *IEC's position* | *375* |
|  | | C. | *The Tribunal's decision* | *376* |
|  | 1.2 | No compensation for July 2008 – January 2011 | | 378 |
|  | | A. | *EGAS' position* | *378* |
|  | | | a. Shortfall Compensation: exclusive regime | 378 |
|  | | | b. Settlement | 379 |
|  | | B. | *IEC's position* | *379* |
|  | | | a. No waiver | 379 |

|   |   |   | b. | On-Sale exclusion clauses not applicable | 379 |

|   |   | C. | | *The Tribunal's decision* | *380* |

|   |   |   | a. | Possible waiver | 380 |
|   |   |   | b. | Shortfall Compensation | 380 |
|   |   |   | c. | Settlement | 385 |

|   | 1.3 | Damages not foreseeable or too remote | | | 385 |

|   |   | A. | | *EGAS' position* | *385* |

|   |   |   | a. | Losses caused by IEC's alleged inefficiencies | 386 |
|   |   |   | b. | Remoteness, foreseeability and proof | 387 |
|   |   |   | c. | Other Costs | 388 |

|   |   | B. | | *IEC's position* | *389* |

|   |   |   | a. | Alleged inefficiencies | 389 |
|   |   |   | b. | Foreseeability, remoteness and proof | 391 |

|   |   | C. | | *The Tribunal's decision* | *391* |

|   |   |   | a. | Exclusion of losses under second limb in *Hadley v. Baxendale* | 392 |
|   |   |   | b. | IEC's alleged inefficiencies | 395 |
|   |   |   | c. | Proof of future loss | 396 |

| **2.** | | **The experts' calculations of Additional Fuel Costs** | | | **396** |

|   | 2.1 | PAC: July 2008 – June 2013 | | | 397 |

|   |   | A. | | *Nera's assumptions* | *397* |

|   |   | B. | | *JWC's criticism* | *399* |

|   | 2.2 | Near FAC (July 2013 – June 2015) | | | 400 |

|   | 2.3 | Long FAC (July 2015 – June 2028) | | | 401 |

|   |   | A. | | *Price and quantity* | *401* |

|   |   | B. | | *Duration* | *403* |

| **3.** | | **The Tribunal's decision** | | | **403** |

|   | 3.1 | Tripartite Delivery Breaches | | | 403 |

|   |   | A. | | *Nera's calculation* | *404* |

|   |   |   | a. | UCOD | 404 |
|   |   |   | b. | PUA's decisions on Additional Fuel Costs | 406 |

|   |   | B. | | *The Tribunal's decision* | *408* |

|   |   |   | a. | PUA's decision as an indication of the Additional Fuel Cost | 408 |
|   |   |   | b. | The amount of Additional Fuel Costs | 409 |

|   |   | C. | | *Calculation of the liability cap* | *410* |

|   |   |   | a. | Hourly Shortfall Compensation | 410 |
|   |   |   | b. | Monthly Shortfall Compensation | 411 |

|   | 3.2 | Tripartite Repudiatory Breach | | | 413 |

|   |   | A. | | *Pre-Tamar AC* | *413* |

|   |   |   | a. | May – December 2012 | 413 |

|  |  | b. | January – March 2013 ................................................................. 414 |
|  |  | B. | *Post-Tamar AC* ............................................................................. *415* |
|  |  |  | a. The 2012 PUA Decision ....................................................... 415 |
|  |  |  | b. Difference in prices .............................................................. 416 |
|  |  |  | c. Quantity .............................................................................. 417 |
|  |  |  | d. Duration .............................................................................. 418 |
|  | 3.3 | Other Costs | ....................................................................................... 419 |
|  |  | A. | *Insufficient evidence* ....................................................................... *419* |
|  |  |  | a. Additional maintenance costs ............................................... 419 |
|  |  |  | b. Chartering storage facilities ................................................. 421 |
|  |  |  | c. LNG shipments ..................................................................... 421 |
|  |  | B. | *Avoidance of double recovery* .......................................................... *422* |
| **4.** | | **Capitalisation and discounting** | **.................................................... 423** |
|  | 4.1 | Discount rate: WACC | ......................................................................... 423 |
|  | 4.2 | Discounting | ....................................................................................... 425 |
|  |  | A. | *May – December 2012* ................................................................... *425* |
|  |  | B. | *January – March 2013* .................................................................. *426* |
|  |  | C. | *April 2013 – June 2023* ................................................................ *426* |

**XVI. QUANTUM (IV): INTEREST** ........................................................... **429**

| **1.** | | **EMG's position** | **..................................................................................... 429** |
| **2.** | | **IEC's position** | **...................................................................................... 430** |
| **3.** | | **EGAS' Position** | **.................................................................................... 430** |
|  | 3.1 | With respect to EMG | .......................................................................... 430 |
|  | 3.2 | With respect to IEC | ............................................................................ 431 |
| **4.** | | **The Tribunal's decision** | **..................................................................... 431** |
|  | 4.1 | IEC's modification of the interest rate | ................................... 432 |
|  | 4.2 | Applicable law | .................................................................................... 432 |
|  |  | A. | *Pre-award* ...................................................................................... *433* |
|  |  |  | a. Interest rate ......................................................................... 433 |
|  |  |  | b. Simple vs. compound .............................................................. 435 |
|  |  |  | c. *Dies a quo* and *dies ad quem* ............................................... 436 |
|  |  | B. | *Post-award* .................................................................................... *436* |
|  |  |  | a. Interest rate ......................................................................... 436 |
|  |  |  | b. Simple v. compounded .............................................................. 437 |
|  |  |  | c. *Dies a quo* and *dies ad quem* ............................................... 437 |
|  | 4.3 | Quantification of interest | ................................................... 437 |
|  |  | A. | *Amounts awarded to EMG* ............................................................. *437* |

|  |  |  | B. | Amounts awarded to IEC | 438 |

| XVII. | COSTS |  |  |  | 439 |
|  | 1. | EMG's position |  |  | 439 |
|  |  |  | A. | Jurisdictional phase | 440 |
|  |  |  | B. | Merits and Quantum phase | 440 |
|  | 2. | EGAS' position |  |  | 440 |
|  |  |  | A. | Jurisdictional phase | 441 |
|  |  |  | B. | Merits and Quantum phase | 441 |
|  | 3. | IEC's position |  |  | 441 |
|  |  |  | A. | Jurisdictional phase | 441 |
|  |  |  | B. | Merits and Quantum phase | 442 |
|  | 4. | The Tribunal's decision |  |  | 442 |
|  |  | 4.1 | Legal Fees |  | 443 |
|  |  |  | A. | Criteria for the allocation of costs | 443 |
|  |  |  |  | a. Jurisdictional issues | 444 |
|  |  |  |  | b. Liability issues | 444 |
|  |  |  |  | c. Quantum issues | 444 |
|  |  |  | B. | The reasonable Legal Fees | 445 |
|  |  |  | C. | Apportionment of EGAS' reasonable Legal Fees | 446 |
|  |  |  |  | a. Jurisdictional Issues | 446 |
|  |  |  |  | b. Liability Issues | 446 |
|  |  |  |  | c. Quantum Issues | 446 |
|  |  |  | D. | The allocation of reasonable Legal Fees | 447 |
|  |  |  |  | a. Jurisdictional Issues | 447 |
|  |  |  |  | b. Merits Issues | 447 |
|  |  |  |  | c. Quantum Issues | 447 |
|  |  | 4.2 | ICC Costs |  | 448 |
|  |  | 4.3 | Interest |  | 449 |

| XVIII. | SUMMARY OF THE DECISIONS |  |  |  | 450 |
|  | 1. | Jurisdiction and Admissibility |  |  | 450 |
|  |  | 1.1 | Summary of the decisions |  | 450 |
|  |  | 1.2 | Relief sought |  | 451 |
|  |  |  | A. | Claimant's Relief | 451 |
|  |  |  | B. | Respondent 3's Relief | 452 |
|  |  |  | C. | Respondents 1 and 2's Relief | 452 |

| | | | |
|---|---|---|---|
| **2.** | **Merits** | | **452** |
| | 2.1 | Summary of the decisions | 452 |
| | | A. *Force majeure* | *453* |
| | | B. *Merits* | *454* |
| | 2.2 | Relief sought | 455 |
| | | A. *Claimant's Relief* | *455* |
| | | B. *Respondent 3's Relief* | *456* |
| | | C. *Respondents 1 and 2's Relief* | *456* |
| **3.** | **Quantum** | | **457** |
| | 3.1 | Claimant's Claim for compensation | 457 |
| | | A. *Summary of decisions* | *457* |
| | | B. *Claimant's Relief* | *459* |
| | 3.2 | Respondent 3's Claim for compensation | 460 |
| | | A. *Summary of the decisions* | *460* |
| | | B. *Respondent 3's relief* | *462* |
| **4.** | **Costs and expenses** | | **463** |
| | 4.1 | The Parties's relief | 463 |
| | | A. *EMG's* | *463* |
| | | B. *IEC's* | *464* |
| | | C. *EGAS'* | *464* |
| | 4.2 | The Tribunal's decision | 464 |
| | | A. *Legal Fees* | *464* |
| | | B. *ICC Costs* | *464* |
| | | C. *Interest* | *465* |
| **XIX. DECISION** | | | **466** |

# ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| **2% Tranche** | Portion of Daily Shortfall Gas which is exempted from accruing Shortfall Compensation |
| **2012 PUA Decision** | Decision issued by PUA on 14 June 2012 |
| **7% Tranche** | Threshold of the Monthly Shorfall Gas which triggers the right for Monthly Shortfall Compensation |
| **ACQ** | Annual Contract Quantity |
| **Additional Costs/Additional Fuel Costs** | Costs of alternative fuels incurred by IEC as a consequence of EGAS' breaches of the Tripartite Agreement |
| **Admissibility Objections** | EGAS' admissibility objections as to IEC's claims against EGAS |
| **AGP** | Arab Gas Pipeline in the Middle East for export of Egyptian natural gas to Jordan, Syria, Lebanon and Israel |
| **Al Sakka FWS** | First witness statement from Mr. Maamoun Al-Sakka, Managing Director for Operations at EMG |
| **Al Sakka SWS** | Second witness statement from Mr. Maamoun Al-Sakka, Managing Director for Operations at EMG |
| **Amit WS** | Witness statement from Mr. Moshe Amit, Manager of Economics, Financial Planning and Tariffs at IEC |
| **Andrews** | Legal Opinion prepared by Ms. Geraldine Andrews Q.C. of Essex Court Chambers |
| **Aronovich WS** | Witness statement from Mr. Igor Aronovich, Senior Deputy Operations Manager at IEC |
| **Art.** | Article |
| **Art. 1** | Article 1 of the Tripartite Agreement |
| **Art. 14.9** | Art. 14.9 of Annex 1 to the GSPA |
| **Art. 16** | Art. 16 of Annex 1 to the GSPA |
| **Authorisation** | Decree No. 100 of 2004 issued by the Ministry of Petroleum |
| **Avoidance Requirement** | Condition for the availability of the *force majeure* defence |
| **A-XXX** | Communications from the Tribunal |
| **B&O'B-Freeny FR** | First report on repairs of the Pipeline prepared by Mr. Charles C. Freeny, Mr. Gerald B. Gump and Mr. Timothy D. Rooney from Baker & O'Brien, expert witnesses presented by Claimant |
| **B&O'B-Freeny SR** | Second report on repairs of the Pipeline prepared by Mr. Charles C. Freeny, Mr. Gerald B. Gump and Mr. Timothy D. Rooney from Baker & O'Brien, expert witnesses presented by Claimant |

| | |
|---|---|
| **B&O'B-Schrader FR** | First report on security of the Pipeline prepared by Mr. Benjamin F. Schrader from Baker & O'Brien, expert witnesses presented by Claimant |
| **B&O'B-Schrader SR** | Second report on security of the Pipeline prepared by Mr. Benjamin F. Schrader from Baker & O'Brien, expert witnesses presented by Claimant |
| **Balance of Payments** | Item of compensation claimed by EMG consisting of the net amounts owed between EGAS and EMG |
| **BCM** | Billion cubic meters of natural gas |
| **Brokman FWS** | First witness statement form Mr. Shimshon Brokman, Head of the Fuel Management Department in the Generation and Transmission Division at IEC |
| **Brokman SWS** | Second witness statement form Mr. Shimshon Brokman, Head of the Fuel Management Department in the Generation and Transmission Division at IEC |
| **Buyer** | EMG |
| **C FS C** | Claimant's First Submission on Costs |
| **C FS J** | Claimant's First Submission on Jurisdiction |
| **C FS M** | Claimant's First Submission on the Merits |
| **C PHB** | Claimant's Post Hearing Brief |
| **C S RF** | Claimant's submission on reverse flow |
| **C SS J** | Claimant's Second Submission on Jurisdiction |
| **C SS M** | Claimant's Second Submission on the Merits |
| **C SU SC** | Claimant's Second Updated Statement of Costs |
| **C SupS** | Claimant's Supplemental Submission |
| **C USC** | Claimant's Updated Statement of Costs |
| **Cairo Arbitration** | Arbitration under the CRCICA Rules initiated by EGPC and EGAS against EMG pursuant to Art. 14.2 of the GSPA |
| **Claimant** | East Mediterranean Gas S.A.E. |
| **Com. C-XXX** | Communications from Claimant addressed to the Tribunal |
| **Com. R$_{1+2}$-XXX** | Communications from Respondents 1 and 2 addressed to the Tribunal |
| **Com. R$_3$-XXX** | Communications from Respondent 3 addressed to the Tribunal |
| **Committee of Five** | Committee instructed to issue a Technical Report by the Cairo criminal court in the case felony no. 3642 of 2011 |
| **common law right** | EMG's right to accept EGAS' termination of the GSPA and the Tripartite Agreement at common law |
| **Conciliatory Letter** | Letter sent by EMG to EGAS of 21 September 2011 |
| **Contracts** | The GSPA, the On-Sale Agreement and the Tripartite Agreement |

| | |
|---|---|
| **Cook** | Report on the security of the Pipeline prepared by Dr. Steven Cook, expert witness presented by Respondent 3 |
| **Court** | The International Court of Arbitration of the ICC |
| **CRCICA** | Cairo Regional Centre for International Commercial Arbitration |
| **CY** | Contract Year |
| **DCF** | Discounted Cash Flow |
| **DCQ** | Daily Contract Quantity |
| **Doc. CLA-XXX** | Legal authorities presented by Claimant |
| **Doc. C-XXX** | Documentary evidence presented by Claimant |
| **Doc. H-XXX** | Documents submitted by the Parties during the First and Second Hearing |
| **Doc. $R_{1+2}$-XXX** | Documentary evidence presented by Respondents 1 and 2 |
| **Doc. $R_3$-XXX** | Documentary evidence presented by Respondent 3 |
| **Doc. $RL_{1+2}$-XXX** | Legal authorities presented by Respondents 1 and 2 |
| **Dolphinus** | Dolphinus Holding Limited |
| **EBT** | Earnings before taxes |
| **EGAS** | Egyptian Natural Gas Holding Company |
| **EGPC** | Egyptian General Petroleum Corporation |
| **Eiland** | Report on the security of the Pipeline prepared by Major General Giora Eiland, expert witness presented by Respondent 3 |
| **EMG** | East Mediterranean Gas S.A.E. |
| **EMG Pipeline** | Ramification of the Peace Pipeline constructed and operated by EMG |
| **Enforceability Objections** | EGAS' enforceability objection as to the unenforceability of the GSPA |
| **EUR** | Euros |
| **Facilities** | Valve stations, railway valves, traps and off-take rooms of the Pipeline |
| **FHT** | First Hearing Transcript |
| **Fifth Amendment** | Fifth amendment of the On-Sale Agreement on 17 September 2009 |
| **First Amendment** | First amendment of the GSPA on 31 May 2009 |
| **First Hearing** | Hearing held at the ICC Hearing Center located at 112 avenue Kléber, 75016 Paris, between 13 and 24 January, 2014 |
| **First Proposal** | First proposal by EGAS for the calculation of the daily maximum |
| **fn.** | Footnote |
| **Framework Resolution** | Resolution issued by the Egyptian Council of Ministers on 18 September 2000 |

| FSPL | Swiss Federal Statute on Private International Law |
|---|---|
| FTI I | First expert report on damages produced by FTI Consulting on behalf of Claimant |
| FTI II | Second expert report on damages produced by FTI Consulting on behalf of Claimant |
| FTI/JWC | Joint expert report from Messrs. Moselle and Nicholson (Claimant's experts) and Messrs. Wood-Collins and Giles (Respondents 1 and 2's experts) on calculation of EMG's losses |
| GASCO | EGAS' subsidiary entrusted with the operation of the AGP |
| GBP | British pound sterling |
| GSPA | Long-term gas purchase and sale agreement between EMG and EGPC/EGAS entered into on 13 June 2005 |
| GSPA Claims | EMG's claims under the GSPA |
| Gurevich WS | Witness statement from Mr. Vladimir Gurevich, Manager in the Generation System Planning Department at IEC |
| Hoffman I | First legal opinion of Lord Hoffman on behalf of Respondents 1 and 2 |
| Hoffman II | Second legal opinion of Lord Hoffman on behalf of Respondents 1 and 2 |
| ICC | The International Court of Arbitration of the ICC |
| ICC Costs | Advance on costs fixed by the ICC |
| ICC Rules | Rules of Arbitration of the ICC in force as from 1 January 1998 |
| Jurisdictional Objections | EGAS' jurisdictional objections as to EMG's claims against EGAS |
| JWC | EGAS experts Mr. John Wood Collins and Mr. Timothy Giles |
| JWC I to VIII | Expert reports on damages prepared by Mr. John Wood Collins and Mr. Timothy Giles, expert witnesses presented by Respondents 1 and 2 |
| KTISTAR | Operator of the EMG Pipeline |
| Legal Fees | Reasonable legal and other costs incurred by the parties for the arbitration |
| Letter of Intent | Letter of Intent signed by Dolphinus and the Delek Group on 19 October 2014 |
| Ling FR | First report on the security of the Pipeline prepared by Brigadier Tony Ling CBE, expert witness presented by Respondent 3 |
| Ling SR | Second report on the security of the Pipeline prepared by Brigadier Tony Ling CBE, expert witness presented by Respondent 3 |
| LNG | Liquidified natural gas |
| Long FAC | Long Term Future Additional Costs |

| | |
|---|---|
| **Long FAC** | Long Term Future Additional Costs in Nera's calculation of IEC's damages |
| **MFO** | Multinational Force and Observers |
| **MIDOR** | Middle East Oil Refinery |
| **MMBTU** | Million British thermal unit |
| **MoU** | Memorandum of Understanding signed by the States of Egypt and Israel on 30 June 2005 |
| **Near FAC** | Near Term Future Additional Costs |
| **Near FAC** | Near Term Future Additional Costs in Nera's calculation of IEC's damages |
| **Nera** | Nera Economic Consulting |
| **Nera I to III** | Three expert reports on damages prepared by Nera Economic Consulting, on behalf of Respondent 3 |
| **NIS** | Israeli new Shekel |
| **Nudelman FWS** | First witness statement form Ms. Lena Nudelman, Head of Maintenance Planning at IEC |
| **Nudelman SWS** | Second witness statement form Ms. Lena Nudelman, Head of Maintenance Planning at IEC |
| **On-Sale Agreement** | Long-term gas purchase and sale agreement between EMG and IEC entered into on 8 August 2005 |
| **Other Costs** | Other costs incurred by IEC as a consequence of EGAS' breaches of the Tripartite Agreement |
| **Other ICC Arbitration** | ICC Arbitration initiated on 21 September 2011 by Claimant *versus* Respondent 3 but suspended by agreement of the parties |
| **p.** | Page |
| **PAC** | Past Additional Costs |
| **para.** | Paragraph |
| **Partial Award in the Cairo Arbitration** | Partial Award in the Cairo Arbitration issued on 11 November 2013 |
| **Parties** | EMG, IEC and EGAS and EGPC |
| **Pelham FR** | First report on the security of the Pipeline prepared by Mr. Nicolas Pelham, expert witness presented by Respondents 1 and 2 |
| **Pelham SR** | Second report on the security of the Pipeline prepared by Mr. Nicolas Pelham, expert witness presented by Respondents 1 and 2 |
| **Pipeline** | First section of 192 km of the AGP between Damietta and Al-Arish |
| **PNQs** | Properly Nominated Quantities |
| **PO** | Procedural Order |
| **Post-Tamar AC** | Period selected by the Tribunal to assess Respondent 3's damages |
| **Press Release** | Press release issued on 18 March 2015 by the Delek Group |

| Pre-Tamar AC | Period selected by the Tribunal to assess Respondent 3's damages |
|---|---|
| PUA | Public Utilities Authority of Israel |
| PUA Decisions | Decisions issued by the Public Utilities Authority of Israel |
| PUA Letter | Letter of PUA dated 14 May 2014 |
| $R_{1+2}$ FS C | Respondents 1 and 2's First Submission on Costs |
| $R_{1+2}$ FS J | Respondents 1 and 2's First Submission on Jurisdiction |
| $R_{1+2}$ FS M | Respondents 1 and 2's First Submission on the Merits |
| $R_{1+2}$ PHB | Respondents 1 and 2's Post Hearing Brief |
| $R_{1+2}$ S RF | Respondents 1 and 2's Submission on Reverse Flow |
| $R_{1+2}$ SC | Respondents 1 and 2's Statement of Costs |
| $R_{1+2}$ SI | Respondents 1 and 2's Submission on Interest |
| $R_{1+2}$ SS J | Respondents 1 and 2's Second Submission on Jurisdiction |
| $R_{1+2}$ SS M | Respondents 1 and 2's Second Submission on the Merits |
| $R_{1+2}$ SupS | Respondents 1 and 2's Supplemental Submission |
| $R_{1+2}$ USC | Respondents 1 and 2's Updated Statement of Costs |
| R3 FS C | Respondent 3's First Submission on Costs |
| $R_3$ FS J | Respondent 3's First Submission on Jurisdiction |
| $R_3$ FS M | Respondent 3's First Submission on the Merits |
| $R_3$ PHB | Respondent 3's Post Hearing Brief |
| $R_3$ S RF | Respondent 3's Submission on Reverse Flow |
| $R_3$ SS J | Respondent 3's Second Submission on Jurisdiction |
| $R_3$ SS M | Respondent 3's Second Submission on the Merits |
| $R_3$ SupS | Respondent 3's Supplemental Submission |
| $R_3$ USC | Respondent 3's Updated Statement of Costs |
| Release of Claims | Letter signed by EMG and EGPC/EGAS dated 31 May 2009 agreeing reciprocal release of claims for liability for breaches of the GSPA prior to the First Amendment |
| Respondent 1 or EGPC | Egyptian General Petroleum Corporation |
| Respondent 2 or EGAS | Egyptian Natural Gas Holding Company |
| Respondent 3 or IEC | Israeli Electric Corporation LTD. |
| Respondents 1 and 2 | EGAS and EGPC |
| Reverse Flow | Hypothesis raised by Respondents 1 and 2 in relation to the quantification of EMG's claim, consisting of the possibility of gas being imported from Israel to Egypt through EMG's pipeline |
| Ronai WS | Witness statement from Mr. Yaron Ronai, Head of the Haifa office at IEC |
| RPPO | Reasonable and Prudent Pipeline Operator |
| RPPO Requirement | Condition for the availability of the *force majeure* |

| | defence |
|---|---|
| **Rules** | Rules of Arbitration of the ICC in force as from 1 January 1998 |
| **Second Hearing** | Hearing held at the ICC Hearing Center located at 112 avenue Kléber, 75016 Paris, on 15 and 16 May, 2014 |
| **Second Proposal** | Second proposal by EGAS for the calculation of the daily maximum |
| **Seller** | EGPC/EGAS |
| **SHT** | Second Hearing Transcript |
| **Simulated Actual Scenario** | Item used by Respondent 3's expert in the damages calculation |
| **Simulated What If Scenario** | Item used by Respondent 3's expert in the damages calculation |
| **Source Contract** | Long-term gas purchase and sale agreement between EMG and EGPC/EGAS entered into on 13 June 2005 |
| **Tamar Contract** | Contract entered into by IEC on 14 March 2012 for the supply of gas from the Tamar field |
| **Technical Report** | Report issued in February 2014 by the Committee of Five before the Cairo criminal court in the case felony no. 3642 of 2011 |
| **Terms of Reference** | Terms of Reference governing this arbitration approved by the Court on 26 July 2012 |
| **The April Ruling** | Tribunal's communication A 68 |
| **Third Proposal** | Third proposal by EGAS for the calculation of the daily maximum |
| **Tripartite Agreement** | Agreement concluded between EMG, EGPC and EGAS and IEC on 13 June 2005 |
| **Tripartite Agreement Claims** | EMG's claims under the Tripartite Agreement |
| **Tripartite Delivery Breaches** | EGAS' breach of its delivery obligations under the Tripartite Agreement |
| **Tripartite Repudiatory Breach** | EGAS' breach of the Tripartite Agreement for repudiation of the GSPA and Tripartite Agreement |
| **UK Base Rate** | UK Clearing Banks' Base Lending Rate |
| **USD** | United States dollar |
| **Valuation Date** | Valuation date used by the Tribunal to calculate compensation owed by EGAS to IEC |
| **WACC** | Weighted Average Cost of Capital |
| **Weiss WS** | Witness statement from Moshe Weiss, Contract Manager at the Mechanical Department at IEC |

# I.   PERSONS INVOLVED IN THE ARBITRATION

## 1.   THE PARTIES

### 1.1   CLAIMANT

1.   The Claimant is EAST MEDITERRANEAN GAS S.A.E. ["**Claimant**" or "**EMG**"], a privately owned company incorporated in Egypt for the purpose of purchasing natural gas for export to locations in the East Mediterranean and, in particular, to Israel. Its registered office is at:

> 24 Roushdy St.
> Heliopolis 11361
> Cairo
> Egypt

2.   EMG is represented in this arbitration by Ms. Lucy Reed, Mr. Noah Rubins, Mr. Ben Juratowitch and Mr. Ben Love from FRESHFIELDS BRUCKHAUS DERINGER LLP, Mr. Niv Sever from M. FIRON & CO. ADVOCATES, and Mr. Sarwat Abd El-Shahid from SARWAT A. SHAHID LAW FIRM, who stated that notifications and communications arising in the course of the arbitration should be made at:

> Ms. Lucy Reed
> Freshfields Bruckhaus Deringer LLP
> 11th Floor
> Two Exchange Square
> Hong Kong
> Tel:       +852 2846 3400
> Fax:      +852 2810 6192
> Email:   lucy.reed@freshfields.com
>
> Messrs. Noah Rubins, Ben Juratowitch and Ben Love
> Freshfields Bruckhaus Deringer LLP
> 2, rue Paul Cézanne
> 75008 Paris
> France
> Tel:       +33 (0) 1 44564456
> Fax:      +33 (0) 1 44564400
> Email:   noah.rubins@freshfields.com
>             ben.love@freshfields.com
>             ben.juratowitch@freshfields.com
>
> Mr. Niv Sever
> M. Firon & Co. Advocates
> 16 Abba Hillel Silver St.

Ramet Gan 52506
Israel
Tel:      +972 375 40000
Fax:      +972 375 40011
Email:    niv_firon.co.il

Mr. Sarwat Abd El-Shahid
Sarwat A. Shahid Law Firm
20 B Adly Street
Cairo
Egyt
Email:    sarwat@shahidlaw.com

**1.2   RESPONDENTS 1 AND 2**

3.     Respondent 1 is EGYPTIAN GENERAL PETROLEUM CORPORATION ["**Respondent 1**"
       or "**EGPC**"], an entity organised and existing under the laws of Egypt. EGPC is
       engaged *inter alia* in the exploration, refining and processing of crude oil as well
       as the production of natural gas. It holds a stake of 10% of the share capital of
       EMG[1]. Its registered office is at:

       4 Palestine Street
       4th Division
       New Maadi 11742
       Cairo
       Egypt

4.     Respondent 2 is EGYPTIAN NATURAL GAS HOLDING COMPANY ["**Respondent 2**"
       or "**EGAS**"], an entity organised and existing under the laws of Egypt. EGAS is
       engaged in the upstream and downstream natural gas sectors and its activities
       include the exploration, production, processing, transmission, distribution and
       liquefaction of natural gas, as well as the marketing and sale of natural gas in both
       its gas and liquefied forms. Its registered office is at:

       85, El Nasr Road
       1st District, Nasr City 11371
       P.O. Box 8064
       Cairo
       Egypt

5.     Respondents 1 and 2 are represented in this arbitration by Prof. Emmanuel
       Gaillard, Dr. Yas Banifatemi, Mr. Alexander Uff and Mr. Mohamed Shelbaya
       from SHEARMAN & STERLING LLP, who stated that notifications and
       communications arising in the course of the arbitration should be made at:

---

[1] C FS M, para. 24.

## 2.   THE ARBITRAL TRIBUNAL

8.   On 5 April 2012 the ICC International Court of Arbitration [the "**ICC**" or the "**Court**"] decided, pursuant to Art. 10(2) of the Rules of Arbitration of the ICC in force as from 1 January 1998 [the "**Rules**" or the "**ICC Rules**"], to appoint Mr. John Marrin QC and Mr. Osman Berat Gürzumar co-arbitrators and Mr. Juan Fernández-Armesto as Chairman of the Arbitral Tribunal. The arbitrators stated that notifications and communications arising in the course of the arbitration should be made at:

Mr. John Marrin QC
Keating Chambers
15 Essex Street
London WC2R 3AA
United Kingdom
Tel:      +44 20 7544 2600
Fax:      +44 20 7544 2700
E-mail:  jmarrin@keatingchambers.com

Mr. Osman Berat Gürzumar
Bilkent Universitesi Hukuk Fakultesi
06800 Bilkent-Ankara
Turkey
Tel:      +90 312 290 34 90
Fax:      +90 312 266 22 80
E-mail:  berat@bilkent.edu.tr

Mr. Juan Fernández-Armesto (Chairman)
Armesto & Asociados
General Pardiñas 102
28006 Madrid
Spain
Tel:      +34-91.562.16.25
Fax:      +34-91.515.91.45
E-mail:  jfa@jfarmesto.com

## 3.   THE ICC SECRETARIAT

9.   The administration of this arbitration was granted to the ICC Secretariat, in the person of Mrs. Galina Zukova, who initially acted as Counsel for the case management. All notifications and communications should be addressed at:

33-43 avenue du Président Wilson,
75116 Paris
France
Tel: + 33-1 49 53 29 05

Fax: +33 1 49 53 29 33
E-mail: ica7@iccwbo.org

10.    On 30 November 2012 the ICC Secretariat informed the Parties and the Tribunal that Mrs. Maria Hauser-Morel replaced Mrs. Zukova as Counsel in charge of the arbitration.

**4.    THE ADMINISTRATIVE SECRETARY**

11.    On 26 July 2012 the Parties agreed on the appointment of Mrs. Deva Villanúa as Administrative Secretary, in order to perform the support requested by the Tribunal, such as keeping all documents and records arising in the course of the arbitration.

# II. <u>PROCEDURAL HISTORY</u>

12.   This arbitration has lasted four years. The parties have produced hundreds of communications and submissions (EMG 98, EGAS 111 and IEC 70) and the Tribunal has issued 78 decisions. It is impossible to summarise each submission, communication and decision in this chapter devoted to recapitulating the procedural history. The Tribunal however, confirms that it has carefully analysed all submissions and communications submitted by the Parties and that all decisions are reasoned on the basis of such submissions.

## 1.   THE ARBITRATION CLAUSE

13.   The Parties to this arbitration are linked by three different contracts, each of which created a separate legal relationship:

- the **GSPA** is a long-term gas purchase and sale agreement between EMG (Buyer) and EGPC/EGAS (Seller), which are jointly and severally liable pursuant to Art. 13.3 of the GSPA (for convenience EGPC/EGAS will frequently be referred to simply as "**EGAS**" or as the "**Seller**"), entered into on 13 June 2005. EGAS agreed to make a specific volume of natural gas available to EMG on a take or pay basis at the delivery point located at Al-Arish, Egypt. This contract enables EMG to satisfy its obligations as seller towards its customers under the on-sale agreements.

- the **On-Sale Agreement** is another long-term gas purchase and sale agreement between EMG (Seller) and IEC (Buyer) entered into on 8 August 2005. EMG undertook to deliver to IEC a specific amount of natural gas on a take or pay basis at the delivery point located at Ashkelon, Israel.

- the **Tripartite Agreement** was concluded between all Parties (EGAS and EGPC, EMG and IEC). The purpose of this agreement was for EGAS to guarantee the supply of gas to IEC through fulfilling their obligations towards EMG under the GSPA.

14.   This arbitration was initiated by EMG pursuant to the arbitration clauses contained in the GSPA and the Tripartite Agreement. IEC is also pursuing its counterclaim against EGAS under the arbitration clause of the Tripartite Agreement.

GSPA

15.   Art. 9.2 of the GSPA provides as follows:

"<u>Dispute Resolution</u>. All Disputes or disagreements arising under this Agreement and in connection hereto will be conducted in the English language and as per the

applicable procedures in Article 14 of Annex 1 and Annex 4 (Expert Provisions), respectively".

16. Annex 1 to the GSPA contains its "General Terms and Conditions". And Art. 14 of Annex 1 refers to "Governing Law and Dispute Resolution", and provides for three separate dispute resolution clauses:

"Art. 14.2 –Disputes and Arbitration

Except as set forth in Section 14.9 and 14.11[4] and Paragraph 17 of Annex 4[5], if any dispute between the Parties arising out of or in connection with this Agreement ("Dispute") has not been settled within thirty (30) days of a Party notifying the other Party of the Dispute, then a Party wishing to arbitrate such Dispute may submit such Dispute to arbitration in accordance with and pursuant to the Rules of Arbitration of the Cairo Regional Centre for International Commercial Arbitration ("CRCICA"). All Disputes submitted for arbitration shall be heard and resolved by a panel of three (3) arbitrators, appointed according to the rules of the CRCICA; provided that no member of such panel of arbitrators shall be connected and/or associated with any of the Parties and/or their legal and other advisors. The seat of arbitration shall be in Cairo, Egypt. The arbitration proceedings shall be conducted in the English language, and all documentation submitted for the consideration of the panel shall be translated into English at the expense of the submitting Party".

"Art. 14.9 – Arbitration under On-Sale Agreement

Notwithstanding the foregoing provision of this Article 14, if Buyer and Seller have a Dispute under this Agreement, and if a dispute arising from or related to the same or similar factual circumstances at issue in the Parties' disagreement is subject to dispute resolution under any On-Sale Agreement, Buyer may choose to resolve the Dispute between Buyer and Seller pursuant to the dispute resolution procedures of the relevant On-Sale Agreement; provided that (a) Buyer provides Seller with notice of the dispute under the relevant On-Sale Agreement, and Buyer's election to resolve such Dispute pursuant to the dispute resolution procedures under the relevant On-Sale Agreement ("Dispute Resolution Notice"), on or before fifteen (15) days following initiation of the applicable dispute resolution procedure under the On-Sale Agreement; and (b) Buyer shall consult with Seller in respect of such dispute resolution procedure. If Buyer delivers such Dispute Resolution Notice and Seller gave his written consent, neither Party may seek arbitration or an Expert determination regarding such Dispute under this Agreement, and the outcome of such dispute resolution under the On-Sale Agreement shall be binding on the Parties hereunder".

"Art. 14.10 – Disputes under the Tripartite Agreement

Notwithstanding the provisions of the Tripartite Agreement to the contrary, if any dispute under the Tripartite Agreement arises between EGPC and EGAS on the one hand, and EMG on the other hand, and if the Initial On-Sale Customer is not a party to such dispute, such dispute shall be resolved pursuant to the dispute resolution provisions provided for in this Article 14".

---

[4] Dispute resolution by an expert.
[5] Expert provisions.

### Tripartite Agreement

17.  The Tripartite Agreement includes the following dispute resolution clause:

> "9. This Tripartite Agreement shall be governed by, and construed in accordance with, the Laws of England, but excluding (to the fullest extent) any rules or principles of English Law that would prevent adjudication upon (or accord presumptive validity to) the transactions of sovereign states, and without regard to such principles or requirements of conflicts of Laws that would require the application of Laws of any other jurisdiction to govern this Agreement or any matter arising hereunder. If any dispute between the Parties arising out of or in connection with this Agreement ("Dispute"), has not been settled within (30) Days of a Party of the Dispute, then a Party wishing to arbitrate such Dispute may submit such Dispute to arbitration in accordance with and pursuant to the Rules of Arbitration of the International Chamber of Commerce ("ICC"). All Disputes submitted for arbitration shall be heard and resolved by a panel of three (3) arbitrators, appointed according to the ICC rules; provided that no member in such panel of arbitrators shall be a citizen or national of either Egypt or Israel or a citizen or national of a country which does not have diplomatic relations with either Egypt or Israel, nor will any member of such panel of arbitrators be connected and/or associated with any of the Parties and/or their legal and other advisors. The seat of arbitration shall be in Geneva, Switzerland. The arbitration proceedings shall be conducted in the English language, and all documentation submitted for the consideration of the panel shall be translated into English at the expense of the submitting Party. For the purposes of enforcement in Egypt of any decision or award rendered pursuant to this Tripartite Agreement, the Egyptian Arbitration Law No. 27 of 1994, as amended from time to time, shall apply".

### On-Sale Agreement

18.  Another relevant dispute resolution clause, which however is not being invoked by any of the Parties, is the arbitration clause contained in the On-Sale Agreement:

> "10.2 Disputes and Arbitration. Except as set forth in Section 10.9, if any dispute between the Parties arising out of or in connection with this Agreement ("Dispute"), has not been settled within (30) days of a Party notifying the other Party of the Dispute, then a Party wishing to arbitrate such Dispute may submit such Dispute to arbitration in accordance with and pursuant to the Rules of Arbitration of the International Chamber of Commerce ("ICC"). All Disputes submitted for arbitration shall be heard and resolved by a panel of three (3) arbitrators, appointed according to the ICC rules; provided that no member in such panel of arbitrators shall be a citizen or national of either Egypt or Israel or a citizen or national of a country which does not have diplomatic relations with either Egypt or Israel, nor will any member of such panel of arbitrators be connected and/or associated with any of the Parties and/or their legal and other advisors. The seat of arbitration shall be in Geneva, Switzerland. The arbitration proceedings shall be conducted in the English language, and all documentation submitted for the consideration of the panel shall be translated into English at the expense of the submitting Party".

2.     **SEAT OF ARBITRATION, LANGUAGE AND APPLICABLE LAW**

19.   As per arbitration clause 14 of the GSPA and 10.2 of the On-Sale Agreement; and clause 9 of the Tripartite Agreement, the seat of this arbitration is Geneva, Switzerland. The Parties to these agreements also arranged for the proceedings to be conducted in English language; and the applicable law to be English law. Accordingly, all of these agreements were incorporated into the **Terms of Reference**[6].

3.     **THE COMMENCEMENT OF THE ARBITRATION**

20.   On 7 October 2011 the Secretariat of the Court registered EMG's Request for Arbitration submitting claims against EGPC, EGAS and IEC under the Tripartite Agreement and claims against EGPC and EGAS under the GSPA[7], received by the Secretariat on 6 October 2011.

21.   On 10 November 2011 Norton Rose LLP, representing IEC – as Respondent 3 – informed the Court that due to the divergence of interests with those of EGAS, a joint nomination by all respondents of a co-arbitrator was not feasible. For this reason IEC requested the Court to appoint the Tribunal pursuant to Art. 10(2) of the Rules[8].

22.   On the same day Sherman & Sterling LLP informed the Secretariat that it would be representing EGPC and EGAS as Respondents 1 and 2 in this arbitration. Furthermore, it objected to the appointment of the Tribunal under Art. 10(2) of the Rules as suggested by Respondent 3. It alleged that IEC was not a "proper party" to this arbitration and that its inclusion as respondent was only a tactic by EMG and IEC to deprive Respondents 1 and 2 of their right to nominate a co-arbitrator. It therefore requested leave to nominate a co-arbitrator[9]. EMG rejected such suggestions[10]. The Secretariat referred the final decision on the constitution of the Tribunal to the Court[11].

23.   Furthermore, the Secretariat invited the Parties to comment on the application of Art. 6(2) – i.e. the Court's determination of *prima facie* jurisdiction[12]. The Parties presented their comments on this issue on 30 November and 2 December 2011[13].

---

[6] Terms of Reference, paras. 85-88.
[7] Secretariat's letter of 7 October 2011.
[8] Respondent 3's letter of 10 November 2011.
[9] Respondents 1 and 2's letter of 10 November 2011.
[10] Claimant's letter of 14 November 2011.
[11] Secretariat's letter of 15 November 2011.
[12] Secretariat's letter of 25 November 2011.
[13] Respondent 3's and Respondents 1 and 2's letters of 30 November 2011 and Claimant's letter of 2 December 2011.

24.   Subsequently, after being granted an extension of time[14], on 21 December 2011 Respondents 1 and 2 and Respondent 3 filed their respective Answers to the Request for Arbitration. Respondents 1 and 2 requested leave to file comments on Respondent 3's Answer to the Request for Arbitration. Accordingly, the Secretariat granted all the Parties until 6 February 2012 to file comments on each of Respondent's Answers to the Request for Arbitration, and specifically to address whether the matter should proceed pursuant to Art. 6(2) of the Rules[15].

25.   In the meantime, on 23 January 2012, Respondent 3 filed a Counterclaim against Claimant and Respondents 1 and 2. Claimant and Respondents 1 and 2 were invited to file a response to the Counterclaim within 30 days from the day following the notification of said Counterclaim[16].

26.   Respondents 1 and 2 alleged that Respondent 3's Counterclaim included new allegations and new claims against EGPC and EGAS which had not been advanced in the Respondent 3's Answer to the Request for Arbitration dated 21 December 2011. Respondents 1 and 2 therefore requested an extension of time in order to file in one single submission their comments regarding Art. 6(2) of the Rules and the response to Respondents 3's Counterclaim[17]. Claimant and Respondent 3 opposed such request[18], and the Secretariat eventually rejected the requested extension of time[19].

27.   On 9 February 2012 the Secretariat[20]

   -   acknowledged receipt of Claimant's and Respondent 3's comments on Art. 6(2) of the Rules and noted that Respondents 1 and 2 had failed to submit comments within the allotted time frame;

   -   confirmed that Respondents 1 and 2's right to make comments on Art. 6(2) had expired;

   -   noted that the Court was to examine whether the arbitration should proceed pursuant to Art. 6(2) of the Rules taking into consideration Claimant's and Respondent 3's comments of 6 February 2012 and Respondents 1 and 2's letter dated 10 November 2011 and the Answer to the Request for Arbitration of 21 December 2011; and

---

[14] Secretariat's letter of 15 November 2011.
[15] Secretariat's letter of 4 January 2012.
[16] Secretariat's letter of 25 January 2012.
[17] Respondents 1 and 2's letter of 2 February 2012.
[18] Claimant's and Respondent 3's letters of 3 February 2012.
[19] Secretariat's letter of 6 February 2012.
[20] Secretariat's letter of 9 February 2012.

- decided that it was appropriate to grant Respondents 1 and 2 permission to file a submission with comments on Respondent 3's Answer to the Request for Arbitration and Counterclaim.

28. On 27 February 2012 Claimant and Respondents 1 and 2 submitted their respective Replies to Respondent 3's Counterclaim. Additionally, Respondents 1 and 2 requested that their Reply should be taken into account by the Court in relation to the pending decision pursuant to Art. 6(2) of the Rules. By letter of 29 February 2012 Respondent 3 opposed said request.

29. In its session of 1 March 2012 the Court decided that, pursuant to Art. 6(2) of the Rules, the arbitration should proceed[21]. The Secretariat noted that, in assessing this issue, the Court had examined all the Parties' submissions, including Claimant's and Respondents 1 and 2's Replies dated 27 February 2012 and Respondent 3's letter of 29 February 2012[22].

30. Furthermore the Secretariat noted the disagreement between the Parties in respect of the constitution of the Tribunal – namely Respondent 3's request for the Court to appoint the Tribunal *in toto*[23], and approved by Claimant[24], which was opposed by Respondents 1 and 2, who requested authorisation to nominate a co-arbitrator without consulting or obtaining an agreement with Respondent 3[25] – and transmitted their comments to the Court for it to adopt a final decision.

31. On 5 April 2012, pursuant to Art. 10(2) of the Rules, the Court decided to appoint[26]:

- Mr. John Marrin QC as co-arbitrator;
- Mr. Osman Berat Gürzumar as co-arbitrator;
- Mr. Juan Fernández-Armesto as Chairman of the Arbitral Tribunal.

32. As per Art. 7(2) of the Rules, each member of the Tribunal provided the Secretariat with a Statement of Acceptance, Availability and Independence, and their *curriculum vitae*, for its transmittal to the Parties[27]. None of them raised an objection or comments regarding appointment of the members of the Tribunal by the Court.

---

[21] Secretariat's letter of 1 March 2012.
[22] Secretariat's letter of 2 March 2012.
[23] Respondent 3's letter of 13 March 2012.
[24] Claimant's letters of 8 and 13 March 2012.
[25] Respondents 1 and 2's letters of 8 and 15 March 2012.
[26] Secretariat's letter of 5 April 2012.
[27] Secretariat's letter of 5 April 2012.

## 4.   PO 1 AND THE TERMS OF REFERENCE

33.   On 24 April 2012 the Parties and the Tribunal held a case management conference call to establish the procedure for drawing up the Terms of Reference. The agreed procedure consisted in the circulation among the Parties and the Tribunal of two successive drafts incorporating the agreed issues and the points still under discussion. Additionally, the Tribunal requested the Parties to make a submission on the appropriateness of bifurcating the proceeding into a jurisdictional phase and a mertis phase[28]. The Parties presented their submission on bifurcation by 24 May 2012.

34.   On 31 May 2012 the Parties and the Tribunal held a meeting in Paris at the offices of Freshfields Bruckhaus Deringer LLP, at 2, rue Paul Cézanne, 75008 Paris for the purpose of signing the Terms of Reference and discussing and, if possible, agreeing the procedural timetable contained in a draft Procedural Order No. 1 ["PO 1"]. The Parties did not reach an agreement as to the place of arbitration, and this lack of agreement led to the Terms of Reference not being signed by the Parties during the meeting. Additionally, Claimant and Respondent 3 agreed to incorporate into the file a redacted version of their On-Sale Agreement[29].

35.   On 31 May 2012 the Tribunal requested the Court to make a determination of the place of arbitration pursuant to Art. 14(1) of the ICC Rules. On 21 June 2011 and after comments of the Parties in relation to this issue[30], the Court decided not to fix the place of arbitration pursuant to Art. 14(1) of the ICC Rules and stated that any question as to the scope and validity of the arbitration agreement was to be decided by the Tribunal[31].

36.   The Tribunal then invited the Parties to comment on the determination of the place of arbitration[32]. Thereafter, on 9 July 2012, the Tribunal issued its PO 1 in which it decided that the proper place of arbitration was Geneva, Switzerland; this being the place of arbitration agreed upon by the Parties in the arbitration clauses invoked by Claimant in its Request for Arbitration (Art. 14.9 of the GSPA, with a cross-reference to Art. 10.2 of the On-Sale Agreement, which provides that the seat of the arbitration shall be Geneva, Switzerland, and Art. 9 of the Tripartite Agreement, which foresees that the seat of arbitration be Geneva, Switzerland).

37.   The determination of the seat of arbitration was incorporated into the Terms of Reference, which thereafter were duly signed by Claimant, Respondent 3 and the Arbitral Tribunal, and was transmitted to the Court, and approved by the latter on

---

[28] A-1.

[29] A-3.

[30] Claimant's letter of 11 June 2012; Respondents 1 and 2's letter of 11 June 2012; and Respondent 3's letter of 11 June 2012.

[31] Secretariat's letters of 21 and 22 June 2012.

[32] A-4; the parties presented the submission on this issue: Com. C-5 of 29 June 2012, Com. R$_{1+2}$-3 of 29 June 2012, and Com. R$_3$-9 of 29 June 2012.

26 July 2012[33]. The Secretariat invited Respondents 1 and 2 to sign the approved Terms of Reference within a period of 15 days[34]. Despite Respondents 1 and 2's non-compliance with the Secretariat's invitation, the arbitration proceeded pursuant to Art. 18(3) of the Rules.

**5.**  **PO 2**

38.  On 1 August 2012 the Tribunal issued Procedural Order No. 2 ["**PO 2**"] and decided to provisionally bifurcate the proceedings to address the jurisdictional and admissibility objections. The Tribunal nevertheless reserved the right to join the jurisdictional issues to the merits.

39.  Accordingly, it established two different procedural calendars: one if the Tribunal decided to issue a decision on the jurisdictional issues separately from the merits; another in case the Tribunal decided to opt-out of the provisional bifurcation.

**6.**  **FIRST SUBMISSIONS JURISDICTION AND PO 3**

40.  On 31 July 2012 the Parties simultaneously filed the First Submission on Jurisdiction[35].

41.  Claimant's and Respondents 1 and 2's submissions included a request for document production. Thereafter, on 14 August 2012, each Party submitted a response to the document production request addressed to it[36]; and on 28 August 2012 they filed a subsequent reply[37].

42.  On 10 September 2012 the Tribunal issued Procedural Order No. 3 ["**PO 3**"] deciding on the document production requests on jurisdictional issues.

**7.**  **PO 4**

43.  Prior to the signature of the Terms of Reference, the Parties had initiated negotiations on the confidentiality regime for this arbitration, but were unable to reach an agreement[38]. On 27 July 2012 the Tribunal invited the Parties to submit their last proposals on the confidentiality issue[39].

---

[33] Secretariat's letter of 26 July 2012.
[34] Secretariat's letter of 26 July 2012.
[35] The Tribunal will refer to Claimant's First Submission on Jurisdiction as **C FS J**; Respondents 1 and 2's First Submission on Jurisdiction as $R_{1+2}$ **FS J**; and Respondent 3's First Submission on Jurisdiction as $R_3$ **FS J**.
[36] Claimant's Response to Respondents 1 and 2's document request and Respondents 1 and 2 Response to Claimant's document request, both dated 14 August 2012.
[37] Claimant's Response to Respondents 1 and 2's objections on document production and Respondents 1 and 2's Response to Claimant's objections, both dated 28 August 2012.
[38] A-8.
[39] A-8.

44.   On 14 August 2014, after hearing the Parties, the Tribunal issued communication A-9 in which it decided that the confidentiality status would be adopted by the Tribunal on a case-by-case basis, upon a specific request by any Party of a confidentiality order with regards to any document or set of documents[40].

45.   On 13 September 2012 Claimant and Respondent 3 filed a request for a confidentiality order in relation to the documents that came to light after the document production[41]; and on 18 September 2012 Respondents 1 and 2 responded to said request[42]. On 19 September 2012 Claimant submitted additional arguments[43].

46.   The Tribunal issued Procedural Order No. 4 ["**PO 4**"] adopting a confidentiality order in relation to the documents produced in compliance with PO 3. These documents should not be disclosed to third parties or used for any other purpose than this arbitration, save for written consent by the disclosing party, or order or permission by a competent court.

## 8.   SECOND SUBMISSION JURISDICTION AND PO 5 AND 6

47.   On 16 October 2012 the Parties filed their Second Submission on Jurisdiction[44]; and after reviewing Respondents 1 and 2's objections on jurisdiction and admissibility and Claimant's and Respondent 3's response, the Tribunal held a meeting to deliberate and decided to join the jurisdictional issues to the merits and adjudicate both issues in the same award[45].

48.   Accordingly, the Tribunal issued Procedural Order No. 5 modifying the provisional calendar and providing guidance to the Parties on the additional briefing required with regard to certain jurisdictional issues. This new provisional calendar was later modified by the Tribunal, after consultation with the Parties, in Procedural Order No. 6 ["**PO 6**"][46].

49.   The new calendar provided for a first round of submissions (the First Submission on the Merits) followed by a document production phase, after which the Parties would file a Second Submission on the Merits. The merits phase would conclude with a hearing and the presentation by the Parties of Post-Hearing Briefs.

---

[40] A-9.
[41] Com. C-13 dated 13 September 2012 and Respondent 3's application for a Confidentiality Order dated 13 September 2012.
[42] Respondents 1 and 2's Response to the Application for a Confidentiality Order dated 18 September 2012.
[43] Com. C-14 of 19 September 2012.
[44] The Tribunal will refer to Claimant's Second Submission on Jurisdiction as **C SS J**; Respondents 1 and 2's Second Submission on Jurisdiction as $R_{1+2}$ **SS J**; and Respondent 3's Second Submission on Jurisdiction as $R_3$ **SS J**.
[45] PO 5, para. 7.
[46] See A-15, A-16 and PO 6

### 9.   FIRST SUBMISSION MERITS AND PO 7

50.   On 7 February 2013, pursuant to the calendar established on PO 6, the Claimant and Respondent 3 simultaneously presented their respective First Submissions on the Merits[47]. With its First Submission on the Merits Respondent 3 presented its assessment of the damages allegedly suffered, which was based on the software program UCOD.

51.   Respondents 1 and 2 requested the Tribunal to order Respondent 3 to produce certain information and codes which were relevant for operating the models used in IEC's damages calculation. After hearing the Parties[48], the Tribunal issued Procedural Order No. 7 ["**PO 7**"] and decided to order Respondent 3 to deliver to Respondents 1 and 2 the information provided to Respondent 3's expert and to provide Respondents 1 and 2 the necessary assistance in running the models[49]. Furthermore, the Tribunal granted leave to Respondents 1 and 2 to present an extraordinary submission on the UCOD model.

52.   On 6 June 2013[50] Respondents 1 and 2 filed their First Submission on the Merits in response to Claimant's and Respondent 3's submission[51]; and on 17 July 2013 Respondents 1 and 2 presented their Supplemental Submission with regard to the UCOD program[52].

### 10.   DOCUMENT PRODUCTION AND PO 8

53.   On 28 June 2013, pursuant to the procedural calendar[53] and its subsequent amendment[54], the Parties filed their respective requests for document production; and on 10 and 17 July 2013 each Party presented a response and a follow-up reply to the requests made by the other Parties.

54.   On 26 July 2013 the Tribunal issued Procedural Order No. 8 ["**PO 8**"] which formalised its decision with regard to the document production requests submitted by the Parties.

55.   On 3 August 2013 Respondents 1 and 2 informed that they would not be able to comply with the deadline set by the Tribunal for the production of documents due

---

[47] The Tribunal will refer to Claimant's First Submission on the Merits as **C FS M**; and to Respondent 3's First Submission on the Merits as **R₃ FS M**.
[48] A-20 and PO 7.
[49] PO 7 paras. 28-37.
[50] Respondents 1 and 2 requested an extension of the original deadline established in PO 6 to file their First Submission on the Merits on 23 May 2013 and the Tribunal granted a two-week extension (A-19).
[51] The Tribunal will refer to Respondents 1 and 2's First Submission on the Merits as **R₁₊₂ FS M**.
[52] The Tribunal will refer to Respondents 1 and 2's Supplemental Submission on the UCOD/OPED models as **R₁₊₂ SupS**.
[53] PO 7.
[54] A-25.

to the social unrest that Egypt was going through[55]. After numerous communications with the Parties, the Tribunal decided that Claimant and Respondent 3 were to prioritise the documents they required most for the preparation of the Second Submission on Merits and ordered Respondents 1 and 2 to produce documents on a rolling basis as they became available with a cut-off date set at 24 October 2013. Claimant and Respondent 3 would be given the opportunity to file a Supplemental Submission with their observations to any document produced by Respondents 1 and 2 after 28 August 2013[56].

## 11.   SECOND SUBMISSION MERITS AND SUPPLEMENTAL SUBMISSIONS

56.   On 19 September 2013 Claimant and Respondent 3 simultaneously presented their Second Submissions on the Merits[57]; and on 15 December 2013 Claimant and Respondent 3 simultaneously presented their Supplemental Submissions[58].

57.   On 9 December 2013 Respondents 1 and 2 presented its Second Submission on the Merits[59].

## 12.   PO 9

58.   On 10 October 2013 Respondents 1 and 2 objected to the content of Claimant's Second Submission on the Merits, alleging that Claimant had introduced new allegations and a new claim not previously raised: that Respondents 1 and 2 had forced Claimant through coercion to accept the amendment of the GSPA[60].

59.   The Tribunal granted all Parties the opportunity to put in submissions in relation to this issue[61]. Claimant accepted that it had introduced a new claim, not included in the Terms of Reference, and asked for authorisation to do so, under Art. 19 of the Rules[62].

60.   On 27 November 2013 the Tribunal issued Procedural Order No. 9 ["**PO 9**"] and decided to dismiss Claimant's motion to introduce its new claim, given the advanced stage of the proceedings and the undue delay that the admission of the new claim would generate[63].

---

[55] $R_{1+2}$-34.
[56] A-35.
[57] The Tribunal will refer to Claimant's Second Submission on the Merits as **C SS M** and to Respondent 3's Second Submission on the Merits as **$R_3$ SS M**; EMG's submission was dated 20 September 2013.
[58] The Tribunal will refer to Claimant's Supplemental Submission as **C SupS** and to Respondent 3's Supplemental Submission as **$R_3$ SupS**.
[59] The Tribunal will refer to Respondents 1 and 2's Second Submission on the Merits as **$R_{1+2}$ SS M**.
[60] Com. $R_{1+2}$-39.
[61] A-36.
[62] C-37.
[63] PO 9.

**13.   PO 10 AND HEARING**

61.   The Hearing took place in the premises of the ICC Hearing Centre located at 112 avenue Kléber, 75016 Paris, between January 13 and 24, 2014 ["**First Hearing**"].

62.   The Tribunal had previously thereto issued Procedural Order No. 10 ["**PO 10**"], organising the procedural and technical matters affecting the First Hearing.

63.   The following witnesses and experts attended the First Hearing and were duly examined by counsel to the Parties:

On behalf of Claimant

| Witnesses | Experts |
|---|---|
| Mr. Maamoun Al Sakka | Mr. James Nicholson (*FTI Consulting*) |
| Mr. Abdel Hamid Ahmed Hamdy | Mr. Boaz Moselle (*FTI Consulting*) |
| | Mr. Charles Freeny (*Baker & O'Brien*) |
| | Mr. Benjamin Schrader (*Baker & O'Brien*) |

On behalf of Respondents 1 and 2

| Witnesses[64] | Experts |
|---|---|
| | Mr. John Wood-Collins and Mr. Tim Giles |
| | Mr. Nicolas Pelham |

On behalf of Respondent 3

| Witnesses | Experts |
|---|---|
| Ms. Lena Nudelman | Mr. Steven Cook |
| Mr. Yaron Ronai | Mr. Giora Eiland |
| Mr. Shimshon Brokman | Mr. Graham Shuttleworth |
| Mr. Moshe Amit | |

64.   As per PO 10 the First Hearing was transcribed by a Court Reporter [the "**FHT**"]. A corrected version of the FHT was approved by the Parties.

**14.   PO 11: PHB, SECOND HEARING AND COSTS**

65.   During the First Hearing the Tribunal requested the Parties to produce certain evidence and to address specific issues in their Post-Hearing Briefs. The Tribunal set forth in Procedural Order No. 11 ["**PO 11**"] a calendar for submissions on each of the issues on which the Tribunal required assistance, and fixed a date to hold a second hearing [the "**Second Hearing**"].

---

[64] Respondents 1 and 2 did not present fact witnesses.

66.   Pursuant to PO 11, on February 2014 the Parties submitted joint expert reports, and where unable to reach an agreement, their respective approaches in relation to each issue:

-   Annual Reconciliation Simulation according to Claimant's construction and Respondents 1 and 2's construction;

-   A joint expert report from Messrs. Moselle and Nicholson (Claimant's experts) and Messrs. Wood-Collins and Giles (Respondents 1 and 2's experts) on calculation of EMG's losses[65];

-   A counter-report of Messrs. Wood-Collins and Giles (Respondents 1 and 2's experts) on the report prepared by Nera (Respondent 3's expert) on IEC's losses; Respondent 3 presented a reply to the Wood-Collins and Giles counter-report prepared by its expert Mr. Graham Shuttleworth (Nera).

67.   The Tribunal also declared the record closed and that only under exceptional circumstances would the Tribunal admit further evidence upon application by one party after hearing the counterparties[66].

68.   On 8 April 2014 the Parties simultaneously presented their Post-Hearing Briefs[67]. In its closing submission Respondent 3 requested the Tribunal for leave to amend its prayer for relief – in particular its claim for interest[68]. After receiving submissions from the Parties[69], the Tribunal held that the new position of Respondent 3 in relation to its claim for interest was not a new claim in the sense of Art. 19 of the Rules, and therefore, declared it admissible; and afforded Respondents 1 and 2 an opportunity to present a submission on this issue[70]. Respondents 1 and 2 did so by 30 May 2014[71].

69.   On 15 and 16 May 2014 the Second Hearing was held at the ICC Hearing Centre located at 112 Avenue Kléber, 75016 Paris. The Parties devoted the Second Hearing to present their concluding remarks on jurisdiction and merits issues. No witness or expert was examined. The Second Hearing was transcribed by a Court Reporter [the "**SHT**"]. A corrected version of the SHT was approved by the Parties.

---

[65] The Tribunal will refer to the joint expert report as **FTI/JWC**.
[66] PO 11, section D.
[67] The Tribunal will refer to Claimant's Post-Hearing Brief as **C PHB**; Respondents 1 and 2's Post-Hearing Brief as **R$_{1+2}$PHB**; and Respondent 3's Post-Hearing Brief as **R$_3$ PHB**.
[68] R$_3$ PHB, para. 228.
[69] Com. R$_{1+2}$-79 of 19 April 2014, Com. R$_3$-49 of 28 April 2014.
[70] A-53.
[71] Respondents 1 and 2's submission on IEC's claim for interests of 30 May 2014.

70.    Pursuant to the Tribunal's directions in PO 11 and A-58, on 30 May 2014 the Parties simultaneously presented their First Submission on Costs[72]. On 24 July 2015 the Parties updated their submissions on costs[73] pursuant to the Tribunal's directions[74]. On 11 November 2015 the Claimant further updated its cost submission.

## 15.    POST-HEARING INCIDENTS

### 15.1 REVERSE FLOW INCIDENT

71.    Seven months after the submission of the Post-Hearing Briefs, on 21 November 2014 Respondents 1 and 2 filed a communication requesting exceptional leave to introduce new and previously unavailable documentary evidence, which allegedly revealed the possibility of gas being imported from Israel to Egypt through EMG's pipeline ["**Reverse Flow**"]; EGAS submitted that the Reverse Flow would have a direct impact on EMG's claim for damages. Respondents 1 and 2 further requested that the Tribunal afford the Parties an opportunity to file written and oral submissions on this issue[75]. After hearing the Parties[76], the Tribunal authorised EGAS request and invited Claimant and Respondent 3 to present documentary evidence in reply[77]; the Tribunal however rejected for the time being Respondents 1 and 2's request for written and oral submissions, pending the analysis of the documentary evidence[78].

72.    On 23 December 2014 Respondents 1 and 2 requested leave to present a short submission, arguing that Claimant had not only submitted documentary evidence, but also made substantive allegations[79]. The Tribunal granted the request, and Respondents 1 and 2 presented their submission on 9 January 2015[80].

73.    Thereafter both Claimant and Respondents 1 and 2 requested another round of written arguments and supporting evidence[81]. The Tribunal allowed the

---

[72] The Tribunal will refer to Claimant's First Submission on Costs as **C FSC**; Respondents 1 and 2's First Submission on Costs as **R$_{1+2}$ FSC**; and Respondent 3's First Submission on Costs as **R$_3$ FSC**.
[73] The Tribunal will refer to Claimant's Updated Submission on Costs as **C USC**; Respondents 1 and 2's Updated Submission on Costs as **R$_{1+2}$ USC**; and Respondent 3's Updated Submission on Costs as **R$_3$ USC**.
[74] A-72.
[75] Com. R$_{1+2}$-91 of 21 November 2014.
[76] Com. R$_3$-59 of 1 December 2014, Com. C-81 of 1 December 2014 and Com. R$_{1+2}$-92 of 4 December 2014.
[77] A-64.
[78] A-64.
[79] Com. R$_{1+2}$-94 of 23 December 2014.
[80] Com. R$_{1+2}$-95 of 9 January 2015.
[81] Com. C-84 of 2 March 2015 and Com. R$_{1+2}$-97 of 18 March 2015.

marshalling of further documents; and invited the Parties to propose a schedule for filing written arguments and evidence[82].

Briefs on Reverse Flow

74. The Tribunal finally adopted a calendar for the Parties to file briefs, and submit documents, witness statements and expert reports on Reverse Flow. Respondents 1 and 2 had also requested a hearing[83], but the Tribunal postponed its decision, until it had had the opportunity to review the Parties' submissions [the "**April Ruling**"][84].

75. Accordingly, Respondents 1 and 2 filed their submission on Reverse Flow on 18 May 2015[85]. Respondent 3 did so by 15 June 2015[86] and Claimant presented its submission by 22 July 2015[87].

Further application

76. Respondents 1 and 2 filed another application to submit four documents regarding Reverse Flow[88], one of which was a certain portion of the transcript of the hearing in a parallel arbitration under the CRCICA Rules between EGPC and EGAS, and EMG. After hearing all Parties[89], on 10 September 2015 the Tribunal accepted three of the documents[90], but in a reasoned decision declined to accept the transcript[91]. The Tribunal added that the introduction of transcripts was inappropriate, since the Tribunal had, "for the time being", not yet adopted a decision to organise a hearing and to examine witnesses on the Reverse Flow issue, making reference to its April Ruling[92].

77. On 18 September 2015 Respondents 1 and 2 submitted the documents which had been authorised, and complained that the Tribunal's decision of 10 September 2015 indicated that the Tribunal had prejudged its decision not to summon witnesses on Reverse Flow[93]. According to Respondents 1 and 2, in the April Ruling the Tribunal had stated that it would decide whether subsequent steps were required, after having had the opportunity to review the Parties' submissions on Reverse Flow, while now in September the Tribunal stated that it had decided not to summon (for the moment) the witnesses and experts on Reverse Flow.

---

[82] A-67.
[83] Com. C-86 of 21 April 2015, Com. R$_3$-63 of 21 April 2015 and Com. R$_{1+2}$-99.
[84] A-68.
[85] The Tribunal will refer to Respondents 1 and 2's submission on reverse flow as **R$_{1+2}$ S RF**.
[86] The Tribunal will refer to Respondent 3's submission on reverse flow as **R$_3$ S RF**.
[87] The Tribunal will refer to Claimant's submission on reverse flow as **C S RF**.
[88] Com. R$_{1+2}$-109 and Com. R$_{1+2}$-110 of 12 August 2015.
[89] Com. C-96 and Com. R$_3$-69 of 19 August 2015.
[90] Doc. R$_{1+2}$-722. Claimant did not object to the introduction of this document.
[91] A-76.
[92] A-68.
[93] Doc. R$_{1+2}$-111.

Respondents 1 and 2 reserved all their rights and recourse in relation to this alleged violation of due process.

78. The Tribunal does not agree with Respondents 1 and 2's complaint that their due process rights have been infringed. No possible interpretation of the Tribunal's words can lead to the conclusion that it had prejudged its decision on whether to hold a hearing or not. The Tribunal's statement that "it ha[d] decided not to summon (for the moment) the witnesses and experts on reverse flow" was a true reflection of reality: in April Respondents 1 and 2 had requested that the Tribunal hold a hearing, but the Tribunal had postponed its decision and in September the decision remained pending. In any case, the Tribunal's remark was made as an alternative argument. The reason for not accepting the CRCICA arbitration transcripts was that they were not necessary.

79. In their submissions the Parties have sufficiently briefed the Arbitral Tribunal on this issue and the Tribunal will discuss in chapter XIV of the Award dealing with the quantum of EMG's claims, the actual value of EMG's pipeline. In that chapter the Arbitral Tribunal will analyse in detail all the arguments raised by the Parties.

**15.2   THE ALLEGED FORGERY AND EXCLUSION OF WITNESS STATEMENTS**

80. A year after the conclusion of the Second Hearing, on 30 May 2015[94], Respondents 1 and 2 averred that the document production in the CRCICA arbitration had revealed the existence of two different versions of the minutes of the meeting of EMG's Board of Directors held on 2 November 2009 (none of the two versions had been produced in this arbitration). Respondents 1 and 2 alleged that one of the minutes was forged and requested that it be allowed to introduce new documents into the record.

81. Claimant and Respondent 3 rejected Respondents 1 and 2's assertion that one of the versions of the minutes was forged and objected to the introduction of this evidence into the file[95]. On 6 July 2015, upon the authorisation from the Tribunal granted on 15 June 2015, Respondents 1 and 2 filed a reply and sought to submit to the record eight additional new documents, and to examine Messrs. Hamdy and Al Sakka on the issue. Respondents 1 and 2 alleged that these documents revealed that the witness statements given by Mr. Hamdy and Mr. Al Sakka (EMG's executives) in this arbitration in relation to the negotiation of the First Amendment, was contradictory with their testimony given in other arbitrations. Respondents 1 and 2 also asked to be given the opportunity to make written and oral submissions regarding the impact of the alleged forgery on the case[96]. One of the new documents were the excerpts of the transcripts in the CRCICA arbitration, allegedly relevant to the issue of forgery.

---

[94] Com. R$_{1+2}$-102 of 30 May 2015.
[95] Com. C-87 of 9 June 2015 and Com. R$_3$-65 of 11 June 2015; Com. C-88 of 10 July 2015.
[96] Com. R$_{1+2}$-105.

82.   The Tribunal accepted the documents and granted the Parties an opportunity to file written submissions[97]. Respondents 1 and 2 did so on 12 August 2015 and Claimant and Respondent 3 on 26 August 2015[98].

83.   In its 12 August 2015 submission Respondents 1 and 2 also requested[99]:

   -   the exclusion of Mr. Hamdy's and Mr. Al Sakka's witness statements[100];

   -   authorisation to submit two additional demonstrative exhibits, which allegedly disproved the credibility of one of EMG's witness.

84.   Claimant and Respondent 3 opposed these requests[101]. Furthermore, Claimant asked the Tribunal to exclude form the record the portions of the transcript of the CRCICA arbitration submitted by Respondents 1 and 2 which did not relate the forgery issue[102].

85.   The Tribunal granted Claimant's request to exclude from the record the parts of the transcript of the CRCICA arbitration which were not related to the forgery issue[103]. And, after having reviewed all submissions from the Parties, the Tribunal concluded that there was no legitimate reason to exclude Messrs. Hamdy's and Al Sakka's witness statements; and that it would assess the credibility of the witnesses and decide what evidentiary weight would be attached to each testimony taking into consideration all arguments advanced by the Parties. The Tribunal also admitted into the record the two demonstrative exhibits requested by Respondents 1 and 2.

## 16.   SUMMARY OF THE EVIDENCE

86.   The documentary evidence presented by the Parties was:

| Party | Documents | Legal authorities |
|---|---|---|
| Claimant | Doc. C-1 through Doc. C-428 | Doc. CLA-1 through Doc. CLA-146 |
| Respondents 1 and 2 | Doc. $R_{1+2}$-1 through Doc. $R_{1+2}$-724[104] | Doc. $RL_{1+2}$-1 through Doc. $RL_{1+2}$-144 |
| Respondent 3 | $R_3$-1 to $R_3$-414[105] | |

---

[97] A-73.
[98] Com. $R_{1+2}$-110 of 12 August 2015, Com. C-97 and $R_3$-70 of 26 August 2015.
[99] Com. $R_{1+2}$-110 of 12 August 2015.
[100] Com. $R_{1+2}$-110 of 12 August 2015.
[101] Com. C-97 and $R_3$-70 of 26 August 2015.
[102] Doc. $R_{1+2}$-721.
[103] A-76.
[104] No documents were filed under the numbering Doc. $R_{1+2}$-682 to $R_{1+2}$-684.
[105] These documents submitted by Respondent 3 include legal authorities.

87.    The Parties presented the following <u>witness statements</u>[106]:

| Claimant | Position |
|---|---|
| Mr. Maamoun Al Sakka[107] | Managing Director for Operation, Engineering and Contracts at EMG |
| Mr. Abdel Hamid Ahmed Hamdy | Commercial Manager at EMG |
| **Respondent 3** | |
| Mr. Igor Aronovich[108] | Senior Deputy Operations Manager at IEC |
| Ms. Lena Nudelman[109] | Head of Maintenance Planning at IEC |
| Mr. Yaron Ronai[110] | Head of the Natural Gas and Coal Department, Generation & Transmission Division at IEC |
| Mr. Shimshon Brokman[111] | Head of the Fuel Management Department in the Generation and Transmission Division at IEC |
| Mr. Moshe Amit[112] | Manager of the Economics, Financial Planning and Tariffs Department at IEC |
| Mr. Alexander Zaid | Company Comptroller at IEC |
| Mr. David Elmakis | Senior Vice President and Head of the Planning, Development and Technology Division at IEC |
| Mr. Joseph Dvir | Former Senior Vice President and CFO at IEC |
| Mr. Moshe Weiss[113] | Contract Manager in the Mechanical Department in the Generation Division at IEC |
| Mr. Vladimir Gurevich[114] | Manager in the Generation System Planning Department in the Planning, Development & Technology Division at IEC |
| Mr. Zecharia Kay | Head of Finance Division at IEC |

88.    Respondents 1 and 2 did not submit any witness statements.

89.    The Parties presented reports from the following <u>expert witnesses</u>:

| Claimant | Issue |
|---|---|
| Mr. Charles C. Freeny, Mr. Gerald B. Gump and Mr. Timothy D. Rooney from *Baker & O'Brien* | Two expert reports on repairs of the Pipeline[115] |
| Mr. Benjamin F. Schrader from *Baker & O'Brien* | Two expert reports on security[116] |
| Mr. Boaz Moselle and Mr. James Nicholson from *FTI Consulting* | Two expert reports on quantification of EMG's damages[117], and an Annual Reconciliation Simulation |
| Ms. Zoe Young, Mr. Richard Poole and Mr. Bill Cline form *Gaffney, Cline & Associates* | Compliance with document production |
| Mr. Daniel Muthmann from *Global Gas Partners GmbH* | A financial report |

---

[106] Respondents 1 and 2 did not present fact witnesses.
[107] [**Al Sakka FWS** and **Al Sakka SWS**].
[108] [**Aronovich WS**].
[109] [**Nudelman FWS and Nudelman SWS**].
[110] [**Ronai WS**].
[111] [**Brokman FWS and Brokman SWS**].
[112] [**Amit WS**].
[113] [**Weiss WS**].
[114] [**Gurevich WS**].
[115] [**B&O'B-Freeny FR** and **B&O'B-Freeny SR**].
[116] [**B&O'B-Schrader FR** and **B&O'B-Schrader SR**].
[117] [**FTI I and FTI II**].

| Respondents 1 and 2 | |
|---|---|
| Mr. Nicolas Pelham (independent consultant) | Two expert reports on security[118] |
| Mr. Chris Clements form *Grant Thornton LLP* | Two expert reports on quantification of IEC's damages |
| Ms. Geraldine Andrews Q.C. of *Essex Court Chambers* | A legal opinion[119] |
| Leonard, Lord Hoffman | Two legal opinions[120] |
| Mr. John Wood-Collins (independent consultant) and Tim Giles from *Independent Economics & Finance LLP* | Eight expert reports on quantification of EMG's and IEC's damages[121] |
| Respondents 3 | |
| Major General (ret.) Giora Eiland | An expert report on security[122] |
| Dr. Steven Cook, Senior Fellow at the *Council on Foreign Relations* | An expert report on security[123] |
| Brigadier Tony Ling CBE | Two expert reports on security[124] |
| Mr. Graham Shuttleworth from *Nera Economic Consulting* | Three expert reports on IEC's damages[125] |
| Joint Expert Reports | |
| Calculation of EMG's losses by Messrs. Boaz Moselle and James Nicholson from *FTI Consulting* (Claimant) and Messrs. John Wood-Collins and Tim Giles (Respondents 1 and 2) | |

## 17. ADVANCE ON COSTS

90. The Court initially fixed the advance on costs at USD 240.000[126]; thereafter, on 1 August 2013, it fixed it at USD 750.000[127]; and on 27 March 2014 the Court reconsidered the advance on costs and decided to increase it to USD 2.215.000[128]. It made a last adjustment and increased the advance on costs to USD 2.930.000[129].

91. The Parties have contributed to the advance on costs in the following amounts[130]:

| Party | Amount paid |
|---|---|
| Claimant | USD 1.146.633[131] |
| Respondent 2 | USD 738.370[132] |
| Respondent 3 | USD 1.044.997[133] |

---

[118] **[Pelham FR and Pelham SR]**.
[119] **[Andrews]**.
[120] **[Hoffman I and Hoffman II]**.
[121] **[JWC I to VIII]**.
[122] **[Eiland]**.
[123] **[Cook]**.
[124] **[Ling FR and Ling SR]**.
[125] **[Nera I to III]**.
[126] Secretariat's letter of 1 March 2012.
[127] Secretariat's letter of 1 August 2012.
[128] Secretariat's letter of 28 March 2014.
[129] Secretariat's letter of 24 September 2015.
[130] See Secretariat's email of 4 June 2014, letter of 10 September 2014 and 4 November 2015.
[131] See Secretariat's letter of 4 November 2015.
[132] Secretariat's email of 4 June 2014 and letter of 4 November 2015. There was a small error in the Secretariat's letter: the aggregate amount disbursed by Respondents should read USD 1,783,367 (not 1,783,337).

ICC Case 18215/GZ/MHM
Award

**18.** **CLOSING OF THE PROCEEDING, TIME PERIOD FOR THE ISSUANCE OF THE AWARD**

92. Taking into consideration that the last submission by one of the Parties was filed on 18 September 2015, on 3 November 2015, in accordance with Art. 22 of the Rules, the Tribunal declared the proceedings closed with respect to the matters to be decided in this arbitration, and invited the Parties to submit their last update on their statement of costs, in light of the full payment made of the advance of costs on 20 October 2015[134]. Accordingly, on 11 November 2015 Claimant submitted its second updated statement of costs[135].

93. Pursuant to Art. 24(1) of the Rules, the time limit to render the Final Award is six months from the date of the approval of the Terms of Reference by the Court, i.e. 26 January 2013.

94. In its session of 17 January 2013, pursuant to Art. 24(2) of the Rules, the Court extended the time limit for rendering the Final Award until 30 May 2014[136]; in its session of 28 May 2014, for the second time, the Court extended the time limit for rendering the Final Award until 31 October 2014[137]; and on 30 October 2014, once again, the Court extended the time limit for rendering the Final Award until 30 January 2015[138]; on 29 January 2015 the Court extended once more the time limit for rendering the Final Award until 29 May 2015[139], and then until 31 August 2015[140]. The Court granted another extension until 30 October 2015[141] and a last one until 31 December 2015[142].

95. Therefore, this Award is rendered within the time limit granted.

---

[133] Out of this total, the amount of USD 675.837 are Claimant's share of the advance on costs which Respondent 3 agreed to pay (see Secretariat's letters of 3 and 23 September 2014). There was a small typo in the Secretariat's letter of 4 November 2015: the aggregate amount disbursed by Respondents should read USD 1,783,367 (not 1,783,337).
[134] A-77.
[135] The Tribunal will refer to Claimant's Second Updated Statement of Costs as C SU SC.
[136] Secretariat's letter of 22 January 2013.
[137] Secretariat's letter of 30 May 2014.
[138] Secretariat's letter of 30 October 2014.
[139] Secretariat's letter of 30 January 2015.
[140] Secretariat's letter of 29 May 2015.
[141] Secretariat's letter of 1 September 2015.
[142] Secretariat's letter of 30 October 2015.

# III. ALLEGED VIOLATIONS OF DUE PROCESS RIGHTS

96. EGAS has repeatedly complained that its due process rights had been violated and has reserved its right with respect to such violations.

97. When the arbitration reached the stage of the First Hearing, the Tribunal requested the Parties to present a brief, listing the alleged breaches of their due process rights and to propose a way in which such alleged violations could be remedied.

98. On 24 January 2014 EGAS presented its list, setting out its reservation of rights in relation to alleged breaches of its due process rights[143]. EMG and IEC made no written submissions and instead addressed this issue orally on the last day of the First Hearing.

## 1. THE PARTIES' POSITIONS

99. EGAS raised a number of due process violations[144], which relate to the allegedly unfair treatment suffered, in view of the fact that EMG and IEC are aligned, and EGAS had to reply to two co-claimants under serious time constraints.

100. Claimant submitted orally that this arbitration had been conducted in accordance with the principles of due process, and therefore, had nothing to object in this regard[145]. Additionally, Claimant expressed its concern regarding the effect that the due process violation allegations raised by Respondents 1 and 2 could have on the Tribunal's decision making process; and requested the Tribunal to be vigilant so as to prevent that an abuse of these type of defences had an impact on its substantive decisions[146].

101. In line with Claimant's position, Respondent 3 submitted that it had no complaints as to the conduct of the proceeding and the Parties' due process rights[147].

## 2. THE TRIBUNAL'S VIEW

102. The Tribunal will first analyse the applicable law to due process (**2.1**); and then it will express its views with respect to the allegations of violation of due process (**2.2**).

---

[143] Com. R$_{1+2}$-60.
[144] Com. R$_{1+2}$-60.
[145] FHT, Day 10, p. 2346.
[146] FHT, Day 10, pp. 2347 and 2348.
[147] FHT, Day 10, p. 2348.

## 2.1 APPLICABLE RULES

103. This arbitration is conducted under the Rules of Arbitration of the ICC in force as from 1 January 1998.

104. Art. 15 of the ICC Rules sets forth that the proceedings shall be governed by the ICC Rules and, where silent, by any rules which the parties, or failing them, the Arbitral Tribunal may settle on. In this case, the Parties agreed that the Tribunal could take into consideration the IBA Rules on the Taking of Evidence in International Arbitration[148].

105. Furthermore, the seat of arbitration is Geneva, Switzerland[149], and thus the *lex fori* applicable to procedural issues is Swiss law ; the law of the seat of arbitration provides the mandatory legal framework applicable to the conduct of an arbitral proceedings.

106. Therefore, in analysing the compliance with the due process rights of the Parties in this arbitration the Tribunal shall first look at the ICC Rules (**A.**), then it will also take into account the IBA Rules on the Taking of Evidence (**B.**); and in any case, the Tribunal will give special relevance to the imperative rules on due process under Swiss Law (**C.**).

### A. ICC Rules

107. The ICC Rules include several norms which have the purpose of preserving the equality of arms among the parties during the proceedings.

108. For instance, Art. 15(2) requires that the Tribunal acts fairly and impartially, and ensures that each party has a reasonable opportunity to present its case. Other principles, such as the assurance of the proper notification of communications (Art. 3) or the principle of contradictory proceeding and the right to be heard, also act as guarantees of equal treatment of the parties (Arts. 4, 5 and 21).

### B. IBA Rules

109. As for the IBA Rules on Taking of Evidence, they establish a framework to govern the taking of evidence in international arbitration (except if any provision is in conflict with mandatory rules) i.e., presentation of documents, witness examination, organisation of the evidentiary hearing and the admissibility and assessment of evidence.

---

[148] PO 2, para. 44.
[149] Terms of Reference, para. 87.

### C.  **Swiss Law**

110. The statute applicable to international arbitrations seated in Switzerland is Chapter 12 of the Swiss Federal Statute on Private International Law ["**FSPL**"], save where an explicit declaration by the parties to the arbitration for the exclusion of its applicability exists[150]. The present arbitration has its seat in Geneva, Switzerland[151]; and there is no record in the file of the existence of any agreements among the Parties that excludes the application of the FSPL to this arbitration.

111. Under Swiss Law the determination of the rules of the arbitral procedure, and hence, the rules applicable to due process, is left, to a large degree, to the parties' autonomy[152]; there is however, in Art. 182(3) of the FSPL a mandatory rule which neither the Parties, nor the Tribunal can derogate[153]:

> "Regardless of the procedure chosen, the arbitral tribunal shall ensure <u>equal treatment</u> of the parties and the <u>right of the parties to be heard</u> in adversarial proceedings".

## 2.2  EGAS' ALLEGATIONS OF VIOLATION OF DUE PROCESS

112. EGAS maintains that it was put in an unfair position in this arbitration due to the fact that EMG and IEC were in fact two co-claimants, and EGAS had to respond to both their claims under procedural and time constraints[154]. Specifically, EGAS claims that:

- EGAS had to respond to two claimants in the same time frame that each of the claimants had to defend one case only; the Tribunal should have ordered EMG and IEC to act as co-claimants in this arbitration and by not doing so, EGAS' right to equality of arms was breached[155] (**A.**);

- EGAS was granted insufficient time and opportunities during the First Hearing[156] (**B.**); and

- EGAS feels that the decisions made by the Tribunal regarding evidence afforded EGAS an unfair treatment (**C.**).

---

[150] FSPL, Art. 176.
[151] See para. 19 *supra*.
[152] FSPL 182(1); See Judgement of 12 March 2003, dft 4p.2/2003, para. 3 (Swiss Federal Tribunal) interpreting Art. 182 of the FSPL.
[153] FSPL 182(3). Emphasis added by the Tribunal.
[154] This generic complaint has given rise to specific protests with respect to distinct claims, which will be dealt with by the Tribunal in the appropriate sections of this Award.
[155] ToR, para. 60. Included in allegation 3 of the list of due process violations in Com. $R_{1+2}$-60.
[156] Included in allegation 3 of the list of due process violations in Com. $R_{1+2}$-60.

**A.**   **A case against two co-claimants**

113.   The Tribunal agrees with EGAS that EMG's and IEC's positions in this arbitration are close to co-claimants: both are, basically, claiming against EGAS for breach of the gas supply obligations EGAS had assumed under the relevant contracts, and that EGAS wrongfully terminated the GSPA thereby repudiating the GSPA and the Tripartite Agreement.

114.   This notwithstanding, the Tribunal disagrees with EGAS on the consequences of there being two claimants: EGAS' due process rights have not been violated.

115.   Multiple parties and multiple contracts are not uncommon in international commerce. And in this case, the three Parties concerned agreed to structure their complex relationship in two bilateral agreements (the GSPA and the On-Sale Agreement) plus a trilateral contract, the Tripartite Agreement, to which EGAS/EGPC, EMG and IEC were party, and which created an overall contractual framework, spanning the complete transaction. When they entered into this complex contractual structure, the three Parties must have foreseen that trilateral disputes could arise, and that these disputes would be solved under the dispute resolution mechanism agreed upon in the Tripartite Agreement. The very reason why the Tripartite Agreement was executed was precisely to create an overall bond between the Parties, and to establish a unified forum where tripartite disputes could be adjudicated in one single procedure by one single set of arbitrators.

116.   Tripartite disputes are consequently the natural outcome of the arbitration mechanism agreed upon in the Tripartite Agreement. Respondents 1 and 2 are wrong when they complain that they have been confronted with two co-claimants who acted in concert. This situation is the natural consequence of having executed the Tripartite Agreement: if EGAS/EGPC failed to deliver gas under the Tripartite Agreement, it would be confronted by a joint claim from EMG, the pipeline operator, and from IEC, the final buyer of the gas.

117.   Notwithstanding the fact that trilateral claims represent the natural outcome of signing a Tripartite Agreement, in the present arbitration the Tribunal has taken all necessary and appropriate measures to accommodate the proceedings to the trilateral nature of the dispute, whilst respecting all Parties' due process rights. Such measures include, amongst other:

-   EMG and IEC have been treated in this procedure as de facto co-claimants: they have produced submissions simultaneously and have been given equal time in the arbitration;

- Due to the fact that EGAS had to respond to two claimants – whose claims, significantly overlapped – EGAS was given more time to present its reply submissions[157];

- The amount of time to be given to each party was agreed upon by the Parties and the Tribunal in telephone conferences and recorded in Procedural Orders issued in advance;

- Despite the schedules agreed upon and reflected in the Procedural Orders, EGAS was granted significant extensions[158]; and

- EGAS' claim that it should have been granted twice as much time as EMG or IEC is totally unfounded, because EGAS was not faced with two distinct claims: in fact, there is significant overlap between the merits claims of EMG and IEC.

## B.   Time granted during the First Hearing

118. In view of the fact that EGAS was, in essence, responding to claims from two claimants, the Tribunal accepted EGAS' request that during the First Hearing it be allocated more time than the counterparties. The Tribunal decided to grant EGAS 40% of the available time, and IEC and EMG had to share the remaining 60% in equal portions of 30%[159]. The Tribunal reasoned its decision as follows[160]:

> "In deciding the proportion of time allocated to each party the Tribunal sides with Respondents 1 and 2 and accepts that their extraordinary position, facing significant claims and counterclaims, requires that they be awarded more time than their counterparties. The Tribunal disagrees however, that the proportion of time be 50% for Respondents 1 and 2 and the remaining 50% to be split between Claimant and Respondent 3. A large part of Respondents 1 and 2's defence, regarding admissibility and merits, is identical, irrespective of whether it is the Claimant or Respondent 3 who is pressing the claim. Bearing in mind this overlap, the Tribunal finds that a fair solution is that Respondents 1 and 2 are granted 40% of the time while the rest is split equally between Claimant and Respondent 3".

119. As it turned out, during the First Hearing EGAS used more time than that initially allocated to it, which was possible because the Tribunal decided to sit longer hours and IEC assigned part of its time to EGAS.

---

[157] Four months to reply to Claimant's and Respondent 3's First Submission on the Merits, and an additional month and a half to reply to Respondent 3's submission on damages; and three months to reply to Claimant's and Respondent 3's Second Submission on the Merits (see paras. 50-57 *supra*).

[158] See for instance, A19 and PO 7, para. 40 (two week extension for filing its Second Submission on the Merits); A 26, para. 13, granting extension of three weeks to file its Supplemental Submission on damages); A 30 and 32, granting extension of time for compliance with the Tribunal's order on document production.

[159] PO 10, para. 19.

[160] PO 10, para. 20.

120. The Tribunal also set forth the principle that each Party was free to allocate its time for opening statements, direct examination cross-examination, as it best saw fit[161]:

> "Subject to the Tribunal's directions, each party is free to use its allocation of time for opening statements, direct examination, cross-examining and re-examining witnesses or any other intervention".

121. At the end of each session, the Administrative Secretary regularly informed the Parties of the detail of the time used by each of them. Below is a table which reflects the time (in minutes) used by each party in the examination of witnesses and experts[162]:

| | EMG | IEC | EGAS |
|---|---|---|---|
| Mr. Hamdy | 30 | - | 82 |
| Mr. Al Saaka | 17 | 5 | 13 |
| Mr. Ronai | 1 | 1 | 25 |
| Mr. Brokman | 3 | 28 | 131 |
| Ms. Nudelman | - | 15 | 52 |
| Mr. Amit | - | 1 | 17 |
| Mr. Freeny | 59 | 43 | 91 |
| Mr. Schrader | 25 | - | 61 |
| Mr. Eiland | - | 54 | 75 |
| Mr. Cook | 10 | 26 | 36 |
| Mr. Pelham | 151 | 181 | 71 |
| FTI | 70 | - | 162 |
| NERA | - | 99 | 95 |
| JWC | 182 | 101 | 123 |
| **TOTAL** | 548 | 554 | 1034 |
| **%** | **25,7%** | **25,9%** | **48,4%** |

122. EGAS now claims that its due process rights were infringed because:

- It was not attributed half of the available time for examination: in fact, it was allocated almost 50% of the available time.

- It was forced to examine witnesses it did not call[163]: each party was free to use the time allocated to it as it deemed appropriate; if EGAS decided to cross-examine witnesses that it had not initially wished to call, that was EGAS' decision – no party was coerced to conduct examinations.

---

[161] PO 10, para. 22.
[162] The font colour of each witness corresponds to the Party which presented said witness. As way of example, Claimant made a direct examination of its witness Mr. Al Saaka for 17 minutes; and Respondent 3 and Respondents 1 and 2 made a cross-examination of 5 and 13 minutes respectively.
[163] Included in allegation 3 of the list of due process violations in Com. R$_{142}$-60.

-   IEC could perform a direct examination of its quantum expert in two hours, while EGAS' quantum experts were restricted to 30 minutes direct presentation: the table reproduced *supra* shows that actually, IEC's expert (NERA) was subject to 99 minutes of examination by IEC[164], while EGAS' experts (JWC) were subject to 123 minutes of examination by EGAS[165]; in any case, it was ultimately EGAS' decision how to allocate the available time.

-   EMG and IEC were able to make a second direct examination on each other's witnesses to support their common position[166]: In fact EGAS was granted as many rounds of examination as it wished; the Tribunal did not dismiss any witness unless it was satisfied that none of the Parties wished to put any additional question to the witness.

## C.   Document production and submission of evidence

123.  EGAS submits that the Tribunal treated it unfairly when it decided on document production requests and on the organisation of the submission of evidence:

-   EGAS was denied access to information relating to the On-Sale Agreement – especially with respect to the gas flow between IEC and EMG – and to the UCOD and OPED models[167]: IEC did produce the On-Sale Agreement[168] and information on the gas flows[169]. As regards UCOD and OPED, both are optimisation programs and the former was used by IEC to calculate a part of the damages sought in this arbitration; due to its intrinsic characteristics, EGAS could not be given full access to the programs and the Tribunal has decided in this Award to disregard the calculations made by IEC based on UCOD precisely because EGAS could not verify the underlying assumptions.

-   EGAS was ordered to produce documents while preparing its written submissions and seeking to respond to new submissions and expert evidence filed by EMG and IEC[170]: EMG, IEC and EGAS filed approximately 80, 70 and 110 communications, respectively; it is almost inevitable that some were drafted in parallel to major submissions and this risk has affected all Parties equally. As regards the specific allegation that EGAS was ordered to produce documents while preparing its Second Submission on Merits, the Tribunal redirects to the exchange of communications that took place from

---

[164] See para. 121 *supra*.

[165] See para. 121 *supra*.

[166] Included in allegation 3 of the list of due process violations in Com. R$_{1+2}$-60.

[167] Allegations 1 and 2 of the list of due process violations in Com. R$_{1+2}$-60.

[168] Doc. R$_3$-40.

[169] Ronai WS-Schedule A.

[170] Included in allegation 4 of the list of due process violations in Com. R$_{1+2}$-60.

26 July 2013 through 6 January 2014[171]. According to EGAS, it was unable to meet the originally granted deadline for the production of documents due to the political situation in Egypt at that time – an event outside of the Parties' control[172]. The Tribunal encouraged all Parties to cooperate[173] and urged EMG and IEC to prioritise the documents that were most essential for the preparation of its Second Submission (which was due by 20 September 2013)[174] while the rest of the ordered documents would be produced on a "rolling basis" as the situation in Egypt regained normality[175].

- EMG and IEC were allowed to submit new expert evidence at a stage in which it was impossible for EGAS to deal with it[176]: EGAS is referring to two expert reports attached to the Supplemental Submissions of 15 November 2013[177]. The Supplemental Submissions were required because EGAS could not meet the deadline for the production of documents and most of the documents were handed to IEC and EMG after the presentation of the Second Submissions; the Supplemental Submission gave IEC and EMG the opportunity to comment and present counterevidence with respect to the documents produced by EGAS after the Second Submission had been presented. All three Parties were extensively heard before the Tribunal adopted a decision on this matter, and the admissibility of the two expert reports is duly motivated in the Tribunal's decision A-39. The Tribunal notes that it also granted EGAS an extension to produce counter-evidence to respond to these reports[178].

- EMG was allowed to call one of its security experts (Mr. Freeny) to the Hearing, despite the fact that no counterparty had called him, but EGAS was not given the opportunity to call his legal expert (Lord Hoffman) who was not called by any counterparty[179]: there is no unfair treatment when the two situations compared are different in nature. EMG's expert was not a legal expert, while EGAS' was. This distinction is essential to the question whether the legal expert was allowed to be heard in the First Hearing, because, as the Tribunal argued in its decision A-44, it is standard practice in international arbitration that experts on applicable law are not required to support their statement with an oral testimony, and the Tribunal did not find a solid reason to deviate from that standard practice.

---

[171] Com. C-29 – Com. C-51; Com. $R_{1+2}$-34 – Com. $R_{1+2}$-55; Com. $R_3$-25 – Com. $R_3$-40 and PO 8 – A-46.
[172] $R_{1+2}$-34.
[173] A-31 and 32.
[174] A-30.
[175] A-35.
[176] Included in allegation 4 of the list of due process violations in Com. $R_{1+2}$-60.
[177] Respondent 3 requested leave for an extension to present an expert report, and did so by 22 November 2013.
[178] A-39.
[179] Included in allegation 4 of the list of due process violations in Com. $R_{1+2}$-60.

- Respondents 1 and 2 aver that the Tribunal prejudged or ignored unresolved issues raised by Respondents 1 and 2, by anticipating the date in which the draft of the award would be sent to the ICC before hearing the Parties on several outstanding issues[180]: this allegation became moot in light of the Tribunal's decision A 73 in which it granted the Parties further opportunities to present their arguments on the remaining issues to be decided by the Tribunal.

* * *

124. <u>In conclusion</u>, EGAS has not made out a case that its due process rights were violated.

---

[180] $R_{1+2}$-111.

# IV. SUMMARY OF THE FACTS OF THE CASE

125. This is a complex arbitration, affecting the production, transport and sale of a strategic asset – natural gas – between two States in one of the most troubled parts of the world. The purpose of the GSPA, the On-Sale Agreement and the Tripartite Agreement, the three "**Contracts**" which underlie this arbitration, was the export by EGPC and EGAS of a significant quantity of Egyptian gas to Israel, using the so called "Peace Pipeline" (the "**EMG Pipeline**") built and operated by EMG. IEC, the State owned utility which produces approximately 40% of the Israeli electricity demand, was to purchase ⅓ of the gas, the remaining ⅔ going to other Israeli purchasers. The total expected gas sales amounted to 7.0 BCM or almost 258 Million MMBTU per year, an amount which covered a substantial part of Israel's energy needs.

126. The dispute arose because three years after construction of the EMG Pipeline and commencement of deliveries, the gas supply was severely disrupted by terrorist attacks and eventually the GSPA and the Tripartite Agreement were terminated, leaving EMG with an idle pipeline, in which it had invested approximately USD 500 Million[181], and forcing IEC to purchase alternative fuels to meet Israel's electricity demand.

127. IEC and EMG are claiming damages against EGPC and EGAS in a total amount close to USD 6 Billion.

## 1. THE PARTIES AND THE CONTRACTS

128. The dispute involves three Parties:

- Respondents 1 and 2, the State-owned Egyptian companies entrusted with the production, distribution and sale of petroleum and natural gas – EGPC and EGAS (which, for convenience will frequently be referred to simply as "**EGAS**" or as the "**Seller**");

- Claimant, EMG, an Egyptian company with Egyptian, Israeli and American shareholders, that had constructed and was operating an underwater gas pipeline, linking Egypt and Israel, and who was buying the gas from EGAS, transporting it via the EMG Pipeline and reselling it in Israel (which will also be referred to as the "**Buyer**"); and

- Respondent 3, the principal final buyer of the gas, IEC, the Israeli State-owned electricity company, which used it for producing electricity.

---

[181] FHT, Day 1, p. 224.

129. The Parties are linked through the Contracts, which can be traced back to the 1979 Peace Treaty between Egypt and Israel, and which were concluded in a short period of time between June and August 2005[182]:

- The gas sellers (EGPC and EGAS) and the intermediary (EMG) are bound by the "**GSPA**", the upstream supply agreement;

- The intermediary (EMG) and the Israeli customer (IEC) executed an "**On-Sale Agreement**", for the downstream supply of gas;

- All three are Parties signed an overarching "**Tripartite Agreement**".

130. This Tribunal has been constituted pursuant to the arbitration clauses contained in the Tripartite Agreement and in the GSPA.

**1.1   THE MOU AND THE "GAS FOR PEACE DEAL"**

131. In addition to the execution of the three Contracts between EGAS, EMG and IEC, on 30 June 2005 the States of Egypt and Israel signed an inter-State Memorandum of Understanding [the "**MoU**"], formalising their understanding that significant quantities of Egyptian gas were to be exported to Israel via EMG's Peace Pipeline. The 1979 Peace Treaty between the two countries had already established that the supply of natural gas from Egypt to Israel would contribute to enhancing peace and stability in the Middle East.

132. The road map set out in the MoU was as follows:

- The MoU, although signed by the States, designated EGPC as the company responsible for exporting the gas.

- Egypt would sell gas to an intermediary exporter, EMG.

- The transmission of gas would take place through a Pipeline between Al Arish and Ashkelon.

- IEC was identified as the anchor customer, but the MoU "welcome[d] contracts between EMG and [other] Israel companies".

- Egypt guaranteed the supply of gas contracted or to be contracted in an amount of up to 7 BCM per year.

- A Tripartite Agreement would be signed between the Egyptian Government (through EGPC and EGAS), EMG and IEC, in which the Egyptian Government would guarantee the gas supply.

---

[182] C FS M, para. 37.

- Once other Israeli customers were identified, similar tripartite agreements would be concluded between the Egyptian Government, EMG and the final buyers.

133. The MoU was not only executed by the duly authorised representatives of Egypt and Israel, it was also attached to the GSPA as Schedule 5. And, in accordance with Art. 1.1 of the GSPA, all Schedules form an integral part of the GSPA and are incorporated by reference.

## 1.2    GSPA

134. A few days before, on 13 June 2005 EGAS and EMG had already entered into the Gas Supply and Purchase Agreement to which the MoU refers. The GSPA is a carefully drafted, lengthy contract comprising 13 articles, six schedules and six annexes, and subject to English law. All schedules and annexes form an integral part of the GSPA[183]. The crucial annex is Annex 1, which contains the General Terms and Conditions. The GSPA also incorporates the MoU as Schedule 5 and the Tripartite Agreement as Schedule 6.

135. The GSPA was amended for the first time on 31 May 2009, less than a year after commencement of commercial deliveries [the "**First Amendment**"][184]. Simultaneously, EMG and EGAS signed a letter agreement[185] [the "**Release of Claims**"], agreeing to a reciprocal release of claims for any liability for breach of the GSPA which might have occurred before the First Amendment[186].

Object

136. The object of the GSPA is the purchase and sale of gas, to be delivered at Al-Arish, Egypt (Art. 2). The quantity of gas is defined as up to 7.0 BCM per year (Art. 5), and the price is to be determined according to the pricing provision and formula of Annex 5. EMG had to anticipate the daily nomination of gas under a take or pay regime. If EGAS did not deliver part or all of the properly nominated gas, it was liable for shortfall compensation [the "**Shortfall Compensation**"].

137. As a consequence of the First Amendment, the gas price was raised and the maximum quantity of gas to which EMG was entitled was divided into three delivery quantities (Q1, Q2 and Q3), priced differently[187]. "**Q1**" represents the quantity of gas that was needed to supply IEC.

---

[183] Doc. R$_{1+2}$-1(A) [the "**GSPA**"], Art. 1.1.
[184] Doc. R$_{1+2}$-2, Schedule A, Annex 5.
[185] Doc. C-138.
[186] Doc. C-138, para. 1.
[187] C FS M, para. 107.

138. The First Amendment acknowledged that late deliveries of Q2 and Q3 volumes had occurred and that such delay had to be compensated by the additional delivery of the so called "**Recovery Gas**".

*Force majeure*

139. The GSPA provides for a *force majeure* regime under which neither party would be held liable for any delay or failure in performance due to *force majeure* (Annex 1, Art. 16.1).

Dispute resolution

140. The GSPA provides that disputes will be subject to arbitration.

141. The general rule is that disputes will be subject to an arbitration with its seat in Cairo before the CRCICA (Annex 1 Art. 14.2). The GSPA however provides for an exception, Art. 14.9 of Annex 1, which incorporates by reference the dispute resolution mechanisms of an On-Sale Agreement, subject to certain requirements. Art. 14.9 is one of the sources, which EMG claims afford jurisdiction to this Tribunal (alternatively, it also claims jurisdiction under the Tripartite Agreement).

**1.3   TRIPARTITE AGREEMENT**

142. On 13 June 2005[188] all three Parties to this arbitration concluded a Tripartite Agreement in which EGAS guarantee the supply of up to 2.2 BCM annually of gas to IEC, through fulfilling their obligations to EMG under the GSPA (called Source Contract in the Tripartite Agreement).

143. The Tripartite Agreement, which is governed by English law, includes an arbitration clause providing for ICC arbitration, with a seat in Geneva (which is one of the two alternative arbitration clauses invoked by EMG for its claim against EGAS and the only arbitration clause invoked by IEC for its counterclaim against EGAS).

144. The penultimate Recital of the GSPA includes a specific reference to the Tripartite Agreement, acknowledging that[189]

> "in such Tripartite Agreement EGPC and EGAS guarantee the commencement and continuous supply of Gas to IEC through fulfilling their obligations to EMG under [the GSPA]".

145. Furthermore, the Tripartite Agreement was attached to the GSPA as Schedule 6 and Art. 1.1 of the GSPA specifically provides that all Annexes "form an integral part hereof and are hereby incorporated by reference herein".

---

[188] IEC signed on 28 August 2005.
[189] GSPA, p. 12.

146. Art. 7 of the MoU stated that multiple tripartite agreements would be signed; one for each on-sale customer. Eventually, seven additional on-sale customers were identified. EMG wrote to EGAS requesting that individual tripartite agreements with each new customer be executed[190]. EMG alleges that EGAS refused to sign such tripartite agreements, despite the commitment set out in the MoU[191]. There is no evidence that any additional tripartite agreement was ever signed.

## 1.4   ON-SALE AGREEMENT

147. On 8 August 2005 EMG as seller, and IEC as buyer concluded a gas sale and purchase agreement[192]. This contract has been referred to in this arbitration as the 'EMG GSPA', the 'Downstream Contract', or the 'On-Sale Agreement'. The Tribunal prefers to refer to this contract as the "**On-Sale Agreement**".

148. Under the On-Sale Agreement, EMG agreed to the supply to IEC of an annual contract quantity of 1.2 BCM for the first year[193], which could be augmented by 25%[194].

149. The On-Sale Agreement was modified on several occasions. To the matters disputed in this arbitration, however, only the "**Fifth Amendment**" executed on 17 September 2009[195] becomes relevant[196]. The Fifth Amendment raised annual maximum gas supply to 2.125 BCM, permitted IEC to nominate additional gas quantities per day[197] and established that any shortfall in EMG's deliveries was to be added to IEC's entitlement for the following month[198].

150. The dispute resolution clause of the On-Sale Agreement provides for an ICC arbitration, with its seat in Geneva[199]. The governing law is English law[200].

   Other on-sale agreements

151. Evidence contained in the file proves the existence of the following customers of EMG, each of which should have signed an on-sale agreement with EMG[201]:

   -   Mashav Initiating and Development Ltd. ["**Mashav**"]

---

[190] Doc. C-62.
[191] C FS M, para. 122.
[192] Doc. R₃-40.
[193] Art. 3.1.1 of the On-Sale Agreement.
[194] Art. 3.2 of the On-Sale Agreement.
[195] Doc. R₃-41.
[196] Ronai WS, para. 53.
[197] Art. 7 of the Fifth Amendment.
[198] Art. 8 of the Fifth Amendment and Ronai WS, para. 54.
[199] Art. 10.2 of the On-Sale Agreement.
[200] Art. 10.1 of the On-Sale Agreement.
[201] Exhibits 6 to 16, FTI I. In Appendix 18 to FTI I, the expert also mentions Ashdod Energy Ltd. and Ramat Negev Energy Ltd. – two contracts which expired prior to the termination of the GSPA.

- Haifa Chemicals South Limited

- Agan Chemicals Manufactures Ltd.

- Oil Refineries Limited

- Dorad Energy Limited[202]

- Negev Natural Gas Marketing[203] plus

- O.P.C. Rotem Ltd[204]

- DSW Works Industries[205]

- DSW Works Limited[206]

- IC Power Israel[207]

## 2. THE PIPELINE

152. The Arab Gas Pipeline ["**AGP**"], but which often will simply be referred to as the "**Pipeline**" is a natural gas pipeline in the Middle East, which exports Egyptian natural gas to Jordan, Syria and Lebanon (and, through the underwater branch built and owned by EMG, to Israel). The AGP receives gas from a natural gas complex in Damietta, which is located 60 km west of Port Said, and it has a 10 BCM annual capacity[208]. The first section of the AGP is approximately 192 km long, begins in Damietta and ends in Al-Arish[209], the capital and largest city of the North Sinai Peninsula. This section of the AGP is also called the Trans Sinai Pipeline (because it crosses the Sinai desert) or the feeder line. Most of the disputes to be adjudicated in this arbitration are related to this section of the AGP.

---

[202] Commercial start date was 1 January 2013.
[203] Commercial start date was 30 June 2013.
[204] Commercial start date was 31 January 2013.
[205] Commercial start date was 30 November 2015.
[206] Commercial start date was 28 February 2015.
[207] Commercial start date was 30 April 2014.
[208] Ling FR, para. 27.
[209] Also referred to as Arish or Al Arish.



Source: FTI I, p. 23

153. The AGP has two major off-takes: in southern Al-Arish it connects to a branch which heads to the Red Sea and in the east of Al-Arish it connects to the EMG Pipeline, which crosses underwater to Ashkelon in Israel. In addition, there are other off-takes to feed a number of recipients, including cement factories and power stations located in the vicinity of the Pipeline, plus the Al-Arish Township[210].

154. The AGP is State-owned, and operated by an EGAS subsidiary, the Egyptian Natural Gas Company ["**GASCO**"][211].

EMG's pipeline

155. As soon as the GSPA and the On-Sale Agreement were concluded, EMG started the construction of the Al-Arish – Ashkelon branch of the AGP, the so-called EMG Pipeline, which was to export Egyptian gas to Israel through a 100 km submarine duct. EMG's facilities are located in Sheikh Zuwaid district[212].

156. EMG's pipeline is owned by EMG, operated by a separate Egyptian company, **KTISTAR**, and was partly financed through a USD 340 Million loan from the

---

[210] B&O'B-Freeny FR, para. 41.
[211] C FS M, para. 7.
[212] Ling FR, para. 26.

National Bank of Egypt. The investment amounted to USD 500 Million approximately[213].

## 3. CHRONOLOGY OF MAIN EVENTS

### Early years

157. The MoU and the Contracts were executed in 2005, at the time when President Mubarak was in power in Egypt.

158. The construction of the EMG Pipeline was finalised some three years thereafter, and on 15 June 2008 commercial operations were commenced[214]. Although gas deliveries started, the quantities actually made available by EGAS to EMG were consistently less than the quantities agreed in the GSPA. Negotiations ensued and led to the execution on 31 May 2009 of the First Amendment and the Release of Claims. This settlement proved, however, to be only a temporary solution, because soon thereafter renewed shortfalls occurred: in November 2010 EGAS acknowledged that since the signature of the First Amendment, it had incurred in a 15% shortfall[215].

### Egyptian revolution

159. At the beginning of 2011, the third year of performance of the GSPA, an unexpected event shook the Middle East: the revolutionary movement which was to be known as the "Arab Spring". By the end of January 2011 the Mubarak regime was toppled, and a period of confusion and violence ensued. In North Sinai, the region crossed by the Pipeline, local insurgents took advantage of the power vacuum.

160. As early as 5 February 2011 the Pipeline suffered a terrorist attack; the first in a chain of 13. The first six attacks targeted the facilities of the Pipeline, such as traps and off-take rooms, which are above ground and easily vulnerable; the next seven attacks targeted segments of the buried duct. The Parties discuss whether these attacks qualify as *force majeure* events or whether this excuse is unavailable because EGAS failed to act as a reasonable and prudent pipeline operator in its efforts to protect and secure the Pipeline and its facilities.

161. As a result of these attacks, gas supply suffered significant disruptions during 2011 and the first quarter of 2012. In fact, the total amount of gas delivered was 26 Million MMBTU in 2011 and only 2 Million MMBTU in 2012 (January –

---

[213] C FS M, para. 40.
[214] C FS M, para. 192.
[215] Doc. C-153, slide 38.

March)[216] – the annually contracted Q1 gas, i.e. the gas allocated to IEC only, was 78 Million MMBTU[217].

Lack of payment

162. In the course of 2011 – in the midst of the alleged *force majeure* events – EMG fell behind in the payment of invoices due to EGAS for the gas delivered. The GSPA provides that the failure to pay invoices due for four consecutive months entitles EGAS to terminate the GSPA[218]. On 24 August 2011 EGAS delivered notice to EMG requesting that EMG cure its failure to pay the January through April 2011 invoices[219]. In January 2012 EMG was able to pay USD 12 Million to EGAS, which covered the January 2011 invoice.

Termination of the GSPA

163. On 18 April 2012 EGAS formally terminated the GSPA[220], claiming a total debt of USD 55 Million[221].

164. EMG reacted by claiming that EGAS' purported termination was wrongful and that it amounted to a repudiation of the GSPA, which entitled EMG to treat the GSPA as discharged at common law. EMG did so on 9 May 2012[222].

Repudiation of the Tripartite Agreement

165. It is EMG's and IEC's common position that EGAS' repudiation of the GSPA also implied a repudiation of the Tripartite Agreement. On 6 February 2013 IEC notified EGAS of its election to accept the repudiation of the Tripartite Agreement and to treat the Tripartite Agreement as discharged under English law[223].

166. Since March 2012 EGAS has not delivered any gas to EMG (and EMG has failed to deliver to IEC) and EMG's pipeline has remained idle and seemed doomed to be scrapped.

Changes in the Middle Eastern gas market

167. In the meantime, the Middle Eastern gas market has experienced dramatic changes, which have led to a turnover in the roles of exporting and importing countries: Egypt has suffered a steep decrease in the amount of gas available for

---

[216] FTI I, Appendix 6, Gas Status Spreadsheets.
[217] Art. 5.2 of the GSPA.
[218] Art. 2.5.2 of Annex 1 to the GSPA.
[219] Doc. C-10.
[220] Doc. C-48.
[221] C FS M, para. 276.
[222] C FS M, para. 141.
[223] Doc. R₃-56.

export[224], while Israel has discovered two significant new gas reserves: the Tamar and Leviathan fields, with production capabilities well in excess of Israel domestic requirements.

168. The abundance of gas in Israel, its relative scarcity in Egypt, and the availability of a liquefaction plant in Damietta, which would permit the export of liquefied natural gas ["**LNG**"], has rekindled the interest in the EMG Pipeline. One of the alternatives discussed for the future is whether this Pipeline could be used in reverse flow, i.e. to permit export of gas from Israel to Egypt.

---

[224] $R_{1+2}$ S RF, para. 11.

# V. RELIEF SOUGHT

## 1. CLAIMANT

169. Claimant's final prayer for relief – for jurisdictional and for merits issues – is summarised in its Post-Hearing Brief as follows:

> "VI. REQUEST FOR RELIEF
>
> 178. The Claimant respectfully requests that the Tribunal:
>
> (a) With respect to objections to the Tribunal's jurisdiction and to the admissibility of the Claimant's claims:
>
> (i) DISMISS the First and Second Respondents' objections to jurisdiction and admissibility in their entirety;
>
> (ii) DECLARE that the Tribunal has jurisdiction over the Claimant's Source GSPA claims pursuant to Article 14.9 of Annex 1 to the Source GSPA and Article 9 of the Tripartite Agreement;
>
> (iii) DECLARE that the Tribunal has jurisdiction over the Claimant's Tripartite Agreement claims under Article 9 of the Tripartite Agreement; and
>
> (iv) DECLARE that the Claimant's claims under the Source GSPA and the Tripartite Agreement are admissible.
>
> (b) With respect to questions of liability:
>
> (i) DECLARE that the First and Second Respondents breached their obligations under the Source GSPA;
>
> (ii) DECLARE that the First and Second Respondents repudiated the Source GSPA, entitling the Claimant to accept that repudiation, terminate the Source GSPA, and claim full compensation under English law;
>
> (iii) DECLARE that the First and Second Respondents breached the Tripartite Agreement; and
>
> (iv) DECLARE that the First and Second Respondents repudiated the Tripartite Agreement, entitling the Claimant to accept that repudiation, terminate the Tripartite Agreement, and claim full compensation under English law;
>
> (c) ORDER the First and Second Respondents to pay to the Claimant compensation of US$1,500.4 million as the principal sum due for breaches of the Source GSPA and the Tripartite Agreement and their repudiation of the Source GSPA and the Tripartite Agreement;
>
> (d) AWARD the Claimant pre-judgment interest on all amounts payable from the relevant date of injury, as more specifically described in this pleading;

(e) DECLARE that the award of damages and interest is made net of applicable Egyptian taxes;

(f) ORDER the First and Second Respondents to indemnify the Claimant should Egypt impose tax on the Award;

(g) ORDER the First and Second Respondents to pay all of the costs and expenses of this arbitration, including the Claimant's reasonable legal and expert fees, and the expenses of the Tribunal;

(h) AWARD the Claimant post-judgement interest on all amounts payable, as more specifically described in this pleading, until the award is paid in full; and

(i) AWARD the Claimant any other relief deemed appropriate by the Tribunal.

179. To the extent the Claimant is not fully compensated for its loss, the Claimant expressly reserves the right to seek additional or modified remedies in any other current or future arbitral proceedings, including (but not limited to) indemnification for any additional losses incurred towards third parties due to the First and Second Respondents' breaches, and claims concerning the First Amendment to the Source GSPA".

## 2.   RESPONDENTS 1 AND 2

170.   In their Post-Hearing Brief, Respondents 1 and 2 request the Tribunal to:

"Request for Relief

370. In light of the foregoing, EGAS[225] respectfully reiterates its request that the Arbitral Tribunal:

1. Find and declare that it has no jurisdiction over the claims submitted by EMG or IEC in this arbitration;

2. Alternatively, to the extent the Arbitral Tribunal may find it has jurisdiction to hear any of the claims submitted in this arbitration, find and declare that such claims are inadmissible and/or premature and/or fail to state a cause of action and/or unfounded;

3. Order EMG and IEC to bear the costs of this arbitration in their entirety, including but not limited to compensation for all the arbitrators' fees and expenses, administrative costs and legal fees, and all expenses incurred by EGAS in connection with the present dispute; and

4. Grant EGAS such further relief as the Arbitral Tribunal deems fit and proper".

---

[225] In its Post-Hearing Brief Respondents 1 and 2 referred to EGPC and EGAS collectively as "EGAS"; See $R_{1+2}$ PHB, fn. 1.

3.   **RESPONDENT 3**

171. In its Second Submission on Jurisdiction Respondent 3 captures the relief sought
     in relation to the jurisdiction of this Tribunal and admissibility of the claims as
     follows:

> "Conclusion
>
> 98. By way of summary:
>
> (1) For the reasons given in IEC's First Submission, article 9 of the Tripartite
> Agreement confers jurisdiction on the Tribunal to determine the dispute that has
> arisen between EGPC/EGAS, EMG and IEC as to whether there has been
> compliance, in particular, with article 1 of the Tripartite Agreement. EGPC/EGAS
> raises no arguments of construction of article 9 to the contrary.
>
> (2) On the true construction of article 1 of the Tripartite Agreement, it amounts to a
> promise to EMG, as well as IEC. Consequently, EMG was entitled to commence
> this arbitration on the footing of a breach of article 1, enforceable by EMG, on the
> part of EGPC/EGAS. If it were necessary (which it is not), EMG had a cause of
> action under English law for breach of contract which arises out of or in connection
> with the Tripartite Agreement. At the very least, there is an arguable case to that
> effect which is more than sufficient to found the Tribunal's jurisdiction.
>
> (3) In any event, a cause of action is not a prerequisite for the commencement of an
> arbitration under article 9. The requirement is that there should be a dispute between
> the parties to the Tripartite Agreement. There plainly is a dispute about whether
> EGPC/EGAS have performed their promise to continue the supply of gas to IEC
> through fulfilment of their obligations under the GSPA, which is a dispute that arises
> out of or in connection with article 1 of the Tripartite Agreement. It is a dispute
> between all the parties to the Tripartite Agreement, i.e. EGPC/EGAS, EMG and
> IEC, regardless of whether each of those parties has a cause of action for breach of
> contract or not. The dispute was validly raised by EMG's Request for Arbitration
> and, in any event, by IEC's Counterclaim.
>
> (4) EGPC/EGAS's "condition precedent" argument on admissibility is without
> substance. There is, in particular, no need to await the outcome of bilateral
> arbitrations under the GSPA and On-Sale Agreement before a claim for breach of
> article 1 of the Tripartite Agreement can be heard by this Tribunal. The Tripartite
> Agreement contains no such precondition which would, in any event, be unworkable
> and unjust. It will be for this Tribunal to determine whether there has been
> compliance with article 1 and, if and insofar as this may require the Tribunal to have
> regard to the content of obligations created by the GSPA or On-Sale Agreement and
> to make findings about whether they have been performed, this Tribunal will be
> entitled and duty-bound to do so.
>
> 99. Accordingly, the Tribunal should hold that it has jurisdiction under article 9 of
> the Tripartite Agreement to determine the dispute raised in the Request and the
> Counterclaim and order EGPC/EGAS to bear all of the costs of and occasioned by
> the jurisdiction phase of this arbitration, including IEC's legal costs".

172. And in its Post-Hearing Brief Respondent 3 consolidates its prayer for relief in relation to liability and *quantum* as follows:

> "H        PRAYER
>
> 294. IEC seeks the following relief from the Tribunal
>
> (a) a declaration that EGAS/EGPC are in breach of Articles 1 and/or 2 of the Tripartite Agreement for the shortfalls in supply that IEC has suffered to date;
>
> (b) a declaration that IEC has lawfully terminated the Tripartite Agreement on account of the continuing and repudiatory breaches by EGAS/EGPC of the Tripartite Agreement and/or breaches of the conditions of the Tripartite Agreement;
>
> (c) an award of damages in IEC's favour in the principal amount of US$3,566,479,895 in respect of additional fuel costs, or such other sum as the Tribunal finds appropriate;
>
> (d) an award of damages in IEC's favour in the principal amount of US$39,939,320 in respect of additional maintenance and associated costs;
>
> (e) an award of damages in IEC's favour in the principal amount of US$6,845,727 in respect of additional gasoil storage costs;
>
> (f) an award of damages in IEC's favour in the principal amount of US$211,225,376 in respect of LNG vessel charter costs;
>
> (g) an award of damages in IEC's favour for penalties for the cancellation of two LNG cargos in the principal amount of US$24,350,600;
>
> (h) an award of damages in IEC's favour for ship demurrage charges in the principal amount of US$445,000;
>
> (i) an award in IEC's favour for compound interest on the principal amount of US$2,601,612,903 (being IEC's additional fuel costs for the historical period July 2008 through June 2013) in the amount of US$105,897,235;
>
> (j) an award in IEC's favour for compound interest on all other principal amounts (set out at sub-paragraphs (d) to (h) above, totalling US$282,806,023) in respect of losses already incurred as at 30 June 2013, in the amount of US$2,042,982;
>
> (k) an award in IEC's favour for compound interest on IEC's total claim from 30 June 2013 to the date of any award, accruing at a daily rate of [US]$350,038, based on Bank Prime Loan Rate published by the US Federal Reserve Bank, or such other rate or on such other basis as may be fixed by the Tribunal;
>
> (l) an award that EGAS/EGPC and/or EMG be liable in full for IEC's costs of the arbitration, including the fees and expenses of the Tribunal, the ICC's costs, IEC's legal costs and expenses;
>
> (m) an award in IEC's favour for post-award interest at 8% per annum on any amount awarded to IEC, from the date of the award until payment, or at such rate or for such period as the Tribunal deems appropriate; and/or

(n) such other or further relief (whether against EGAS/EGPC or EMG) as the Tribunal may deem appropriate".

## 4.  MODIFICATION OF THE RELIEFS SOUGHT

173. EMG has in the course of the procedure modified the declaratory relief with respect to the Tripartite Agreement. At the beginning of the arbitration, in the Terms of Reference[226], EMG requested the Tribunal to make four declarations with respect to the Tripartite Agreement:

> "1. Respondents 1 and 2 breached the Tripartite Agreement;
>
> 2. Respondents 1 and 2, and not the Claimant, are liable to Respondent 3 for any damages resulting from their failure to deliver contractual quantities of gas to the Claimant;
>
> 3. Respondents 1 and 2, and not the Claimant, are liable to Respondent 3 for any damages resulting from Respondents 1 and 2's repudiation of the GSPA; and
>
> 4. the Claimant is not liable to Respondent 3 for any damages resulting from Respondents 1 and 2's breaches of GSPA and the Tripartite Agreement".

174. The Tribunal notes that in its Post-Hearing Brief the only declaratory relief which is still being sought by Claimant is a simple declaration that Respondents 1 and 2 breached the Tripartite Agreement (see para. 178.(b.)(iii) of its Post-Hearing Brief, which is consistent with the prayers for relief sought in all previous submissions on merits). The Tribunal finds that EMG has tacitly abandoned the three additional declaratory prayers for relief (nos. 2, 3 and 4) originally formulated in the Terms of Reference.

175. IEC's prayer for relief has also undergone modifications. In the Terms of Reference IEC included a conditional claim against EMG[227]:

> "In relation to the Claimant, insofar as the Claimant may be found to have breached Art. 5 of the Tripartite Agreement prior to the termination of the GSPA and/or in such a way as to justify Respondents 1 and 2's purported termination of the GSPA or in any other way, Respondent 3 requests that the Arbitral Tribunal award Respondent 3 compensation and interest on the basis set out above".

176. In its First Submission, IEC continued to reserve its position in relation to any alleged breach of Art. 5[228]. But during the First Hearing, Mr. Ronai, one of IEC's representatives, answering a direct question from the Tribunal, stated that IEC was not bringing any claim against EMG[229]. And in its Post-Hearing Brief there is no prayer for relief directed against EMG. The Tribunal understands that IEC's

---

[226] Terms of Reference, p. 19.
[227] Terms of Reference, para. 82.(vi).
[228] R₃ FS M, para. 133.
[229] FHT, Day 4, pp. 886-887.

reservation of rights to claim against EMG has not been exercised and the Tribunal will therefore not address the issue of a possible breach of Art. 5 of the Tripartite Agreement.

# VI. GENERAL OVERVIEW

## 1. THE PARTIES' CLAIMS

### 1.1 EMG'S CLAIMS

177. EMG is the Claimant in this procedure; it is submitting claims against EGPC and EGAS based on the allegation that it breached the supply obligations under the GSPA and under the Tripartite Agreement, and then wrongfully repudiated not only the GSPA but also the Tripartite Agreement. A significant initial hurdle for EMG's claims is the jurisdiction of the Tribunal:

   - For the breaches affecting the GSPA, EMG invokes jurisdiction derived from the arbitration clause contained in Art. 14.9 of Annex 1 to the GSPA, and alternatively, from Art. 9 of the Tripartite Agreement; and

   - For the claims deriving from the Tripartite Agreement, the alleged jurisdictional basis is Art. 9 of that agreement.

### 1.2 IEC'S CLAIMS

178. IEC, Respondent 3, was called into this procedure as a respondent vis-à-vis EMG's initial request for declaratory relief (which EMG later abandoned).

179. IEC has used the present arbitration, initiated by EMG, to submit a counterclaim against the other Respondents, EGPC and EGAS, alleging that they have breached Art. 1 and/or 2 of the Tripartite Agreement for the shortfalls in supply, entitling IEC to lawfully terminate the Tripartite Agreement on account of the continuing and repudiatory breaches by EGAS of its conditions. The jurisdictional basis for this counterclaim is, again, Art. 9 of the Tripartite Agreement.

### 1.3 EGAS' DEFENCE

180. Respondents 1 and 2, which for reasons of convenience are frequently referred to simply as EGAS, in fact not only rejects having breached or having wrongfully repudiated either the GSPA or the Tripartite Agreement, but it also:

   - objects to the Tribunal's jurisdiction over EMG's claims, submitting two "**Jurisdictional Objections**" denying that the Tribunal has jurisdiction to adjudicate EMG's claims against EGAS; and

   - avers that the GSPA is void and not enforceable having been procured and executed by corruption [the "**Enforceability Objection**"].

181.  EGAS has reacted against IEC's claims submitting:

- three "**Admissibility Objections**", arguing that these claims are inadmissible and/or premature and/or fail to state a cause of action;

- and alternatively that all claims be dismissed as unfounded; mainly because delivery failures were due to *force majeure* events, and thus, excused.

## 2.  OVERVIEW OF THE AWARD

### 2.1  PRELIMINARY OBJECTIONS

182.  In the next Chapter the Tribunal will analyse the Jurisdictional and Admissibility Objections, and come to the conclusion:

- that it lacks jurisdiction under Art. 14.9 of Annex 1 of the GSPA, but that it does benefit from jurisdiction under Art. 9 of the Tripartite Agreement; and

- that EGAS' Admissibility Objections must be dismissed.

183.  Having come to the conclusion that the Tribunal has jurisdiction to settle disputes between the three Parties arising from the Tripartite Agreement, the Tribunal then will establish the scope of rights granted by the Tripartite Agreement in favour of IEC and EGAS:

- As regards the relationship between EMG and EGAS, the Tribunal will conclude that EGAS' obligation to deliver gas to EMG under the GSPA is reititerated, as a repeat obligation in Arts. 1 and 2 of the Tripartite Agreement, and any dispute relating to that obligation can be adjudicated by a tribunal formed under Art. 9 of the Tripartite Agreement (as the present Tribunal is), provided that IEC is also a party to such dispute (as required by Art. 14.10 GSPA), that an annual amount of gas not to exceed 2.2 BCM is delivered to EMG in compliance with the GSPA, for redelivery to IEC under the On-Sale Agreement.

- As regards the relationship between IEC and EGAS, the conclusion will be that Art. 1 of the Tripartite Agreement also affords IEC a freestanding enforceable right for delivery of gas vis-à-vis EGAS up to the same annual maximum quantity, for delivery under the GSPA and re-delivery under the On-Sale Agreement.

184.  EGAS also denies the enforceability of the GSPA, averring that the GSPA is void and unenforceable because it is tainted by bribery and profiteering – two crimes allegedly committed in Egypt. This is an extremely serious allegation, which the Tribunal will study in detail in Chapter VIII, reaching the conclusion that EGAS has failed to make out its contention of corruption.

## 2.2 THE MERITS

185. Having rejected the Jurisdictional, Admissibility and Enforceability Objections, the Tribunal is in a position to delve into the merits of the different disputes.

### A. *Force majeure* defence

186. Before analysing whether EGAS breached the Tripartite Agreement, as claimed by EMG and IEC, it will prove necessary to address a further preliminary defence advanced by EGAS: that even if EGAS had failed to deliver gas as it was bound to do under the Tripartite Agreement, such failure was excused by a general *force majeure* situation. President Mubarak was toppled in January 2011 by a popular uprising, Sinai's Bedouin population rebelled, Egypt's State police abandoned the area, a security vacuum resulted, and in this context of revolution, in the period between February 2011 and April 2012 the Pipeline suffered a total of 13 attacks, which significantly affected gas supply.

187. The Tribunal's analysis will centre on whether two requirements for the availability of the *force majeure* defence have been met:

- the requirement that EGAS act as a Reasonable and Prudent Piepline Operator ["**RPPO**"]; and

- the additional consequence that the attacks could have been mitigated or prevented, had EGAS acted as a RPPO [the "**Avoidance Requirement**"].

188. The Tribunal will conclude that EGAS has not proven that it acted as a RPPO in preventing and mitigating the effects of the attacks, and that there is sufficient circumstantial evidence to affirm that, had EGAS implemented the security measures which a RPPO should have adopted, the attacks on the facilities and on the Pipeline could have been prevented or at least significantly mitigated.

189. The Tribunal will then be in a position to analyse EMG's and IEC's claims, requiring in essence that the Tribunal adjudicate the same two distinct issues:

- the first is a declaration that EGAS has repudiated the Tripartite Agreement, as a consequence of its wrongful termination of the GSPA [the "**Tripartite Repudiatory Breach**"]; and

- the second that EGAS breached its delivery obligations under the Tripartite Agreement [the "**Tripartite Delivery Breaches**"].

### B. The Tripartite Repudiatory Breach

190. On 18 April 2012 EGAS decided to terminate the GSPA, the 15 year gas supply agreement between Egypt and Israel, invoking as a formal cause for termination that EMG had for four consecutive months (January – April 2011) failed to pay

the invoices due for the delivery of gas (in an amount of USD 23 Million). It is worth noting that EGAS failed to put IEC on notice of the potential termination of the GSPA.

191. EGAS contends that it properly terminated the GSPA, while EMG and IEC claim that EGAS' purported termination of the GSPA was unlawful and amounted to a repudiation of the GSPA and of the Tripartite Agreement.

192. The Tribunal will conclude that EGAS' purported termination indeed was unlawful, because EMG did not owe any amount to EGAS on account of obligations deriving from the GSPA for February 2011 – to the contrary, it was rather EGAS who owed money to EMG that month; and therefore, the conditions of four consecutive months of unpaid invoices was not met. And, in any event, the termination would also be unlawful because EGAS failed to comply with the requirements of good faith. Hence, the Tribunal will:

- accept IEC's submission (made in a letter dated 6 February 2013 addressed to EGAS) that EGAS' unlawful termination of the GSPA implied a repudiation of the Tripartite Agreement; and

- that EMG, being the innocent party, has an equal right to terminate the Tripartite Agreement at common law, on account of EGAS' repudiation of the Tripartite Agreement.

193. Since EGAS was obliged, but failed, to put IEC on notice of the potential termination of the GSPA, the Tribunal will conclude that EGAS, when it terminated the GSPA in the manner in which it did, also breached its implied obligation of good faith under the Tripartite Agreement.

## C.   **The Tripartite Delivery Breaches**

194. Under the heading of Tripartite Delivery Breaches EMG and IEC are seeking a general declaration that EGAS breached the Tripartite Agreement by failing to:

- provide a continuous supply of up to 2.2 BCM of gas annually, and more specifically 55.248 Million MMBTU in Contract Year ["**CY**"] 1 and 78.268 Million MMBTU for the following years;

- exercise "reasonable endeavours" to enable EMG to meet its delivery obligations to IEC; and

- ensure that EGAS' contractual supply arrangements did not interfere with its supply obligations under the Tripartite Agreement, by committing EMG's volumes to third parties.

195. After analysing the claims, the Tribunal will reach the following conclusions:

- On 29 May 2009 EGAS and EMG executed a First Amendment to the GSPA and a Release of Claims; under the terms of these agreements, EMG's claims that EGAS (i) incurred in delivery failures before the date of the Release and (ii) violated the representations and warranties contained in Art. 7 of the Tripartite Agreement must be deemed settled as between EGAS and EMG.

- EMG's claims for delivery failures under the Tripartite Agreement occurring after 29 May 2009 remain outstanding and the proper compensation will be established in the quantum section of the Award.

- The settlement does not affect IEC, who suffered delivery failures since the commencement of supply and whose claims for that reason are outstanding and will be properly quantified in the quantum section of the Award.

- EMG's and IEC's claim that EGAS failed to exercise reasonable endeavours to enable EMG to make available to IEC an uninterrupted supply of gas (under Art. 2 of the Tripartite Agreement) will be dismissed, except with regard to EGAS' failure to protect the Pipeline, which forms part of EGAS' general duties as a RPPO.

## 2.3   QUANTUM

196. EMG and IEC sought a compensation for the Tripartite Delivery Breaches and for the Tripartite Repudiatory Breaches in an amount of USD 2 Billion and USD 4 Billion, respectively.

### A.   EMG's compensation

197. With respect to the compensation for the Tripartite Delivery Breaches, the Tribunal will decide that the Shortfall Compensation agreed in the GSPA has the nature of liquidated damages and as such, it is the only indemnification available to EMG for the Tripartite Delivery Breaches. The Tribunal will determine that EMG obtained the Shortfall Compensation for the period comprising July 2009 through January 2011. And for the remaining period until the repudiation (which, for convenience reasons, will be deemed to occur on 30 April 2012) the total liquidated damage amounts to USD 57.357 Million.

198. Said liquidated damage is the aggregate of the amounts due, at the end of each month, for Daily and for Monthly Shortfall Compensation. These monthly liquidated damages will accrue interest at USD LIBOR for one month deposits plus a margin of 3% p.a., recalculated on a monthly basis, and compounded annually, each 31 of December, until actual payment.

199. As regards the compensation for the Tripartite Repudiatory Breach, the Tribunal will award EMG's loss of value caused by the repudiation of the Tripartite Agreement. Such loss shall be calculated as the difference in EMG's value comparing a But For and the Actual Scenarios. The Tribunal will determine that EMG's value at repudiation date (i.e. 30 April 2012) in the But For Scenario is 280,935,579 using 12% as discount rate; and its value in the Actual Scenario amounts to USD 50 Million, which is equivalent to EMG's liquidation value. The net amount is USD 230,935,579.

200. Interest shall accrue on USD 230,935,579 at USD LIBOR for one month deposits plus a margin of 3% p.a., to be recalculated at the end of each month, and to be compounded annually, each 31 of December, as of 30 April 2012 until actual payment.

**B.   IEC's compensation**

201. The Tribunal will decide that IEC's compensation for Tripartite Delivery Breaches is capped at the amount resulting for Shortfall Compensation. Since IEC has not denied that the shortfall compensation regime was complied with until the end of January 2011, IEC is not entitled to seek further damages for that period. As regards the remainder until repudiation (30 April 2012), the Tribunal will accept that the reasonable compensation due for 2011 be USD 466 Million and USD 533 Million. This compensation will, however, be capped at the amounts resulting from Shortfall Compensation, which are approximately USD 73 Million in 2011 and USD 40 Million in 2012. Said Shortfall Compensation is the aggregate of the amounts due, at the end of each month, for Hourly and for Monthly Shortfall Compensation.

202. This monthly compensation will accrue interest at USD LIBOR for one month deposits plus a margin of 3% p.a., recalculated on at the end of each month, and compounded annually, each 31 of December, until actual payment.

203. As regards the compensation due for the Tripartite Repudiatory Breach, the Tribunal will first divide the compensation into two periods: pre-Tamar and the post-Tamar compensation. The Tribunal will establish that the pre-Tamar compensation (May 2012 – March 2013) amounts to some USD 1.3 Billion; and the post-Tamar compensation (April 2013 – June 2023) to USD 15.5 Million per quarter. The present value of these amounts, at repudiation date (30 April 2012), discounted at a 9.8% rate, reaches USD 1.65 Billion.

204. Interest shall accrue on USD 1.65 Billion at USD LIBOR one month deposits plus a margin of 3% p.a., recalculated at the end of each month, and compounded annually, each 31 of December, as of 30 April 2012 until actual payment.

# VII.   JURISDICTION AND ADMISSIBILITY

205.  EMG is submitting claims against EGAS based on alleged breaches of the GSPA and of the Tripartite Agreement:

-  for breaches affecting the GSPA, EMG invokes jurisdiction derived from the arbitration clause contained in Art. 14.9 of Annex 1 to the GSPA ["**Art. 14.9**"], and alternatively, from Art. 9 of the Tripartite Agreement; and

-  for claims deriving from the Tripartite Agreement, the jurisdictional basis is simply Art. 9 of that agreement.

206.  IEC has submitted a counterclaim against the other Respondents, EGAS, alleging that EGAS has breached the Tripartite Agreement. The jurisdictional basis for this counterclaim is, again, Art. 9 of the Tripartite Agreement.

207.  EGAS, however, objects to the Tribunal's jurisdiction over Claimant's claims [the "**Jurisdictional Objections**"]. Additionally, it submits that IEC's claims are not admissible for three reasons [the "**Admissibility Objections**"]:

-  First, the claims brought under the Tripartite Agreement are premature; IEC's claims could only be admitted once a tribunal with proper jurisdiction under the GSPA had decided that EGAS had breached the GSPA and a tribunal with jurisdiction pursuant to the On-Sale Agreement had determined that EMG breached the On-Sale Agreement;

-  Second, EMG's rights are unenforceable for lack of consideration; and

-  Third, IEC's participation in this arbitration, which adjudicates breaches of the GSPA, has resulted in a violation of EGAS' due process rights.

208.  In this section the Tribunal will analyse and determine EGAS' Jurisdictional and Admissibility Objections. In order to do so, the Tribunal will first explain the dispute resolution mechanisms agreed upon in the Contracts (**1.**); it will then describe the parallel arbitration procedures which have been filed by the Parties (**2.**); it will go on to summarise the Parties' positions (**3.**); and it will then analyse and decide the Jurisdictional Objections (**4.**) and the Admissibility Objections (**5.**). The chapter will be closed with sections devoted to conclusions (**6.**) and the impact of the decisions on EMG's request for relief (**7.**).

1. **THE DISPUTE RESOLUTION MECHANISMS**

209. Claimant submits that the Tribunal's jurisdiction to adjudicate upon its claims derives from two sources: Art. 14.9 of Annex 1 of the GSPA and Art. 9 of the Tripartite Agreement. This last provision is also the basis for IEC's claims.

Tripartite Agreement

210. Art. 9 of the Tripartite Agreement reads as follows:

> "This Tripartite Agreement shall be governed by, and construed in accordance with, the Laws of England, but excluding (to the fullest extent) any rules or principles of English Law that would prevent adjudication upon (or accord presumptive validity to) the transactions of sovereign states, and without regard to such principles or requirements of conflicts of Laws that would require the application of Laws of any other jurisdiction to govern this Agreement or any matter arising hereunder. If any dispute between the Parties arising out of or in connection with this Agreement ("**Dispute**"), has not been settled within (30) Days of a Party notifying the other Party of the Dispute, then a Party wishing to arbitrate such Dispute may submit such Dispute to arbitration in accordance with and pursuant to the Rules of Arbitration of the International Chamber of Commerce ("**ICC**"). All Disputes submitted for arbitration shall be heard and resolved by a panel of three (3) arbitrators, appointed according to the ICC rules; *provided that* no member in such panel of arbitrators shall be a citizen or national of either Egypt or Israel or a citizen or national of a country which does not have diplomatic relations with either Egypt or Israel, nor will any member of such panel of arbitrators be connected and/or associated with any of the Parties and/or their legal and other advisors. The seat of arbitration shall be in Geneva, Switzerland. The arbitration proceedings shall be conducted in the English language, and all documentation submitted for the consideration of the panel shall be translated into English at the expense of the submitting Party. For the purposes of enforcement in Egypt of any decision or award rendered pursuant to this Tripartite Agreement, the Egyptian Arbitration Law No. 27 of 1994, as amended from time to time, shall apply".

GSPA

211. Art. 9.2 of the main body of the GSPA reads as follows:

> Dispute Resolution
>
> "All Disputes or disagreements arising under this Agreement and in connection hereto will be conducted in the English language and as per the applicable procedures in Articles 14 of Annex 1 [...]".

212. Art. 9.2 of the GSPA refers to the following arbitration clauses contained in Art. 14 of Annex 1 to the GSPA:

"Art. 14.2 – Disputes and Arbitration

Except as set forth in Section 14.9 and 14.11[[230]] and Paragraph 17 of Annex 4[[231]], if any dispute between the Parties arising out of or in connection with this Agreement ("**Dispute**") has not been settled within thirty (30) days of a Party notifying the other Party of the Dispute, then a Party wishing to arbitrate such Dispute may submit such Dispute to arbitration in accordance with and pursuant to the Rules of Arbitration of the Cairo Regional Centre for International Commercial Arbitration ("**CRCICA**"). All Disputes submitted for arbitration shall be heard and resolved by a panel of three (3) arbitrators, appointed according to the rules of the CRCICA; *provided that* no member of such panel of arbitrators shall be connected and/or associated with any of the Parties and/or their legal and other advisors. The seat of arbitration shall be in Cairo, Egypt. The arbitration proceedings shall be conducted in the English language, and all documentation submitted for the consideration of the panel shall be translated into English at the expense of the submitting Party. [...]"

"Art. 14.9 – Arbitration under On-Sale Agreement

Notwithstanding the foregoing provision of this Article 14, if Buyer and Seller have a Dispute under this Agreement, and if a dispute arising from or related to the same or similar factual circumstances at issue in the Parties' disagreement is subject to dispute resolution under any On-Sale Agreement, Buyer may choose to resolve the Dispute between Buyer and Seller pursuant to the dispute resolution procedures of the relevant On-Sale Agreement; provided that (a) Buyer provides Seller with notice of the dispute under the relevant On-Sale Agreement, and Buyer's election to resolve such Dispute pursuant to the dispute resolution procedures under the relevant On-Sale Agreement ("**Dispute Resolution Notice**"), on or before fifteen (15) days following initiation of the applicable dispute resolution procedure under the On-Sale Agreement; and (b) Buyer shall consult with Seller in respect of such dispute resolution procedure. If Buyer delivers such Dispute Resolution Notice and Seller gave his written consent, neither Party may seek arbitration or an Expert determination regarding such dispute under this Agreement, and the outcome of such dispute resolution under the On-Sale Agreement shall be binding on the Parties hereunder".

"Art. 14.10 – Disputes under the Tripartite Agreement

Notwithstanding the provisions of the Tripartite Agreement to the contrary, if any dispute under the Tripartite Agreement arises between EGPC and EGAS on the one hand, and EMG on the other hand, and if the Initial On-Sale Customer is not a party to such dispute, such dispute shall be resolved pursuant to the dispute resolution provisions provided for in this Article 14".

---

[230] Dispute resolution by an expert.
[231] Expert provisions.

The On-Sale Agreement

213. Art.10.2 of the On-Sale Agreement creates a separate dispute resolution system:

> "10.2 <u>Disputes and Arbitration</u>. Except as set forth in <u>Section 10.9</u>, if any dispute between the Parties arising out of or in connection with this Agreement ("**Dispute**"), has not been settled within (30) days of a Party notifying the other Party of the Dispute, then a Party wishing to arbitrate such Dispute may submit such Dispute to arbitration in accordance with and pursuant to the Rules of Arbitration of the International Chamber of Commerce ("**ICC**"). All Disputes submitted for arbitration shall be heard and resolved by a panel of three (3) arbitrators, appointed according to the ICC rules; *provided that* no member in such panel of arbitrators shall be a citizen or national of either Egypt or Israel or a citizen or national of a country which does not have diplomatic relations with either Egypt or Israel, nor will any member of such panel of arbitrators be connected and/or associated with any of the Parties and/or their legal and other advisors. The seat of arbitration shall be in Geneva, Switzerland. The arbitration proceedings shall be conducted in the English language, and all documentation submitted for the consideration of the panel shall be translated into English at the expense of the submitting Party".

## 2. THE PARALLEL ARBITRATION PROCEDURES

214. The existence of multiple Contracts with different dispute resolution systems has given rise to two other arbitrations, which are relevant to the present proceedings.

215. On 21 September 2011 (i.e. a few days before the commencement of the present arbitration) EMG filed a separate request for arbitration against IEC under the ICC Rules [the "**Other ICC Arbitration**"][232], seeking a declaration that IEC has no right to claim shortfall compensation under the On-Sale Agreement and that EMG is free to enter into, or renew, contractual arrangements with buyers other than IEC. Before IEC submitted its answer to the request for arbitration and before the tribunal was constituted, this Other ICC Arbitration was suspended by agreement of the parties[233].

216. On 6 October 2011 EMG started this arbitration against EGAS, as well as against IEC, claiming that EGAS breached the GSPA and the Tripartite Agreement and requesting damages. As regards its claims against IEC, EMG requests a declaration that under the Tripartite Agreement it is not responsible for any damages resulting from EGAS' breaches of the GSPA and the Tripartite Agreement.

217. In April 2012[234] EGAS started an arbitration against EMG under the CRCICA Rules, pursuant to Art. 14.2 of Annex 1 to the GSPA, claiming – among other – that EMG had breached the GSPA by failing to make payments, and that EGAS

---

[232] Doc. C-69.
[233] R₁₊₂ FS J, para. 42.
[234] Submitted as Doc. R₁₊₂-418, hereinafter, the **Partial Award in the Cairo Arbitration**, para. 32.

had validly terminated the GSPA, and claiming the sums due from EMG [the "**Cairo Arbitration**"].

218. The arbitral tribunal in the Cairo Arbitration was faced with the issue whether the proper jurisdiction to adjudicate a claim under the GSPA was an arbitration under Art. 14.2 or rather under Art. 14.9 (which is one of the grounds invoked for the jurisdiction of this Tribunal). That tribunal decided to bifurcate the proceedings in order to first decide on the jurisdictional issue and on 11 November 2013 it rendered a partial award confirming its jurisdiction under Art. 14.2[235].

219. The Cairo tribunal added that, although it was for this Tribunal to rule on its own jurisdiction, it was implicit in its Partial Award that this Tribunal[236]

> "would not appear to have jurisdiction under Art. 14.9 and that jurisdiction over EGAS can derive only from Art. 9 of the Tripartite Agreement".

The partial award abstained from entering into an analysis of jurisdiction under the Tripartite Agreement[237], but anticipated that it would consider the application for a stay of its proceedings on the merits on the basis that this Tribunal took jurisdiction under the Tripartite Agreement[238].

## 3. THE PARTIES' POSITIONS

220. EMG submits that this Arbitral Tribunal has jurisdiction both under the GSPA (**3.1.A**) as well as under the Tripartite Agreement (**3.2.A**). EGAS submits a Jurisdictional Objection, and objects to the Tribunal's jurisdiction under the GSPA (**3.1.B**) and under the Tripartite Agreement (**3.2.B**). EGAS also advances an Admissibility Objection in respect of IEC's claims, averring that such claims are not admissible for three separate reasons (**3.3.A**). IEC and EMG disagree with EGAS' position (**3.3.B** and **3.3.C**). Laslty EGAS avers that EMG waived its right to submit GSPA Claims before this Tribunal (**3.4**).

### 3.1 JURISDICTION UNDER ART. 14.9 OF ANNEX 1 TO THE GSPA

#### A. Claimant's position

221. Claimant concedes that Art. 14.9 is a clause whose meaning needs to be interpreted[239], but it identifies one possible interpretation (**a.**) which in its view renders a perfectly enforceable clause (**b.**). On the basis of that interpretation, it maintains that Art. 14.9 confers jurisdiction upon the Tribunal (**c.**).

---

[235] Partial Award in the Cairo Arbitration, para. 189.
[236] Paraphrasing para. 189 of the Partial Award in the Cairo Arbitration.
[237] Partial Award in the Cairo Arbitration, para. 192.
[238] Partial Award in the Cairo Arbitration, para. 190.
[239] FHT, Day 1, p. 76.

### a.  Claimant's interpretation

222. EMG acknowledges that the GSPA includes overlapping jurisdictional clauses:

   -   If there is an upstream dispute between EMG and EGAS solely under the GSPA, unrelated to any downstream customer, that dispute would be subject to the Cairo Arbitration under Art. 14.2[240].

   -   If a dispute arises between EGAS and EMG from the same or similar facts as a downstream dispute, the GSPA entitles EMG to submit the dispute to the same arbitration clause as the downstream dispute[241]. If EMG so chooses, the dispute resolution provision would apply to all volumes of gas under the GSPA, and not simply those covered by the particular downstream contract[242]. The Claimant submits that the parties' intent was that these transnational disputes about the interruption of gas could be resolved outside Egypt[243].

223. EMG acknowledges that Art. 14.9 contemplates consultation between EMG and EGAS, but submits that it is limited to discussing the possibility of representing their common interests in a downstream arbitration, in which case the outcome of that arbitration would be binding for both[244]. The Claimant sees perfect sense in the possibility that EMG and EGAS and EGPC adopt a joint position in the downstream dispute: EGPC holds a 10% of EMG's shares and thus there is a real prospect that a common interest would exist[245]. As regards the timing of EMG's proposal for consultation, Claimant suggests that it would be joined together with the Dispute Resolution Notice[246].

### b.  Validity and enforceability of Art. 14.9

224. English case law has emphasised that a contract is very rarely held to be uncertain; in order for a court to make such a determination, it has to be legally or practically impossible to give to the parties' agreement any sensible content[247]; and according to English law, an arbitration clause will be interpreted "to give effect, so far as the language used by the parties will permit, to the commercial purpose of the arbitral clause". And a court will attempt to respect the contracting

---

[240] C FS M, para. 148.
[241] C FS M, para. 150.
[242] C FS M, para. 153.
[243] C FS M, para. 70.
[244] C FS M, para. 175.
[245] C FS M, para. 178.
[246] C FS M, para. 182.
[247] C SS J, para. 98.

parties' intention by giving meaning to a clause rather than simply declaring it void for want of certainty[248].

225. In Claimant's view, its interpretation of Art. 14.9 is the correct construction since it renders a valid arbitration clause:

- It gives effect to the unambiguous terms "buyer's election" and "buyer may choose", and harmonises them with the other words of the provision[249] so as to preserve the independent and distinct function of the second sentence[250];

- It reconciles the various references within it to "dispute resolution procedures" (generally, the method of dispute resolution offered under the on-sale agreement), "dispute resolution procedure" (the procedure that the parties are to consult) and "dispute resolution" (between EMG and the on-sale customer)[251]; and

- It gives meaning to all parts of Art. 14.9 and does violence to none[252].

226. EGAS has questioned the enforceability of the arbitration agreement, as construed by the Claimant, because it would require the incorporation of an arbitration clause yet to come into existence, and has cited case law in support of its position.

227. Claimant disagrees and questions the relevance of such case law, which in fact refers to the incorporation through general terms of the entirety of another contract[253]. This case, however, is different: here a dispute resolution clause from another contract (the On-Sale Agreement) is incorporated by reference into the GSPA[254]. Furthermore, EGAS was perfectly aware of the terms of the dispute resolution provisions in the On-Sale Agreement from the outset[255].

### c.   Compliance with all requirements

228. According to the Claimant, Art. 14.9 stipulates four conditions, which are all met:

### (i)   A *bona fide* dispute

229. The interruption of gas supply is clearly a factual circumstance which has given rise to both a downstream and an upstream dispute[256]. The upstream dispute between EGAS and EMG is evident. But there is also a downstream dispute, as

---

[248] C SS J, para. 97.
[249] C SS M, para. 553.
[250] C SS J, para. 92.
[251] C SS M, para. 554.
[252] C SS M, para. 552.
[253] C SS J, para. 102.
[254] C SS J, para. 105.
[255] C SS J, para. 100.
[256] C SS M, para. 572.

shown in the declaratory relief sought by EMG against IEC and by the USD 4 Billion reserved claim submitted by IEC against EMG, if its claim against EGAS prove unsuccessful[257]. English courts recognise the existence of a genuine dispute where one party has a claim against another party who does not admit liability, even if this claim is no more than a declaratory relief[258].

(ii)  Notice

230. Art. 14.9 requires that EMG provide notice that a dispute with a specified on-sale customer has arisen and that it elects to resolve the dispute with EGAS in accordance with the dispute resolution provision of that on-sale agreement. EMG's letter of 21 September 2011 unambiguously provides for this election[259]. Furthermore, the letter refers to all the correspondence exchanged between EMG and EGAS regarding IEC's complaints[260], which date back as early as July 2010 – so EGAS were perfectly aware of IEC's allegations of delivery failure[261].

(iii)  Consultation

231. Art. 14.9 does not specify the obligations of either party with respect to consultation. In the absence of any requirements, the Claimant submits that its letter of 21 September 2011[262] is a valid consultation under English law[263], because in it EMG specifically invited EGAS to promptly discuss the dispute resolution election and a possible settlement. And it sent a second letter eight days later[264]. Yet EGAS remained silent: it did not allege that the consultation requirement was more demanding nor did it require EMG to provide further details of the dispute[265]. A week later EMG filed its Request for Arbitration[266].

232. EMG submits that the 15 days it waited for EGAS to take part in the consultation procedure, before filing its request for arbitration, is a reasonable time, especially taking into consideration Respondents 1 and 2's standing threat to terminate the GSPA and EMG's need to preserve its rights[267].

---

[257] C SS M, para. 573.
[258] C SS J, para. 75.
[259] C SS J, para. 81.
[260] C SS M, para. 571.
[261] C SS M, para. 570.
[262] Doc. C-24.
[263] C SS J, para. 84.
[264] Doc. C-18.
[265] C SS J, para. 85.
[266] C FS, para. 59.
[267] C SS J, para. 86.

(iv)   Consent

233. The first sentence of Art. 14.9 provides EMG with a unilateral right to choose to arbitrate disputes arising out of the GSPA under the dispute resolution mechanism of an on-sale agreement.

234. The second sentence, which refers to the consent, concerns a different scenario: that there is no arbitration at all under the GSPA, and EGAS agrees to be bound by the result of the arbitration between the on-sale customer and EMG, on any issue resolved in that arbitration that was also in dispute between EGAS and EMG[268]. It would involve Respondents 1 and 2 foregoing their own right to arbitration concerning those issues under the GSPA. This would, of course, require EGAS' consent[269].

## B.   **Respondents 1 and 2's position**

### a.   **Respondents 1 and 2's interpretation of Art. 14.9**

235. In Respondents 1 and 2's view, Claimant mischaracterises Art. 14.9 and its purported interpretation must be rejected (**i.**). Respondents 1 and 2 aver that the only possible way in which the mechanism contemplated in Art. 14.9 can be interpreted is as a consolidation provision[270] (**ii.**).

(i)   Art. 14.9's erroneous characterisation as a transplantation provision

236. In Respondents 1 and 2's view, EMG purports to divorce the two sentences of Art. 14.9 and to treat them as separate dispute resolution mechanisms[271]:

- the first sentence would permit EMG to impose any arbitration agreement in an on-sale agreement onto its dispute with EGAS under the GSPA;

- the second sentence should be understood as a distinct dispute resolution mechanism, by which EGAS may consent to be bound by the outcome of a dispute between EMG and an on-sale customer, without having any right to participate in the resolution of that dispute.

237. EGAS disagrees with this construction. As a general matter, to divorce the two sentences and treat them as different mechanism frustrates the meaning of that provision. The two sentences are linked as the second is explained and defined in the first[272].

---

[268] C SS J, para. 87.
[269] C SS J, para. 89.
[270] R$_{142}$ FS M, para. 119.
[271] R$_{142}$ FS M, para. 132.
[272] R$_{142}$ FS M, para. 137.

238. And the proposition that Art. 14.9 be regarded as a "transplant mechanism" crafted to adjudicate upstream and downstream disputes in a neutral forum outside Egypt[273], in a harmonised dispute resolution system, is illogical because it would achieve the contrary result[274]: there would be two arbitrations,

- one between EGAS and EMG, to which the on-sale customer is not a party;

- another between EMG and the on-sale customer, in which EGAS would not participate.

    (ii)   Art. 14.9's characterisation as a consolidation provision

239. There are two aspects of these provisions which are undisputed:

- the GSPA contemplated that a dispute concerning the performance of obligations under an on-sale agreement between EMG and one of its on-sale customers might arise out of the same or similar factual circumstances as a dispute between EMG and EGAS under the GSPA[275].

- Art. 14.9 is an exception to the mandatory dispute resolution provision of Art. 14.2[276].

240. If a related dispute arises, EMG is given the option to propose consolidation to EGAS (which is evidenced through the words "Buyer may choose"[277]), to which EGAS may consent as an exception to the general rule of Art. 14.2[278]. Thus, EMG controls the initiative over Art. 14.9[279], but EGAS' subsequent consent is mandatory.

241. This is the only interpretation which accords with economic common sense and with the plain wording of the provisions in question[280] – thus the only possible interpretation pursuant to the applicable principles of construction under English law[281]:

- Consolidation is the reason why the provision requires that the dispute "arises out of the same or similar factual circumstances"[282]. If Art. 14.9 simply provided for the removal of a dispute under the GSPA to a different forum, to be heard by a different tribunal from that constituted to decide

---

[273] R₁₄₂ FS M, para. 144.
[274] R₁₄₂ FS M, para. 145.
[275] R₁₄₂ FS M, para. 120.
[276] R₁₄₂ FS M, para. 121.
[277] R₁₄₂ FS M, para. 125.
[278] R₁₄₂ FS M, para. 127.
[279] FHT, Day 3, p. 467.
[280] R₁₄₂ FS M, para. 141.
[281] R₁₄₂ FS M, para. 139.
[282] R₁₄₂ FS M, para. 146.

downstream disputes, it would make no difference whether the disputes were related or not[283].

- Only a consolidation mechanism would require EMG to deliver a Dispute Resolution Notice containing all the relevant details of its downstream dispute[284].

- EGAS would not forego its procedural rights and entrust the defence of their interests to EMG in a proceeding in which they would not be entitled to participate[285] and where their interest would, by definition, be adverse to EMG's[286].

**b.     Art. 14.9's requirements were not met**

242.   Regardless of the interpretation of Art. 14.9, it sets out a number of requirements, which were not met in this case:

(i)     <u>EMG never provided a proper Dispute Resolution Notice</u>

243.   The letter of 21 September 2011[287] cannot constitute a proper Dispute Resolution Notice as it provides no details of the on-sale dispute. And as a matter of principle, EGAS, who has no knowledge of any disputes arising between EMG and its downstream customers, needs to be provided with sufficient detail to allow it to decide whether it wishes to consent to consolidation[288].

244.   And no information has been disclosed in this arbitration, except that EMG and IEC suspended the Other ICC Arbitration by mutual consent[289] before an answer was filed or the tribunal constituted[290]. This rather shows that EMG initiated the Other ICC Arbitration as an abuse of process for the sole purpose of creating the appearance of a dispute arising out of the On-Sale Agreement[291].

(ii)    <u>On-Sale Dispute does not stem from the same or similar circumstances</u>

245.   EMG's request for arbitration against IEC in the Other ICC Arbitration concerns a purely bilateral dispute[292]: shortfall payments allegedly owed by EMG to IEC under the On-Sale Agreement from the period 20 March 2011 – end of August

---

[283] R$_{142}$ FS M, para. 146.
[284] R$_{142}$ FS M, para. 147.
[285] R$_{142}$ FS M, para. 148.
[286] R$_{142}$ FS M, para. 149.
[287] Doc. C-24.
[288] R$_{142}$ FS M, para. 166.
[289] R$_{142}$ FS M, para. 154.
[290] R$_{142}$ FS M, para. 156.
[291] R$_{142}$ FS M, para. 155.
[292] R$_{142}$ FS M, para. 173.

2011. These matters are entirely unrelated to the claims advanced by EMG against EGAS[293].

(iii)  **EMG made no attempt to consult with EGAS**

246.  Given the scarcity of information contained in the 21 September 2011 letter[294], EGAS submits that such letter cannot be viewed as a genuine attempt to engage with them in meaningful consultation[295].

(iv)  **EGAS never consented**

247.  Art. 14.9 explicitly requires that EGAS give its written consent before EMG could rely on this provision. However, EGPC and EGAS never consented[296].

248.  And any interpretation of Art. 14.9 as not requiring consent would render that provision unenforceable both under English[297] and Swiss law[298], because it would imply that EGAS was agreeing to resolve disputes under the GSPA with EMG at EMG's sole discretion, in accordance with any as-yet non-existent and undetermined dispute resolution procedure that EMG might negotiate in the future, and with no requirement that EMG obtain any further agreement from EGAS[299].

249.  Under English law an agreement must be sufficiently definite at the time when it is concluded, so that the intention of the parties may be reasonably ascertained[300]. However, the Claimant's interpretation could result in a dispute resolution before a potentially unlimited number of *fora* and pursuant to a potentially unlimited number of rules and there would be no means to ascertain the specific terms of the dispute resolution clause[301].

250.  The same conclusion would be reached under Swiss law, which requires a clear and unambiguous expression of the parties' intention to refer disputes to arbitration[302].

---

[293] R₁₄₂ FS M, para. 172.
[294] R₁₄₂ FS M, para. 177.
[295] R₁₄₂ FS M, para. 178.
[296] R₁₄₂ FS M, para. 180.
[297] R₁₄₂ FS M, para. 186.
[298] R₁₄₂ FS M, para. 187.
[299] R₁₄₂ FS M, para. 185.
[300] R₁₄₂ SS J, para. 93.
[301] R₁₄₂ SS J, para. 94.
[302] R₁₄₂ SS J, para. 96.

## 3.2    JURISDICTION UNDER THE TRIPARTITE AGREEMENT

### A.    Claimant's position

251. Claimant submits that there is no question that this Arbitral Tribunal has jurisdiction over any dispute "arising out of or in connection with" the Tripartite Agreement[303]. If Respondents 1 and 2 challenge that the Claimant has advanced claims which comply with this requirement, or whether the Claimant has any substantial rights under the Tripartite Agreement, it is a question of the characterisation of the claims, not of the Tribunal's jurisdiction under Art. 9 of the Tripartite Agreement[304].

### a.    Comprehensive arbitration clause

252. The Tribunal has jurisdiction under Art. 9 of the Tripartite Agreement to decide whether EGAS has breached its obligations to EMG under the GSPA:

- In order to determine the extent of each party's liability under the Tripartite Agreement[305]: the adjudication of legal issues under the Tripartite Agreement and under the GSPA entails the examination of an identical factual matrix[306], because the Parties' rights and obligations under the Tripartite Agreement are intertwined with their rights and obligations under the GSPA and the On-Sale Agreement[307]. The Arbitral Tribunal will necessarily have to examine compliance with the relevant provisions of the GSPA, even if the Tribunal were to decline jurisdiction under the GSPA[308]. In this case, claims under the Tripartite Agreement would be confined to failures to supply 2.2 BCM of gas[309].

- As a related dispute arising out of or in connection with the Tripartite Agreement[310]: in English law the phrase 'arising out of or in connection with' provides for jurisdiction not only over claims for breach of the agreement containing an arbitration clause, but also over claims for breach of a related agreement[311]. But even if a narrower interpretation were adopted, the conclusion would be the same because the Tripartite

---

[303] C SS J, para. 9.
[304] C SS J, para. 9.
[305] C FS M, para. 170.
[306] C SS J, para. 27.
[307] C SS J, para. 28.
[308] C SS J, para. 15.
[309] FHT, Day 1, p. 38.
[310] C FS M, para. 171.
[311] C FS M, para. 577.

Agreement is an integral part of the GSPA and hence disputes relating to the latter are disputes arising out of the former[312].

**b.   Diversity of arbitration clauses**

253.  The Claimant acknowledges that its proposition that claims for breach of the GSPA be resolved under the arbitration clause contained in the Tripartite Agreement may contrast with the fact that the GSPA includes its own dispute resolution mechanisms.

254.  This notwithstanding, under English law it is entirely possible for a dispute under one contract to be decided in accordance with the jurisdictional provision of another contract[313]. That is the position here because:

-   Arts. 14.2 and 14.9 of the GSPA and Art. 9 of the Tripartite Agreement are phrased permissively ('a party may submit'), so as to not render the particular arbitral regime chosen in each clause exclusive of any other arbitral regime. The Parties were conscious that the rights and obligations in the Tripartite Agreement overlapped with those of the GSPA and the On-Sale Agreement and they used overlapping dispute resolution clauses to match[314]. The same arbitration clauses, however, use the expression 'shall' in respect of other points that apply if that particular form of arbitration is chosen[315].

-   Art. 14.10 GSPA proves that disputes from a related agreement (the Tripartite Agreement) would be arbitrable under Art. 14.2[316].

-   The Tripartite Agreement is part of the GSPA[317], which implies that disputes do not arise from a related agreement, but from the same[318].

-   Art. 14.2 is a provision which provides a tribunal in Cairo with jurisdiction over claims "arising out of or in connection with" the GSPA; thus, the Cairo Arbitration could extend to disputes under other agreements, such as the Tripartite Agreement[319]. Respondents 1 and 2 and the Claimant could submit their disputes for arbitration under the arbitration clause in either of those two agreements[320]. Because this Arbitral Tribunal was seized prior to

---

[312] C SS M, para. 586.
[313] C FS M, para. 172.
[314] C SS M, para. 580.
[315] C PHB, para. 159.
[316] C SS M, para. 582.
[317] C SS M, para. 583.
[318] C SS M, para. 584.
[319] C SS J, para. 30.
[320] C SS J, para. 31.

the Cairo tribunal, the present arbitration takes priority and should proceed[321].

### c.   EMG has rights under the Tripartite Agreement

255.   EMG is of the firm view that Art. 1 of the Tripartite Agreement confers rights on EMG. This provision establishes that EGAS will fulfil its contractual obligations "to EMG". The fact that these obligations had their origin in the GSPA does not detract from the fact that they were incorporated into the Tripartite Agreement as obligations to EMG[322]. And the Claimant enjoys more rights under the Tripartite Agreement in addition to Art. 1[323].

256.   The above conclusion is further confirmed by Art. 14.10 of Annex 1 to the GSPA, which states that "if any dispute under the Tripartite Agreement arises between EGPC and EGAS on the one hand and EMG on the other hand […]"[324] – this is a clear indicator that EMG has rights under the Tripartite Agreement.

257.   EMG has substantive rights to obtain gas, both under the GSPA as well as under the Tripartite Agreement. This repetition of rights makes perfect commercial sense, since one of the aims of the Tripartite Agreement is to provide additional security to EMG, by harmonising the upstream and downstream liability schemes flowing from breaches of the GSPA[325].

258.   This renewed undertaking to perform a pre-existing duty constitutes valuable consideration pursuant to contemporaneous case law[326], because it confers a practical benefit[327]. In this case, there is such benefit, because the Tripartite Agreement:

-   Is essential to the existence of the On-Sale Agreement; as confirmed by Art. 2.5.6 of the On-Sale Agreement, which provides that in case of termination of the Tripartite Agreement, IEC is entitled to also terminate the On-Sale Agreement[328];

-   Offers EMG an international neutral arbitration forum[329];

---

[321] C SS J, para. 34.
[322] C SS J, para. 42.
[323] C SS J, paras. 46 – 54.
[324] C SS J, para. 44.
[325] C SS J, para. 43.
[326] C SS J, para. 58.
[327] FHT, Day 1, p. 49.
[328] FHT, Day 1, p. 50.
[329] FHT, Day 1, p. 50.

- Allows EMG to sue EGAS directly for the consequences of EGAS' breaches of its supply obligations, instead of being caught in the middle, facing IEC's claim first and, later on, seeking to recoup from EGAS[330].

259. The existence of consideration is further confirmed by the very wording of the Tripartite Agreement, which includes the following recital "[…] and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged […]"[331]. Even Respondents 1 and 2's expert accepts this conclusion[332].

### d.    Third party beneficiary

260. EMG submits a subsidiary argument: even if the Tribunal decides that the promise undertaken by EGAS under Art. 1 of the Tripartite Agreement was to IEC only and not to EMG, EMG would nonetheless be in a position akin to that of a third-party beneficiary and still may claim damages against EGAS for breach of EGAS' obligations to IEC[333].

### B.    Respondents 1 and 2' s position

261. EGAS' starting point is that EMG's claims against it arise solely out of the GSPA (**a.**), that the Tripartite Agreement creates no rights in favour of EMG (**b.**) and that the Tripartite Agreement and the GSPA are not the same contract (**c.**). It then follows that EMG's claims cannot be subject to the dispute resolution mechanism included in the Tripartite Agreement (**d.**). EGAS relies in support of its position on the opinion of Ms. Geraldine Andrews (**e.**).

### a.    EMG's claims arise solely out of the GSPA

262. EMG has tried in vain to label certain of its allegations against EGAS as breaches of the Tripartite Agreement[334]. But, according to EGAS it is clear that EMG's claims arise exclusively out of the GSPA, as they basically relate to the supply of natural gas by Respondents 1 and 2 to the Claimant[335], to the quality of gas, shortfall compensations, and the termination of the GSPA[336].

263. This is further confirmed by the expert valuation on damages, which is quantified at USD 1.680 Million for the alleged breach of obligations arising under the

---

[330] FHT, Day 1, p. 51.
[331] C SS J, para. 59.
[332] Andrews, para. 50.
[333] FHT, Day 1, p. 43.
[334] $R_{142}$ FS M, para. 65.
[335] $R_{142}$ SS J, para. 59, with reference to para. 34 of the Terms of Reference.
[336] $R_{142}$ FS M, para. 62.

GSPA, and subsumes any losses that EMG could incur under the Tripartite Agreement[337].

264. Furthermore, in none of the multiple notices of dispute that EMG addressed to EGAS during the period from June through August 2011, did EMG ever allege that the Tripartite Agreement had been breached – it only referred to breaches of the GSPA[338].

**b.     The Tripartite Agreement creates no rights in favour of EMG**

(i)     Literal meaning

265. English law mandates that contractual language be construed according to its natural and ordinary meaning[339]. And the plain language of Art. 1 of the Tripartite Agreement makes clear that the assurance by EGAS was given "to IEC"[340], whilst all aspects of the supply and purchase of gas between EGAS and EMG would be governed by the GSPA[341]. Nothing in the Tripartite Agreement can be interpreted as attributing enforceable rights to EMG.

(ii)     Economic sense

266. As a matter of economic common sense, the Parties would not have agreed that EMG should have enforceable rights against Respondents 1 and 2 under the Tripartite Agreement, because the commercial purpose of that agreement was to grant an assurance to IEC that EGAS would supply gas through its intermediary, EMG[342]. Thus, Art. 1 of the Tripartite Agreement is framed as an assurance solely addressed to IEC[343].

267. EMG had no interest in obtaining a direct promise from EGAS for the supply of gas; the GSPA was signed before the Tripartite Agreement[344] and the GSPA already contained a binding promise between those two parties[345]. The only reason why EMG was made a party to the Tripartite Agreement was in light of its obligation under Art. 5 to take actions as reasonably requested by EGAS for the performance of the Tripartite Agreement[346].

---

[337] R$_{142}$ FS M, paras. 69 and 70.
[338] R$_{142}$ FS M, para. 72.
[339] R$_{142}$ FS M, para. 88.
[340] R$_{142}$ FS M, para. 90.
[341] R$_{142}$ FS M, para. 92.
[342] R$_{142}$ FS M, para. 79.
[343] R$_{142}$ SS J, para. 51.
[344] R$_{142}$ FS M, para. 82.
[345] R$_{142}$ SS J, para. 55.
[346] R$_{142}$ FS M, para. 99.

(iii)  <u>Factual matrix</u>

268. None of the provisions contained in the GSPA indicate that EMG had any substantive rights under the Tripartite Agreement. In fact, Art. 14.10 of Annex 1 to the GSPA only provides that if a dispute arises between EMG and EGAS – and such dispute could only concern Art. 5 of the Tripartite Agreement – it would, as a general rule, be submitted to arbitration under the Cairo Arbitration[347]. EMG cannot purport to interpret rights under the Tripartite Agreement by reference to Art. 14.10 of Annex 1 to the GSPA[348].

269. The only way in which the Tripartite Agreement could include a promise in EMG's favour, would be if the Tripartite Agreement superseded the GSPA, something which is not possible pursuant to Art. 12 of the Tripartite Agreement[349].

(iv)  <u>Enforceability and admissibility</u>

270. And, even if EMG had obtained a promise under the Tripartite Agreement, such right would be unenforceable, because under English law a promise by EGAS to perform an existing obligation under the GSPA would not constitute consideration – which is a fundamental requirement of all contracts under English law[350]. It is important to note that EMG did not obtain an additional practical benefit by entering into the Tripartite Agreement[351].

271. Last, even if is assumed *arguendo* that EMG had obtained an enforceable right, then EMG would still lack a cause of action, because it has not alleged, let alone shown, that EGAS' alleged failure to satisfy its obligation to EMG led EMG to breach its own obligations to IEC under the On-Sale Agreement[352].

**c.  Two contracts**

272. EGAS submits that it is untenable that the GSPA and the Tripartite Agreement constitute a single contract containing two non-exclusive arbitration agreements[353]; the GSPA and the Tripartite are clearly two distinct contracts:

-  <u>different subjects</u>: the GSPA is a contract for the sale of gas, whilst the Tripartite Agreement is an assurance that EGAS will perform the GSPA[354];

---

[347] R$_{142}$ FS M, para. 100.
[348] R$_{142}$ FS M, para. 101.
[349] R$_{142}$ FS M, para. 102.
[350] R$_{142}$ FS M, para. 104.
[351] R$_{142}$ FS M, para. 109.
[352] R$_{142}$ PHB, para. 82.
[353] R$_{142}$ PHB, para. 3.
[354] R$_{142}$ PHB, para. 49.

- <u>different parties</u>: IEC is not a party to the GSPA[355];

- <u>different dates</u>: when the GSPA was concluded there was no Tripartite Agreement[356]; and

- <u>different terms</u>: the GSPA is an elaborate contract, with detailed provisions, while the Tripartite Agreement is a guarantee spanning a mere 14 pages (including annex) and only includes obligations of a general character[357].

273. Moreover, the very wording of Art. 12 of the Tripartite Agreement refers to the GSPA as a separate contract and makes clear that the Tripartite Agreement cannot amend or modify any of the provisions of the GSPA[358]. This is further confirmed by Art. 14.10 of Annex 1 to the GSPA – another coordination provision, which exists because the GSPA and the Tripartite Agreement are separate contracts[359].

**d.    GSPA Claims not subject to a Tripartite Agreement arbitration**

274. The Tripartite Agreement does not incorporate the terms of the GSPA[360] and thus, any delivery obligation owed by EGAS to EMG under the GSPA would not be simultaneously owed to IEC under the Tripartite Agreement[361].

275. The only possible way in which claims under the GSPA could be subject to the Tripartite Agreement's arbitration clause would be to construe the wording "arising out of or in connection with" widely. However, English[362] and Swiss[363] law do not construe such wording as authorising the extension of jurisdiction under an arbitration clause contained in one contract, to disputes arising under a different contract, which contains conflicting provisions for the resolution of disputes. And international arbitral practice confirms that it is impermissible to hear claims which arise from different contracts, with different parties, together in a single proceeding, even where the arbitration clauses contained in those agreements were otherwise identical[364].

276. It is EGAS' submission that the parties chose to include incompatible dispute resolution clauses in different contracts because their intention was that such disputes were resolved before different *fora*[365]. Therefore, an arbitral tribunal

---

[355] R₁₄₂ PHB, para. 52.
[356] R₁₄₂ PHB, para. 52.
[357] R₁₄₂ PHB, para. 52.
[358] R₁₄₂ PHB, para. 56.
[359] R₁₄₂ PHB, para. 57.
[360] R₁₄₂ SS J, para. 65.
[361] R₁₄₂ SS J, para. 63.
[362] R₁₄₂ SS J, para. 38.
[363] R₁₄₂ SS J, para. 40.
[364] R₁₄₂ FS M, para. 219.
[365] R₁₄₂ FS M, para. 221.

constituted pursuant to Art. 9 of the Tripartite Agreement cannot hear claims arising under the GSPA[366].

277. Pursuant to the dispute resolution provision contained in Art. 9.2 of the GSPA, claims for breaches of the GSPA have to be resolved under the applicable procedures in Art. 14 of Annex 1[367].

### e.    Opinion of Ms. Geraldine Andrews

278. EGAS instructed Ms. Geraldine Andrews Q.C., then a barrister specialised in Commercial Law and author of the leading textbook on guarantees[368], to produce a legal opinion[369] on two questions: (**i**) the characterisation of the Tripartite Agreement and (**ii**) the scope of rights awarded in the Tripartite Agreement.

279. Ms. Andrews' main conclusions are:

(i)    <u>The Tripartite Agreement is not a guarantee</u>

280. Ms. Andrews acknowledges that in Art. 1 of the Tripartite Agreement EGAS "guarantees" the supply of gas; however the use of that word can mean very different things, depending on the context (a warranty, representation, assurance, promise, etc.)[370].

281. In her opinion, Art. 1 includes a promise made by EGAS to IEC to enable EMG to satisfy its obligation to IEC under the On-Sale Agreement[371], but it is neither a guarantee in the technical sense[372], nor an indemnity; and it affords IEC less protection than a contract of suretyship would have done[373].

> [The Tribunal notes that the parties have not contested Ms. Andrews' characterisation of the Tripartite Agreement and that none of them claims that the Tripartite Agreement is a guarantee under English law[374].]

---

[366] R$_{1+2}$ FS M, para. 222.
[367] SHT, Day 2, p. 2678.
[368] "The Law of Guarantees", last edition is the 6th, published by Sweet & Maxwell on January 1, 2012.
[369] Doc. RL$_{1+2}$-30.
[370] Andrews, para. 21.
[371] Andrews, para. 38.
[372] Andrews, para. 18.
[373] Andrews, para. 39.
[374] FHT, Day 1, p. 42.

(ii)    Art. 1 contains a promise made to IEC alone

282. Before giving her opinion on the correct interpretation of the scope of rights conferred under Art. 1 of the Tripartite Agreement, Ms. Andrews sets out the basic principles of construction of a contract governed by English Law[375]:

-    the literal interpretation prevails;

-    except if it produces an uncommercial result, which would be against the parties' intent;

-    in determining the parties' intent the background of the making of the contract – the factual matrix – is often of crucial importance.

283. Ms. Andrews then goes on to apply these principles of construction and reaches the conclusion that IEC is the sole beneficiary of the promise made by EGAS in Art. 1:

-    the language of the provision is clear in addressing the "guarantee" to IEC[376];

-    from a commercial point of view, only IEC had an interest in obtaining a direct promise from EGAS that it would supply the gas to EMG[377] and a direct right of recourse against EGAS in the event that it breached its obligation of supply under the GSPA; without the Tripartite Agreement, IEC would only be able to make a claim against EMG under the On-Sale Agreement[378].

-    the context in which the Tripartite Agreement was made can be derived from the Recitals, which do not mention EMG but only IEC[379]; and the GSPA also makes it clear in Art. 13.6 that no person who is not a party to the GSPA has any rights under the GSPA – IEC required thus a separate, direct contractual promise made by EGAS that it would fulfil the GSPA[380].

284. Her legal opinion then elaborates on why it would make no sense that Art. 1 awarded substantial rights to EMG: EGAS would not enter into another agreement to promise to EMG that it will perform its existing contractual obligations under the GSPA, because EMG is already in a position to enforce EGAS' contractual obligations[381]. There is no commercial logic in parties entering

---

[375] Andrews, para. 40.
[376] Andrews, para. 45.
[377] Andrews, para. 47.
[378] Andrews, para. 51.
[379] Andrews, paras. 46 and 47.
[380] Andrews, para. 46.
[381] Andrews, para. 49.

simultaneous agreements containing identical obligations, but with entirely separate dispute resolution procedures[382].

(iii)  IEC could not make a direct claim against EGAS under Art. 1

285. Ms. Andrews opines that, before commencing an arbitration against EGAS for failure to supply gas, IEC would have to prove first that EGAS was in breach of its obligations to EMG under the GSPA and that that breach had caused EMG, in turn, to be in breach of its supply obligations under the On-Sale Agreement[383].

## 3.3  ADMISSIBILITY OF CLAIMS UNDER THE TRIPARTITE AGREEMENT

### A.  Respondents 1 and 2's position

### a.  No enforceable rights

286. The first question which EGAS raise is that the Tripartite Agreement does not create enforceable rights regarding the interruption of supply; it is limited to an assurance addressed by EGAS to IEC for the commencement and continuation of supply of gas through fulfilling its obligations to EMG under the GSPA[384].

287. Had the Parties intended that IEC could enforce EGAS' supply obligations under the Tripartite Agreement, they would have used appropriate language. However, Art. 12 of the Tripartite Agreement expressly provides that it does not supersede the GSPA or the On-Sale Agreement[385]:

> "This Tripartite Agreement, including the attached Annexes, is intended as the final, complete, and exclusive statement of the terms of the final agreement between the Parties with respect to the subject matter hereof and supersedes in its entirety any and all prior agreements, contracts and representations, written and oral, pertaining to such matters, other than with respect to the Source Contract and the GSPA. The Parties agree that under no circumstances will the provisions of this Tripartite Agreement be construed as amending or modifying the provisions of the GSPA or the Source Contract".

### b.  Breach of fundamental rights

288. Respondents 1 and 2 say that allowing IEC to enforce EGAS' delivery obligations under the GSPA, a contract to which IEC is not a party, would contravene the fundamental principle of privity of contract, established under Art. 13.6 of the

---

[382] Andrews, para. 52.
[383] Andrews, para. 56.
[384] R$_{1+2}$ FS M, para. 590.
[385] R$_{1+2}$ FS M, para. 592.

GSPA[386]. That principle would also be breached if GSPA and Tripartite Agreement claims were heard in the same proceeding[387].

289. Furthermore, the principle of privacy of the arbitral process would also be breached, because it is a widely accepted principle of international arbitration law, and especially of English law[388], that arbitral proceedings are to be held in private, and that entities which are not party to the contract on which the tribunal has based its jurisdiction, are not to be admitted[389]. As a consequence, EGAS' due process right to be heard without intervention of a third party such as IEC, who has made submissions with respect to a contract to which it is no party[390] – the GSPA – were violated[391].

### c.    Prematurity

290. Any claim that IEC could bring against EGAS for a breach of its agreement to make available gas to EMG, to enable it to satisfy its obligations of delivery to IEC, is preconditioned on three prior findings[392], to be made by the respective tribunals having jurisdiction over each of the agreements[393]:

- EGAS has not fulfilled its obligations to EMG under the GSPA;

- EMG has not fulfilled its obligations to IEC under the On-Sale Agreement;

- and EMG's breach of the On-Sale Agreement was caused by EGAS' breach of the GSPA.

291. Until the Cairo Arbitration and the Other ICC arbitration have reached a decision, IEC's Tripartite Agreement claims are and remain premature and, therefore, inadmissible in this arbitration[394].

### d.    No breach of the Tripartite Agreement

292. In any event, Respondents 1 and 2 submit that they did not breach the Tripartite Agreement:

- The proper remedy for any shortfalls is to claim Shortfall Compensation under the On-Sale Agreement[395].

---

[386] R$_{142}$ FS M, para. 593.
[387] R$_{142}$ FS M, para. 597.
[388] R$_{142}$ FS M, para. 599.
[389] R$_{142}$ FS M, para. 598.
[390] R$_{142}$ FS M, paras. 612 and 613.
[391] R$_{142}$ FS M, para. 609.
[392] R$_{142}$ FS M, para. 617.
[393] R$_{142}$ FS M, para. 618.
[394] R$_{142}$ FS M, para. 625.

- All claims relating to the first contract year of the On-Sale Agreement were settled in the Release of Claims[396].

- EGAS did not breach the Tripartite Agreement between June 2009 and the beginning of the *force majeure* periods because EMG obtained the shortfall compensation due under the GSPA, a remedy in the nature of liquidated damages which was the only available claim in cases of delivery failures[397]; and no breach of the On-Sale Agreement by EMG has been established[398].

- EGAS did not breach the Tripartite Agreement from the beginning of the *force majeure* period until the termination of the GSPA, because the obligations to deliver gas were suspended during that period[399], and EMG consistently notified IEC of the *force majeure* circumstances and relied thereon to excuse supply shortfalls under the On-Sale Agreement[400].

- There can be no breach by EGAS of the Tripartite Agreement after the lawful termination of the GSPA on 18 April 2012, when there is no GSPA to comply with[401].

## B.   **Respondent 3's position**

### a.   **Enforceable rights**

293. IEC agrees that the Tripartite Agreement is not a contract of suretyship, which would only provide IEC with means of recourse against Respondents 1 and 2 in respect of EMG's default[402]. And, although Art. 1 of the Tripartite Agreement uses the word "guarantee", it does not fall within the narrow, technical English law definition of a guarantee – a secondary obligation to see that the principal performs its contractual obligations – but represents a promise on part of Respondents 1 and 2 to secure the continued supply of gas to IEC via EMG[403]; thus entitling a primary liability[404].

294. In conclusion, Arts. 1 and 2 of the Tripartite Agreement create direct obligations for EGAS, enforceable by IEC, consisting of a commitment that EGAS will fulfill its obligations to EMG arising under the GSPA[405].

---

[395] R₁₊₂ SS M, para. 886.
[396] R₁₊₂ SS M, para. 884.
[397] R₁₊₂ SS M, para. 889.
[398] R₁₊₂ SS M, para. 891.
[399] R₁₊₂ SS M, para. 898.
[400] R₁₊₂ SS M, para. 899.
[401] R₁₊₂ SS M, para. 904.
[402] R₃ SS J, para. 19.
[403] R₃ SS, para. 9.
[404] R₃ SS J, para. 11.
[405] R₃ PHB, para. 166.

### b. Mature claim

295. All three Parties entered into the Tripartite Agreement in full knowledge that it was going to be part of a wider contractual scheme involving upstream and downstream contracts. The Parties, however, did not provide for any form of hierarchy of agreements in the dispute resolution clause of the Tripartite Agreement[406].

296. IEC submits that it is simply wrong to suggest that it should wait, before bringing its claim against EGAS to:

   - A decision in a Cairo Arbitration between EMG and EGAS under the GSPA, in which the latter is held liable for breach of their supply obligations: IEC is not a party to such an arbitration and cannot be bound by any determination in such Egyptian arbitration[407]; and IEC cannot compel EMG or EGAS to bring any claim under the GSPA; it therefore follows that if either of them decided not to start an arbitration, IEC would be left unable to pursue its rights under the Tripartite Agreement[408]. IEC notes that EGAS suggests that IEC be bound by an arbitration to which it is a stranger, yet they argue at the same time that confidence and other basic procedural rights must be breached in order for IEC to be able to bring any claim under the Tripartite Agreement[409].

   - A decision in an arbitration between IEC and EMG under the On-Sale Agreement in which the latter is held liable for non-supply: that Tribunal is not and cannot determine any claims under the Tripartite Agreement; nor would EGAS be bound by or privy to the findings in that arbitration; hence there is no possible reason for this Tribunal to await the findings of that arbitration[410]. Moreover, Art. 1 of the Tripartite Agreement creates an obligation for EGAS to put EMG in a position which permits it to perform its obligations under the On-Sale Agreement. The question is whether EGAS has or has not put EMG in such a position[411] and, thus, the issue whether EMG did or did not perform, or was or was not excused from performing, has no impact[412].

### c. Valid claim

297. The only requisite established in Art. 9 of the Tripartite Agreement for an arbitration to proceed is that a "dispute between the Parties [...]" exists, which is

---

[406] R₃ PHB, para. 162.
[407] R₃ PHB, para. 163.
[408] R₃ PHB, para. 167.
[409] R₃ PHB, para. 168.
[410] R₃ PHB, para. 165.
[411] R₃ SS J, para. 58.
[412] R₃ SS J, para. 60.

clearly satisfied here[413]. This is so even if IEC were the only entity with legal standing to claim the breach of Art. 1 of the Tripartite Agreement[414].

298. It then follows that the Counterclaim against Respondents 1 and 2 is well founded: Respondents 1 and 2 have failed to supply gas to EMG to enable it to perform its obligation under the On-Sale Agreement, the failure to deliver under the On-Sale Agreement is clear[415], and thus, EGAS has breached its direct contractual promise and created a dispute[416].

## C.   **Claimant's position**

299. Claimant takes issue with EGAS' averment that IEC's participation in these proceedings would breach fundamental procedural principles.

300. EMG submits that the privacy standard applicable in this arbitration is not English law, but the ICC Rules, which only prevent "persons not involved in the proceedings" from participating in them (Art. 21(3)). This is not the case here, since IEC is a named party to this arbitration[417]: EGAS agreed to arbitrate with IEC "disputes arising out of or in connection with" the Tripartite Agreement[418], which in turn, concern the rights and obligations under the GSPA[419].

301. EGAS' due process worries are likewise unfounded, since it has always received an equal opportunity to respond in this arbitration; and IEC's direct interest in the interpretation and application of the GSPA derives from its status under the Tripartite Agreement, whose rights are informed by the rights and obligations under the GSPA[420].

## 3.4   ALLEGED WAIVER OF GSPA CLAIMS

302. On 17 June 2015 Respondents 1 and 2 drew the Tribunal's attention to the fact that Claimant has submitted identical claims in this arbitration and in the Cairo Arbitration, and that this amounted to a waiver by EMG of its damages claims in this arbitration. For this reason it requested the Tribunal to establish a briefing schedule to address this issue[421].

303. Claimant denied that overlapping claims would imply a waiver of its damages claim in this arbitration. EMG's position has always been that this Tribunal has

---

[413] R₃ SS J, para. 39.
[414] R₃ SS J, para. 40.
[415] FHT, Day 2, p. 421.
[416] R₃ SS J, para. 13.
[417] C SS J, para. 109.
[418] C SS J, para. 110.
[419] C SS J, para. 111.
[420] C SS J, para. 116.
[421] Com. R1+2-104 of 17 June 2015.

jurisdiction over GSPA claims and Tripartite Agreement claims; and that it was only as a consequence of EGAS' referral of their dispute to the Cairo arbitration, that EMG had to reiterate its GSPA claims before that tribunal. In any case, EMG assured that it was not seeking double recovery, as the impact of this Tribunal's decision on EMG's GSPA claims will be taken into account by the Cairo tribunal[422].

304. After reviewing the Parties' positions in this regard, the Tribunal decided that it had been sufficiently briefed, and that no further procedural steps would be required[423]. The decision on this question will be adopted in para. 473 *infra*.

## 4.   THE TRIBUNAL'S DECISION ON THE JURISDICTIONAL OBJECTION

305. The Tribunal must now decide on EGAS' Jurisdictional Objection. In order to improve the clarity of the decision, the Tribunal will depart from the structure followed when explaining the Parties' positions. The Tribunal will divide its decision into two distinct sections:

- Jurisdictional Objection with respect to claims for breaches[424] and repudiation[425] of the GSPA ["**GSPA Claims**"] (**4.1**): the Tribunal will conclude that it lacks jurisdiction over these Claims, both under Art. 14.9 of Annex 1 to the GSPA (**A.**), and under Art. 9 of the Tripartite Agreement (**B.**).

- Jurisdictional Objection with respect to claims for breaches[426] and repudiation[427] of the Tripartite Agreement ["**Tripartite Agreement Claims**"] (**4.2**): the Tribunal will come to the conclusion that under Art. 9 of the Tripartite Agreement it has jurisdiction to adjudicate these claims. Having assumed jurisdiction, the Tribunal will be confronted with EGAS' argument that the Tripartite Agreement does not grant EMG any substantive rights. Although EGAS' objection, by nature, is a question of merit and not an issue which affects the Tribunal's jurisdiction, for reasons of efficiency the Tribunal will address the objection in the same section.

## 4.1   JURISDICTION FOR GSPA CLAIMS

306. EMG invokes two contractual sources affording the Tribunal jurisdiction over GSPA Claims: the first source is Art. 14.9 of Annex 1 to the GSPA (**A.**), the second Art. 9 of the Tripartite Agreement (**B.**).

---

[422] Com. C-95 of 12 August 2015.
[423] A-76.
[424] C PHB, para. 178(b)(i).
[425] C PHB, para. 178(b)(ii).
[426] C PHB, para. 178(b)(iii).
[427] C PHB, para. 178(b)(iv).

## A.   Jurisdiction under Art. 14.9 of Annex 1 to the GSPA

307. Art. 14.9 of Annex 1 to the GSPA[428] is the first of the two alternative sources of jurisdiction invoked by EMG to plead its claims against EGAS for breach of the GSPA. Art. 14.9 is a rather unfortunate piece of drafting. Even EMG concedes that its plain terms are difficult to comprehend[429].

308. Claimant and Respondents 1 and 2 have involved themselves in a lengthy debate about the proper construction of such provision: EMG submits that it is a valid arbitration clause, whilst EGAS maintains that it is a mechanism to facilitate the consolidation of proceedings.

309. After an exhaustive analysis of Art. 14.9 the Arbitral Tribunal concludes that there is no satisfactory reading of the provision. There are two alternative constructions, which lead to contradictory results, and there are arguments supporting one interpretation, and others leading to the opposite conclusion. In such a situation the Tribunal, overcoming the drafting infelicities, must choose one construction over the other, by pondering the various elements and reasonings which favour each interpretation.

### a.   The constructions proposed by EMG and EGAS

310. The Tribunal has summarised the two interpretations submitted by EMG and EGAS in the following table:

| EMG's proposition | Art. 14.9 | EGAS' proposition |
|---|---|---|
| If a downstream dispute exists, which arises out of the same or similar circumstances as an upstream Dispute | Notwithstanding the foregoing provisions of this Article 14, if Buyer and Seller have a Dispute under this Agreement, and if a dispute arising from or related to the same or similar factual circumstances at issue in the Parties' disagreement is subject to dispute resolution under any On-Sale Agreement, | If a downstream dispute exists, which arises out of the same or similar circumstances as an upstream Dispute |
| Buyer may choose to submit the upstream Dispute to the arbitration clause of the relevant On-Sale Agreement | Buyer may choose to resolve the Dispute between Buyer and Seller pursuant to the dispute resolution procedures of the relevant On-Sale Agreement | Buyer may offer Seller the possibility to submit the upstream Dispute to the arbitration clause of the relevant On-Sale Agreement |
| by | Provided that: | by |

---

[428] The text of which has been copied in para. 212 *supra*.
[429] FHT, Day 1, p. 76.

| | | |
|---|---|---|
| Providing Seller with a Dispute Resolution Notice on or before 15 days following the commencement of the downstream arbitration. | (a) Buyer provides Seller with notice of the dispute under the relevant On-Sale Agreement, and Buyer's election to resolve such Dispute pursuant to the dispute resolution procedures under the relevant On-Sale Agreement ("**Dispute Resolution Notice**"), on or before fifteen (15) days following initiation of the applicable dispute resolution procedure under the On-Sale Agreement; and | (a) Providing Seller with a Dispute Resolution Notice on or before 15 days following the commencement of the downstream arbitration; and |
| Buyer shall consult with Seller with respect to the downstream arbitration and the possibility to align their positions in such arbitration. | (b) Buyer shall consult with Seller with respect of such dispute resolution procedure. | (b) Consulting with Seller with respect of such arbitration clause. |
| And if Buyer gives his written consent, | If Buyer delivers such Dispute Resolution Notice and Seller gave his written consent, | If Seller accepts such offer, |
| neither Buyer nor Seller may arbitrate their upstream dispute under Art. 14.9 or 14.2 | neither Party may seek arbitration or an Expert determination regarding such dispute under this Agreement, | neither Buyer nor Seller may arbitrate their upstream Dispute under Art. 14.2, |
| and the outcome of such downstream arbitration shall be binding on Buyer and Seller | and the outcome of such dispute resolution under the On-Sale Agreement shall be binding on the Parties hereunder. | and the outcome of the arbitration under the arbitration clause of the On-Sale Agreement shall be binding on Buyer and Seller |

(i)    EMG's: interpretation: arbitration clause + waiver to arbitrate

311. EMG sees a perfectly valid arbitration clause in the first part of Art. 14.9 (**red cells**), which permits Buyer to submit an upstream dispute to a downstream arbitration, upon the delivery of a Dispute Resolution Notice[430]. In this particular case, downstream disputes between EMG and IEC must be adjudicated in accordance with the arbitration clause contained in the On-Sale Agreement by ICC arbitration, seat Geneva. Consequently EMG is entitled to submit related upstream dispute with EGAS to the same *forum*.

312. The second part of Art. 14.9 (**mustard coloured cells**) is – in EMG's reading – a waiver provision, which is distinct from the previous arbitration clause: Buyer shall consult with EGAS with respect to the downstream arbitration and the possibility to align their positions. If EGAS consents, then EMG and EGAS foreclose the possibility of submitting their dispute to separate arbitration under

---

[430] C SS M, para. 539.

the GSPA, and the award issued in the downstream arbitration shall also be binding between EMG and EGAS and shall finally settle the dispute. EMG concedes that EGAS' consent is mandatory; and if EGAS does not consent, it is authorised to start a Cairo Arbitration under Art. 14.2 of Annex 1 to the GSPA and Buyer will be equally free to commence an arbitration pursuant to the terms of the On-Sale Agreement[431].

313. EMG adds that its proposal to EGAS could be made in the Dispute Resolution Notice (or in the subsequent consultation)[432]. The requirement to provide a Dispute Resolution Notice serves, thus, a double purpose: to inform of the existence and circumstances of the downstream dispute, and also to invite EGAS to consultation[433].

314. Claimant argues that there are two elements which speak in favour of this interpretation: the literal meaning and that it is consistent with what the parties intended.

315. First, Art. 14.9 uses the expressions "buyer may choose" and "buyer's election"[434]; these two words cannot be overlooked or diminished in their effect. EMG's interpretation is the only one that gives effect to the whole clause, causing the minimum harm.

316. Moreover, if Art. 14.9 were to be interpreted as a consolidation clause, as EGAS submits, it would be shocking that the provision does not mention the word "consolidation", nor that it fails to say anything about the role of the on-sale customer in the consolidation process[435].

317. Second, EMG underlines that the parties understood that it was imperative for the acceptance of the project that there should be a possibility of independent dispute resolution outside the supervision of the Egyptian courts[436]. Issues concerning supply to Israel would have to be resolved before an impartial and independent tribunal, outside Egypt[437]; whilst arbitration in Cairo was limited to domestic disputes, which did not affect the Israeli On-Sale Customer.

   (ii)   EGAS' interpretation: offer to novate + consent

318. EGAS submit that Art. 14.9 has to be read as a whole and that EMG's proposal to read the "**red** and **mustared** cells" separately must be rejected.

---

[431] FHT, Day 1, p. 78.
[432] C SS M, para. 540.
[433] C FS M, para. 182.
[434] C PHB, para. 167.
[435] C PHB, para. 166.
[436] C PHB, para. 167.
[437] FHT, Day 1, p. 36.

319. Art. 14.9 gives Buyer the possibility to offer Seller the option to novate their general arbitration agreement (Cairo Arbitration) contained in Art. 14.2 of Annex 1 to the GSPA[438]. If EMG has a dispute with an on-sale customer pursuant to the arbitration clause in that on-sale agreement, EMG can give EGAS the possibility to substitute their Cairo Arbitration clause with the arbitration clause contained in the on-sale agreement.

320. The procedure for this "offer to novate the arbitration agreement" commences with the delivery of a Dispute Resolution Notice leading to a consultation period (light blue cells, a) and b)). If Seller consents (to this novation), neither Buyer nor Seller can start a Cairo Arbitration and the outcome of the arbitration pursuant to the novated arbitration agreement shall be binding (dark blue cells).

321. EGAS avers that the literal meaning supports its position, because Art. 14.9 clearly subjects any rights that could emerge, to Seller's consent ("If Seller consents") [439]. And the requirement for consultation would otherwise make no sense[440].

322. EGAS would never have accepted to submit themselves to arbitration agreements unknown to it, with any possible venue[441]. Moreover, the arbitration agreement would come to exist only in the future[442]. Such an arbitration agreement would not be enforceable under applicable Law[443].

323. And to suggest that EGAS would agree to forego its rights, entrust the defence of its interests to its adverse party, and accept as binding the outcome of another arbitration, in which it had not even participated, lacks realism[444].

324. EGAS sees Art. 14.9 as a mechanism to facilitate the consolidation of disputes: if EMG proposes to submit their dispute to the same arbitration agreement as an already existing dispute with its on-sale customer, and if EGAS accepts, then there would be two arbitrations in parallel dealing with similar facts with identical arbitration clauses, and it would be easier for those two proceedings to merge. This is the only purpose of Art. 14.9.

### b.     The preferred construction

325. The Arbitral Tribunal sides with EGAS on this point. The literal meaning (**i.**), as confirmed by the parties' intent (**ii.**), speaks in favour of EGAS' proposed construction:

---

[438] R$_{1+2}$ FS M, paras. 125 and 127.
[439] R$_{1+2}$ FS M, para. 180.
[440] R$_{1+2}$ PHB, para. 29.
[441] FHT, Day 3, p. 474.
[442] R$_{1+2}$ SS J, para. 66.
[443] See paras. 249 and 250 *supra*.
[444] R$_{1+2}$ PHB, para. 33.

(i)   Literal meaning

326. Art. 14.9 includes two sets of expressions which are inconsistent and cannot be reconciled: on the one hand, it mentions "buyer may choose" and "buyer's election", but on the other hand it contains the words "if seller consents". Claimant clings to the first expression, while Respondents 1 and 2 insist on the second. The fact that both parties seek and, to a certain extent, find support for their position in the literal interpretation of Art. 14.9, reveals that clause is inconsistently worded:

- if the Tribunal prefers Claimant's proposition, the requirement that there be "seller's consent" would be of no effect;

- but if it sides with EGAS' drafting proposal, "the buyer's choice" provision would be reduced to EMG's right to propose to EGAS that both disputes be consolidated.

327. The Tribunal has thus to decide between two sub-optimal interpretations.

328. After due consideration of all the arguments, the Tribunal sides with EGAS. Its proposed construction is closer to the literal wording of the clause, because it gives effect to Art. 14.9 as a whole; whilst Claimant's construction requires an interpretation which the Tribunal perceives as forced and against the natural reading of the article.

329. In very simplistic terms, Art. 14.9 provides that buyer may choose to resolve the dispute pursuant to another arbitration clause "provided that"

- "(a)" EMG delivers a Dispute Resolution Notice "and"

- "(b)" EMG consults with EGAS.

330. Both requirements seem cumulative, because they are established in successive paragraphs labelled "(a)" and "(b)", and linked by the coordinating conjunction "and". Art. 14.9 thus clearly calls for a Notice plus a period of consultation. And while the Notice serves the purposes of informing EGAS of the dispute under the on-sale agreement and of EMG's forum election[445], EMG has failed to explain why the second requirement – the consultation with Seller – would be necessary for the operation of a free-standing arbitration clause. EGAS has emphasised this gap in Claimant's proposed construction and the Tribunal concurs.

---

[445] "(a) Buyer provides Seller with notice of the dispute under the relevant On-Sale Agreement, and Buyer's election to resolve such Dispute pursuant to the dispute resolution procedures under the dispute resolution procedures under the relevant On-Sale Agreement […]".

331. Art. 14.9 then draws the conclusions: once EMG has delivered the Notice and EGAS "gave its written consent", both parties waive their right to commence a separate arbitration and are bound by the outcome of other arbitration.

332. The literal construction of Art. 14.9 does not leave much room for doubt: it requires that EGAS give its consent, and furthermore, that such consent be formalised in writing. The object of the consent is also rather clear: the Seller must agree to the content of the Dispute Resolution Notice, as established in the preceding sentence:

> "[N]otice of the dispute under the relevant On-Sale Agreement and Buyer's election to resolve such Dispute pursuant to the dispute resolution procedure under the relevant On-Sale Agreement ("**Dispute Resolution Notice**")" [emphasis in the original].

333. In other words: what Art. 14.9 literally requires is that Buyer notify Seller of its (preferred) election of dispute resolution procedure, and if Seller gives its consent in writing, then both parties agree not to file a separate arbitration and agree to become bound by the decision issued in the down-stream arbitration.

334. The Tribunal will now address the question whether this literal interpretation is consistent with the parties' intent.

(ii)   Parties' intent

335. Ms. Andrews suggests that economic logic is a strong indicator of the parties' intent[446]. Adopting this approach, Claimant seems to have a strong argument: it must have been the parties' intent that disputes which affect Israeli customers be submitted to a neutral *forum*. Claimant's international shareholders would not have accepted that their USD 500 Million investment be subject to a CRCICA arbitration in Egypt against a State entity, but would have insisted that major disputes, affecting an Israeli on-sale customer, be resolved before a neutral *forum*.

336. Claimant argues that the submission to the arbitration clause of the on-sale agreement made in Art. 14.9 would guarantee such a neutral *forum*, because all on-sale agreements as a matter of fact provided for ICC arbitration and the only two seats agreed were either London or Geneva[447] – two unquestionably neutral *fora*.

337. The Tribunal would be inclined to accept this argument, were it convinced that the only mechanism for Claimant to resort to a neutral forum was Art. 14.9. But that is not so and the Tribunal is not persuaded.

---

[446] Andrews, para. 40.
[447] C FS J, para. 74.

338. Ms. Andrews explains that the historical background of the genesis of a contract often provides guidance on the parties' intent[448]; and in this case, the Tribunal is convinced that the factual matrix speaks against Claimant's argument: there is no evidence that on-sale agreements would provide for neutral *fora* (ii.1); and Claimant would in any case have access to neutral *fora* under the Tripartite Agreement (ii.2).

### (ii.1)   No evidence of neutral fora in on-sale agreements

339. Claimant suggests that Art. 14.9 creates a valid submission to arbitration under the arbitration clause of the relevant on-sale agreement, and that such submission does not require EGAS' consent, because Seller was well aware that all on-sale agreements provided for a neutral arbitration seat, which was either London or Geneva[449]. Claimant has submitted in support of this argument a letter of 14 April 2011[450] from EMG to EGAS, providing an updated list of on-sale agreements and annexing relevant data from those contracts, including the arbitration clauses[451].

340. The Tribunal does not accept this argument, because the fact that EGAS may have learnt in 2011 that all on-sale agreements provided for neutral *fora* is irrelevant to the issue of determining what EGAS knew back in 2005 when it agreed to Art. 14.9. This provision does not include any specific requirement that the arbitration be administered by a neutral institution or that it be seated in a neutral location. The relevant question is: is there is any contemporaneous evidence showing that it was EMG's and EGAS' understanding, when they negotiated the GSPA, that all on-sale agreements with Israeli clients would provide for neutral *fora*?

341. No evidence has been marshalled to this effect, and consequently EGAS is correct in asserting that Claimant's interpretation of Art. 14.9 leads to an untenable result: that EGAS was accepting to submit all future disputes involving an on-sale customer to an undefined arbitration mechanism, to be agreed between EMG and its Israeli customers, and which could provide for any possible venue and administering entity – including Israel.

342. The record shows that the possibility that an on-sale agreement might include a submission to a *forum* in Israel was at least discussed between EMG and its potential clients: in the first draft of the On-Sale Agreement, which was called "Key Principles"[452], the parties were considering whether to apply Israeli or English law and Israeli Courts or ICC arbitration (the parties had left the seat of such an ICC arbitration blank).

---

[448] Andrews, para. 40.
[449] C FS J, para. 151.
[450] Doc. C-63.
[451] Doc. C-63, Annex 2, para. 10.
[452] Doc. C-83.

343. This evidence reinforces EGAS' argument: if there indeed was a possibility that EMG and the final Israeli client could have agreed that the *forum* in the on-sale agreements could be in Israel, EGAS and EGPC, two State-owned Egyptian companies, would never have accepted that, without their consent, EMG be authorised to transfer any dispute for adjudication in Israel.

(ii.2)   <u>Neutral fora available</u>

344. The Tribunal has already stated that the economic logic in a transaction is an indicator of the parties' intent; and that there is business sense in the submission that Claimant's international shareholders would not have intended an international dispute over their USD 500 Million investment to be subject to a Cairo Arbitration[453]. Does this imply that the Tribunal must accept Claimant's interpretation of Art. 14.9?

345. The answer is in the negative.

346. There is another agreed mechanism which affords EMG a neutral dispute resolution *forum* for international disputes affecting an on-sale customer. And such mechanism is foreseen in the MoU. In this agreement Egypt represented to Israel that a GSPA would be signed between EGAS and EMG[454], that a tripartite agreement would be entered into between EGAS, EMG and IEC guaranteeing natural gas supply[455]; and, more importantly, that as new Israeli customers contracted gas with EMG, new tripartite agreements would be signed, one for each on-sale customer[456].

347. There is no doubt that EMG (and its shareholders) were perfectly aware of this representation, because the MoU was annexed to the GSPA[457], and thereby, formed an integral part of the latter[458]. And in fact, on 29 September 2010 EMG requested EGAS to sign tripartite agreements with EMG's other seven on-sale customers (apart from IEC), in accordance with the terms of the MoU[459] and attached a draft tripartite agreement, similar to the Tripartite Agreement with IEC.

348. Apparently, these other tripartite agreements were never signed. But this does not change the fact that back in 2005, when the GSPA was signed, EMG entered into Art. 14.9 under the assumption that EMG, EGAS and every on-sale customer would be bound by tripartite agreements. Tripartite agreements give rise to

---

[453] C FS J, para. 76.
[454] Doc. C-5-, Recital no. 4.
[455] Doc. C-5, Art. 7.
[456] Doc. C-5, Art. 7.
[457] In Schedule 5.
[458] Art. 1.1 Incorporation and Interpretation: The Preamble to this Agreement and all its Schedules and Annexes are completing this Agreement and form an integral part hereof and are hereby incorporated by reference herein.
[459] C FS M, para. 122.

trilateral differences, which are precisely the kind of disputes for which EMG claims the only available neutral forum to be Art. 14.9.

349. The next question which arises is whether it was reasonable to assume that such tripartite agreements would have provided for a neutral forum and the answer is yes:

- first, because the Tripartite Agreement annexed to the GSPA[460] afforded jurisdiction to ICC arbitration in Geneva and therefore, a legitimate expectation was created that this or an equivalent forum would be inserted in the rest of the tripartite agreements; and

- second, because Egypt would not be an acceptable venue for the on-sale customer and Israel would not be adequate for EGAS; thus the only suitable option would be a neutral *forum*.

350. The Tribunal is therefore not convinced by Claimant's argument that Art. 14.9 would be EMG's only available neutral forum for disputes which affected an on-sale customer.

> [The argument is reinforced by the fact that – as the Tribunal will decide in section 4.2 *infra* – that Art. 1 of the Tripartite Agreement grants EMG substantive rights and permits EMG to claim against EGAS for non-delivery of gas.]

**c.   Allegations of breach of due process**

351. There is one final issue which the Tribunal feels compelled to address: from its very first submission until the last EGAS has claimed that EMG's reliance on Art. 14.9 of Annex 1 to the GSPA was an abuse of process, there being no genuine dispute between EMG and IEC[461]:

- the Other ICC Arbitration was a sham: it was suspended shortly after its initiation[462] and the few available documents do not evidence the existence of a real dispute[463]; and

- IEC has never claimed that EMG breached the On-Sale Agreement[464].

352. EGAS also claimed that allowing IEC to be a party to an arbitration over GSPA Claims, would seriously breach EGAS' due process and privacy rights[465].

---

[460] GSPA, Schedule 6.
[461] $R_{1+2}$ FS J, para. 42.
[462] $R_{1+2}$ FS J, para. 42.
[463] $R_{1+2}$ FS M, para. 155; $R_{1+2}$ SS M, para. 114.
[464] $R_{1+2}$ SS J, para. 860; $R_{1+2}$ FS M, para. 10; $R_{1+2}$ SS M, para. 3, $R_{1+2}$ PHB, para. 96.
[465] $R_{1+2}$ FS M, para. 30.

353. Since this Tribunal has no jurisdiction under Art. 14.9 of Annex 1 to the GSPA, and it is not adjudicating GSPA Claims, but only Tripartite Agreement Claims, the above allegations of breach of due process rights and/or of abuse of process are moot and hereby dismissed.

## B.   Jurisdiction under the Tripartite Agreement

354. EMG puts forward an alternative source for this Tribunal's jurisdiction over claims for breach of the GSPA: Art. 9 of the Tripartite Agreement. Claimant argues that Art. 9 of the Tripartite Agreement is worded in such broad terms so as to include GSPA Claims as related disputes. Breaches of the GSPA are related to disputes under the Tripartite Agreement not only because they share the same factual matrix, but also because the Tripartite Agreement is part of the GSPA; therefore claims arising from the GSPA are so closely integrated, as to be part of the Tripartite Agreement[466].

355. EGAS replies that the GSPA and the Tripartite Agreement are two different contracts[467] and that, even though the Tripartite Agreement is incorporated into the GSPA, this is not sufficient to make its dispute resolution clause available for GSPA Claims: not when the GSPA has its own arbitration clauses[468] and when Art. 9 of the GSPA mandates that any dispute be resolved pursuant to the procedures established in Art. 14 of Annex 1 to the GSPA[469].

356. The Tribunal is not persuaded by Claimant's argument.

357. Jurisdiction under Art. 9 of the Tripartite Agreement extends to disputes "arising out of or in connection with" the Tripartite Agreement. The Tribunal is minded to accept that the Claimant's claims for damages for breaches of the GSPA fall within that category. On that basis, looking at Art. 9 of the Tripartite Agreement in isolation, the Tribunal takes the view that the Claimant's claims for damages for breach of the GSPA are such as might be referred to ICC arbitration in Geneva pursuant to that provision.

358. However, as EGAS has pointed out, Art. 9.2 of the GSPA requires that disputes and disagreements arising under the GSPA be conducted in accordance with the applicable procedures set out in Art. 14 of Annex 1 to the GSPA. In this context, the Tribunal takes the view that Art. 14.10 of Annex 1 is important. It is in mandatory terms: in cases where IEC is not a party to the dispute, Art. 14.10 of Annex 1 trumps Art. 9 of the Tripartite Agreement and requires that the matter be referred to arbitration in Cairo; notwithstanding that Art. 9 of the Tripartite

---

[466] See para. 252 *supra*.
[467] See para. 272 *supra*.
[468] See para. 276 *supra*.
[469] See para. 277 *supra*.

Agreement would otherwise have permitted it to be referred to ICC arbitration in Geneva.

359. In the Tribunal's view, Art. 14.10 of Annex 1 to the GSPA applies to the Claimant's claims for breach of the GSPA, provided that IEC is not a party to any such dispute – and IEC is not a party to the GSPA Claims. Thus:

- although Art. 9 of the Tripartite Agreement would have permitted such claims to be referred to ICC arbitration in Geneva,

- the governing provision is Art. 14.10 of Annex 1, which requires that such claims be referred to arbitration in Cairo pursuant to Art. 14.2 of Annex 1 to the GSPA.

360. In conclusion, the Arbitral Tribunal dismisses Art. 9 of the Tripartite Agreement as an alternative source for this Tribunal to have jurisdiction over EMG's claims based on the breach of the GSPA by EGAS.

## 4.2 JURISDICTION FOR TRIPARTITE AGREEMENT CLAIMS

361. The decision reached in the previous chapter does not imply that the Tribunal lacks jurisdiction with regard to all of EMG's claims submitted in this arbitration, because EMG is also claiming against EGAS based on Respondents 1 and 2's default on the obligations assumed in the Tripartite Agreement – the overarching trilateral contract signed by EGAS, IEC and EMG to record the "gas for peace" deal.

362. EGAS disagrees, arguing that Art. 1 does not award EMG any substantive rights – EMG being only entitled to claim under the GSPA. EGAS' position is again supported by the legal of opinion of Ms. (as she then was) Geraldine Andrews[470].

363. EMG notes that EGAS' objection in reality is a question of merit and not an issue which affects the Tribunal's jurisdiction, nor the admissibility of EMG's claims[471]. The Tribunal concurs, but for reasons of efficiency it will nonetheless address the objection in this chapter devoted to jurisdiction – because if EGAS succeeds, all claims submitted by EMG and based on Art. 1 of the Tripartite Agreement would fall away.

364. The debate, in essence, centers around Art. 1 of the Tripartite Agreement ["**Art. 1**"], which provides as follows:

"EGAS and EGPC hereby guarantee the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas to IEC through fulfilling their obligations to EMG under the [GSPA], this guarantee shall be for a period of up to 20 years

---

[470] Doc. RL$_{1+2}$-30.
[471] FHT, Day 1, p. 39.

> starting from the first year of operation of EMG's Pipeline Facilities (estimated to begin in 2007), at the quality and specifications specified in Annex 1 attached hereto and considered an integral part hereof, such Natural Gas to be delivered to EMG, its successors and permitted assigns by EGPC and EGAS pursuant to the [GSPA] in order to enable EMG to satisfy its obligations for the delivery of Natural Gas to IEC, in accordance with the terms and conditions of the [On-Sale Agreement]" [472].

365. The dispute between EMG and EGAS hinges upon the proper construction of Art. 1, a provision which can be subject to different readings. In trying to establish the correct interpretation, the Tribunal will apply the three construction criteria suggested by Ms. Andrews (and accepted by EMG[473]):

-   whether the literal interpretation of Art. 1 suggests that EMG is also a beneficiary of the promise (**A.**);

-   and whether the commercial sense (**B.**)

-   or the context of the Tripartite Agreement (**C.**)

reinforce such conclusion or lead to its rejection.

366. Thereafter, the Tribunal will analyse in a separate section the defences available to EGAS vis-à-vis EMG's or IEC's claims under Art. 1 (**D.**).

> [Breach of Art.1 is EMG's fundamental claim under the Tripartite Agreement. It has however also claimed breaches of Arts. 2 and 3 and an unlawful repudiation[474]. These claims are unaffected by the discussion regarding the proper construction of Art.1 and will be dealt with in chapters XI and XII].

## A.   The literal interpretation of Art. 1

367. Art 1 can be broken down into its main thrust and five other attributes.

368. The main thrust of Art. 1 is this:

> "EGAS and EGPC hereby guarantee the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas to IEC through fulfilling their obligations to EMG under the GSPA".

369. And the other attributes are the following:

-   duration of the guarantee: "this guarantee shall be for a period of up to 20 years starting from the first year of operation of EMG's Pipeline Facilities (estimated to begin in 2007)";

---

[472] For consistency reasons, the Tribunal has substituted some definitions for those adopted in this Award.
[473] FHT, Day 1, pp. 36 and 41.
[474] FHT, Day 1, pp. 40, 53 and 54.

- quality of the gas: "at the quality and specifications specified in Annex 1 attached hereto and considered an integral part hereof";

- recipient of the gas: "such Natural Gas to be delivered to EMG, its successors and permitted assigns by EGPC and EGAS";

- conditions for the delivery of gas: "pursuant to the GSPA";

- purpose of the delivery of gas: "in order to enable EMG to satisfy its obligations for the delivery of Natural Gas to IEC, in accordance with the terms of the On-Sale Agreement".

370. Two issues arose: the meaning of "guarantee" (**a.**), and the beneficiary of such guarantee (**b.**)

### a.    Meaning of "guarantee"

371. All Parties accept that technically Art. 1, although it uses the verb "guarantee", does not qualify as a guarantee under English law. In her legal opinion, Ms. Andrews has substituted the expression "guarantee" by "promise"[475], and the Tribunal concurs.

372. Consequently, the general principle established in Art.1. should be read as follows:

> "EGAS and EGPC hereby promise the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas to IEC through fulfilling their obligations to EMG under the GSPA".

### b.    The beneficiary of the guarantee/promise

373. The Parties disagree on the precise beneficiary of the commitment assumed by EGAS in Art. 1:

> "EGAS and EGPC hereby [promise] the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas to IEC [...]"[476]

374. EMG submits that the literal construction of Art.1 shows that EGAS' commitment is directed both to IEC as well as to EMG[477]; EGAS disagrees, based on Ms. Andrews opinion, and avers that the language of Art. 1 is clear in indicating that IEC is the only beneficiary of such promise[478].

---

[475] See e.g. Andrews, para. 39.
[476] Emphasis added.
[477] C SS J, para. 40.
[478] Andrews, para. 45.

375. The dispute can be expressed in the following question: does the wording "<u>to IEC</u>" imply:

- that EGAS makes a <u>promise</u> "to IEC" and only to IEC (as Ms. Andrews suggests),

- or could the words "to IEC" refer to the eventual recipient of the gas, not to the beneficiary of the promise, in which case EGAS would promise to both counterparties in the Tripartite Agreement (i.e. to EMG and IEC, who remain unnamed) the <u>supply</u> of gas "to IEC"?

376. The Arbitral Tribunal is more convinced by the second alternative, because it seems a better reflection of the literal meaning of the words used. As a matter of English idiom, had EGAS wished to make a promise to IEC alone, the natural position in Art. 1 of the words "to IEC" would have been after the words "guarantee":

> "EGAS and EGPC hereby [promise] <u>to IEC</u> the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas [...]"

377. But that is not the wording chosen by the Parties. Art. 1 reads so:

> "EGAS and EGPC hereby [promise] the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas <u>to IEC</u> [...]"

378. The positioning of the expression "to IEC" within the sentence seems to indicate that it qualifies the recipient of the gas supply and not the beneficiary of EGAS' commitment.

379. If this interpretation is adopted, as the Tribunal suggests, Art. 1 would remain silent as regards the beneficiary or beneficiaries of EGAS' promise to supply gas. IEC clearly would qualify as such, because the undisputed primary purpose of the Tripartite Agreement is to grant IEC a direct cause of action against EGAS. What about EMG? Could EMG be a second beneficiary of the undertaking assumed by EGAS in Art. 1, notwithstanding the fact that EMG and EGAS had already entered into the GSPA?

<u>EMG as beneficiary</u>

380. Ms. Andrews takes the view that the fact that EMG is a signatory to the Tripartite Agreement does not imply that <u>each</u> contractual obligation undertaken is owed by the obligor to the two other contracting parties[479]. The Tribunal agrees. But the very fact that EMG has become a signatory strongly suggests that it has thereby acquired <u>some</u> right or rights or, at least, that it has taken on <u>some</u> obligation.

---

[479] Andrews, para. 47.

381. EGAS and IEC could have agreed to enter into a bilateral arrangement (a "bipartite agreement") between both of them, and to exclude EMG. They did not. They deliberately opted for a trilateral structure, and the very name given to the contract (<u>Tripartite</u> Agreement) underlines the importance that the signatories gave to the creation of a contractual bond between the three Parties involved in the commercial deal – the Egyptian gas producer, the Israeli final consumer and the pipeline operator.

382. In the present case, the words chosen by the Parties in Art. 1 do not make clear that EMG is an intended beneficiary of EGAS' delivery promise. But equally, those words do not convey the message that the only beneficiary of EGAS' commitment is IEC: the words "to IEC" are used to identify the ultimate recipient of the gas delivery which is being promised, not the beneficiary of the promise.

<u>An additional consideration: Art. 10 of the Tripartite Agreement</u>

383. However, there is support for EMG's case to be found in the wording of Art. 10 of the Tripartite Agreement.

384. Art. 10 of the Tripartite Agreement reads as follows:

> "Neither this Tripartite Agreement, nor the <u>rights</u> granted hereunder, nor any <u>duties</u> to be performed hereunder, shall be assigned, transferred, delegated or otherwise disposed of by <u>EMG</u> and IEC to this Tripartite Agreement, without the prior consent of the other parties, such consent shall not be unreasonably withheld or delayed"[Emphasis added].

385. This provision prohibits EMG from assigning any of the rights or duties it has under the Tripartite Agreement, without the consent of the other parties. The clause only has an *effet utile*, if EMG indeed holds rights or duties deriving from such contract.

* * *

386. <u>Summing up</u>, the literal interpretation of Art. 1 leads to the conclusion that the expression "to IEC" qualifies the obligation to deliver gas, not the beneficiary of EGAS' commitment, leaving open the question whether EMG, being a signatory of the Tripartite Agreement, must be considered as one of the beneficiaries of EGAS' commitment. And Art. 10 of the Tripartite Agreement seems to confirm that EMG must be the holder of some rights and duties.

**B.    The purpose of Art. 1**

387. Ms. Andrews raises two arguments, which in her opinion militate against the argument that EMG should be considered a beneficiary of EGAS' commitment under Art. 1: the first is that EGAS commitment to deliver gas to EMG is an obligation which already arises from the GSPA – the existence of a repeat obligation in the Tripartite Agreement does not make any commercial sense (**a.**);

and the second that EMG had no interest in receiving a duplicate commitment of delivery (**b.**).

### a.    The commercial sense of repeat obligations

388. Ms. Andrews' first argument is that repeat obligations make commercially no sense: there is no reason for EMG to enter into two agreements simultaneously with EGAS, which contain almost identical obligations[480].

389. EMG does not agree and avers that a repetition of rights makes perfect commercial sense, since one of the aims of the Tripartite Agreement was to provide additional security and consideration to EMG, by harmonising the upstream and downstream liability schemes flowing from breaches of the GSPA[481].

<u>Repeat obligations</u>

390. The first issue under discussion is whether "repeat obligations" – i.e. the execution among two parties of two coetaneous agreements, each creating an identical (or very similar) set of rights – makes commercial sense.

391. In fact, the creation of repeat obligations is a common legal practice. Merchants and other legal operators frequently insist that a given set of rights deriving from an existing contract (the principal contract) be reiterated in a second, separate agreement between the same parties (the ancillary agreement). The reasons for adopting this practice are manifold, but in essence can be reduced to two:

- the ancillary agreement clarifies the precise scope of the obligations assumed under the principal contract; and

- and it facilitates judicial enforcement of such obligations, either by the creditor itself or by a third party to whom the creditor has assigned the rights.

392. In commerce, the standard procedure for formalising repeat obligations is through the issuance of negotiable securities. In fact, negotiable securities were invented in the late Middle Age for that very purpose. In the most basic structure, two parties enter into a principal contract (e.g. a sales agreement), and the debtor's obligation (e.g. the buyer's obligation to pay the price) is formalised in a promissory note or a bill of exchange, principal contract and ancillary agreement being executed concurrently and the ancillary agreement not voiding the principal contract. Depending on circumstances, the creditor can enforce the debtor's obligation either by claiming under the promissory note or bill of exchange, or under the

---

[480] Andrews, para. 52.
[481] C SS J, para. 43.

principal contract. And a debtor who has been ordered to pay under the ancillary agreement may still enforce its rights and counterclaim against the creditor under the principal contract.

393. Repeat obligations are used not only in bilateral, but also in trilateral structures. The classic example is the bill of lading. Two underlying principal contracts:

- a (bilateral) contract for transportation between shipper and carrier,

- and a (bilateral) contract between shipper and consignee for the transfer of goods (e.g. a sales agreement),

- are covered by one single ancillary agreement, the bill of lading – a negotiable security issued by the carrier, formalising receipt of goods from the shipper and subsequent delivery of such goods to the consignee.

A similar structure is found in negotiable insurance policies.

394. Repeat obligations are formalised not only as negotiable securities: there are also instances where the ancillary agreement takes the form of a contract. A classic example is the acknowledgement of debt – a unilateral declaration in which a debtor recognises the existence of a debt deriving from a principal contract. Another example, this one in a trilateral context, is the documentary letter of credit: payments due under the principal contract are reiterated and secured by an ancillary agreement, the letter of credit issued by the bank, promising to pay the beneficiary against delivery of certain documents.

395. Accordingly, the Tribunal finds that in commerce it is quite common that an existing set of rights deriving from a principal contract, is re-formalised as a repeat obligation by executing an ancillary agreement, which in some cases takes the form of a negotiable security and in other of a contract. This practice is found not only in bilateral structures, but also in complex trilateral structures.

## b.   EMG's alleged lack of interest

396. Ms. Andrews submits a second argument: It is only IEC who has an interest in EGAS' promise under Art. 1 of the Tripartite Agreement, because IEC lacks any other direct action against EGAS. EMG on the other hand has no interest in the Tripartite Agreement: its right to receive deliveries of gas from EGAS is already covered by the GSPA[482].

397. The Tribunal, again, disagrees.

---

[482] Andrews, para. 47.

398. To fully understand EMG's interest in the Tripartite Agreement it is necessary to take a step back, and to consider the underlying transaction in its entirety.

399. From the outset, the "gas for peace deal", the proposal to bind Israel and Egypt by a pipeline which would deliver Egyptian gas to the national Israeli electricity company (and to other Israeli buyers) was a project fraught with political and business risk. The Parties were well aware that, in the course of the 15 to 20 year duration of the deal, a number of disputes could arise. And the question of how these disputes should be settled must have been one of the issues to which the Parties, in the course of the protracted negotiations, devoted much thought.

400. In the end, the Parties agreed to formalise the "gas for peace deal" in three different contracts:

- a GSPA binding EGAS and EMG;

- an On-Sale Agreement between EMG and IEC; plus

- a Tripartite Agreement binding all three Parties, and serving as the only overarching contractual structure.

401. In this complex trilateral structure, the Parties identified and provided for three types of potential disputes:

- bilateral disputes involving EMG and EGAS (two Egyptian companies), but not affecting IEC (e.g. issues relating to the determination of the up-stream price);

- bilateral disputes between EMG (an Egyptian company) and IEC (an Israeli company), not affecting EGAS (e.g. issues affecting the maintenance of EMG's pipeline); and

- trilateral disputes involving the three Parties, arising from a repudiation or from a significant breach of EGAS' commitment to supply the agreed volume of gas to Israel, leading to EMG's inability to deliver gas to IEC – or, vice-versa, a payment default between IEC and EMG leading to EMG defaulting its payment obligations vis-à-vis EGAS.

402. For bilateral disputes, the Parties agreed on bilateral arbitration clauses in the GSPA and in the On-Sale Agreement:

- Art. 14.2 of the GSPA provides for adjudication in a domestic Cairo based arbitration;

- Art. 10.2 of the On-Sale Agreement provides for ICC arbitration in Geneva.

403. The real concern were the trilateral disputes, which represented an increased risk for EMG, as the intermediary caught in between the initial seller (EGAS) and the

ultimate buyer (IEC): a delivery default by EGAS would necessarily result in EMG's own breach vis-à-vis IEC (or vice-versa in case of a payment default by IEC). In that situation, EMG ran the risk of having to indemnify one counter-party, and not being able to recover fully (or simultaneously) from the other.

404. The answer to this difficulty was the Tripartite Agreement: its purpose was not only to grant IEC a direct cause of action against EGAS (for that, a "bipartite agreement" would have sufficed), but also to create a neutral arbitration forum, in which any trilateral disputes affecting the three Parties would be resolved in a consistent way. And this purpose was achieved by Art. 9, which obliges EGAS, EMG and IEC to adjudicate any trilateral dispute through ICC arbitration in Geneva.

405. Ms. Andrews avers that the Tripartite Agreement denies EMG any substantive rights vis-à-vis EGAS[483].

406. The Tribunal does not share her view, because if her position were accepted, EMG would have no right to claim against EGAS in a tripartite arbitration based on Art. 9 of the Tripartite Agreement and the very purpose of the Tripartite Agreement – creating a unified forum for settling tripartite disputes – would not be achieved. With Ms. Andrews' interpretation trilateral disputes involving EGAS, EMG and IEC (such as a significant and continuous failure to supply gas under or a repudiation of the GSPA) would have to be adjudicated in three different parallel procedures:

- Between EMG and EGAS, in a Cairo Arbitration under Art. 14.2 of the GSPA, to determine whether EGAS had breached its delivery obligations arising under the GSPA;

- Between EMG and IEC in an ICC Geneva arbitration under Art. 10.2 of the On-Sale Agreement, in order to establish whether EMG has incurred in default of its obligations under the On-Sale Agreement;

- Between IEC and EGAS in another ICC Geneva arbitration under Art. 9 of the Tripartite Agreement, to determine whether IEC had respected the commitment vis-à-vis IEC (and only vis-à-vis IEC) assumed in the Tripartite Agreement.

407. This result makes no commercial sense and cannot have been the Parties' intent: multiplicity of arbitral proceedings, administered by different institutions within one overarching commercial transaction, is highly inefficient and creates a potential risk of inconsistent findings.

---

[483] Andrews, para. 50.

408. The purpose of the Tripartite Agreement must have been to create a single forum in which trilateral disputes involving EGAS, EMG and IEC are consistently adjudicated by one set of arbitrators. That purpose is only achieved if the literal interpretation of Art. 1 of the Tripartite Agreement prevails: EGAS' promise to deliver gas in accordance with the GSPA is addressed both to EMG and IEC, and EMG has the option to sue EGAS for failure to deliver gas either under the GSPA or under the Trilateral Agreement.

* * *

409. <u>Consequently</u>, the Tribunal finds that repeat obligation are a common occurrence in other commercial transactions. Merchants frequently reiterate existing contractual obligations by executing ancillary agreements, so as to achieve certain advantages like certainty, ease of transfer or facilitation of enforcement. In the present case, the purpose of the Tripartite Agreement was not only to grant IEC a direct cause of action against EGAS, but also to create a common arbitral forum, in which disputes affecting all three Parties could be adjudicated consistently by one single ICC arbitral tribunal, seated in Geneva – as is the present Tribunal.

410. And in order to achieve this result, to allow that all disputes among EMG and EGAS deriving from the GSPA are adjudicated in the arbitral forum provided for in the Tripartite Agreement, the necessary prerequisite is that the Tripartite Agreement also creates a cause of action between EMG and EGAS. This implies that the proper interpretation of Art. 1 of the Tripartite Agreement is that the beneficiaries of EGAS' promise to deliver gas in accordance with the GSPA, are both IEC and EMG.

## C.   The contractual context

411. The above conclusion is in fact reinforced, and not, as Ms. Andrews avers, contradicted, by the contractual context of Art. 1 Tripartite Agreement: the Recitals (**a.**), Art. 5 of the Tripartite Agreement (**b.**) and Art. 14.10 of Annex 1 to the GSPA (**c.**).

### a.   Recitals

412. Ms. Andrews argues that the Recitals enlighten the context in which the Tripartite Agreement was made[484]. She particularly draws the Tribunal's attention to the third Recital:

> "WHEREAS        EGPC has delivered two letters to IEC, dated 24th of May 2000 and 10[th] of September 2003, respectively, in which EGPC reaffirmed its decision to sell Natural Gas for export by EMG and to guarantee supply of Natural Gas to EMG for sale by EMG to IEC for up to 20 years [...]".

---

[484] Andrews, para. 46.

413.  In her opinion, the fact that EGAS' two letters of 24 May 2000 and 19 September 2003 were addressed to IEC alone[485], and not to EMG, indicates that IEC is the sole beneficiary of the promise to supply contained in Art. 1.

414.  The Tribunal does not share Ms. Andrews' conclusion.

415.  The fact that the third Recital quotes two historic letters in which EGAS had represented that it would guarantee the supply of gas and that it addressed the letters to IEC alone, is a strong indicator that IEC is beneficiary of EGAS' promise to supply gas. This much the Tribunal accepts. But the fact that the letters were not addressed to EMG does not have the effect of excluding EMG as a second beneficiary; especially so taking into consideration that EMG had not even been formally constituted by the time the first letter was issued[486].

416.  In fact, a careful comparison between the wording of the third Recital and of Art. 1 leads to a conclusion which contradicts Ms. Andrews' opinion:

-    Third Recital: "EGPC [...] reaffirmed its decision [...] to guarantee supply of Natural Gas to EMG for sale by EMG to IEC for up to 20 years";

-    Art. 1: "EGAS and EGPC hereby guarantee the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas to IEC through fulfilling their obligation to EMG under the [GSPA] [...] for a period of up to 20 years [...] .

417.  The Tribunal has already established that in its opinion the words "to IEC" in Art. 1 qualify the final consignee of the gas delivery, not the beneficiary of EGAS' commitment. This conclusion is, if anything, reinforced by the third Recital, which twice uses the expression "to EMG" and "to IEC", in both cases to signify the consignee of the delivery, and not the beneficiary of the guarantee.

418.  Accordingly, the third Recital tends to confirm the Tribunal's (and not EGAS') construction of Art. 1 of the Tripartite Agreement.

**b.    Art. 5 of the Tripartite Agreement**

419.  An inherent weakness in EGAS' line of reasoning is that EMG indeed is a party to the Tripartite Agreement, and that EMG's execution of the Agreement must result in some useful purpose. If – as EGAS avers – Art.1. does not create rights in favour of EMG, where is the *effet utile* of its participation?

---

[485] Andrews, para. 47.
[486] The first Recital mentions that EMG was constituted by resolution of the Council of Ministers of the Government of the Arab Republic of Egypt, dated 18 September 2000.

420. EGAS has tried to preempt this argument, reasoning that in Art. 5 of the Tripartite Agreement EMG assumes certain additional obligations, which would justify its participation[487]. Art. 5 reads as follows:

> "To the extent that EGAS or EGPC are called upon to perform obligations pursuant to this Tripartite Agreement, EMG and IEC shall take all such actions as may be reasonably requested by either EGAS or EGPC to facilitate and enable the performance of such obligations by EGAS or EGPC".

421. EGAS' reasoning is that EMG executed the Tripartite Agreement, not to become a beneficiary of rights under Art. 1, but rather an obligee of certain ancillary commitments under Art. 5.

422. The difficulty in EGAS' argument is that EMG's obligation under Art. 5 is itself a repeat obligation, already assumed by EMG in Art. 13.10 of the GSPA.

423. Art. 13.10 of the GPSA contains an obligation to cooperate, which is drafted in terms almost identical to those of Art. 5 of the Tripartite Agreement:

> "Further assurances. Each of the Parties shall from time to time and at all times do all such further acts and deliver such documentation as shall be reasonably requested and required by the other Party in order to enable the performance of any of its obligations under this Agreement".

424. EGAS' position regarding the interpretation of the Tripartite Agreement is inconsistent:

- In order to claim that Art. 1 does not award EMG any substantial rights, it argues that the same rights were already contained in the GSPA and that the parties cannot have intended to create a repeat obligation;

- However, when it comes to arguing that EMG's participation in the Tripartite Agreement meets the *effet utile* test, it accepts that the only purpose of EMG's execution of the Tripartite Agreement is to assume the ancillary obligation to cooperate contained in Art. 5 of the Tripartite Agreement – an obligation which is also a repeat obligation.

425. EGAS cannot have it both ways:

- Either it accepts that in the EMG-EGAS relationship the Tripartite Agreement formalises repeat obligations, already established in the GSPA (in which case it must drop the argument that Art. 1 cannot formalise repeat obligations and share the Tribunal's interpretation),

- Or it rejects such possibility (in which case, EMG's execution of the Tripartite Agreement fails to meet the *effet utile* test).

---

[487] R$_{142}$ FS M, para. 99.

### c.  Art. 14.10 of Annex 1 to the GSPA

426. Art. 14.10 of Annex 1 to the GSPA between EMG and EGAS is a provision which – although contained in the GSPA – in fact deals with disputes arising under the Tripartite Agreement:

> "Notwithstanding the provisions of the Tripartite Agreement to the contrary, if any dispute under the Tripartite Agreement arises between EGPC and EGAS on the one hand and EMG on the other hand, and if [IEC] is not a party to such dispute, such dispute shall be resolved pursuant to the dispute resolution provisions provided for in this Article 14".

427. Both parties have invoked Art. 14.10 in support of their position: EMG to prove that there could be disputes between EMG and EGAS under the Tripartite Agreement[488]; and EGAS to reinforce that the natural forum for disputes between EMG and EGAS is the dispute resolution mechanism of the GSPA[489].

428. In fact, Art. 14.10 significantly reinforces the Tribunal's reading of the Tripartite Agreement.

429. Art. 14.10 plainly contemplates the existence of a dispute between EGAS and EMG arising in connection with the Tripartite Agreement. Such a dispute would be liable to arise only if either EGAS or EMG had failed to comply with its obligations thereunder. But, in either case, the obligations in question would be repeat obligations and the proceedings contemplated by Art. 14.10 would be directed toward the enforcement of such repeat obligations. In these circumstances, the Tribunal takes the view that Art. 14.10 provides clear evidence that the parties intended such repeat obligations to be enforceable.

430. Art. 14.10 goes on to provide that if EMG sues EGAS because of an alleged breach of EGAS' commitments under the Tripartite Agreement, and if IEC is not a party to the procedure, the arbitration should proceed as a Cairo based domestic arbitration, and not as an ICC international arbitration in Geneva.

431. This rule is clearly an anti-abuse provision.

432. The agreed principle between EGAS and EMG, two Egyptian companies, was that all bilateral disputes should be settled by domestic, Cairo based arbitration, and Art. 14.10 tries to avoid that EMG escapes this principle through the backdoor of the Tripartite Agreement – due to the existence of a repeat obligation EMG has the option to sue EGAS either under the arbitration clause of the GSPA, or that of the Tripartite Agreement. To avoid abuse, Art. 14.10 orders that if the dispute only affects EMG and EGAS, but not IEC, the arbitration procedure foreseen in the GSPA becomes obligatory.

---

[488] C SS J, para. 44.
[489] R₁₄₂ FS M, para. 100.

433. *A contrario sensu* Art.14.10 conveys a clear message: any dispute between EGAS and EMG deriving from the Tripartite Agreement, which also involves IEC, must be solved in accordance with the arbitration procedure contained in Art. 9 of the Tripartite Agreement: ICC arbitration in Geneva.

434. This is precisely the case in the present arbitration.

\* \* \*

435. In conclusion, the contractual context reinforces the Tribunal's reading of Art. 1 of the Tripartite Agreement. The third Recital and Art. 5 of the Tripartite Agreement and Art. 14.10 of Annex I to the GSPA all point in the same direction: the Parties' intention was:

- that EGAS' obligation to deliver gas to EMG be formalised in the GSPA and reiterated, as a repeat obligation, in the Tripartite Agreement,

- and that any dispute between EMG and EGAS to which IEC is also a party, deriving from EGAS' default or repudiation of its commitments vis-à-vis EMG under the Tripartite Agreement, should be solved by ICC arbitration in Geneva.

436. The first practical implication of the decisions reached so far by the Tribunal is that approximately ⅔ of Claimant's claims for damages are struck out for lack of jurisdiction: while the GSPA guarantees the supply of 7 BCM, the Tripartite Agreement only guarantees the supply of 2.2 BCM. The Tribunal will decide in the following section that under the Tripartite Agreement EMG has enforceable rights vis-à-vis EGAS/EGPC for the non-delivery of gas, but that its claim for damages will be capped at those arising out of the failure to supply 2.2 BCM. This limitation has been acknowledged by EMG.

### D. Scope of EGAS' repeat obligation and available defences

437. The Tribunal has already concluded that EGAS' obligation to deliver gas to EMG deriving from the GSPA has been reiterated, as a repeat obligation, in the Tripartite Agreement. Two issues remain outstanding: to establish the precise scope of EGAS' repeat obligation (**a.**), and of the defences available to EGAS vis-à-vis EMG's claim (**b.**).

### a. Scope of repeat obligation

438. The scope of EGAS' repeat obligation can be derived from the wording used in Art. 1 of the Tripartite Agreement:

"EGAS and EGPC hereby guarantee the commencement and continuation of supply of up to 2.2 BCM annually of Natural Gas to IEC through fulfilling their obligations to EMG under the [GSPA] […] for a period of up to 20 years starting from the first year of operation of EMG's Pipeline Facilities (estimated to begin in 2007), at the

quality and specifications specified in Annex 1 attached hereto [...] such Natural Gas to be delivered to EMG by EGPC and EGAS pursuant to the [GSPA] [...] in order to enable EMG to satisfy its obligations for the delivery of Natural Gas to IEC, in accordance with the terms and conditions of the [On-Sale Agreement]".

439. The repeat obligation assumed by EGAS shows the following characteristics:

- It is restricted to the obligation assumed by EGAS to supply natural gas to EMG under the GSPA; all other obligations assumed by EGAS under the GSPA remain unaffected;

- The quality and specification of the gas to be delivered are defined in the Tripartite Agreement;

- It is further limited by the maximum amount of gas to be delivered (2.2 BCM annually) and by the period of delivery (up to 20 years[490] from operation of the EMG Pipeline);

- The repeat obligation shows a trilateral character: the gas is supplied under the GSPA, in order to enable EMG to comply with its own delivery obligations vis-à-vis IEC under the On-Sale Agreement; this implies that bilateral obligations, assumed in the GSPA between EGAS and EMG, and which have no impact on the re-delivery of gas to IEC under the On-Sale Agreement, are excluded from the scope of Art. 1 of the Tripartite Agreement.

**b.  Defences available to EGAS**

440. There are two different types of defences which EGAS can invoke against a claim by EMG under the Tripartite Agreement:

- the first consists in a procedural defence of lack of jurisdiction: bilateral claims must be submitted to a Cairo arbitration and not to an ICC arbitration (**i.**), and

- the second type refers to the contractual remedies which EGAS is entitled use to counter the merits of an EMG claim (**ii.**).

(i)  Procedural defence

441. Art. 14.10 of Annex 1 to the GSPA grants EGAS a procedural defence against claims under the Tripartite Agreement:

---

[490] In the *quantum* section the Tribunal will explain in detail that, in fact, such period of 20 years comprises an initial term of 15 years and a possible extension by a five year term. The Tribunal will accept as a reasonable hypothesis only the initial 15 year term.

> "Disputes under the Tripartite Agreement. Notwithstanding the provisions of the Tripartite Agreement to the contrary, if any dispute under the Tripartite Agreement arises between EGPC and EGAS on the one hand, and EMG on the other hand, and if [IEC] is not a party to such dispute, such dispute shall be resolved pursuant to the dispute resolution provisions provided for in this Article 14".

442. Art. 14.10 implies that if a Tripartite dispute arises between EMG (an Egyptian company) and EGAS (also an Egyptian company), to which IEC (an Israeli company) is not party, such dispute must be settled not in an ICC arbitration, but in a Cairo arbitration. If EMG chooses to bring the dispute to an ICC arbitration, EGAS would be entitled to validly object to the jurisdiction of the Tribunal[491].

(ii)   Contractual remedies

443. A separate question refers to the contractual remedies available to EGAS to counter a claim submitted by EMG under the Tripartite Agreement. Is EGAS entitled to invoke remedies deriving from the GSPA and/or the On-Sale Agreement?

GSPA

444. In its defence against EMG's Tripartite Agreement Claims EGAS is relying on remedies deriving from the GSPA (e.g. the *force majeure* remedy[492] or the liability limitation clauses[493]). And EMG has not disputed EGAS' entitlement to do so – a reasonable position, given that EMG and EGAS are both parties to the GSPA.

445. But what about IEC, who is not a party to the GSPA? Can EGAS validly invoke remedies deriving from the GSPA vis-à-vis IEC? EGAS has in fact done so on a number of occasions (e.g. it has invoked vis-à-vis IEC *force majeure* or shortfall compensation deriving from the GSPA[494]). IEC has not objected to EGAS' entitlement. The underlying reason may be that the guarantee offered by EGAS under the Tripartite Agreement includes a specific reference to the GSPA ("EGAS guarantees the supply of 2.2 BCM of Natural Gas to IEC through fulfilling its obligations to EMG under the GSPA")[495].

---

[491] The dispute before this Tribunal requires it to adjudicate two main claims: the so called Tripartite Delivery Breaches and the Tripartite Repudiatory Breach (and the monetary consequences deriving therefrom); there is no discussion that such dispute is trilateral and that the Art. 14.10 defence has not been invoked and that it would not be available.
[492] R$_{1+2}$ SS M, para. 350.
[493] R$_{1+2}$ PHB, para. 291.
[494] R$_{1+2}$ SS M, para. 658.
[495] Paraphrasing the original. Emphasis added.

On-Sale Agreement

446. What has been discussed at length is whether EGAS may also invoke as a defence against IEC's Tripartite Agreement Claims remedies deriving from the On-Sale Agreement (between EMG and IEC): EGAS has argued that it can invoke the same remedies available to EMG under the On-Sale Agreement[496] (e.g. the liability exclusion clauses agreed upon in the On-Sale Agreement); whilst IEC avers that its claims are brought solely under the Tripartite Agreement – the only contract between IEC and EGAS – and not under the On-Sale Agreement[497] (e.g. since the Tripartite Agreement, contrary to the On-Sale Agreement, lacks any liability exclusion clauses, no such clause could be invoked by EGAS).

447. The Tribunal sides with EGAS: its supply obligation vis-à-vis IEC deriving from the Tripartite Agreement is referenced to the GSPA and to the On-Sale Agreement:

> "EGAS guarantees the supply of 2.2 BCM of Natural Gas to IEC through <u>fulfilling its obligations</u> to EMG <u>under the GSPA</u> [...] such Natural Gas to be delivered to EMG [...] in order to enable EMG to satisfy its obligations for the delivery of Natural Gas to IEC, <u>in accordance with the terms and conditions of the On-Sale Agreement</u>"[498].

448. The language used in Art. 1 of the Tripartite Agreement implies that EGAS' responsibility is limited to:

- supplying gas to EMG in compliance with the GSPA, so that EMG is "enabled" to re-deliver the gas to IEC,

- on the proviso that the re-delivery of gas be made in accordance with the terms and conditions (including the terms and conditions for failure to deliver) agreed upon between EMG and IEC in the On-Sale Agreement.

\* \* \*

449. <u>Summing up</u>, the Tripartite Agreement does not create an independent obligation. The obligation to deliver gas which EGAS assumes under Art. 1 of the Tripartite Agreement is the same obligation assumed under the GSPA (but limited in volume) with one addition: the supply of gas must enable EMG to redeliver the gas to IEC in accordance with the On-Sale Agreement. This important conclusion implies that all defences available to EGAS under the GSPA (e.g. *force majeure*, exclusion clauses or statute of limitations) and to EMG under the On-Sale Agreement are also available to EGAS when EMG and IEC claim under the Tripartite Agreement.

---

[496] R1+2 PHB, para. 976.
[497] R3 SS M, para. 273.
[498] Paraphrasing the original. Emphasis added.

5.   **THE TRIBUNAL'S DECISION ON THE ADMISSIBILITY OBJECTIONS**

450. EGAS also submits that IEC's claims are not admissible for three separate reasons:

  -      The claims brought under the Tripartite Agreement are premature and could only be adjudicated once a tribunal with proper jurisdiction under the GSPA had decided that EGAS had breached the GSPA and a tribunal with jurisdiction pursuant to the On-Sale Agreement had determined that EMG breached the On-Sale Agreement (**5.1.**);

  -      EMG's rights are unenforceable for lack of consideration (**5.2.**), and IEC's participation in this arbitration has resulted in a violation of EGAS' due process rights (**5.3.**).

**5.1   PREMATURITY OF TRIPARTITE AGREEMENT CLAIMS**

451. EGAS' position is that the claims brought under the Tripartite Agreement would be premature, because IEC lacks any freestanding right to the supply of gas[499]. Hence, any valid claim would require that first:

  -      The tribunal with proper jurisdiction under the GSPA decides that EGAS breached the GSPA; plus that

  -      The tribunal with jurisdiction pursuant to the On-Sale Agreement determines that EMG breached the On-Sale Agreement.

452. EGAS' argument implies that IEC, before being in a position to file a Tripartite Agreement Claim, would have to obtain separate arbitral decisions, showing that two distinct breaches – under the GSPA and under the On-Sale Agreement – had occurred.

453. The Tribunal disagrees with EGAS' interpretation.

454. <u>First</u>, as IEC maintains[500], EGAS' position finds no support in the literal reading of the Tripartite Agreement. There is no specific language requiring that IEC's claims be preceded by bilateral arbitral decisions issued under the arbitration clauses of the GSPA and the On-Sale Agreement.

455. <u>Second</u>, the Tribunal has already established that the commercial sense of a transaction is a strong indicator of the parties' intent, and thus a source for determining the proper construction of a contract. Does EGAS' interpretation make any commercial sense?

---

[499] R$_{142}$ SS M, paras. 587 and 591.
[500] R$_3$ SS J, para. 70.

456. The answer is a clear no.

457. IEC is not a party to the GSPA. It has no possibility to force EMG or EGAS to file a GSPA arbitration. EGAS and EMG enjoy full discretion to do so. It is completely unreasonable to suggest, as EGAS does, that a condition precedent to IEC's right to sue EGAS under the Tripartite Agreement should be:

- that EMG and EGAS must have commenced an arbitration amongst themselves[501]; and

- that this arbitration must have resulted in a final decision establishing that EGAS has indeed incurred in a breach of the GSPA.

458. EGAS' interpretation leads to the absurd result that IEC's rights against EGAS under the Tripartite Agreement are conditional upon the goodwill and cooperation of EMG – an untenable proposition: EGPC is a shareholder in EMG and both Egyptian companies could share a common interest in not initiating any arbitration under the GSPA, thus thwarting IEC's rights under the Tripartite Agreement.

459. The Tribunal consequently agrees with IEC[502] that it suffices if in this tripartite arbitration IEC (or EMG) establishes:

- that EGAS failed to supply gas to EMG,

- that EMG did not supply gas to IEC and

- that a reasonable causation between both breaches exists.

460. In the present case EGAS' and EMG's failures to supply gas are uncontested facts and no party has challenged the causality; it is undisputed that EMG did not have any other source of supply of gas, except for EGAS.

461. The Tribunal accordingly dismisses the objection to admissibility based on prematurity.

\* \* \*

462. This does not imply, of course, that in adjudicating this tripartite dispute the Tribunal lacks jurisdiction to interpret and apply the GSPA. The Tripartite Agreement repeats, in a single phrase, the essence of the supply obligation embedded in the GSPA and in the On-Sale Agreement. In order to establish the precise scope of the obligation and the defences available to EGAS, it is undisputed by the Parties that the Tribunal must interpret and apply the GSPA,

---

[501] R₃ SS J, para. 71.
[502] R₃ PHB, para. 23.

and the Tribunal has already concluded that it is bound to do so also with regard to the On-Sale Agreement[503].

## 5.2 LACK OF CONSIDERATION

463. EGAS submits two additional Admissibility Objections: if EMG was granted substantive rights under Art. 1, such rights would be unenforceable for lack of consideration; furthermore IEC's participation in this arbitration which adjudicates breaches of the GSPA has violated EGAS' due process rights.

464. Consideration is a fundamental requirement of all contracts under English law[504]. And under English law – argues EGAS – a promise contained in the Tripartite Agreement to perform their existing obligations under the GSPA does not constitute consideration, because EMG failed to obtain an additional practical benefit by entering into the Tripartite Agreement[505].

465. EMG replies that the literal wording of the final recital of the Tripartite Agreement confirms that the Tripartite Agreement was additional to the GSPA and not redundant with respect to EMG[506].

466. The Tribunal sides with EMG.

467. Ms. Andrews, EGAS' legal expert, has addressed the issue of consideration and has come to the following conclusion[507]:

> "I am not seeking to suggest that the Tripartite Agreement is unenforceable for lack of consideration: the Agreement itself records that good and valuable consideration has been given".

468. Ms. Andrews is referring to the last recital of the Tripartite Agreement, already mentioned by EMG:

> "NOW THEREFORE, in furtherance and consideration of the agreement of EGAS and EGPC and EMG to enter into the Source Contract and the agreement of IEC and EMG to enter into the Gas Purchase and Sale Agreement [...], and for the other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged [...]".

469. The Tribunal concurs: EMG, by signing the Tripartite Agreement, has indeed obtained an important additional advantage, which constitutes sufficient

---

[503] See para. 447 *supra*. The Tribunal acknowledges that tribunals deciding bilateral disputes between EGAS and EMG (under the GSPA) or between EMG and IEC (under the On-Sale Agreement) may arrive at different conclusions regarding the scope of supply or the availability of defences; this is a risk assumed by the Parties when they agreed upon the trilateral overarching contractual structure.
[504] R$_{1+2}$ FS M, para. 104.
[505] R$_{1+2}$ FS M, para. 109.
[506] C SS M, para. 118.
[507] Andrews, para. 50.

consideration; it has gained access to a trilateral adjudication procedure, in which all trilateral disputes are consistently solved by an international arbitral tribunal seated in Geneva, and it thus avoids the risk of being made responsible vis-à-vis one of its partners, without possibility of recovering from the other.

## 5.3   ALLEGED VIOLATION OF DUE PROCESS RIGHTS

470.  EGAS argues that allowing IEC to enforce EGAS' delivery obligations under the GSPA, a contract to which IEC is not a party, would contravene the fundamental principle of privity of contract, acknowledged in Art. 13.6 GSPA[508]:

> "No Third Party Beneficiaries. A person or entity who is not Party to this Agreement shall have no rights under the Contract (Rights of Third Parties) Act 1999. The Parties may vary or rescind this Agreement, in whole or in part, without notice to or consent of any other Person, irrespective of reliance or acceptance by any such Person".

471.  EGAS goes one step further in its argument, submitting that its due process right to be heard without intervention of a third party has been violated, because IEC has been allowed to make submissions with respect to a contract to which it is not a party[509]; and English law has also been breached because arbitral proceedings are to be held in private, and entities which are not party to the contract giving rise to the claims, should not be admitted[510].

472.  The argument has become moot, because the Tribunal has found that its jurisdiction is limited to claims arising under the Tripartite Agreement, while claims deriving from the GSPA are outside its remit. Since EGAS, IEC and EMG are all parties to the Tripartite Agreement, any issue regarding privity of contract and intervention of third parties falls away. Similarly, the GSPA's limitations regarding third party beneficiaries cannot apply to IEC, because IEC's legal standing in this arbitration derives from its participation in the Tripartite Agreement, and not from an assignment of the GSPA.

\* \* \*

473.  There is still one issue to address: EGAS has contended that EMG should be deemed to have waived its GSPA Claims, because such claims are duplicative. Since the Tribunal has no jurisdiction over GSPA Claims, this questions is now moot.

---

[508] $R_{142}$ FS M, para. 593.
[509] $R_{142}$ FS M, paras. 609, 612 and 613.
[510] $R_{142}$ FS M, para. 598.

6.  **CONCLUSION**

474. In conclusion, the Tribunal,

-   upon considering Art. 14.9 of Annex 1 to the GSPA, has decided that it lacks jurisdiction under such provision;

-   has further determined that it does have jurisdiction under Art. 9 of the Tripartite Agreement, in order to decide trilateral disputes between the three[511] Parties to the Tripartite Agreement;

-   has decided that EMG and IEC enjoy freestanding enforceable rights under Art. 1 of the Tripartite Agreement, limited to trilateral disputes affecting EGAS' obligation to deliver gas to EMG under the GSPA, for re-delivery to IEC under the On-Sale Agreement, up to the limit of 2.2 BCM annually;

-   has established that its jurisdiction does not extend to bilateral disputes between EGAS and EMG, when such disputes arise out of the GSPA, the GSPA having its own dispute resolution mechanism;

-   has concluded that all defences available to EGAS under the GSPA and the On-Sale Agreement are also available vis-à-vis trilateral disputes submitted either by EMG or by IEC under the Tripartite Agreement;

-   and has dismissed EGAS' Admissibility Objections for alleged prematurity and for alleged lack of consideration and violation of due process rights.

7.  **IMPACT ON EMG'S REQUEST FOR RELIEF**

475. The Tribunal's decisions on jurisdiction have a significant impact on EMG's request for relief: EMG is claiming damages under the assumption that the Tribunal's jurisdiction is wider than what the Tribunal has actually decided.

476. Claimant's request for relief can be divided in four sections: jurisdiction and admissibility (**7.1.**); liability (**7.2.**); quantum (**7.3.**) and a residual category, which includes interest, costs and other claims, and which is the only one to remain unaffected by the Tribunal's decision on jurisdiction.

---

[511] In this context, EGAS and EGPC count as one party.

## 7.1  JURISDICTION AND ADMISSIBILITY

477. Claimant's prayer for relief reads as follows[512]:

- (i) DISMISS EGAS' objections to jurisdiction and admissibility in their entirety;

- (ii) DECLARE that the Tribunal has jurisdiction over the EMG's GSPA Claims pursuant to Art. 14.9 of Annex 1 to the GSPA and Art. 9 of the Tripartite Agreement;

- (iii) DECLARE that the Tribunal has jurisdiction over EMG's Tripartite Agreement claims under Art. 9 of the Tripartite Agreement; and

- (iv) DECLARE that the EMG's claims under the GSPA and the Tripartite Agreement are admissible.

478. The Tribunal has:

- partially accepted the prayer under (i), because it has dismissed some (but not all) of EGAS' objections to jurisdiction and admissibility;

- dismissed the prayer under (ii);

- accepted the prayer under (iii), clarifying the scope of the repeat obligation assumed by EGAS under Art. 1 of the Tripartite Agreement and the availability of defences; and

- partially accepted the prayer under (iv), by finding that EMG's claims under the Tripartite Agreement (but not those under the GSPA, which are outside the Tribunal's jurisdiction) are admissible.

## 7.2  LIABILITY

479. EMG submitted the following prayer for relief[513]:

- (i) DECLARE that EGAS breached its obligations under the GSPA;

- (ii) DECLARE that EGAS repudiated the GSPA, entitling EMG to accept that repudiation, terminate the GSPA, and claim full compensation under English law;

- (iii) DECLARE that EGAS breached the Tripartite Agreement;

---

[512] C PHB, para. 178. The Tribunal has used the defined terms contained in this Award for the sake of consistency.
[513] C PHB, para. 178.

- (iv) DECLARE that EGAS repudiated the Tripartite Agreement, entitling EMG to accept that repudiation, terminate the Tripartite Agreement, and claim full compensation under English law.

480. Prayers (i) and (ii) refer to the GSPA and as such fall outside the jurisdiction of the Tribunal. Prayers (iii) and (iv) relate to the Tripartite Agreement, over which the Tribunal has assumed jurisdiction.

481. Notwithstanding the above conclusion, since the Tripartite Agreement incorporates a repeat supply obligation, identical to that assumed by EGAS in the GSPA, establishing a breach or repudiation of the Tripartite Agreement will require as a condition precedent an analysis of the breach of the obligations assumed under GSPA, and of the repudiation and termination of such Agreement.

## 7.3 QUANTUM

482. Claimant asks the Tribunal to[514]:

> "ORDER EGAS and EGPC to pay to EMG compensation of USD 1,500.4 million as the principal sum due for breaches of the Source GSPA and the Tripartite Agreement and their repudiation of the Source GSPA and the Tripartite Agreement".

483. In accordance with the table included in its Post-Hearing Brief[515], of those damages, USD 656.7 Million derive from breaches of the Tripartite Agreement[516]. Consequently, Claimant's prayer for relief as regards *quantum* is reduced to this figure.

---

[514] C PHB, para. 178.
[515] C PHB, para. 151.
[516] Pre-tax figures.

# VIII. <u>CORRUPTION</u>

484. Respondents 1 and 2 contend that the GSPA is void and unenforceable because it is tainted by bribery and profiteering – two crimes committed in Egypt. Claimant and Respondent 3 deny the allegation.

485. The Tribunal takes Respondents 1 and 2's contention very seriously. Corruption is not only morally odious and a hindrance to economic development, it also impoverishes the corrupted party: via inflated prices or worsened conditions the it is forced to assume the (hidden) additional expense required to fund the bribe; scarce funds are misdirected to enriching well connected individuals, at the expense of the common good or of legitimate owners. There being suspicion of malfeasance, every international arbitration tribunal has the duty to investigate and sanction corrupt practices surrounding the procurement or execution of the agreement from which it derives its jurisdiction.

## 1. THE FACTS

### 1.1 EMG

486. EMG's founders were Messrs. Hussein Salem and Yosef Maiman. According to EGAS both individuals are closely connected to the Egyptian government, with contacts that date back some forty years.

487. In 1994, Messrs. Salem and Maiman founded Middle East Oil Refinery ["**MIDOR**"], a company established to construct and operate an oil refinery in Egypt. Mr. Salem was appointed Chairman. Shortly after incorporating MIDOR, Messrs. Salem and Maiman appointed Mr. Amin Sameh Fahmy as its Vice-Chairman[517].

488. Before the refinery began production, Messrs. Salem and Maiman sold the lion's share of their interests in MIDOR to EGPC and other State-owned companies, realising personal profits from the transaction[518].

489. In October 1999, Mr. Fahmy left his position as Vice-President in MIDOR to become the Egyptian Minister of Petroleum.

490. On 23 January 2000, the Egyptian Prime Minister, Mr. Atef Ebeid, approved the establishment of East Mediterranean Gas Company (EMG), an Egyptian joint

---

[517] $R_{1+2}$ FS M, para. 238; $R_{1+2}$ SS M, para. 215.
[518] $R_{1+2}$ FS M, para. 237; $R_{1+2}$ SS M, para. 214; $R_{1+2}$ PHB, para. 102.

stock company under the free zone system[519]. Not a week later, on 29 January 2000, the Chairman of the General Authority for Investment and Free Zones System ratified said decision issuing Decree No. 230 of 2000, which describes EMG's purpose[520]:

> "The Company shall purchase the entire quantities of exportable surplus gas from the Egyptian General Petroleum Corporation, as well as from non-Egyptian gas investment companies working in Egypt; transport and sell said gas, in all its different forms, gas or liquid, from all Egyptian ports and sell it to Turkey, the countries located on the eastern coast of the Mediterranean Sea, and any other countries. For the said purpose, the Company may construct pipelines extending from the Al-Arish exit and in territorial waters along the eastern coast of the Mediterranean Sea, and construct any other facilities required for said activities […]"

491. On 12 April 2000 the Board of Directors of EGPC – including Mr. Fahmy in his capacity as Minister of Petroleum – met to decide that[521]:

- EGPC would subscribe 10% in EMG's capital, with two board members representing EGPC in EMG's board of directors;

- The price of gas sold to EMG would be USD 1.5/MMBTU associated with the Brent price according to a formula;

- The Vice-Chairman was authorised to draft the proposed agreement and undertake necessary procedures.

492. On 19 April 2000 EMG was finally incorporated[522].

## 1.2   THE GENESIS OF THE GSPA

493. On 18 September 2000 the Egyptian Council of Ministers passed a Resolution [the "**Framework Resolution**"], in which it was agreed that[523]:

- EGPC will sell up to 7 BCM of natural gas to EMG annually.

- The selling price of natural gas shall be FOB basis at the receiving terminal in Al Arish according to the formula presented in a memorandum with a minimum of USD 0.75/MMBTU and a maximum of USD 1.25/MMBTU or

---

[519] Doc. C-53, in which the Approval of the Prime Minister Decree dated 23 January 2000 is referred to.
[520] Doc. C-80. See also Doc. R$_{1+2}$-297, which, however, does not represent a full translation of the document.
[521] Doc. C-82.
[522] Doc. C-308.
[523] Doc. C-76.

exceptionally, USD 1.50/MMBTU (in case Brent crude price reached at least USD 35 per barrel).

- For a period of 15 years to be renewed by mutual agreement for further durations.

494. On 26 January 2004 the Ministry of Petroleum passed the Decree No. 100 of 2004, signed by Mr. Fahmy in his capacity as the Minister of Petroleum, which authorised EGPC and EGAS' respective chairmen, Messrs. Tawila and Mahmoud, to conclude the contract with EMG [the "**Authorisation**"][524].

495. On 23 May 2005 the Ministry of Petroleum passed Decree No. 456 of 2005, empowering Mr. Tawila to sign the GSPA[525].

496. On 13 June 2005 the GSPA was concluded. The relevant features of the GSPA to the issues discussed in this section of the Award are:

- the GSPA was signed by Mr. Tawila, on behalf of EGAS, in his capacity as Chairman;

- the Preamble made explicit reference to the Framework Resolution and to the Authorisation[526]; and

- pursuant to Art. 1 (c) of Annex 5 to the GSPA, the floor contract price for the gas sold was USD 0.75/MMBTU and the ceiling USD 1.5/MMBTU[527].

497. On 17 July 2005, one month after the signature of the GSPA, Mr. Tawila left EGAS and became the Chairman and Managing Director of EMG, with an annual bonus of USD 100,000[528].

498. On 31 May 2009 the First Amendment to the GSPA was signed. Mr. Tawila was again one of the signatories, but this time on behalf of EMG, in his capacity as Chairman and CEO of EMG[529]. The First Amendment significantly raised the selling price of gas[530].

---

[524] Doc. C-59.
[525] Doc. C-61.
[526] Doc. R-1(A).
[527] Doc. R-4(L). The Annex refers to million MMBTU. This seems to be a typographical error.
[528] Doc. R$_{1+2}$-460.
[529] Doc. R$_{1+2}$-2.
[530] Doc. R$_{1+2}$-2.

### 1.3   THE COURT PROCEEDINGS

499. The court proceedings relevant to the present case were lodged with administrative courts (**A.**) and with criminal courts (**B.**).

#### A.   <u>The administrative court proceedings</u>

500. The Chairman of the Human Rights Advocates Associates in Alexandria commenced proceedings no. 33418 of JY62 before the Cairo administrative court, apparently challenging the Authorisation and the Framework Resolution, and requesting the stay of its execution and annulment. On 18 November 2008 a Cairo administrative court ruled in favour of the claimant and decided that the provisions contained in the Authorisation which involved the sale of natural gas to Israel were contrary to the Egyptian Constitution and, thus, harmed Egyptian public interests[531].

501. The Prime Minister, the Minister of Petroleum and Mineral Sources and the Minister of Finance appealed the above decision before the Egyptian Supreme Administrative Court. The Egyptian Supreme Administrative Court decided on 27 February 2010[532] to "abolish the appealed ruling" and to re-rule to the effect that[533]:

- the Framework Resolution and the Authorisation are indivisibly linked, so that both together form a single unit[534];

- to stay the enforcement of the Authorisation and of the Framework Resolution on the ground that they do not include a mechanism for periodical revision of quantities and prices, in line with the price developments in the global market[535]; and

- to cancel the Brent Crude price ceiling at USD 35 provided for in the Framework Resolution, because it violates the economic balance between the two parties[536].

502. The Egyptian Supreme Administrative Court highlighted that the Framework Resolution was an act of sovereignty and a matter of Egyptian national security[537].

---

[531] Doc. CLA-50, the introductory explanation of the Egyptian Supreme Administrative Court mentioned in 3.(n) *infra*.
[532] Doc. CLA-50.
[533] Doc. CLA-50, p. 22.
[534] Doc. CLA-50, p. 16.
[535] Doc. CLA-50, p. 22.
[536] Doc. CLA-50, p. 22.
[537] Doc. CLA-50, p. 22.

## B.    The criminal court proceedings

503.   There are two distinct criminal proceedings which run in parallel: one against Messrs. Fahmy and Tawila (**a.**) and the other against former President Mubarak, which peripherally touches upon the issue of the GSPA's legality (**b.**).

### a.    Proceedings against Messrs. Fahmy and Tawila

504.   On 28 June 2012 the Cairo criminal court trying the felony no. 1061 of 2011, convicted seven persons, amongst other Messrs. Fahmy and Tawila, on the charges of profiteering and causing serious deliberate damage to public funds[538], based on the following reasoning:

-    Mr. Fahmy, at that time Minister of Petroleum, commissioned a memorandum on the appropriate sale price in view of the production costs, which he asked to decrease[539]; this memorandum was presented to the Egyptian Council of Ministers for approval, and led to the issuance of the Framework Resolution[540];

-    Mr. Fahmy directly ordered the sale and export of gas to EMG, a company which lacked experience[541] and it did so in violation of Art. 4 of EGPC's internal Commercial Activity Regulation[542]; he then issued the Authorisation, which enabled EGPC to sign the GSPA with EMG[543];

-    Mr. Tawila, in his capacity of Chairman of EGPC, signed the GSPA with EMG[544];

-    Mr. Salem, who owned 70% of EMG' shares[545] and was EMG's Chairman[546], profiteered in an amount of over USD 2 Billion[547]

505.   Messrs. Fahmy and Tawila appealed the decision before the Court of Cassation. On 25 March 2013, the Court of Cassation accepted the appeal and in its decision took issue with the following rulings made by the Cairo criminal court[548]:

-    When the Cairo criminal court resolved that Messrs. Fahmy and Tawila had the intention of enabling Mr. Salem to profiteer by obtaining benefits to

---

[538] Doc. CLA-130, p. 14.
[539] Doc. CLA-130, p. 12
[540] Doc. CLA-130, p. 9.
[541] Doc. CLA-130, p. 15.
[542] Doc. CLA-130, p. 8.
[543] Doc. CLA-130, p. 9.
[544] Doc. CLA-130, p. 12.
[545] Doc. CLA-130, p. 8.
[546] Doc. CLA-130, p. 12.
[547] Doc. CLA-130, p. 15.
[548] Doc. CLA-49.

which he was not entitled, the decision was "tainted with ambiguity and vagueness in citing the punishable incident" and lacked an analysis of "the correlation between the very act of profiteering and the job duties the Messrs. Fahmy and Tawila were assigned according to the regulatory bylaws, decrees and circulars"[549];

- the Cairo criminal court did not ascertain the existence of the mental element of each offence in Messrs. Fahmy and Tawila, i.e. that they had a special intent to unlawfully confer a profit or benefit to Mr. Salem[550];

- the Cairo criminal court did not find proof that the procedures followed by Messrs. Fahmy and Tawila were devoid of impartiality, tainted with corruption and abuse of authority with a purpose other than that for which they were conferred the authority[551];

- the Cairo criminal court was mistaken when it held that the Egyptian Council of Ministers had no supervisory authority over Messrs. Fahmy and Tawila[552].

506. The Court of Cassation, thus, concluded that the ruling by the Cairo criminal court was "tainted with insufficient reasoning, defective deduction and breach of the right of defence, and therefore ought to be rescinded"[553]. The consequence of this decision is that the criminal case must be returned to the Cairo criminal court to be re-judged by a different circuit[554]. The Tribunal has no knowledge of the status of the new trial.

**b.   Proceedings against Mr. Mubarak**

507. The Cairo criminal court also investigated former President, Mr. Mohammad Hosni Mubarak, in the case felony no. 3642 of 2011, for unlawfully profiteering and wilfully squandering public funds with the aid of, among other, Mr. Fahmy. On 2 October 2013 the court instructed a committee to issue a report on (among other issues) the facts surrounding the conclusion of the GSPA[555]:

"To indicate the elements required to be present in contracts for sale of natural gas starting from 2000 in light of the provisions of laws and decrees and assessing whether they were present during the negotiation, contracting, and execution [of the contract] concluded between the Egyptian Petroleum Sector and East Mediterranean Gas Company for the sale of natural gas for

---

[549] Doc. CLA-49, p. 10.
[550] Doc. CLA-49, p. 10.
[551] Doc. CLA-49, p. 10.
[552] Doc. CLA-49, p. 12.
[553] Doc. CLA-49, p. 11.
[554] Doc. CLA-49, p. 14.
[555] Doc. C-385, p. 3.

the purpose of export to Israel. [The foregoing in order] to highlight the defects, including the reasons therefor, basis thereof, the person(s) causing said defects, and whether or not such person aimed to enable others to profiteer without any right, and finally to determine whether or not any person profiteered".

508. The committee consisted of five members – Mr. Alaa Abdel Khalek Ibrahim and Mohammed Roushdy Galal (both working in EGAS), Dr. Attiya Mahmoud Attiya (from Port Said University), Mr. Ahmed Mohy El-Din El-Qadi (from the Administrative Control Authority) and Mr. Mohammed Fikry Abdel Hamid (from the Experts' Sector of the Ministry of Justice) – and is known as the "**Committee of Five**".

509. The Committee of Five had its report ready by February 2014 [the "**Technical Report**"]. Its findings are the following:

- the Council of Ministers Resolution issued on 18 September 2000 defined the general framework for the GSPA[556];

- the GSPA was a transaction with a special nature due to its political and security aspects, in addition to its commercial aspects[557];

- the GSPA was mentioned by General Omar Soliman, the former Chairman of the General Intelligence Service, in a letter dated 8 May 2005 to Mr. Fahmy, the former Minister of EGPC, who urged the Minister to make all preparations necessary for the signature of the GSPA before the end of the month[558];

- the conclusion of the GSPA with EMG was the result of a direct order from the former Prime Minister, Dr. Atef Ebeid, and nobody in the Petroleum Sector, whether the former Minister Mr. Fahmy nor EGPC had any saying or role in the decision[559];

- Mr. Fahmy had no participation, by aiding or abetting, during the conclusion of the GSPA, in causing damage to public funds[560];

- a comparison between the terms of the GSPA and the terms of other similar agreements for the export of gas through pipelines reveals a high degree of similarity[561]; specifically, the GSPA pricing formula was appropriate according to the then available data and forecasts and cannot be compared

---

[556] Doc. C-385, p. 23.
[557] Doc. C-385, pp. 53 and 54.
[558] Doc. C-385, p. 20.
[559] Doc. C-385, pp. 31 and 54.
[560] Doc. C-385, p. 53.
[561] Doc. C-385, p. 54.

with the pricing formulae applied in other countries[562]; the actual sale price under the GSPA was close to the net return realised from other export agreements signed by other Egyptian companies around the same period[563].

510. <u>In conclusion</u>, the Committee of Five found there had been no illegality in the procedures implemented during the negotiation, conclusion, delivery and performance of the GSPA[564].

## 2. THE PARTIES' POSITION

### 2.1 EGAS' POSITION

#### A. Additional facts

511. EGAS alleges that the web of influence of Messrs. Salem and Maiman – EMG's founders – reaches to:

- Mr. Hosni Mubarak, Mr. Salem's close confidante who had become President of Egypt in 1981;

- Mr. Atef Ebeid, the Egyptian Prime Minister, who signed the Framework Resolution on 18 September 2000, and whose son-in-law, Mr. Ayman Hamdy, held an executive position in EMG;

- Mr. Shabtai Shavit, the former head of Mossad, who had reportedly recruited Mr. Maiman and had helped solidify Mr. Maiman's links with the Israeli Government[565]; who was accused of using confidential information obtained from the intelligence services to garner support for the gas deal[566] and following the conclusion of the On-Sale Agreement, was appointed to a high-level position in Mr. Maiman's group of Israeli Merhav companies.

512. Messrs. Salem and Maiman realised personal profits by selling their interests in the company before it became operational[567]: between 2005 and 2006, Mr. Maiman reportedly realised a personal gain of over USD 150 Million from the sale of his shares in EMG to Ampal-American Israeli Corporation and its subsidiaries; and in June 2007 Mr. Salem sold 12% of his shares at a price of USD 145,000,800, and later another 25% for USD 486,937,500, whereas the original value of the shares was USD 17,640,000 and 36,750,000, respectively[568].

---

[562] Doc. C-385, p. 54.
[563] Doc. C-385, p. 55.
[564] Doc. C-385, p. 56.
[565] $R_{1+2}$ SS M, para. 216.
[566] $R_{1+2}$ SS M, para. 218.
[567] $R_{1+2}$ SS M, para. 221.
[568] $R_{1+2}$ FS M, para. 246; $R_{1+2}$ SS M, para. 221.

513. Meanwhile in Israel, several individuals who supported the gas deal with Egypt, including Mr. Eli Landau, the Chairman of IEC at the time, were questioned by the Israeli police for reportedly having bribed and put "extraordinary pressure" on other IEC board members during the four-year negotiation between 2001 and 2005[569].

514. Although Mr. Salem formally cut off his relation with EMG after the sale of his shares, EGAS argues that he continued to be involved in it, and that there is evidence that he paid a generous bonus to Messrs. Hamdy and Al Sakka from his personal account following the conclusion of the First Amendment in 2009[570]; and that it was his company who took care of the administrative costs of EMG, including Mr. Tawila's salary[571]. Given that Mr. Salem was a close confidante and reputed "bag man" of the then President, Mr. Mubarak, EGAS affirms that the GSPA was surrounded by a web of corruption[572].

515. EGAS arrives at the following conclusions with respect to the established facts:

- EMG's selection as the intermediary company in the gas deal is devoid of any economic logic[573]: no public tender process was organised; EMG was selected directly, despite the fact that EMG had no previous experience in the transportation of gas, nor did its founders – in fact, EMG did not even exist at that time;

- EMG's selection was only possible by Messrs. Salem and Maiman's improper exercise of influence on the Egyptian Government[574];

- The price of the gas sold to EMG under the GSPA was extremely low, because pursuant to the GSPA, EGPC and EGAS were to receive a price ranging between USD 0.75 and 1.50/MMBTU for the exploitation, production, development, processing and transport of gas to Al-Arish; and EMG would receive USD 1.25/MMBTU just for the transportation of the gas from Al-Arish and resale to its Israeli customers[575].

516. In EGAS' view the GSPA was tainted by corruption. EGAS argues that it is for EMG to demonstrate that the GSPA was a result of a *bona fide* negotiation and that EMG has failed to do so (**B.**); but even if it was incumbent upon EGAS to prove the illegality, EGAS is able to show that the GSPA was procured by

---

[569] R$_{1+2}$ FS M, para. 245.
[570] R$_{1+2}$ 110, p. 5.
[571] R$_{1+2}$ 110, p. 6.
[572] R$_{1+2}$ 110, p. 5.
[573] R$_{1+2}$ FS J, para. 18, FS M, para. 242.
[574] R$_{1+2}$ FS M, para. 241; R$_{1+2}$ SS M, para. 211.
[575] R$_{1+2}$ SS M, para. 219; R$_{1+2}$ FS M, para. 251.

unlawful acts under Egyptian law (**C.**) and is thus unenforceable under English law (**D.**).

## B.    EMG's burden of proof

517. It it is a recognised principle under international arbitration law that "[b]ecause of the near impossibility to 'prove' corruption", the appropriate way to make a determination of corruption is to shift the burden of proof to the party alleged to have perpetrated the corrupt act (who would be in possession of the evidence of corruption)[576]. According to EGAS, EMG – the party who must be in the possession of evidence relating to the illegal acts[577] – has not produced any evidence showing that the GSPA was a result of a *bona fide* negotiation process between the Parties[578].

518. But even if the onus of proving the illegality lay on EGAS, there is uncontested evidence demonstrating the illegality, as will be shown in the next section.

## C.    Unlawfulness under Egyptian law

519. The selection of EMG by Mr. Sameh Fahmy in April 2000 for the purchase of Egyptian gas from EGPC and its export to Israel, and the subsequent conclusion of the GSPA was in breach of EGPC's internal Commercial Activity Regulation (**a.**), and constitutes a crime under the provisions of the Egyptian Criminal Code (**b.**):

### a.    EGPC's Commercial Activity Regulation

520. Pursuant to Art. 4 of EGPC's internal Commercial Activity Regulation of 30 July 1992, the conclusion of contracts with entities for the export of natural gas must normally be held through a competitive selection (i.e. tender) procedure[579]. The Regulation provides in Art. 15 that the direct selection of an exporting entity may take place in exceptional circumstances only, and that the conclusion of a direct agreement for the exportation of resources is subject to express and cumulative conditions[580]. These conditions are the following[581]:

- there must be a case of necessity to conclude such a direct agreement;

- such an agreement must be concluded at appropriate prices;

---

[576] R$_{1+2}$ SS M, para. 237.
[577] R$_{1+2}$ PHB, para. 109.
[578] R$_{1+2}$ SS M, para. 236.
[579] R$_{1+2}$ SS M, para. 224.
[580] R$_{1+2}$ FS M, para. 248; R$_{1+2}$ SS M, para. 224.
[581] Doc. RL$_{1+2}$-59, Art. 15.

- such an agreement must be based on a recommendation by the deciding committee; and

- such an agreement is subject to the approval by the Minister of Petroleum and Mineral Resources.

521. According to EGAS, none of these conditions were fulfilled when Mr. Fahmy directly selected EMG as an intermediary to purchase and export gas[582]:

- there was clearly no "necessity" for EGPC to conclude the GSPA with EMG: EMG had just come into existence as a company and neither EMG nor its founders had previous experience in transporting natural gas and were unlikely candidates for the role when compared to the other major gas companies that were already operating in Egypt[583];

- the price which was to be paid to EGPC and EGAS by EMG under the GSPA was not appropriate, especially compared to the fee that EMG received for the same gas[584]: EGPC and EGAS were to receive a price ranging between USD 0.75 and 1.50/MMBTU under the GSPA, while EMG was to receive USD 1.25/MMBTU merely for transporting the gas from the Delivery Point to its Israeli customers;

- contrary to the express requirement under Art. 15 of the Regulation, no Deciding Committee ever issued a "recommendation" for the direct selection of EMG; rather, Mr. Fahmy acted unilaterally to award the GSPA to EMG's founders, Messrs. Salem and Maiman[585].

**b.    Egyptian Criminal Code**

522. According to EGAS two crimes were committed: profiteering (**i.**) and bribery (**ii.**).

(i)    <u>Mr. Fahmy's alleged profiteering</u>

523. Mr. Fahmy's involvement in the selection of EMG for the conclusion of the GSPA without the organisation of a tender process constituted a crime of "profiteering" under Art. 115 of the Egyptian Criminal Code[586], because all three elements required in said article are met[587]:

---

[582] R$_{142}$ FS M, para. 249; R$_{142}$ SS M, para. 225.
[583] R$_{142}$ FS M, para. 250.
[584] R$_{142}$ FS M, para. 251.
[585] R$_{142}$ FS M, para. 252.
[586] R$_{142}$ SS M, para. 228.
[587] R$_{142}$ SS M, para. 229.

- the person committing the crime of profiteering must be a public official as defined by Art. 119 *bis* of the Criminal Code: at the time selection as well as the signature of the GSPA, Mr. Fahmy was Minister of Petroleum[588];

- the public official must obtain (or try to obtain) for himself or for a third party a profit or benefit by exercising his functions; if the profit or benefit is being obtained for a third party, it must be undue or, in other words, confer an advantage that the third party does not deserve[589]: Mr. Fahmy granted EMG an undue benefit by directly selecting it for the conclusion of the GSPA, despite lacking experience and at an extremely low price[590]; and

- Mr. Fahmy was aware of all the components of the crime and by exercising his functions intended EMG to obtain a benefit[591].

(ii)   Mr. Tawila's alleged bribery

524.   In EGAS' view, Mr. Tawila, EGAS' Chairman at the time of signature of the GSPA, who later became EMG's Chairman, was bribed to conclude the GSPA – a crime defined by Art. 103 of the Egyptian Criminal Code[592]:

- the person committing the crime of bribery must fall within the broad concept of an official under Art. 111 of the Criminal Code, which includes "board members [...] of companies [...], if the State [...] is contributing a share to their capital, in any capacity whatsoever"; Mr. Tawila signed the GSPA as Chairman of EGAS' board of directors, and EGPC, a State company, owned 100% of EGAS' shares[593];

- the material element of the crime of bribery consists in taking, accepting or requesting a promise or donation to perform a public duty: Mr. Tawila accepted from EMG a benefit – his appointment as Chairman of the board of directors of EMG, where he received an annual salary equivalent to several times the annual salary he received as chairman of EGAS[594]; and the Minutes of EMG's Board of Directors meeting dated 17 July 2005 confirm that EMG paid him a bonus of USD 100,000 only a month after he signed the GSPA on behalf of EGAS; and

---

[588] R₁₄₂ SS M, para. 229.
[589] R₁₄₂ SS M, para. 229.
[590] R₁₄₂ SS M, para. 229.
[591] R₁₄₂ SS M, para. 229.
[592] R₁₄₂ SS M, para. 232.
[593] R₁₄₂ SS M, para. 233.
[594] R₁₄₂ SS M, para. 233.

- Mr. Tawila was aware of all the components of the crime and accepted the consideration[595]: Mr. Tawila's professional expertise in the field of natural gas made him aware of the unbalanced price of the GSPA, the lack of expertise of both EMG and its founders in transporting natural gas, but in return for his signature of the GSPA, he was appointed Chairman of EMG[596].

\* \* \*

525. EGAS further maintained that the above conclusions are not altered by the Egyptian Court of Cassation's decision dated 25 March 2013, which ruled that "criminal charges against Mr. Fahmy and Mr. Tawila were unsubstantiated"[597]. This is so because the Court of Cassation does not convict or acquit individuals: it simply reviews decisions of lower courts on legal grounds[598], but does not enter into an analysis of the factual aspects of the case[599]; and in any event the charges brought in the local proceedings are different from those in this arbitration[600].

### D.    Unenforceability under English law

526. The question before a court or tribunal called to enforce a contract governed by English law is whether that contract is unlawful according to the law of the contract's place of performance, in accordance with the principle established in *Ralli Bros*[601]. There is no doubt that the *lex executionis* here is Egyptian law[602].

527. The signature of the GSPA was the result of a conduct which violated fundamental provisions of Egyptian criminal law and public policy: the prohibition of bribery and profiteering[603]. This prohibition taints the procurement of the contract, and also its performance, because under Egyptian law (the law of the place of the GSPA's performance) it is also unlawful to perform a contract which has been obtained through corruption or illegality[604].

---

[595] $R_{1+2}$ SS M, para. 233.
[596] $R_{1+2}$ SS M, para. 233.
[597] $R_{1+2}$ PHB, para. 110.
[598] The only three grounds for appealing before the Court of Cassation are when:
(i) the lower court violated, misapplied or misinterpreted the law,
(ii) the judgment did not include the requirements or information necessary for its validity, or
(iii) a procedural error that affected the judgment was committed. ($R_{1+2}$ PHB, para. 111).
[599] $R_{1+2}$ PHB, para. 111.
[600] FHT, Day 3, 521 and 522
[601] $R_{1+2}$ FS M, para. 201 and 202; *Ralli Bros v. Compania Naviera Sota y Aznar* [1920] 1 KB 614, submitted as Doc. RL$_{1+2}$-50 ["*Ralli Bros*"].
[602] $R_{1+2}$ FS M, para. 228; $R_{1+2}$ SS M, para. 197.
[603] $R_{1+2}$ SS M, para. 206.
[604] $R_{1+2}$ SS M, para. 207.

## 2.2   CLAIMANT'S POSITION

528. EMG denies all accusations. EMG first contends that the burden of proof lies with
EGAS (**A.**), it then argues that, in any event, no illegality occurred (**B.**) and that
the arguments on unenforceability must be rejected (**C.**).

### A.   <u>Burden of proof on EGAS</u>

529. EGAS suggests that the Tribunal should shift the burden of proof with respect to
illegality onto EMG. The basis for such an extraordinary proposition is unclear.
The sole authority that EGAS cites confirms that the burden of proof remains
squarely on a party alleging corruption: the tribunal in *Consultant v Contractor*[605]
explained that the party alleging corruption must "bring some relevant evidence",
and only then might a tribunal "exceptionally" consider requesting the accused
party to submit counter-evidence[606]. But EGAS has presented no evidence at all.

### B.   <u>No illegality</u>

530. EGAS suggests that the events surrounding EMG's selection as the intermediary
in the gas deal with Israel was contrary to EGPC's internal Commercial Activity
Regulation (**a.**) and to the Egyptian Criminal Code (**b.**).

#### a.   **EGPC's Commercial Activity Regulation**

531. EGAS asserts that EMG's "direct selection" as contractual partner to export
natural gas to Israel on a long-term basis breached EGPC's internal Commercial
Activity Regulation, thereby rendering the GSPA contrary to Egyptian law and,
pursuant to EGAS' theory, unenforceable under English law.

532. EGPC's Commercial Activity Regulation is an internal collection of rules issued
by EGPC's Board of Directors, which have never been publicly available; it is
thus unquestionable that it is not a law in Egypt – in fact only a few limited
categories of Egyptian regulations have the force of legislation[607]. EGAS has
failed to explain how EGPC's alleged failure to comply with its own internal
regulation could nullify their contractual obligations to EMG under the GSPA[608],
especially taking into consideration that the Egyptian *Conseil d'Etat* has held that
failure by a public authority to comply with the terms of a law when contracting
with a private party does not permit the public authority to deny the private
party's contractual rights[609].

---

[605] *Consultant v. Contractor*, ICC Case No. 6497, Final Award, 1994, submitted as Doc. RL$_{1+2}$-117.
[606] C PHB, para. 171.
[607] C SS M, para. 67.
[608] C SS M, para. 64.
[609] C SS M, para. 68.

533. In any event, EGPC and EGAS were specifically authorised and instructed by the Egyptian Council of Ministers and the Ministry of Petroleum (the direct parent of EGPC) to enter into the GSPA. These very authorisations were incorporated into the GSPA, and Egypt's Supreme Administrative Court subsequently sanctioned these decisions as "an act of sovereignty and a matter of Egyptian national security"[610].

### b.   Egyptian Criminal Code

534. EGAS' argument that the GSPA was "devoid of any economic logic" (**i.**) and that it, thus, could not have been concluded other than by illicit behaviours (**ii.**), is completely false.

### (i)   EGAS' gain in the GSPA

535. In fact, Egypt's natural gas sector stood to profit handsomely from gas prices well above domestic levels, and to benefit from a multi-hundred million dollar undersea pipeline financed and constructed by EMG, which granted EGAS access to a new export market and to new customers for Egyptian natural gas, including the possibility to extend the pipeline system to other Mediterranean markets such as Turkey, with no need for EGPC and EGAS or any other state entity to commit any capital[611]. The government of Egypt also received, through EGPC, a 10% stake in EMG at no investment cost[612].

### (ii)   No criminal behaviour

536. EGAS' allegations that Messrs. Fahmy and Tawila, respectively, committed an act of profiteering and of bribery, are particularly irresponsible in the context of the Egyptian judicial procedures against Messrs. Fahmy and Tawila: in 2012, the Cairo criminal court convicted a number of defendants, including Messrs. Fahmy and Tawila, for misuse of public funds; and in March 2013, the Egyptian Court of Cassation overturned these convictions on the grounds that all allegations of illegitimacy in relation to the gas deal were unsubstantiated; the Court held that the criminal court of first instance had failed to take into account the possibility that Messrs Fahmy and Tawila simply followed orders[613].

537. Furthermore, the Technical Report unequivocally rejected any suggestion of impropriety on the part of Mr. Fahmy. The Committee of Five who drafted the report comprised five experts of the highest levels within the Egyptian government, including two senior EGAS officials nominated for that role by EGAS' Chairman. The Committee of Five concluded that Mr. Fahmy was not

---

[610] C SS M, para. 65.
[611] C SS M, para. 62.
[612] C SS M, para. 63.
[613] C PHB, para. 174.

responsible for the selection of EMG. The Committee's findings are consistent with the decision of Egypt's Supreme Administrative Court, which held that the export of gas to Israel is "a matter of Egyptian national security"[614].

538. Similarly, documentary evidence definitively disproves EGAS' contention that Mr. Tawila signed the GSPA in return for his appointment to EMG management. An Egyptian government Decree of 23 May 2005 establishes that Mr. Tawila signed the GSPA because he was empowered to do so by the Ministry of Petroleum[615]. He had no discretion in the matter. Furthermore, Mr. Hamdy confirmed that Mr. Tawila was offered a position with EMG only after he had signed the GSPA, and in light of his impending mandatory retirement[616].

539. With no evidence to support their allegation of corruption, EGAS is left to point out that Messrs. Salem and Maiman sold shares in EMG for a significant profit. This is neither illegal nor surprising: between the time they bought and sold those shares, EMG had evolved from a mere concept into a company with firm long-term upstream and downstream agreements, backed by Egyptian sovereign assurances at the highest levels. Moreover, EMG's facilities in El-Sheikh Zuwaid had been completed by mid-2007 and the pipeline itself was nearing completion[617].

## C.   English law

540. EMG has confirmed the validity of the GSPA under Egyptian law. But even if EGAS' arguments were successful and the Tribunal held that the GSPA violated Egyptian laws so as to turn the GSPA invalid, the consequence would not be its unenforceability under English law.

541. EGAS' proposition of unenforceability by reference to the 1929 House of Lords decision in *Ralli Bros* is inapposite: this case relates to the performance of an English law contract that is allegedly contrary to the law of the state in which that contract is to be performed, but EGAS' only claim is that the GSPA was allegedly procured in breach of Egyptian law[618].

542. In any event EGAS is claiming the unenforceability of the GSPA as a matter of English law even though the parties had been operating on the basis that the GSPA was valid and enforceable since it was concluded in 2005[619].

---

[614] C PHB, para. 175.
[615] Doc. C-61.
[616] C PHB, para. 176.
[617] C SS M, para. 61.
[618] C PHB, para. 170, n. 353.
[619] C Supp S, para. 12.

### 2.3 IEC'S POSITION

543. IEC's response is that EGAS' case should be rejected because it was for EGAS to prove the allegations and it has failed to provide any evidence (**A.**), because unenforceability under English law has not been established (**B.**), and finally because no illegal acts were committed (**C.**).

### A. Burden of proof and evidence of corruption

544. It is EGAS who alleges corruption and it is for EGAS to prove the corruption. The case law and doctrine relied upon by EGAS to support the shifting of the burden of proof do not help its case:

- The case *Consultant v. Contractor*[620] relied upon by EGAS presupposes that the party alleging corruption has brought some evidence, which EGAS has not, to begin with; only then can the Tribunal exceptionally, under "special circumstances" or for "very good reasons", request counter-evidence and such counter-evidence must be overwhelming – none of this has happened in this case[621];

- The article by Karen Mills does not assist EGAS either[622], because the author notes that there must first be a reasonable indication of corruption – there is no such reasonable indication here; and reverse burden is contemplated only for situations where it is effectively impossible for the alleging part to prove a negative – that is not this case since all the relevant information should have been in the possession of EGAS and their ultimate owners, the Egyptian Government; yet EGAS has chosen to adduce no evidence to make good their allegations of criminality[623].

545. EGAS confines its submissions to a vague suggestion that a number of individuals involved in the gas deal have been investigated by various authorities for wrongdoing in various jurisdictions going back to the 1970s and that Messrs. Salem and Maiman made a significant profit when selling some of their shares in EMG in 2006-2007. This is not evidence of corruption, and certainly not of corruption in this deal[624].

### B. English conflict of laws and the *Ralli Bros* case

546. As EGAS correctly identifies, the usual rule under English conflicts of law principles is that the English courts will not enforce a contract governed by

---

[620] *Consultant v. Contractor*, ICC Case No. 6497, Final Award, 1994, submitted as Doc. RL$_{1+2}$.117, p. 4.
[621] R$_3$ PHB, para. 97.
[622] R$_3$ PHB, para. 97.
[623] R$_3$ PHB, para. 97.
[624] R$_3$ SS M, para. 174.

English law insofar as performance of the contract is unlawful by the law of the country in which performance is to take place[625]. Despite setting out the test correctly, EGAS then proceeds to ignore it[626]: the question is not whether the contract or its execution was unlawful; but whether its performance was unlawful. Indeed the Privy Council has held that a contract will not – as a matter of English conflicts of law rules – be regarded as invalid merely because it was invalid at the place where the contract was made[627].

547. Despite it being a necessary pre-condition for the Tribunal to entertain any argument as to Egyptian law, EGAS has provided no explanation whatsoever of any acts of performance in Egypt under the GSPA which are said to be illegal under Egyptian law. Neither is any illegal act of performance (whatever that may be) evidenced. In the circumstances, EGAS' case must fail[628].

548. Moreover, it would be surprising if there was anything illegal under Egyptian law in selling or transporting gas, whether under a binding contract or not – it is simply part of what EGAS and EGPC do. Indeed, since EGAS does not suggest there was anything illegal about those acts, it is presumed that EGAS accepts that the performance of the GSPA was lawful and therefore *Ralli Bros* is simply inapplicable[629].

549. Finally, and in any event, EGAS also faces the problem that Art. 9 of both the Tripartite Agreement and the GSPA provide that the parties contracted out of any English conflicts rules which require the application or consideration of any law other than English law; the parties have therefore effectively contracted out of the application of *Ralli Bros* and therefore Egyptian law[630].

## C.    No illegal acts

550. Even if Egyptian law was relevant to any matters in question, the only Egyptian law actually referred to by EGAS as breached is EGPC's own internal Commercial Activity Regulation, which is irrelevant (**a.**). Furthermore, no illicit acts under the Criminal Code were committed (**b.**).

---

[625] R₃ SS M, para. 177.
[626] R₃ SS M, para. 179.
[627] R₃ SS M, para. 180.
[628] R₃ SS M, para. 181.
[629] R₃ SS M, para. 182.
[630] R₃ SS M, para. 184.

### a.   EGPC's Commercial Activity Regulation

551.  EGAS' assertion that the conditions of Art. 15 of EGPC's internal Commercial Activity were not met is irrelevant[631]:

- first, the regulation is irrelevant under English law because it is concerned with the formation of export contracts (when in fact, the GSPA is purely domestic)[632] and not their performance[633]; and

- secondly, EGPC's Commercial Activity Regulation is an internal regulation governing the conduct of EGPC – it is no different from any other internal rule or regulation governing when a company can and cannot contract; any alleged breach of any such internal rule or regulation does not and cannot invalidate the contract under English law, being the law applicable to the formation of the GSPA[634];

552.  But, in any event, the conditions set out in Art. 15 have been fulfilled:

- The case of "necessity" does not refer to the necessity for a contract for the sale of gas, it refers to a necessity to enter into a direct contract rather than tendering for buyers; given the unusual and political nature of the contracts, an intermediate company such as EMG (co-owned by Israelis and Egyptians) was needed to construct and operate what was termed the 'peace pipeline' between Israel and Egypt, it would have been pointless and inappropriate to have put the GSPA out to public tender.

- The price agreed in the GSPA cannot be said to be less than an "appropriate" price; even if it were true that the price was below the then prevailing market price, when one considers the unique background to the Contracts and the unique circumstances in which the GSPA was formed, it becomes apparent that it is inappropriate and artificial to compare this transaction to a purely commercial sale and purchase of gas.

- Finally, the GSPA and the wider transaction had been the subject of governmental approval at the highest levels: indeed EGAS and EGPC expressly warranted in the Tripartite Agreement that their performance of their obligations under the Tripartite Agreement, and therefore their promise of performance of the GSPA, was not in breach of any applicable law, regulation or judicial order[635].

---

[631] R₃ SS M, para. 186.
[632] R₃ SS M, para. 188.
[633] R₃ SS M, para. 187.
[634] R₃ SS M, para. 189.
[635] R₃ SS M, para. 190.

b.    **Egyptian Criminal Code**

553. The Egyptian Court of *Cassation* has quashed the convictions of Messrs. Tawila and Fahmy. The appeal succeeded on a number of bases, including that the first instance criminal court's decision was based upon "unsubstantiated assumptions and considerations [...]" and was "tainted with ambiguity and vagueness [...]". The Court of *Cassation* noted that the first instance court simply failed to establish the mental element of any of the crimes. It is unsurprising in these circumstances that the convictions were set aside[636].

554. It is obvious that allegations of the commission of criminal acts face a very high burden of proof, and the absence of any actual evidence against Mr. Fahmy and Mr. Tawila makes such findings impossible[637].

(i)    No profiteering by Mr. Fahmy

555. The alleged basis for the charge against Mr. Fahmy for profiteering is that he is said to have failed to organise a tender process for the selection of EMG in apparent violation of EGPC's internal Commercial Activity Regulation[638].

-    This is no evidence of profiteering[639], because EGPC's Regulation does not require a tender; it expressly contemplates selection without a tender in the case of necessity and at appropriate prices[640].

-    As regards necessity, the Technical Report of the Committee of Five (which included two representatives of EGAS) specifically concluded that "it is apparent that there was a strong inclination from the General Intelligence Service and the Cabinet of Ministers towards the necessity of concluding the agreement in question"[641].

-    As regards the price under the GSPA, the rate was deemed fair by EGPC's Board, indeed the deal with EMG was obviously sanctioned at the very highest levels of government in Egypt; moreover, the Committee of Five concluded that the price charged to EMG was either above or close to the general average of net revenue from other such gas supply contracts[642].

-    Finally, and even if EGAS could overcome the hurdles above, in order to establish profiteering, EGAS/EGPC would have to establish that Mr. Fahmy

---

[636] R₃ PHB, para. 95.
[637] R₃ PHB, para. 89; FHT, Day 3, pp. 525 and 526.
[638] R₃ PHB, para. 93.
[639] R₃ PHB, para. 93.
[640] R₃ PHB, para. 93.
[641] R₃ PHB, para. 93.
[642] R₃ PHB, para. 93.

criminally intended to give EMG an undue profit; but there is no evidence to support any such finding, on the contrary, the Technical Report expressly absolved Mr. Fahmy[643].

(ii)   No bribery by Mr. Tawila

556.  The case against Mr. Tawila for bribery is based only on the fact that he joined EMG after he left EGAS. This is equally hopeless[644].

-      The bribe is said to be that he "presumably received a salary at EMG that was several times higher than what he received at EGAS, and this could have been a motivation"; this is not a promising start to a criminal charge which lacks any evidence to support this presumption[645].

-      Moreover, the evidence established that Mr. Tawila left EGAS not because of some corrupt bargain with EMG, but because he was reaching the mandatory retirement age in July 2005[646].

-      There is no evidence that any bribery occurred – the evidence is to the contrary; it is obvious that the Memorandum of Understanding with Israel, the selection of EMG and the price under and entry into the GSPA were tantamount to sovereign acts of Egypt sanctioned at the very highest levels of government. Mr. Tawila was authorised by specific Ministerial Decree to sign the Source Contract[647].

\* \* \*

557.  It is also notable that, at the same time as asking the Tribunal to refuse any damages claim by IEC or EMG because the GPSA is said to be illegal, EGAS has simultaneously been pursuing EMG for a large damages claim under the GSPA in the Cairo Arbitration; these are inconsistent positions for EGAS to adopt, and demonstrates how hollow the allegations of illegality in this arbitration are[648].

**3.    THE TRIBUNAL'S DECISION**

558.  As a preliminary comment, the Tribunal notes that the Parties have not raised any jurisdictional objection with respect to enforceability issues. The Tribunal infers that the Parties accept that, if the GSPA is unenforceable due to corruption, then the Tripartite Agreement must suffer the same consequence; it follows that, even

---

[643] R$_3$ PHB, para. 93, fn.118.
[644] R$_3$ PHB, para. 94.
[645] R$_3$ PHB, para. 94.
[646] R$_3$ PHB, para. 94.
[647] R$_3$ PHB, para. 94.
[648] R$_3$ PHB, para. 96.

if the Tribunal's jurisdiction is limited to the Tripartite Agreement, the Tribunal is empowered to decide on the GSPA's alleged unenforceability.

559. The Tribunal will first decide on the relevant applicable law (**3.1.**), it will then analyse whether the burden of proof shall be reversed (**3.2.**) and finally, the Tribunal will take a decision on the alleged invalidity of the GSPA (**3.3.**).

## 3.1   APPLICABLE LAW

560. Arts. 9.1 and 14.1 of Annex 1 to the GSPA provide that English law governs the GSPA, while Annex 6 to the GSPA states that the place of contractual performance, i.e. the delivery point for gas sold by EGPC and EGAS to EMG, is Egypt.

561. All parties agree, and the Tribunal concurs, that under English law a contract procured by corruption is invalid and as such cannot be enforced[649]. The conclusion reached under English law is confirmed as a matter of international or transnational public policy: if the Tribunal were to find that the GSPA had been procured by corruption, the necessary consequence would be that the GSPA is void and unenforceable, if the aggrieved party so requests[650].

562. The parties have however discussed an ancillary issue: the relevance under English law, of the historic *Ralli Bros* case – a discussion which in any case does not affect the main conclusion that contracts affected by corruption are unenforceable:

-   EGAS states that the GSPA, whether or not it is lawful under English law, must be held unenforceable since it contravenes the laws of Egypt, the agreed place of contractual performance, which allegedly prohibit the performance of corrupt contracts[651]; for this conclusion EGAS relies on the *Ralli Bros* case.

-   EMG, however, questions the relevance of the case, since it relates to an entirely different situation, where performance of an English law contract is contrary to the law of the state in which that contract is to be performed[652].

---

[649] FHT, Day 1, p. 104.
[650] See Alan Redfern, *Law and Practice of International Commercial Arbitration* (Sweet & Maxwell, 2004, 4th Ed.), at 142, 457 fn. 38, 458; Julian D.M. Lew, Loukas A. Mistelis, Stefan Kröll, *Comparative International Commercial Arbitration* (Kluwer Law International, 2003), at 17-36 (see also cases at fn 47). See Richard Kreindler, *Die international Investitionsschiedsgerichtsbarkeit und die Korruption*, in SchiedsVZ 2010/1 p. 3; See *Niko Resources (Bangladesh) Ltd v. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") and Bangladesh Oil Gas and Mineral Corporation ("Petrobangala")*, ICSID Case No. ARB/10/11 and ICSID Case No. ARB/10/18, Decision on Jurisdiction, 19 August 2013, para. 433.
[651] $R_{1+2}$ FS M, para. 234; $R_{1+2}$ PHB, para. 99.
[652] C SS M, fn.88; C PHB, para. 170, fn. 353.

- And IEC argues that the relevant question in that case was whether the performance of the contract was unlawful – not whether its execution was unlawful[653]; IEC adds that in this respect, EGAS has provided no explanation whatsoever of any acts of performance in Egypt under the GSPA which are said to be illegal, nor is there evidence of any illegal act[654].

563. The *Ralli Bros* case dates back to 1920. The case is unrelated to corruption: it refers to a contract governed by English law, which was to be performed in Spain. The Spanish government issued a decree after the contract had been validly entered into, which limited the payment of freight on jute; and since the limit foreseen in the decree was lower than the contractual freight, the English court rejected to enforce the contract due to supervening illegality at the place of performance, i.e. Spain. Thus, the action brought to the court, to recover the freight at the contractual rate, failed.

564. The Tribunal considers that the *Ralli Bros* case has little relevance, because the premise for that decision is dissimilar to the discussion in this arbitration: in *Ralli Bros* a valid contract under English law was executed, but the agreement became unenforceable due to a subsequent change of law at the place of performance, while in our case the question is whether the GSPA was invalid since the time of its conclusion, the consent having been tainted by corruption.

565. This takes the Tribunal to deal with the next question, as to whether such corruption has been established.

## 3.2   BURDEN AND STANDARD OF PROOF

566. The general rule is that the party who makes an argument has the burden of providing the evidence which proves its case – it would be for EGAS to prove that the procurement of the GSPA was tainted by corruption. The question here is whether in cases of corruption, where the aggrieved party is confronted with notorious difficulties to find and marshal convincing evidence of the wrongdoing, it is appropriate that the burden of proof be shifted to the party responsible for the corrupt practices. The relevant case on the reversing the burden of proof is *Consultant v. Contractor*[655].

---

[653] R$_3$ SS M, para. 180.
[654] R$_3$ SS M, para. 181.
[655] *Consultant v. Contractor*, ICC Case No. 6497, Final Award, 1994, submitted as Doc. RL$_{1+2}$-117.

*Consultant v. Contractor*

567. The relevant passage of the award in the *Consultant v. Contractor* case is the following[656]:

> "The 'alleging Party' may bring some relevant evidence for its allegations, without these elements being really conclusive. In such case, the arbitral Tribunal may exceptionally request the other party to bring some counter-evidence, if such task is possible and not too burdensome. If the other party does not bring such counter-evidence, the arbitral Tribunal may conclude that the facts alleged are proven (Art. 8 of the Swiss Civil Code). However, such change in the burden of proof is only to be made in special circumstances and for very good reasons".

568. The tribunal, thus, ruled that:

- a generally recognised legal principle of international arbitration law is that the burden of proof of an alleged fact rests on the party who relies upon such fact in support of its case (*"actori incumbit probatio"*)[657];

- exceptionally ("in special circumstances and for very good reasons") it is the opposing party who has to submit counterevidence, at the request of the tribunal,

- provided that the alleging party brought forward relevant, but inconclusive evidence on the bribery; i.e. when there is evidence that points to the corruption with some degree of probability[658].

569. The question here is whether the exceptional circumstances for reversing the burden of proof have been met. The Tribunal is of the view that this is not the case, because EGAS has failed to establish with a sufficient degree of

---

[656] ICC Case No. 6497, at p. 73, para. 4. The arbitral Tribunal in ICC Case No. 6497 ultimately found that respondent (the Contractor) failed to conclusively prove bribery, despite the fact that the amounts paid to claimant (the Consultant) were very high, and the effective costs of claimant have been a small fraction of such amount. The Tribunal perceived these payments as not being abnormal for a consultancy agreement, which "was without any bribery nature".

[657] Sayed, Abdulhay, *Corruption in International Trade and Commercial Arbitration*, (Kluwer Law International, The Hague, London, New York, 2004), p. 92 with further references in fn. 282. The same principle is stated in Art. 8 of the Civil Code of Switzerland, which is the law of arbitration place in the present arbitration, i.e. Geneva. This provision reads as follows: "Unless the law provides otherwise, the burden of proving the existence of an alleged fact shall rest on the person who derives rights from that fact". Art. 55(1) of the Civil Procedure Code foresees the same principle: "The parties must present the court with the facts in support of their case and submit the related evidence". Relevant for the reference to the said provisions are Art. 15 (1) of the ICC Rules (1998) as well as Arts. 176(1) and 182(2) of Swiss Federal Code on Private International Law.

[658] Sayed, Abdulhay, *Corruption in International Trade and Commercial Arbitration*, (Kluwer Law International, The Hague, London, New York, 2004), pp 105, 106.

reasonableness that the conclusion of the GSPA must have been surrounded by corruption.

EGAS' case

570. EGAS' main contention is that EMG's choice as counterparty in the GSPA was influenced by corruption. EGAS' case rests on two arguments:

- EMG was selected directly, not through a tender process, which was the ordinary course in accordance with EGPC's internal Commercial Activity Regulation; and EGAS seems to suggest that, had a tender been organised, EMG would not have been selected, given that it lacked experience in the transportation of gas;

- Messrs. Fahmy and Tawila committed criminal offences such as bribery and profiteering when, in the discharge of their official capacity, they selected EMG; as is proven by the fact that they were convicted for profiteering and damaging public funds by the Cairo criminal court.

571. The Tribunal is not convinced that EGAS' case meets the test established in *Consultant v. Contractor*, namely that the evidence marshalled is "relevant, but inconclusive":

- EGPC's internal Commercial Activity Regulation accepts that, under exceptional circumstances, direct selection is possible; and the Tribunal is persuaded – as will be analysed *infra* – that this case indeed presents exceptional circumstances;

- the Cairo criminal court's decision has been overturned by the Court of Cassation; at the time of delivering this award, Messrs. Fahmy and Tawila have not been convicted for any criminal offence and are entitled to the presumption of innocence; and

- the Technical Report of the Committee of Five concluded that Mr. Fahmy signed the GSPA with EMG obeying a direct order of Dr. Atef Ebeid, the Egyptian Primer Minister, within the Framework Resolution passed by the Egyptian Council of Ministers on September 2000.

572. EGAS has thus failed to marshall a minimum of evidence, showing that there is a likelihood, or at least a reasonable chance, that the crimes of corruption were committed either during the procurement or the execution of the GSPA and the Tripartite Agreement. EGAS has also been unable to convincingly argue that exceptional circumstances are at hand, which give cause for reversing the burden of proof. The onus of demonstrating the existence of corruption, therefore, lies with EGAS.

573. EGAS' alternative position is that it has established with sufficient evidence that EMG's direct selection was irregular, that Mr. Fahmy committed the criminal offence of profiteering, and Mr. Tawila of bribery – all three sufficient grounds to hold the GSPA voidable and unenforceable under Egyptian law. Whether EGAS has been able to satisfy its burden of proof will be analysed in the next Section.

## 3.3 EVIDENCE ON THE ALLEGED CORRUPTION

### A. The direct selection of EMG

574. It is not disputed that EGPC decided to select EMG as counterparty in the GSPA directly and that no tender process was ever organised. There also is no evidence of negotiations with other alternative third parties.

575. EGAS has argued that this way of proceeding is contrary to EGPC's internal Commercial Activity Regulation and thus, illegal.

576. The Tribunal is not convinced.

577. Leaving aside the question whether EGPC's internal Commercial Activity Regulation is a binding legal rule, or simply an internal organisational document (a question which in nationalised companies is difficult to ascertain), the fact is that the Regulation, although providing that the ordinary course for the selection of exporting entities should be through public tender, also authorises that in exceptional circumstances the counterparty be determined through a direct selection procedure[659].

578. The requirement of exceptional circumstances is clearly met in this case: as the Egyptian Supreme Administrative Court decided on 27 February 2010[660], the selection of EMG and the main features of the GSPA was a matter of Egyptian national security. The Tribunal is persuaded that the obvious political sensitivities involved in the resale of Egyptian gas to Israeli customers justify the non application of the tender process in the Commercial Activity Regulation so that the company responsible for the transportation and resale be chosen directly.

### B. Mr. Fahmy's alleged profiteering

579. EGAS submits that Mr. Fahmy conferred EMG an undeserved benefit when he irregularly selected EMG as a counterparty to the GSPA. In EGAS' view, EMG's lack of experience in the transportation of gas made it an unsuitable candidate; had a regular tender process been organised, EMG would never have been chosen.

---

[659] Doc. RL$_{1+2}$-59, Art. 15.
[660] Doc. CLA-50.

And furthermore, EMG obtained a disproportionate benefit in the gas deal, if one compares the sale price with the re-sale price[661].

580. EMG and IEC deny the existence of profiteering and base their position on the Technical Report of the Committee of Five, which confirmed that there was nothing inappropriate in Mr. Fahmy's participation in the conclusion of the GSPA and that the features of the GSPA, especially the provisions on price, were in line with other international contracts and with market conditions.

581. The Tribunal will place significant evidentiary weight on the Technical Report prepared by the so called Committee of Five, a thorough (some 50 pages long), well-prepared report, drafted by a balanced group of experts in the field, including two representatives from EGAS, an expert of the Ministry of Justice, a university professor and a member of the Administrative Control Authority[662]. Furthermore, the Technical Report was drafted at the request of, and formally delivered to the Cairo criminal court, in the course of a criminal investigation of former President Mubarak – a fact which reinforces the impartiality and responsibility of the experts who participated and increases the report's power of conviction as a piece of evidence in the present proceedings.

582. Based on the conclusions established as proven in the Technical Report, the Tribunal finds that EGAS has failed to marshall conclusive evidence proving that Mr. Fahmy committed a crime of profiteering, in violation of Art. 115 Criminal Code:

- EMG was created with the endorsement of the Egyptian government as part of the overall project to export gas to Israel; this is evidenced by the Prime Minister's approval of 23 January 2000 and Decree no. 230/2000 of 29 January 2000[663];

- the decision to select EMG as counterparty to the GSPA was formally taken by the Egyptian Council of Ministers, not by EGPC, in accordance with a Resolution dated 18 September 2000;

- the Technical Report of the Committee of Five has come to the conclusion that when Mr. Fahmy, as the Minister of Petroleum, selected EMG, he was only carrying out orders, which came from higher echelons within the Public Administration, and which were being coordinated by the head of Intelligence Service; and the Court of Cassation added that EMG's selection was explicitly endorsed by Mr. Fahmy's superiors; and

---

[661] R$_{1+2}$ SS M, paras 223-230.
[662] Doc. C-385, p. 4.
[663] Doc. R$_{1+2}$-297.

168

- in the Committee of Five's view the pricing arrangements agreed upon in the GSPA represent market prices, comparable to those established in similar, contemporaneous international gas contracts.

583. EGAS has also stressed the alleged corrupt background of some individuals, who were directly or indirectly involved in the procurement of the GSPA, the supposed influence of Mr. Fahmy (the Minister of Petroleum) on the government and the alleged close relationship between all of them. The Tribunal sees in this suspected net of contacts no evidence that Mr. Fahmy committed an offence of profiteering: his involvement in EMG's selection was purely instrumental, since he was only enforcing a decision taken at higher political levels.

EGAS' additional arguments

584. EGAS has tried to undermine the relevance of the Technical Report and that of the Decision by the Court of Cassation:

585. As regards the Technical Report, EGAS emphasises that, although two representatives of EGAS were part of the Committee of Five, EGAS is not bound by the opinions of those individuals[664]. The Tribunal accepts this conclusion. But it does not affect the fact that the Technical Report is a thorough document, prepared by independent experienced professionals from different backgrounds related to the petroleum sector, at the request of a judicial authority, for the purposes of a criminal investigation, which inspires confidence in the impartiality of the drafters and in the correctness of the conclusions reached.

586. EGAS also argues that the criminal case against Mr. Fahmy before the Cairo criminal court is based on different facts to those analysed in this arbitration. The Tribunal is not persuaded: Mr. Fahmy was charged with profiteering – the only difference is that in this arbitration EGAS argues that it was EMG who obtained the benefit, whilst in the Egyptian proceedings Mr. Salem – EMG's major shareholder at the relevant time – is singled out as the ultimate beneficiary. These nuances do not alter the essence: the facts analysed by the criminal court and by this tribunal are the same.

587. EGAS further avers that the Court of Cassation can only review the ruling by the lower criminal court to confirm the correct application of the law, but cannot make a determination with respect to the facts of the criminal case[665]; hence, the Court of Cassation's decision to quash the judgement by the Criminal court to convict Messrs. Fahmy and Tawila does not imply that these individuals were acquitted. The Tribunal acknowledges the remits of the Court of Cassation, but in taking its decision, the Court of Cassation has adopted certain conclusions, which are relevant for this adjudication, and it has not put in doubt the relevance and

---

[664] SHT, Day 11, p. 2523.
[665] Doc. RL$_{1+2}$-141; R$_{1+2}$ PHB, paras. 109, 111-113; SHT, Day 12, pp. 2521 and 2522.

veracity of the Technical Reports. There is the possibility that the Cairo criminal court initiates new criminal investigations against Messrs. Fahmy and Tawila, but in the meantime one fact remains unchallenged: the acts of profiteering were allegedly committed 15 years ago, the criminal investigations were initiated three years ago and neither Mr. Fahmy (nor Mr. Tawila) have been convicted and thus must be presumed innocent until proven guilty.

## C.    Mr. Tawila's alleged bribery

588. EGAS submits that Mr. Tawila, who was EGAS' Chairman at the time of signature of the GSPA, resigned from this position shortly thereafter, to join EMG as Chairman, where he earned a salary several times higher than as chairman of EGAS, plus a significant annual bonus. EGAS sees in these facts evidence that Mr. Tawila was bribed to sign the GSPA[666]. In essence, EGAS argues that EMG bribed Mr. Tawila, EGAS' chairman, to sign the GSPA, offering him the benefit of becoming chairman of EMG, with a higher salary.

589. The Tribunal is unconvinced. The documentary evidence disproves EGAS' contention that Mr. Tawila signed the GSPA in return for his appointment to EMG management: the Decrees No. 100 of 2004[667] and No. 456 of 2005[668] issued by the Ministry of Petroleum empowered Mr. Tawila to sign the GSPA, within the limits and in accordance with the Framework Resolution passed by the Egyptian Council of Ministers back in 2000, which already included the prices and terms of the GSPA; and the Technical Report of the Committee of Five concluded that these acts of the Ministry of Petroleum were a result of a direct order of Dr. Atef Ebeid, Egyptian Primer Minister, who was the ultimate authority for EMG's selection[669].

590. The Tribunal sees nothing suspicious in the circumstances surrounding Mr. Tawila's change of employment; there is no evidence that the promise of a new position was made in consideration for signing the GSPA; to the contrary, there are good reasons which explain his appointment:

-    EGAS and EMG are related companies: EGPC holds a 10% of EMG's shares and EGPC and EGAS are both State-owned companies controlled by the Ministry of Petroleum; transferral of managing directors from one government participated company to another is not infrequent.

-    EGAS has failed to prove that after joining EMG Mr. Tawila obtained a salary increase; the only evidence marshalled is that he was to receive a

---

[666] R[1+2] SS M, paras. 231 and 232.
[667] Doc. C-59.
[668] Doc. C-61.
[669] Doc. C-385, pp. 31 and 54.

yearly bonus of USD 100,000[670]; in any case, the positions of chairman of EGAS – a 100% publicly owned company entrusted with the monopoly of gas production – and of EMG – a start-up company controlled by private investors for the construction and exploitation of a pipeline to Israel – are not equivalent and may justify different levels of remuneration.

\* \* \*

591. <u>In conclusion</u>, the Tribunal finds that the allegation made by EGAS that in procuring and executing the GSPA, EMG's officers or shareholders committed crimes of bribery or profiteering remains unproven, and the validity and enforceability of the GSPA remains unaffected.

---

[670] FHT, Day 3, pp. 514 and 515.

# IX. *FORCE MAJEURE*

592. The Tribunal has already established that its jurisdiction derives from Art. 9 of the Tripartite Agreement, and it has dismissed EGAS' contention regarding unenforceability due to alleged corruption. The Tribunal's next task is to delve into the merits of the dispute and establish whether EGAS has indeed defaulted under the obligations it assumed in the Tripartite Agreement.

593. EMG and IEC hold a common position: that EGAS (i) wrongly terminated the GSPA, amounting to a repudiation of the GSPA and of the Tripartite Agreement, and that (ii) EGAS also breached the obligations under Art. 1, 2 and 3 of the Tripartite Agreement, which in essence provide:

- that EGAS commits to supply up to 2.2 BCM of gas to EMG under the GSPA, for EMG to redeliver to IEC under the On-Sale Agreement (Art. 1);

- that EGAS undertakes to exercise reasonable endeavours to enable EMG to deliver such gas to IEC (Art. 2); and

- that the exact amount of gas delivered is 55.246 MMBTU during CY 1 and 78.268 MMBTU in each subsequent CY (Art. 3).

The alleged wrongful termination and the alleged breach of the Tripartite Agreement obligations will be analysed in chapters XI and XII.

594. Before doing so it is however necessary to address a preliminary defence advanced by EGAS: even if delivery failures occurred, they were excused by a general *force majeure* situation. Between 5 February 2005 and 9 April 2012 the Pipeline was attacked 13 times, explosives were used to blow up the pipe or its facilities, the gas flow was interrupted while repairs were carried out, and EGAS stopped gas deliveries to EMG (and EMG to IEC).

Application of the GSPA to the *force majeure* defence

595. The Tribunal has already concluded that the obligation to supply gas formalised in the Tripartite Agreement is a repeat of the equivalent obligation assumed in the GSPA[671]. There is however a significant difference in the degree of detail with which the obligation is described in both contracts: while the Tripartite Agreement only provides a succinct summary, the structure of compliance and the availability of defences is fully developed in the GSPA. The Parties have acknowledged this in their pleadings: in its defence against EMG's Tripartite Agreement Claims EGAS is (among other defences) relying on the *force majeure*

---

[671] See para. 481 *supra*.

remedy deriving from the GSPA; and EMG and IEC have not disputed EGAS' entitlement to do so, and rather have denied the merits of the *force majeure* defence under the contractual regime provided for in the GSPA, arguing that EGAS has failed to act as a Reasonable and Prudent Pipeline Operator ["**RPPO**"].

596. Therefore, although the Tribunal has found that it lacks jurisdiction under the GSPA, it is uncontested that the Parties have empowered the Tribunal to interpret and apply the GSPA in adjudicating the *force majeure* issue.

## 1. INTRODUCTION

### The Pipeline

597. Line 36 of the Arab Gas Pipeline is almost 192 km long and runs between Damietta and the east of Al-Arish, where it connects with EMG's own section of the pipeline. Line 36 has been defined as the "**Pipeline**".

598. The Pipeline is a straight pipe, interrupted by valve stations, railway valves, traps and off-take rooms [jointly, the "**Facilities**"]. The Pipeline has around 15 of such Facilities[672], all relatively small in size (typically, 25 m x 25 m)[673]. These Facilities serve specific purposes and usually host valuable equipment. Off-take rooms, for example, are used to connect the main pipeline with a ramification of smaller diameter leading to a certain customer and house among other material, metering equipment used to measure supplies to a particular customer.

599. Another characteristic feature of the Pipeline is that for half of its length it is looped. The section of the Pipeline between Off-take room nos. 2 and 3 is doubled: there is thus a mainline with several valve rooms, and a simple looping line of approximately 100 km length.

600. EMG's facility is located at the end of the Pipeline in the town of El Sheikh al Zuwaid – in close vicinity of the Gaza border. From there, the pipeline is operated by EMG and leads underwater to Israel.

### North Sinai

601. The Pipeline crosses North Sinai. All experts agree that this has been and continues to be a historically conflictive zone. It is populated mostly by Bedouin, who were marginalised during the Mubarak era[674], and regarded themselves as an alien body within the Egyptian Republic[675]. Restricted from entry into the formal economy, Bedouins developed a market for unlicenced tourism, cannabis and

---

[672] The exact number of these facilities is not clear: the diagram provided in B&O'B-Freeny FR depicts 15, Exhibit BFS 3, p. 2 refers to 19 and GASCO'S Contingency Plan lists 14 (Doc. R₃-393, p. 65).
[673] FHT, Day 6, p. 1304.
[674] Pelham FR, para. 20.
[675] Pelham FR, para. 15.

opium cultivation, arms-running and smuggling into Israel and Gaza[676]. Bedouin
are organised in tribes, with their own terrain; and revenues from the informal
economy helped revive old coping mechanisms and patronage networks[677].

602. After the Camp David Accords, Egyptian military presence in Sinai was curtailed.
Sinai was divided in four zones, named A through D, with Egyptian military
presence decreasing from west to east. EGAS' Pipeline runs through Zone B,
where military force was limited to four infantry battalions (approx. 2,000
troops)[678], armed with AK 47 rifles[679]. As a counterweight to the low military
presence, there was a strong local police (under the Ministry of Interior), which –
at least during the Mubarak era – was effective in keeping the area secure[680].

<u>Revolution and attacks</u>

603. With the eruption of the popular uprising that toppled President Mubarak in
January 2011, Sinai's Bedouin seized the opportunity to shrug off Egypt's internal
security yoke and push for communal empowerment[681]. Militants grew strong and
lawless[682], and their violence against the police led Egypt's State police to
abandon the area[683]. A security vacuum resulted[684].

604. In this context of revolution, in the period between February 2011 and April 2012
the Pipeline suffered a total of 13 attacks, which significantly affected gas supply.

\* \* \*

605. The analysis will be structured as follows: the Tribunal will first summarise the
arguments submitted and the evidence marshalled by each party (**2.**, **3.** and **4.**);
thereafter the Tribunal will establish the facts of the case (**5.**), and analyse the
contractual regulation of *force majeure* in the GSPA (**6.**); finally, the Tribunal will
take its decisions regarding burden of proof (**7.**), and then decide whether two
requirements for the availability of the *force majeure* defence have been met:

-   the requirement that EGAS act as a RPPO (**8.**); and

-   the so-called "**Avoidance Requirement**": whether the attacks could indeed
    have been mitigated or prevented, had EGAS acted as a RPPO (**9.**).

---

[676] Pelham FR, para. 24.
[677] Pelham FR, para. 17.
[678] Eiland, para. 137.
[679] Eiland, para. 138.
[680] Pelham FR, para. 26.
[681] Pelham FR, para. 39.
[682] Pelham FR, para. 4.
[683] Pelham FR, para. 41.
[684] Pelham FR, para. 40.

606. The chapter will close with sections devoted to EGAS' counter-arguments (**10.**), a specific analysis of the first attack (**11.**), an alleged waiver of rights (**12.**), and to EGAS' accusation of bad faith (**13.**)

## 2. EGAS' POSITION

607. Respondents 1 and 2 claim that the attacks on the Pipeline amounted to *force majeure* events, which justify EGAS' failure to deliver.

### 2.1 ARGUMENTS

608. EGAS submits two basic arguments: that it is undeniable that *force majeure* occurred, causing gas supply failures (**A.**) and that the contractual requirements for that *force majeure* event to become a contractual remedy have been met (**B.**).

### A. Occurrence of a *force majeure* event that impeded gas supply

609. To EGAS it is undisputable that a *force majeure* event existed because the sabotages were terrorist attacks and once this is established, by definition, it follows that this prevented EGAS from supplying gas.

610. Respondents 1 and 2 submit that the Pipeline was not bombed by a small primitive group, but suffered terrorist attacks[685]:

- In the aftermath of the Arab Spring, sophisticated weaponry began to flow into the region and Bedouin tribes were provided with resources to build up their strength[686]; contemporaneous reports confirm that machine guns, rocket-propelled grenades and remote detonated explosives were among the weapons used during the attacks[687].

- Although the perpetrators of the attacks remain unknown, even IEC's expert Gen. Eiland has recognised that the Ansar Bayt al-Maqdis group is most likely to be held responsible[688]; this group is the most prolific terrorist organisation operating in Egypt[689], and part of a far-reaching network[690].

611. By definition, terrorist attacks constitute *force majeure* events, as they are outside the control of the affected party[691]. And this *force majeure* caused a delay or

---

[685] R[142] SS M, para. 514.
[686] R[142] SS M, para. 506.
[687] R[142] PHB, para. 146.
[688] R[142] PHB, para. 145.
[689] R[142] PHB, para. 146.
[690] R[142] SS M, para. 514.
[691] R[142] SS M, para. 490.

failure by EGAS to perform its obligations under the GSPA. The causality between the event and this lack of performance has not been contested[692].

612. The real question is whether EGAS is entitled to a *force majeure* remedy. EGAS accepts that the GSPA sets out certain requirements that the party affected by *force majeure* must comply with, in order to claim *force majeure*.

## B.   Requirements for *force majeure* remedy

613. The contractual regulation of *force majeure* contained in Art. 16 of Annex 1 to the GSPA ["**Art. 16**"] sets out two requirements for a *force majeure* remedy: acting as a prudent and reasonable person (**a.**) and giving proper notice of the *force majeure* event (**b.**) – both of which were met.

### a.   Acting as a RPPO

614. The party affected by *force majeure* is required to act as a RPPO in preventing (**i.**), overcoming and mitigating the effects of the *force majeure* event (**ii.**)[693]. EGAS accepts this premise, but notes that the GSPA also introduces a significant qualification[694]: the standard of reasonableness must be measured taking into consideration the circumstances and conditions of the affected party.

615. Such circumstances include the context of social unrest in which EGAS operated, which affected its ability to run the Pipeline and to repair the damage following terrorist attacks[695]. EGAS submits that[696]:

- It was impossible for its personnel to perform its functions: employees feared for their physical safety and refused to resume their work; and those who worked were compelled to shorter working hours, so that they could return to their accommodation in daylight.

- Delivery of supplies and equipment to the site was also hampered: most transportation companies were unwilling to take the risk and send vehicles and employees to the North Sinai region.

616. Against this factual background, EGAS goes on to explain why it acted as a RPPO in preventing, overcoming and mitigating the effects of *force majeure*.

---

[692] R$_{142}$ PHB, para. 122.
[693] R$_{142}$ FS M, para. 357.
[694] R$_{142}$ FS M, para. 366.
[695] R$_{142}$ FS M, para. 359.
[696] R$_{142}$ FS M, para. 361.

(i)    Preventing the *force majeure* event

617. In the years preceding the Revolution, Police and State Security forces were responsible for security in Sinai. The threat of terrorism was marginal, as Police and Security Force presence had a powerful deterrent effect[697]. EGAS relied heavily on the protection provided by these forces[698], as any reasonable and prudent company then operating in Sinai would have done[699].

618. According to EGAS, two salient facts from that time are that:

- EMG never raised any concerns regarding lack of security, which should be interpreted as an acknowledgment that the Pipeline was being secured in accordance with reasonable standards[700].

- No attacks occurred: the measures implemented were not only reasonable, but also effective[701].

(i.1)    The first attack

619. EGAS vehemently claims that if there is one attack that for sure was unpreventable, it was the first one[702]: the Pipeline was attacked in the midst of the period of violence and severe unrest that led President Mubarak to step down[703]; and it was impossible for EGAS to predict the Revolution and the collapse of security forces that ensued in Sinai[704].

620. But even if it had been able to predict the decline in security, EGAS could still not have protected the pipeline, as security forces at those times were unable to protect themselves[705].

(i.2)    Subsequent attacks

621. EGAS alleges that thereafter it took several measures to enhance the security on the Pipeline facilities through:

- armed security forces, who were provided with housing[706], that duly compensated for the absence of State Security and Police[707];

---

[697] R$_{142}$ PHB, para. 132.
[698] R$_{142}$ PHB, para. 133.
[699] R$_{142}$ PHB, para. 135.
[700] R$_{142}$ PHB, para. 135.
[701] R$_{142}$ PHB, para. 135.
[702] R$_{142}$ PHB, para. 137.
[703] R$_{142}$ PHB, para. 136.
[704] R$_{142}$ PHB, para. 137.
[705] R$_{142}$ PHB, para. 137.
[706] R$_{142}$ FS M, para. 371.

- surveillance towers were erected and remote surveillance equipment purchased[708];

- additional wire around key installations to a total length of 10,344 km was set up[709];

- exposed sections of the pipeline were buried710; and

- motor vehicles were supplied to the Ministry of Interior to improve defence[711].

622. Once security on the facilities had increased, terrorists shifted to attacking the line itself[712]. And EGAS submits that enhancing security of the pipeline is an impossible accomplishment, because it runs through 192 km of an almost uninhabited desert[713].

623. Respondents 1 and 2 further argue that substantially greater forces would have been to no avail at preventing attacks, because other major and better protected installations in Sinai (such as cement factories and the MFO) were also the object of successful militant attacks[714].

    (ii)    Overcoming the *force majeure* event and mitigating the effect

624. The identification and arrest of suspected perpetrators was not viable when the State Security apparatus had ceased to operate[715].

625. And as far as damage repair is concerned, EGAS avers that it carried out repair works as soon as practicable in light of the general state of unrest in Egypt and particularly in Sinai[716]. It coordinated with the relevant suppliers, placed the necessary orders and made the required arrangements for repair works to start[717]. This struggle was not unique to EGAS, since other enterprises in North Sinai also encountered serious difficulties in obtaining contractors and supplies to conduct business and carry out repairs[718].

---

[707] $R_{1+2}$ PHB, para. 142.
[708] $R_{1+2}$ FS M, para. 371.
[709] $R_{1+2}$ PHB, para. 142.
[710] $R_{1+2}$ PHB, para. 142.
[711] $R_{1+2}$ PHB, para. 142.
[712] $R_{1+2}$ FS M, para. 372.
[713] $R_{1+2}$ FS M, para. 370.
[714] $R_{1+2}$ SS M, para. 516.
[715] $R_{1+2}$ SS M, para. 512.
[716] $R_{1+2}$ FS M, para. 377.
[717] $R_{1+2}$ FS M, para. 377.
[718] $R_{1+2}$ SS M, paras. 541 and 543.

626. Expert evidence submitted by EMG suggests that EGAS' repairs should have been finalised in 119 days. EGAS replies that this evidence is completely irrelevant to the case, because it is based on unrealistic assumptions which do not apply to North Sinai. Alternatively, if the expert opinion is deemed relevant, then EGAS should be entitled to those 119 days of *force majeure* relief[719].

### b.   Notice

627. The GSPA required the party affected by *force majeure* to keep the other party informed, by[720]:

   -   serving a *force majeure* notice;

   -   providing a report of the circumstances of the *force majeure*, indicating the place where the event took place and the reasons why the *force majeure* event affected the performance of the GSPA; and

   -   providing updates.

628. EGAS submits that it complied with such requirements, as can be seen from the communications it exchanged with EMG and have been filed as evidence in this arbitration[721].

*   *   *

629. Respondents 1 and 2 add two additional arguments.

### C.   Acceptance of *force majeure*

630. EGAS' first additional argument is that EMG has asserted *force majeure* under the On-Sale Agreement; and under Art. 12.8 of the On-Sale Agreement[722] EMG cannot claim *force majeure*, without accepting that the same event constitutes *force majeure* for EGAS[723]. It follows that EMG is bound by its assertion of *force*

---

[719] R$_{1+2}$ PHB, para. 156.

[720] R$_{1+2}$ FS M, para. 356.

[721] See exhibits quoted in R$_{1+2}$ SS M, footnote 619.

[722] "Third Party *Force majeure*: to the extent that any Party delegates or sub-contracts the performance of its obligations under this Agreement to a third party, such Party will remain liable for any delay or failure to perform such obligations, and may only claim relief by reason of *Force majeure* in respect of such delegated or sub-contracted obligations if [...]... the event or circumstance causing such delay or failure to perform would have entitled such third party to relief by reason of *Force majeure* if such third party had been a party to this Agreement. The foregoing provisions [...]... will apply *mutatis mutandis* [...]... with respect to Seller, to events or circumstances impacting the gas transmission pipeline system of EGPC or EGAS".

[723] R$_{1+2}$ SS M, para. 493.

*majeure* in the On-Sale Agreement[724] and that it is prevented from disputing that the Pipeline attacks constituted *force majeure* events under the GSPA[725].

### D.   Alleged godsend

631.   EGAS is incensed by EMG's suggestion that the attacks on the Pipeline were a godsend[726] which allowed it to deviate gas supply from Israel to other more "palatable"[727] export customers, such as Jordan, and to the national market[728]. EGAS adds that the proposition is in any event easily refuted by the fact that all but one attack interrupted gas supply to local and export customers[729].

## 2.2   EVIDENCE

632.   The first issue addressed by EGAS is who bears the burden of proving whether EGAS failed to act as a reasonable and prudent person. EGAS submits that it has made a clear case that a *force majeure* event existed and if EMG and IEC contend that EGAS has prejudiced its *force majeure* remedy because it failed to act as a reasonable and prudent person in securing the Pipeline, then it is for EMG and IEC to prove so[730].

633.   In any case, EGAS argues that it acted as a reasonable and prudent person, given the situation of chaos in North Sinai; and it has attempted to prove its case through expert evidence (**A.**) and documents (**B.**).

### A.   Expert evidence

634.   Respondents 1 and 2 engaged the services of Mr. Nicolas Pelham, a journalist specialised since 1992 in Middle East politics, who has authored numerous publications – amongst other topics, on Sinai after the fall of the Mubarak regime. Mr. Pelham, who is based as a correspondent in Jerusalem, was in a position to closely monitor the events in Sinai[731].

635.   Mr. Pelham submitted two expert reports and was subject to an extensive examination during the Hearing.

636.   He explained that the aim of his reports was to give an eyewitness account of what was happening in North Sinai at the times the attacks took place[732]. Pursuant

---

[724] R$_{1+2}$ SS M, para. 494.
[725] R$_{1+2}$ PHB, para. 130.
[726] R$_{1+2}$ PHB, para. 124.
[727] In fact, this is an expression used in Cook, para. 16.
[728] C SS M, para. 7.
[729] R$_{1+2}$ SS M, para. 496.
[730] FHT, Day 3, p. 564.
[731] Pelham FR, para. 5.
[732] FHT, Day 7, p. 1481.

to his personal knowledge he opined that the fall of the Mubarak regime in January 2011 resulted in a security vacuum[733], of which Bedouin tribes took advantage to erupt as violently armed insurgents[734]. Mr. Pelham's recollection is that insecurity and violence greatly hampered normal operations, not only by precipitating direct sabotage of the Pipeline, but also by obstructing the process of maintenance and repairs[735]. Mr. Pelham reported several attacks on other targets in North Sinai with heightened security measures and his main conclusion was that it is questionable whether improved defences would have deterred militant attacks on the Pipeline[736].

637.  In his second report Mr. Pelham stressed that militant capabilities in North Sinai after the Revolution were formidable and Bedouins were not a small primitive group that could have been easily overcome[737]. He went on to repeat that no feasible security measures could have beaten the attacks[738]. His main conclusion was that if heightened security had been implemented, it would actually have attracted more attacks[739] and therefore, a low profile security approach[740] as adopted by EGAS proved to be more effective and had prevented any increase in the rate of attacks[741].

**B.   Documents**

638.  EGAS has referred to a number of contemporaneous documents in order to prove the existence of *force majeure* events and of their effort to secure the Pipeline, such as:

-    13 notices of *force majeure*, one for each attack[742];

-    technical reports in relation to five attacks[743];

-    minutes of GASCO's Board of Directors meetings in which it decided to implement and/or approve the implementation of heightened security measures[744], such as the building of concrete walls to defend the facilities,

---

[733] Pelham FR, para. 40.
[734] Pelham FR, para. 42.
[735] Pelham FR, para. 8.
[736] Pelham FR, para. 82.
[737] Pelham SR, para. 8.d.
[738] Pelham SR, para. 33.
[739] Pelham SR, para. 71.
[740] Pelham SR, para. 74.
[741] Pelham SR, para. 95.
[742] Doc. $R_{1+2}$-191, Doc. $R_{1+2}$-195, Doc. $R_{1+2}$-197, Doc. $R_{1+2}$-201, Doc. $R_{1+2}$-203, Doc. $R_{1+2}$-209, Doc. $R_{1+2}$-216, Doc. $R_{1+2}$-219, Doc. $R_{1+2}$-225, Doc. $R_{1+2}$-232, Doc. $R_{1+2}$-236 and Doc. $R_{1+2}$-239.
[743] Doc. $R_{1+2}$-196, Doc. $R_{1+2}$-205 and Doc. $R_{1+2}$-229.
[744] Doc. $R_{1+2}$-470 and Doc. $R_{1+2}$-473.

installation of barbed wire, erection of surveillance towers and building of housing units for the soldiers guarding the Pipeline[745];

- preparatory studies for the acquisition of surveillance equipment[746]; and

- checks issued by GASCO to the Armed Forces[747].

639. The Arbitral Tribunal will devote a whole section in 8 *infra* to analysing the evidence adduced by EGAS, but the Tribunal can already anticipate that it is surprised by the scarcity of evidence that EGAS has submitted: for instance, there are no witness statements from the persons responsible for securing the Pipeline, no photographs of the watchtowers and of the accommodation built, no footage from the surveillance cameras, no invoices for supplies acquired or for services rendered.

## 3.   EMG'S POSITION

640. In EMG's view, EGAS saw in the situation of unrest in Egypt a golden opportunity to create and maintain a sweeping claim of indefinite *force majeure*. This would permit EGAS to cease supply to EMG and redirect such gas to the local market and to friendly export customers[748].

641. But *force majeure* is not a general remedy which can be argued lightly. Quite the contrary: *force majeure* is a legal concept which is subject to precise contractual regulation. Claimant's case is that EGAS has not proven that it complied with the contractual requirements; alternatively, EMG submits that it has marshalled sufficient evidence to prove the contrary of EGAS' assertion: that EGAS did not behave as a reasonable and prudent person. The result is the same, because in both cases the *force majeure* remedy would cease to be available.

### 3.1   ARGUMENTS

642. Claimant takes issue with Respondents 1 and 2's arguments: EMG contends that it is EGAS who bears the burden of proving that a *force majeure* remedy is available (**A.**); furthermore, Claimant denies that EGAS acted as a reasonable and prudent person in securing the Pipeline (**B.**) and even if EGAS had secured the Pipeline properly, it did not comply with its reporting obligations (**C.**) and, finally, it did not repair the Pipeline in a timely fashion (**D.**).

---

[745] Doc. R$_{1+2}$-468, Doc. R$_{1+2}$-469, Doc. R$_{1+2}$-470, Doc. R$_{1+2}$-473, Doc. R$_{1+2}$-474, Doc. R$_3$-325 and Doc. R$_3$-354.
[746] Doc. R$_{1+2}$-375 and Doc. R$_{1+2}$-477.
[747] Doc. R$_{1+2}$-469, Doc. R$_{1+2}$-474 and Doc. R$_{1+2}$-475.
[748] C SS M, para. 219.

A. **Burden of proof**

643. *Force majeure* has been introduced in this arbitration as a defence raised by EGAS against Claimant's claim for failure to supply gas. It is therefore EGAS' contention and for it to prove that a valid *force majeure* remedy is available[749].

644. According to the Claimant, EGAS has failed to discharge its burden[750]: all arguments made by EGAS that it effectively implemented measures to enhance security of the Pipeline, are no more than simple, unproven allegations[751].

B. **Failure to properly secure the Pipeline**

645. Alternatively, EMG claims that EGAS is not excused from supplying gas under a *force majeure* defence because this remedy was prejudiced by EGAS' failure to act as a RPPO: all 13 attacks could have been prevented if security measures had been implemented in accordance with industry practice by an operator performing its duties in good faith[752].

646. EMG argues that a RPPO would have taken steps to secure vulnerable facilities from the outset, as EMG had done on its own facility, which included 50 armed men and nine sentry towers[753]. Yet EGAS' preventive measures were almost non-existent: the first attack, on 5 February 2011, targeted Off-take Room 4, which was guarded by one single person; the lack of security is manifest if contrasted with the security deployed by EMG at its own facility[754].

647. But even if one accepted that there was an element of surprise in the first attack, a RPPO would have taken corrective steps after that attack. There is however no evidence that EGAS refined and intensified security measures to prevent repeat incidents[755], and any contention made by EGAS that it indeed implemented heightened security remains unproven[756].

648. The same can be said with respect to attacks on the pipe, which showed a uniform *modus operandi*[757]: they took place within 32 km of Al Arish and on each occasion saboteurs appear to have been undisturbed, while they located the buried pipeline, dug a trench, placed explosives and detonated them[758].

---

[749] C SS M, para. 222.
[750] C FS M, para. 219.
[751] C SS M, para. 229.
[752] C SS M, para. 236.
[753] Al Sakka FWS, para. 70 and Al Sakka SWS, para. 35.
[754] C FS M, para. 214.
[755] C FS M, para. 218.
[756] C SS M, para. 229.
[757] C FS M, para. 215.
[758] C SS M, para. 232.

649. EGAS retorts that no matter what security means may have been adopted, it would not have made a difference on the ground; this view is allegedly supported by EGAS' expert, Mr. Pelham. Yet Mr. Pelham's report does not offer either factual argument or relevant experience to support his opinion as a journalist[759]. And it is simply not acceptable that EGAS justifies its failure to adopt even the most basic measures with speculation that this would not have protected the facilities from a large-scale attack[760].

650. Furthermore, such speculation is not even realistic. Attacks were carried out by between three and six lightly-armed men, and all of them around the Al-Arish area. Such kind of threat could have been deterred had standard security procedures been followed[761]. Proof of it is the fact that EMG was very successful in preventing damage from the one and only attack it suffered on its facilities in Al-Arish[762] on 29 July 2011, which was repelled by EMG's security forces in three minutes[763].

## C.   Failure to report

651. The GSPA requires the party advancing a claim of *force majeure* to[764]:

- Notify the other party, as soon as is reasonably practicable: EMG accepts that EGAS provided a standard formatted notice for all the attacks.

- Provide a report of the alleged *force majeure* circumstances, including all available relevant information: EGAS drafted reports only in five of the 13 attacks[765]; and even when it did so, expert evidence has demonstrated[766] that the little material that was provided was submitted late and falling short in a number of key items.

- Provide updates from time to time on the status of the *force majeure* event: EMG repeatedly requested information about the *force majeure* claims but rarely received it[767].

652. In conclusion, EMG submits that reporting requirements were not met: for those events where only a standard notice of *force majeure* was sent, because they lacked technical reporting and updates[768]; and for those where a technical report

---

[759] C SS M, para. 233.
[760] C SS M, para. 234.
[761] C SS M, para. 234.
[762] C FS M, para. 213.
[763] C FS M, para. 213.
[764] C FS M, para. 231.
[765] C FS M, para. 234.
[766] C SS M, para. 262.
[767] C FS M, para. 234.
[768] C SS M, para. 263.

was provided, because such reports were deficient and submitted after the damage had been belatedly repaired[769]. EMG thus never received contemporaneous information on the situation of *force majeure*[770].

### D.   Failure to repair

653.   EMG's default position is that, if a *force majeure* defence is accepted, then it should only be available for the time it would have taken a reasonable and prudent person to repair the damages.

654.   EMG submits that EGAS failed to take reasonable steps to remedy its failure to perform. And this submission has been proven by an expert opinion that concludes that 207 of the claimed repair days would have been avoided by a reasonable operator[771]. It thus took EGAS three times longer to restore the pipeline to service than was reasonably necessary[772].

655.   EMG specifically criticises a number of actions of EGAS or excuses that EGAS has adopted:

<u>5 February and 12 July 2011 Attacks</u>

656.   After this first attack on 5 February 2011, EGAS informed EMG that repair would be slowed by a lack of spare parts. EMG offered to procure the parts itself but EGAS refused[773].

657.   EMG is particularly critical with EGAS' repair of the damage caused by the 12 July 2012 Attack, which took 84 days – the longest of all 13 attacks. EMG attributes this slowness to the fact that it was the one attack that solely damaged the section of the Pipeline between the last offtake and EMG's facilities. Thus, the only customer which suffered gas flow failures was Israel[774]. The snail pace of repair stands in stark contrast with EGAS' reaction to the 27 September 2011 incident (attack no. 6), where greater damage was repaired in just one month – this incident affected, of course, other customers beside Israel, such as Jordan and Syria[775].

---

[769] C SS M, para. 264.
[770] C SS M, para. 265.
[771] C FS M, para. 224.
[772] C SS M, para. 239.
[773] C FS M, para. 229.
[774] C SS M, paras. 243 and 244.
[775] C FS M, para. 225.

Social unrest

658. EGAS has manifestly failed to discharge their burden of proving that they were unable to repair due to the alleged general social unrest in Egypt[776]:

- The allegation that most transportation companies were unwilling to risk sending their employees and vehicles to the North Sinai region is unproven. There is evidence of quite the contrary: EMG operated a pipeline facility in the North Sinai region during the same period, which could only be reached by the same coastal road that services EGAS' and GASCO's offices in Al-Arish; yet EMG had no difficulty in obtaining supplies and equipment[777].

- The allegation that employees and technicians were unwilling to deploy to the North Sinai region is not only unproven, but unlikely because EMG experienced no similar problems[778].

- The allegation that due to the risks in transportation of employees, working hours had to be shortened in not supported by corroborating evidence. And in EMG's experience it never had to shorten working hours at its facilities due to security concerns[779].

659. As regards the resumption of delivery, expert evidence has proven that once the Pipeline was operational, there was no technical difference between delivering some gas or all of the required gas. However, after the sabotage repairs, EGAS rarely restored the delivery rate to full capacity[780].

## 3.2 EVIDENCE

660. According to EMG, the little evidence in the file shows that EGAS failed to act as a reasonable and prudent person when securing the Pipeline and when repairing the damages. To support this contention the Claimant has provided three types of evidence: expert reports (**A.**), documents (**B.**), and witness statements (**C.**):

### A.   Expert reports

661. Claimant has produced four expert reports prepared by the consulting firm Baker & O' Brian, which is specialised in oil and natural gas industries. Two of the reports are on pipeline security and the other two on pipeline repairs and on *force majeure* reporting.

---

[776] C SS M, para. 259.
[777] C SS M, para. 256.
[778] C SS M, para. 257.
[779] C SS M, para. 258.
[780] C SS M, para. 254.

### a. Pipeline security

662. The report on pipeline security is authored by Mr. Benjamin Schrader, a security advisor and manager of oil and gas facilities[781]. After document production was completed, Mr. Schrader provided a supplemental report in which he basically confirmed his previous opinion. The following summary puts together the conclusions of both reports.

663. Mr. Schrader opines that security consists of three key elements, which a reasonable and prudent pipeline owner/operator would have in place, but EGAS failed to meet:

(i)   <u>Prevention</u>

664. The pipeline operator has to monitor the level of the security threat to its pipeline infrastructure assets, identify the critical ones and implement countermeasures to deter and prevent attacks. The results of such exercise will be reflected in a security plan, which shall be revised after possible incidents[782].

665. Security measures to be implemented include among other: policies and procedures, physical barriers (fences, walls, barbed wire, gates, etc.[783]), access controls and psychological barriers (guards, cameras, etc.[784]).

666. A prudent pipeline operator will also engage the local government and community groups[785].

(ii)   <u>Detection</u>

667. Detection implies personnel and equipment monitor potential attacks[786], including random patrols on foot or vehicle[787], aerial surveillance in remote locations, proper lighting[788] and motion detection equipment[789].

---

[781] B&O'B-Schrader FR, para. 2.
[782] B&O'B-Schrader FR, para. 24.
[783] FHT, Day 6, p. 1235.
[784] FHT, Day 6, p. 1235.
[785] B&O'B-Schrader FR, para. 19.
[786] B&O'B-Schrader FR, para. 20.
[787] FHT, Day 6, p. 1236
[788] B&O'B-Schrader FR, para. 17.
[789] B&O'B-Schrader FR, para. 21.

(iii)   Response

668.   Response measures imply[790]:

- Reaction: security forces who respond adequately to a security breach. Implies a planned coordination with local, regional or national security assets who can be rapidly mobilised to supplement its internal security (if necessary);

- Damage control: automatic shutdowns upon pressure loss and isolation capabilities;

- Recovery: skilled personnel to conduct repair work and maintain the necessary spare parts; and

- Re-assessment: conduct an investigation after each attack to identify weaknesses and determine improvements.

669.   Once an intrusion is detected, the better the delay tactics, the more time is provided to the reaction team to apprehend the intruders before they reach their objective[791].

670.   Mr. Schrader is of the view that all the measures listed above should have been in place prior to the first attack, particularly given that the Pipeline had been threatened[792]; and had they been implemented, the expert is certain that all attacks would have been prevented, since the assaults were of minimal force and sophistication, predictable and broadly consistent over time[793].

671.   The security expert also opined on the documentary evidence produced by EGAS, in support of its contention that reasonable security measures had been taken:

- Surveillance towers and housing units for security staff: the evidence produced consists of two decisions from GASCO's committee and board of June and December 2011; this provides no evidence that the constructions were ever built, especially in the absence of more suitable proof such as construction contracts and photographs. Hence the expert assumes that these elements were not built[794]. And, if they ever were, Mr. Schrader opines that these measures are very basic and should have been implemented long before[795].

---

[790] B&O'B-Schrader FR, para. 23.
[791] B&O'B-Schrader FR, para. 22.
[792] B&O'B-Schrader FR, para. 58.
[793] FHT, Day 6, p. 1265.
[794] B&O'B-Schrader SR, para. 22.
[795] B&O'B-Schrader SR, para. 23.

- <u>Surveillance equipment</u>: the evidence is an undated[796] comparison between various security systems and a July 2011 letter regarding a proposed closed circuit television systems for valve rooms. If this equipment had been acquired and deployed, there would be more accurate evidence such as purchase orders, footage, etc.[797].

- <u>Security personnel</u>: EGAS has disclosed 330 individual contracts for security services. Mr. Schrader opines that the industry standard mandates that a specialised and fully-equipped security force be engaged[798], which normally means a public security agency or a recognised professional private security company[799]. A number of privately contracted, mostly illiterate individuals[800], without a clearly defined command structure[801], does not comply with the standards.

672. Mr. Schrader opines that, whatever measures were implemented they were precarious since there is no evidence that:

- all facilities were guarded[802];

- saboteurs were ever challenged[803];

- a response team was contacted after an attack[804];

- any existing coordination with local security forces existed[805]; or

- a re-assessment was undertaken after the attacks[806].

**b.  Pipeline repairs**

673. Mr. Freeny is an engineer, who has worked for more than 20 years in the Middle East in the oil, gas and hydrocarbon sector, serving as project manager as well as other positions[807]. Mr. Freeny produced a main and a supplementary report in which he replied to certain criticisms made by EGAS.

---

[796] But seems to go back to 2008.
[797] B&O'B-Schrader SR, para. 27.
[798] B&O'B-Schrader SR, para. 14.
[799] B&O'B-Schrader SR, para. 15.
[800] B&O'B-Schrader SR, para. 18.
[801] B&O'B-Schrader SR, para. 16.
[802] See e.g. B&O'B-Schrader SR, para. 37 commenting attack #3, he notes that the report does not describe any security personnel guarding the facility.
[803] FHT, Day 6, p. 1265.
[804] See e.g. B&O'B-Schrader SR, para. 42 commenting attack #4.
[805] See e.g. B&O'B-Schrader SR, para. 30, commenting attack #1.
[806] This observation is common to every attack.
[807] B&O'B-Freeny FR, Annex A.

674. Mr. Freeny's reports support EMG's argument that EGAS took longer to resume gas supply after each attack than it should, had it behaved as a reasonable and prudent person. In summary, the expert identifies four assumptions on which standard repair works in the industry are premised:

(i)     Prioritisation of gas flow resumption

675. Repair works should be split into two phases[808]:

-       the first, to carry out crucial repairs to re-establish supply;

-       the second, to repair the remaining damage while commercial activities are resumed.

676. If this approach is followed, then non-critical activities such as police investigation or damage assessment can be performed in parallel to repair works[809].

(ii)    Standard emergency response plan

677. A standard emergency response plan should be in place[810]. This plan lists the activities required to complete repair for standard types of damages, prescribes purchase of spare parts for such repairs[811] and provides a contracting strategy so that valid contracts for repair are in force[812].

(iii)   Pre-hydrostatically tested pipe

678. Pre-hydrostatically tested pipeline should be available[813]. This avoids post-repair hydrostatic pressure testing and allows for gas supply to resume at normal pressure levels upon finalisation of repair[814].

(iv)    Efficiency factor of 61%

679. The expert has applied a productivity efficiency factor for piping work of 61%, which is, in his view, conservative and significantly lower than the 70% used as a standard basis[815]. And around-the-clock work is presumed[816].

---

[808] B&O'B-Freeny FR, para. 36.
[809] B&O'B-Freeny FR, para. 49.
[810] B&O'B-Freeny FR, para. 29.
[811] FHT, Day 6, p. 1144.
[812] FHT, Day 6, p. 1140.
[813] B&O'B-Freeny FR, para. 58.
[814] B&O'B-Freeny FR, para. 59.
[815] B&O'B-Freeny FR, para. 38.
[816] B&O'B-Freeny FR, para. 123.

680. Based on the above assumptions Mr. Freeny concludes that repair works could have been performed in 108 days, which implies reducing the actual repair time by ⅔[817].

### c. *Force majeure* reporting

681. The other area on which Mr. Freeny gave his expert opinion was *force majeure* reporting.

682. Mr. Freeny explained that *force majeure* reports enable a contractual counterparty to assess the impacts, and merits of a claim to *force majeure*. This is especially relevant in contracts for the supply of gas, where a contractual relationship is a link in a chain of relationships: the report can be used by that counterparty to justify its own failure to perform in another linked relationship, as a result of the *force majeure*[818].

683. According to his experience, EGAS' *force majeure* reporting did not meet the industry standards:

(i)   Extemporaneous filing

684. Reports were filed too late.

685. Reports should be issued within 48 hours of each attack. It took EGAS, however, on average 46 days after gas flow resumed to provide a report[819]. This delay had an impact on the practical usefulness of reports[820].

(ii)   Failure to provide updates

686. After a *force majeure* event has occurred, information should continuously be updated through daily emails[821] and telephone conversations[822].

687. EGAS acknowledged this duty, because all notices of *force majeure* delivered included the promise that updates would follow. However no such updates were provided[823].

688. Respondents 1 and 2 have provided 11 communications, which they purport to be up-dates. In Mr. Freeny's opinion, they are not adequate for the following reasons[824]:

---

[817] B&O'B-Freeny FR, para. 7.
[818] B&O'B-Freeny FR, para. 45.
[819] B&O'B-Freeny FR, para. 47.
[820] B&O'B-Freeny FR, para. 48.
[821] B&O'B-Freeny FR, para. 49.
[822] B&O'B-Freeny SR, para. 42.
[823] B&O'B-Freeny SR, para. 40.

- the communications relate to only five of the 13 *force majeure* events – there are thus eight events where no updates were received;

- two communications did not provide any update but simply transferred technical reports long after gas flow had resumed; and

- the other nine communications only inform of the date for resumption of gas flow, which was modified in another so called update letter; or simply state that gas flow would be severely restricted.

(iii)    Inadequate substantive content

689. Notification and reporting of *force majeure* events is expected to be as comprehensive as possible, and at least provide an expected duration for the claimed *force majeure* event and a plan to overcome it[825].

690. Mr. Freeny also opines that according to his experience, reports usually contain contemporaneous photographs, schematic diagrams or sketches and a preliminary schedule repair[826]. All of which were missing from the communications received from EGAS.

## B.    **Documents**

691. EMG has presented documents either in support of its written submissions (**a.**), or in support of the opinion of its experts. In this latter case, documents were annexed to the expert reports (**b.**).

### a.    **Exhibits to the submissions**

692. Documents produced by Claimant are basically the *force majeure* notices received from EGAS[827], technical reports on certain attacks[828] and letters exchanged with EGAS on gas resumptions[829]. Claimant also exhibited a number of newspaper articles on the Egyptian Army's intervention in the Sinai in April 2012[830].

693. There is one document submitted by Claimant[831] at the outset of the arbitration, well before document production took place. It is a letter which merits special attention:

---

[824] B&O'B-Freeny SR, para. 41.
[825] B&O'B-Freeny FR, para. 52.
[826] B&O'B-Freeny FR, para. 50.
[827] See e.g. Doc. C-176, Doc. C-177, Doc. C-178, etc.
[828] See e.g. Doc. C-182, 183 and 185.
[829] See e.g. Doc. C-188, 189, etc.
[830] See Doc. C-293, 294 and 295.
[831] Doc. C-17.

The letter is dated 19 September 2011 (i.e. after the five attacks), and was sent by EGAS to EMG to discuss a number of issues in dispute. One of such issues was *force majeure*, and more precisely, whether EGAS had failed to put in place security measures[832]. EGAS replied that it had taken several additional measures to enhance the security of the Pipeline which included, but were not limited to "retaining the services of a specialised and fully-equipped security force" and "taking the steps to obtain advance remote surveillance equipment". EGAS added that, though it had hoped for this security force to be operational immediately, the general state of unrest had delayed its efforts and that civil works like erecting surveillance towers and housing units need to be accomplished first.

### b.   Annexes to the reports

694.  Mr. Schrader exhibited almost 350 contracts[833] between GASCO and individuals for the supply of security services. These contracts were delivered by EGAS to EMG through the document production procedure. The evidentiary weight of these contracts will be analysed *infra*.

### C.   Witness statement

695.  EMG has produced two witness statements signed by its Managing Director for Operation, Engineering and Contracts, Mr. Maamoun Al Sakka[834].

696.  Mr. Al Sakka explains how EMG faced security concerns and his perceptions of EGAS' response to the attacks on the Pipeline. Mr. Al Sakka's views are summarised as follows:

- EMG's facilities were protected by nine sentry towers, a perimeter fence and a paved road for armed patrols[835], and 50 armed guards[836]. EMG asked the Ministry of Interior to provide the security force and the Ministry developed a security plan, which included security shifts at all gates, armed security patrols on a paved the road outside the facility patrols[837]. Security was supervised 24-hour by an officer[838]. EMG paid the Ministry of the Interior approximately 6,000 USD a month for security services – a modest outlay, in Mr. Al Sakka's view. In addition, EMG employed a retired general in the Egyptian Army as a consultant on security matters[839].

---

[832] Doc. C-17, p. 4.
[833] Exhibit BFS-1 includes 335 contracts; Exhibits BFS-5 – 12 are also security services contracts.
[834] Al Sakka FWS, para. 3.
[835] Al Sakka SWS, para. 35.
[836] Al Sakka FWS, para. 70.
[837] Al Sakka SWS, para. 35.
[838] Al Sakka SWS, para. 36.
[839] Al Sakka SWS, para. 38.

- EMG's facilities were larger and more expensive to secure than offtake and valve rooms along the Pipeline route[840].

- After the 5 February 2011 Attack (no. 1) EMG contacted its security consultant asking whether additional security was necessary, and he suggested procuring an armoured vehicle. The Ministry provided it at no extra cost[841].

- After the 27 April 2011 Attack (no. 3) Mr. Al Sakka called EGAS' Chairman to express his concerns over EGAS' ongoing failure to secure the Pipeline[842]. The Chairman told him that the Ministry of Defence had indicated that a number of security measures had to be implemented before gas transmission could resume. Such measures included raising the height of fences, installing barbed wire on top, increasing lighting, levelling sand dunes around the sites and installing a monitoring system with cameras[843]. Mr. Al Sakka was concerned to hear that these types of measures were not yet in place and offered EGAS the contact details of the Siemens Security Equipment Manager for Egypt[844], but found out a few weeks later that he had not been contacted[845].

- Some 15 days after the 12 July 2011 Attack (no. 5)[846] EMG sent its local manager to the site to verify how repairs were progressing and he reported to have seen no guards protecting the facility nor evidence that repair works were underway[847].

- On 29[848] July 2011 EMG's facilities were attacked by a number of armed men, who fired a rocket-propelled grenade at a water tank. EMG's security forces immediately opened fire and sent an armoured vehicle that chased the attackers. In three minutes the attack was repelled[849]. EMG's facilities suffered no more attacks while the GSPA was in force[850].

- On 19 September 2011 EGAS wrote for the first time claiming that they had retained a security force. Yet Mr. Al Sakka says that he has never seen any evidence that such force was indeed retained or deployed[851].

---

[840] Al Sakka SWS, para. 23.
[841] Al Sakka SWS, para. 39.
[842] Al Sakka SWS, para. 24.
[843] Al Sakka SWS, para. 25.
[844] Al Sakka SWS, para. 26.
[845] Al Sakka SWS, para. 27.
[846] The exact date is not mentioned, but it had to be at some time between 17 and 29 July 2011.
[847] Al Sakka FWS, para. 95.
[848] In Al Sakka SWS, para. 40 Mr. Al Sakka erroneously refers to 19 July.
[849] Al Sakka FWS, para. 96.
[850] C FS M, para. 213.
[851] Al Sakka SWS, para. 29.

697. Mr. Al Sakka disagrees with Mr. Pelham's recollection of how business operated in North Sinai after January 2011. The witness submits that he was able to hire employees and to bring technicians to work at EMG's facilities, transporting them by bus, and no one ever refused to attend work due to safety concerns[852]. He does not recall any problems in the delivery of materials and spare parts[853] and particularly remembers the transport of 20 containers in a convoy of 11 trucks for 1,000 km crossing seven different governorates[854]. EMG held a limited tender for the transporting contract and several private contractors were willing to undertake the task, and in addition EMG arranged a security escort of two vehicles provided by the Ministry of Interior[855].

698. EGAS has questioned Mr. Al Sakka's credibility as witness, due to the fact that in a parallel arbitration it has been established that he had some part in the drafting of two different versions of the minutes of a certain meeting of EMG's board of directors. The Tribunal notes:

- that none of the affirmations summarised in para. 696 *supra* is controversial;

- that most relate to objective facts which could have easily been refuted had they been untrue, but in fact have not been rebutted; and

- that there is other evidence supporting Mr. Al Sakka's witness statement (e.g. Mr. Pelham has conceded that EMG's facility was well protected by guards[856], Mr. Al Sakka has produced letters[857] and security plans[858]).

The Tribunal thus, sees no ground to question Mr. Al Sakka's credibility on the points mentioned in para. 696 *supra*).

## 4.   IEC'S POSITION

699. IEC also rejects EGAS' main defence that the failure to supply gas was excused by *force majeure*.

### 4.1   ARGUMENTS

700. Respondent 3 first considers the relevant contractual provision (**A.**) and then turns to analyse the evidence (or lack thereof) (**B.** and **C.**).

---

[852] Al Sakka SWS, para. 43.
[853] Al Sakka SWS, paras. 45 and 46.
[854] Al Sakka SWS, para. 46.
[855] Al Sakka SWS, para. 48.
[856] Pelham FR, para. 81: "On occasions when I passed by, by guides […] cautioned me against stopping or driving algon the road, suggesting that guards might open fire".
[857] Doc. C-343 and Doc. C-17.
[858] Doc. C-344 and Doc. C-345.

A.    **Contractual requirements**

701. Art. 16.1 provides that neither party shall be liable for any delay or failure in its performance if it is due to *force majeure*. Arts. 16.2 and 3 go on to require the person affected by the *force majeure* event to act as a reasonable and prudent person both in preventing its effects and in overcoming and mitigating them (**a.**). And Art. 16.8 requires the party to serve notice of *force majeure* with all relevant information and to provide updates of the events (**b.**)[859].

a.    **Reasonable and prudent person**

702. EGAS has expressly acknowledged that, in order to claim *force majeure*, it must act as a reasonable and prudent operator[860]. It is improper for EGAS to qualify that statement suggesting that a breach to act reasonably must in fact have caused the failure to prevent attacks – this is inconsistent with Art. 16.3 of the GSPA[861]. In any event, there is sufficient evidence to support that, had EGAS acted as a reasonable and prudent person, the attacks could and would have been prevented[862].

703. The reasonable and prudent person definition contains several important features[863]:

- it requires EGAS to exercise diligence and foresight that a skilled and experienced person would have: EGAS was compelled to look forward and consider what situations they might face given their place of business, and to plan and put in place appropriate measures to prevent or ameliorate risks of attacks;

- EGAS must comply with the Law, which includes good and prudent international practices; and

- EGAS has to act in good faith.

704. Faced with a *force majeure* event, EGAS was obliged to take all reasonable steps to remedy the problem as soon as practical. Failure to do so meant that *force majeure* relief ceased to be available[864].

---

[859] R₃ PHB, para. 27.
[860] R₃ PHB, para. 31.
[861] R₃ PHB, para. 32.
[862] R₃ PHB, para. 33.
[863] R₃ PHB, para. 34.
[864] R₃ PHB, para. 35.

### b.    Reporting

705. EGAS had to serve notice of *force majeure* as soon as practicable and such notice must include all relevant information; and EGAS must also, from time to time, provide updates, including information and explanations as soon as they became available. Satisfying these provisions was also a precondition to claiming *force majeure*[865].

### B.    Burden of proof and evidence

706. The onus of proof for establishing any entitlement to *force majeure* relief lies with the party seeking to invoke that relief[866]. This is so because it is being invoked as a defence from what would otherwise be a breach of contract for failure to deliver[867].

707. IEC is astonished that EGAS marshalled almost no evidence:

- No fact witness: EGAS has chosen not to put forward a single witness of fact to explain the measures it took (if any) to protect the Pipeline and why those failed[868], although it became evident during Mr. Pelham's examination, that the Security Manager for GASCO and the Head of Planning and Operations for EGAS, who discussed the attacks with Mr. Pelham (EGAS' only expert), had relevant evidence to give[869]. The only possible explanation it that this decision serves a tactical purpose[870].

- No documents: if adequate measures had been taken, one would expect to find contemporaneous documentation witnessing their implementation. Yet EGAS has failed to produce documentation to show that security measures were actually put in place[871].

- No expert on security: the only evidence advanced by EGAS is the opinion of Mr. Pelham, who is not a security expert nor has any experience in the oil and gas industry[872].

### C.    EGAS' failure to act as a RPPO

708. EGAS was under an obligation to act as a RPPO in securing the Pipeline (**a.**) and in repairing the damage caused (**b.**)

[865] R3 PHB, para. 35.
[866] R3 PHB, para. 36.
[867] R3 PHB, para. 37.
[868] R3 PHB, para. 40.
[869] R3 PHB, para. 43.
[870] R3 PHB, para. 41.
[871] R3 PHB, para. 44.
[872] R3 PHB, para. 61.

a.    **Security**

709.  IEC has first determined what security measures a reasonable and prudent person would have put in place (**i.**), then it has addressed two defences raised by EGAS (**ii.**), and finally it has submitted that there is sufficient proof to sustain that a reasonable and prudent person would have prevented the attacks (iii.).

(i)    <u>Reasonable security measures</u>

710.  The expert evidence listed the basic, not complicated, nor particularly expensive or unusual[873] sorts of security measures, which a party complying with standards would have in place[874]:

-    detailed security plan and risk assessment: no document in this regard has been produced[875];

-    adequate fortifications to deny access and to protect sensitive components;

-    adequate number of trained, reliable and experienced armed guards, alongside housing and sentry towers: there are documents by mid 2011 vaguely mentioning plans for construction of certain facilities or the employment of Bedouin guards, yet there is no evidence that any of these measures was actually put in place[876];

-    a rapid response team;

-    sophisticated surveillance equipment.

711.  As there is no adequate proof of its existence, it must be deduced that the above security was lacking. And this fact was already evident at the times of the attacks. Indeed, Mr. Al Sakka (EMG's representative) expressed his concerns about the lack of security to EGAS' Chairman after the 27 March and 27 April 2011 attacks[877]. And contemporaneous news articles confirm his perception[878].

(ii)    <u>Two arguments raised by EGAS</u>

712.  It is now EGAS' submission that contingencies could not have prepared EGAS for the collapse of internal security forces in Sinai and so the attacks between

---

[873] R₃ PHB, para. 53.
[874] R₃ PHB, para. 52.
[875] R₃ PHB, para. 58. Please see also para. 748 *infra*.
[876] R₃ PHB, para. 58.
[877] R₃ PHB, para. 58.
[878] See e.g. Doc. R₃-413.

2011 and 2012 could not have been prevented[879]. IEC does not accept this argument:

713. First, if the State had used non conventional methods of policing, such as torture and brutality, which are unlawful, to maintain order in the Sinai, EGAS was never entitled to rely on their continued application;

714. Second, in the days after the Revolution EGAS should have undertaken a massive effort to secure the Pipeline, but it did not do so[880].

715. Another argument put forward by EGAS is that, had it implemented the sort of security measures which the standard requires, the attacks would not have been prevented. This is, in IEC's view, a bad point, because it is really irrelevant: the requirement to act as a reasonable and prudent person is a contractual precondition to invoke the *force majeure* relief, and the Tribunal should not embark on a speculative exercise as to whether sabotage attacks would have been stopped if adequate security had been in place, which never in fact existed[881].

(iii)  Reasonable security measures would have prevented the attacks

716. If the Tribunal wishes to embark on a speculative exercise and determine what would have happened if adequate security had been provided, then IEC submits that all evidence points to the fact that the attacks could have been prevented[882].

717. Three eminent security experts have reached this conclusion. The only expert who disagrees is Mr. Pelham who, as he himself concedes, does not have the military experience to assess the specifics of the security measures proposed by IEC and EMG[883].

718. The conclusions reached by the experts are borne out by a number of important factors[884]:

- Without exception, the attacks were perpetrated by a small number of individuals, and there is no suggestion that they were heavily armed, nor that they ever fired their weapons: such attackers by their nature should be easy to stop;

- The Pipeline was buried and the actual facilities to protect were small in size and in number.

---

[879] R₃ PHB, para. 68.
[880] R₃ PHB, para. 66.
[881] R₃ PHB, para. 68.
[882] R₃ PHB, para. 68.
[883] R₃ PHB, para. 68.
[884] R₃ PHB, para. 68.

719. IEC notes that EMG had in place appropriate security measures (referred to in para. 710 *supra*) ever since their facilities were constructed in 2007[885]. EMG faced an attack by gunmen who actually fired a rocket propelled grenade – something that never occurred at EGAS' facilities – and EMG repelled the attack at ease because EMG had adequately trained guards who opened fire to chase the attackers away[886].

720. In conclusion, basic security measures should have been deployed by EGAS to protect the Pipeline and facilities; and had it done so, the attacks could have been prevented.

### b.   Repairs

721. Mr. Freeny gave clear evidence that EGAS took far longer than a reasonable and prudent person should have taken to complete the repairs[887].

722. If the Tribunal were to accept that *force majeure* is available, then IEC submits that it only should be so for the repair time that Mr. Freeny accepts as being reasonable[888].

### D.   Inadequate reporting

723. The notices of *force majeure* provided by EGAS do not comply with the contractual standard[889]:

-   The initial notices provided shortly after each event gave little or no information;

-   The subsequent more detailed notices were only sent on five out of 13 occasions, on average 85 days after the event itself had occurred.

724. Accordingly, having not satisfied the notification provisions, EGAS cannot invoke *force majeure* relief[890].

### E.   Alleged acceptance of *force majeure*

725. EGAS has sought to argue that EMG and/or IEC somehow accepted that *force majeure* applied under the GSPA because EMG also sent *force majeure* notices to IEC under the On-Sale Agreement[891].

---

[885] R$_3$ PHB, para. 56.
[886] R$_3$ PHB, para. 68.
[887] R$_3$ PHB, para. 78.
[888] R$_3$ PHB, para. 81.
[889] R$_3$ PHB, para. 84.
[890] R$_3$ PHB, para. 85.
[891] R$_3$ PHB, para. 86.

726. This is, in IEC's opinion, a *non-sequitur*[892]:

   - Whether non-supply of gas by EGAS after the attacks entitled EMG to declare an event of *force majeure* under the On-Sale Agreement is irrelevant to the question of whether EGAS is entitled to declare *force majeure* under the GSPA;

   - IEC, in any event, did not accept any of EMG's *force majeure* claims.

## 4.2   EVIDENCE

727. IEC coincides with EMG's views that EGAS did not act as a reasonable and prudent person in securing the Pipeline and that the little measures that EGAS undertook where basic and should have been implemented long before.

728. Respondent 3 has supported its position on expert reports and documentary evidence.

### A.   Expert reports

729. IEC has produced three expert reports: one from an expert on Middle East conflicts, which is aimed at directly replying to Mr. Pelham's report; and two on security: one of them prepared by an expert on pipeline security with experience in various countries, the other prepared by an expert on security in Sinai.

### a.   Expert on Middle East conflicts

730. Mr. Steven Cook is Hasib J. Sabbagh Senior Fellow for Middle Eastern Studies at the Council on Foreign Relations based in Washington D.C. As an expert on Egyptian politics he has published a wide variety of articles and authored two books[893]. His report is comparable to the Pelham Report in that both are written by experts on Middle East conflicts and drafted in a journalistic way.

731. Mr. Cook's report provides a comprehensive historical and political context of the gas deal between Egypt and Israel.

732. The main conclusion reached regarding *force majeure* issues is that the Pipeline, although privately held, was a national asset[894] and Egypt had the military capability to secure the Pipeline[895] had they wished to do so; but Egypt had zero

---

[892] R₃ PHB, para. 86.
[893] Cook, para. 1.
[894] Cook, para. 109.
[895] Cook, para. 109.

202 of 469

incentive to protect the Pipeline from terrorist attacks[896] because the attacks served the purpose of the regime change:

- Neglecting a deal which symbolised Mubarak's corruption[897],

- Halting supply to Israel[898], and at the same time,

- Supplying Egypt's own energy needs[899].

**b.    Expert on pipeline security**

733.  General Tony Ling, a retired Brigadier from the British Army, prepared an extensive report on pipeline security. Brig. Ling worked as security manager for British Petroleum in Colombia, and subsequently in other parts of the world, including Egypt, where he was the Regional Security Adviser[900]. Brig. Ling is thus a specialist in pipeline security and has authored guides, handbooks and procedures on pipeline security[901]. Brig. Ling is the only expert on *force majeure* who was not examined at the Hearing.

(i)    Risk assessment and security in the construction phase

734.  Brig. Ling explains how risk assessment is crucial for the pipeline's security and that risks assessments need to be performed in the construction phase[902]. Had such a standard security assessment been prepared between 1998 and 2001 it would have identified security risks from Bedouins[903] and it would have implemented a social programme among the local community. But, apparently, security risk assessment was never carried out[904] and therefore EGAS failed to recognise Bedouin threat[905].

735.  After the risk assessment is performed, a security plan is developed and implemented[906]. The cornerstones of protection are: deter, detect, delay and respond[907], and the following basic actions should be foreseen in a security plan, and should have been undertaken:

---

[896] Cook, para. 111.
[897] Cook, para. 110.
[898] Cook, para. 112.
[899] Cook, para. 112.
[900] Ling FR, para. 18.
[901] Ling FR, para. 19.
[902] Ling FR, para. 28.
[903] Ling FR, para. 47.
[904] Ling FR, para. 52.
[905] Ling FR, para. 51.
[906] Ling FR, paras. 10 and 11.
[907] Ling FR, para. 32.

(i.1)     Deter

736. It implies that physical security[908] and a protected perimeter line[909] must be present at the facilities to deter assaults. And as regards the pipeline, slab and wire protective material must be laid over the pipeline[910].

737. Though the above measures should have been present right from the outset, the first action to upgrade security on facilities allegedly came in May 2011 (after three attacks) in the form of increased fence heights and lighting, barbed wire, levelling of sand dunes near facilities and the installation of monitoring cameras[911]. Brig. Ling says that there is no evidence that these changes were actually effected[912].

738. Physical security around the Pipeline was also inadequate:

- Private individuals: numerous identical individual security service contracts between GASCO and named individuals have been produced. But this is no evidence that a proper private security force was retained. In particular, there is no evidence that these individuals had any military education and most seem to be illiterate, which would prevent them from implementing contingency plans. Anyway, the contracts were predominantly signed towards the end of 2011, which is far too late[913].

- Army: there is documentation referring to various payments made to the Engineering Authority of the Armed Forces, in respect of services rendered[914]. It is also well-known that on 30 July 2011 (after five attacks) Egyptian military carried out operation Eagle aimed at capturing insurgents across the Sinai[915]. By the end of August 2011 3,750 soldiers were placed to supply general area defence and road blocks were set up; although Brig. Ling qualifies that it was not until the two final attacks that troops were said to be assisting with direct pipeline protection[916].

---

[908] Ling FR, para. 32.
[909] Ling FR, para. 36.
[910] Ling FR, para. 67.
[911] Ling FR, para. 58.
[912] Ling FR, Para. 62.
[913] Ling SR, p. 5.
[914] Ling SR, p. 4.
[915] Ling FR, para. 58.
[916] Ling FR, para. 63.

(i.2)    Detect

739.  Brig. Ling opines that foot and vehicle patrolling[917], central monitoring and the use of a special fibre optic monitoring cable buried above the pipeline, that gives instant warning to the nearest armed reaction force, is absolutely essential[918].

740.  The only evidence regarding detection equipment is that the purchase of surveillance cameras was a recurring promise made by EGAS since May 2011. After the fifth attack EGAS still represented that it would install surveillance cameras. There is no adequate proof that such equipment was acquired; in fact the Technical Report signed in September 2011 does not mention any cameras in place[919].

(i.3)    Delay

741.  Barriers should be arranged in concentric layers, with level of security growing progressively[920]. And the pipeline should be covered with slab and special wire protective material[921].

742.  The only reference to delay tactics can be found in a general statement made by GASCO in late October 2011 assuring that security along the Pipeline had improved by installing early warning systems and obstacles, and increasing the number of guards[922]. There are no details, however, of what was actually done[923].

(i.4)    Respond

743.  It means that forces need to be assigned to respond to the attack. This is the second step to detection: the central monitoring has to trigger a reaction[924].

744.  Brig. Ling doubts that early warning systems were in place at all, but if they were, they clearly failed as there was no immediate armed mobile reaction[925]. And no attacker was ever challenged.

(ii)    Risk assessment during operation

745.  Once the pipeline is operating, a holistic security strategy must be implemented in order to mitigate the defined risks[926].

---

[917] Ling FR, para. 39.
[918] Ling FR, para. 67.
[919] Ling FR, para. 62.
[920] Ling FR, para. 69.
[921] Ling FR, p. 25.
[922] Ling FR, para. 64.
[923] Ling FR, para. 64.
[924] Ling FR, para. 32.
[925] Ling FR, para. 64.

746. EGAS clearly ignored the prevailing social environment[927], failed to gain support of the local community and to ensure that standard protective security was built. These errors were compounded by the failure to take sufficient remedial actions, which were either too little or too late[928].

747. Since tensions in Sinai increased from the start of the Egyptian Revolution, EGAS should have seen this as an indicator of possible future trouble and increased alert levels and reinforce security[929], in accordance with a risk mitigation plan. None happened. And attacks started as early as 12 days later[930].

748. The only evidence of anything close to a security plan is the so called "North Sinai Area Contingency Plan"[931], dated April 2011, which does not meet the standards or details expected from a Health, Safety and Environmental plan; nor is it a security plan in any sense because there are no proper procedures referenced for security or surveillance, incident response, etc.[932].

749. In conclusion, Brig. Ling accepts Mr. Pelham's geopolitical recount of the Sinai Peninsula, and that the regional and local security risks of building and operating a pipeline in North Sinai were high, but opines that these were far from unique[933]. Hence, he takes issue with Mr. Pelham's conclusion that no matter what security measures EGAS had implemented, all would have been overcome by the attackers[934]. Brig. Ling believes that, had EGAS carried out the most basic physical protection of the pipeline and trained and positioned quick reaction forces with immediate warning in the manner of other pipelines, then the specific attacks on the Pipeline could have been prevented[935].

c.    **Expert on security in Sinai**

750. Major General Giora Eiland served for 33 years in the Israel Defence Forces[936], only to retire in 2003[937]. During those years he spent a significant amount of time in Sinai; specifically, in the spring of 1982 one of his missions was to evacuate the Israeli settlements in the district of Al Arish[938]. After his retirement, he was appointed as Head of the National Security Council of Israel[939]. He was

---

[926] Ling FR, para. 30.
[927] Ling FR, para. 55.
[928] Ling FR, para. 56.
[929] Ling FR, para. 22.
[930] Ling FR, para. 57.
[931] Doc. R$_3$-393.
[932] Ling SR, para. 8. a.
[933] Ling FR, para. 50.
[934] Ling FR, Annex B, para. 3.
[935] Ling FR, para. 56, d.
[936] Eiland, para. 4.
[937] Eiland, para. 7.
[938] Eiland, para. 5.
[939] Eiland, para. 7.

personally involved in the discussions with the Egyptian authorities concerning Sinai's new security needs in 2005 as part of the Israeli withdrawal from the Gaza strip during that year[940].

751. Based upon all this experience, Gen. Eiland submits that he has the tactical understanding of how to protect a strategic asset in Sinai[941].

(i)    Basic elements of a successful security

752. Gen. Eiland opines that for protection of a pipeline to be successful, six elements have to be implemented:

-    Intelligence: the goal of intelligence is to identify security threats and the possible perpetrator; intelligence surveillance is essential and is most effectively carried out by the State[942]; and in this instance, intelligence had an easy case because of the repeat *modus operandi* of attackers assaulting the Pipeline[943].

-    Security Plan: a document containing a risk analysis[944], a description of security elements that should be built in[945] and of the activities of the guards[946]; it should be a heavy document, with a detailed program[947], and such plan requires governmental approval[948] and an update after each attack[949];

-    Access limitations: barriers must be put up to prevent access to the pipeline; the most common is burying the pipeline[950]; installations, on the other hand, cannot be buried, but access to them can be complicated by setting fences or walls and by adding specific protection in the form of cement on or around sensitive devices within the installations[951].

-    Sensors: devices must be acquired that are capable of identifying hostile activity[952].

---

[940] Eiland, para. 8.
[941] Eiland, para. 11.
[942] Eiland, para. 46.
[943] Eiland, para. 52.
[944] Eiland, para. 54.
[945] Eiland, para. 55.
[946] Eiland, para. 56.
[947] FHT, Day 6, p. 1298.
[948] Eiland, para. 58.
[949] Eiland, para. 58.
[950] Eiland, para. 59.
[951] Eiland, paras. 59 and 76.
[952] Eiland, para. 63.

- Security forces: it is impossible to post armed guards along the entire Pipeline, but it is feasible to have mobile forces patrol along the line so that they are able to reach any facility in less than 30 minutes[953]; as the Pipeline runs across flat, open terrain without bushes or forests[954], it should have been easy to protect[955]; as regards Facilities, trained and fully aware of their job armed guards should be posted at vital above grounds facilities[956], an ex-police or ex-army officer should be employed as head of security in each facility[957]; the same goes for specific areas that had already been attacked, as they have proven to be vulnerable[958]; the mobile alert force must be able to pursue and capture the attackers[959].

- Damage limitation: damage to installations can be limited by cementing sensitive devices[960]; as to the pipeline, the more valves are placed, the easier it is to isolate the part of the pipeline affected by explosion (the Israeli standard is 10 km distance between each valve station)[961].

(ii)   Assessment of the Pipeline's security

753.  Security of the Pipeline was precarious and a complete failure:

- Access limitation elements were minimal and below what is considered basic[962]; though it seems that in May 2011 the Ministry of Defence passed new security requirements[963], there is no evidence that these measures were implemented; but even assuming that they were, in such a high risk region[964] they should have been put in place years earlier[965], as they were really very basic measures for pipeline security[966].

- There is no information that suggests that any type of visual protection or surveillance was in place[967]; in fact, it was only late in September 2011

---

[953] Eiland, para. 65 and FHT, Day 6, p. 1302.
[954] FHT, Day 6, p. 1311.
[955] FHT, Day 6, p. 1312.
[956] FHT, Day 6, p. 1301.
[957] FHT, Day 6, p. 1305.
[958] Eiland, para. 66.
[959] Eiland, para. 65.
[960] Eiland, para. 76.
[961] Eiland, para. 76.
[962] Eiland, para. 61.
[963] Eiland, para. 60.
[964] Eiland, para. 62.
[965] Eiland, para. 61.
[966] Eiland, para. 61.
[967] Eiland, para. 63.

(after eight attacks) that EGAS admitted that they had begun to take steps to obtain surveillance equipment[968].

- No specialised security forces were retained until September 2011, yet EGAS failed to provide basic infrastructure such as housing or sentry towers[969].

- Egyptian authorities did little to pursue the perpetrators[970].

754. EGAS relied mostly on the general security provided by the government. As this proved insufficient, EGAS should have required specific governmental assistance. Since the Pipeline was a strategic infrastructure for Egypt and EGAS a State-owned company, it should have been able to obtain substantial governmental assistance in security issues[971]. Gen. Eiland is confident that, when an asset is perceived as important for the Nation at a political level, then the Army is given a very precise instruction to make itself available to intervene[972].

755. But if no support from the Army is provided, then EGAS cannot just sit and do nothing: it should have taken security measures on its own, as do all energy companies around the globe[973]. The potential price that a company will pay if the pipe or its installations are damaged by attacks is far beyond the direct cost of appropriate security means[974].

756. It was however not until late June 2011 that EGAS undertook a limited and inadequate attempt at improvement[975]. The efforts were clearly insufficient, as attacks continued. Insecurity was so manifest that in July 2011 even journalists reported the lack of security in the area[976]. The only real effort to secure the Pipeline was made as late as 1 September 2011, when EGAS represented that it would implement effective preventative measures such as retaining specialised security forces[977].

757. In conclusion, Gen. Eiland is certain that the Pipeline was attacked because it was the weakest target. Any saboteur would have chosen EMG's facilities over the Pipeline because of the former's connection to Israel[978], were it not for the excellent security deployed by EMG. Attackers soon learned that EMG was

---

[968] Eiland, para. 64. Doc. C-17.
[969] Eiland, para. 74, referring to C FS M, para. 217.
[970] Eiland, para. 81.
[971] Eiland, para. 121.
[972] FHT, Day 6, p. 1319.
[973] Eiland, para. 157.
[974] Eiland, para. 157.
[975] Eiland, para. 66.
[976] Eiland, paras. 71 and 73.
[977] Doc. C-17.
[978] Eiland, para. 102.

effective in defending its facilities, so they turned to the Pipeline. The weakest object was at first the installations, because they were easy to locate and caused serious damage; and then, when the Army augmented their presence in the area, attackers shifted to exploding the pipeline[979].

## B.   **Documents**

758. IEC has submitted a significant number of exhibits to this arbitration. Not only as annexes to its written submissions, but also as attachments to the expert reports. Many of those documents are contemporaneous news reports. There are three specific exhibits which the Tribunal singles out for their significance:

- A chain of emails between EMG and IEC, of which the most important is one dated 17 May 2011, in which EMG informs IEC that it has in turn been advised by EGAS that the Ministry of Defence was requiring that certain additional security measures be taken[980]. This chain of emails will be analysed further in para. 776 *infra*.

- A news article posted in July 2011 which reports the attacks to the Pipeline and includes interviews with guards at some facilities and with a security officer in GASCO[981]. The Tribunal will describe the article in more detail in para. 785 *infra*.

- A resolution by GASCO's Processing Committee dated 16 October 2011 regarding a tender process for the supply of 20 Toyota pickup trucks, determining the successful bidders and the amount to be spent. The resolution ends mentioning that it is to be considered a "proposal to be referred to the board to approve"[982].

## 5.   **FACTS**

### 5.1   **THE CONSTRUCTION OF THE PIPELINE**

759. The Pipeline crossing the Sinai peninsula was built in 2001[983], the GSPA was signed in 2005, while it was not until 2008 that the EMG Pipeline entered into operational mode for the supply of gas to Israel.

760. At the beginning of the XXI century, when the construction of the Pipeline was undertaken, EGAS and GASCO (the Pipeline operator) must have been aware that a pipe crossing a historically conflictive zone, which was (at least partially) intended for the supply of gas to Israel, was open to attack. The awareness of

---

[979] Eiland, para. 93.
[980] Doc. R₃-126.
[981] Doc. R₃-128. Resubmitted in an alternative translation into English as Doc. R₃-413.
[982] Doc. R₃-403.
[983] Doc. R₃-393, p. 65.

some risk is evidenced by the fact that EGAS decided to adopt at least certain protective measures:

- <u>Some segments of the Pipeline were protected by cement</u>: experts have explained that in risky areas it is advisable that the pipeline be covered with cements slabs as an additional protection[984] to delay attacks[985]; of the 192 km long Pipeline, a 30 km long section was covered with cement[986]; no explanation has been provided as to why only this small proportion of the pipeline benefitted from this extra protection, or on the criteria used to select the portion of the pipe which was protected; it can already be anticipated that all attacks on the pipe were performed on unprotected segments;

- <u>GASCO sought offers for the procurement of security systems</u>: experts agree that the installation of special fibre optic monitoring cable buried above the pipeline is a basic detection measures[987], and visual surveillance is also essential to detect intrusions[988]; there is some evidence that GASCO asked international companies to submit offers for the supply of fibre cable and visual surveillance[989]; there is however no proof that this equipment was ever procured or employed.

- All facilities were surrounded by a <u>defensive brick wall</u> topped by barbed wire[990].

## 5.2 OPERATION OF THE PIPELINE UP TO THE REVOLUTION

761. The Pipeline operated for a period of three years (2008 – 2011), before the Arab Spring Revolution toppled the government of President Mubarak. EGAS has not provided much information on how it organised security during that period.

762. In his expert report Mr. Pelham recalls that though police presence was limited in size and arms, due to the Camp David Accords, the State Security apparatus was effective in tamping down dissent[991], and he did not shy away from conceding that

[984] Eiland, para. 59.
[985] Ling FR, para. 67.
[986] Doc. R3-393, p. 65.
[987] Ling FR, para. 67. B&O'B-Schrader FR, fn. 9.
[988] Eiland, para. 46. Ling FR, paras. 21 and 52.
[989] BFS-2. Exhibit annexed to B&O'B-Schrader SR. The document is undated. Mr. Schrader deduces from a phrase contained in p. 2 of the memorandum that it was drafted before the Pipeline was operational (B&O'B-Schrader SR, para. 28). Respondents 1 and 2 have not refuted this deduction. The Tribunal notes that IEC has suggested that the memorandum could also have been an attachment to GASCO's study on surveillance equipment sent to the Ministry of Defence, see para. 776 *infra* (R3 SupS, para. 20); the fact that Respondents 1 and 2 have submitted the same two documents (numbered as Docs. R142-477 and 375) separately and have made reference to them in the same footnote (SS, fn 664) without mentioning that one document was annexed to the other, speaks against IEC's proposition.
[990] Photographs of attacked facilities show this sort of protection.
[991] Pelham FR, para. 26.

210

such effectiveness was procured by the use of all kind of means, including non-conventional ones[992].

763. There is no evidence that during this period any special security measures were adopted, and the Tribunal must assume that police protection plus limited structural defences around facilities were the only measures in existence. In any event, it is a fact that the Pipeline did not suffer any harm during three years: save for a threat which was reported in June 2010[993], no incidents occurred[994].

<u>EMG's security</u>

764. EMG, on the other hand, who had to operate its own facility in North Sinai, approached security concerns the opposite way: instead of relying on the local police, it contracted the Ministry of Interior to militarise and fortify its premises, providing guards in nine sentry towers, with a total of 50 armed guards securing the facility, taking shifts at all gates and patrolling the compound with an armoured vehicle. Guards were supervised by an officer and a retired general from the Army was engaged as a consultant. The facility also provided housing for guards and weapon storage.

765. Mr. Pelham (EGAS' expert on security in Sinai) has confirmed that EMG's facility was well guarded, when he testified that it lay behind the road leading from Al Arish to Sheikh Zuwayed and that, whenever he passed by the road, his guides would caution him not to stop, because EMG's guards were prone to open fire[995].

## 5.3   ATTACKS AFTER THE REVOLUTION

766. On 25 January 2011 a popular uprising precipitated the fall of the Mubarak regime[996]. Chaos and violence ensued in Egypt. Particularly in North Sinai, violent Bedouins seized the opportunity to shrug off Egypt's internal security yoke and push for communal empowerment[997]. Across the peninsula, police took flight[998], while police stations and prisons were attacked[999]. And the Army, too preoccupied with events in Cairo and the Nile Valley, shied away from curbing the mayhem in the Sinai[1000].

---

[992] Pelham SR, para. 14.
[993] Doc. $R_{1+2}$-55.
[994] Pelham SR, para. 14.
[995] Pelham FR, para. 81.
[996] Pelham FR, para. 39.
[997] Pelham FR, para. 39.
[998] Pelham FR, para. 39.
[999] Pelham FR, para. 39.
[1000] Pelham FR, para. 77.

767. The Pipeline's security, which had mainly relied on police forces, literally disappeared overnight. Insurgents soon took advantage of the vacuum and attacked the Pipeline. Between February 2011 and April 2012 (the date of termination of the GSPA), the Pipeline suffered 13 attacks. In contrast, EMG, who operated in the same area at the same time, suffered one attempted attack, which was quickly repelled.

768. All of the attacks (but one) took place around the area of Al Arish. The first six targeted facilities on the Pipeline (such as valve and off-take rooms), while the other seven blew up segments of pipe. It is no surprise that saboteurs, at first, preferred the Facilities to the pipe: Facilities are the most vulnerable elements of a Pipeline, as they are:

- limited in size (not bigger than 25 m x 25 m) and number (there were around 15 of them);

- located above ground (in comparison to the pipe, which is mostly buried) and therefore easy to locate; and

- house valuable equipment, so that damage to a facility causes potentially more severe economic consequences than damage to the pipe.

On the other hand, it is equally true that for the same reasons, the 15 Facilities are easier to protect than the pipe, which runs for 192 km.

## A. Attacks on facilities

769. There were a total of six attacks on facilities: on off-take room no. 4, trap 2 (twice), off-take room no. 3, railway valve no. 2 and valve station no. 7. Attacks started on 5 February 2011 and there were two more on 27 March and April 2011. A two month truce ensued. But attacks resumed, hitting twice on 4 and 12 July 2011 and once again on 27 September 2011.

### a. Attack no. 1 (and 2) (February – March 2011)

770. After the fall of President Mubarak on 25 January 2011 the police fled from North Sinai and the Pipeline's protection was left to itself. Some 10 days thereafter, the first attack occurred.

771. All proven facts regarding the first attack have been drawn from the Technical Report dated 10 April 2011, which EGAS prepared and sent to EMG[1001], and from contemporaneous press articles[1002]. The facts are the following:

---

[1001] Doc. R$_{1+2}$-196.
[1002] Doc. R$_3$-353, 354.

On 5 February 2011 at 8.30 am four masked men arrived in two unmarked vehicles at off-take room no. 4[1003], which is located some 20 km east from El-Arish. The perimeter brick walls with wire fences on top and the four guards who were posted "in the area"[1004] were not sufficient deterrent. There is no proof of how saboteurs forced the guards to leave their post: none of the produced documents mentions whether the attackers or the guards were armed nor, if they were, what kind of arms they had. In any event, it is undisputed that no shooting took place and, though saboteurs and guards were equal in number, there is no evidence that the guards challenged the attackers[1005]. The attackers locked the four men who guarded the facility in a car and placed two explosives that were successfully detonated, causing a large fire and significant damage to the pipe and the gas filtering and metering equipment[1006].

772. There is no evidence that a security protocol was set in motion to apprehend the attackers. The Technical Report only describes the actions taken to control the damages caused on the Pipeline[1007]. And there is also no evidence that EGAS adopted any security measures after the first attack or that it performed a risk assessment.

773. The second attack took place on 27 March 2011 at Trap 2, which is 10 km west from El-Arish. The attack is of minor significance because no damage was caused and gas flow was only stopped for half a day. The assault is only worth mentioning because it has been described by EGAS as a successfully repelled attack[1008]. Yet the evidence (a contemporaneous news article[1009]) shows that it was pure luck that no damage occurred: apparently six armed persons attacked the (only) guard present at the facility and set a bomb, but the explosive failed to explode[1010]. Again, there is no evidence that a response protocol was activated, nor of any measures being adopted to increase security.

### b.   Subsequent attacks and reactions

Attack no. 3 (April 2011)

774. Exactly a month later, the third attack took place at off-take room no. 3, which forks from the Pipeline to supply customers in El-Arish. For reasons which have not been disclosed, this point of the Pipeline was especially prone to attacks: after this initial attack, the pipe close to the off-take room would again be blown up in five successive blasts (November 2011 – April 2012).

---

[1003] Doc. R₃-353, p. 2.
[1004] Doc. R₃-353: "the sources said unknown assailants threw arrested on 4 guards of the area ...".
[1005] FHT Day 6, p. 1265.
[1006] Technical Report, p. 5.
[1007] Technical Report, pp. 5 and 6.
[1008] FHT Day 7, p. 1509. Transcript Day 8, p. 1699.
[1009] Doc. R₃-288.
[1010] "Six armed persons attacking the guard, setting there a bomb and leaving [...]... yet a failure prevented the explosion" (Paraphrase).

775. The Technical Report prepared after this third attack[1011] only mentions that on 27 April 2011 at 3.30 am the off-take room was blown up with explosives. There is no indication of any guards being present and the fact that the attackers were not described reinforces the presumption that there were no security forces guarding the facility.

Reaction from the State (May – June 2011)

776. After three unchallenged attacks there is evidence showing that the Egyptian State decided to get involved in the security issues affecting the Pipeline. The Ministry of Defence and the Supreme Military Council warned EGAS that they would not allow resumption of the gas transmission unless additional security on the Pipeline was provided and, in particular, the following measures were undertaken[1012]:

- raising height of fences;

- installing barbed wires on top of fences;

- increasing lighting;

- levelling sand dunes around each site; and

- installing monitoring system with TV cameras.

777. Upon this warning, GASCO's Chairman and its Managing Director held a meeting on 1 June 2011 in which they took the following decisions[1013]:

- to assign the security of valve rooms to the Engineering Service of the Armed Forces with an estimated cost of 3,023,000 Egyptian pounds[1014];

- to build 20 housing units to accommodate the security agents;

- to install 5,562 km of barbed wire around the gas rooms;

- to heighten walls with 4,782 km of concertina wire.

778. The minutes of the meeting reflect that the above decisions were subject to approval by the Board of Directors. The first of the decisions, however, seems to have been executed right away, because EGAS has produced a copy of a check in

---

[1011] Doc. $R_{1+2}$-205.
[1012] See email from EMG to IEC dated 17 May 2011 (Doc. $R_3$-126); the veracity of the information contained therein has not been questioned.
[1013] Doc. $R_{1+2}$-468.
[1014] More than 400,000 USD at current conversion rates.

an amount of 3,023,000 Egyptian pounds, the beneficiary being the Engineering Service of the Armed Forces.

779. A second meeting, this time of GASCO's Board of Directors was held on 15 June 2011. The Board of Directors approved two of the decisions proposed by the Chairman and Managing Director[1015]:

- The purchase of iron angles to heighten the walls with wire, in an amount of 160,750 Egyptian pounds;

- The construction of 20 housing units for the security agents in an amount of 400,000 Egyptian pounds.

- GASCO's Contingency Plan (probably after June 2011).

780. IEC has produced GASCO's Contingency Plan, which it obtained through the document production procedure[1016]. The document is dated April 2011, but according to IEC there are doubts whether all of its content was prepared at such date[1017].

781. The Contingency Plan lists the so called "solutions applied to the reactive phase to avoid the recurrence of line explosion accidents"[1018]. Although the term ("applied") is used, a careful analysis of the Contingency Plan reveals that: (i) not all of the measures proposed were actually implemented, and (ii) those measures that were implemented, could not have been in place by April 2011:

782. (i) The list clearly differentiates between measures which were in place and those which were still being discussed:

- Solutions in place:

- Cooperation with armed forces and Ministry of Interior to secure the site of priority valve rooms and supervision of the Al-Arish line using four-wheel drive cars provided by GASCO and cell phones to ensure communication in case of discovery.

- Establishing guard persons in the valve rooms and stations and along the line track, with accommodation rooms.

- Metal cladding of the doors of valve rooms, changing the barbed wire and raising its height in valve rooms, and improve lighting.

---

[1015] Doc. R$_{1+2}$-470.
[1016] Doc. R$_3$-393.
[1017] R$_3$ SupS, paras. 12 *et seq.*
[1018] Doc. R$_3$-393, p. 73.

- Solutions under discussion: assignment of the protection of valve rooms to a specialised security company able to provide trained and armed staff; a study is to be prepared and, if accepted, a tender should be organised.

783. (ii) The Contingency Plan is dated April 2011 in its front page. The list with the security solutions is an annex to the document. Was this attachment prepared on the same date as the Contingency Plan, or was it added at a later stage? Contemporaneous evidence seems to indicate that the list may have been added afterwards: the minutes of GASCO's Board of Directors meeting mentioned *supra* in paras. 777 and 779, where cooperation with the Army, the building of housing and the raising and installation of barbed wire was considered for the first time, took place two months later, in June 2011. And payment for the construction of accommodation was not made until December 2011 (see para. 796 *infra*).

Attack no. 4 (July 2011)

784. This is the only attack that did not occur within a 25 km radius around Al-Arish radius, but 80 km[1019] west from Al-Arish. The attack took place on 4 July 2011 and targeted Railway Valve Room 2. According to a press article, it was again pure luck that not all the explosives exploded[1020] and therefore damage was constrained to a one day shutdown.

785. The Technical Report[1021] prepared by EGAS does not describe any additional protective measures in place (this was the first attack after the warning made by the State requiring additional protection), and the photographs contained in the report show a protective perimeter wall with a wire fence on top[1022], which does not seem to be significantly higher than the walls around previously attacked facilities. IEC has produced a very interesting newspaper article[1023], contemporaneous to the attack:

> The article is dated 21 July 2011 and refers in total to three attacks which seem to coincide with Attacks nos. 3, 4 and 5. The reporter had the opportunity to interview guards involved in the attacks, other security guards, neighbours, and even a security official of GASCO. The scene described in the report is very similar in all attacks: the facility is guarded by unarmed persons who, once confronted with armed attackers, leave the site immediately. Guards complain that their duty is to monitor the stations rather than to protect them because "security without weapons means that there is no security", and that a two meters high wall covered with barbed wire is no obstacle to attackers. Criticism extends to the housing, which consists of primitive tents, and to the absence of any lighting which makes identification of suspects in the area impossible. GASCO was also blamed for lack of response: in

---

[1019] The facility is located 80 km west from El-Arish, according to the Mr. Freeny, yet the notice of *force majeure* (Doc. R$_3$-358) situates the facility 120 km west.

[1020] Doc. R$_3$-359.

[1021] Doc. C-185.

[1022] See p. 18.

[1023] Doc R$_3$-128. Resubmitted with a new translation into English as Doc. R$_3$-413.

case of Attack no. 4 guards reported unusual suspicious activity in the area before
the attacks, but triggered no reaction in GASCO. In the case of Attack no. 5, the
guard "rushed to call the security officers [...] but none of them was able to do
anything about the situation [...] then there was an explosion".

Attack no. 5 (July 2011)

786. This attack has given rise to much debate. On 12 July 2011 Valve Station 7 was
assaulted. This is the one shutdown of gas which affected EMG only, because
Valve Station 7 is located 2 km east from the offtake heading south to Jordan.
There is an allegation made by EMG that this damage, although less complex,
took the longest to repair (84 days)[1024], the reason being that Israel was the only
customer affected, and so EGAS had no incentive to speed up repairs.

787. The attack is reported in a Technical Report prepared on 28 December 2011[1025].
For once this report provides some details on how the attack was perpetrated and
how security was built up. The account of events is the following:

> Apparently Valve Station 7 was secured by one guard only, living there with persons
> whom the experts identify as family (the report simply refers to "those associated
> with him"). The facility was protected by the usual brick wall with wire fence on
> top, but there seemed to be also a lower concertina wire fence running in parallel[1026].

> Around 1 am four armed masked individuals entered the facility, threatened the
> guard and demanded that he leave the facility. The guard complied with the order,
> and promptly (at 1.20 am) contacted the security officer in the administrative offices
> of GASCO, who in turn informed the security officer at the East Gas station. This
> security officer called the military force unit in the area (*pro memoria*: in June
> GASCO had transferred a significant amount of money to the Army for security
> services). The security officer reported that only some soldiers were available, but
> not the Army officer in command, and the soldiers then replied that they could do
> nothing.

> 40 minutes after the initial call from the guard, the explosives placed at Valve
> Station 7 exploded. There was no attempt to identify or chase the intruders.

788. This new attack caused the State to intervene again on security issues. The
Technical Service of the National Defence Council requested GASCO to draft a
memorandum on surveillance of the Pipeline. GASCO sent on 26 July 2011 a
technical study to secure the Pipeline by monitor surveillance cameras and digital
recording systems for a distance of 190 km with a cost of 16,875,000 Egyptian
pounds[1027]. There is no evidence that surveillance cameras ever were purchased or

---

[1024] B&O`B-Freeny FR, para. 104.

[1025] Doc. $R_{1+2}$-229, pp. 7 and 8.

[1026] Doc. $R_{1+2}$-229, p. 39.

[1027] Doc. $R_{1+2}$-375. The cost is, at these days currency rate, over 2 Million USD. For a translation of the
full memorandum please refer to Schrader Report, annex BFS-3. Although the date shown is 27 July
2011, it seems to refer to the same memorandum.

employed: no purchase order, contract, proof of payment, footage or pictures has been produced by EGAS.

Attack no. 6 (September 2011)

789. On 27 September 2011 Trap 2 exploded. This attack is noteworthy because it was the last attack perpetrated against facilities and it was also the second assault on the same target (Trap 2 had already suffered an attack on 27 March 2011 but at that time luckily explosives failed to detonate).

790. In contrast with the first assault, this second time there was not even one watchman. In fact, the attack was noticed – according to the Technical Report on prepared by EGAS on 28 December 2011[1028] – by the watchman of another facility (Valve Room 5), who saw distant fire on the track of the pipeline towards Al-Arish[1029].

## B.   **Attacks on pipe**

### a.   **Operation Eagle (August 2011)**

791. The Egyptian armed forces, well-resourced and the largest in the Middle East, remained powerful after the January uprising. At that time the Egyptian military had 11 battalions in the Sinai Peninsula[1030] and on 30 July 2011 it launched operation Eagle aimed at reverting the deterioration of the general security situation in Sinai[1031].

792. By the end of August 2011 3,750 soldiers were placed to supply area defence and road blocks were set up. There is no evidence whether the duties assumed by the Army included the protection of the Pipeline. Brig. Ling submits that it was not until March 2012 that troops started assisting with direct pipeline protection[1032] and EGAS has not challenged this assertion. Be it as it may, there is no doubt that the presence of the Military in the area had an effect on attackers: saboteurs shifted their *modus operandi* to attacking the pipeline, instead of the facilities.

793. As said before, from a security point of view, facilities and pipes are the two basic elements to protect and they are completely different from another: facilities are more vulnerable because they are visible, limited in number and size and contain valuable equipment; the segments of pipe are difficult to locate because they are

---

[1028] Doc. C-186.
[1029] Doc. C-186, p. 13.
[1030] Eiland, para. 96.
[1031] Ling FR, para. 58.
[1032] Ling FR, para. 63.

(mostly) buried, but on the other hand, it is extremely burdensome to guard a 192 km long Pipeline with security forces[1033].

### b.   Subsequent attacks and reactions

Attacks nos. 7, 8 and 9 (November 2011)

794.  Attacks nos. 7 and 8 targeted the pipeline at the same segment: 121 KP. The first was on 10 November 2011; and as soon as damage was repaired it was attacked a second time on 25 November 2011. Attack no. 9 hit two sections of the pipe (136 and 148 KP).

795.  The *modus operandi* was the same: saboteurs dug up sections of the pipeline and detonated explosives. This is only a presumption because EGAS provided no technical reports. There is also no evidence that any security measure detected the attacks and/or responded to them.

796.  After the especially violent month of November, GASCO's Board of Directors met on 14 December 2011. The minutes of the meeting[1034] reflect that the Board decided to:

-   pay 10 Million Egyptian pounds[1035] to the Engineering Service of the Armed Forces to build housing camps for the security agents;

-   pay 655,820 Egyptian pounds to the Engineering Service of the Armed Forces to protect police vehicles;

-   complete land communication means with telephone lines for a cost of 1 Million Egyptian pounds.

797.  There is evidence of the disbursement of the 10 Million Egyptian pounds[1036]; no proof has been marshalled as regards implementation of the other measures.

Attacks nos. 10 – 13 (December 2011 – April 2012)

798.  Despite the payments made to the Army, and of a further payment of 2 Million Egyptian pounds made in early March 2012[1037], attacks did not stop, but went on – while the GSPA was in force – until 9 April 2012. All sabotages concentrated around two segments:

---

[1033] Eiland, para. 66.
[1034] Doc. R$_{1+2}$-173.
[1035] 1.4 Million USD at current exchange rates.
[1036] Doc. R$_{1+2}$-474.
[1037] Doc. R$_3$-399; the equivalent of 280,000 USD at current exchange rates.

- 151/153 KP: Attacks nos. 10, 11 and 12 (18 December 2011, 5 February and 5 March 2012). This section of the pipe was attacked three times in a row, as soon as repairs were completed.

- 140 KP: Attack no. 13 on 28 November 2011 (this segment had already been attacked in no. 9).

799. The *modus operandi* was the same and no technical reports were provided which could serve as evidence of the security measures in place. It must be assumed that security measures had not improved.

## 5.4   ATTACKS ON OTHER TARGETS

800. In the hazardous environment of the Sinai, during this period violent groups targeted various assets. The parties have discussed at length two particular scenarios: the facilities of EMG and of the MFO.

> [The Arbitral Tribunal will not address EMG's attack in this section, because there is already ample information on that subject in the summary of Mr. Al Sakka's testimony (EMG's Managing Director), in paras. 695 *et seq. supra*.]

801. Interestingly, both parties have used the example of the MFO in support of their arguments: EGAS to report a case which, despite heightened security, could not prevent attacks[1038]; IEC to show how the MFO enhanced security after the Revolution and the first attacks[1039].

802. The MFO stands for the Multinational Force and Observers, an independent international organisation with peacekeeping responsibilities in Sinai, whose main base is located in El Gorah, in Zone C (*pro memoria*: the Pipeline mainly runs across Zone B, with higher military presence).

803. As evidence of MFO's efforts in security, IEC has produced the 2011 Annual Report[1040], which summarises the attacks suffered by the MFO:

- Local grievances in the form of peaceful protests outside MFO facilities, intermittent attempts to restrict the movement of MFO vehicles[1041].

- On 27 May 2011 an improvised explosive device was exploded as a armoured vehicle passed[1042].

> [Note: the parties also placed importance on the attack on the MFO's main base in September 2012. Since this occurred after the termination of the GSPA and long

---

[1038] Pelham FR, paras. 31 *et seq.*

[1039] FHT, Day 7, p. 1599.

[1040] Doc. R₃-356.

[1041] Doc. R₃-356, p. 7.

[1042] Doc. R₃-356, p. 7.

221 of 469

after the events for which EGAS has claimed *force majeure*, the parties' discussion
is not relevant and will be omitted from this summary.]

Response by the MFO

804. As early as the first uprisings, the MFO set in motion a series of internal steps to review possible enhancements to its security and to increase vigilance at all their sites[1043]. Concurrent with increased security concerns the MFO conducted a weekly evaluation of security and travel conditions which resulted in an advisory approved by the Force Commander on security concerns[1044]. In March 2011, at the request of the Director General, the U.S. Army Central Command Joint Security Office conducted a force protection assessment of both MFO camps, of all remote sites and of the dock area[1045].

805. The MFO undertook the following security improvements:

-   remote site renovations completed by October 2011, including the installation of ballistic towers, replacement perimeter fencing, protective blast walls, bunkers[1046] and improved lighting[1047];

-   acquisition of five fully armoured vehicles, in addition to the exiting three light armoured vehicles[1048];

-   command and control procedures: including, among other things, a new operations centre, centralising all operational elements and facilitating command and control of MFO assets[1049].

**5.5   IDENTITY OF THE ATTACKERS**

806. Gen. Eiland (one of IEC's experts) notes that up to three terrorist organisations have claimed responsibility for the attacks on the Pipeline[1050]: Ansar al-Hijad in the Sinai, Ansar Baytal-Maqdi and Al-Jabhahal-Salafiya fi Sinaa.

807. Based on his expertise, Gen. Eiland is of the opinion that Ansar Baytal-Maqdis are the most credible authors of the attacks[1051]. Mr. Pelham (EGAS' expert) found this conclusion questionable[1052] and thought that it was more likely that Jihadi

---

[1043] Doc. R₃-356, p. 6.
[1044] Doc. R₃-356, p. 7.
[1045] Doc. R₃-356, p. 8.
[1046] Doc. R₃-356, p. 9.
[1047] Doc. R₃-356, p. 10.
[1048] Doc. R₃-356, p. 9.
[1049] Doc. R₃-356, p. 11.
[1050] Eiland, para. 40.
[1051] Eiland, para. 41.
[1052] Pelham SR, para. 177.

groups and Al Quade were guilty[1053]. In any event – he insisted – all these militant groups are well-trained and battle-hardened. They maintain their own training camps, insurgency and they acquired an array of weaponry from North Africa's fallen regimes[1054]; and as far as Jama'at Ansar Bayt al-Maqdis is concerned, this group has claimed responsibility for lethal raids and rocket attacks on Israel among other attacks. Mr. Pelham insisted that, whoever was responsible, it would not be a primitive group[1055].

808. As regards the degree of violence used in the attacks against the Pipeline, Mr. Pelham recognised that attacks "only" involved the direct use of explosive devices[1056] and, as compared to other targets of Jihadi militants (such as the MFO), no violent crowd was present, nor were Molotov cocktails used[1057].

809. Mr. Schrader also underlined that there is no evidence that attackers were heavily armed and there would not even be a need for the use of strong weapons, as none of the attackers was ever challenged[1058].

## 6.   CONTRACTUAL REGULATION

810. Since the Pipeline runs through the inhospitable Sinai desert, a land ruled by Bedouin outcasts, and the Pipeline represents a commercial alliance with Israel, the possibility that the Pipeline be the object of terrorist attacks must have been a major concern when the GSPA was negotiated: in principle, a terrorist attack is by definition a *force majeure* event outside the control of the parties, causing failure to perform, for which none of the parties can be held liable.

811. It is, thus, no surprise that the GSPA includes a detailed regulation of *force majeure*, which defines what is to be understood under a *force majeure* event and creates certain requirements which must be met if the affected party is to be validly excused from performing.

Force majeure provisions

812. Art. 16.3 Annex 1 to the GSPA defines "*force majeure*" as follows:

> "[it] means an event or circumstance which is beyond the control of the Party concerned (acting and having acted as a Reasonable and Prudent Person), resulting in or causing the delay or the failure by such Party to perform all or any of its obligations under this Agreement (including, in the case of Buyer, the inability to take delivery of any Properly Nominated Quantity of Gas and in the case of Seller, the inability to deliver the Properly Nominated Quantities of Gas), which delay or

---

[1053] Pelham SR, paras. 17 and 102.
[1054] FHT, Day 7, p. 1471.
[1055] Pelham SR, para. 17.
[1056] FHT, Day 7, p. 1577.
[1057] FHT Day 7, p. 1578.
[1058] FHT Day 6, p. 1265.

failure could not have been prevented or overcome by the standard of a Reasonable and Prudent Person".

813. A reasonable and prudent person is defined in Annex 6 to the GSPA:

"A Person seeking in good faith to perform its contractual obligations and in so doing and in the general conduct of its undertaking exercising that degree of skill, prudence, diligence and foresight that would reasonably and ordinarily be expected from a skilled and experienced Person complying with Law engaged in the same type of undertaking under the same or similar circumstances and conditions".

814. The requirement to act with this standard of diligence is developed in Art. 16.2:

"A Party claiming *force majeure* must act as a Reasonable and Prudent Person in preventing the effects of any *force majeure* events (and as soon as reasonably practicable after the commencement of an event of *force majeure*, a Party claiming *force majeure* must act as a Reasonable and Prudent Person to overcome and mitigate the effects of such event of *force majeure*), and shall continue to perform its obligations pursuant to this Agreement to the extent such obligations are not impacted by such *force majeure* events. To the extent a Party claiming *force majeure* fails to act as a Reasonable and Prudent Person in preventing or mitigating the effects of any *force majeure* events, such Party shall not be excused for any delay or failure to perform that would have been avoided if such Party had acted as a Reasonable and Prudent Person".

815. Art. 16.7 imposes an obligation to remedy:

"*Force majeure* relief will cease to be available to the affected Party in the event of a failure to take all reasonable steps to remedy the failure as soon as practicable".

816. And 16.8 provides some notification requirements:

"Notice of *force majeure*: In the event of a *force majeure*, the affected Party will serve notice of such *force majeure* to the other Party as soon as is reasonably practicable, promptly provide a report of the circumstances of such *force majeure*, providing all relevant information as is available as to such event (including the Place thereof, the reasons for failure and the reasons why such Party's obligations under this Agreement were affected), and from time to time, provide updates of such event, including further information and explanation as it becomes available".

<u>Contractual requirements</u>

817. The GSPA establishes the following requirements for an event to qualify as *force majeure*:

818. <u>First</u>, there must be a circumstance beyond the control of the party concerned[1059]: the Pipeline suffered 13 violent attacks and whilst it can be argued whether the attackers were a sophisticated and organised terrorist group or not, the parties do not question that the assaults were beyond EGAS' control.

---

[1059] Art. 16.3 of Annex 1 to the GSPA

819. Second, such circumstance must cause a failure to perform[1060]: the attacks blew up the Pipeline and during the repair time, gas flow had to be interrupted – no party has challenged that the gas interruptions were caused by the attacks (although there is an issue about the reasonableness of the repair time).

820. Third, the party affected by *force majeure* must act and have acted as a reasonable and prudent person[1061], which implies showing the degree of skill, prudence, diligence and foresight that would ordinarily be expected from an experienced pipeline operator [a "**RPPO**"] engaged in the same type of undertaking under the same or similar circumstances and conditions[1062]; such actions must be directed at preventing, overcoming and mitigating the effects of the event[1063] [the "**RPPO Requirement**"].

821. Fourth, the failure to perform would have been avoided if the party affected by *force majeure* had acted as a RPPO[1064] [the "**Avoidance Requirement**"].

822. Fifth, as soon as practicable after the commencement of a *force majeure* event, the party claiming relief must act as a RPPO to overcome and mitigate the failure to perform[1065]. This obligation is reinforced by Art. 2 of the Tripartite Agreement, which provides as follows:

> "[…] EGAS and EGPC shall exercise reasonable endeavors to enable EMG […] to make available for delivery an uninterrupted supply of Natural Gas to IEC […]".

If a *force majeure* event occurs, and the supply of gas is interrupted, the Tripartite Agreement thus requires EGAS to adopt all "reasonable endeavors" to promptly reactivate delivery.

823. Sixth, the affected party must serve notice of the *force majeure* event as soon as possible and promptly provide a more complete report, and updates when new information is available[1066].

824. Aware of their importance, the largest part of the Parties' submissions and evidence regarding *force majeure* deals with the RPPO and the Avoidance Requirements, which will be analysed in sections 8 and 9. Before that, the Tribunal will dedicate section 7 to the burden of proof.

---

[1060] Art. 16.3 of Annex 1 to the GSPA.
[1061] Art. 16.3 of Annex 1 to the GSPA.
[1062] Annex 6 to the GSPA.
[1063] Art. 16.2 of Annex 1 to the GSPA.
[1064] Art. 16.2. *in fine* of Annex 1 to the GSPA.
[1065] Art. 16.2 of Annex 1 to the GSPA.
[1066] Art. 16.8 of Annex 1 to the GSPA.

## 7. BURDEN OF PROOF

825. During the first two rounds of written submissions all parties accepted that the burden of proving that the requirements for a *force majeure* relief had been met lay with the party relying on the *force majeure* event, i.e. Respondents 1 and 2. The burden of proof did not become an issue until the Hearing, when Respondents 1 and 2 for the first time submitted that their burden of proof was limited to demonstrating that a *force majeure* event had occurred; and that the burden for the defence that EGAS had failed to act as a RPPO corresponded to IEC and EMG[1067].

> [Respondents 1 and 2 seem to have dropped this argument almost immediately, because in the same Hearing they acknowledged that establishing that EGAS acted as a RPPO is a condition under the GSPA to claim *force majeure*[1068]. The abandonment of the proposition seems to have been tacitly confirmed in their Post-Hearing Brief, which does not address the question of burden of proof.]

826. Claimant[1069] and Respondent 3[1070] – unaware of Respondents 1 and 2's change of opinion – replied in their respective Post-Hearing Briefs that, as a matter of English Law, it was for the person advancing a *force majeure* claim to prove that it is entitled to a *force majeure* relief.

827. The Tribunal agrees. The parties established a precise contractual regulation of *force majeure* situations and in so doing, they drew a clear distinction between:

- A *force majeure* event (Art. 16.3): an event or circumstance which is beyond the control of the party concerned acting and having acted as a reasonable and prudent person.

- The requirements for a *force majeure* event to become an available remedy (Art. 16.2): a party claiming *force majeure* must act as a RPPO.

828. These two contractual provisions do not leave room for doubt: it is not sufficient for a party invoking *force majeure* to establish that a *force majeure* event occurred, it must also prove that it acted as a RPPO to avail itself of the remedy. The question of who bears the onus of proof is answered by the principle *alegans incumbit probatio*. It is Respondents 1 and 2 who claim *force majeure* as defence from delivery failure, and it is for them to prove that such remedy is available.

---

[1067] FHT, Day 3, p. 563.
[1068] FHT, Day 3, ps. 564 and 565 (paraphrasing): "Do you accept that it is necessary for the Tribunal to be satisfied that EGAS did not act as a reasonable and prudent person as a precondition of claiming *force majeure*? Yes, we do believe it's a condition under the Agreement; in order to claim *force majeure*, EGAS must act as a reasonable and prudent operator. That we accept".
[1069] C PHB, para. 34.
[1070] R₃ PHB, paras. 36 *et seq*.

829. This is further confirmed by English Law: it is for a party relying upon a *force majeure* clause to prove the facts bringing the case within the clause[1071].

830. <u>In conclusion</u>, the Tribunal decides that a requirement for invoking a *force majeure* defence is that the party relying on it acted as a RPPO and it is for that party to prove that it behaved so.

## 8. THE RPPO REQUIREMENT

831. The GSPA requires a party affected by *force majeure* to act as a reasonable person; and this implies that it should prevent, overcome and mitigate the effects of the *force majeure* event with the degree of skill, prudence, diligence and foresight that would ordinarily be expected from an experienced person engaged in the same type of undertaking under the same or similar circumstances and conditions (and it must have acted so at all times).

832. The RPPO Requirement gives rise to two types of questions:

- The first is: what measures would a RPPO, with sufficient foresight, implement to prevent, overcome and mitigate the effects of the attacks?

- And the second: what measures did EGAS actually adopt in order to meet the RPPO Requirement?

833. The proper way to ascertain the first question is through expert evidence. EMG and IEC have marshalled ample evidence from security experts explaining how a RPPO should address security issues, in accordance with industry standards, based on the so-called "four D's" (deter, detect, delay and defend). And the Tribunal is able to draw from that expert evidence general guidelines on the standards of diligence expected from a RPPO that operates a pipeline in a hostile environment as the Sinai. EGAS has produced one single expert, Mr. Pelham, a journalist specialised in Middle East conflicts[1072], who is not a security specialist, and thus could not provide an expert view on whether EGAS' security measures complied with the reasonable and prudent person standard.

834. The second question can only be answered through evidence marshalled by EGAS – and the burden of proof rests with EGAS, who is the party invoking *force majeure* relief. Notwithstanding that it bears the burden of proof, EGAS has chosen to produce very little evidence regarding the 13 attacks suffered by the Pipeline, and of the reactive security measures adopted by the Pipeline operator.

---

[1071] See Chitty on Contracts, submitted as Doc. R₃-122; *Mamidoil-Jetoil v. Okta*, submitted as Doc. R₃-123.

[1072] The Tribunal appreciates Mr. Pelham's insight in Sinai's socio-geo-political intricacies, which has greatly assisted the Tribunal in understanding under what kind of circumstances EGAS had to conduct its business in Sinai, and in no way does it intend to downplay the extraordinarily hard times in which EGAS had to operate the Pipeline.

EGAS has produced very few documents explaining the security measures adopted to protect its Pipeline – most of the documents which are relevant to the outcome of this dispute have not been marshalled by EGAS but by EMG's and IEC's experts. What is even more surprising is that EGAS also failed to put forward a single fact witness to support its *force majeure* case. Before filing this arbitration, EGAS did arrange a private meeting between its expert, Mr. Pelham and GASCO's Security Manager and EGAS' Head of Planning and Operations[1073]. EGAS however chose not to submit any witness statement from these managers – and consequently, neither the Tribunal nor EGAS' counterparties had the possibility of obtaining a first-hand view from those EGAS officers who had the highest level of direct information.

Basic security measures

835. The Tribunal has identified the following four basic security measures, proposed by all of the three experts, as the minimum threshold which a RPPO should adopt:

- The first measure is the adoption and periodic reassessment of a security plan for the pipeline (**8.1.**).

- The second is the construction of certain structural protection measures (**8.2.**).

- The third the procurement of technological devices to detect intruders (**8.3.**).

- The fourth the creation of a professional security force (**8.4.**).

**8.1 SECURITY PLAN**

836. The experts highlighted the importance of carrying out successive risks assessments of the pipeline, starting at the time of construction. Such assessments should result in an identification of those sections and facilities of the pipeline requiring additional protection[1074]. The level of security threats should be continuously monitored[1075], and whenever substantial changes in the circumstances affecting security occur, a new risk assessment should be carried out[1076]. The results of the risks assessment should be formalised in a security and emergency response plans[1077]: a threat alert must unchain a series of planned and organised reactions from the monitoring control rooms to the security forces response teams.

---

[1073] FHT, Day 8, p. 1694.
[1074] Ling FR, para. 29.
[1075] B&O'B-Schrader FR, para. 9.
[1076] Ling FR, para. 22; B&O'B-Schrader FR, paras. 23 and 24.
[1077] Ling FR, para. 34.

837. The Tribunal agrees that an early risk assessment was especially important in this case, because it is undisputed that the Pipeline encountered (at least) two difficulties right from the outset:

838. <u>First</u>, it was an unpopular project in Egypt. Opposition came from three primary sources:

- Normalisation of relations between Israel and Egypt was viewed as a defeat of the Arab cause[1078].

- It was commonly believed that EMG purchased the gas at preferential rates[1079], while average Egyptians were under significant economic stress due to an economic reform program[1080].

- EMG was held to sit at the confluence of Egyptian national security, intelligence cooperation with Israel and President Mubarak associates[1081].

839. <u>Second</u>, the Pipeline crosses North Sinai, a region which presents a number of challenges: the Pipeline traverses 192 km of desert, between sand dunes – a dark, inhospitable place. And the population of North Sinai is mainly Bedouin, a community with anti-government feelings, historically marginalised[1082], restricted from entry into the formal economy and thus forced to develop a market for illicit business as smuggling drugs and weapons[1083].

840. Brig. Ling attested that hostile Bedouin neighbours constituted a clear threat to the project, which should have been identified in a standard risk assessment[1084]. Was this risk assessment performed, when the Pipeline was built before it started delivery of gas to Israel?

<u>Actions taken by EGAS</u>

841. Respondents 1 and 2 were explicitly ordered to produce documents reflecting the performance of any security risk assessment[1085].

842. In the course of the document production procedure EGAS presented a so – called "Contingency Plan"[1086] – the only document which shows some resemblance to a security plan.

---

[1078] Cook, para. 54.a.
[1079] Cook, para. 54.b.
[1080] Cook, para. 54.d.
[1081] Cook, para. 54.c.
[1082] Pelham FR, para. 20.
[1083] Pelham FR, para. 26.
[1084] Ling FR, para. 51.
[1085] EMG's request no. 19.a) "Documents reflecting […]… any security risk assessments undertaken between June 2005 and May 2012".

843. The Tribunal has already described the Contingency Plan, dated April 2011 on its cover, in paras. 780 *et seq. supra*. The document contains a separate section analysing the attacks against the Pipeline and the security improvements adopted in response thereto (It is doubtful whether such section was actually drafted in April 2011, at the same time as the rest of the Contingency Plan, because other evidence shows that some of the measures had not been adopted by that time).

844. Brig. Ling submits that the Contingency Plan can in no way be viewed as a risk assessment or a security plan, because it does not include proper procedures referenced for security, and the section on the attacks does not include an analysis of how or why the attacks were occurring, what deficiencies had been singled out and how to cure them.

845. The Tribunal concurs: the Contingency Plan is not a security plan, which properly identifies and assesses the risk faced by the Pipeline, and was adequately reviewed after significant alterations in the risk environment.

846. EGAS has failed to discharge its duty of proving that it had carried out and formalised a proper risk assessment, either before construction, at the time when the Pipeline was built or ever thereafter. This is a major shortfall, the more inexplicable given the location of the Pipeline and its ultimate beneficiary. The security plan should have been in place and it should have been revised to take account of the new risks arising as a consequence of the Revolution, and also after each attack.

**8.2    STRUCTURAL PROTECTION**

847. Experts have explained that pipelines can be protected by installing physical barriers: the pipe can be covered with concrete[1087] slabs[1088] to protect it from explosions; and it can be buried to delay access; facilities can improve their defence by erecting high walls and fences[1089] and building watch towers for sentinels[1090]; valuable equipment can also be placed in cement vaults[1091].

848. The Pipeline had some structural security in place: it was buried and a small segment was covered in cement; and facilities had a perimeter fence topped by barbed wire. The question is whether these measures were sufficient to comply with the reasonable and prudent standard.

---

[1086] Doc. R$_3$-393.
[1087] Eiland, para. 55.
[1088] Ling FR, para. 67.
[1089] Ling FR, para. 36. Eiland, para. 55; B&O'B-Schrader FR, para. 17.
[1090] Eiland, para. 55.
[1091] Eiland, paras. 59 and 76.

<u>Insufficient cement protection</u>

849. EGAS acknowledges the importance of covering the pipeline with cement as an additional protection from aggressions, but it only applied this extra shield in certain areas[1092], while others remained unprotected. It is very telling that the blasted sections of the pipe were always unprotected – no bombing of the covered segments ever happened.

850. Respondents 1 and 2 have produced no evidence which explains why this measure was applied only partially and the Arbitral Tribunal is at loss to understand the reasons why EGAS failed to take action and to extend the measure to the totality of the pipeline (or at least to the confined areas where most of the attacks were taking place).

<u>Unsatisfactory fences and wire</u>

851. Fences and wire surrounding facilities were clearly insufficient to deter attacks, because the project to heighten the walls and adding more wire was discussed and approved in a Board meeting[1093], but there is no evidence that EGAS actually implemented this decision.

<u>No sentry towers</u>

852. EGAS has submitted on several occasions that it "erected surveillance towers"[1094]; there is however no proper evidence (e.g. actual plans, photographs or videos) that such turrets were indeed built.

853. Instead of providing adequate proof, EGAS has referred to seven documents, which allegedly support the erection surveillance towers[1095], without any explanation; these documents as a general rule do not mention the existence of towers, and the one that does[1096], is still no satisfactory proof, because it refers to vague hearsay evidence for the construction of some structure.

<u>Deficient lighting</u>

854. Although EGAS was called upon by the Ministry of Petroleum, the Ministry of Defence and the Supreme Military Council to improve the lighting of the Pipeline as early as May 2011[1097], guards interviewed in July complained that they had to secure facilities in the pitch black dessert night, and that the darkness made it

---

[1092] Doc. R₃-393, p. 65.
[1093] Doc. R₁₊₂-470.
[1094] R₁₊₂ FS M, para. 371, R₁₊₂ SS M, para. 521.
[1095] Doc. R₃-354, Doc. R₃-325, Doc. R₁₊₂-468, Doc. R₁₊₂-469, Doc. R₁₊₂-470, Doc. R₁₊₂-473 and Doc. R₁₊₂-474.
[1096] Doc R₃-325.
[1097] Doc. R₃-126.

impossible for them to see approaching attackers. EGAS has produced no evidence that it ever adopted the decision – let alone implemented it – to improve lighting.

Exposure of equipment

855. Experts advise that valuable equipment housed inside facilities should be protected, ideally in cement vaults[1098]; the photographs contained in the Technical Reports prepared after some of the attacks show that the equipment was always completely exposed and thereby an easy target for attacks.

## 8.3 TECHNOLOGICAL DEVICES

856. The experts acknowledge that it is impossible to physically guard a 192 km pipeline at all times, but that this difficulty can be offset by employing technological instruments to detect threats.

857. The experts have identified a large number of electronic devices with varied degrees of sophistication, which could have been available to EGAS. Two stand out, being highly efficient and reasonably affordable:

- Fibre cable[1099]: a cable buried along the Pipeline, which is sensitive to movements[1100], and triggers an alarm if activities are sensed. Has EGAS proved that it deployed these instruments? As explained in para. 760 *supra*, before the Pipeline entered into operation, GASCO requested international companies to provide offers for the procurement of fibre cable[1101]; there is however no proof that the acquisition of fibre cable was an issue that was ever considered again.

- Surveillance cameras[1102]: the cameras capture and record any activity in the surroundings of the Pipeline; this kind of surveillance requires a central control room[1103], with personnel reviewing the camaras and activating an alert if suspicious movements are detected. The purchase of surveillance cameras was a question recurrently under discussion. GASCO asked international suppliers to submit offers for the procurement of surveillance cameras, and there is even a cost study prepared by GASCO in July 2011 (at the request of the Egyptian public administration)[1104]; there is no evidence however that the surveillance cameras were actually installed.

---

[1098] Eiland, paras. 59 and 76.
[1099] Ling FR, paras. 39 and 67.
[1100] B&O'B-Schrader FR, para. 17.
[1101] Exhibit BFS 2.
[1102] Ling FR, para. 39. Eiland, para. 63. B&O'B-Schrader FR, para. 17.
[1103] Ling FR, para. 32.
[1104] Doc. $R_{142}$-375, and with a full translation in BFS-3.

858. Had either of these devices been procured, EGAS would have been able to produce convincing evidence without undue efforts: invoices, payment orders, reports of alarms, photographs, witness statements from officers manning the control systems, etc.. But this has not happened; no evidence has been provided and the Tribunal notes that EGAS was specifically ordered to produce documents confirming the acquisition of these devices, and that none were submitted[1105]. Consequently, the Tribunal must infer that although the installation of fibre cable and surveillance cameras was discussed at some point in time, the plan was never carried out.

859. This represents, again, a significant deficit – especially taking into consideration that the structural protection of the Pipeline (cement shield, fences and wire, sentry towers, lighting) was already insufficient. When EGAS decided not to pursue the acquisition of fibre cable and surveillance cameras, or of any other technological devices to detect the presence of intruders, EGAS must have been aware that the Pipeline was being left vulnerable to attacks.

**8.4   SECURITY FORCES**

860. Security forces which provide defence capabilities constitute the fourth pillar in any security plan. Their task consists of physically guarding the Pipeline, preventing the intrusion by unauthorised persons, challenging intruders and (to the extent permitted by law) chasing assailants.

861. Appropriate security forces are a fundamental element in the protection of a pipeline: as a powerful deterrent, to detect possible attacks and to respond to any intrusion. The presence of security forces is required both to guard facilities and to patrol along the pipeline[1106] and security forces must be equipped to enable them to carry out those tasks.

862. Experts have explained[1107] how, in an environment like a gas pipeline, where an involuntary shot can cause an ignition leading to a blast, or a leak to asphyxiation, security forces require sophistication obtained through specific training and education[1108]. Security forces must be well-structured and organised, with a clear line of command and a standardised operating procedure[1109]. Security can be provided by private or public entities, but always professionals; and when

---

[1105] See Annex 1 to Procedural Order no. 8, Request. No. 19 (i): "Documents confirming EGPC and EGAS' assertion that they procured "advanced remote surveillance equipment, including motion sensors, surveillance cameras and remotely operated loudspeakers" for the Trans-Sinai Pipeline, including purchase orders, invoices".
[1106] B&O'B-Schrader FR, para. 52; FHT Day 6, pp. 1236 and 1302.
[1107] B&O'B-Schrader SR, para. 14.
[1108] B&O'B-Schrader FR, para. 64.
[1109] Eiland, para. 56.

private[1110], it is recommended that a retired army or police officer should be the commanders of each Facility[1111].

863. Security forces should be posted at the entrance of Facilities[1112] and also inside, watching from sentry towers[1113]. Additionally, forces should carry out patrols along the Pipeline[1114]. Security has to be deployed in such way that a unit be able to reach any point of the Pipeline in less than 30 minutes[1115].

864. Security forces require adequate equipment, which includes:

- arms to challenge attackers[1116];

- vehicles to carry out patrols and chase down intruders; and

- proper accommodation[1117].

865. EGAS avers that it complied with this standard by retaining the services of an "armed"[1118], "specialised and fully equipped security force"[1119]. The evidence submitted in support of this argument is minimal: with the first two submissions no evidentiary record was provided[1120]. It was Claimant's security expert who submitted a number of individual services or employment contracts, entered into between GASCO and individual Bedouins for the provision of security services[1121]. During the Hearing EGAS presented a chart based on these contracts, and in the Post-Hearing Brief EGAS specifically referred to the chart in support of its argument[1122].

866. The chart shows that in January 2011, 25 guards were employed. The number rose to 86 by February 2011. Another significant increase took place in October 2011, reaching 261 guards. When the GSPA was terminated, in April 2012, 331 were being employed.

---

[1110] B&O'B-Schrader SR, para. 15.
[1111] Eiland, para. 117.
[1112] Eiland, para. 65. B&O'B-Schrader FR, para. 17.
[1113] Eiland, para. 74.
[1114] Ling FR, para. 39.
[1115] Ling FR, para. 42.
[1116] Ling FR, para. 67. Eiland, para. 56.
[1117] Eiland, para. 74.
[1118] R$_{1+2}$ PHB, para. 142.
[1119] R$_{1+2}$ FS M, para. 371; R$_{1+2}$ SS M, para. 521.
[1120] R$_{1+2}$ FS M, para. 371 provides no support; R$_{1+2}$ SS M, para. 521 includes footnote 663 which simply reads: In response to EMG and IEC's Requests for Document Production, EGPC and EGAS provided ample evidence relating to the guards securing the Pipeline".
[1121] Annexes to B&O'B-Schrader SR, BFS-1, BFS-5 to BFS-12.
[1122] R$_{1+2}$ Opening Statements, Volume II-1, p. 82.

867. The question is: do these individual security contracts prove that EGAS retained the services of an "armed, specialised and fully equipped security force"? The Tribunal is not convinced.

(i)   No evidence that the guards were armed

868. There is no direct evidence that the guards wore weapons; and there is also no evidence – not even circumstantial– that any attacker was ever challenged. In fact, there is no evidence that in any of the 13 attacks a single bullet was shot from either side. In a news article dated July 2011, guards interviewed by the journalist complained basically about two things: the poor housing conditions and that they were unarmed and thus unable to defy attackers[1123].

(ii)   No evidence that guards were specialised

869. Though the individual contracts included in standardised terms that "the second party specialises in this field [guarding people, vehicles and equipment]", Claimant's expert on security doubts that the hired individuals met the level of specialisation required.

870. The expert has pointed out that the oil and gas security is a specialised field, requiring an understanding of the operating environment[1124]. The fact that many of the contracts were not signed, but have thumbprint marks, would indicate that many of the guards were illiterate[1125]. This, added to the low wages paid, leads the expert to conclude that the level of sophistication required was not met[1126].

871. And the Tribunal concurs.

(iii)   No evidence that the guards were fully equipped

872. EGAS has submitted that vehicles were procured and accommodation erected. But again there is no evidence that these measures actually materialised:

873. A tender process was set up to acquire 20 vehicles[1127], but the final decision was subject to the approval by GASCO's Board, and there is no proof that such resolution was ever adopted. And there is also no evidence (like witness statements, or photographs) proving that the vehicles became operational. Without proper vehicles any patrolling along the Pipeline was in jeopardy.

874. And there is a final argument, which confirms that no organised patrols were ever carried out: the Pipeline suffered a total of 13 attacks and not once were the

[1123] Doc. R3-413.
[1124] B&O'B-Schrader SR, para. 14.
[1125] B&O'B-Schrader SR, para. 18.
[1126] B&O'B-Schrader SR, para. 18.
[1127] Doc. R3-403.

attackers chased, and in the reports prepared by EGAS to explain the attacks there is no reference whatsoever to the presence of or reaction by a patrol; *res ipsa loquitur*.

875. As regards the building of housing, the evidence produced by EGAS shows that this was an issue discussed in several board meetings[1128] and that a cheque was issued in December 2011 in the amount approved for the building of the housing for guards[1129]. Whether the cheque was cashed, and how the money was spent, and whether accommodation was actually erected before the GSPA was terminated, the Tribunal does not know. EGAS has failed to marshal any proof: no construction contracts, no pictures of the housing, no witness statements explaining the activities performed.

(iv)   No evidence that a security force was available

876. The Tribunal has found evidence in the file that EGAS did at some point contemplate retaining the services of a proper private security force. The Contingency Plan reveals that EGAS[1130]:

> "[c]onsidered assigning the guard of distribution centers and valve rooms to a specialized guard and security company able to provide trained and armed staff to allow them encounter such sabotage acts"

877. There is however no further evidence that EGAS ever went beyond this mere consideration and actually hired such a security company.

878. Instead, EGAS chose:

-      to hire individual (Bedouin) guards; and

-      to establish what the Contingency Plan refers to as a "cooperation" with the State's Armed Forces[1131].

879. Did these measures amount to the retaining of a proper security force, which satisfies the reasonable and prudent operator standard? The Tribunal is not persuaded.

880. First, entering into separate contracts with private individuals was an unusual and irregular practice, as the expert Mr. Schrader has highlighted[1132]. The industry practice is contracting with a public security entity or a recognised professional

---

[1128] Doc R$_{1+2}$-470.

[1129] Doc. R$_{1+2}$-474.

[1130] Contingency Plan. Annex "Solutions applied to the reactive phase to avoid the recurrence of line explosion accidents", Doc. R$_3$-393. Emphasis added.

[1131] Contingency Plan. Annex "Solutions applied to the reactive phase to avoid the recurrence of line explosion accidents", Doc. R$_3$-393.

[1132] B&O'B-Schrader SR, para. 14.

private security company[1133], with a clearly-defined command structure in place[1134]. Respondents 1 and 2 have not explained – let alone proven – how individually contracted guards who, as time advanced, increased in number, amounted to a security force: there was no explanation on how they were structured, who was in command, how tasks were assigned, what protocols they applied.

881. <u>Second</u>, the scope of cooperation with the Armed Forces seems to have been rather limited – at least this is the impression given by the very scarce information provided by EGAS, who has failed to marshall any cogent evidence regarding the agreements with and the measures adopted by the Armed forces in relation to the Pipeline.

882. After a thorough review of the file, the only information garnered by the Tribunal is the following:

- EGAS made two payments to the Engineering Services of the Armed Forces in June 2011 (after three attacks) and in March 2012 (a month before the termination of the GSPA).

- The Technical Report on the 12 July 2011 attack mentions that soldiers were contacted, who could not act because the Officer was not present.

- GASCO's Board decided in December 2011 to hire the Armed Forces to protect police vehicles.

883. The scarce evidence does not prove that EGAS and the State Armed Forces entered into a formalised and continuous relationship for providing Pipeline security. If such cooperation existed, it must have been sporadic and informal: given the recurring *modus operandi* of attackers, if the Army had been providing security, at some time the Army would have engaged the saboteurs. But the fact is that attackers were not once challenged, no response team reacted, intruders were never chased down or apprehended and explosions were not prevented.

884. <u>In conclusion</u>, there is no evidence in the file showing that either before or after the Revolution EGAS had organised a sophisticated, professional security force which protected facilities, nor any system of motorised patrols, with the duty of securing the pipeline and reacting to the attacks – either using its own private security forces or contracting it out to a public security force. If any cooperation in security matters existed between State Armed Forces and EGAS, it must have been sporadic and an intermittent.

\* \* \*

---

[1133] B&O'B-Schrader SR, para. 15.
[1134] B&O'B-Schrader SR, para. 16.

885. <u>In summary</u>, EGAS has not proven that it acted as a RPPO in preventing and mitigating the effects of the attacks; in particular, it has failed to prove that it implemented security plans, provided physical security to the pipe, deployed technological detection devices, and retained proper security forces. Art. 16.2 of Annex 1 to the GSPA, EGAS provides that if

> "To the extent a Party claiming *force majeure* fails to act as a Reasonable and Prudent Person in preventing or mitigating the effects of any *force majeure* events, such Party shall not be excused for any delay or failure to perform that would have been avoided if such Party had acted as a Reasonable and Prudent Person".

886. Consequently, to the extent that such failure could have been mitigated or avoided by acting as a reasonable and prudent pipeline operator the Tribunal finds that EGAS cannot be excused from any failure to perform under the GSPA.

## 9.   THE AVOIDANCE REQUIREMENT

887. The Tribunal must now analyse the second requirement, the so-called Avoidance Requirement: whether the attacks could indeed have been mitigated or prevented, had EGAS acted as a reasonable and prudent pipeline operator.

888. EGAS argues that any additional security measures that it could have implemented would have made no difference, because attacks could not have been prevented. Mr. Pelham, has even gone one step further: additional security measures would in fact have been counter-productive[1135]:

> "EGAS's record suggests that low profile security measures actually proved more effective in containing attacks than the highly conspicuous and provocative steps that Schrader cites as a model".

889. IEC and EMG sustain the opposite: in their view, all attacks were predictable and of minor intensity, and if EGAS had acted as a RPPO, they could easily have been prevented.

890. The Tribunal agrees with IEC and EMG.

891. IEC and EGAS argue that the 13 attacks were all predictable and of low intensity, and could easily have been prevented, if EGAS had acted as a RPPO. Their position is supported by the expert report submitted by Gen. Ling, who has created a diagram[1136] which depicts the possible attack profiles, by difficulty of defence (from most difficult to least difficult):

---

[1135] Pelham SR, para. 95.
[1136] Ling FR, p. 11.



892. Gen. Ling opines that of the six categories of possible attackers identified in the chart, only attacks by foreign Armed Forces or by covert foreign Special Forces can be expected to succeed against the defences of a RPPO. The remaining five possible adversaries should have been stopped by proper protection[1137].

<u>Identity of the attackers</u>

893. The Tribunal has already addressed the question of who attacked the Pipeline in section 5.5 *supra* and concluded that a terrorist organisation must have been responsible, the most likely candidate being Ansar Baytal-Maqdi; in accordance with Mr. Pelham's report a well-trained armed group[1138]. The experts also agree that the degree of violence used in the attacks was low, the number of attackers did not exceed six, no heavy arms were deployed and no shot was fired[1139]. In Gen. Ling's diagram, the attackers fit into the category of "local insurgents", after "Vandals" and "Criminal Gangs" the third least serious category of attackers. In his professional opinion, a RPPO should be able to successfully defend the pipeline against this type of attackers.

894. The Tribunal accepts that – as Mr. Pelham has stated – Ansar Baytal-Maqdi is a well-trained armed group; the Tribunal is also ready to accept that a RPPO may not be able to avoid that a terrorist group like Ansar Baytal-Maqdi carries out isolated attacks against the Pipeline or its Facilities. But a RPPO should adopt measures to prevent or at least significantly mitigate repeat incidents. In the present case, the attackers were able to launch 13 successive attacks, all sharing the same main characteristics, without ever being detected, apprehended or pursued by the forces allegedly guarding the pipeline.

---

[1137] Ling FR, para. 49.
[1138] See para. 807 *supra*.
[1139] See paras. 808 and 809 *supra*.

895. The evidence in the file confirms this view and leads the Tribunal to conclude that the attacks initially against the Facilities and afterwards against the pipe could have been avoided (or at least significantly mitigated) had EGAS adopted the minimal standard security measures suggested by the counter-experts.

## 9.1   ATTACKS ON FACILITIES

896. The first six attacks were directed against facilities of the pipeline (off-take rooms, traps, valve stations). The *modus operandi* of the attackers was consistent: a limited number of saboteurs (never more than six) reached the facility during the night, carrying light arms (no evidence of hard weaponry, no bullets were ever fired), were not challenged or repelled by any security force, forced access to the facility, put explosives in place and detonated them remotely.

897. Basic security measures which a RPPO should have adopted to protect a finite number of facilities, include the following[1140]:

- a formal security plan, periodically reviewed and adapted;

- an armed, professional security force, guarding the facility from sentry towers;

- improved lighting;

- monitored surveillance cameras;

- a motorised armed reinforcement team.

898. EGAS failed to implement these measures. The Tribunal is convinced that had it done so, the attacks could have been prevented. And the proof is provided by the very facts: when EGAS finally took some minimal measures to improve security on its Facilities (which, albeit enhanced, still did not meet the reasonable and prudent standard), attackers moved on to attacking the unprotected line. In attacks 7 through 13 saboteurs chose to blow up the pipe, and not any facility, although the damage than can be caused to the line is more limited.

899. There is further evidence in the file that gas facilities, if properly protected, are immune to terrorist attacks. In July 2011 EMG suffered an attack of much heavier violence against its own facilities (a rocket propelled grenade was fired), and still was able to repel it in three minutes, using only its security force stationed inside the facility.

900. EGAS has questioned an analogy with EMG because[1141]

---

[1140] See paras. 836 *et seq.*, 856 *et seq.*, 847 *et sea.* and 860 *et seq. supra*.
[1141] R$_{142}$ FS M, para. 373.

> "the efforts required to secure the 192 km long Pipeline which crosses the Sinai desert [far exceed] those needed to secure EMG's very small installation, located close to the Egyptian-Israeli border, where security is naturally higher".

901. The Tribunal agrees with the principle that for analogies to be validly drawn, the two situations must be comparable. But in this case, the situations indeed are comparable: the Tribunal is comparing the protection of successive facilities on the same pipeline. There is no reason justifying that EGAS' facilities were left totally unprotected, while EMG's facility was properly guarded.

## 9.2   ATTACKS ON THE PIPE

902. Attacks on the pipe began when the saboteurs decided to discontinue attacks against the Facilities. All conform to the same *modus operandi*: the saboteurs acted during the night and their target was the segment of the pipe placed 25 km around the town of Al Arish; they located the pipe, which was buried at a depth of 1,5 m, dug a hole, put explosives in, left the site and detonated the bomb remotely.

903. The Arbitral Tribunal has already determined that a RPPO would have implemented the following security measures, which were lacking[1142]:

   -   a formal security plan, periodically reviewed and adapted;

   -   fibre cables and surveillance cameras monitored through a control room;

   -   cement slabs covering the duct;

   -   motorised patrols by properly structured and armed security forces.

904. The question is: could these attacks have been prevented had the above security measures been in place? The answer is in the affirmative:

   -   Surveillance cameras would have detected the attacker while approaching the pipe and starting to dig, and the officer in the control room would have triggered an alarm. If the saboteurs were able to avoid camera detection, then the fibre cable would in any case have detected the digging activity and would also have rung the alarm.

   -   The alarm would have activated a response protocol and a patrol would have been sent to challenge the attackers. Experts submit that response teams should be capable of reaching any point of the Pipeline in less than 30 minutes[1143]. Intruders need at least the same time to locate the pipe, dig the hole and place the explosive; enough time for the response team to reach its destination.

---

[1142] See paras. 846, 850, - and 879 *supra*.
[1143] FHT, Day 6, p. 1302.

Even if the response team did not make it on time, and attackers were able to detonate the bomb, if the duct had been protected by a cement slab, harm could have been mitigated.

## 10.   EGAS' COUNTER-ARGUMENTS

905. EGAS argues that it did not adopt additional security measures, because to do so would have been futile; any additional security measures that it could have implemented would have made no difference, because attacks could not have been prevented[1144].

## 10.1   OTHER TARGETS

906. The argument is supported by the opinion of its expert, Mr. Pelham, who submits that the attacks could not have been prevented, even if substantially greater forces had been deployed; and as evidence for his proposition he refers to the attacks suffered by a cement factory in North Sinai and by the MFO's North Base:[1145]

> "Attacks on other installations including major security targets following the military build-up in Sinai confirm that it would not have been possible to prevent attacks even with substantially greater forces".

Cement factory

907. According to Mr. Pelham, a cement factory in North Sinai suffered two attacks[1146], one in March 2011 and the other in January 2012. In the March attack Bedouin tribesmen raided the plant, halting production; and in January 24 Chinese workers and a translator were kidnapped (but later on released)[1147].

908. The difficulty with Mr. Pelham's comparator is that there is insufficient evidence in the file to confirm the comparability. Neither EGAS nor the expert provide any indication about the security measures in place at the cement factory, other than a suggestion that it was military-operated[1148]. Not knowing the level of protection afforded to the factory (it may well be that it had as little protection as the Pipeline), it is impossible to establish the hypothetical effects of an increased level of protection on the likelihood of the attacks.

---

[1144] $R_{1+2}$ FS M, paras. 372-374.
[1145] Pelham SR, para. 148147.
[1146] During the time that concerns the *force majeure* case.
[1147] Pelham SR, para. 29.
[1148] During the time that concerns the *force majeure* case.

MFO's North Base

909. *Pro memoria*: the MFO is an international peace force located in Sinai, whose North Base in El Gorah is close to EMG's facility and to the Gaza border, and which suffered several attacks in 2011[1149].

910. The expert explained that during 2011 the MFO replaced degraded fencing and introduced perimeter lighting[1150], and that despite these improved security measures, in March 2012 locals laid siege to the El Gorah base for nine days and destroyed the main gate[1151].

911. Mr. Pelham's report must be completed with the information contained in MFO's Annual Report for 2011[1152] (as already described in paras. 802 *et seq.*): as soon as the Revolution broke out, the MFO conducted a force protection assessment, which resulted in a number of security improvements. Those accomplished in 2011 were the installation of ballistic towers, protective blast walls and bunkers, the replacement of perimeter fencing and lighting, the acquisition of five fully armoured vehicles and the establishment of command and control procedures.

912. Notwithstanding these protective measures, the MFO suffered two attacks: an improvised explosive device blasted as an armoured vehicle passed[1153] and it suffered a nine day siege of its base, during which the main entrance gate was destroyed. But the improved security measures which had been adopted minimised the damage: the explosive caused no harm to the armoured vehicle, and the base was never penetrated or taken by the terrorists, as Gen. Eiland confirmed[1154].

913. The developments at MFO's North Base thus do not confirm, but to the contrary, they contradict, Mr. Pelham's averments: the developments prove that properly planned and executed protective measures, even if they cannot totally exclude the possibility of terrorist attacks, they can at least significantly reduce their likelihood and the harm caused.

The special circumstances in the Sinai

914. EGAS criticises[1155], and this criticism is shared by its expert, Mr. Pelham, that the security actions proposed by the security experts as reasonable, do not take into account the specific circumstances of Sinai in the aftermath of a Revolution.

---

[1149] See paras. 802 *et seq.*
[1150] Pelham SR, para. 41.
[1151] Pelham SR, para. 34.
[1152] Doc. R₃-356.
[1153] See Doc. R₃-356, p. 7.
[1154] Eiland Report, para. 151.
[1155] R₁₄₂ PHB, para. 144.

915. The Tribunal accepts that the standard of a RPPO applicable in this case must take into consideration the same or similar circumstances and conditions under which EGAS operated. This is a principle established in the GSPA[1156].

916. EGAS then goes on to say that any gas operator in North Sinai would have approached security the same way as EGAS did, both before and after the Revolution.

## A.    Before the Revolution

917. Since the threat of terrorism was marginal, Pipeline security was in the hands of the police and State security forces, whose mere presence had a powerful deterrent effect[1157]. EGAS additionally built walls topped with barbed wire around its facilities[1158]. EGAS further submits that the fact that EMG never raised any concerns about security issues reinforces the conclusion that EGAS' security measures were reasonable and prudent[1159].

918. The Tribunal is not persuaded that any RPPO in Sinai would have addressed security issues the way that EGAS did.

919. EMG was also a pipeline operator, located in North Sinai, at the times of the Revolution, with a facility to secure. Thus it is the only available comparable for the purposes of determining how a RPPO operating in Sinai would have prevented and mitigated the effects of an attack.

920. *Pro memoria*: EMG's facility was guarded by 50 armed security guards, provided by the Ministry of Interior, who were supervised by an officer. In addition, EMG retained the consultancy services of a retired general in the Egyptian Army. The compound was watched over from nine sentry towers with two guards posted on each of them. The site also contained housing for the guards and was protected externally by a perimeter fence. Outside the facility, security forces ran frequent patrols.

921. EMG engaged the Ministry of Interior to conduct three risk assessments: the first during the construction of the facilities, the second when gas deliveries started and the third after the first attack. The improvements suggested in the second assessment was to include guards stationed at the main gate to the compound, expanding security patrols to the perimeter and hiring criminal investigations personnel to gather information on possible security threats[1160]. The only improvement made after the third assessment was to request an armoured vehicle from the Ministry of Interior, which was provided.

---

[1156] Paraphrasing the definition of Reasonable and Prudent Person, Annex 6.
[1157] R$_{1+2}$ PHB, para. 132.
[1158] R$_{1+2}$ PHB, para. 134.
[1159] R$_{1+2}$ PHB, para. 135.
[1160] Al Sakka SWS, para. 36.

922. The facts prove that EMG applied international security standards:

- EMG engaged the Ministry of Interior to make risk assessments and produce a security plan, which was implemented and revised as circumstances changed; and

- an organised, structured and armed security force led by officers was created to guard the duly fortressed compound.

EMG's approach towards security is in line with what experts consider to be the industry standard. Thus, EGAS' proposition that implementing industry standards would be "unrealistic"[1161] is untenable: EMG decided to adopt security measures in accordance with international standards, and any RPPO operating in Sinai should have done the same.

## B.   After the Revolution

923. According to EGAS the collapse of security forces and the eruption of violence that ensued in Sinai were impossible to predict[1162] and EGAS took prompt and important security measures following the eruption[1163], such as increasing the size of its armed security forces and providing accommodation for them, supplying motor vehicles to the Ministry of Interior[1164], installing additional concertina wire, and burying exposed sections of the pipe.

924. EGAS avers that "it took prompt and important security measures following the eruption of the Revolution" as any other prudent operator would have done[1165]. But in fact, there is evidence that in May 2011 (four months after the Revolution) the State had to intervene, because EGAS had not implemented basic security measures, such as raising the height of fences and installing barb wires, increasing the lighting, levelling sand dunes and installing monitoring system with TV cameras[1166]. A RPPO operating in Sinai should have adopted these minimal security measures *sua sponte*, without requiring reminders from State security.

925. EGAS adds that in fact it "took steps" to obtain surveillance equipment, and to retain a specialised and fully-equipped security force, but that "the general state of unrest in the country delayed the efforts" [1167]. There is evidence that GASCO's Board of Directors met at least twice during 2011, in June and in December; and during such meetings the Board took several decisions regarding security: the

---

[1161] R$_{1+2}$ PHB, para. 144.
[1162] R$_{1+2}$ PHB, para. 137.
[1163] R$_{1+2}$ PHB, para. 142.
[1164] R$_{1+2}$ refers to Doc. R$_3$-403 as evidence, with only shows the successful bidders of a tender process and the price awarded. The document also mentions that a final decision must be taken by the Board.
[1165] R$_{1+2}$ PHB, para. 135.
[1166] Doc. R$_3$-126.
[1167] Doc. C-17.

Board however, failed to adopt a resolution authorising the purchase of surveillance cameras and fibre cable; it is thus not a question of difficulties in the implementation of a decision, the issue is that there is no evidence that the decisions were approved in the first place.

\* \* \*

926. <u>In conclusion</u>, the Tribunal has been presented with sufficient circumstantial evidence to affirm that, had EGAS implemented the security measures which a RPPO should have adopted, the attacks on the facilities and on the Pipeline could have been prevented (or at least significantly mitigated). There is no evidence supporting EGAS' proposition that its so-called low profile approach towards security was a valid alternative, justifying the failure to adopt a number of security measures expected to be adopted by a RPPO.

## 11. SPECIAL CASE: FIRST ATTACK

927. EGAS submits an alternative argument: even if the Tribunal were to find that the attacks in general did not constitute *force majeure* events, the first attack immediately after the Revolution should in any case be an exception, because the violence that ensued was completely unforeseeable and no RPPO would have been prepared for such attack[1168].

928. The Tribunal does not agree for two reasons:

- <u>First</u>, it has already determined that a RPPO would have had in place security measures before the Revolution, such as EMG had done[1169].

- <u>Second</u>, the GSPA requires a party affected by *force majeure* to have acted as a RPPO[1170], and to have exercised a degree of foresight[1171]; but in this case, EGAS has not proven that it carried out any risk assessments at all, which are the quintessence of the exercise of foresight.

929. <u>In conclusion</u>, the Tribunal finds that the first attack dated 5 February 2011 also does not constitute a *force majeure* event, because EGAS failed to act as a RPPO, particularly in showing the required degree of foresight.

---

[1168] R$_{1+2}$ PHB, para. 137.
[1169] See paras. 974 *et seq. infra*.
[1170] Art. 16.3 of Annex 1 to the GSPA.
[1171] Definition of "Reasonable and Prudent Person", Annex 6 to the GSPA.

**12.  ALLEGED WAIVER OF RIGHT TO CHALLENGE *FORCE MAJEURE***

930.  Art. 12.8 of the On-Sale Agreement between EMG and IEC reads as follows:

> "Third Party *force majeure*: to the extent that any Party delegates or sub-contracts
> the performance of its obligations under this Agreement to a third party, such Party
> will remain liable for any delay or failure to perform such obligations, and may only
> claim relief by reason of *force majeure* in respect of such delegated or sub-
> contracted obligations if [...] the event or circumstance causing such delay or failure
> to perform would have entitled such third party to relief by reason of *force majeure*
> if such third party had been a party to this Agreement. The foregoing provisions [...]
> will apply *mutatis mutandis* [...] with respect to Seller, to events or circumstances
> impacting the gas transmission pipeline system of EGPC or EGAS".

931.  Upon EGAS' declaration of *force majeure* under the GSPA, EMG approached
IEC and declared Third Party *force majeure* under Art. 12.8 of the On-Sale
Agreement. IEC has confirmed that it did not accept EMG's *force majeure*
declaration[1172].

932.  EGAS now submits an additional argument: since EMG declared Third Party
*force majeure* under the On-Sale Agreement, it is prevented from disputing
EGAS' declaration of *force majeure* under the GSPA[1173].

933.  EGAS' argument is without merit.

934.  The GSPA does not provide that EMG's decision to declare a Third Party *force
majeure* under the On-Sale Agreement will impair EMG's right to challenge
EGAS' declaration of *force majeure* under the GSPA. In the absence of an
express contractual provision providing otherwise, the declaration of a Third Party
*force majeure* in the downstream contract cannot be construed as an implicit
waiver by EMG of its right to challenge the upstream declaration of *force
majeure*.

935.  Furthermore, the Tribunal does not appreciate a situation of *venire contra factum
proprium*: By invoking Third Party *force majeure* vis-à-vis IEC, EMG was simply
preserving its rights in case this Tribunal decides that EGAS validly declared
*force majeure* under the GSPA. The Claimant is applying a coherent and
consistent strategy in seeking a coordination of the *force majeure* declarations
under upstream and under the downstream agreements.

**13.  BAD FAITH**

936.  During the Hearing EMG claimed that, not only was EGAS prevented from
invoking a *force majeure* defence, but that EGAS had raised said remedy in bad
faith.

---

[1172] R₃ PHB, para. 86.
[1173] R₁₊₂ PHB, paras. 129 and 130.

937. EMG argues that EGAS claimed the benefit of *force majeure* on a false pretext[1174]: during the times when EGAS relied on a *force majeure* excuse, it was actually supplying gas to satisfy the local demand. EMG relies[1175] in support of this argument on a statement of its expert, Mr. Freeny, who opines that if EGAS is capable of supplying some gas to EMG, there was no technical impediment to supplying all the committed gas; and on a presentation by EGAS in which it identified as its first policy goal to prioritise local demand over export to EMG[1176].

938. The Tribunal is not persuaded. A bad faith allegation is a very serious matter which requires proof. EMG's support is, however, circumstantial: Mr. Freeny's opinion, even if correct, does not prove bad faith; and the presentation refers to the Egyptian natural gas industry in general, dates back to 2010 and the statement does not specifically refer to EMG.

939. Consequently, there is not sufficient evidence to establish that EGAS acted in bad faith when it advanced a *force majeure* defence.

\* \* \*

940. In conclusion, the Tribunal finds that EGAS failed to act as a RPPO in preventing or mitigating the effects of the 13 alleged *force majeure* events and therefore, pursuant to Art. 16.2 of Annex 1 to the GSPA, EGAS cannot be excused for its failure to perform and to deliver the contractually agreed quantities of gas. The Tribunal also dismisses all additional arguments and defences raised by EGAS relating to this issue.

941. The consequences of EGAS' non-excused failure to deliver the gas promised in accordance with the Tripartite Agreement will be addressed in the following sections.

---

[1174] FHT, p. 161.
[1175] FHT p. 161.
[1176] Doc. C-153.

# X.  MERITS (I): INTRODUCTION

942. Having dismissed EGAS' preliminary defence of *force majeure*, the Tribunal must now analyse the merits of the dispute.

943. The starting point of such analysis must be the relief sought by each Party.

EMG's relief

944. EMG submits the following prayer as regards questions of liability[1177]:

> "VI. REQUEST FOR RELIEF
>
> 178. The Claimant respectfully requests that the Tribunal: [...]
>
> (b) With respect to questions of liability:
>
> (i) DECLARE that the First and Second Respondents breached their obligations under the Source GSPA;
>
> (ii) DECLARE that the First and Second Respondents repudiated the Source GSPA, entitling the Claimant to accept that repudiation, terminate the Source GSPA, and claim full compensation under English law;
>
> (iii) DECLARE that the First and Second Respondents breached the Tripartite Agreement; and
>
> (iv) DECLARE that the First and Second Respondents repudiated the Tripartite Agreement, entitling the Claimant to accept that repudiation, terminate the Tripartite Agreement, and claim full compensation under English law".

945. EMG's Prayers (i) and (ii), which refer to the breach and repudiation of the GSPA, fall outside the Tribunal's remit, its jurisdiction being limited to claims (iii) and (iv), which are those arising from the Tripartite Agreement; consequently, the Tribunal will not take a decision in the dispositive of the Award with respect to EMG's prayers (i) and (ii). But all Parties have submitted arguments either supporting or denying these prayers because a breach or a repudiation of the GSPA has the nature of a condition precedent to the breach or repudiation of the Tripartite Agreement. Hence, the Parties have empowered the Arbitral Tribunal to interpret and apply the GSPA when deciding on the breach or repudiation of the Tripartite Agreement[1178].

---

[1177] C PHB, para. 178.(b).
[1178] See paras. 444443 *et seq.*, 481, 595 and 596 *supra*.

IEC's relief

946. IEC submits the following prayer for relief, limited to breaches and compensation under the Tripartite Agreement[1179]:

> "H. PRAYER
>
> 294. IEC seeks the following relief from the Tribunal
>
> (a) a declaration that EGAS/EGPC are in breach of Articles 1 and/or 2 of the Tripartite Agreement for the shortfalls in supply that IEC has suffered to date;
>
> (b) a declaration that IEC has lawfully terminated the Tripartite Agreement on account of the continuing and repudiatory breaches by EGAS/EGPC of the Tripartite Agreement and/or breaches of the conditions of the Tripartite Agreement;
>
> [...] "

947. There are small drafting differences between the prayers for relief submitted by EMG and IEC which refer to the Tripartite Agreement; but in essence, both Parties require that the Tribunal adjudicate the same two distinct issues:

- The first is a declaration that EGAS has breached its delivery obligations under the Tripartite Agreement [the "**Tripartite Delivery Breaches**"] and

- The second, that EGAS has repudiated the Tripartite Agreement [the "**Tripartite Repudiatory Breach**"].

948. Both Breaches give rise to significant quantum claims:

- EMG is claiming (i) USD 53.3 Million as compensation for the Tripartite Delivery Breach plus (ii) USD 606.8 Million as compensation for the Tripartite Repudiatory Breach[1180].

- IEC's corresponding claims for the Tripartite Delivery Breaches plus the Tripartite Repudiatory Breach amount together to USD 3,957.2 Million[1181].

949. The Tribunal will proceed as follows: it will first analyse the Tripartite Repudiatory Breach (**XI**), coming to the conclusion that EGAS indeed wrongfully terminated the GSPA and thus provoked the repudiation of the Tripartite Agreement; then the Tribunal will adjudicate the Tripartite Delivery Breaches (**XII**). The quantum consequences of these breaches will be analysed in the subsequent chapters, separately for EMG (**XIV**) and for IEC (**XV**).

---

[1179] R₃ PHB, para. 294.
[1180] FTI III, Table 7-4 as later amended, p. 13 (pre-tax).
[1181] R₃ PHB, Schedule C, p. 75.

# XI. <u>MERITS (II): THE REPUDIATORY BREACH</u>

950. In 2005 Egypt and Israel signed an inter-State MoU. The agreement formalised a political decision: to strengthen the economic ties between both nations, via the construction of an under-water gas pipeline, the so-called "Peace Pipeline", and the export of significant quantities of Egyptian gas to Israel. The bulk of the gas was earmarked for final use by IEC, Israel's State-owned utility, in the production of electricity. Israel's electricity production was to become dependent upon the deliveries of Egyptian gas.

951. Contemporaneously EGAS (the Egyptian State-owned gas producer) and EMG (the company selected to finance and build the Peace Pipeline) executed the GSPA, a 15 year gas supply contract, with a five year extension at Buyer's option, which provided for annual deliveries of up to 7.0 BCM of gas. EMG then turned around and signed the On-Sale Agreement with IEC (the Israeli State-owned electricity utility) for 2.2 BCM annually (the remaining gas was to be sold to other Israeli customers). Finally, the overall relationship between EGAS, EMG and IEC was formalised in the Tripartite Agreement, in which EGAS guaranteed supply of up to 2.2 BCM annually to IEC.

952. Relying on the various agreements signed, EMG immediately started construction of the EMG Pipeline. After three years, in June 2008 gas deliveries commenced. Such deliveries (albeit at quantities lower than expected) continued until February 2011, when the first of a string of 13 terrorist attacks on the Pipeline occurred. These attacks led to significant disruptions in the gas supply during 2011 and the first quarter of 2012.

953. In the course of 2011 – in the midst of the alleged *force majeure* events – EMG fell behind in the payment of gas invoices due to EGAS. The GSPA provides that the failure to pay invoices due for four consecutive months entitles EGAS to terminate the GSPA[1182]. On 18 April 2012 EGAS formally terminated the GSPA[1183], arguing that EMG had failed to pay the invoices for the period January – April 2011[1184].

954. The contractual structure had been designed in such manner that EMG acted as a mere middleman, buying only the gas requested by its on-sale customers and paying EGAS with the monies received from the Israeli final recipient. Thus payment default was a highly unlikely event, provided that the up-stream supply by Egypt and the down-stream payment by Israel were not interrupted. But in fact,

---

[1182] Art. 2.5.2 of Annex 1 to the GSPA.
[1183] Doc. C-48.
[1184] C FS M, para. 276.

EMG became strapped for cash and was unable to satisfy certain of its payment obligations vis-à-vis EGAS.

955. How could this happen?

- The four invoices allegedly due and unpaid refer to the period comprising January through April 2011, a time during which the Pipeline was attacked three times while EGAS was failing to act as a RPPO.

- Gas flow suffered significant disruptions: in February, for instance, gas was supplied only during four days; and with every new attack it was uncertain when gas supply was expected to resume.

- Without gas flow, EMG was not generating sufficient revenue to satisfy its outstanding obligations.

- The allegedly outstanding amounts were not significant in the overall structure of a 7 BCM, 15 to 20 year gas deal: the total price owed for the four months January – April 2011 amounted to USD 37.4 Million[1185]; by April 2012 this amount had been reduced to USD 25.4 M[1186] by way of several partial payments effected by EMG (to give an indication of magnitude, USD 23 Million was equivalent to the invoicing of Q1 gas for a low demand month).

- IEC (the principal beneficiary of the long term gas supply arrangements) was not informed of the impending termination of the GSPA and was not offered the opportunity to pay on behalf of EMG and to preserve the validity of the long-term supply deal.

956. In short, EGAS, the party who was in breach of its RPPO requirement, decided to put an end to a 15-year gas supply contract, which had arisen from an inter-governmental MoU between Israel and Egypt, and on which Israel's electricity production depended, using as a pretext EMG's failure to pay USD 23 Million, and not taking into consideration that during the relevant period gas supply had been deeply jeopardised by repeat attacks against the Pipeline.

957. In this context, while EGAS contends that it properly terminated the GSPA, EMG and IEC claim that EGAS' purported termination of the GSPA was unlawful and amounted to a repudiation of the GSPA and of the Tripartite Agreement.

---

[1185] R$_{1+2}$ PHB, p. 39, Table A.
[1186] R$_{1+2}$ PHB, p. 40, Table B.

1.  **EMG'S AND IEC'S COMMMON POSITION**

958.  EMG and IEC submit that when EGAS purported to terminate the GSPA by letter dated 18 April 2012[1187], it had no lawful grounds for doing so[1188]. Art. 2.5.2 of Annex 1 on which EGAS relies identifies, as a ground for termination by the Seller, the failure to make timely payment of any amounts due for four consecutive months. EGAS relies on its invoices for the months January to April 2011, but EMG and IEC aver that there was no amount due to EGAS for the month of February[1189].

959.  According to EMG and IEC the amounts due for February 2011 are not those reflected in the invoice issued by EGAS, because such invoice failed to take into account Shortfall Compensation and Hourly Pass Through Compensation, which should be credited to EMG. In fact, when these credits are properly deducted, the balance is of USD 5,261,126 in EMG's favour[1190].

960.  EGAS' purported termination of the GSPA[1191] was without lawful grounds and constituted a conduct which amounted to a repudiatory breach of both the GSPA and of the Tripartite. If the GSPA was brought to an end by EGAS' repudiatory breach of contract, then it follows that EGAS was similarly in repudiatory breach of the Tripartite Agreement. Accordingly, IEC was entitled to and did accept EGAS' repudiatory breach of contract as bringing the Tripartite Agreement to an end by letter dated 6 February 2013[1192], and EMG was equally entitled[1193].

2.  **EGAS' POSITION**

961.  EGAS disagrees and firmly maintains that it is owed moneys for the four months January – April 2011, including the February invoice. With regard to February, EGAS advances two arguments: the first is that invoiced amounts become payable if not challenged and in this case EMG did not challenge the February 2011 invoice (**2.1.**) and the second is that, in any event, EMG's and IEC's calculations of the amounts reciprocally owed in February 2011 are flawed (**2.2.**). It thus follows that EGAS was entitled to terminate the GSPA (**2.3.**). But, even if it was not, its purported termination would not amount to a repudiation of the GSPA because Art. 2.5 represents a closed regime for termination (**2.4.**).

---

[1187] Doc. C-48.
[1188] C PHB, para. 48; R₃ PHB, para. 117.
[1189] C PHB, para. 59.
[1190] FTI II, Appendix 13, BoP Analysis.
[1191] Doc. C-48.
[1192] R₃ PHB, paras. 155-156; Doc. R₃-56.
[1193] C PHB, para. 90; FHT, Day 1, p. 233.

**2.1   UNCHALLENGED INVOICES BECOME PAYABLE**

962.  EGAS submits that, in order to determine, for the purposes of Art. 2.5.2 of Annex 1, whether EMG failed to pay amounts due for four consecutive months, it is necessary to have regard to the provisions for invoicing and for challenging of invoices. Art. 9.3.1 provides for the delivery of Monthly Invoices to EMG and Art. 9.4.7, for the challenging of disputed invoices.

963.  Where amounts were disputed by EMG, it was necessary to determine whether EMG's challenge was justified by reference to the provision at Art. 9.3.2 of Annex 1 governing the calculation of amounts due in any particular month in cases of delivery shortfalls[1194]. It provides for adjustments in the Buyer's favour in respect of[1195]:

-   the amount of any Daily Shortfall Compensation falling due pursuant to Art. 6.8.3 of Annex 1;

-   the amount of any Monthly Shortfall Compensation falling due pursuant to Art. 6.9.3 of Annex 1; and

-   the amount of any costs expenses or penalties payable by the Buyer to its on-sale customers under a Transportation Agreement which are attributable to Hourly Delivery Failure and which fall to be deducted pursuant to Art. 6.7.3 of Annex 1.

964.  The effect of Art. 9.4.7 was that, where an amount invoiced was not promptly challenged, it became payable[1196].

965.  EMG never challenged EGAS' invoice for February 2011[1197]. Accordingly, pursuant to Art. 9.4.7, the amount of USD 3,906,584.91 stated in that invoice became payable.

**2.2   WRONGFUL ALTERNATIVE CALCULATIONS**

966.  EMG's figures for the month of February 2011 purport to show a balance in favour of EMG, suggesting that there was no failure by EMG to pay EGAS in the amount due during that month. But those figures wrongly take into account:

-   Pass through costs (compensations due to on-sale customers on account of delivery failures), which were not incurred by or even claimed against EMG (**A.**) , and

---

[1194] $R_{1+2}$ PHB, para. 172.
[1195] $R_{1+2}$ SS M, para. 549.
[1196] $R_{1+2}$ PHB, paras. 172 and 200.
[1197] Doc. R1+2-263.

- Daily Shortfall Compensation (**B.**), which was not claimed or has been waived.

- Further, those figures wrongly assume a PNQ for the period 6 to 28 February of 325,000 MMBTU, which exceeds the permissible maximum (**C.**).

### A.   Pass Through Compensation

967. According to EGAS, any right to have pass through costs taken into account pursuant to Arts. 3.2 and 6.7.3 of Annex 1 depended on proof that such costs had actually been incurred by EMG[1198].

968. But EMG does not suggest that such costs have in fact been incurred or even claimed. As FTI I records, IEC agreed temporarily to renounce its claims to such costs[1199]. It was accepted at the First Hearing that, after January 2011, EMG's claim for such pass through costs depended upon an assumption that IEC would claim such costs from EMG at some point in the future[1200].

### B.   Shortfall Compensation

969. EGAS' submission is that when EMG maintained that shortfall compensation fell to be taken into account, it was necessary for EMG to claim such compensation[1201]. EGAS argues that this is reflected in EMG's practice of sending letters claiming such compensation, as confirmed by Mr. Al Sakka in cross-examination[1202]. But EMG never claimed shortfall compensation in respect of the period from 6 to 28 February 2011:

- By 24 August 2011 when EGAS served its cure notice, EMG had not claimed any shortfall compensation.

- Later, in EMG's letter of 21 September 2011, although EMG did advance a claim for shortfall compensation in respect of the months of January, March and April 2011, there was still no claim for shortfall compensation in respect of February 2011[1203]. The letter identified zero nominations of gas by EMG for the period 5 to 28 February[1204].

970. EMG thereby waived any right to have such compensation taken into account.

---

[1198] R$_{1+2}$ PHB, para. 217.
[1199] FTI I, fn. 123.
[1200] FHT, Day 8, p. 1848.
[1201] R$_{1+2}$ PHB, para. 208.
[1202] R$_{1+2}$ PHB, para. 204.
[1203] R$_{1+2}$ PHB, paras. 187-188.
[1204] R$_{1+2}$ PHB, paras. 210-211.

C.  **Incorrect PNQ**

971.  EGAS further contests EMG's PNQ figures credited to EMG's nominations. As a matter of fact, EMG failed to make nominations from 6 to 28 February 2011 and it should now be prevented from claiming deemed nominations for such period.

972.  And even if deemed nominations were admissible, the amounts put forward as daily deemed nominations would exceed the contractually agreed maximum PNQ.

973.  In summary, by the time that EGAS served its notice of non-payment on 24 August 2011, EMG had failed to pay the amounts due in USD for four consecutive months, as follows[1205]:

| Month | Invoices claimed by EGAS | Shortfalls claimed by EMG | Payments made | Amounts outstanding based on EMG's data |
|---|---|---|---|---|
| January 2011 | 27,662,277.48 | 0.00 | 17,662.277.48 | 10,000,000 |
| February 2011 | 3,966,869.16 | 0.00 | 0.00 | 3,966,869.16 |
| March 2011 | 9,896,115.56 | 0.00 | 0.00 | 9,896,115.56 |
| April 2011 | 13,529,954.54 | 0.00 | 0.00 | 13,529,954.54 |
| **Total** | | | | **37,392,938.26** |

2.3  **LAWFUL TERMINATION OF THE GSPA**

974.  Accordingly, EGAS had, on 24 August 2011, good grounds for issuing notice of non-payment pursuant to Art. 2.5.2 of Annex 1. On that day EGAS gave notice to EMG pursuant to that article requiring that it cure its failure to pay the amounts due[1206].

975.  EMG failed to cure its failures within the prescribed 30 business days or at all[1207]. Thereafter, on five separate occasions, EGAS granted EMG extensions of time for payment. On each occasion, EGAS reserved its right to terminate in accordance with Art. 2.5.2 of Annex 1. The last extension expired on 31 March 2012[1208].

---

[1205] R$_{1+2}$ PHB, para. 186.
[1206] R$_{1+2}$ PHB, para. 183.
[1207] R$_{1+2}$ PHB, para. 184.
[1208] R$_{1+2}$ PHB, para. 184.

## 2.4 ART. 2.5 IS A COMPLETE CODE

976. Even if EGAS had no grounds to terminate pursuant to Art. 2.5.2 of Annex 1, it was not open to EMG to treat the termination as a repudiatory breach of contract at common law and give notice of bringing the GSPA to an end[1209].

977. Since EGAS committed no repudiatory breach of the GSPA, it was not in breach of the Tripartite Agreement.

## 3. EMG'S AND IEC'S REPLY

978. EMG and IEC affirm that amounts payable are determined by the Monthly Payment regime and not by the Monthly Invoices; they, thus, do not agree that unchallenged invoices become payable (**3.1.**), and insist that all shortfall compensations must be deducted and an Annual Reconciliation has to be performed at the end of the year (**3.2.**). Since Art. 2.5 of Annex 1 to the GSPA is not a complete code for termination, EMG was entitled to accept EGAS' repudiation and to terminate at common law (**3.3.**). Alternatively, if the Tribunal finds that EMG owed amounts to EGAS for February 2011, then EMG advances a number of arguments (**3.4.**).

## 3.1 MONTHLY PAYMENT

979. Monthly invoices issued pursuant to Art. 9.3.1 of Annex 1 do not trigger an obligation to pay. Art. 9.3.2 created a separate regime, involving the calculation of the Monthly Payment. That calculation required the determination of amounts not mentioned in Art. 9.3.1 and not required to be stated in a Monthly Invoice.

980. The primacy which the GSPA accords to the Monthly Payment over the Monthly Invoices is highlighted by the provisions relating to shortfall compensation. Arts. 6.7.3, 6.8.3 and 6.9.4 of Annex 1 relate respectively to Hourly Short Pass Through Compensation, Daily Shortfall Compensation and Monthly Shortfall Compensation. Each of those provisions requires that the relevant amount of compensation be deducted from the Monthly Payment. None requires that such compensation be deducted in the Monthly Invoice[1210].

981. The only payment obligation appears at Art. 9.3.2[1211]. The provisions set out at Art. 9.4.7 of Annex 1 relating to the challenging of invoices do not apply to Monthly Invoices issued pursuant to Art. 9.3.1, because Art. 9.4.7 is expressly concerned with invoices which show sums as payable[1212], and the Monthly Invoice called for by Art. 9.3.1 is neither required nor intended to show a sum which is payable.

---

[1209] $R_{1+2}$ SS M paras. 588-616.
[1210] $R_3$ PHB, para. 107.
[1211] $R_3$ PHB, para. 107
[1212] SHT, Day 11, p. 2471.

982. EMG and IEC therefore submit that, whether the Monthly Invoice is challenged or not is irrelevant to the matter of determining what is payable, because that is governed by Art. 9.3.2 of Annex 1[1213].

983. Under EGAS' construction of Art. 9.4.7, the absence of prompt notice of dispute by EMG could have the effect that an amount which is not in fact due could be deemed to be due[1214]. Given that repeated payment defaults give grounds for termination, the effect is potentially draconian[1215]. Given the potential consequences, clear wording would be required to bring about that effect. But there is no such wording.

984. <u>In conclusion</u>, even though EGAS' Monthly Invoice for February 2011[1216] was not challenged, it did not become binding on the parties and does not determine the amount due in respect of that month.

## 3.2 DEDUCTIONS

985. The provisions for the deduction of Daily Shortfall Compensation under Art. 6.8.3 and Monthly Shortfall Compensation under Art. 6.9.3 of Annex 1 represent the default position. They apply even in cases of alleged *force majeure*, until and unless the relevant failure is agreed or determined to be due to a *force majeure* event.

986. There has never been either an agreement or a determination to the effect that EGAS' delivery failures between 6 and 28 February were due to such an event. EMG did not accept EGAS' declaration of *force majeure* in respect of February 2011 by its letter dated 21 September 2011[1217] or otherwise. That letter was expressly subject to a reservation of rights by EMG[1218].

987. Accordingly, in determining the amount due in respect of February 2011, it was and remains necessary to take Daily and Monthly Shortfall Compensation for the period 6 to 28 February into account, as well as the amount of any Pass Through Compensation. EGAS' invoice for February 2011 was in breach of contract in that it failed to take such compensation into account[1219].

988. EMG was and remains entitled to have those amounts taken into account in calculating the amount due for February 2011, without having made a claim in respect of them. And EMG is not to be taken to have waived its right to challenge EGAS' Monthly Invoice for February 2011 by reason of its failure to do so at the

---

[1213] R₃ PHB, para. 123(b).
[1214] SHT, Day 11, pp. 2478-2480.
[1215] SHT, Day 11, pp. 2480.
[1216] Doc. R₁₊₂ -263.
[1217] Doc. C-11.
[1218] C PHB para. 60.
[1219] R₃ PHB para. 134.

time. By Art. 13.2 of the GSPA, no waiver was to be effective unless set down in writing and formally executed by both parties.

989. Applying these principles to the events of February 2011, there was a balance for that month in EMG's favour amounting to some USD 5 M[1220]. Even excluding the amount of EMG's claims to take into account Pass Through Compensation, there was still a balance for February 2011 in EMG's favour amounting to some USD 500,000[1221].

## 3.3 TERMINATION AT COMMON LAW

990. Upon its true construction, Art. 2.5 does not amount to a complete and exclusive code for the termination of the GSPA[1222].

991. Accordingly, EMG was entitled to and did accept EGAS' repudiatory breach of contract as bringing the GSPA to an end[1223] and was equally entitled to terminate the Tripartite Agreement on account of EGAS' repudiatory breach[1224].

## 4. THE PARTIES' POSITION ON ALTERNATIVE ARGUMENTS

992. In case the Tribunal decided that EMG had defaulted upon its GSPA obligations vis-à-vis EGAS, EMG and IEC advance some alternative arguments, with respect to which EGAS takes issue:

## 4.1 EMG'S *FORCE MAJEURE*

993. According to EMG, its failure to pay EGAS' invoices is excused by *force majeure* pursuant to Art. 16.1 of Annex 1, because EMG's inability to pay was due to *force majeure*[1225].

994. EGAS replies that EMG's payment default cannot be excused by *force majeure* because[1226]:

- EMG failed to serve notice pursuant to Art. 16.8 of Annex 1 to the GSPA to the effect that performance of its obligations was affected by *force majeure*.

- The payment default upon which EGAS relies relates to quantities of gas in the months of January to April 2011 which were actually delivered, rather than to quantities of gas which were not delivered.

---

[1220] FTI II, Appendix 13, BoP Analysis. The exact figure is USD 5,261,126.
[1221] FTI II, Appendix 13, BoP Analysis. The exact figure is USD 573,231 = 5,261,126-4,687,895.
[1222] C PHB, paras. 90-98.
[1223] C PHB, paras. 90-98.
[1224] C PHB, para. 178.(b)(iv).
[1225] C PHB, para. 83 and 84.
[1226] R$_{1+2}$ PHB, para. 242.

- In any event, the terms of Art. 16 of Annex 1 are such as to exclude from *force majeure* the late payment or non-payment of money and the lack or unavailability of funds.

## 4.2 GOOD FAITH

995. EMG and IEC contend that both the GSPA and the Tripartite Agreement required the parties to perform their obligations in good faith; but EGAS failed to do so in that it[1227]:

- cynically manipulated the effect of attacks on the pipeline so as to bring the GSPA to an end; in that it purported to terminate the GSPA when it in fact owed to EMG far more than EMG owed to it; and

- never informed IEC of its intention to terminate pursuant to Art. 2.5.2 of Annex 1 to the GSPA or of the fact that it had served notice to terminate and thereby deprived IEC of the opportunity to assist EMG in curing any breach so as to prevent termination.

996. EGAS submits that neither the GSPA nor English law imposes a good faith requirement[1228]. And a requirement of good faith could not modify the provisions of the GSPA[1229]. In any event, EGAS acted in good faith and allowed EMG an ample opportunity to cure its non-payment default[1230].

## 4.3 RELIANCE ON ONE'S OWN WRONG

997. According to EMG and IEC, the GSPA ought not to be construed so as to allow EGAS to take advantage of its failure to perform, because it amounted to a breach of contract on EGAS' part[1231] and the words of the GSPA are not such as to exclude the principle that a party may not rely on its own wrong (as far as IEC is concerned, IEC submits that the relevant contract is the Tripartite Agreement, which contains no such words[1232]); in the present case EMG's inability to pay was brought about by EGAS' own breach of contract in failing to deliver properly nominated quantities of gas.

998. EGAS avers that the principle that a party should not be allowed to benefit from its own wrong applies only where a party seeks to obtain a benefit directly derived from a breach of its own contractual obligations[1233]. But EMG's failure to make the requisite payments was the result of its own decision to prioritise payments to

---

[1227] R3 PHB, paras. 153 and 154.
[1228] R1+2 SS M, paras. 409-415; R1+2 PHB, para. 252.
[1229] R1+2 SS M, paras. 416-427; R1+2 2 PHB, paras. 256.
[1230] R1+2 PHB, para. 256.
[1231] C PHB, para. 77-82.
[1232] R3 PHB, para. 141.
[1233] R1+2 PHB, para. 246.

other creditors; or the result of EMG's funding or loan arrangements; or the result of decisions by its wealthy shareholders not to provide support[1234]. In any event, in excluding set-off, the terms of the GSPA were such as to exclude the application of that principle[1235].

## 4.4    ANNUAL STATEMENT AND RECONCILIATION

999.  EMG submits that, had EGAS issued a timely Annual Statement for CY 3, such statement would have been issued in August 2011 and any sum due would have been payable in mid-August 2011, thus allowing EMG to cure any payment default[1236].

1000. EGAS submits that it is not open to EMG to rely on a hypothetical Annual Reconciliation, which EGAS should have prepared, when in fact it was EMG itself who withheld necessary information to produce the Annual Reconciliation of CY3[1237] and it was open to EMG to perform an Annual Reconciliation itself and issue it pursuant to Art. 9.4.9 of Annex 1[1238]; in any event, an *ex post facto* Annual Reconciliation could have no retrospective effect on the parties' respective obligations[1239].

1001. On a true construction of the provisions of Annex 1 relating to Annual Reconciliations, the amount of Monthly Payments did not fall to be taken into account[1240]. Accordingly, the obligation to make Monthly Payments was not and could not have been supplanted by any Annual Reconciliation[1241]. And the submission that Art. 9.4.7 applies to disputed Annual Statements but not to disputed Monthly Invoices is unrealistic[1242] and makes no commercial sense[1243]. Furthermore, EMG's established practice was to challenge Monthly Invoices when it did not accept the amount invoiced as being payable[1244].

## 4.5    JANUARY 2012 PAYMENT

1002. EMG paid the sum of USD 11.9 Million in January 2012, which was sufficient to cover any amount due in respect of January 2011 and thereby – so EMG submits – broke the chain of four consecutive monthly failures to pay the amount due[1245].

---

[1234] R$_{1+2}$ PHB, para. 245.
[1235] R$_{1+2}$ PHB, para. 250.
[1236] C PHB, para. 74.
[1237] R$_{1+2}$ PHB, para. 224(ii).
[1238] R$_{1+2}$ PHB, para. 224(iii).
[1239] R$_{1+2}$ PHB, para. 224(i).
[1240] R$_{1+2}$ PHB, para. 226.
[1241] R$_{1+2}$ PHB, para. 225.
[1242] R$_{1+2}$ PHB, para. 201.
[1243] R$_{1+2}$ PHB, paras. 197-198.
[1244] R$_{1+2}$ PHB, paras. 204-205.
[1245] C PHB, para. 67-69.

1003. EGAS does not agree:

- The question whether EMG had failed to pay amounts due in respect of four consecutive months fell to be assessed at the date of EGAS' notice pursuant to Art. 2.5.2 of Annex 1, i.e. 24 August 2011; EMG's subsequent payment in respect of the January 2011 invoice did not retrospectively break the chain of four monthly overdue payments[1246];

- The question whether EMG had failed to cure its payment default in accordance with EGAS' letter dated 24 August 2011 fell to be assessed at the date of EGAS' termination letter dated 18 April 2012[1247]. EMG's payment of USD 11.9 Million in January 2012 failed to cure the default because there remained payments outstanding in respect of February, March and April 2011.

1004. EGAS further argues that EMG wrongly suggests that the sum which it paid in January 2012 exceeds any amount which should properly have been stated as payable to EGAS in any hypothetical Annual Reconciliation. On EGAS' figures, the correct amount for a hypothetical Annual Reconciliation for CY 3 even assuming no *force majeure* event was USD 47.87 Million[1248]. Once the amounts wrongly claimed by EMG in respect of February 2011 for Shortfall Compensation are taken out of account, the balance in favour of EGAS would for CY 3, even on EMG's figures, be USD 18.7 Million[1249].

**4.6   LATE TERMINATION**

1005. EMG and IEC submit that EGAS exercised its right to terminate too late: a right to terminate such as that conferred by Art. 2.5.2 of Annex 1 must be exercised within a reasonable period after the right to serve notice of termination accrues. EGAS failed to exercise any right to terminate the GSPA following the expiry of the cure period on 5 October 2011[1250]. Although EGAS purported in correspondence to reserve its right to terminate, that was not effective to preserve the right to terminate beyond the last date which would otherwise have been reasonable[1251].

1006. EGAS replies that it did not lose its right to terminate by delaying too long before exercising it. By a series of five letters, EGAS extended the cure period provided for by Art. 2.5.2 from 11 October 2011 to 31 March 2012. On each occasion, EGAS reserved its right to terminate in the event of failure to cure, as it was

---

[1246] R$_{1+2}$ PHB, para. 180.
[1247] R$_{1+2}$ PHB, para. 180.
[1248] R$_{1+2}$ PHB, para. 231.
[1249] R$_{1+2}$ PHB, para. 230.
[1250] R$_3$ PHB, paras. 143-152.
[1251] R$_3$ PHB, para. 151.

entitled to do[1252]. By the time EGAS served its Notice of Termination on 18 April 2012, EMG had still failed to remedy its non-payment default in respect of the months of February, March and April 2011. EGAS was, accordingly, entitled to terminate the GSPA pursuant to Art. 2.5.2 of Annex 1.

## 5.   THE TRIBUNAL'S DECISION

1007. The disputed issues on which the Tribunal is called to decide are in essence two: whether EGAS' purported termination of the GSPA was correct and, if the Tribunal finds that it was unlawful, whether it constituted a repudiatory breach of the GSPA and, consequently, a repudiatory breach of the Tripartite Agreement[1253].

1008. The specific questions to be answered are as follows:

- For the purposes of Art. 2.5.2 of Annex 1, how is the amount due to be identified? Do the provisions of Art. 9.4.7 of Annex 1 apply to EGAS' Monthly Invoices (**5.1.**)? The Tribunal will determine that an "amount due" is not equivalent to an "invoiced amount".

- Do Daily Shortfall Compensation, Monthly Shortfall Compensation and Pass Through Costs have to be claimed? Do Pass Through Costs have to be incurred? And did EMG waive the right for such compensation and costs to be taken into account? Are there flaws in EMG's calculation of Shortfall Compensation (**5.2.**)? The Tribunal will decide that there is no need for EMG to claim those amounts, and that EMG did not waive the right to do so. As regards the Pass Through Costs, the Tribunal will decide that EMG must prove that these costs were, at least, claimed by the on-sale customer. The Tribunal will also decide that there are flaws in EMG's calculation of Shortfall Compensation which fall to be corrected.

- As of 24 August 2011, had EMG failed to pay the amounts due to EGAS in respect of four consecutive months (**5.3.**)? The Tribunal will come to the conclusion that EMG had not failed to pay amounts due for four consecutive months, because the balance of amounts due in February 2011 was in favour of EMG.

- Was the Tripartite Agreement brought to an end as a consequence of EGAS' repudiatory breach (**5.4.**)? The Tribunal will decide that EGAS repudiated the GSPA and, as a consequence, it also repudiated the Tripartite Agreement; and thus, the Tripartite Agreement was correctly terminated by EMG and IEC at common-law on account of EGAS' repudiatory breach.

---

[1252] R$_{1+2}$ PHB, para. 262.
[1253] There being an understanding, shared by all Parties, that the repudiation of the GSPA implies a repudiation of the Tripartite Agreement.

1009. The decisions taken in (**5.3.**) and (**5.4.**) render various alternative arguments moot. Since the parties have devoted significant efforts towards briefing the Tribunal on these alternative issues, the Tribunal will address them albeit in a cursory fashion (**5.5.**). The questions are the following:

- Did EMG's partial payment of January 2012 break the four consecutive months of non-payment?

- Was EMG excused from payment by *force majeure*?

- Is EGAS prevented from relying upon EMG's payment default on the principle that a party may not take advantage of its own wrong?

- Did EGAS purport to implement Art. 2.5.2 of Annex 1 in bad faith?

- Was EGAS' termination letter dated 18 April 2012 too late?

## 5.1 HOW IS THE AMOUNT DUE TO BE CALCULATED?

1010. The Tribunal will address this issue by first establishing the relevant contractual provisions on payment (**A.**) and then deciding whether such provisions apply to EGAS' invoices (**B.**).

### A. <u>Payment provisions</u>

1011. The payment procedures and mechanism applicable to the GSPA were set out in Art. 9 of Annex 1:

### a. Art. 9.3

1012. Art. 9.3 deals with Monthly Payments, Statements and Invoicing:

> "9.3.1 Seller shall, in respect of each Month of any Contract Year, on or before the fifth (5th) Business Day following the end of that Month ("**Delivery Month**"), provide Buyer with an invoice for the actual Gas delivered by Seller, ("**Monthly Invoice**") together with a supporting statement specifying
>
> (a) the applicable Contract Price;
>
> (b) the total quantity of Gas delivered by Seller and taken by Buyer during the Delivery Month;
>
> 1. the Properly Nominated Quantity;
>
> 2. the total quantity of Gas delivered by Seller;
>
> 3. the total quantity of Gas taken by Buyer; and
>
> 4. the total quantity of Daily Shortfall Gas.

(c) for each Day in the Delivery Month, the total quantity of Off-Specification as properly rejected by Buyer, if any, and the total quantity of Daily Shortfall Gas, if any, and

(d) the amount of the Daily Shortfall Compensation, if any.

9.3.2 Monthly Payment. On or before the fifteenth (15th) Business Day after Buyer's receipt by facsimile of Seller's Monthly Invoice (the "**Monthly Payment Due Date**") Buyer shall pay Seller the "**Monthly Payment**", which is an amount equal to

(a) the total quantity of Gas taken by Buyer during the Delivery Month multiplied by (ii) the applicable Contract Price;

Except for reasons of Force Majeure, less the aggregate of

(b) the Daily Shortfall Compensation for such Delivery Month;

(c) Payments due to Buyer during the Delivery Month from Seller as a result of Seller's failure to being deliveries as set forth in Sections 4.5 and 4.6;

(d) Payments due to Buyer during the Delivery Month from Seller as a result of Seller's delivery of Off-Specification Gas during such Delivery Month, as set forth in Sections 8.4 and 8.5;

(e) any other amounts due to Buyer from Seller during such delivery Month".

1013. Both EMG and IEC take the position that, for the purposes of ascertaining the amount due under the GSPA in any particular month for the purposes of Art. 2.5.2 of Annex 1, it is necessary to undertake the calculation required by Art. 9.3.2 of Annex 1.

1014. On the other hand, EGAS submits that an undisputed amount set out in a Monthly Invoice provided pursuant to Art. 9.3.1 of Annex 1 would become payable whether or not it accorded with the calculation required by Art. 9.3.2. EGAS relies for this point on Lord Hoffmann's opinion[1254]:

> "It follows in my opinion the question of whether there was non-payment of all or part of the Monthly Payments for four consecutive months depends solely upon the calculations under clause 9.3.2 for those months and is unaffected by what happened in any other month, before or afterwards".

1015. The Tribunal returns to that submission under the next heading. Subject to that submission, it is common ground that the amount due in any particular month for the purposes of Art. 2.5.2 of Annex 1 falls to be calculated by reference to the provisions of Art. 9.3.2.

---

[1254] Hoffmann I, para. 16.

**b.   Art. 9.4.7**

1016. This provision refers to Disputed Invoices:

> "If a Party has a bona fide dispute with respect to any sum shown in any invoice (or accompanying statement) as being payable by that Party, then such Party shall (i) pay in full all of the undisputed amount shown in such invoice on or before the relevant due date, (ii) promptly give notice to the other Party of the amount in dispute and the reasons therefore, (iii) in such notice, inform the other Party whether the Party disputing such amount intends to pay such disputed amount pending resolution of such dispute (in which case such disputed amount shall be paid together with the payment of any undisputed amount), or withhold payment of the disputed amount pending resolution of the dispute. The Parties shall seek to settle the disputed amount as soon as reasonably practicable. Any disputed amount agreed or determined, pursuant to Article 14 to be not payable by the Party disputing such amount shall (to the extent that such disputing Party previously paid such disputed amount) shall be re-paid by the other Party to the disputing Party (such amount to be included in the Monthly Invoice or Annual Statement, as applicable, next following such agreement or determination, together with the interest on such amount at a rate equal to the Agreed Interest Rate plus three percent (3%) (compounded annually) from the date when such payment was due until and including the date when the disputed amount was settled or decided pursuant to Article 14. Any disputed amounts agreed or determined, pursuant to Article 14, to be payable by the Party disputing such amount shall be retained by the other Party if the disputing Party previously paid such disputed amount, or (to the extent that such disputing Party elected not to pay such disputed amount) shall be paid by the disputing Party to the other Party (such amount to be included in the Monthly Invoice or Annual Statement, as applicable, next following such agreed or determination, together with interest on such amount at a rate equal to the Agreed Interest Rate plus three percent (3%) (compounded annually) from the date when such payment was due until and including the date when the disputed amount was settled or decided pursuant to Article 14".

1017. The Tribunal notes that Art. 9.4 of Annex 1 is primarily concerned with annual accounting:

- Art. 9.4.1 to 9.4.4 and Art. 9.4.9 are exclusively concerned with the content and preparation of Annual Statements;

- Art. 9.4.5 is concerned with payments arising out of Annual Statements;

- However, Art. 9.4.6 (headed "Calculations"), Art. 9.4.7 (headed "Disputed Invoices") and Art. 9.4.8 (headed "Interest on Late Payments") are expressed in terms which are not necessarily confined in their application to Annual Statements.

**B.   EGAS' Monthly Invoices**

1018. The issue which divides the parties is whether the provisions of Art. 9.4.7 apply to Monthly Invoices issued by EGAS pursuant to Art. 9.3.1 (set out *supra*).

### a.   EGAS' position

1019. EGAS relies on a passage from Lord Hoffmann's opinion where, in connection with the Monthly Invoice for February 2011, he said[1255]:

> "But Article 9.4.7 has a clear procedure for challenging an Invoice. The Buyer must give prompt notice of the amount in dispute and the reasons for the dispute. He must state whether or not he intends to make a provisional payment of the disputed sum and pay the undisputed amount. If the dispute cannot be settled by agreement, it goes to arbitration under Article 14. This procedure does not appear to have been followed by EMG either at the time the invoice was delivered or even in the subsequent Annual Reconciliation. Consequently it seems to me that the validity of the invoice as a Monthly Invoice and the correctness of the Monthly Payment which it stated to be due cannot now be challenged. At the time when the notice to terminate was given, the sum due for February 2011 remained due".

1020. EGAS maintains that the challenge procedure provided a ready means of swiftly ascertaining precisely how much was to be paid in each month; and that any other interpretation of the contractual machinery would give rise to an uncommercial result.

1021. In terms of the way in which these provisions work, EGAS summarised its position as follows[1256]:

> "In order to determine whether an amount was owed under the GSPA, the straightforward consideration was whether this amount was disputed by EMG in accordance with Section 9.4.7 of Annex 1. Undisputed amounts were payable. As for amounts disputed by EMG, it was necessary to determine whether EMG's dispute was justified under the provision regulating the calculation of amounts owed to EGAS and deductions of Shortfall Compensation that could be made therefrom (Section 9.3.2 of Annex 1)".

### b.   EMG's and IEC's position

1022. EMG and IEC take the position that Art. 9.4.7 has no application to Monthly Invoices issued pursuant to Art. 9.3.1.

1023. In this connection, IEC emphasises the opening words of Art. 9.4.7 that relate to invoices showing sums "as being payable". IEC points out that the Monthly Invoice called for by Art. 9.3.1 is not required to show a sum as being payable.

1024. IEC emphasises the distinctions between the matters to be stated in the invoice as required by Art. 9.3.1 and the elements to be taken into account in calculating the Monthly Payment as required by Art. 9.3.2. And therefore, the payment obligation relates to the Monthly Payment defined by Art. 9.3.2 and not to the Monthly

---

[1255] Hoffmann II, para. 8.
[1256] $R_{142}$ PHB, para. 172.

Invoice called for by Art. 9.4.1. On this basis, it is submitted that the Monthly Invoice is not a document which is subject to the challenge provision at Art. 9.4.7.

1025. IEC goes on to maintain that the construction of Art. 9.4.7 for which EGAS contends is itself uncommercial. IEC points out that, on EGAS' construction, EMG could find itself in the position of being bound to make payment of a sum stated in a Monthly Invoice without any obvious recourse, even though that amount exceeded the amount of the Monthly Payment for the relevant month, correctly calculated.

1026. On behalf of IEC, Mr. McCaughran summarised the point during his oral closing as follows[1257]:

> "Suppose EGAS delivers a Monthly Invoice Under 9.3.1 which sets out all of the information required by 9.3.1. So it sets out the quantity, the Contract Price, and it sets out the Daily Shortfall Compensation as required. Let us suppose that. And let us suppose that EMG does not dispute anything that is said in the Monthly Invoice. But they correctly take the view that, if one takes account of the Monthly Shortfall Compensation, which is not shown in the Monthly Invoice, then nothing is due for the month in question. So, if one looks at the invoice, EMG agrees with all of it. It doesn't dispute any of it, but in fact, nothing is due, and so EMG pays nothing.
>
> On EGAS' construction, that leads to the conclusion that because they did not write a letter promptly, whatever 'promptly' means in this context saying, we are paying nothing because although we don't dispute what's in your invoice, actually, there is an amount due for Shortfall Compensation, that's why we are not paying, because they don't do that, it is said by EGAS that somehow one derives an amount due from the invoice and deems it to be due under 9.4.7 because such a letter was not written".

1027. Mr. McCaughran went on to submit that it would be draconian to deem a sum of money to be due which is not actually due, particularly since that feeds through to a right to terminate. Clear language would be required to bring about that result.

## C.    The Tribunal's decision

1028. The Tribunal finds the following matters compelling:

-   The matters to be specified in a statement supporting a Monthly Invoice under Art. 9.3.1 differ in material respects from the elements to be taken into account in calculating the Monthly Payment under Art. 9.3.2;

-   The GSPA accords primacy to the Monthly Payment, in that the Monthly Payment is expressed to be the amount payable by EMG;

-   As was pointed out by Mr. McCaughran, circumstances might well arise in which there was nothing to challenge in a Monthly Invoice even though the

---

[1257] SHT, Day 11, p. 2478.

invoiced amount was greater, perhaps substantially greater, than the Monthly Payment, correctly calculated; in such circumstances, it would be surprising if EMG became bound to pay the greater amount, merely by reason of its failure to launch a challenge to an invoice that was unimpeachable;

- It is necessary to bear in mind that the contractual provisions relating to monthly payments underpin the grounds for termination set out at Art. 2.5.2 of Annex 1;

- On EGAS' case, the payment obligation at Art. 9.3.2 ceases to apply, being supplanted by an obligation to pay the amount claimed in a Monthly Invoice;

- Annex 1 contains no wording, still less clear wording, to show that, in the absence of a challenge an invoiced amount becomes payable;

- Similarly, there is no wording to show that the payment obligation at Art. 9.3.2 is supplanted.

1029. Having regard to these matters, on this question the Tribunal prefers the arguments advanced on behalf of EMG and IEC. It holds that Art. 9.4.7 did not apply to Monthly Invoices issued pursuant to Art. 9.3.1.

## 5.2   SHORTFALL COMPENSATION AND PASS THROUGH COST

1030. Again the Tribunal will first establish the relevant contractual provisions (**A.**). The Tribunal will then decide: whether Daily and Monthly Shortfall Compensations need to be expressly claimed (**B.**); whether Pass Through Costs need to be incurred and claimed (**C.**); and whether EMG has waived its right to claim such compensation (**D.**). Finally, the Tribunal will decide on the alleged flaws in EMG's calculation of Shortfall Compensation (**E.**).

### A.   <u>Shortfall Compensation provisions</u>

1031. The provisions of the GSPA relating to Shortfall Compensation are set out as follows:

> "6.8.1 To the extent that Seller fails to deliver during any Day during the Supply Period the aggregate of the Properly Nominated Quantities for such Day (other than in circumstances which Seller is excused pursuant to this Agreement) ("**Daily Delivery Failure**"), the quantity of Gas attributable to the Daily Delivery Failure that is greater than an amount equal to two percent (2%) of the aggregate Properly Nominated Quantity for that Day shall be classified as "**Daily Shortfall Gas**".

> "6.8.3 In respect of any Daily Shortfall Gas in a Delivery Month, the Monthly Payment [...] for such Contract Year shall be reduced by an amount (the "**Daily Shortfall Compensation**") equal to the sum of:

(a) with respect to each On-Sale Agreement in force during such Delivery Month, ten percent (10%) of the product of (i) the amount of the Daily Delivery Shortfall Gas attributable to such On-Sale Agreement for each Day during which there was a Daily Delivery Failure during such Delivery Month, multiplied by (ii) the then applicable Contract Price with respect to such On-Sale Agreement […].".

"6.9.1 To the extent that Seller fails to deliver during any Month during the Supply Period the Properly Nominated Quantities on a Day-by-Day basis for such Month […] ("**Monthly Delivery Failure**") the aggregate quantity of Gas that Seller fails to deliver on a Day-by-Day basis during such Delivery Month shall be classified as "**Monthly Shortfall Gas**" […]".

"6.9.3 To the extent that the Monthly Delivery Failure in any Delivery Month attributable to the Initial On-Sale Agreement is greater than seven percent (7%) of the aggregate Properly Nominated Quantities for such Delivery Month for the Initial On-Sale Agreement, in addition to any Daily Shortfall Compensation payable pursuant to Section 6.8.3 of Annex 1 with respect to such quantities of Q1 and in addition to the re-delivery obligations of Seller set forth in Section 6.9.5, Buyer shall be entitled to receive an amount (the "**Monthly Shortfall Compensation**") equal to the product of (a) ten percent (10%), multiplied by (b) the amount of the Monthly Shortfall Gas attributable to the Initial On-Sale Agreement during such Delivery Month, multiplied by (c) the then applicable Contract Price with respect to the Initial On-Sale Agreement […]".

"6.9.4 Buyer shall deduct any Monthly Shortfall Compensation payable by Seller pursuant to Section 6.9.3 of Annex 1 from the Monthly Payment […] for such Delivery Month".

"6.9.5 To the extent that there is a Monthly Delivery Failure in respect of any Delivery Month, Seller shall be obligated to deliver such Monthly Shortfall Gas in accordance with the following procedures:

(a) Within thirty (30) days following the Delivery Month in which the Monthly Delivery Failure occurred, the Parties, acting in good faith, will agree on the delivery schedule of such Monthly Shortfall Gas; such delivery schedule shall provide for the delivery of all such Monthly Shortfall Gas within a period of 180 days following the last day of the Delivery Month during which the Monthly Delivery Failure occurred.

(b) The delivery of such Monthly Shortfall Gas shall be in addition to the other delivery obligations of Seller pursuant to this Agreement. Buyer shall pay no additional amounts for such Gas other than the applicable Contract Price for such Gas in effect during the Delivery Month in which the Monthly Delivery Failure occurred.

(c) To the extent that Seller makes available quantities of Monthly Shortfall Gas in accordance with the provisions of this Section 6.9.5, any Daily Shortfall Compensation previously deducted by Buyer pursuant to Section 6.8.3(a) of Annex 1, and any Monthly Shortfall Compensation previously deducted by Buyer pursuant to Sections 6.9.3 and 6.9.4. of Anex 1, attributable to such quantities of Monthly Shortfall Gas shall be paid by Buyer to Seller, such payment to be made within thirty (30) days following the end of the Month during which such deliveries of Monthly Shortfall Gas occurred".

1032. There is an additional material provision:

> "3.2 Liability <u>Under</u> On-Sale Agreements. Seller shall indemnify, hold harmless and
> promptly reimburse Buyer for direct costs, expenses or penalties incurred by Buyer
> [...] under any On-Sale Agreement [...], provided however that Buyer shall
> demonstrate and give proof that such fault is attributable to Seller and Buyer shall
> demonstrate proof of incurred costs, expenses and penalties".

## B.    Claim for Daily and Monthly Shortfall Compensation

1033. EMG and IEC maintain that neither the GSPA itself nor Annex 1 impose a
requirement to claim such compensation. In respect of Daily Delivery Failure,
they submit that, by Art. 6.8.1 of Annex 1, the quantity of gas attributable to a
Daily Delivery Failure in excess of 2% of the PNQ is to be classified as Daily
Shortfall Gas; and that, by Art. 6.8.2 the Monthly Payment falls to be reduced by
an amount equal to the corresponding Daily Shortfall Compensation.

1034. Similarly, in respect of a Monthly Delivery Failure, EMG and IEC submit that, by
Art. 6.9.1 of Annex 1, the amount of gas by which deliveries fall short of the PNQ
falls to be classified as Monthly Shortfall Gas; and that, by Art. 6.9.4, EMG is
required to deduct the corresponding amount of Monthly Shortfall Compensation
from the relevant Monthly Payment.

1035. EMG and IEC go on to submit that these mechanisms continue to apply even in a
case of suspected or alleged *force majeure* until such time as there is agreement or
a determination to the effect that the relevant failure was due to *force majeure.*

1036. As already indicated, EGAS has suggested that Art. 9.4.7 of Annex 1 applies to
Monthly Invoices, so that EMG was required to challenge the relevant monthly
invoice, if appropriate. Such a challenge might entail making a claim to Daily or
Monthly Shortfall Compensation.

1037. EGAS has also put in issue the question whether the machinery for the deduction
of Shortfall Compensation is to apply in a case of claimed *force majeure.*

1038. The Tribunal has already rejected EGAS' first suggestion in the preceding section.
Apart from that, EGAS has not offered any reasoned basis for maintaining that
such compensation had to be claimed. On this part of the case, the Tribunal agrees
with the submissions advanced on behalf of EMG and IEC. Having regard to the
express terms of Arts. 6.8 and 6.9, the Tribunal is satisfied that the deduction
machinery applies whether or not EMG mounts a specific claim to the
compensation in question.

1039. Equally, the Tribunal is satisfied that, even in a case of suspected or alleged *force
majeure,* the deductions fall to be made, unless and until there is agreement or a
determination to the effect that the *force majeure* provisions apply.

### C.   Pass Through Costs

1040. The question with respect to the Pass Through Costs is whether the GSPA requires evidence that EMG has incurred into such costs.

1041. The Tribunal notes that Art. 6.7[1258] makes no reference to the question whether the costs in question have been incurred by EMG. The condition which EMG must satisfy under that provision is that the costs were "payable". By contrast, Art. 3.2 does require that EMG should demonstrate "proof of incurred costs, expenses and penalties".

1042. The Tribunal is unable to read Art. 6.7.3 of Annex 1 as giving rise to a requirement that the relevant costs, expenses or penalties should have been "incurred" by EMG. The specified criterion is that the relevant sums should be "payable" by EMG.

1043. In the Tribunal's view, the issue, therefore, is whether a sum incurred by IEC can be regarded as payable by EMG, even where it has not been invoiced to or claimed from EMG. The Tribunal recognises that circumstances could arise in which an amount might properly be regarded as payable by a party even though it had not been invoiced to or claimed from that party. However, Art. 6.7.3 of Annex 1 must be read in context. The intention is to identify a category of costs which may be set up in reduction of the Monthly Payments otherwise due from EMG to EGAS. Given that context, the Tribunal holds that Art. 6.7.3 is to be treated as limiting the sums which can be used in that way to those which have at least been claimed against or invoiced to EMG by its On-Sale Customers.

---

[1258] "6.7 Hourly Delivery Failure
6.7.1 If in respect of any Hour during the Supply Period, Seller fails to deliver the Properly Nominated Quantity for such Hour (other than in circumstances when Seller is excused pursuant to this Agreement) ("**Hourly Delivery Failure**"), the difference between Propoerly Nominated Quantity and the quantity of Gas delivered by Seller during such Hour shall be the "**Hourly Failure Quantity**". To the extent that the Hourly Failure Quantity exceeds five percent (5%) of the Properly Nominated Quantity for such Hour, such excess quantity shall be classified as "**Hourly Shortfall Gas**".
6.7.2 If and to the extent that an Hourly Delivery Failure is agreed by the Parties in writing or decided pursuant to Article 16 of this Annex 1 to have been due to an event of Force Majeure affecting Seller, the corresponding quantity of Gas that was classified as Hourly Shortfall Gas shall no longer be so classified. In those circumstances, Seller shall make the necessary adjustment in the next Annual Statement, following that agreement or decision so as to adjust any amounts previously credited to Buyer under this Section 6.7 of this Annex 1, together with interest on the adjustment amount at a rate equal to the "**Agreed Interest Rate**" plus three (3) percentage point (compounded annually) from the Annual Statement Due Date in respect of the Annual Statement for the Contract Year in which the Hourly Delivery Failure occurred.
6.7.3 In respect of each Delivery Month in which there accrues Hourly Shortfall Gas, the Monthly Payment (as described in Section 9.3.2 of this Annex 1) for such Delivery Month shall be reduced by an amount equal to the sum of: any costs, expenses or penalites incurred by an On-Sale Customer under a Transportation Agreement payable by Buyer (or Buyer's Affiliate) where Buyer can demonstrate that such cost, expense or penalty resulted from Sellers Hourly Delivery Failure.
[…]" [Emphasis in the original].

1044. The next question is whether there is proof of IEC's claim against EMG for shortfall compensation. Whilst it is undisputed that IEC collected shortfall compensation from July 2008 through January 2011, it is uncertain what happened thereafter:

- Mr. Ronai (IEC's Head of the Natural Gas and Coal Department, Generation & Transmission Division) confirmed during his cross-examination that IEC did collect Shortfall Compensation from EMG in an amount of "about USD 5.75 Million"[1259]; Mr. Ronai also recalled – albeit with some hesitation – that IEC collected shortfall compensation until March or April 2011[1260];

- FTI's expert, Mr. Nicholson, confirmed during his examination that up to January 2011 the invoices from EMG to IEC show a deduction for shortfall compensation[1261], but that after January 2011 there is no such documentation[1262]; and in the expert report he mentions that after the 5 February 2011 attacks IEC agreed to temporarily renounce to Hourly Shortfall Compensation under the On-Sale Agreement[1263];

- EGAS acknowledged in its Second Submission that IEC had produced documents that show that EMG paid IEC Shortfall Compensation for the period until February 2011[1264]; whether EGAS intended February 2011 to be included or not was clarified in the PHB, where EGAS strongly claimed that "EMG never actually incurred any [shortfall compensation] under the [On-Sale Agreement] in respect of the month of February 2011"[1265].

1045. The Tribunal has pondered the evidence, and has come to the conclusion that the proof that IEC only claimed shortfall compensation until the end of January 2011 outweighs the only evidence (Mr. Ronai's testimony) that extends the period at least to February 2011.

1046. The Tribunal's decision is further supported by FTI's calculations: the expert has calculated the Pass Through Costs (Hourly Shortfall Compensation under the On-Sale Agreement) from July 2009 through May 2012[1266]; the amount for the period July 2009 – January 2011 is USD 4.9 Million[1267]; if February[1268] is added, the

---

[1259] FHT, p. 895.
[1260] FHT, p. 896.
[1261] FHT, p. 1846.
[1262] FHT, p. 1847.
[1263] FTI I, fn. 123.
[1264] R₁₊₂ SS M, para. 999.
[1265] R₁₊₂ PHB, para. 217.
[1266] FTI II, Appendix 13, BoP Analysis (by Contract Year).
[1267] USD 2.16 Million from July 2009 – June 2010; and USD 2.74 Million from July 2010 – January 2011.
[1268] USD 4,687,895.

total amount would be USD 9.56 Million. The amount received from EMG as Shortfall Compensation, recalled by Mr. Ronai during his examination, is USD 5.75 Million – an amount which clearly cannot include February 2011.

1047. In conclusion, EMG is not entitled to recover Pass Through Compensation from EGAS for the period starting on 1 February 2011 because there is not sufficient evidence that such compensation was claimed by IEC, let alone paid by EMG.

## D.     Waiver of Shortfall Compensation

1048. EGAS' case is that EMG waived the right to obtain shortfall compensation for the period 6 to 28 February 2011 in view of EMG's letter dated 21 September 2011[1269].

1049. The letter was sent by EMG after EGAS had given notice to EMG of its intention to terminate the GSPA for payment default; and by this letter EMG tried to persuade EGAS out of it [the "**Conciliatory Letter**"].

1050. In the Conciliatory Letter EMG submitted calculations to EGAS of the amounts due in EMG's view. That letter enclosed a document entitled "Annual Statement for IEC On-Sale Agreement". Attachment 4.8 related to the month of February 2011 and showed, on its face, a PNQ of zero for each day during the period 6 to 28 February 2011. Similarly, the columns which were intended to set out any claims to Shortfall Compensation were all marked zero throughout.

1051. EGAS submits that Attachment 4.8 was in stark contrast to EMG's case as presented before the Tribunal, because EMG now contends a PNQ for each of those days of 325,000 MMBTU. The suggestion is that, having conceded a PNQ of zero in Attachment 4.8, it is not now open to EMG to maintain that the PNQ was or should have been 325,000 MMBTU, so that shortfall compensation was recoverable.

1052. In responding to this part of EGAS' case, Mr. McCaughran drew attention[1270] to the following passage which appeared in EMG's covering letter:

> "Although EMG does not recognize *force majeure* claims by EGPC/EGAS for CY2011 as matter of law, the attached Annual Statement for IEC On-Sale Agreement reflects a *force majeure* period through 28 February 2011 in connection with the 5 February 2011 attack. This inclusion of a *force majeure* period in the attached Annual Statement for IEC On-Sale Agreement does not constitute EMG's acceptance of any period of *force majeure* with respect to the 5 February 2011 attack; nor should it be considered a waiver of EMG's right to contest any claims of *force majeure* made by EGPC/EGAS, or EMG's right to seek damages for non-delivery of gas for any period during CY2011. Rather, this inclusion of a *force majeure* period reflects EMG's willingness to attempt to agree to a reasonable

---

[1269] Doc. R$_{1+2}$-208.
[1270] FHT, Day 2, pp. 322-323.

> compromise with respect to the 5 February 2011 *force majeure* claim by EGPC/EGAS".

1053. On the basis of that passage, Mr. McCaughran submitted that the zero entries in Attachment 4.8 were inserted by EMG in a spirit of compromise and were not intended to prejudice EMG's right to advance different arguments in due course.

1054. The Tribunal accepts that submission and holds that EMG is not bound by the suggested concession.

### E.   Calculation of the Shortfall Compensation

1055. The Tribunal will first analyse the contractual regime for shortfall compensation (**a.**), and then decide how the Monetary Compensation is to be calculated (**b.**), and finally confirm whether FTI's calculations adhere to the decision (**c.**).

### a.   Contractual regime

1056. The shortfall compensation regime of the GSPA, in summary, provides that:

- If EGAS fails to deliver at any day a quantity of gas which exceeds a certain minimum, then such failure is considered "Daily Shortfall Gas"[1271] and if it fails to deliver during any month a quantity of gas which exceeds a minimum, then such failure is considered "Monthly Shortfall Gas"[1272];

- If Daily and/or Monthly Shortfall Gas exists, then EMG can deduct the "Daily and/or Monthly Shortfall Compensation" from the Monthly Payment[1273]; such compensation is, basically, 20%[1274] of the price for the shortfall gas.

- The parties are then to agree on a schedule for the redelivery of the monthly shortfall gas in addition to its ordinary delivery obligations, within 180 days; and when such gas is redelivered, EMG must pay the price[1275] and reimburse to EGAS the shortfall compensation previously deducted[1276]; but if EGAS fails to redeliver the gas, then EMG can keep the 20% compensation received (deducted from the Monthly Payment)[1277].

---

[1271] Art. 6.8.1 of Annex 1 to the GSPA.
[1272] Art. 6.9.1 of Annex 1 to GSPA.
[1273] Arts. 6.8.3 and 6.9.4 of Annex 1 to the GSPA.
[1274] 10% for the Daily Shortfall Gas and another 10% for the Monthly Shortfall Gas.
[1275] Art. 6.9.5.(b) of Annex 1 to the GSPA.
[1276] Art. 6.9.5 of Annex 1 to the GSPA.
[1277] Art. 6.9.5.(c) of Annex 1 to the GSPA.

- If the delivery shortfalls cause EMG to incur costs, expenses or penalties under any on-sale agreement[1278], then EGAS shall indemnify EMG for such costs, provided that the on-sale customer claims such costs.

1057. In short, if EGAS fails to deliver gas beyond a certain minimum, EMG is entitled to a "**Shortfall Compensation**" which consists of three remedies:

- EMG is entitled to obtain delivery within six months of the shortfall gas, in accordance with an agreed schedule, against payment of the agreed ordinary price [the "**Redelivery**"];

- Meanwhile, EMG receives a monetary compensation, which it can deduct from the Monthly Payments owed to EGAS in an amount equal to approximately 20% of the price of the undelivered gas – the **Daily** and the **Monthly Shortfall Compensations**; but this amount has to be refunded if EGAS redelivers the gas, if it does not, then EMG is allowed to keep it [the "**Monetary Compensation**"][1279];

- EMG is entitled to recover from EGAS any shortfall compensation EMG is obliged to pay to its down-stream customers under the applicable on-sale agreements [the "**Pass Through Penalty**"].

1058. As regards the issue of EGAS' alleged Repudiatory Breach, the only two remedies potentially relevant are the Monetary Compensation and the Pass Through Penalty. But since the Tribunal has already determined that there is no evidence that IEC claimed shortfall compensation vis-à-vis EMG for the period starting on 1 February 2011, that limb bears no significance. The only limb remaining is the Monetary Compensation.

**b.    Calculation of the Monetary Compensation**

1059. The Monetary Compensation consists of two items, the so called Daily Shortfall Compensation plus the Monthly Shortfall Compensation:

- Daily Shortfall Compensation: the difference between the PNQ for a given day and the gas actually delivered is considered a "Daily Delivery Failure"[1280] and the Daily Delivery Failure which is greater than 2% of the PNQ will be classified as "**Daily Shortfall Gas**"[1281]; this Daily Shortfall Gas is multiplied by 10% and by the applicable price with respect to the

---

[1278] Art. 3.2 of Annex 1 to the GSPA.
[1279] The Tribunal will analyse in section XIV *infra* the nature of these Liquidated Damages.
[1280] Art. 6.8.1 of Annex 1 to the GSPA.
[1281] Art. 6.8.1 of Annex 1 to the GSPA.

relevant on-sale agreement and thus the Daily Shortfall Compensation is established[1282];

- Monthly Shortfall Compensation: all the aggregate gas that EGAS fails to deliver daily during a month is classified as "**Monthly Shortfall Gas**"[1283]; if such the Monthly Shortfall Gas attributable to IEC is greater than 7% of the aggregate PNQ for IEC during that month, in addition to any Daily Shortfall Compensation, EMG is entitled to a Monthly Shortfall Compensation, in an amount equal to 10% of the Monthly Shortfall Gas attributable to IEC multiplied by the price under the On-Sale Agreement[1284].

### c.   FTI's calculation of the Monetary Compensation

1060. EMG's quantum expert, FTI, has provided spreadsheets showing the total Shortfall Compensation for each month[1285].

1061. EGAS disagrees with FTI's calculations, claiming that the amounts of Daily Shortfall Compensation are inflated, because FTI has calculated Daily Shortfall Gas on the basis of 100% of the Daily PNQ, when the GSPA clearly provides that calculations are to be made on the basis of the difference between 98% of the Daily PNQ and the delivered quantity[1286]. Similarly, the Monthly Shortfall Compensation amounts are also flawed, because they were calculated on the basis of 100% of the Monthly PNQ and not 93%[1287].

1062. The Tribunal has reviewed FTI's calculations of the Shortfall Compensation[1288] and notes that it is, indeed, flawed in a number of aspects:

- The Daily Shortfall Compensation has been calculated as 10% of all the difference between the PNQ and the delivered gas, whenever the difference is greater than 2% of the PNQ [the "**2% Tranche**"][1289]; but this is not what Arts. 6.8.1 and 6.8.3 provide for: the 10% compensation is to be applied to the Daily Shortfall Gas, which, by definition, excludes the 2% Tranche; the 2% Tranche is exempted from accruing Shortfall Compensation, no matter the size of the delivery failure.

- The Monthly Shortfall Compensation has been calculated as 10% of Daily Shortfall Gas for Q1, whenever the difference is greater than 7% of the aggregate PNQ [the "**7% Tranche**"]; this time the approach taken by FTI is

---

[1282] Art. 6.8.3.(a) of Annex 1 to the GSPA.
[1283] Art. 6.9.1 of Annex 1 to the GSPA.
[1284] Art. 6.9.3 of Annex 1 to the GSPA.
[1285] FTI II, Appendix 13-Gas Status Spreadsheets.
[1286] R$_{1+2}$ FS M, p. 86.
[1287] R$_{1+2}$ FS M, p. 86.
[1288] FTI II, Appendix 13, Delivery Gas Status and BoP Inputs.
[1289] FTI I, p. 55.

only partially correct, because the GSPA provides that Monthly Shortfall Compensation be subject to a different regime: Art. 6.9.3 stipulates that Monthly Shortfall Gas is equal to the aggregate quantity of delivery failures during that month, and that the 10% compensation is applied to the total Monthly Shortfall Gas, provided that the delivery failure exceeds the 7% Tranche; the 7% is thus a threshold, but once surpassed, the 7% Tranche is not exempted from accruing compensation. The Tribunal notes that FTI's calculation of the Monthly Shortfall Compensation is based on the Daily Shortfall Gas, i.e. the Daily Delivery Failure which exceeds 2% of the PNQ, when in fact the Monthly Shortfall Compensation should be calculated on the aggregate quantity of delivery failures during that month (including daily failures below 2% of a PNQ)[1290]. The impact of this difference in the approach taken is, in any event, minimal.

1063. When the Tribunal makes the actual calculations of the amounts due for the months of January, February, March and April 2011, it will adjust FTI's numbers to correct these inaccuracies.

**5.3    FAILURE TO PAY AMOUNTS FOR FOUR CONSECUTIVE MONTHS**

1064. The Tribunal must now decide whether EGAS' termination was *prima facie* lawful: had EMG failed to pay the amounts due for four consecutive months? EMG accepts that it owed amounts for the months of January, March and April 2011; but it denies that amounts were due for February 2011 – quite the contrary, EMG submits that for that month it was EGAS who owed EMG a sizeable amount.

1065. Determination of how much was owed for February 2011 requires as a first step to decide whether EMG can be deemed to have recurrently nominated quantities during that month (**A.**) and, if so, how much gas was deemed nominated (**B.**) and whether such deemed nomination is in agreement with the maximum daily nominations admitted by the GSPA (**C.**). As a third step the Tribunal must establish the amount EGAS owed to EMG for that month as Shortfall Compensation (**D.**). Finally, the Tribunal will prepare a table with the balance due (**E.**) and come to the conclusion that EMG did not owe any amount to EGAS under the GSPA for February 2011, and that EGAS' purported termination of the GSPA was improper (**F.**).

---

[1290] Art. 6.9.1: "To the extent that Seller fails to deliver during any Month [...]... the Properly Nominated Quantities on a Day-by-Day basis for such Month [...]... ("Monthly Delivery Failure") the aggregate quantity of Gas that Seller fails to deliver on a Day-by-Day basis during such Delivery Month shall be classified as "Monthly Shortfall Gas". Art. 6.9.3: To the extent that the Monthly Delivery Failure during any Delivery Month attributable to the initial On-Sale Agreement is greater than 7% seven percent of the aggregate Properly Nominated Quantities for such Delivery Month for the Initial On-Sale Agreement in addition to any Daily Shortfall Compensation [...]... Buyer shall be entitled to receive an amount (the Monthly Shortfall Compensation") equal to the product of a) 10% multiplied by b) the amount of the Monthly Shortfall Gas [...]"....".

### A.    Recurrent deemed nominations

1066. February 2011 was a month with particular features:

-    During the first five days EMG[1291] nominated a very high quantity of gas as compared to its average nominations;

-    On 5 February the Pipeline suffered the first of the string of attacks, which put the Pipeline out of service for the remainder of the month;

-    And during this period of inactivity EMG failed to make any explicit daily nominations for the delivery of gas.

1067. The main issue which has arisen is whether, despite the fact that EMG made no nominations, for the purposes of determining the balance of amounts due for that month, EMG can be deemed to have nominated a certain quantity of gas.

### a.    Relevant contractual provisions

1068. A failure to nominate gas is a situation specifically foreseen in Art. 7.8 of the GSPA, which provided for the following general rule:

> "7.8 Deemed Nominations
>
> 7.8.1. If Buyer fails to nominate a Properly Nominated Quantity in respect of any Hour, Buyer shall be deemed to have nominated a quantity equal to the Properly Nominated Quantity for the same Hour in the preceding Day".

1069. The principal provision relating to Properly Nominated Quantities ["**PNQs**"] was set out at Art. 7.6(a) of Annex 1 as follows:

> "7.6 Properly Nominated Quantity
>
> (a) For the purposes of this Agreement, the "**Properly Nominated Quantity**" in respect of an Hour shall be the quantity of Gas nominated by Buyer from and after the Start Date pursuant to Section 7.4 of this Annex 1 (or deemed to have been nominated pursuant to Section 5.5 or Section 7.8 of this Annex 1), as may be varied or deemed varied pursuant to Section 7.7 of this Annex 1".

### b.    The Tribunal's decision

1070. Notwithstanding that these provisions are expressed in terms of hourly nominations, it is common ground that, in general, the effect of Art. 7.6(a) was to convert a deemed nomination for a particular day (arising as a result, for example, of the operation of Art. 7.8.1) into the PNQ for that day.

---

[1291] Strictly speaking, it was KTISTAR who made the nomination on behalf of EMG.

1071. EMG's case goes further. It maintains, that, if there were two consecutive days on which it failed to make a nomination, there was a deemed PNQ for the first day; that became the PNQ for the second day; and that in turn gave rise to an equivalent deemed PNQ for the second day. EGAS, on the other hand, maintains that Art. 7.8.1 did not operate consecutively in respect of repeated nomination failures so as to produce recurrent deemed nominations[1292].

1072. The Tribunal is unable to accept the arguments advanced on behalf of EGAS in relation to this point. The Tribunal takes the view that the natural meaning of the words used in Art. 7.6(a) and 7.8.1 favours the construction advanced on behalf of EMG. There is, in the Tribunal's view, no warrant for reading a restriction into those words.

1073. For these reasons, the Tribunal holds that the application of the deeming provision at Art. 7.8.1 of Annex 1 is not restricted to a single day but can apply to consecutive days.

**B.    Amount of gas deemed to have been nominated by EMG**

1074. Now that the Tribunal has determined that recurrent deemed nominations are possible, it has to decide how much gas EMG is deemed to have nominated during the period comprising 6 – 28 February 2011.

1075. It is undisputed that on 4 February 2011 the parties agreed a nomination of a volume of 325,000 MMBTU for 5 February, which became a deemed nomination for 6 February 2011. In accordance with the Tribunal's findings, that quantity became the deemed nomination for that day and for all successive days until the end of February 2011.

**C.    Are deemed nominations subject to a contractual maximum?**

1076. The next question to be addressed is whether the amount of 325,000 MMBTU falls foul of any agreed contractual maximum nomination, i.e. a provision in the GSPA which restricts EMG's ability to nominate quantities of gas beyond a certain ceiling. The Tribunal will refer to the relevant contractual provisions (**a.**), then explain the Parties' position (**b.**), and finally take a decision (**c.**).

---

[1292] $R_{1+2}$ SS M, para.294.

a.     **Relevant contractual provisions**

1077. The GSPA devotes Art. 5.2 through 5.3 of the GSPA and Art. 7.4 and 7.6 of Annex 1 to this question. The relevant parts read as follows:

GSPA:

> "**Art. 5 Quantities**
>
> […]
>
> 5.2 Annual Contract Quantity.
>
> The Annual Contract Quantity ("**ACQ**") shall be: […] 5.2.2. 78.267 Million MMBTU of Gas for each Contract Year".

This quantity of gas will be referred to as **Q1**.

> "5.3 Increase in ACQ; On Sale Notices.
>
> […]
>
> 5.3.1. **Q2 quantity**. Buyer is entitled to increase the Annual Contract Quantity (in excess of the quantities set forth in Section 5.2) by the total Q2 quantity of 87.47488 Million MMBTU (2.375 BCM) of Gas per Contract Year pursuant to the following provisions […]:
>
> (a) the Annual Contract Quantity shall be increased (in excess of the quantities set forth in Section 5.2) on a date between 1 July 2009 and 30 September 2009 […] by a quantity of 2.5 Million MMBTU (0.069 BCM) of Gas per Contract Year (the "**First Q2 Increase**"), and the ACQ of the applicable Contract Years shall be amended accordingly.
>
> (b) Buyer, by delivery from time to time of one or more On-Sale Notices […] is entitled to increase the Annual Contract Quantity (in excess of the quantities set forth in Sections 5.2 and 5.3.1(a) and (b) from and after 1st of January 2010 by a quantity determined by Buyer not to exceed an additional 41.238 Million MMBTU (1.1185 BCM) of Gas per Contract Year (the "**Second Q2 Increase**"), in which event the ACQ of the applicable Contract Years […] shall be amended accordingly".
>
> "5.4 Delivery Plan for Q1 after the First Amendment Effective Date
>
> […]
>
> (b) Starting from the beginning of the second $(2^{nd})$ Contract Year and in each remaining Contract Year, the Annual Contract Quantity of Q1 specified in Article 5.2.2 of this Agreement (and the "Initial Contracted Quantity" specified in Section 6.1.2(b) of Annex 1 of this Agreement) shall be

delivered at a daily rate nominated by Buyer not to exceed 215,000 MMBTU per Day.

(c) Notwithstanding the foregoing provisions of this Section 5.4, in order to permit Buyer to take delivery of Recovery Gas (as defined below): [...] (ii) in addition to the quantities of Q1 described in Section 5.4(b) [...] Buyer shall be entitled to nominate (and if so nominated, Seller shall deliver) additional quantities of Recovery Gas for delivery pursuant to this Agreement, subject to the following: [...] (C) Buyer's nominations of Recovery Gas for delivery during any day [...] (subject to the restrictions set forth in Section 5.4(c)(iii)(B)) shall not exceed 50,000 MMBTU per Day.

(d) Buyer's right to nominate Recovery Gas pursuant to this Section 5.4 shall be in addition to Buyer's nomination rights as set forth in Article 7 of Annex 1 to this Agreement; provided that in no event shall Buyer's nominations for Recovery Gas for any Day exceed the amount set forth in Section [...] 5.4(c)(ii)(C).

[...]

(f) To the extent that the provisions of Article 7 of Annex 1 of this Agreement are inconsistent with this Section 5.4, Article 7 of Annex 1 of this Agreement shall be deemed to be amended with respect to Recovery Gas to conform with this Section 5.4."

Annex 1 to the GSPA:

**"Art. 7 Nominations**

[...]

7.4 <u>Daily Nominations</u>.

7.4.1 [...] Buyer shall nominate to Seller the quantity of Gas that it requires to be delivered [...] the following Day [...] and shall not exceed the applicable Daily Maximum, as defined in Section 7.5 of this Annex 1, for that Day".

[...]

7.6 <u>Properly Nominated Quantity</u>

[...]

(b) In addition to the quantities specified in Sections 5.4, 6.9.5, 7.6(a) and elsewhere in this Agreement, Buyer shall be entitled to nominate (and if so nominated, Seller shall deliver) additional quantities of Gas for delivery pursuant to this Agreement in order to provide fuel for Buyer's turbines. Such nominations by Buyer shall be made on a Daily basis (along with the Daily Nomination described in Section 7.4).

[...]

7.8 Deemed Nominations

7.81. If Buyer fails to nominate a Properly Nominated Quantity in respect of any Hour, Buyer shall be deemed to have nominated a quantity equal to the Properly Nominated Quantity for the same Hour in the preceding Day.

7.8.2. From and after the Start Date, if an event of *force majeure* impairs the ability of (a) Seller to make available or Buyer to take, Gas in accordance with this Agreement, or (b) Buyer (or Affiliate of Buyer) to make available, or an On-Sale Customer to take Gas in accordance with the applicable On-Sale Agreement, then, until the expiration of the period covered by a nomination pursuant to Section 7.4 [or] the cessation of the *force majeure* event (whichever occurs first), the Properly Nominated Quantity each Hour during the first Day in that period shall be deemed to be the Properly Nominated Quantity that would have otherwise applied in the absence of such event of *force majeure*, if any, and (c) thereafter, during the continuation of such event of *force majeure*, the "**Properly Nominated Quantity**" in respect of each Hour shall be deemed to be equal to the lesser of (i) the quantity of Gas nominated by Buyer pursuant to Section 7.4 for such Hour, and (ii) the Hourly Contract Quantity".

## b.    The Parties' positions

1078. EMG maintains that the nomination it made for 5 February 2011, which was 325,000 MMBTU, should become a deemed daily nomination for the remainder of the month, because this is the agreed contractual regime.

1079. EGAS does not agree. EGAS suggests that any deemed nomination is limited by Art. 5.4(b) and (c) of the GSPA.

1080. During the cross-examination of Mr. Nicholson – EMG's quantum expert – EGAS asked the expert whether in the preparation of the table with the deemed nominations he had taken into account Art. 5.4 (which would render a limit of 265,000 MMBTU)[1293]. Mr. Nicholson explained that he had been instructed to perform calculations of deemed nominations pursuant to Art. 7.8.1 of Annex 1 to the GSPA only, and that he had not applied any limitation provided for in Art. 5.4 of the GSPA (or in any other provision)[1294].

1081. In the Post-Hearing Brief, EGAS focused on this answer and averred that the expert's assumption that a deemed nomination of 325,000 MMBTU must be

---

[1293] FHT, Day 8, p. 1856.
[1294] FHT, Day 8, p. 1856.

applied from 5 through 28 February 2011, was in breach of the applicable contractual limit on nominations established in the GSPA[1295].

1082. EMG covered this issue in its Post-Hearing Brief, arguing that there is nothing unusual about daily nominations exceeding 265,000 MMBTU, because EMG could nominate gas quantities corresponding to shortfall gas from past months[1296]; and that in fact, EGAS had acknowledged this practice on numerous occasions when it accepted nominations exceeding 265,000 MMBTU[1297].

1083. During the Conclusion Hearing, both Parties again addressed the issue. EMG simply repeated the conclusions reached in its Post-Hearing Brief[1298], and EGAS explained that on a single day the Parties may agree on a nomination in excess of the daily contractual maximum, but in order for that nomination to become a PNQ in subsequent days it will either have to be accepted by GASCO, or else it will have to be brought down to the contractual maximum[1299].

**c.    The Tribunal's decision**

1084. On this point, the Tribunal agrees with EMG (and with the assumption relied upon by its quantum expert[1300]): a deemed nomination where the PNQ for the preceding day was the result of an agreed PNQ, is not subject to a contractual maximum.

1085. In identifying the amount of a deemed nomination where the PNQ for the preceding day was the result of an agreed PNQ at a level in excess of a daily permitted maximum, the effect of Art. 7.8.1 is that the agreed PNQ for the preceding day becomes the amount of the deemed nomination. Accordingly, for 6 February 2011, for which there was no actual nomination, the amount of the deemed nomination is 325,000 MMBTU, because that is the amount of the agreed PNQ for 5 February 2011[1301]. The same figure becomes a PNQ for 6 February 2011 and a deemed nomination for the following day and so on for the remaining days of February 2011.

1086. The Tribunal prefers the arguments put forward on behalf of EMG, based on the fact that the nomination in excess of a hypothetical maximum had its origins in an agreement between the parties: on 4 February 2011 KTISTAR (on behalf of EMG) made a nomination for 5 February 2011 and GASCO (on behalf of EGAS) signed the nomination sheet and accepted the nomination[1302], even if such nomination exceeded what EGAS then held was the contractual maximum

---

[1295] FHT, Day 8, p. 1855.
[1296] C PHB, para. 63.
[1297] C PHB, para. 64.
[1298] SHT, Day 12, p. 2394.
[1299] SHT, Day 12, p. 2647.
[1300] FTI II, Appendix. 13.
[1301] Doc. H-41.
[1302] Doc. H-41.

nomination. EGAS, thus, gave its informed consent to a nomination made in excess of (what it believed to be) the contractual maximum, and in doing so it was (or should have been) aware of the risk that if EMG failed to make new nominations on the following day, that nomination would become a recurrent deemed nomination.

EGAS' counter-arguments

1087. During the oral submissions, EGAS made two arguments in support of its proposition that deemed nominations are subject to a limit[1303]:

- If the nomination procedure were not subject to a daily maximum, it would be open to abuse, because a deemed nomination would be more favourable to EMG than an actual nomination.

- Art. 7.8.2 of Annex 1 to the GSPA represents another circumstance in which the parties saw fit to limit deemed nominations.

1088. The Tribunal does not agree:

- The deemed nomination procedure is not without limits: it is restricted by the annual contracted quantity; the Tribunal simply confirms that the procedure is not subject to a daily maximum;

- The Tribunal fails to see the relevance of Art. 7.8.2: this provision applies after the first day of a period of *force majeure* and in that instance the parties saw fit to expressly limit deemed nominations; however, for deemed nominations under circumstances other than *force majeure* (a situation governed by Art. 7.8.1), which is the case here, the parties had no intention to cap or limit deemed nominations.

1089. In conclusion, the Tribunal takes the view that the natural meaning of the words used in Art. 7.6(a) and 7.8.1 favours the construction advanced on behalf of EMG. There is, in the Tribunal's view, no warrant for reading a restriction into those words.

\* \* \*

1090. The Tribunal has just decided that recurrent deemed nominations under Art. 7.8.1 become PNQs, subject to no daily maximum. This notwithstanding, for the sake of argument, the Tribunal will assume that deemed nominations, in order to become a PNQ, were subject to a daily maximum. On that assumption, a question would arise as to whether the deemed nominations for the period 6 – 28 February 2011 would be above or below such daily maximum. On that question, the

---

[1303] SHT, Day 12, p. 2829.

Tribunal is divided. One member of the Tribunal takes the view that the provisions of the GSPA do not support a calculation of a daily maximum for nominations of as much as 325,000 MMBTU. However, the majority of the Tribunal [the "**Majority**"] would hold that, in any event, the applicable daily maximum for nominations in February 2011 comfortably exceeded 325,000 MMBTU. The reasons of the Majority are set out in the next section.

### D.   The hypothetical application of a daily maximum

1091. If the deemed nominations were subject to a maximum – *quod non* – the question is, how should such maximum be calculated? The Majority will first add some contractual provisions to those already reproduced *supra* (**a.**), then explain the calculations made by the Parties (**b.**), and finally take a decision (**c.**), and make the appropriate quantification (**d.**).

### a.   Relevant contractual provisions

1092. Art. 7 of Annex is the relevant provision:

> "**Art. 7 Nominations**
>
> [...]
>
> 7.5 <u>Maximum and Minimum Quantities</u>.
>
> During the Term of the Agreement as of the Start Date:
>
> 7.5.1 "**Daily Contract Quantity**" or "**DCQ**" shall mean, with respect to any Day of any Contract Year, an amount equal to the then-applicable Annual Contract Quantity divided by the number of Days in the Contract Year;
>
> 7.5.2. "**Daily Maximum**" shall mean, with respect to any Day during any Contract Year, an amount equal to the Daily Contract Quantity multiplied by one hundred twenty-five percent (125%).
>
> [...]
>
> "7.6 <u>Properly Nominated Quantity.</u>
>
> [...]
>
> (b) In addition to the quantities specified in Sections 5.4, 6.9.5, 7.6(a) and elsewhere in this Agreement, Buyer shall be entitled to nominate (and if so nominated, Seller shall deliver) additional quantities of Gas for delivery pursuant to this Agreement in order to provide fuel for Buyer's turbines. Such nominations by Buyer shall be made on a Daily basis (along with the Daily Nomination described in Section 7.4) [...]".

### b. The proposed calculations

1093. EGAS has produced successive calculations of the daily maximum, but has showed no preference for any one in particular:

- During the Hearing EGAS averred that "the daily rate nominated by EMG was not to exceed 215,000 MMBTU", with some add-ons like Recovery Gas under Art. 5.4(c) in an amount of 50,000 MMBTU[1304]; this would result in 265,000 MMBTU per day[1305] [the "**First Proposal**"].

- In the Post-Hearing Brief EGAS attached as Annex A specific calculations of "applicable Daily Maximum"[1306]: 5,000 MMBTU per day per turbine[1307], plus 215,000[1308] or 265,000 MMBTU (Art. 5.4.), plus 125% of Q2 Daily Contract Quantity (Art. 7.5.2) [the "**Second Proposal**"].

- During the Second Hearing EGAS proposed that the maximum daily nomination was subject to a maximum of 269,850 MMBTU[1309] (rounded up to 270,000 MMBTU[1310]), made up as follows: 215,000 MMBTU (Art. 5.4.(b)), plus 50,000 MMBTU for Recovery Gas (Art. 5.4.(c)), plus 4,850 MMBTU turbine fuel [the "**Third Proposal**"].

1094. The Majority notes that the First Proposal is EGAS' base calculations. The Third Proposal adds the turbine fuel and the Second Proposal augments it by 125% of Q2 gas and calculates the turbine fuel differently.

1095. EMG's position is that no maximum should apply, and therefore, EMG has not offered alternative calculations, but has averred since its early submissions[1311] that the maximum nominated quantity is 125% of the contract quantity, pursuant to Art. 7.5[1312]; EMG makes no distinction between Q1 and Q2 contract quantity, contrary to what is suggested by EGAS in its Second Proposal.

1096. Which of the three is the correct calculation of the daily maximum?

### c. The Majority's decision

1097. The Majority can rule out the First and the Third Proposal right away: the First Proposal fails to include turbine fuel (a gas that pursuant to Art. 7.6(b) EMG is

---

[1304] FHT, Day 8, p. 1857.
[1305] FHT, Day 8, p. 1857.
[1306] R1+2 PHB, Annex A, pp. 98 and 99.
[1307] EMG uses one turbine for deliveries not exceeding 300,000 MMBTU (R1+2 PHB, fn. 530).
[1308] During summer months, when no Recovery Gas is available.
[1309] SHT, Day 12, p. 2827.
[1310] SHT, Day 12, p. 2644.
[1311] C FS M, para.
[1312] C FS M, para. 54.

entitled to "in addition to quantities specified anywhere in the GSPA"[1313]) and Q2 gas (Art. 5.3[1314]); while the Third Proposal, although it includes turbine fuel, it also falls short of Q2 gas. The only proposal which, thus, comes into question is the Second Proposal.

1098. The Second Proposal provides for turbine fuel and for Q1 and Q2 gas, and in order to obtain the daily maximum, the Second Proposal increases only Q2 gas by 125% (pursuant to Art. 7.5.2); but denies this uplift to Q1 gas, because EGAS avers that Q1 is subject to a specific maximum provision in Art. 5.4(b), which displaces Art. 7.5.2. EMG holds the contrary view.

The contractual provisions

1099. Art. 5.4(b) of the GSPA was introduced as a consequence of the First Amendment. Its stated purpose is to establish a "Delivery Plan for Q1" (i.e. for the gas intended for IEC). In that context, the GSPA provides that Q1 "shall be delivered at a daily rate nominated by the Buyer not to exceed 215,000 MMBTU per Day".

1100. Art. 7 of Annex 1 regulates EMG's "Nominations" and provides

- That EMG is additionally entitled to obtain turbine fuel further to the nominated quantities (including Recovery Gas) (Art. 7.6.(b) of Annex 1);

- That the "Daily Maximum" with respect to any Day shall be equal to the Daily Contract Quantity ["**DCQ**"] multiplied by 125%, and that the DCQ shall be equal to the Annual Contract Quantity divided by 365 (Art. 7.5.1 and 7.5.2 of Annex 1).

The relevant question

1101. The relevant question is whether the factor provided for in Art. 7.5.2 (125% of the contractual quantities) applies to all contractual quantities, or whether (as EGAS maintains) it should only apply to Q2 and Q3; Q1 being implicitly excluded, because Art. 5.4(b) of the GSPA creates an absolute ceiling for Q1 in the amount of 215,000 MMBTU.

1102. The Majority is persuaded that Art. 5.4(b) of the GSPA does not displace the regulation of the daily maximum nomination for Q1 of Art. 7.5.2, for the following reasons:

---

[1313] The Majority is paraphrasing Art. 7.6(b): "In addition to the quantities specified in Sections 5.4, 6.9.5, 7.6(a) and elsewhere in this Agreement, Buyer shall be entitled to nominate [...]... additional quantities of Gas for delivery pursuant to this Agreement in order to provide fuel for Buyer's turbines ...".
[1314] Pursuant to Art. 5.3 of the GSPA, EMG can increase the annual contract quantity by Q2 gas, which is 2.5 Million MMBTU plus the gas needed for each Q2 on-sale customer (Art. 5.3.1).

1103. First, Art. 5.4(b) and Art. 7.5.2 are not conflicting provisions: Art. 5.4(b) of the GSPA establishes that the Annual Contract Quantity of Q1 nominated by EMG shall not exceed 215,000 MMBTU; this provision is in line with Art. 7.5.1 of Annex 1, which states that the DCQ with respect to any day is equal to the Annual Contract Quantity divided by the number of days – in the case of Q1, the Daily Contract Quantity is, in rounded figures, 215,000 MMBTU.

1104. This implies that the 125% factor provided for in Art. 7.5.2, which applies on the DCQ, is calculated on the following amounts:

-   in the case of Q1, 215,000 MMBTU, as agreed in Art. 5.4(b) of the GSPA,

-   and in the case of Q2 and Q3, on the figures agreed in Art. 5.3 of the GSPA and in the relevant On-Sale Notices.

1105. Second, even if both provisions were conflicting (*quod non*), Art. 5.4 is the specific regulation concerning delivery (it is entitled "delivery plan for Q1"), whilst Art. 7.5 is the specific regulation on the maximum quantities which EMG can nominate (the provision is entitled "maximum and minimum quantities" under the heading "nominations") – Art. 7.5 is thus *lex specialis* for the relevant matter and enjoys preferential application.

1106. Third, even if Art. 5.4(b) were construed as a provision establishing a ceiling to EMG's Q1 nominations, this alleged limitation cannot be interpreted as an absolute maximum, but rather as a maximum subject to two undisputed exceptions: the addition of Recovery Gas and turbine fuel can exceed 215,000 MMBTU. Can there be a third exception, namely that the uplift factor of 125% applies to all contractual quantities (including Q1)?

1107. The Majority is convinced that the third exception also applies for two reasons:

-   At the time of the First Amendment EMG had only one client, IEC, and the only operative amount of gas was Q1 – thus the only DCQ on which the 125% factor could have been applied was Q1; an interpretation of the GSPA which excludes Q1 from the uplift factor would render Art. 7.5.2 meaningless;

-   When the parties introduced Art. 5.4(b) into the GSPA through its First Amendment, they also added Art. 5.4(c) on Recovery Gas and Art. 7.6.(b) on turbine fuel (the two undisputed exceptions to the ceiling), but decided not to apply any change to the 125% factor of Art. 7.5. Had the parties intended that the 125% factor should not apply to Q1 (and to restrict its applicability to Q2 and Q3), they would have done so in express terms.

1108. The Majority will now establish the correct amount for the daily maximum nomination:

**d.    Daily Maximum**

1109. In light of the decisions reached above, the daily maximum nominations on a given day in February 2011 (CY3) amounts to 344,469 MMBTU:

- The Daily Contract Quantity (Art. 7.5 of Annex 1 to the GSPA) in an amount of 227,575 MMBTU, split as follows:

  · 215,000 MMBTU/day (Art. 5.4.(b)) for Q1;

  · Increased by Q2 (Art. 5.3.1): 6,849 MMBTU/day (which were added as of 30 September 2009[1315]) plus the quantities required to supply any Q2 on-sale customers – it is undisputed that the only Q2 on-sale customer existing at the relevant time was Mashav[1316] who was entitled to 5,726 MMBTU per day[1317].

- 25% uplift: the Daily Contract Quantity multiplied by 125% is the Daily Maximum under Art. 7.5.2 of Annex 1 to the GSPA; in this case 227,575 MMBTU * 1,25 is 284,469 MMBTU.

- Recovery Gas (Art. 5.4(c)): EMG was allowed to obtain (except during the summer months) a maximum of 50,000 MMBTU/day in addition to any other quantities provided for in the GSPA, as compensation for delivery shortfalls occurred prior to the First Amendment.

- Turbine Fuel (Art. 7.6 of Annex 1 to the GSPA): although the GSPA only states that Buyer is entitled to nominate gas to provide fuel for its turbines, in addition to any other quantity, EGAS has agreed that the turbine fuel be estimated at 5,000 MMBTU per turbine per day and that EMG used two turbines when the total gas delivery for a day exceeded 300,000 MMBTU[1318:] – in this case, since the gas to be delivered to IEC would be 334,469 MMBTU/day[1319], EMG would be allowed to nominate an additional 10,000 MMBTU for turbine fuel.

* * *

---

[1315] Art. 5.3.1(a): refers to an annual amount of 2,500,000 MMBTU, which is equivalent to 6,849 MMBTU per day.

[1316] $R_{1+2}$ FS M, fn. 472.

[1317] Doc. $R_{1+2}$-189: the annual contractual amount is 2,090,000 MMBTU, which equals 5,726 MMBTU/day.

[1318] $R_{1+2}$ PHB, Annex A.

[1319] 284,469 MMBTU + 50,000 MMBTU.

1110. In conclusion, the Majority thus concludes that, under the hypothesis that EMG's nomination in February 2011 were subject to a contractual maximum, then such maximum would amount to 344,469 MMBTU. Since EMG's PNQ for 5 February 2011 was 325,000 MMBTU, this nomination in any case was below the contractual maximum, and the subsequent deemed nominations for the rest of February did not fall foul of any hypothetical agreed contractual maximum and became proper PNQs.

## E.  Shortfall Compensation owed by EGAS for delivery failures

1111. The Tribunal has already concluded that during the period from 6 to 28 February 2011, EMG must be deemed to have made daily PNQs equal to 325,000 MMBTU; it is undisputed that EGAS delivered no gas during such period, and the Tribunal has established that such failure of delivery cannot be excused for reasons of *force majeure*.

1112. The question which arises is whether EGAS owes any amounts to EMG for such delivery failures.

1113. *Pro memoria*, the GSPA provides that, if EGAS' failure to deliver gas exceeds a minimum, EMG will be entitled to a Shortfall Compensation which consist of three remedies:

-   the Redelivery of the shortfall gas in accordance with an agreed schedule within six months, against payment of the ordinary price;

-   the Monetary Compensation in an amount equal to (approximately) 20% of the price of the shortfall gas, between failure to deliver and redelivery; and

-   the Pass Through Penalty, i.e. the compensation for the shortfall penalties EMG had to pay to its down-stream customers.

1114. The Redelivery, the Monetary Compensation and the Pass Through Penalty are the relevant concepts which must be calculated in order to establish the balance due between EGAS and EMG as of February 2011.

1115. FTI has incurred in slight incorrections in calculating these amounts:

-   FTI applied Daily Shortfall Compensation equal to 10% of the Daily Delivery Failure whenever such delivery failure exceeded 2% of the PNQ, i.e. the "Daily Shortfall Gas", multiplied by the price. The Tribunal, has decided that the correct interpretation of Arts. 6.8.1 and 6.8.3 of Annex 1 to the GSPA is that this 2% Tranche should be excluded from the calculations

– which in essence requires to apply a 2% reduction to the Daily Shortfall Compensation calculated by FTI[1320];

- The Monthly Shortfall Compensation, however, has been calculated by FTI as 10% of the monthly aggregate of the Daily Shortfall Gas multiplied by the price, when in fact the GSPA stipulates that the monthly aggregate quantity of gas which EGAS fails to deliver[1321] (including such failure which falls below 2% of the PNQ) be the basis for the Monthly Shortfall Compensation[1322].

---

[1320] See para. 1062 *supra*.

[1321] See para. 1062 *supra*; Art. 6.9.1: "To the extent that Seller fails to deliver during any Month [...]... the Properly Nominated Quantities on a Day-by-Day basis for such Month [...]... ("Monthly Delivery Failure") the aggregate quantity of Gas that EGAS fails to deliver on a Day-by-Day basis during such Delivery Month shall be classified as "Monthly Shortfall Gas". Art. 6.9.3: To the extent that the Monthly Delivery Failure during any Delivery Month attributable to the initial On-Sale Agreement is greater than 7% seven percent of the aggregate Properly Nominated Quantities for such Delivery Month for the Initial On-Sale Agreement in addition to any Daily Shortfall Compensation [...]... Buyer shall be entitled to receive an amount (the Monthly Shortfall Compensation") equal to the product of a) 10% multiplied by b) the amount of the Monthly Shortfall Gas [...]"....".

[1322] See para. 1062 *supra*.

### F.    Determination of amounts due between EMG and EGAS

1116. In view of the above, the Tribunal has prepared two tables with amounts due by EMG and by EGAS, based on FTI's calculations, albeit amended where appropriate:

### a.    Amounts owed by EMG[1323]

|  | $DG_1$ | Redelivery $G_1$ | $DG_2$ | Redelivery $G_2$ |
|---|---|---|---|---|
| 01/02/2011 | 324.377 | 54.527 | 5.223 | (30) |
| 02/02/2011 | 314.101 | 44.251 | 4.243 | 53 |
| 03/02/2011 | 304.184 | 34.334 | 6.072 | 12 |
| 04/02/2011 | 321.877 | - | 3.011 | 48 |
| 05/02/2011 | 37.656 | - | - | - |
| 06/02/2011 | - | - | - | - |
| 07/02/2011 | - | - | - | - |
| 08/02/2011 | - | - | - | - |
| 09/02/2011 | - | - | - | - |
| 10/02/2011 | - | - | - | - |
| 11/02/2011 | - | - | - | - |
| 12/02/2011 | - | - | - | - |
| 13/02/2011 | - | - | - | - |
| 14/02/2011 | - | - | - | - |
| 15/02/2011 | - | - | - | - |
| 16/02/2011 | - | - | - | - |
| 17/02/2011 | - | - | - | - |
| 18/02/2011 | - | - | - | - |
| 19/02/2011 | - | - | - | - |
| 20/02/2011 | - | - | - | - |
| 21/02/2011 | - | - | - | - |
| 22/02/2011 | - | - | - | - |
| 23/02/2011 | - | - | - | - |
| 24/02/2011 | - | - | - | - |
| 25/02/2011 | - | - | - | - |
| 26/02/2011 | - | - | - | - |
| 27/02/2011 | - | - | - | - |
| 28/02/2011 | - | - | - | - |
| | **1.302.195** | **133.112** | **18.549** | **83** |

1117. EGAS delivered 1,302,195 MMBTU of Q1 and 133,112 MMBTU redelivery gas of Q1 and also 18,549 MMBTU of Q2 and 83 MMBTU redelivery gas of Q2. The price for each MMBTU is USD 3 for Q1[1324] and USD 3.25 for Q2[1325].

---

[1323] $DG_1$ stands for Q1 Delivered Gas; Redelivery $G_1$ stands for Q1 Redelivered Gas; $DG_2$ stands for Q2 Delivered Gas and Redelivery $G_2$ stands for Q2 Redelivered Gas.

1118. The Tribunal notes that EGAS' invoices for February[1326] show

- 1,302,195 MMBTU of Q1, multiplied by USD 3, amounting to USD 3,906,585, and
- 18,549 MMBTU of Q2, multiplied by USD 3.25, amounting to USD 60,284.

These are the amounts actually invoiced by EGAS for February 2011.

1119. But to determine the amounts owed by EMG to EGAS for February 2011, the Tribunal will include in EGAS' credit additional amounts, to which the Seller is entitled, although not shown in the invoices.

1120. These additional amounts are: the price of the Redelivery Gas, and the refunds of shortfall compensation related to Redelivery Gas, pursuant to Art. 6.9.5(c) of Annex 1 to the GSPA. Since EGAS did redeliver past shortfall gas in February 2011, EGAS is also entitled to obtain a refund of the shortfall compensation deducted in the past when the delivery failures occurred.

1121. FTI has calculated this refund:

- USD 39,934 for Q1's refund of Daily Shortfall Compensation[1327];
- USD 39,934 for Q1's refund of Monthly Shortfall Compensation[1328]; and
- USD 27 for Q2's refund of Daily Shortfall Compensation[1329].

1122. In summary, amounts due by EMG to EGAS for February 2011 are **USD 4,446,370** broken down as follows:

- Q1 gas: USD 3,906,585[1330];
- Q1 Redelivery Gas: USD 399,336[1331];
- Refund of Q1 Shortfall Compensations: USD 79,868[1332];
- Q2 gas: USD 60,284[1333];
- Q2 Redelivery Gas: USD 270[1334];

---

[1324] FTI II, Appendix 13, Q1 Monthly Payment, Applicable Contract Price.

[1325] FTI II, Appendix 13, Q2 Monthly Payment, Applicable Contract Price.

[1326] Doc. $R_{1+2}$-263 and Doc. $R_{1+2}$-264.

[1327] FTI II, Appendix 13, IEC Daily Redelivery. The Tribunal will not apply the 2% Tranche reduction given the lack of information regarding the historic PNQ which gave rise to the redelivery. The impact is, in any event, minimal.

[1328] FTI II, Appendix 13, IEC Monthly Redelivery; FTI's calculation is correct.

[1329] FTI II, Appendix 13, Mashav Daily Redelivery.

[1330] As is shown in invoice exhibited as Doc. $R_{1+2}$-263.

[1331] FTI II, Appendix 13, IEC Daily Redelivery. 133,112 MMBTU * USD 3.

[1332] FTI II, Appendix 13, IEC Daily Redelivery and IEC Monthly Redelivery. (USD 39,934 + USD 39,934).

[1333] As is shown in invoice exhibited as Doc. $R_{1+2}$-264.

[1334] FTI II, Appendix 13, Mashav Daily Redelivery. 83 MMBTU * USD 3.25 = USD 270.

-     Refund of Q2 Shortfall Compensation: USD 27[1335].

## b.    Amounts owed by EGAS

| | $PNQ_1$ | $DG_1$ | DDF $Q_1$[1336] | 10% DSG $Q_1$[1337] | $MSC$[1338] | $PNQ_2$ | $DG_2$ | DDF $Q_2$[1339] | 10% DSG $Q_2$[1340] |
|---|---|---|---|---|---|---|---|---|---|
| 01/02/2011 | 324.747 | 324.377 | 370 | - | | 5.253 | 5.223 | 30 | - |
| 02/02/2011 | 310.802 | 314.101 | - | - | | 4.190 | 4.243 | - | - |
| 03/02/2011 | 303.940 | 304.184 | - | - | | 6.060 | 6.072 | - | - |
| 04/02/2011 | 317.034 | 321.877 | - | - | | 2.963 | 3.011 | - | - |
| 05/02/2011 | 325.000 | 37.656 | 287.344 | 28.084 | | - | - | - | - |
| 06/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 07/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 08/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 09/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 10/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 11/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 12/02/2011 | 325.000 | - | 325.000 | 31.850 | | - | - | - | - |
| 13/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 14/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 15/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 16/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 17/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 18/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 19/02/2011 | 325.000 | - | 325.000 | 31.850 | | - | - | - | - |
| 20/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 21/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 22/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 23/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 24/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 25/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 26/02/2011 | 325.000 | - | 325.000 | 31.850 | | - | - | - | - |
| 27/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| 28/02/2011 | 318.196 | - | 318.196 | 31.183 | | 6.804 | - | 6.804 | 667 |
| | | | 7.626.643 | 747.299 | 762.664 | | | | 13.335 |

---

[1335] FTI II, Appendix 13, Mashav Daily Redelivery. 27 USD.
[1336] Stands for Q1 Daily Delivery Failure: $PNQ_1 - DG_1$.
[1337] Stands for Q1 Daily Shortfall Gas: $(DDF\ Q_1 - 2\%\ PNQ_1) * 0.1$, provided that DDF $Q_1 > 2\% PNQ_1$.
[1338] Stands for Monthly Shortfall Gas: DDF $Q_1 * 0.1$, provided that the monthly aggregate of DDF $Q_1 > 7\% PNQ_1$.
[1339] Stands for Q2 Daily Delivery Failure: $PNQ_2 - DG_2$.
[1340] Stands for Q2 Daily Shortfall Gas: $(DDF\ Q_2 - 2\%\ PNQ_2) * 0.1$, provided that DDF $Q_2 > 2\% PNQ_2$.

1123. In accordance with this Table, EMG has the right to deduct Shortfall Compensation for:

- 747,299 MMBTU for Daily Q1 Shortfall Gas

- 762,664 MMBTU for Monthly Q1 Shortfall Gas and

- 13,335 MMBTU for Daily Q2 Shortfall Gas.

If those quantities are multiplied by USD 3 and USD 3.25, the prices for Q1 and Q2, respectively, the result is USD 4,529,889[1341] for Q1 and USD 43,339[1342] for Q2; and jointly **USD 4,573,228**[1343]. This is the amount which EMG is entitled to deduct for the month of February 2011, as Monetary Compensation which compensates EGAS' failure to deliver properly nominated Gas.

1124. The deduction exceeds the amount of **USD 4,446,370**, which is the amount due to EGAS for the gas delivered, the Redelivery Gas and the refund of shortfall compensation related to such Redelivery Gas.

1125. In conclusion, EMG did not owe any amount to EGAS on account of obligations deriving from the GSPA for February 2011; in fact, it was EGAS who owed money to EMG.

## G.  EGAS' improper termination of the GSPA

1126. The above conclusion is fatal to EGAS' case on termination under Art. 2.5.2. This provision requires that "Buyer fails to timely pay any amounts due under this Agreement for four (4) consecutive Months" in which case "Seller shall be entitled to terminate this Agreement upon delivery of a written notice to Buyer".

1127. EGAS claims that EMG had failed to pay the amounts due under the GSPA for the four consecutive months of January, February, March and April 2011 and based on this argument, terminated the GSPA. In fact, the Tribunal has concluded that for February 2011 the amounts due were not in favour of EGAS, but of EMG, and that consequently EMG cannot have "fail[ed] to pay any amount due under this Agreement". This being so, EGAS' purported termination of the GSPA did not meet the requirement of Art. 2.5.2 and was improper.

---

[1341] (747,375 MMBTU + 762,664 MMBTU) * USD 3.

[1342] 13,335 MMBTU * USD 3.25.

[1343] 1,510,039 MMBTU * USD 3 + 13,335 MMBTU * USD 3.25.

## 5.4   EMG'S AND IEC'S RIGHT TO TERMINATE AT COMMON LAW

1128. All Parties have at some point in time exercised, or purported to exercise, their right to termination:

- On 18 April 2012 EGAS took the decision to terminate the GSPA, under Art. 2.5.2. of Annex 1, arguing that EMG had failed to pay the amounts due for four consecutive months;

- A few days thereafter, on 9 May 2012[1344], EMG wrote to EGAS stating that it terminated the GSPA at common law, reasoning that EGAS had committed a repudiatory breach of the GSPA;

- Finally on 6 February 2013[1345] IEC sent a letter to EGAS communicating its decision to terminate the Tripartite Agreement at common law on account of EGAS' repudiatory breach.

1129. EMG has requested this Tribunal to declare that EGAS' repudiatory breach of the Tripartite Agreement entitled EMG to accept that repudiation, terminate the Tripartite Agreement at common law and claim full compensation under English law[1346]. Similarly, IEC has submitted a prayer for relief, requesting the Tribunal to declare that IEC has lawfully terminated the Tripartite Agreement at common law on account of the continuing and repudiatory breaches by EGAS of the Tripartite Agreement[1347].

1130. EGAS disputes that termination at common law, on the basis that such remedy was excluded in the GSPA, because Art. 2.5 of Annex 1 creates an exclusive contractual regime for the termination of the GSPA, but otherwise does not contest that the repudiation of the GSPA would result in a repudiation of the Tripartite Agreement, nor does it object to the Tribunal's jurisdiction to decide on the alleged repudiation of the GSPA.

### A.   Relevant contractual provisions

1131. The relevant provisions of Annex 1 to the GSPA are in the following terms:

> "2.5 Termination Rights.
>
> 2.5.1 In the event of the occurrence of either of the following circumstances with respect to either Party (a "Defaulting Party"), the other Party (the "Non-Defaulting Party") shall be entitled to terminate this Agreement prior to the expiration of the Term by delivering written notice to the Defaulting Party of such termination no less than twenty (20) Business Days prior to the proposed date of termination: (a)

---

[1344] Doc. C-49.
[1345] Doc. R₃-56.
[1346] C PHB, para. 178 (b) (iv).
[1347] R₃ PHB, para. 294 (b).

material breach by the Defaulting Party of this Agreement; *provided that* if such breach is capable of being cured, such breach shall not create the right to terminate this Agreement unless the Defaulting Party fails to cure such breach within sixty (60) Business Days after receiving notice thereof from the Non-Defaulting Party; (b) the Defaulting Party suffers or commits an Act of Insolvency.

2.5.2 In the event that Buyer fails to timely pay any amounts due under this Agreement for four (4) consecutive Months, Seller shall be entitled to terminate this Agreement upon delivery of written notice to Buyer, *provided that* such failure shall not create the right to terminate this Agreement unless Buyer fails to cure such failure within thirty (30) Business Days after receiving notice from Seller of the fourth (4th) consecutive occurrence of such non-payment.

2.5.3. Any termination of this Agreement (including in Accordance with the provisions of this Section 2.5) will not impede, relieve or otherwise affect any rights or obligations which may have arisen before such termination.

2.5.4. In the event that this Agreement is terminated pursuant to this Section 2.5:

(a) save in respect of Article 13, each Party shall be relieved of all further obligations and liabilities under this Agreement to the other Party arising from and after the date of such termination (including any potential loss or damage sustained, arising or accruing in respect of the period from the date of termination), *provided that* each Party shall remain liable to the other Party for liabilities that accrue prior to the date of termination of this Agreement;

(b) each Party shall be relieved of the right to claim damages from the other Party to compensate it for loss of the benefit of that other Party's performance of its obligations pursuant to the Agreement after the date of such termination for the remaining term of the Agreement.

2.5.5 In the event of a written notice of unilateral cancellation, termination or repudiation of the Tripartite Agreement by Seller for reasons not attributable to Buyer, Buyer shall be entitled to terminate this Agreement upon delivery of written notice to Seller, *provided that* such cancellation, termination or repudiation shall not create the right to terminate this Agreement unless Seller fails to re-affirm the validity of the Tripartite Agreement in writing within thirty (30) Business Days after Seller's receipt of a notice from Buyer of Buyer's intention to terminate this Agreement pursuant to this Section 2.5.5".

"6.4 Buyer's Suspension Rights

[...]

6.4.2 If Buyer reduces Buyer's Take-or-Pay Obligation for specified quantities pursuant to Section 6.4.1 of this Annex l, within 3 months from Buyer's written notice to Seller (unless otherwise agreed between Seller and Buyer), Buyer shall have the right to restore Buyer's Take-or-Pay Obligation for such quantities of Gas as previously reduced for the remaining Term of this Agreement upon ten (10) days notice to Seller; *provided, however*, if Buyer reduces Buyer's Take-or-Pay Obligation in its entirety pursuant to Section 6.4.l of this Annex 1 and does not take delivery of any Gas pursuant to this Agreement for six (6) consecutive Months (save to the extent either Party is excused due to reasons of *force majeure*), Seller may, upon written notice to Buyer, terminate this Agreement, *provided that* Buyer shall

have thirty (30) days from the receipt of Seller's notice to provide notice defining the date of which Buyer will resume Buyer's Take-or-Pay Obligation".

"Article 13 Confidentiality

13.1 Confidential Information. No Confidential Information shall be disclosed in whole or in part by either Party, its agents, or its employees to any third party during the Term of this Agreement and for a period of five (5) years following the expiration or termination of this Agreement, except with the prior written consent of the other Party, or as expressly provided in Section 13.2".

"Article 19 Limitation on Liabilities

19.1 No Consequential Losses

19.1.1 Notwithstanding any other provision of this Agreement, no Party shall be liable to any other Party for punitive or exemplary damages in any circumstances, and no Party shall be liable to any other Party for any indirect or consequential loss or damage including indirect or consequential:

(a)     loss of profit;
(b)     loss of business;
(c)     loss of production;
(d)     loss of revenue; or
(e)     loss of contract.

[...]

19.3 Any limitations or exclusions of liability contained in this Agreement shall survive any termination of this Agreement however arising".

## B.    **The Parties' positions**

### a.    **EMG**

1132. EMG maintains[1348] that, as a consequence of EGAS' unlawful termination of the GSPA, EGAS was in repudiatory breach of the GSPA and that EMG exercised its common law right to accept that breach as bringing the GSPA to an end [the "**common law right**"] by its letter dated 9 May 2012; as a consequence of which EMG was also entitled to terminate the Tripartite Agreement at common law[1349].

1133. In support of its case that EGAS was in repudiatory breach of the GSPA and so, of the Tripartite Agreement, EMG relies on a number of grounds, one of which is that EGAS wrongly purported to terminate the GSPA and wrongly refused to withdraw its termination notice[1350].

---

[1348] C FS M, para. 141.
[1349] C SS M, para. 381; FHT, Day 1, p.233.
[1350] C FS M, para. 268.

### b.   IEC

1134. IEC avers that EGAS was in repudiatory breach of the Tripartite Agreement because EGAS:

- failed to provide gas to EMG, which was EGAS' primary obligation under Art. 1 of the Tripartite Agreement[1351]; and

- because it terminated the GSPA: irrespective of whether EGAS' termination of the GSPA was lawful or not, it is the clearest possible evidence that EGAS had no intention of performing the promise contained in Art. 1 of the Tripartite Agreement[1352].

1135. The effect of EGAS' conduct has been to deprive IEC of substantially the whole of the benefit which it was intended to obtain under the Tripartite Agreement[1353] and faced with these repudiatory breaches IEC elected to treat the Tripartite Agreement as discharged and notified EGAS of this election in its letter dated 6 February 2013[1354].

### c.   EGAS

1136. EGAS maintains[1355] that Art. 2.5 of Annex 1 to the GSPA provided for an exclusive contractual regime for the termination of the GSPA, such that the common law right was displaced. In providing a comprehensive regime in the contract itself, the Parties to the GSPA went out of their way to address the issue of what would happen to obligations which may have arisen prior to the termination, making clear that both Parties would still be liable for any such obligations[1356]. And this regime could operate on the basis of the contract alone[1357]

1137. Accordingly, EGAS contends that, even if it was in repudiatory breach of the GSPA, it was not open to EMG to accept that breach as bringing the GSPA to an end at common law. On the contrary, EGAS contends[1358] that, in that event EMG's remedy was limited to terminating the GSPA for material breach pursuant to Art. 2.5.1 of Annex 1.

---

[1351] R₃ FS M, para. 84.
[1352] R₃ FS M, para. 84.
[1353] R₃ FS M para. 89.
[1354] Doc. R₃-56.
[1355] R₁₊₂ FS M para. 416; R₁₊₂ SS M, para. 588.
[1356] R₁₊₂ SS M, para. 615.
[1357] R₁₊₂ SS M, para. 616.
[1358] R₁₊₂ FS M, para. 442.

### C.   The Tribunal's decision

1138. The Tribunal will divide its analysis into the following sections: it will first determine whether EGAS' behaviour was a repudiatory breach of the GSPA and of the Tripartite Agreement (**a.**); then it will address whether the GSPA excluded the common law right to terminate for repudiatory breach (**b.**).

### a.   EGAS' repudiatory breach

1139. The Tribunal's findings of fact in relation to these various arguments may be summarised as follows:

- The Tribunal has already held that, when EGAS purported to serve notice pursuant to Art. 2.5.2 on 24 August 2011, it did not have good grounds for doing so, because there had not been four consecutive monthly payment defaults.

- By notice dated 18 April 2012[1359] EGAS purported to terminate the GSPA for non-payment pursuant to Art. 2.5.2.

- By its letter in response dated 22 April 2012[1360], EMG asserted that EGAS' Notice of Termination was invalid and demanded that EGAS withdraw it.

- By its letter in response dated 29 April 2012[1361], EGAS continued to maintain that its termination of the GSPA for non-payment was lawful and declined to withdraw it.

- By its letter dated 9 May 2012[1362], EMG gave notice to EGAS that it regarded its conduct as amounting to a repudiatory breach of the GSPA, which EMG accepted.

1140. The Tribunal must first decide whether the breaches of contract committed by EGAS were such as would ordinarily be regarded as repudiatory in nature. In the light of the findings summarised in the preceding paragraph, the Tribunal is satisfied that EGAS' breaches of contract were repudiatory in nature, in that EGAS made clear its intention to treat the GSPA as at an end, even though it had no grounds for terminating it pursuant to Art. 2.5 of Annex 1.

1141. Since "the supply of gas through fulfilling their obligation to EMG under the GSPA"[1363] is the core commitment of EGAS under the Tripartite Agreement, the

---

[1359] Doc. C-48.
[1360] Doc. C-168.
[1361] Doc. C-169.
[1362] Doc. C-49.
[1363] Paraphrasing Art. 1 of the Tripartite Agreement.

Tribunal agrees with EMG and IEC that EGAS' repudiation of the GSPA constitutes a repudiation of the Tripartite Agreement.

### b.   Contractual exclusion of the common law right to terminate

1142. The Tribunal turns to the question whether the right to terminate at common law, on account of the repudiation, is a remedy which has become unavailable because, under the GSPA, the common law right to terminate for repudiatory breach was displaced. It is common ground that this is a question of the interpretation of the GSPA, read in context.

(i)   <u>EMG's suggested construction</u>

1143. Initially, EMG sought to place some reliance on the terms of EGAS' letter dated 18 April 2012[1364]. The passage in question was in the following terms:

> "The termination of the GSPA is without prejudice to any other claims and remedies to which EGPC and EGAS may be entitled under the GSPA <u>and/or applicable law</u> […]".

1144. It was suggested that the words underlined in this passage amounted to a recognition on the part of EGAS that, in addition to the right to terminate under Art. 2.5, it had other rights arising under English law. However, in its oral submissions at the First Hearing[1365], EMG accepted that the terms of the letter afforded it little assistance.

1145. The Tribunal agrees: views expressed long after the conclusion of an agreement as to the meaning of the terms used can afford little in the way of reliable guidance as to the construction which should be placed upon those terms.

1146. In this area of the case, EMG also places reliance on the terms of Arts. 2.5.3, 2.5.4 and 19.3 of Annex 1. EMG submits[1366] that the terms of these provisions should be regarded as recognising that the common law right to accept a repudiatory breach was not displaced[1367]:

> "2.5.3. Any termination of this Agreement (<u>including in accordance with the provisions of this Section 2.5</u>) will not impede, relieve or otherwise affect any rights or obligations which may have arisen before such termination".

> "2.5.4. In the event that this Agreement is terminated <u>pursuant to this Section 2.5</u>: […]".

> "19.3 Any limitations or exclusions of liability contained in this Agreement shall survive any termination of this Agreement <u>however arising</u>".

---

[1364] Doc. C-48.
[1365] FHT, Day 1, p. 234.
[1366] C PHB, paras. 92 and 93.
[1367] Emphasis by the Tribunal.

1147. EMG points out that:

- Art. 2.5.3: by the use of the words underlined, the parties were recognising that the GSPA might be terminated by some means other than by implementation of Art. 2.5 itself; EMG's suggestion is that the only alternative possibility is termination by the exercise of the common law right.

- Art. 2.5.4: the parties apparently found it necessary to qualify the expression "terminated" by the use of the words underlined; the point being made is that this amounts to a recognition that there were other means by which the GSPA might be terminated independently of Art. 2.5 because otherwise there would be no need for such a qualification – again, EMG's suggestion is that the only alternative was termination by the exercise of the common law right.

- Art. 19.3: the words underlined once more recognise the possibility of a termination of the GSPA otherwise than pursuant to the terms of Art. 2.5; again, EMG's suggestion is that the only alternative means of termination was by the exercise of the common law right.

1148. On the basis of Arts. 2.5.3, 2.5.4 and 19.3, EMG therefore suggests that the GSPA repeatedly recognised that the common law right to terminate by acceptance of a repudiatory breach was preserved.

(ii)   EGAS' suggested construction

1149. EGAS places reliance on the terms of Art. 2.5.3[1368] and on the opening words of Art. 2.5.4(a), which cross refer to Art. 13[1369]:

> "2.5.3. Any termination of this Agreement (including in accordance with the provisions of this Section 2.5) will not impede, relieve or otherwise affect any rights or obligations which may have arisen before such termination".

> "2.5.4. In the event that this Agreement is terminated pursuant to this Section 2.5:

> (a) save in respect of Article 13, each Party shall be relieved of all further obligations and liabilities under this Agreement [...]"[1370].

> "13.1 Confidential Information. No Confidential Information shall be disclosed in whole or in part by either Party, its agents or its employees to any third party during the Term of this Agreement and for a period of five (5) years following the expiration or termination of this Agreement, except with the prior written consent of the other Party, or as expressly provided in Section 13.2."

---

[1368] R$_{1+2}$ SS M paras. 615 and 616.
[1369] SHT, Day 11, p. 2572.
[1370] Emphasis added.

1150. EGAS points out that Art. 2.5.4(a) has the effect, in a case of termination under Art. 2.5, of preserving the confidentiality obligations set out under Art. 13; EGAS suggests that it would make no sense if that provision were capable of being circumvented simply by the exercise of a right to terminate at common law.

1151. EGAS maintains[1371] that, in terms of the circumstances in which it might be necessary to bring the GSPA to an end, the parties provided expressly for every eventuality: they allowed for termination in the event of material breach and in the event of persistent non-payment; and further, they provided for the preservation of accrued rights and obligations and for the exclusion of liability for loss of profits.

1152. EGAS makes the argument[1372] that any breach which might otherwise be regarded as repudiatory in nature could and would equally be regarded as a material breach of the purposes of Art. 2.5.1. EGAS goes on to submit[1373] that there are almost no circumstances where the right to terminate for material breach under Art. 2.5.1 would not also give rise to a right to terminate for repudiatory breach at common law. On that footing, EGAS maintains that Art. 2.5.4 would be substantially deprived of any effect if the common law right were held to survive.

1153. EGAS concludes by submitting[1374] that even in the case of a breach of contract, which might otherwise have been regarded as triggering the right to termination at common law, the sole remedy open to the other party under the GSPA was termination for material breach under Art. 2.5.1. Such a termination would be attended by all the other consequences set out under Art. 2.5, including the exclusion of any right to recover damages for loss of profit (by reason of Art. 2.5.4(b)).

(iii)   The Tribunal's preferred construction

1154. The Tribunal has reviewed the parties' submissions, together with the judgments in the *Lockland* case[1375], the *Dalkia* case[1376] and the *Stocznia* case[1377]. From this material, the Tribunal derives the following propositions:

- First, there is a presumption in English law that the terms of a contract do not preclude a party's right to accept a repudiatory breach as discharging

---

[1371] $R_{1+2}$ SS M paras. 589 and 590.
[1372] $R_{1+2}$ SS M paras. 601 and 602.
[1373] FHT, Day 4, p. 718.
[1374] FHT, Day 4, pp. 716 and 717.
[1375] *Lockland Builders Ltd v. Rickwood* [1995] 46 ConLR 92, ["*Lockland* case"], submitted as Doc. RL$_{1+2}$-62.
[1376] Doc. CL-96 ["*Dalkia* case"].
[1377] *Stocznia Gdynia SA v. Gearbulk Holdings Ltd* [2009] EWCA Civ 75, [2010] QB 27, ["*Stocznia* case"], submitted as Doc. RL$_{1+2}$-81.

that party from further liability and to claim damages for the loss of the right to future performance[1378].

- Second, any contractual provision which is said to have that effect is to be construed in the context in which it is found, being both the immediate context of the other terms of that contract and the wider context of the transaction as a whole[1379].

- Third, in considering whether a party to a contract has abandoned a right which arises by operation of law, the more valuable the right, the clearer the language will need to be[1380].

- Fourth, depending upon the wording and the context, a contract may have the implied effect of precluding a party from relying upon a particular matter or matters as entitling it to treat itself as discharged from further performance[1381].

*Dalkia* Case

1155. In the Tribunal's view, the present case has much in common with the *Dalkia* case. The supplier in the *Dalkia* case was held to have retained its common law right to terminate notwithstanding that the agreement in question made express provision (Clause 14) which allowed for termination for material breach. The Court held that the express words of Clause 15.7, which were relied upon by the customer, were insufficiently clear to displace the common law right. The question in the *Dalkia* case, therefore, was whether the common law right should be regarded as co-existing with or being replaced by Clause 14. The Court held that the two alternatives co-existed.

1156. In the present case, the same point arises. The question is whether the common law right should be regarded as co-existing with or as being replaced by the terms of Art. 2.5 of the GSPA. The difference between the two cases is that, in the *Dalkia* case, the customer relied upon the express terms of the contract to displace the common law right, whereas in the present case, EGAS maintains that the common law right is displaced by implication. It is clear from the authorities referred to above that, whether reliance is placed upon the express terms of the contract or upon an implication drawn from those terms, clarity is required.

1157. It is not suggested that the wording of the GSPA is such as expressly to preclude the exercise of the common law right. The question for the Tribunal is whether the

---

[1378] See the *Dalkia* case at para. 21.
[1379] See the *Stocznia* case at para. 23.
[1380] See the *Stocznia* case at para. 23.
[1381] See the *Lockland* case, per Hirst LJ at page 102.

terms of the GSPA read in context are such as to preclude the exercise of that right by clear implication.

1158. The Tribunal's preferred construction of the provisions relied upon by the parties is as follows:

- Art. 2.5.1: the Tribunal takes the view that Art. 2.5.1 is to be construed in a wide sense, applying to all cases of material breach; but it is clear that there are incidences of material breach which would fall well short of what is needed to amount to repudiatory breach[1382] – to the Tribunal's way of thinking, there is no difficulty in reading the GSPA on the basis that material breaches fall into two categories: the first comprising breaches which are material but are relatively less serious (and which trigger the right to terminate under Art. 2.5.1, subject always to the exclusion of liability for loss of profits); and the second category, being relatively more serious, which afford to the innocent party the option of choosing between termination under Art. 2.5.1 (subject to the exclusion of liability for loss of profits) on the one hand, and termination at common law (in which case the exclusion of liability for direct loss of profits would not apply) on the other.

- Arts. 2.5.4(a) and 13: the Tribunal is unable to agree with EMG that Art. 13 could be circumvented in the way suggested by EMG, because the rights and obligations arising under Art. 13 are expressed so as to continue for a period of five years following termination, whether such termination was brought about under Art. 2.5 or Art. 6.4.2 or whether it occurred as a result of the exercise of the common law right; for these reasons, the Tribunal takes the view that the opening words Art. 2.5.4(a) offer no assistance on the question of construction with which it is concerned.

- Art. 2.5.3: termination by the exercise of the common law right was not the only possible alternative to termination pursuant to Art. 2.5 of Annex 1. Another means of termination was provided expressly by Art. 6.4.2 of the GSPA, which permitted EGAS to terminate in the event that EMG reduced the Take or Pay Obligation in its entirety pursuant to Art. 6.4.1. As the Tribunal reads the GSPA, the various references to termination independently of Art. 2.5 are capable of being read as references to termination under Art. 6.4.2. The Tribunal is therefore unable to read such references as necessarily amounting to a recognition of the continuing availability of the common law right. The Tribunal accepts that Art. 2.5.3 shows that the parties were concerned to make clear that accrued rights and obligations should be preserved in all cases of termination, but the Tribunal

---

[1382] An example would be the persistent supply by EGAS of sub-standard gas. That would amount to a material breach for the purposes of Art. 2.5.1 but it would not (at least not ordinarily) amount to a repudiatory breach such as to trigger the common law right.

finds nothing in Art. 2.5.3 which sheds light one way or the other on the question whether the common law right was displaced.

1159. For these reasons, the Tribunal is convinced by the arguments advanced on behalf of EMG: the GSPA, read in context, was not such as implicitly to displace the right to terminate for repudiatory breach at common law.

\* \* \*

1160. Consequently, when EGAS repudiated the GSPA and the Tripartite Agreement, EMG and IEC were entitled to accept the repudiation and terminate the Tripartite Agreement at common law. The Tribunal, therefore, accepts IEC's submission that its letter dated 6 February 2013 had the effect of bringing the Tripartite Agreement to an end.

## 5.5 ALTERNATIVE ARGUMENTS

1161. The conclusions reached above are fatal to EGAS' case that it properly terminated the GSPA under Art. 2.5.2 on account of EMG's purported breach in the payment of amounts due for four consecutive months. The result is that several of the questions which follow have become moot. However, in deference to the efforts expended by the parties in deploying their cases, the Tribunal addresses each in turn, albeit cursorily.

### A.  Partial cure

1162. As an alternative challenge to EGAS' purported termination of the GSPA, EMG relies[1383] upon the fact that, by its payment on account made in January 2012, it discharged the amount due in respect of the month of January 2011. EMG submits that payment in full in respect of just one of the monthly payments relied upon is sufficient to cure the failure relied upon by EGAS to support its decision to terminate the GSPA.

1163. For its part, EGAS maintains[1384] that, in order to cure the failure relied upon under Art. 2.5.2, the entire amount outstanding in respect of all four of the months in question must be discharged. Nothing less will do.

1164. The Tribunal's findings of fact in relation to this part of the case can be summarised shortly as follows:

- When on 24 August 2011 EGAS served its Notice of Non-Payment pursuant to Art. 2.5.2 of Annex 1[1385] the total amount which allegedly remained

---

[1383] C SS M paras. 297 to 302.
[1384] $R_{1+2}$ SS M paras. 265 to 274.
[1385] Doc. C-10.

outstanding in respect of the months January to April 2011 was, on EGAS' case, USD 37,392,939.26[1386].

- At that point, the amount which was in fact outstanding in respect of the month of January 2011 was USD 10,000.00; but in January 2012 EMG made a part payment to EGAS in the sum of USD 11,966,869.16[1387]. The amount of that part payment was, accordingly, sufficient to discharge the full amount outstanding in respect of the month of January 2011.

1165. It is convenient, once again, to set out the terms of Art. 2.5.2 of Annex 1, as follows:

> "2.5.2 In the event that Buyer fails to timely pay any amounts due under this Agreement for four (4) consecutive Months, Seller shall be entitled to terminate this Agreement upon delivery of written notice to Buyer, provided that such failure shall not create the right to terminate this Agreement unless Buyer fails to cure such failure within thirty (30) Business Days after receiving notice from Seller of the fourth (4th) consecutive occurrence of such non-payment".

1166. The Tribunal considers that this issue turns on the ordinary meaning of the language adopted in Art. 2.5.2 of Annex 1. The cure provision refers to a failure in the singular. In the view of the Tribunal, that can only refer to a composite failure, comprised of four separate monthly failures to pay on time. Accordingly, the Tribunal agrees with EGAS that Art. 2.5.2 requires that the amounts due in respect of each of the four months relied upon must be discharged before it can be said that the failure has been cured.

1167. For these reasons, the Tribunal is unable to accept EMG's alternative challenge to EGAS' purported termination of the GSPA, on the basis of the January 2012 payment.

### B. No benefit from one's own wrong

1168. This is again an alternative case pursued both by EMG and by IEC to the effect that the termination for non-payment under Art. 2.5.2 would, in any event, have been unlawful because it would have violated the principle that a party should not be permitted to benefit from its own wrong.

### a. EMG's and IEC's positions:

1169. In support of that case, EMG relies[1388] on the following matters:

- EGAS deliberately withheld contractual quantities in order to coerce price increases and to attempt to decrease contractual quantities.

---

[1386] See para. 973 *supra*.
[1387] FTI II, Appendix 13, Payments made by EMG.
[1388] C FS M para. 268; C SS M, para. 426; C PHB para. 82, Fn. 169.

- In breach of Art.15.5.1 of the GSPA, EGAS failed to make available a sufficient supply of gas to fulfil its delivery obligations.

- In breach of Art.15.5.2 of Annex 1 to the GSPA, EGAS entered into other gas supply arrangements such as to undermine its ability to deliver to EMG the contractual quantities.

- In breach of Art.15.5.4 of Annex 1 to the GSPA, EGAS failed to act as a RPPO to protect, maintain and operate its pipeline and thereby failed to prevent sabotage of the pipeline.

- In breach of Art.15.5.4, EGAS failed to repair its pipeline following such sabotage within a reasonable time.

- EGAS wrongly sought to excuse its non-delivery by claiming *force majeure*.

- EGAS purported to terminate the GSPA on the basis of unpaid invoices when in fact the balance of payments favoured EMG, such that EMG's inability to pay the sums demanded was the result of EGAS' own breaches of contract.

- By failing to issue a timely Annual Statement for CY3, EGAS deprived EMG of the right to recover a substantial sum in August 2001 which would have enabled it to cure any alleged payment default[1389].

1170. And IEC adds[1390]:

- EGAS' refusal to assist EMG by confirming to the National Bank of Egypt that it, EGAS, would perform the GSPA with the result that the National Bank of Egypt refused to make a payment to EGAS on EMG's behalf.

- In failing to make allowance for Daily Shortfall Compensation, EGAS' invoices were not prepared in accordance with the Contract, particularly Art. 6.8.3 of Annex 1 to the GSPA.

**b.   EGAS' position**

1171. EGAS rejects the challenge to its termination of the GSPA on the basis of the principle that a party should not be permitted to benefit from its own wrong. EGAS maintains[1391] that that principle applies only where the benefit sought and the wrong alleged are directly connected; and where the party seeking advantage

---

[1389] C PHB para. 74
[1390] $R_3$ SS M para. 127; $R_3$ PHB paras 134 and 135.
[1391] $R_{142}$ PHB para. 246.

has complete control over whether the grounds for having that advantage exist[1392]. Neither is the case here.

1172. Alternatively, EGAS maintains[1393] that the principle is excluded by the express terms of the GSPA. EGAS relies upon the views expressed by Lord Hoffman[1394] that the contract deals in elaborate terms with the consequence of short delivery (daily and monthly calculations and payment of shortfall compensation); and that it also provides for precisely when these liabilities are to be taken into the account between the parties; insistence upon the enforcement of these provisions cannot be considered to be taking advantage of one's own wrong.

**c.    The Tribunal's decision**

1173. The Tribunal will address EGAS' alternative argument first: whether the principle that a party should not be permitted to benefit from its own wrong was excluded in the GSPA.

1174. In the view of the Tribunal, the following aspects of the GSPA scheme are material:

-    <u>First</u>, the Shortfall Compensation scheme afforded compensation to EMG at agreed rates for any failure on the part of EGAS to comply with its delivery obligations.

-    <u>Second</u>, Art. 9.3.2 of Annex 1 to the GSPA provided for such Shortfall Compensation to be brought into account in calculating the amount of the Monthly Payments which fell due from time to time.

-    <u>Third</u>, before a right to implement Art. 2.5.2 of Annex 1 arose, there had to be no less than four consecutive monthly payment defaults on the part of EMG.

-    <u>Fourth</u>, even where EMG committed four consecutive monthly payment defaults, the right to terminate under Art. 2.5.2 did not arise until and unless EMG had been given 30 business days to cure its default.

1175. In this context, the Tribunal regards the parties' agreement regarding the recovery of Shortfall Compensation as being of particular importance. The Tribunal thinks it right to infer that the parties regarded the agreed level of Shortfall Compensation as being sufficient recompense to EMG in the event of delivery shortfalls, whatever the reason for those shortfalls. The Tribunal, therefore, concurs with EGAS' argument to the effect that the principle that a party should

---

[1392] R$_{1+2}$ PHB para. 247.
[1393] R$_{1+2}$ PHB para. 250.
[1394] Hoffmann II, Doc. RL$_{1+2}$-100, paras. 11 and 12.

not be allowed to benefit from its own breach is, in the case of failure to make Monthly Payments and the consequences of such failure, excluded by the terms of the GSPA.

1176. For these reasons, the Tribunal is unable to accept the case advanced on behalf of EMG and IEC to the effect that EGAS' purported termination of the GSPA fell foul of the principle that a party should not be allowed to rely on its own breach.

### C.    EGAS' attempt to terminate in bad faith

1177. As an alternative basis for challenging EGAS' termination of the GSPA, IEC maintains that EGAS was in breach of an implied obligation to act in good faith.

#### a.    IEC's position

1178. IEC maintains[1395] that the parties were impliedly obliged to exercise their rights and obligations in accordance with reasonable commercial standards of fair dealing, being faithful to the purpose of the contract and mindful of the counter-party's interests. IEC goes on to maintain that EGAS, in purporting to terminate the GSPA, was in breach of the implied term in that:

- The decision to terminate was taken for political reasons[1396];

- Prior to issuing the notice of termination, EGAS waited for almost a year during which it wrongfully declared *force majeure* with the effect that EMG was brought to its knees financially[1397];

- By the time that EGAS served its notice of termination on 18 April 2012, it owed to EMG vastly more than EMG owed to it, such that a fair-minded party mindful of the interests and expectations of its counter-party, would not have terminated the contract[1398];

- EGAS obstructed the payment of invoices by EMG by refusing to confirm to the National Bank of Egypt that it would honour the GSPA[1399]; and

- EGAS failed even to inform IEC of its intention to terminate the GSPA or of the fact that it had purported to serve notice pursuant to Art. 2.5.2 of Annex 1[1400].

---

[1395] R₃ SS M, para. 141(a).
[1396] R₃ SS M, para. 145(a).
[1397] R₃ SS M, para. 145(b).
[1398] R₃ SS M, para. 145(c).
[1399] R₃ SS M, para. 145(d).
[1400] R₃ PHB, para. 154.

### b.    EGAS' position

1179. EGAS submits[1401] that there was no implied term of good faith. It avers that the relevant test for the implication of terms was set out by Scrutton LJ in the *Reigate* case[1402] which emphasises that a term can only be implied if it is necessary in the business sense to give efficacy to the contract.

1180. EGAS points out[1403] that the concept of good faith is expressly incorporated into the GSPA, but only in limited instances. On this basis, EGAS suggests that the terms of the GSPA itself negate the implied term. So far as the instances of express incorporation are concerned, there are at least three. They concern:

- negotiations relating to Q3 quantities[1404],

- discussions with a view to agreeing upon the identity of an expert[1405]; and

- discussions with a view to agreeing upon remedies for non-delivery[1406].

1181. EGAS submits[1407] that no implied term of good faith could modify EGAS' right to rely on Art. 2.5.2 of Annex 1. In support of that argument, EGAS relies on Lord Hoffmann's opinion[1408]: in the absence of a specific implied term parties cannot appeal directly to the concept of good faith to make the contract mean something different from what it says; and in this case the GSPA clearly defines how Monthly Payments are to be calculated and the consequence of not paying them – amongst which is that the Seller is entitled to terminate, as is unambiguously stated in Art. 2.5.2. The concept of good faith does not enable one to modify this clear regime.

1182. In response to IEC's case that the termination was politically motivated, EGAS submits[1409] that motive is irrelevant. In that connection, EGAS again relies on the view expressed by Lord Hoffman[1410]: when a contract specifies a precise event which entitles a party to terminate, no court will inquire into his motives because the court places a high premium upon certainty in commercial relationships and is unwilling to inquire into the motivations for the exercise of clear contractual rights.

---

[1401] R$_{1+2}$ SS M, paras. 413 to 415
[1402] *Reigate v. Union Manufacturing (Co) Ltd [1918] 1KB 592 at 605*, ["***Reigate***"]; *cited in Socimer International Bank v. Standard Bank* [2008] EWCA Civ 116, ["*Socimer*"] submitted as Doc. R$_3$-138, para. 105
[1403] R$_{1+2}$ SS M, paras. 419-421.
[1404] Art. 5.3.2 of the GSPA.
[1405] Art. 2(a) of Annex 4 to the GSPA.
[1406] Paragraph 2 of Annex 5 to the GSPA.
[1407] R$_{1+2}$ SS M, paras. 416 to 427.
[1408] Hoffmann II, Doc. RL$_{1+2}$–100, paras. 13 and 14.
[1409] R$_{1+2}$ SS M, paras. 433 to 437.
[1410] Hoffmann I, Doc. RL$_{1+2}$–95, para. 19.

### c.    The Tribunal's decision

1183. As regards the authorities quoted by the parties, the Tribunal notes that:

-    Whilst adopting the test of necessity, Scrutton LJ went on to elucidate that test by reference to what the parties must be taken to have intended.

-    The words of Scrutton LJ in the *Reigate* case were cited with approval by Sir Thomas Bingham MR (as he then was) in the *Phillips* case[1411] and the relevant passage from the judgment in that case was cited with approval in the *Socimer* case[1412]; a similar approach was taken by Dyson LJ (as he then was) in the *Paragon* case[1413].

-    In the *Yam Seng* case[1414], Leggatt J. held that there should be no difficulty in implying a duty of good faith in any ordinary commercial contract based on the presumed intention of the parties.

1184. Reading these authorities together, the Tribunal accepts the test put forward on behalf of IEC. The Tribunal regards the touchstone as being the apparent intention of the parties. In this context, the Tribunal agrees with IEC that the background is important. The Tribunal thinks it right to express the applicable test in the form of a question: having regard to the terms of and background to the contract, does the proposed implied term express that which must have been the true intention of the parties?

1185. In considering IEC's case on good faith, the Tribunal has found the following matters particularly compelling:

-    First, the transaction which is the subject of the GSPA and the Tripartite Agreement, is effectively, one between two States, as evidenced by the terms of the MoU between the Government of the State of Israel and the Government of the Arab Republic of Egypt concluded in 2005[1415].

-    Second, the transaction involved the long term supply of very substantial quantities of gas of significant value and which was expected to satisfy a significant proportion of the energy demands of domestic consumers in Israel.

---

[1411] *Phillips Electronique Grand Public SA v. The British Sky Broadcasting Ltd* [1995] EMLR 472 (CA), ["***Phillips***"].

[1412] *Socimer* case, para. 105.

[1413] *Paragon Finance Plc v. Nash* [2002] 1 WLR 685, ["***Paragon***"].

[1414] *Yam Seng Pte Ltd v. International Trade Corp Ltd* [2013] EWHC 111, ["***Yam Seng***"], submitted as Doc. $R_3$-141, para. 131.

[1415] Doc. $R_{142}$-1(F).

- Third, the project involved significant investment on the part of EMG in constructing the Peace Pipeline; and, if properly performed on the part of EGAS, would have involved significant investment on its part also in implementing measures to protect that section of the Arab Gas Pipeline running between Damietta and El-Arish.

- Fourth, whilst IEC had a vital interest in the continued implementation of the GSPA, it was a stranger to the notice provisions set out in the termination clause at Art. 2.5.2.

1186. With those matters in mind, the Tribunal is satisfied that the parties to the GSPA and to the Tripartite Agreement must have intended that their various obligations would be performed in good faith. In the context of the termination clause at Art. 2.5.2 of Annex 1, the Tribunal takes the view that EGAS was bound by an implied obligation to act openly and in accordance with reasonable standards of commercial fair dealing. The Tribunal accepts that EGAS was not obliged to subordinate its own interests to those of EMG and IEC. However, the Tribunal does not accept that there was no modification to the provisions of Art. 2.5.2. On the contrary, the Tribunal takes the view that, in implementing that provision, EGAS was obliged to act openly, laying its cards face down on the table. On the other hand, the Tribunal accepts that EGAS' motive in implementing Art.2.5.2 was irrelevant, provided always that the machinery was operated openly and honestly.

1187. The Tribunal turns next to the various criticisms which IEC levels at EGAS' conduct in this connection:

- The first allegation is that the termination was politically motivated. As to this, the Tribunal has already expressed its conclusion that motive was irrelevant.

- The second allegation is that EGAS waited for almost a year before terminating, during which period it wrongfully declared *force majeure*. In the view of the Tribunal, the relevant delay was between 11 October 2011, when the cure period expired, and 18 April 2012, when the termination notice was issued. Accordingly, the Tribunal does not accept that EGAS waited for almost a year before terminating. The Tribunal has already held that EGAS' declarations of *force majeure* during this period were incorrect. However, the Tribunal does not accept that such wrongful declarations necessarily amounted to lack of good faith. On the contrary, on the material before the Tribunal, it seems likely that those involved on EGAS' part at the time held a genuine belief that the *force majeure* provisions of the Contract applied.

- The third allegation is that a fair minded party would not have served the notice of termination on 18 April 2012 because, by that date, EGAS owed to EMG sums far in excess of those owed by EMG to EGAS. Even if the

balance of the account in April 2012 favoured EMG, it does not, in the Tribunal's view, follow that those involved on behalf of EGAS were aware of that fact. If they were not, there can have been no breach of the obligation of good faith on this score. The Tribunal is not satisfied that those involved on behalf of EGAS at the time were aware that the balance of the account had ceased to favour EGAS. In these circumstances, the Tribunal rejects this third allegation.

-    The <u>fourth</u> allegation is that EMG obstructed payment of invoices by refusing to confirm to the National Bank of Egypt that it would honour the GSPA. The Tribunal is aware that discussions took place between the representatives of EGAS and representatives of the National Bank of Egypt and that it was during the course of those discussions that the representatives of EGAS declined to confirm that EGAS would honour its contractual obligations to deliver gas to EMG. However, there is no direct evidence of what was said. In this context, the Tribunal is conscious that there had been a further incident of terrorist damage to the pipeline in July 2011 and that, as at the end of August 2011, the repairs remained incomplete. In those circumstances, it would be understandable if EGAS had taken the position that it could not, on any view, resume supplies immediately. Accordingly, this fourth allegation is not made out.

-    The <u>fifth</u> allegation is that EGAS failed even to inform IEC of its intention to terminate the GSPA or of the fact that it had purported to serve notice pursuant to Art. 2.5.2. The Tribunal takes the view that this argument is well-founded. EGAS was required to be open in the way that it went about implementing the termination provision. IEC had a very substantial financial interest in the continued implementation of the GSPA and the Tribunal accepts that it could reasonably have been expected to consider affording financial assistance to EMG had it been put on notice of the potential termination. In the view of the Tribunal such notice should have been but was not given. The Tribunal accordingly concludes that this fifth allegation is made out. And EGAS' behaviour does nothing but reinforce the conclusion that it repudiated the GSPA.

1188. <u>In summary</u>, therefore, of the various allegations made against EGAS, in the view of the Tribunal only the fifth has been made out. To the extent that EGAS was obliged but failed to put IEC on notice of the potential termination of the GSPA, the Tribunal holds that EGAS breached its implied obligation of good faith under the Tripartite Agreement when it terminated the GSPA in the manner in which it did.

### D.   Timeliness of EGAS' termination letter

1189. Before analysing the parties' respective positions, the Tribunal will set out the relevant contractual provisions:

### a.   Relevant contractual provisions

1190. Art. 13.2 of the GSPA is in the following terms:

> "13.2 <u>Entire Agreement</u>. This Agreement is intended as the final, complete, and exclusive statement of the terms of the final agreement between the Parties with respect to the subject matter hereof and supersedes in its entirety all prior agreements, contracts and representations, written and oral, pertaining to such matters. The Parties agree that parole or extrinsic evidence may not be used to vary or contradict the terms of this Agreement. This Agreement shall not be amended or modified, and no waiver of any provision hereof shall be effective, unless set forth in a written instrument duly executed by the Parties. Each Party acknowledges that on entering into this Agreement it has not relied on any representation or undertaking, whether verbal, written or otherwise, except as are expressly incorporated in this Agreement. Without prejudice to any liability for any fraudulent misrepresentation or fraudulent misstatement, no Party shall be under any liability or shall have any remedy in respect of misrepresentation or untrue statement unless and to the extent that such misrepresentation or untrue statement is expressly incorporated in this Agreement".

1191. Arts. 2.5.1 and 2.5.2 of Annex 1 to the GSPA are in the following terms:

> "2.5.1. In the event of the occurrence of either of the following circumstances with respect to either Party (a "Defaulting Party"), the other Party (the "Non-Defaulting Party") shall be entitled to terminate this Agreement prior to the expiration of the Term by delivering written notice to the Defaulting Party of such termination no less than twenty (20) Business Days prior to the proposed date of termination: (a) material breach by the Defaulting Party of this Agreement; provided that if such breach is capable of being cured, such breach shall not create the right to terminate this Agreement unless the Defaulting Party fails to cure such breach within sixty (60) Business Days after receiving notice thereof from the Non-Defaulting Party; (b) the Defaulting Party suffers or commits an Act of Insolvency.
>
> 2.5.2. In the event that Buyer fulfils to timely pay any amounts due under this Agreement for four (4) consecutive Months, Seller shall be entitled to terminate this Agreement upon delivery of Written notice to Buyer, provided that such failure shall not create the right to terminate this Agreement unless Buyer fails to cure such failure within thirty (30) Business Days after receiving notice from Seller of the fourth (4th) consecutive occurrence of such non-payment."

### b.   IEC's position

1192. IEC contends[1416] that, even if EGAS had a right to terminate the GSPA pursuant to Art. 2.5 of Annex 1, it lost that right by reason of delay. In support of that

---

[1416] R₃ SS M, paras. 136 to 140; PHB, paras. 143 to 152.

contention, IEC relies on a passage from Treitel on Contracts[1417] and upon the observations of Lord Wilberforce in the *Mardorf Peach*[1418] case, to the effect that, in the context of a termination clause in a time charter, the owners must within a reasonable time after the default give notice of withdrawal to the charterers.

1193. IEC submits that the rule that such a termination must be implemented without undue delay has, as its rationale, the need to avoid uncertainty and ambiguity in commercial dealings.

1194. IEC contends that the period of more than six months which EGAS allowed to elapse between the expiry of the 30 day cure period in early October 2011 and the date of its termination notice sent on 18 April 2012 was, in all the circumstances, an unreasonable and undue period of delay. In that connection, IEC draws the attention of the Tribunal to the fact that the cure period allowed by Art. 2.5.2 of Annex 1 was just 30 business days and that the other periods specified in Art. 2.5 are all less than two months.

1195. IEC recognises[1419] that a series of letters were written by or on behalf of EGAS purporting to extend the cure period and stating that they were written without prejudice to EGAS' right to terminate. However, IEC submits that letters of that kind, written unilaterally, cannot by themselves have the effect of extending what would otherwise be a reasonable period within which to exercise the right to terminate.

### c. EGAS' position

1196. For its part, EGAS[1420] denies that it was obliged to exercise any right to terminate within a reasonable time. It maintains that there is no express term of the GSPA to that effect. Further, it relies upon Art. 13.2 of the GSPA as precluding either party's waiver of a contractual right to terminate.

1197. EGAS further submits[1421] that it exercised its right within a reasonable time. In support of that submission, it points to the series of five letters by which it granted EMG extensions of time for payment and reserved its position. In this context, it relies upon the opinion Lord Hoffmann[1422]: under English law a party to a contract will not lose its right to terminate by virtue of offering the other party additional opportunities to perform.

---

[1417] 12th Edn at para. 18-062, submitted as Doc. R$_3$-136.
[1418] *Mardorf Peach & Co Ltd v. Attica Sea Carriers Corporation of Liberia (The Laconia)* [1977] 2 WLR 286 at p. 294, submitted as Doc. R$_3$-137.
[1419] R$_3$ SS M, para. 139.
[1420] R$_{1+2}$ SS M, paras. 442 to 458.
[1421] R$_{1+2}$ SS M, paras. 453 to 457
[1422] Hoffmann II, Doc. RL$_{1+2}$–100, para. 15.

### d. The Tribunal's decision

1198. The Tribunal's findings of fact in relation to this part of the case may be summarised as follows:

- In support of its case on termination under Art. 2.5.2 of Annex 1, EGAS relies upon alleged non-payments in respect of the four months January to April 2011.

- On 24 August 2011 EGAS served its Notice of Failure to Make Payment pursuant to Art. 2.5.2 of Annex 1[1423]. At that point, on EGAS' case, the amount outstanding in relation to the months in question amounted in total to USD 37,392,939.26[1424].

- Following the issue by EGAS of its Notice, the cure period allowed to EMG was 30 business days, expiring on 11 October 2011.

- Thereafter, a series of five letters were sent by or on behalf of EGAS extending EMG's time for payment and reserving EGAS' rights. The letters were dated 13 and 24 October 2011[1425], 15 November 2011[1426], 18 December 2011[1427] and 31 January 2012[1428].

- From late August 2011 EMG had sought to make payment to EGAS in the sum of USD 11.9 Million. However, the National Bank of Egypt was not prepared to make the transfer on EMG's behalf in the absence of an assurance from EGAS that it would comply with its delivery obligations under the GSPA, an assurance which was not forthcoming.

- In the end, the National Bank of Egypt authorised the transfer and, accordingly, part payment was made by EMG to EGAS in January 2012 in the sum of USD 11.9 Million.

- Nevertheless, EGAS issued its Notice of Termination on 18 April 2012.

1199. It is convenient first to address the question whether IEC has made out its case on the facts that there was undue delay.

1200. In relation to IEC's submission that a party cannot unilaterally extend what would otherwise be a reasonable period for exercising such a right, the Tribunal sees the issue in a different light. It declines to hold that there is a hard and fast rule to that

---

[1423] Doc. C-10.
[1424] $R_{1+2}$ PHB, para. 182 (The Tribunal has supplied the total).
[1425] Doc. $R_{1+2}$-212 and Doc. $R_{1+2}$-215.
[1426] Doc. $R_{1+2}$-217.
[1427] Doc. $R_{1+2}$-224.
[1428] Doc. $R_{1+2}$-231.

effect. On the other hand, it takes the view that the existence of letters such as those which were written in the present case, and the circumstances in which they were written, fall to be taken into account in determining the question of fact whether or not there was undue delay.

1201. The Tribunal therefore turns to that question. Whilst ordinarily one might expect a right to terminate for non-payment in a case such as the present to be exercised promptly, the circumstances here were unusual. On the one hand, a substantial part payment was made in January 2012. On the other hand, there were protracted negotiations between the parties, during the course of which extensions of time for payment were granted. Taking these matters into account, the Tribunal is not persuaded that there was undue delay.

1202. For these reasons, the Tribunal is unable to accept IEC's alternative case that EGAS termination of the GSPA was invalidated by undue delay.

## 6.   CONCLUSION

1203. The Tribunal's conclusions are as follows:

- EGAS' purported termination of the GSPA on 18 April 2012 was unlawful and constituted a repudiation of the Tripartite Agreement; and

- IEC and EMG were entitled to accept EGAS' repudiation and to terminate the Tripartite Agreement at common law, as IEC did by its letter dated 6 February 2013.

1204. Since the Tribunal has accepted the claims for repudiation of the Tripartite Agreement, EGAS' request that it declare that these claims fail to state a cause of action and/or are unfounded, must fail.

# XII.   MERITS (III): THE DELIVERY BREACHES

1205. It is undisputed that, since the start of gas supply in July 2008, EGAS consistently delivered quantities which fell below the PNQs demanded by EMG and IEC. Negotiations ensued and led to the execution of the First Amendment and the Release of Claims, an agreement which settled all claims outstanding as of 31 May 2009. This settlement was only a temporary solution, because soon thereafter renewed shortfalls occurred: in November 2010 EGAS acknowledged that since the signature of the First Amendment, it had incurred in a 15% shortfall[1429]. These shortfalls gave rise to the application of the Shortfall Compensation regime provided for in the GSPA.

1206. After 5 February 2011, the date when the first terrorist attack on the Pipeline ocurred, there was a dramatic reduction in the scope of delivery. EGAS discontinued the supply of gas after every attack until the Pipeline had been fully repaired, and when deliveries were finally resumed, EGAS supplied gradually less gas, until it finally terminated the GSPA on 18 April 2012.

1207. EMG and IEC are now seeking a declaration that EGAS breached the Tripartite Agreement by failing to[1430]:

-   provide a continuous supply of up to 2.2 BCM of gas annually; and more specifically of 55.248 Million MMBTU in CY1 and 78.268 Million MMBTU for the following years (Art. 1) (**1.**);

-   exercise 'reasonable endeavours' to enable EMG to meet its delivery obligations to IEC (Art. 2) (**2.**).

1208. EMG is also claiming that EGAS breached its obligation to ensure that EGAS' existing and future contractual supply arrangements did not interfere with its supply obligations under the Tripartite Agreement, by committing EMG's volumes to third parties (Art. 7) (**3.**).

## 1.   SUPPLY OF THE CONTRACTUALLY AGREED QUANTITIES OF GAS

### 1.1   EMG'S POSITION

1209. EMG claims that EGAS breached its supply obligations from the outset, beginning with the Second Commissioning Period in May 2008, when EMG was to test the Pipeline and its downstream facilities in Israel[1431]. The breaches

---

[1429] Doc. C-153, slide 38.
[1430] C SS M, para. 596.
[1431] C FS M, para. 191.

continued after commercial deliveries began in June/July 2008[1432]. During CY1 deliveries were below 50% of the PNQ[1433]. After the First Amendment, when EMG and IEC accepted the price increase imposed by EGAS, the delivery rate improved, although significant shortfalls continued[1434]. The situation became untenable after the first attack on the Pipeline: between first attack and termination of the GSPA, EGAS only delivered 13.6% of the gas owed under the contract[1435].

1210. Additionally, EMG alleges that EGAS abused the Recovery Gas and Monthly Shortfall mechanism to selectively subject EMG to shortfalls during the high-demand summer months[1436].

1211. In EMG's view, this conduct breaches Art. 1 (and 3) of the Tripartite Agreement[1437], which requires EGAS to:

> "guarantee the commencement and continuation of supply of up to 2.2 BCM annually [...]
>
> [...] the quantity shall be 55.248 Million MMBTU [...] during the first Contract Year of the GPSA, and 78.268 Million MMBTU [...] in each subsequent Contract Year of the GPSA".

## 1.2 IEC's Position

1212. IEC claims that the under-supply and non-supply of gas which it has suffered has been persistent through the term of the Contracts[1438].

1213. In IEC's view it is evident that EMG's nominations submitted to EGAS under the GSPA for any given period were sufficient to satisfy the nominations IEC submitted to EMG for the same period and thus, the ultimate cause of the lack of gas supply to IEC was EGAS' failure to supply gas to EMG[1439].

1214. Except for an argument that IEC has waived its entitlement to claim damages for the pre-*force majeure* period, in IEC's view EGAS does not assert a substantive defence[1440]. EGAS' proposition is wrong, because there is nothing to suggest that IEC waived its entitlement to claim damages for breaches of contract, and in any

---

[1432] C FS M, para. 192.
[1433] C FS M, para. 193.
[1434] C FS M, para. 194.
[1435] C FS M, para. 195.
[1436] C FS M, para. 194.
[1437] C FS M, para. 199.
[1438] R₃ SS M, para. 43.
[1439] R₃ SS M, para. 48.
[1440] R₃ SS M, para. 45.

event, pursuant to Art. 12 of the Tripartite Agreement, no waiver is effective unless set forth in writing and there was no such written instrument[1441].

**1.3 EGAS' POSITION**

1215. EGAS has replied that any claims relating to delivery shortfalls predating the First Amendment, i.e. 31 May 2009, were settled[1442]. EGAS argues that any claim under the Tripartite Agreement requires first a finding that EGAS breached its obligations to EMG under the GSPA; the fact that there can be no liability under the GSPA before 31 May 2009 precludes any claims by IEC under the Tripartite Agreement prior to that date[1443].

1216. EGAS denies the specific accusation that the Recovery and Shortfall Gas mechanisms were subject to abuse and argues that it always complied with the contractual provisions; and more precisely:

- It is during the hot summer months when electricity consumption is at its peak and EGAS is more likely to encounter excessive demand for gas and to be unable to deliver to EMG the full requested quantities – a fact which is beyond EGAS' control and in any event, EMG was compensated for such alleged shortfalls[1444];

- The delivery of Recovery Gas during summer months is expressly excluded in Art. 5.4(C)(ii)(B) of the GSPA[1445].

1217. With respect to IEC, EGAS contends that, by not filing any claims against EGAS under the Tripartite Agreement until 23 January 2012, IEC was indicating its intention to abandon any right to bring claims. With the result that IEC is now estopped from claiming damages with respect to those breaches[1446].

**1.4 THE TRIBUNAL'S DECISION**

1218. It is undisputed that, from the outset, in July 2008, EGAS did not fulfill its supply obligations under Art. 1 of the Tripartite Agreement, and that during CY1 deliveries were significantly below the PNQ. After the First Amendment, the delivery rate improved, although shortfalls continued. In CY3 when the attacks on the Pipeline started, deliveries dropped abruptly. Thus, the existence of delivery failures, until the last nomination on 12 May 2012, is not controversial. The only issue subject to debate is the precise amount of the delivery failure and the proper

---

[1441] R₃ SS M, para. 45.
[1442] R₁₊₂ FS M, paras. 342 *et seq*; R₁₊₂ SS M, para. 884.
[1443] R₁₊₂ SS M, para. 885.
[1444] R₁₊₂ FS M, para. 402.
[1445] R₁₊₂ FS M, para. 404.
[1446] R₁₊₂ FS M, para. 196.

redress – two questions which the Tribunal will not analyse in this section, but rather in the quantum sections XIV.2 and XIV.3 *infra*.

1219. The issues to be decided in this section are three minor points: whether EMG and IEC have lost their right to claim with respect to failures pre-dating the Release of Claims (**A.**); whether IEC is estopped from claiming pre-*force majeure* delivery failures (**B.**), and whether EGAS has abused the Recovery and Shortfall Gas mechanism during the summer period (**C.**).

## A.   Release of Claims

### a.   With respect to EMG

1220. EMG claims that EGAS breached the Tripartite Agreement by delaying the commencement of commercial deliveries[1447], by demanding a price increase[1448], and by only permitting extremely low volumes of deliveries during CY1[1449]. EGAS argues, and the Tribunal agrees, that these alleged breaches pertain to CY1 and all claims relating to such period were settled between EGAS and EMG in the Release of Claims signed on 31 May 2009[1450]. Consequently the Tribunal dismisses EMG's claim for breach of the Tripartite Agreement from July 2008 through 31 May 2009 based on these specific issues.

### b.   With respect to IEC

1221. The above conclusion does not, however, apply to IEC.

1222. EGAS is trying to use the settlement it reached with EMG as a defence against IEC's claim, on the basis of an admissibility issue: that the admissibility of IEC's claims against EGAS requires that the Tribunal establish first that EGAS has breached the GSPA. Since this alleged breach is now impossible to determine because of the settlement, EGAS submits that IEC's claim cannot succeed[1451].

1223. The argument is a *non sequitur*: the question is not whether claims under the Tripartite Agreement, in order to be admissible, require that a GSPA tribunal previously renders a decision; the issue is different: what is the impact on a claim under the Tripartite Agreement, submitted by IEC, when the corresponding GSPA claim has been extinguished by a settlement between EMG and EGAS, not consented to by IEC.

1224. The answer to this question is not in doubt: the settlement reached is *res inter alios acta*, an agreement between EMG and EGAS, to which IEC is not privy and

---

[1447] C FS M, para. 191.
[1448] C FS M, para. 192.
[1449] C FS M, para. 193.
[1450] See para. 1205 *supra*.
[1451] R$_{1+2}$ SS M, para. 884.

323 of 469

to which it has not consented. This agreement cannot jeopardise IEC's legal standing and rights under the Tripartite Agreement. *Reductio ad absurdum*: if EMG and EGAS decided to unilaterally settle all claims for non-delivery, the Tripartite Agreement would be rendered meaningless.

## B. Estoppel

1225. It appears that EGAS also seeks to rely upon an argument of estoppel by representation against IEC. In order to succeed on such a plea, EGAS would have to establish not only a representation, to the effect that IEC would advance no claims against it for the relevant period, but also:

- <u>Reliance</u>: proof that, as a matter of fact, EGAS relied upon such a representation or representations; and

- <u>Inequity</u>: that it would be inequitable to allow IEC to resile from its representation.

1226. Although EGAS mentioned the argument in its First Submission[1452], the point was neither developed nor repeated in subsequent submissions, and no evidence has been marshalled in support of the case advanced. In particular, reliance and inequity have not been established. In conclusion, the Tribunal dismisses EGAS' defence based on estoppel by representation on the footing that the requisite facts have not been established.

## C. Abuse argument

1227. EMG avers that EGAS abused the Recovery Gas and Delivery Shortfall mechanisms during the high demand summer months; EMG seems to indicate that this abuse would be tantamount to a delivery failure.

1228. The Tribunal does not agree and sides with EGAS: both Recovery Gas and Delivery Shortfalls are subject to very detailed contractual regimes[1453]; for Recovery Gas, the parties to the GSPA agreed that EGAS had no obligation to deliver such gas during the summer months[1454], while for Delivery Shortfalls, no discrimination between seasons was agreed. EMG has failed to properly establish how EGAS abused the contractual arrangements.

---

[1452] R$_{1+2}$ FS M, para. 5.
[1453] Art. 5.4 of the GSPA and Art. 6 of Annex 1 to the GSPA.
[1454] Art. 5.4.(c).(B) of the GSPA.

## 2. REASONABLE ENDEAVOURS TO ENABLE EMG TO DELIVER

### 2.1 EMG AND IEC'S POSITION

1229. Art. 2 of the Tripartite Agreement provides as follows:

> "[...] EGAS and EGPC shall exercise reasonable endeavors to enable EMG [...] to make available for delivery an uninterrupted supply of Natural Gas to IEC at the Quality Specifications set forth in Annex 1".

1230. EMG argues that EGAS breached this provision by failing to take additional reasonable steps to ensure that EMG could deliver gas volumes to IEC at the specified quantity and quality[1455]. EMG claims that after the first alleged *force majeure* event EGAS only delivered 13.6% of the gas owed, as a consequence of EGAS' failure to increase production or seek alternative sources of supply and to protect and repair the Pipeline[1456].

1231. IEC adheres to this claim[1457].

### 2.2 EGAS' POSITION

1232. EGAS replies that there is no contractual obligation in the GSPA nor in the Tripartite Agreement to increase gas production, to seek alternative sources of gas supply or to repair the Pipeline[1458] and that this pleading is devoid of any explanation of how Art. 2 of the Tripartite Agreement was allegedly breached[1459].

### 2.3 THE TRIBUNAL'S DECISION

1233. The Tribunal partially agrees with EGAS and partially with EMG/IEC.

1234. EMG's first argument is that EGAS' obligation to exercise reasonable endeavours required it to increase its gas production. EMG has simply alleged[1460], but failed to prove, that EGAS, exercising reasonable endeavours could have significantly increased its production. The Tribunal notes that production is naturally limited by the size of the available gas fields. EMG failed to demonstrate how this obstacle could have been overcome.

1235. The second argument submitted by EMG is that EGAS' reasonable endeavours commitment requires it to tap alternative sources of supply.

---

[1455] C FS M, para. 190.
[1456] C FS M, para. 198.
[1457] R₃ FS M, para. 82.
[1458] R₁₊₂ FS M, para. 110.
[1459] R₁₊₂ FS M, para. 119.
[1460] C FS M, para. 198.

1236. The Tribunal disagrees. The understanding underlying the GSPA was that EGAS would only supply gas extracted from its own gas fields[1461]. EGAS had no obligations to acquire gas from third parties. And in any case EMG has failed to prove that there were indeed third parties ready to supply gas to EGAS, and that the technical means to take delivery of such gas and to redirect it to EMG were readily available.

1237. The third argument is EGAS' alleged failure to protect the Pipeline.

1238. The Tribunal has already established that EGAS failed to act as a RPPO in preventing and mitigating the effects of the 13 attacks against the Pipeline[1462]. EGAS' failures as a RPPO also imply a failure to properly protect and repair the Pipeline. EGAS' obligation to use its reasonable endeavours to make available an uninterrupted supply of gas (provided for in Art. 2 of the Tripartite Agreement) includes the commitment to apply the standards of diligence and duty of a RPPO – something which EGAS has failed to achieve.

## 3. NOT COMMITTING EMG'S VOLUMES

### 3.1 EMG'S POSITION

1239. During CY1 EGAS repeatedly confessed to mismanaging their gas portfolio. It was expressly acknowledged that EGAS had entered into arrangements with third parties that reduced the volume of gas that EMG would receive[1463].

1240. EMG submits that EGAS continued to contract with more 'palatable' third party customers even as they sought to reduce its delivery obligations to EMG on grounds of production shortages:

- In April 2008, EGAS committed to supply Jordan with an additional 1 BCM[1464];

- In May 2008 Syria obtained an added 0.9 BCM[1465];

- In May 2009 EGAS undertook to supply Lebanon with 0.6 BCM[1466];

- In 2008 demand in the Egyptian local market increased and EGAS saw fit to undertake to supply industrial customers in the Egyptian market[1467].

---

[1461] Whereas clause II of the GSPA.
[1462] See para. 1013 *supra*
[1463] C FS M, para. 202.
[1464] C FS M, para. 203.
[1465] C FS M, para. 203.
[1466] C FS M, para. 203.
[1467] C FS M, para. 203.

1241. In EMG's view this conduct is in breach of the representation and warranty given by EGAS in Art. 7 of the Tripartite Agreement:

> "Each Party to this Tripartite Agreement hereby declares that neither its execution of this Tripartite Agreement, nor the exercise of its rights nor the performance of its obligations hereunder violate: (i) any agreement, charge or other instrument or document to which such Party is a party and which is binding upon it or any of its respective assets; (ii) its documents of incorporation or constitutive documents; or (iii) any applicable law, regulation or judicial order".

## 3.2  EGAS' POSITION

1242. EGAS notes that EMG has advanced claims that EGAS overextended its delivery commitments during 2008 and before the signature of the First Amendment in 2009[1468], despite the Release of Claims signed on 31 May 2009 that accompanied the First Amendment[1469].

## 3.3  THE TRIBUNAL'S DECISION

1243. The Tribunal, again, sides with EGAS: all additional commitments which allegedly overlapped with EMG's gas entitlement were entered into before the Release of Claims. Thus, this issue is settled between EGAS and EMG (and no equivalent claim is being made by IEC).

## 4.  CONCLUSION

1244. In conclusion, the Tribunal makes the following decisions with regard to the Tripartite Delivery Breaches:

-       EMG's claims under Art. 1 of the Tripartite Agreement with regard to delivery failures before the date of the First Amendment and the Release of Claims (1 July 2008 – 31 May 2009) have been settled as between EGAS and EMG and thus must be deemed released; the precise amount of and proper redress for EGAS' delivery failures to EMG after the First Amendment (1 June 2009 – 12 May 2012) will be established in the quantum section of this Award[1470].

-       The settlement and release, however, does not extend to IEC, whose claims under Art. 1 of the Tripartite Agreement for delivery failure since the commencement of supply (1 July 2008 – 12 May 2012) remain unaffected and will be quantified in the quantum section of this Award[1471].

-       EGAS' estoppel defence, and EMG's abuse claim are dismissed.

---

[1468] R$_{1+2}$ FS M, para. 342.
[1469] R$_{1+2}$ FS M, para. 343.
[1470] See paras. 1253 *et seq. infra.*
[1471] See paras. 1443 *et seq. infra.*

- EMG's and IEC's claim that EGAS failed to exercise reasonable endeavours to enable EMG to make available for delivery an uninterrupted supply of gas to IEC (provided for in Art. 2 of the Tripartite Agreement) is dismissed, except with regard to EGAS' failure to protect the Pipeline, which forms part of EGAS' general duties as a RPPO[1472]; since this failure ultimately caused gas delivery shortfalls, the precise compensation due will be established in the quantum section of this Award as part of the indemnification for the Tripartite Delivery Breaches[1473].

- EMG's claim that EGAS' conduct was in violation of the representations and warranties contained in Art. 7 of the Tripartite Agreement have been settled in the First Amendment and must be deemed released under the Release of Claims.

1245. To the extent that the Tribunal accepts the Tripartite Delivery Breaches, it dismisses EGAS' request that it declares that the Tripartite Agreement Claims fail to state a cause of action and/or are unfounded.

---

[1472] See paras. 1233 *et seq. supra.*
[1473] See paras. 1427 and 1675 *infra.*

# XIII. QUANTUM (I): INTRODUCTION

1246. EMG seeks an award for full compensation under English law in an amount of over USD 2 Billion as compensation for EGAS' breaches[1474]. IEC's request for compensation is for almost USD 4 Billion.

1247. The parties submitted extensive expert evidence to support their cases:

- EMG has produced two expert reports prepared by FTI Consulting: **FTI I**, dated 7 February 2013 and **FTI II** of 20 September 2013;

- IEC has retained the services of Nera Economic Consulting ["**Nera**"] for the quantification of its claim. Nera prepared three reports: **Nera I** on 7 February 2013, **Nera II** on 19 September 2013 and **Nera III** on 25 March 2014, a post-hearing report in response to issues raised by the Tribunal;

- EGAS' experts were Mr. John Wood Collins and Mr. Timothy Giles [jointly, "**JWC**"], who produced eight counter-reports: **JWC I** dated 6 June 2013[1475]; **JWC II**[1476] and **JWC III**[1477] dated 17 July 2013; **JWC IV**[1478] and **JWC V**[1479] dated 9 December 2014, **JWC VI**[1480] dated 24 March 2014, **JWC VII**[1481] dated 8 May 2014, and **JWC VIII**[1482] dated 18 May 2015.

- EMG's and EGAS' experts also submitted a joint expert report on EMG's damages dated 28 February 2014 ["**FTI/JWC**"], pursuant to the Tribunals instructions after the First Hearing[1483].

1248. The experts' reports cover 1000 pages, 150 exhibits and 10 excel workbooks with more than 300 spreadsheets. Additionally counsel have devoted more than 400 pages to legal arguments related to quantum issues.

1249. The Tribunal's task requires that it summarise EMG's and IEC's claim and EGAS' defences in a comprehensible fashion, and then to make a decision. For the sake of intelligibility, an exhaustive exposition must be dispensed with: only the most relevant arguments will be referred to in the Award, and whenever the Tribunal has accepted a principal argument, any alternative argument will be not

---

[1474] Including GSPA Claims.
[1475] Doc. R$_{1+2}$-318.
[1476] Doc. R$_{1+2}$-365.
[1477] Doc. R$_{1+2}$-366.
[1478] Doc. R$_{1+2}$-369.
[1479] Doc. R$_{1+2}$-370.
[1480] Doc. R$_{1+2}$-668.
[1481] Doc. R$_{1+2}$-671.
[1482] Doc. R$_{1+2}$-685.
[1483] PO 14, pp. 8-10.

be addressed; but the Tribunal has carefully studied and taken into consideration all submissions, expert reports, excel sheets, documents, transcripts of the examination of experts and presentations.

1250. The Tribunal notes that, under Art. 13.3 of the GSPA, EGPC and EGAS are jointly and severally liable[1484].

---

[1484] Art. 13.3: "EGAS and EGPC are and shall remain jointly and severally liable under this Agreement".

# XIV. QUANTUM (II): EMG'S COMPENSATION

1251. The two breaches committed by EGAS give rise to two separate claims for full compensation under English law in favour of EMG:

-   For the Tripartite Delivery Breaches, EMG is claiming the profit it would have generated, between the First Amendment and the termination of the Tripartite Agreement, had EGAS delivered the agreed quantities of gas and had EMG resold that gas to its down-stream customers;

-   For the Repudiatory Breach, the compensation demanded amounts to the lost profit which EMG would have made after termination of the Tripartite Agreement, assuming that EGAS had delivered the agreed quantities of gas, and that EMG had supplied this gas to its down-stream customers.

1252. Additionally, EMG requests that the Tribunal settle the account (the so called "**Balance of Payments**") between EMG and EGAS as of the date of termination of the GSPA, and award an indemnity for the supply of certain amounts of off-specification gas. The Tribunal will decide on these two issues first.

## 1.   PRELIMINARY ISSUES

1253. The Tribunal has decided to analyse EMG's claims for balance of payments and off-specification gas as a preliminary issue, because the Tribunal will decide that, as a consequence of the limited scope of its jurisdiction, these two claims fall outside its remit.

### 1.1   CLAIM FOR BALANCE OF PAYMENTS

1254. FTI puts forward as an item of compensation the Balance of Payments deriving from the execution of the GSPA between July 2008 through May 2012. FTI has calculated this Balance of Payments as[1485]:

-   Payments due to EGAS in respect of the quantities of gas delivered to all existing on-sale customers, not just IEC[1486];
-   Reduction for Daily Shortfalls due to EMG;
-   Reduction for Monthly Shortfalls due to EMG;
-   Shortfall Compensation refunded to EGAS for subsequent gas redelivery;
-   Reduction for IEC Hourly Shortfall Compensation;
-   Costs incurred in relation to Off-Specification Gas;

---

[1485] FTI I, p. 16 and Appendix 6, Balance of Payments Summaries.
[1486] FTI I, p. 51.

- Reduction resulting from amounts retained by EMG (Provisional Credit, Additional Provisional Credit and Downstream Guarantee[1487]).

1255. FTI is basically proposing that the Tribunal determine the net amounts owed between EGAS and EMG since the start of delivery and until final termination of the GSPA, setting off the purchase price of the gas, owed by EMG, against the Shortfall Compensation (and other amounts) owed by EGAS. EMG submits that the net amount results in EMG's favour, and requests the Tribunal to order EGAS to pay such amount.

1256. The Tribunal has already concluded that[1488]

- It only has jurisdiction under Art. 9 of the Tripartite Agreement, and that such jurisdiction only extends to disputes arising from the Tripartite Agreement, but not to disputes arising from the GSPA, the GSPA having its own dispute resolution mechanism;

- EMG enjoys freestanding enforceable rights under Art. 1 of the Tripartite Agreement;

- Art. 1 of the Tripartite Agreement reiterates EGAS' obligation to deliver gas to EMG under the GSPA as a repeat obligation, restricted to the duty to supply up to 2.2. BCM annually;

- The repeat obligation shows a trilateral character: the gas is supplied under the GSPA, in order to enable EMG to comply with its own delivery obligations vis-à-vis IEC under the On-Sale Agreement;

- Bilateral obligations, assumed in the GSPA between EGAS and EMG, and which have no impact on the re-delivery of gas to IEC under the On-Sale Agreement, are excluded from the scope of Art. 1 of the Tripartite Agreement.

1257. The purpose of the Balance of Payment is to establish the net amounts due between EGAS and EMG, as a consequence of the delivery of the total amounts of gas agreed upon the GSPA with respect to all existing on-sale customers (i.e. Q1 and Q2 and eventually additional quantities up to 7 BCM annually), while the repeat obligation contained in Art. 1 of the Tripartite Agreement (which defines the scope of the Tribunal's jurisdiction) relates to EGAS' commitment to deliver gas to EMG for redelivery to IEC, up to Q1 ("EGAS and EGPC hereby guarantee the commencement and continuation of supply of up to 2.2 BCM annually of

---

[1487] FTI I, pp. 61 and 62 acknowledges that the USD 18 Million bank guarantee and the USD 6 Million retained when the EMG repaid the Additional Provisional Credit in February 2010 would ultimately have to be repaid by EMG, but does not include these amounts in the calculations of the Balance of Payments. The Tribunal sees no apparent reasons why these amounts should be excluded.

[1488] See paras. 371 and 399 *supra*.

Natural Gas to IEC [...]"). Furthermore, EMG has failed to establish that the setting-off of the Balance of Payments under the GSPA is a trilateral question, which involves IEC. To the contrary: calculating the amounts due under the GSPA appears to be a bilateral issue between EGAS and EMG, regulated in the GSPA, and to be adjudicated through the dispute resolution mechanism established in the GSPA.

1258. In short, the Tribunal lacks jurisdiction to adjudicate a claim for the Balance of Payments allegedly owed by EGAS to EMG under the GSPA for supply of gas to all existing on-sale customers (and not only to IEC). The proper calculation of the Annual Reconciliation Amounts due under Art. 9.4.3 of Annex 1 is a bilateral question between EGAS and EMG which should be solved in accordance with the dispute resolution provisions of the GSPA.

## 1.2    CLAIM FOR OFF-SPECIFICATION GAS

1259. EMG claims that during 21 days EGAS' gas failed to meet quality specifications and that this is a breach of Arts. 1 and 2 of the Tripartite Agreement[1489]:

> "Art. 1 EGAS [...] hereby guarantee the [...] supply of Natural Gas [...] at the quality and specifications specified in Annex 1 attached hereto [...]".

> "Art. 2 [...] EGAS [...] shall exercise reasonable endeavours to enable EMG [...] to make available for delivery [...] Natural Gas [...] at the Quality Specifications set forth in Annex 1".

1260. EMG requests to be indemnified in an amount of USD 975,000 for said breach[1490]. As evidence for the amount claimed EMG has produced a letter dated 14 June 2010[1491] addressed to EGAS, which was drafted by EMG for the purposes of performing the Annual Reconciliation. In this letter EMG claims USD 975,000 as costs associated with the delivery of off-specification gas[1492].

1261. The Tribunal notes that its jurisdiction under Art. 9 of the Tripartite Agreement is subject to one additional limitation: pursuant to Art. 14.10 of Annex 1 to the GSPA, notwithstanding the Tribunal's jurisdiction under the Tripartite Agreement, if a dispute arises between EMG and EGAS, to which IEC is not a party, such dispute shall be resolved through an arbitration under the GSPA.

1262. In this case, IEC has not submitted a claim against EGAS (or EMG) for the supply of off-specification case – the dispute is, thus, between EMG and EGAS and so, even though it is a valid claim under the Tripartite Agreement, pursuant to

---

[1489] C FS M, para. 207.
[1490] C FS M, para. 208 and FTI I, p. 62.
[1491] Doc. C-142.
[1492] Doc. C-142, p. 3.

Art. 14.10 of Annex 1 to the GSPA, it falls outside the jurisdiction of this Arbitral Tribunal.

\* \* \*

1263. Now that the Tribunal has resolved the preliminary issues, it will turn to the core of EMG's damages claim.

1264. The Tribunal will first address EGAS' legal defences (**2.**). Then it will decide EMG's claim for compensation for the Tripartite Delivery Breaches (**3.**), followed by a decision on the claim for compensation for the Tripartite Repudiatory Breach (**4.**). The Tribunal will then make a clarification (**5.**) and a summary of its conclusions (**6.**); and finally, the Tribunal shall decide on EMG's reliefs relating to taxes (**7.**).

## 2. LEGAL ARGUMENTS

1265. EGAS has advanced three arguments that impact on EMG's claim for damages: according to EGAS the parties agreed in the GSPA that Shortfall Compensation should be a closed regime for delivery failures (**1266.**); they further agreed by contract that loss of profit should be excluded (**2.2.**); and that any liability should be subject to a cap (**2.3.**).

1266. The above defences relied on by EGAS arise out of the GSPA. The Tribunal has already determined[1493] that the supply obligation provided for by Art. 1 of the Tripartite Agreement is fully developed in the GSPA (and in the On-Sale Agreement). Although the Tribunal lacks jurisdiction under the GSPA, it is uncontested that the Parties have empowered the Tribunal to interpret and apply the GSPA in deciding on limitations of EGAS' liability for breaches of the Tripartite Agreement. This is acknowledged by EMG, who does not contest the application of the exclusion clauses set forth in the GSPA on grounds of limited jurisdiction, but on the merits.

## 2.1 SHORTFALL COMPENSATION AS A CLOSED REGIME

1267. The GSPA provides in Arts. 6.8 and 6.9 of Annex 1 to the GSPA that shortfall gas gives rise to Daily and Monthly Shortfall Compensation.

1268. The relevant provisions on shortfall compensation read as follows:

> "6.8.1 To the extent that Seller fails to deliver during any Day during the Supply Period the aggregate of the Properly Nominated Quantities for such Day (other than in circumstances which Seller is excused pursuant to this Agreement) ("**Daily Delivery Failure**"), the quantity of Gas attributable to the Daily Delivery Failure

---

[1493] See paras. 443 *et seq.*, 481, 595 and 596, 945 and 1130 *supra*.

that is greater than an amount equal to two percent (2%) of the aggregate Properly Nominated Quantity for that Day shall be classified as "**Daily Shortfall Gas**".

"6.8.3 In respect of any Daily Shortfall Gas in a Delivery Month, the Monthly Payment [...] for such Contract Year shall be reduced by an amount (the "**Daily Shortfall Compensation**") equal to the sum of:

(a) with respect to each On-Sale Agreement in force during such Delivery Month, ten percent (10%) of the product of (i) the amount of the Daily Shortfall Gas attributable to such On-Sale Agreement for each Day during which there was a Daily Delivery Failure during such Month, multiplied by (ii) the then applicable Contract Price with respect to such On-Sale Agreement [...]"

"6.9.1 To the extent that Seller fails to deliver during any Month during the Supply Period the Properly Nominated Quantities on a Day-by-Day basis for such Month [...] ("**Monthly Delivery Failure**") the aggregate quantity of Gas that Seller fails to deliver on a Day-by-Day basis during such Delivery Month shall be classified as "**Monthly Shortfall Gas**" [...]".

"6.9.3 To the extent that the Monthly Delivery Failure in any Delivery Month attributable to the Initial On-Sale Agreement is greater than seven percent (7%) of the aggregate Properly Nominated Quantities for such Delivery Month for the Initial On-Sale Agreement, in addition to any Daily Shortfall Compensation payable pursuant to Section 6.8.3 of Annex 1 with respect to such quantities of Q1 and in addition to the re-delivery obligations of Seller set forth in Section 6.9.5, Buyer shall be entitled to receive an amount (the "**Monthly Shortfall Compensation**") equal to the product of (a) ten percent (10%), multiplied by (b) the amount of the Monthly Shortfall Gas attributable to the Initial On-Sale Agreement during such Delivery Month, multiplied by (c) the then applicable Contract Price with respect to the Initial On-Sale Agreement [...]".

"6.9.4 Buyer shall deduct any Monthly Shortfall Compensation payable by Seller pursuant to Section 6.9.3 of Annex 1 from the Monthly Payment [...] for such Delivery Month".

"6.9.5 To the extent that there is a Monthly Delivery Failure in respect of any Delivery Month, Seller shall be obligated to deliver such Monthly Shortfall Gas in accordance with the following procedures:

(a) Within thirty (30) days following the Delivery Month in which the Monthly Delivery Failure occurred, the Parties, acting in good faith, will agree on the delivery schedule of such Monthly Shortfall Gas; such delivery schedule shall provide for the delivery of all such Monthly Shortfall Gas within a period of 180 days following the last day of the Delivery Month during which the Monthly Delivery Failure occurred.

(b) The delivery of such Monthly Shortfall Gas shall be in addition to the other delivery obligations of Seller pursuant to this Agreement. Buyer shall pay no additional amounts for such Gas other than the applicable Contract Price for such Gas in effect during the Delivery Month in which the Monthly Delivery Failure occurred.

(c) To the extent that Seller makes available quantities of Monthly Shortfall Gas in accordance with the provisions of this Section 6.9.5, any Daily Shortfall Compensation previously deducted by Buyer pursuant to Section 6.8.3(a) of Annex

> 1, and any Monthly Shortfall Gas shall be paid by Buyer to Seller, such payment to
> be made within thirty (30) days following the end of the Month during which
> deliveries of Monthly Shortfall Gas occurred".

1269. There is an additional material provision:

> "3.2 Liability under On-Sale Agreements. Seller shall indemnify, hold harmless and
> promptly reimburse Buyer for direct costs, expenses or penalties incurred by Buyer
> [...] under any On-Sale Agreement [...], provided however that Buyer shall
> demonstrate and give proof that such fault is attributable to Seller and Buyer shall
> demonstrate proof of incurred costs, expenses and penalties".

## A.   EGAS' position

1270. EGAS argues that the Shortfall Compensation under clauses 6.8 and 6.9 of
Annex 1 is the only compensation due in all cases of delivery failure, because in
all delivery breaches the harm caused to EMG will be analogous. This implies that
Shortfall Compensation is the appropriate and only compensation due for all
Tripartite Delivery Breaches, the specific breach of the GSPA which caused the
delivery failure being irrelevant for the establishment of the compensation[1494].

1271. The Shortfall Compensation regime operates as liquidated damages[1495], and any
party claiming compensation is prevented from obtaining more than the
'liquidated' measure of Shortfall Compensation that the parties agreed for
delivery shortfalls[1496]. By liquidating the sum recoverable, the parties avoid the
complexities and vagaries of quantifying the precise damage caused and the
compensation due[1497] giving the parties commercial certainty[1498].

1272. Therefore, EMG cannot now claim past lost profits as compensation for the
Delivery Breaches, to the extent that such lost profits exceed the Shortfall
Compensation set out in the GSPA[1499]. Otherwise, EMG would be retrospectively
emptying the Shortfall Compensation regime of all utility[1500].

## B.   EMG's position

1273. EMG accepts that the Shortfall Compensation regime afforded the parties
certainty as to the amounts owed for any shortfalls in EGAS' supply of
contractual quantities of gas[1501], but makes three additional points:

---

[1494] R$_{1+2}$ SS M, para. 661.
[1495] R$_{1+2}$ SS M, paras. 657 et seq.
[1496] R$_{1+2}$ SS M, para. 665.
[1497] R$_{1+2}$ SS M, para. 676.
[1498] R1+2 SS M, para. 660.
[1499] R$_{1+2}$ SS M, para. 677.
[1500] R$_{1+2}$ SS M, para. 676.
[1501] C SS M, para. 111; R$_{1+2}$ SS M, para. 659.

- Delivery failures under Art. 6 of Annex 1 to the GSPA were expressly compensated under the Shortfall Compensation regime of that article, but the parties did not include any such provision for breach of the conditions set forth in Art. 15 of Annex 1 to the GSPA[1502];

- The Shortfall Compensation regime is premised on the existence of a continuing contractual relationship[1503], but in this case EGAS' failures reached such a massive scale so as to constitute a repudiation of the GSPA[1504]; and once the relationship is terminated, there are no contractual limits on EMG's ability to bring claims for past lost profits[1505];

- In any event, the shortfall penalty regime is not the exclusive remedy for delivery failures: for instance, EMG is entitled to be reimbursed for amounts due under on-sale agreements, if EMG's fault vis-à-vis its down-stream customer is attributable to EGAS under clause 3.2 of Annex 1 to the GSPA[1506].

## C.   The Tribunal's decision

1274. The Tribunal must decide whether the Shortfall Compensation is the only indemnification to which EMG is entitled for gas delivery failures, as EGAS proposes and EMG rejects. In the Tribunal's opinion both parties are partially right.

1275. The Tribunal will first recall how compensation for delivery shortfalls is dealt with in the GSPA (**a.**) and then decide whether the Tribunal construes these provisions as the only available remedy for delivery failures (**b.**).

### a.   Compensation for delivery shortfalls

1276. As the Tribunal has already determined[1507], the Shortfall Compensation regime of the GSPA, in summary, provides for three remedies:

- Redelivery: EMG is entitled to obtain delivery within six months of the shortfall gas, in accordance with an agreed schedule, against payment of the agreed ordinary price;

- Monetary Compensation: meanwhile, EMG receives monetary compensation, because EMG can deduct from the Monthly Payments owed to EGAS an amount equal to approximately 20% of the price of the

---

[1502] C SS M, para. 429.
[1503] C SS M, para. 431.
[1504] C SS M, para. 431.
[1505] C SS M, para. 432.
[1506] C PHB, fn 251.
[1507] See para. 1056 *supra*.

undelivered gas; but this amount has to be refunded if EGAS redelivers the gas; only if EGAS fails to do so, is EMG allowed to withhold the compensation;

- Pass Through Penalty: EMG is entitled to recover from EGAS any shortfall compensation EMG is obliged to pay to its down-stream customers under the applicable On-Sale Agreements.

### b. The Tribunal's interpretation

1277. It is a frequent occurrence in long-term gas supply agreements that the buyer nominates a certain quantity of gas, but that the seller, who only has a limited quantity of gas at its disposal, is unable to meet the full demand. For this reason, long-term gas supply agreements usually include an objective and pre-established system in order to compensate the buyer for the failure to receive the amount of gas which it has properly nominated and to which it is contractually entitled.

1278. The GSPA is no exception: the parties agreed on the Shortfall Compensation regime, which permits EMG to obtain re-delivery of the non-delivered gas within six months, to receive a moderate financial compensation for the delay between failed delivery and redelivery and to be kept indemnified with regard to any penalty levied by its on-sale customers

1279. The question is whether the Shortfall Compensation regime excludes the recovery of further damage, to which EMG may be entitled under applicable law, such as lost profit in excess of the Shortfall Compensation.

1280. Both parties agree that one of the principal objectives of the GSPA is to achieve commercial certainty[1508]; and it is undisputed that in a long-term supply contract, non-delivery of nominated quantities is a frequent occurrence. It can be assumed with reasonable conviction that for this foreseeable eventuality the parties decided to create a fixed, swift and objective procedure to calculate the compensation owed to EMG: the Shortfall Compensation regime.

1281. The Tribunal agrees with EGAS that it is hardly imaginable that the Parties had intended that for each delivery shortfall EMG would be entitled to receive the Shortfall Compensation, and that additionally it could bring a claim for loss of profit, which requires complex and expensive quantification[1509]. The intention of the Parties, when they created the Shortfall Compensation regime, must have been that this procedure excludes the recovery of further damage, to which EMG may be entitled to under applicable law. This conclusion is confirmed by EMG's behaviour during the life of the GSPA: the frequent failures of delivery by EGAS

---

[1508] R[142] SS M, para. 660; C SS M, para. 111.
[1509] R[142] SS M, para. 676.

were met by EMG with Shortfall Compensation requests, but not with requests for additional lost profits.

1282. The Tribunal is persuaded that the Shortfall Compensation regime represents a complete code of remedies in cases of delivery breach. EGAS' liability is thus limited to:

- Redelivering the shortfall gas within six months;

- Crediting a (refundable) monetary compensation to EMG; and

- Keeping EMG harmless against downstream penalties (Arts. 6.8.3, 6.9.3. and 6.9.5).

1283. The Parties do not question that EGAS complied with the Shortfall Compensation regime until the end of January 2011 – the discussion centres on what happened thereafter.

Real Debate

1284. The real debate is, thus, not whether in normal circumstances the Shortfall Compensation was intended to act as an exclusive system of compensation: the real debate is whether EMG still had another available remedy after 1 February 2011, when the attacks against the Pipeline commenced and EGAS ceased complying with the Shortfall Compensation regime, because it could hardly deliver PNQs, let alone Redelivery Gas.

1285. The Tribunal is convinced that for the period between 1 February 2011 and 30 April 2012[1510] (the date of repudiation of the Tripartite Agreement[1511]), EMG's sole remedy was the Shortfall Compensation. The Tribunal is satisfied that Art. 6.9.5 confers on EMG a remedy in the nature of liquidated damages, which excludes any compensation exceeding the amount of those liquidated damages. After termination, however, the Shortfall Compensation regime ceases to be applicable. The core of the regime is the redelivery of shortfall gas. Once the Tripartite Agreement had been repudiated, all deliveries of gas stopped. Without redelivery of gas the Shortfall Compensation regime became moot and could no longer be applied.

---

[1510] The Tribunal has determined that Tripartite Delivery Breaches occurred until 12 May 2012. The Tribunal will, however, disregard the period after the repudiation date for the purposes of assessing damages because any damage caused will already be indemnified by the compensation for Tripartite Repudiatory Breach.

[1511] The repudiation of the Tripartite Agreement occurred on 18 April 2012, but for convenience, the Tribunal will approach the assessment of damages on the basis that it ocurred at the end of the month.

1286. In conclusion, the Tribunal accepts EGAS' submission to the effect that Claimant cannot obtain a compensation for Tripartite Delivery Breaches, which exceeds the amount due for Shortfall Compensation:

- For the period before 1 February 2011 there is no discussion that EGAS complied with the Shortfall Compensation regime and thus, EMG, is not entitled to obtain any further compensation;

- For the period after 1 February 2011 until the repudiation (30 April 2012), Shortfall Compensation is the remedy in the nature of liquidated damages to which EMG is entitled, for the Tripartite Delivery Breaches.

1287. Consequently, Claimant's claim for pre-termination loss of profits, in excess of the liquidated damages, must be dismissed.

## 2.2   EXCLUSION OF INDIRECT LOSS

1288. The question to be addressed in this section is whether (as argued by EGAS) clause 19.1 of Annex 1 excludes EMG's claim for loss of profit allegedly caused by EGAS' breaches of the GSPA:

> "19.1.1 Notwithstanding any other provision of this Agreement, no Party shall be liable to any other Party for punitive or exemplary damages in any circumstances, and no Party shall be liable to any other Party for any indirect or consequential loss or damage including indirect or consequential:
> (a) loss of profit;
> (b) loss of business;
> (c) loss of production;
> (d) loss of revenue; or
> (e) loss of contract".

## A.   EGAS' position

1289. EGAS avers that there is authority under English law for the proposition that references to "indirect or consequential loss" in exclusion clauses should be read as references to losses falling within the second limb of the rule in *Hadley Baxendale*[1512]:

- The first limb embraces all types of losses which may fairly and reasonably be considered to arise naturally as a probable result of a breach of contract[1513];

---

[1512] R$_{1+2}$ FS M, para. 432.
[1513] R$_{1+2}$ FS M, para. 434.

-   The second limb includes additional types of losses which would ordinarily follow from the breach by reason only of special circumstances actually made known to the other party before the contract was concluded[1514].

1290. Under English law, the loss of profit deriving from sub-sales (such as those of EMG to a downstream customer) is not generally recoverable in the event of non-delivery, because such losses are regarded as being too remote. The injured party must establish that the party in breach knew that the buyer had contracted to sell the very same goods to a third party and that would be unable to satisfy its obligations in respect of the sub-sale by obtaining substitute goods[1515].

1291. It follows that EMG's claim for lost profits under the On-Sale Agreement is indirect and consequential, and thereby excluded by Art. 19.1 of Annex 1 to the GSPA[1516].

## B.   EMG's position

1292. In EMG's view, EGAS is incorrect to suggest that EMG's claim for loss of profit falls within the exclusion of indirect or consequential loss in Art. 19.1 of the Annex, simply because it is a claim for loss of profit[1517].

1293. EMG's claim for lost profits is a claim for direct lost profit, which is unaffected by Art. 19.1, because EMG's sole source of revenue was the sale of gas delivered by EGAS to IEC and the direct consequence of not having that gas was to deprive EMG of the revenue it would have generated from such sale. This loss was both inevitable and foreseeable to EGAS[1518].

## C.   The Tribunal's decision

1294. The Tribunal has carefully reviewed the submissions put forward by the parties and the supporting case law. The Tribunal finds that the crucial test of whether the damage claimed by EMG falls within the first or the second limb in *Hadley Baxendale*, or in other words, meets the standard of remoteness and causality[1519], is whether the damage was exceptional and knowledgeable by EGAS.

1295. On this issue the Tribunal, without hesitation, agrees with EMG, because:

-   EGAS knew that the gas it supplied to EMG had to be delivered to IEC;

---

[1514] $R_{1+2}$ FS M, para. 434.

[1515] $R_{1+2}$ FS M, para. 435.

[1516] $R_{1+2}$ FS M, para. 436.

[1517] C SS M, para. 407.

[1518] C SS M, para. 411.

[1519] EMG notes that English courts have questioned the utility of the distinction between direct and indirect loss of profits stemming from *Hadley v. Baxendale*, indicating instead the relevance of principles of causation and remoteness (C PHB, para. 107).

- EGAS was also aware that EGAS' gas was the only gas that EMG could deliver to IEC through its pipeline; hence EMG was unable to obtain substitute gas to deliver to IEC.

1296. In conclusion, EMG' damage under the On-Sale Agreement was thus a direct and foreseeable consequence of EGAS' failure to deliver under the GSPA and under the Tripartite Agreement, which was not excluded by Art. 19.1 of Annex 1 to the GSPA.

## 2.3  CAP ON LIABILITY

1297. EGAS relies on the following limitation of liability clause contained in Art. 3.6 of Annex 1 to the GSPA:

> "Save for Sections 3.4, 3.5, 4.5 and 4.7, under any circumstances whatsoever, the aggregate liability of the Seller under this Agreement shall not exceed 20% of the total annual value of Gas sales per year".

1298. Additionally, EGAS also relies on Art. 19.3 of Annex 1:

> "19.3 Any limitations or exclusion of liability contained in this Agreement shall survive any termination of this Agreement however arising".

### A.  EGAS' position

1299. EGAS argues that this limitation of liability applies to any liability in which EGAS may incur under the GSPA, even in cases of termination at common law. EGAS finds additional support in Art. 19.3 of Annex 1 to the GSPA, which reinforces that limitations of liability survive any termination however arising.

1300. EGAS further contends that the words 'Gas sales per year' used in Art. 3.6 of Annex 1 must refer to the sales of gas by EGAS to EMG under the GSPA, since the GSPA is directly concerned with those sales by EGAS to EMG[1520].

### B.  EMG's position

1301. EMG's initial position is that Art. 3.6 does not apply in this case, because the damages sought by EMG are not "under this Agreement [GSPA]", but rather damages at common law. During the Hearing, however, EMG seemed to accept its application[1521]:

> "Now, we don't say that this does not apply, and the argument is not about whether this applies or not. The question is: What is the meaning of gas – the value of gas sales per year?"

---

[1520] R$_{1+2}$ SS M, paras. 819 and 820.
[1521] FHT, Day 2, p. 261.

1302. EMG maintains that the text and the context of Art. 3.6 indicate that it shall be interpreted as referring to the value of gas sales to the party claiming damages for the loss of that gas under the GSPA, because:

- Art. 3 is entitled "On-Sale Agreements" and contains provisions focusing on EMG's On-Sale Agreement obligations and the consequences of EMG being unable to meet those obligations due to EGAS' non-performance[1522];

- It would make no sense to limit EMG's damages by reference to the revenue that EGAS would have received had it delivered the gas[1523].

### C.    The Tribunal's decision

1303. The Tribunal must decide whether the limitation on EGAS' responsibilities linked to the value of gas sales refers to the upstream or to the downstream sales. The Tribunal favours EGAS' construction that the relevant sales are the upstream one, for two reasons:

- Since the expression appears in the GSPA itself, a reference to annual sales ought, unless otherwise specified, to refer to sales under that agreement – this would be the natural reading of the clause; the immediate context of the clause does not alter this conclusion, because although the expression appears in Art. 3, which is entitled "On-Sale Agreements", it is clear from the terms of Art. 3.6 itself that the provision is not concerned with liability in respect of On-Sale Agreements, because it refers to Arts. 4.5 and 4.7, which relate to other matters;

- From a commercial point of view, one might expect EGAS to be interested in knowing to what extent it had succeeded in limiting its liability – it is fair to say that the annual volumes remained unknown at the time the parties entered into the GSPA and that this applied both to the upstream and downstream volumes; but the same is not true of price: the upstream price was known, the downstream price unknown.

1304. In conclusion, the Tribunal finds that the better interpretation of Art. 3.6 of the GSPA is that EGAS' maximum liability vis-à-vis EMG for each year is capped at the total annual amount of EGAS' gas sales to EMG.

1305. The Tribunal will apply this limitation to cap the compensation owed by EGAS to EMG.

\* \* \*

---

[1522] C SS M, para. 437.
[1523] C SS M, para. 436.

1306. Now that the Tribunal has resolved the legal issues affecting the calculation of damages, the Tribunal will establish EMG's compensation.

## 3.  COMPENSATION FOR TRIPARTITE DELIVERY BREACHES

1307. EMG has claimed "full compensation" under English law[1524] for EGAS' breaches. EMG's expert has quantified the compensation owed for Tripartite Delivery Breaches on the basis of loss of profit[1525]. EGAS has replied that the compensation available to EMG is limited to the amounts of Shortfall Compensation; and the Tribunal has concurred with EGAS.

### 3.1  LIQUIDATED DAMAGES

1308. The Arbitral Tribunal has already determined that EMG was duly compensated under the Shortfall Compensation regime for the Tripartite Delivery Breaches which arose from July 2009 through January 2011[1526].

1309. The Tribunal has also decided that the only compensation recoverable by EMG from February 2011 until 30 April 2012[1527] is the aggregate amount of Daily and Monthly Shortfall Compensations, which constitute liquidated damages pursuant to Arts. 6.8 and 6.9[1528].

1310. The value of Daily Shortfall Gas is the Daily Delivery Failure minus 2% PNQ; the Daily Shortfall Compensation is 10% of the Daily Shortfall Gas multiplied by the contract price; and the Monthly Shortfall Compensation is 10% of the Monthly Shortfall Gas, multiplied by the contract price, provided that the Monthly Delivery Failure is greater than 7% of the aggregate Delivery Failure.

### A.  FTI's expert report

1311. Appendix 13 to FTI II contains the 'Gas Status Spreadsheets', which reflect the daily PNQs and delivered gas for IEC, and calculates the Daily Delivery Failure, as the difference between both amounts. EGAS has not taken issue with these calculations (other than disputing the amount of deemed nominations).

1312. FTI has also calculated the Daily Shortfall Gas, but – as already explained in the merits section – the Tribunal has found that FTI failed to deduct the 2% Tranche[1529]. The Tribunal will determine the amount due for Daily Shortfall

---

[1524] C PHB, para. 178.
[1525] FTI I, pp. 66 *et seq.*
[1526] See para. 1286 *supra.*
[1527] The repudiation of the Tripartite Agreement occurred on 18 April 2012, but for convenience the Tribunal will approach the assessment of damages on the basis that it occurred at the end of the month.
[1528] See para. 1286 *supra.*
[1529] See para. 1062 *supra.*

Compensation, applying a 2% reduction to FTI's figure for Daily Shortfall Gas, and multiplying the result by 10% and by USD 3 (upstream price).

1313. If the monthly aggregate of the Daily Delivery Failure is greater than 7% of the aggregate PNQ, the Tribunal will calculate the Monthly Shortfall Compensation as the monthly aggregate of the Daily Delivery Failure (as provided by FTI) multiplied by 10% and by USD 3. The Tribunal notes that FTI has calculated the Monthly Shortfall Compensation based on the Daily Shortfall Gas, when in fact it should have used the Daily Delivery Failure (as explained in para. 1062 *supra*).

## B.   The calculations

1314. The Tribunal has calculated the amounts due for Liquidated Damages, pursuant to the above methodology and reflected the calculations in the following table[1530]:

|  | PNQ | Aggregate of Daily Delivery Failure | DSC adjusted[1531] | MSC adjusted | Total Liquidated Damages |
|---|---|---|---|---|---|
| February 2011 | 8,920,452 | 7,626,643 | 2,241,898 | 2,287,993 | 4,529,891 |
| March 2011 | 7,816,879 | 4,599,644 | 1,344,402 | 1,379,893 | 2,724,295 |
| April 2011 | 6,544,896 | 2,169,661 | 612,953 | 650,898 | 1,263,851 |
| May 2011 | 8,521,741 | 8,521,741 | 2,505,392 | 2,556,522 | 5,061,914 |
| June 2011 | 7,023,992 | 5,697,311 | 1,667,049 | 1,709,193 | 3,376,243 |
| July 2011 | 4,426,313 | 3,680,935 | 1,080,206 | 1,104,280 | 2,184,486 |
| August 2011 | 7,291,949 | 7,291,949 | 2,143,833 | 2,187,585 | 4,331,418 |
| September 2011 | 7,057,341 | 7,057,341 | 2,074,858 | 2,117,202 | 4,192,061 |
| October 2011 | 7,272,851 | 5,741,454 | 1,678,799 | 1,722,436 | 3,401,235 |
| November 2011 | 8,408,348 | 5,798,266 | 1,689,030 | 1,739,480 | 3,428,510 |
| December 2011 | 8,760,335 | 8,760,335 | 2,575,539 | 2,628,101 | 5,203,639 |
| January 2012 | 8,272,253 | 7,185,843 | 2,106,119 | 2,155,753 | 4,261,872 |
| February 2012 | 7,461,144 | 7,072,727 | 2,077,051 | 2,121,818 | 4,198,869 |
| March 2012 | 7,986,111 | 7,723,827 | 2,269,231 | 2,317,148 | 4,586,380 |
| April 2012 | 7,765,104 | 7,765,104 | 2,282,941 | 2,329,531 | 4,612,472 |
| **TOTAL** |  |  |  |  | **57,357,135** |

1315. The total amount due to EMG by way of Liquidated Damages as compensation for the Tripartite Delivery Breaches is USD 57,357,135, of which

---

[1530] The PNQ, Aggregate of Daily Delivery Failure and Daily Shortfall Compensation (before adjustment) data has been obtained from FTI II, Appendix 13, Lost Profit IEC. The Arbitral Tribunal has calculated the Monthly Shortfall Compensation using the data provided for in FTI II, Appendix 13, Gas Status Spreadsheets.
[1531] (Daily Shortfall Gas per FTI – 2% * PNQ) * 10% * USD 3.

USD 39,697,542 correspond to 2011 and USD 17,659,593 to 2012. The split between 2011 and 2012 becomes relevant in the following section, which analyses the contractual cap on liability.

## 3.2   LIMITATION ON LIABILITY

1316. The Tribunal has already determined that EGAS' maximum annual liability is capped at an amount equal to 20% EGAS' sales to EMG under the GSPA.

1317. FTI has calculated the 20% liability applying this factor to the downstream sales of 13 downstream customers[1532], but the Tribunal has already determined that the correct interpretation of the contractual provision is that the relevant sales are the upstream – and not the downstream – sales.

1318. The Tribunal has to make one further correction: the Tribunal's jurisdiction stems from the Tripartite Agreement, which only covers gas sales where IEC is the ultimate customer. It is incorrect to include on-sale customers other than IEC in the calculation of EGAS' liability cap for breaches of the Tripartite Agreement, because the relevant on-sale customers must be related to the breach in question.

1319. The Tribunal further notes that FTI has calculated the liability cap by calendar year sales and that EGAS has not objected. The Tribunal concurs.

1320. In view of the above, the maximum liability will be calculated as 20% of the PNQ for IEC on a given year multiplied by the applicable upstream price, which is[1533]:

- 91,190,706 MMBTU (aggregate PNQs for 2011) * USD 3 (upstream price) * 20% = USD 54,714,424;

- 33,813,347 MMBTU (aggregate PNQs for 2012) * USD 3 (upstream price) * 20% = USD 20,288,008.

1321. The Tribunal acknowledges that the contractual liability cap, which is agreed as USD 54,714,424 for 2011 and USD 20,288,008 for 2012 is well in excess of the amounts the Tribunal has calculated as liquidated damages for the 2011 and 2012 Tripartite Delivery Breaches: USD 39,697,542[1534] and USD 17,659,593, respectively[1535].

---

[1532] FTI II, Appendix 3, T_FA_LS2LS3.

[1533] FTI II, Appendix 13, IEC Lost Profits.

[1534] The Shortfall Compensation due in January 2011 (prior to the period of major shortfalls which ensued after the first attack in February) is minimal (the aggregate Daily Shortfall Gas amounting to only 156.619 MMBTU) and would not bridge the USD 15 Million gap between the amount awarded for liquidated damages and the contractual maximum liability for 2011.

[1535] See para. 1315 *supra*.

1322. <u>In conclusion</u>, the compensation due to EMG for the Tripartite Delivery Breach is set out in para. 1314 *supra* in amounts due monthly; the yearly aggregate is USD 39,697,542 for the period February – December 2011 and USD 17,659,593 for the period January – April 2012.

## 4.   COMPENSATION FOR THE TRIPARTITE REPUDIATORY BREACH

1323. The Tribunal must now address the compensation due for the second breach committed by EGAS: the repudiation of the Tripartite Agreement on 30 April 2012[1536]. The Tribunal must determine the amount due by EGAS as of 30 April 2012 to keep EMG indemnified of the harm suffered from the Tripartite Repudiatory Breach.

1324. EMG is requesting full compensation under English law for the repudiation of the Tripartite[1537] and FTI has calculated this compensation as the reduction in EMG's enterprise value[1538]. The Arbitral Tribunal agrees that the compensation for a repudiatory breach must be calculated using a different methodology from that applied in the preceding chapter to the Tripartite Delivery Breaches, i.e. the Shortfall Compensation regime. This is because the Shortfall Compensation regime is in the nature of liquidated damages and is premised on EMG's right to obtain Redelivery Gas[1539]; but Redelivery Gas – or any kind of gas for that matter – is no longer available once the gas supply agreement has been repudiated.

1325. The Tribunal will devote the following sections to analysing FTI's calculation of the reduction suffered in EMG's enterprise value, expressed as the difference between:

-   the present value of EMG's future cash flows under a But For Scenario (**4.1.**), i.e. as if EGAS had complied with its contractual obligations, and

-   EMG's liquidation value in the Actual Scenario (**4.2.**), i.e. EMG's value as it presently is, with both the GSPA and the Tripartite Agreement terminated.

1326. The Tribunal will treat discount rate and valuation date issues separately (**4.3.**).

---

[1536] The repudiation of the Tripartite Agreement occurred on 18 April 2012, but for convenience, the Tribunal will approach the assessment of damages on the basis that it occurred at the end of the month.

[1537] C PHB, para. 178 (b) (iv).

[1538] FTI refers to the compensation improperly as a "loss of profit", when in fact it represents a "loss of value", the loss of value suffered by EMG's enterprise as a consequence of the Tripartite Repudiatory Breach. The name given to the damage is, however, immaterial, the only relevant issue being whether the methodology used is an appropriate way to keep EMG appropriately compensated.

[1539] See para. 1276 *supra*.

**4.1   BUT FOR SCENARIO**

### A.   Methodology applied by FTI

1327. FTI has applied a Discounted Cash Flow ["**DCF**"] methodology to establish EMG's future cash flows under a But For Scenario, i.e. as if the GSPA had been in force and had been complied with, and discounted such cash flows at the rate equivalent to EMG's Weighted Average Cost of Capital ["**WACC**"][1540].

1328. FTI's assumptions underlying the DCF model in the But For Scenario are the following[1541]:

- EMG buys a maximum of 6.79 BCM a year of gas[1542], including Redelivery Gas, and sells this gas to various off-takers at a profit over the price paid to EGAS: this profit varies with every customer, because the GSPA and the on-sale agreements link the prices to that of Brent crude oil[1543] and/or to the "generation" component of the Israeli electricity tariffs[1544]; except the margin on IEC's On-Sale Agreement, which was fixed[1545] at USD 1.25/MMBTU resold.

- EMG maintains its Pipeline infrastructure in good repair and incurs operating costs, such as those associated with the transport of gas, day-to-day maintenance, operation costs and other overheads[1546].

- EMG pays 20% tax on the stream of operating profits[1547].

- EMG experiences fluctuations in its level of working capital[1548].

- EMG repays EGAS the provisional credits, downstream guarantee and other outstanding balances.

### B.   Criticism by JWC (and FTI's reply)

#### a.   DCF model

1329. JWC does not view a DCF model as the appropriate methodology to calculate EMG's value, because EMG lacks a proven record of profitability[1549]; and would rather use a Monte Carlo analysis[1550].

---

[1540] FTI II, para. 36.
[1541] FTI I, p. 75.
[1542] FTI I, p. 82.
[1543] FTI I, p. 77.
[1544] FTI I, p. 79.
[1545] FTI I, p. 81.
[1546] FTI I, p. 84.
[1547] FTI I, p. 85.
[1548] FTI I, p. 86.

1330. FTI disagrees; although it acknowledges that EMG has no track record of profits, this does not mean that its future cash flows are unpredictable[1551]; FTI supports the use of DCF as the standard tool which investors use to value all kinds of businesses, including gas fields, even if they are not expected to come online for some time[1552].

### b.    Assumptions

1331. But even assuming that a DCF model is used, JWC takes issue with a number of assumptions:

Quantity of gas sold and resale price

1332. JWC criticises both assumptions used by FTI:

- the quantity to be sold (almost the totality of 7 BCM agreed upon in the GSPA) and

- the re-sale price estimations (given that in 2013 a newly discovered gas field in Israel – Tamar – became operational and yet another Israeli gas field, Leviathan, has been located[1553]; high level of competition in the Israeli market[1554] with these new gas fields is anticipated[1555] and JWC claims that it will lead to a reduction in prices[1556]).

1333. FTI replies that the sort of competition advocated by JWC would be unlikely, because the actual interactions between EMG and Tamar during the short period of active competition demonstrate that Tamar was unable to charge lower prices than EMG, and would not have undermined EMG's ability to sell the annual contracted quantities to its customers[1557].

Political and commercial risks of gas disruptions

1334. JWC points out that social turmoil persists and this unrest gives rise to reductions in production capacity[1558]. The expert recalls that a valuation of EMG made in April 2012 took into consideration the social disorder factor by reducing 30% in

---

[1549] JWC I, para. 133.
[1550] JWC I, para. 126.
[1551] FTI II, para. 55.
[1552] FTI II, para. 47.
[1553] These facts will be developed in more detail in the analysis of IEC's quantum claim, in section XV *infra*.
[1554] JWC I, paras. 44 and 48.
[1555] JWC I, para. 37.
[1556] JWC I, p. 33.
[1557] FTI II, para. 20.
[1558] JWC I, para. 223.

profit margins in its worst case[1559]; alternatively, this risk element could also be reflected in the discount rate[1560]. JWC proposes a 5% annual probability of failure, reflected in a 5% reduction in annual cash flows; but adds that a 10% annual probability could also be adopted[1561].

1335. FTI does not accept this approach, submitting that the purpose of this But For Scenario is to isolate the economic impact of the breach of contract, and that therefore the adverse developments in the society in general must be excluded[1562].

Technical risk of gas supply interruptions

1336. JWC includes in its calculations the probability of gas supply interruptions due to failures in the Pipeline, in EMG's Pipeline and/or in the Israeli grid and their impact on income and costs[1563].

1337. FTI disagrees, arguing that in a But For Scenario supply interruptions should be scarce and the negative effect on EMG's value, negligible[1564].

Duration

1338. JWC argues that the term of the On-Sale Agreement with IEC expires on 30 June 2023 and the cash flows should, thus, stop at that date[1565], or at the latest on 29 January 2025, the date when EMG's project licence expires[1566].

1339. FTI notes that JWC has disregarded IEC' right to a five year extension, a right which according to FTI's experience, IEC would have exercised, since in 2023 EMG's gas would be the cheapest available[1567]. FTI has been instructed to assume that the renewal of EMG's project licence was an administrative formality which would not have prevented EMG from continuing to operate after 2025[1568].

**c.    Cap at book value**

1340. JWC then seems to suggest that, whatever value the DCF calculation renders, the liability should be capped at EMG's book value, because no willing buyer would pay a price which is higher than book value[1569].

---

[1559] JWC I, para. 224.
[1560] JWC I, para. 228.
[1561] JWC I, para. 230.
[1562] FTI II, para. 22 and 233.
[1563] JWC I, paras. 186–192.
[1564] FTI II, paras. 64 and 191.
[1565] JWC I, para. 169.
[1566] JWC I, para. 167.
[1567] FTI II, para. 372.
[1568] FTI II, para. 370.
[1569] JWC I, para. 247.

1341. Again, FTI does not agree, because the book value of a company makes no reference to the prospects of a company as to its profit-generating ability and therefore is completely inappropriate for the assessment of damages in this case[1570].

## C. The Tribunal's decision

1342. The Tribunal will express its view with respect to each of the three main areas of debate:

### a. DCF model

1343. The Tribunal sides with EMG:

- the use of a properly structured But For Scenario (which hypothesises that no breach of contract had occurred) and an Actual Scenario (which represents reality as it is, after the breach),

- the calculation of the value of a business through DCF methodology, and

- the determination of compensation as the difference between the value of the business enterprise in the But For Scenario and in the Actual Scenario

represents a valid methodology to calculate the damage caused by qualified and material contractual breaches, a methodology which is routinely used in the valuation of damages in international arbitration[1571]. In this case, the methodology is especially appropriate, because EGAS incurred in the repudiatory breach, deprived EMG of its sole source of gas and sentenced EMG's only business (the transport and re-sale of gas through its pipeline) to death.

1344. JWC has, additionally, raised an objection as to the accuracy of a DCF model, given the lack of record of EMG's profitability. The Tribunal sees no reason for concern. The important fact is not whether EMG can prove its profitability in the past, but rather whether it is reasonable to presume that, were it not for EGAS' wrongdoing, it would have obtained a foreseeable stream of income in the future. In the case of a 15 year-long gas supply deal, secured by an interlocking mesh of contracts (the MoU, the GSPA, the Tripartite Agreement and the On-Sale Agreement) the Tribunal entirely satisfied of the reasonableness of such presumption.

---

[1570] FTI II, para. 59.
[1571] FTI II, para. 46.

### b.    Assumptions

<u>Quantity of gas resold and resale price</u>

1345. The Tribunal notes that the core of JWC's criticisms relate to the hypothetical sales and re-sale of gas which forms part of Q2 and Q3 – not of Q1, which is the only relevant volume for the Tripartite Repudiatory Breach. As regards Q1, JWC acknowledges that the price for the Tamar gas – EMG's competitor after 2013 in the Israel market – is significantly above EMG's price[1572].

1346. In light of this, the Tribunal accepts the reasonableness of FTI's assumptions with respect to Q1: EMG would be able to resell the whole annual 2.125 BCM (78.268 Million MMBTU) provided for in Art. 3 of the Tripartite Agreement to IEC at a constant price of USD 4.25/MMBTU. No present or future competitor in the Israel market would be likely to be able to match this price.

1347. The Tribunal will award compensation only for the Repudiatory Breach affecting Q1, the amount of gas provided for in the Tripartite Agreement, and will not take Q2 and Q3 quantities into consideration when establishing the amount of compensation. It will therefore not decide on the reasonableness of assumptions regarding Q2 and Q3.

1348. The Tribunal notes that FTI does not make distinct calculations of losses related to the repudiation of the Tripartite Agreement. What FTI does is a calculation of the damage assuming that the repudiation affects the total volume of 7 BCM provided for in the GSPA, and then *pro rata* allocates a portion of the liability to Q1 and to the Tripartite Agreement. This approach is fundamentally wrong for two reasons:

-      When a specific calculation of losses attributable to the Tripartite Agreement is possible, this calculation is to be preferred to an indirect methodology, which induces the amount applying a *pro rata* apportionment;

-      Furthermore, the total lost profit includes items, such as the additional maintenance and operational charges, which only arise when EMG supplies a volume of gas beyond Q1, and thus, these charges have no relevance in the determination of the compensation for the Tripartite Repudiatory Breach.

1349. The Tribunal does not accept this approach and will assess damages from the Tripartite Repudiatory Breach by reference to Q1 quantities.

---

[1572] JWC I, para. 74. In p. 37 JWC estimates future gas price in Israel and all such prices are higher than USD 4.25/MMBTU.

Risks of gas disruptions and other risks

1350. JWC makes one additional proposal: cash flows should be reduced to take account of political risks and technical malfunctions that could cause disruption in the gas delivery. The Tribunal does not agree. The purpose behind the creation of a But For Scenario is to isolate EMG's value from EGAS' breaches, including those which JWC categorises under the brand "political risks". As regards the effect of occasional technical malfunctions which could affect the deliveries of gas, the Tribunal concurs with EMG that the impact is inconsequential and does not diminish the validity of FTI's estimations as a whole.

1351. The Arbitral Tribunal must also dismiss all other adjustments proposed by JWC:

- Complete project failure[1573]: in a But For Scenario where all Parties are presumed to honour their contractual obligations, a complete project failure is excluded by definition;

- Margin squeeze[1574]: JWC estimates that EMG will have to reduce its margin in an increasingly competitive Israeli market[1575]; the Tribunal will analyse future developments of gas price in Israel in the chapter devoted to IEC's quantum[1576], but can already anticipate that FTI's assumption that EMG's resale price to IEC remains stable, is acceptable.

Duration

1352. As regards the duration of the cash flows, JWC only accepts 15 years, which is the initial duration of the GSPA and of the On-Sale Agreement. EMG's expert has made projections for another five years under the assumption that IEC would have exercised its right under the On-Sale Agreement to extend the duration by another five years; and so would EMG, pursuant to an equal right under the GSPA[1577].

1353. The Parties have discussed whether the Tribunal can infer, from the facts of the case, that EMG (and IEC) would have exercised such right to extension. The Tribunal agrees with EGAS that it is not possible to draw such inference, because the Tribunal cannot predict the Parties' decision-making. Whilst the Tribunal will estimate the future price of EMG's gas and a proxy price for alternative gas in the Israeli market, and will assume that EMG's price will be lower[1578], pricing is not the only factor to be taken into account when predicting whether a gas deal between Israel and Egypt will be extended in 2023 for a further period of five years.

---

[1573] JWC I, para. 237.
[1574] JWC I, para. 239.
[1575] See para. 1332 *supra*.
[1576] See paras. 1628 *et seq. infra*.
[1577] Art. 2.4 of Annex 1 to the GSPA and Art. 2.4 of the On-Sale Agreement.
[1578] See para. 1634 *infra*.

1354. The Tribunal finds EMG's assumption that the gas deal will necessarily be extended speculative, and does not accept such hypothesis. The duration, thus, remains at 15 years, i.e. until 30 June 2023.

### c.    Cap at book value

1355. Finally, JWC suggests that the Tribunal limit EMG's compensation to its book value.

1356. The Tribunal disagrees: in this case, EMG is entitled to full compensation of the damage suffered (subject to the contractually agreed caps and limitations), and JWC suggestion that the loss suffered by EMG should be capped at the book value of its assets finds no support either in contract or in law.

### D.    Application of the Tribunal's decision to FTI's calculations

1357. FTI's calculation of the future lost profits consists, in essence, of the following steps:

- Gross margins: the result of the volumes of gas sold multiplied by EMG's margin (**a.**);

- Deduction of the operating expenses (**b.**);

- Less depreciation, capital adjustments and taxes, to obtain EMG's cash flows (**c.**).

### a.    Gross margins

1358. FTI assumes that EMG would be purchasing 84.98 Million MMBTU in 2012 and 84.26 Million MMBTU in 2013; and from then on, 78.27 Million MMBTU annually until the end of the contractual term. In addition, EMG would also be purchasing another 3% of gas for the turbine fuel, i.e. 2.55 and 2.53 Million MMBTU in 2012 and 2013; and a constant volume of 2.35 Million MMBTU annually until the end of the term[1579].

1359. The Tribunal's jurisdiction is limited to the damage caused by the repudiation of the Tripartite Agreement, which guaranteed the supply of up to 78.268 Million MMBTU of gas every year[1580]. The Tribunal will thus disregard any estimated gas purchases exceeding this maximum quantity. This cap affects the volume estimations for 2012 and 2013, 87.53 Million and 86.78 Million MMBTU, respectively, which will be reduced – as foreseen for the following

---

[1579] FTI II, Appendix 3, postFA.
[1580] Art. 3 of the Tripartite Agreement.

years – to 78.268 Million MMBTU for IEC's gas and 2.348 Million MMBTU for the turbines[1581].

1360. EMG's gross margin in its sales to IEC is USD 1.25 (USD 4.25 resale price minus USD 3 purchase price). FTI multiplies this margin by the gas bought from EGAS for resale to IEC (excluding Turbine Fuel) and thereby obtains EMG's gross margin[1582].

**b.    Operating expenses**

1361. EMG's operating expenses are the sum of[1583]:

- KTISTAR (the pipeline operator): USD 0.9 Million for spare parts plus USD 14.10 Million annual fee[1584], which are increased by 3% annually; the Tribunal has disregarded two categories of operational and maintenance expenses – the adjustment to KTISTAR's costs and the addition of two turbines – because these are costs that only arise if EMG sells quantities of gas in excess of Q1[1585].

- Turbine Fuel;

- Overheads: USD 4 Million per year; FTI has estimated that overheads would grow at an annual rate of 2.5% after 2011;

- Revenue tax at 1%, which is applied to EMG's gross margin.

1362. FTI thus obtains the operating profit. It then deducts the depreciation, which results in EMG's earnings before taxes ["**EBT**"].

---

[1581] 3% as estimated by FTI.
[1582] FTI II, Appendix 3, postFA. FTI refers to it as 'gross revenue'.
[1583] FTI II, Appendix 3, Discounted Cash Flows.
[1584] As of 2008.
[1585] JWC I, p. 30.

### c.    Capital adjustments

1363. In order to determine EMG's cash flows, FTI deducts taxes and makes certain adjustments[1586]:

- Taxes: originally, 20% EBT plus any lump sum tax adjustments, which FTI estimates to be USD 2.1 Million annually after 2017; in its 29 March 2013 letter, FTI acknowledges that the correct tax rate due to recent changes in the Egyptian tax legislation would be 25% – the Tribunal has thus changed the tax rate to 25% as of 2013; this modification is consistent with FTI's WACC calculation (see para. 1409 *infra*), which assumes a 25% tax rate;

- Changes in the working capital: the difference between the gross revenue in a given year and that of the previous year divided by 12, to reflect the fact that increased sales would be payable within 30 days;

- Timing of tax payments: an adjustment is made for the difference between the tax paid in a given year and that corresponding to the previous year.

### E.    Calculation of the cash flows

1364. The Tribunal will first establish the stream of cash flows (**a.**), it will then adjust two cash flows (**b.**), calculate the liability cap and apply it when appropriate (**c.**).

### a.    Cash flows

1365. The Tribunal will now calculate the cash flow amounts, as amended in view of the abovementioned adjustments; these amounts represent the additional cash flow EMG would have realised between 2012 and 2023, if EGAS had complied with its delivery obligations under the Tripartite Agreement, and the available gas had been resold to IEC under the terms and conditions of the On-Sale Agreement experessed in USD Million; FCF is the annual cash flow:

---

[1586] The Tribunal notes that in its letter of 28 March 2014 FTI acknowledged that certain capital expenditures would have been required to maintain EMG's pipeline operative, such as the replacement of the turbines after 12-13 years of operations. In its revised spreadsheet FA_LS2LS3 FTI includes a USD 23 Million expenditure in 2011 and another in 2023 of USD 22.09 Million. If EMG had to replace the turbines after 12 or 13 years, in a But For Scenario of EMG's cash flows from Q1 until 2023, it is reasonable to assume that EMG would have waited 13 years; it would make no sense to change the turbines the same year that the gas deal expires.

ICC Case 18215/GZ/MHM
Award

| Volumes | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | IEC | 78,268 | 78,268 | 78,268 | 78,268 | 78,268 | 78,268 | 78,268 | 78,268 | 78,268 | 78,268 | 78,268 | 78,27 |
| | Non-IEC | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 |
| | | | | | | | | | | | | | |
| | Total Contracted Sold | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 |
| | Turbine Fuel - Total | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 | 2,348 |
| Total Purchased in MMBTU | | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 | 80,62 |
| Total Purchased in bcm | | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 | 2,19 |
| Total Sold in MMBTU | | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 | 78,27 |
| | | | | | | | | | | | | | |
| Gross Margins | | | | | | | | | | | | | |
| | IEC | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 |
| | Non-IEC | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 |
| Weighted Average Gross Margin | | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 | 1,25 |
| | | | | | | | | | | | | | |
| Gross Profit | | | | | | | | | | | | | |
| | IEC On-Sale Price | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 |
| | non-IEC On-sale Price | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 |
| | WAVG On-selling price | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 | 4,25 |
| | Revenue | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 | 332,64 |
| | IEC Cost | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 |
| | non-IEC Cost | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 |
| | WAVG Procurement Cost | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 | 3,00 |
| | COGS (ex turb fuel) | 234,80 | 234,80 | 234,80 | 234,80 | 234,80 | 234,80 | 234,80 | 234,80 | 234,80 | 234,80 | 234,80 | 234,81 |
| Gross Revenue | | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 | 97,84 |
| | | | | | | | | | | | | | |
| Operating Costs | | | | | | | | | | | | | |
| | MOM expenditure - flat | (16,88) | (17,39) | (17,91) | (18,45) | (19,00) | (19,57) | (20,16) | (20,76) | (21,39) | (22,03) | (22,69) | (23,27) |
| | MOM (KTISTAR) | (16,64) | (17,14) | (17,65) | (18,18) | (18,72) | (19,29) | (19,87) | (20,46) | (21,07) | (21,71) | (22,36) | (23,03) |
| | MOM - adjustment | | | | | | | | | | | | |
| | MOM - addition of two turbines | | | | | | | | | | | | |
| | Total KTISTAR | (16,64) | (17,14) | (17,65) | (18,18) | (18,72) | (19,29) | (19,87) | (20,46) | (21,07) | (21,71) | (22,36) | (23,03) |
| | Turbine Fuel | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) | (7,04) |
| | Overheads | (4,10) | (4,20) | (4,31) | (4,42) | (4,53) | (4,64) | (4,75) | (4,87) | (5,00) | (5,12) | (5,25) | (5,38) |
| | Revenue Tax at 1% | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) | (3,33) |
| Total Operating Costs | | (31,11) | (31,71) | (32,33) | (32,97) | (33,62) | (34,30) | (34,99) | (35,71) | (36,44) | (37,20) | (37,98) | (38,78) |
| | | | | | | | | | | | | | |
| Operating Profit | | 66,73 | 66,13 | 65,51 | 64,87 | 64,21 | 63,54 | 62,84 | 62,13 | 61,39 | 60,64 | 59,86 | 59,06 |
| | Depreciation | (41,66) | (41,66) | (41,66) | (25,96) | (14,66) | (13,46) | (13,46) | (13,46) | (13,46) | (13,46) | (13,46) | (13,46) |
| | EBT | 25,07 | 24,47 | 23,86 | 38,91 | 49,56 | 50,08 | 49,39 | 48,67 | 47,94 | 47,18 | 46,40 | 45,60 |
| | Lump Sum Tax adjustments | | | | | | (2,10) | (2,10) | (2,10) | (2,10) | (2,10) | (2,10) | (2,10) |
| | Tax rate | 20% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| Tax at 20% until 2012 and 25% as of 2013 | | (5,01) | (6,12) | (5,96) | (9,73) | (12,39) | (14,62) | (14,45) | (14,27) | (14,08) | (13,90) | (13,70) | (13,50) |
| | | | | | | | | | | | | | |
| | Change in Working Capital | - | - | - | - | - | - | - | - | - | - | - | - |
| | Adjustment for timing of tax pay | (4,96) | 1,10 | (0,15) | 3,77 | 2,66 | 2,23 | (0,17) | (0,18) | (0,19) | (0,19) | (0,19) | (0,20) |
| FCF | | 56,75 | 61,11 | 59,39 | 58,91 | 54,49 | 51,15 | 48,22 | 47,68 | 47,13 | 46,55 | 45,96 | 45,36 |

1366. The cash flow for 2012 requires an adjustment to avoid double recovery: the Tribunal has already awarded losses caused by EGAS' Tripartite Delivery Breaches for the time period from 1 February 2011 through 30 April 2012, in an amount of USD 57,431,010, of which USD 17,670,016 correspond to 2012[1587]. FTI has now calculated losses for the complete year 2012 as compensation for the Tripartite Repudiatory Breaches. This approach results in double recovery, because the harm caused to EMG is always the same, even if caused by distinct breaches. FTI's calculations of compensation for 2012 has to be reduced by ⅔, to reflect the time lapsed between May – December 2012, and thus results in USD 37.84 Million.

### b.   Liability cap

1367. The Tribunal notes that FTI has applied the liability cap under Art. 3.6 of Annex 1 to the GSPA to each yearly cash flow, in order to determine EGAS' liability for the Tripartite Repudiatory Breach[1588]. The Arbitral Tribunal must, thus, perform this last verification, with the two corrections already established[1589]: the relevant sales are Q1 upstream sales[1590].

---

[1587] See para. 1321 *supra*.

[1588] See FTI II, Appendix 3, T_FA_LS2LS3.

[1589] See paras. 1317 and 1318 *supra*.

[1590] For consistency reasons the Tribunal is not including Turbine Fuel in these calculations.

1368. Each cash flow will hence be limited to the following amounts: 78,268,000 MMBTU * USD 3 * 20% = USD 46,960,800 each year;

1369. The Tribunal notes that cash flows for 2012 – 2020 are above the limit and consequently, they must be capped: the cash flow in 2012 will be capped at USD 31,307,200[1591] and the remaining years at USD 46,960,800 each.

### c.   End of term

1370. There is one additional adjustment to be made, because the Tribunal has dismissed the hypothesis that the On-Sale Agreement and the GSPA would be extended by an additional five years after the end of its initial term, on 30 June 2023. Since the cash flow for 2023 is calculated until the end of the year, it is necessary to reduce it by half: USD 45,36[1592] Million divided by 2 = USD 22,677,957.

## 4.2   ACTUAL SCENARIO

1371. A distinctive feature of the But For Scenario in contrast with the Actual Scenario is that the former is a hypothetical case in which various hypothesis are built in, whereas the latter does not incorporate any assumptions and depicts reality as it is; parties typically focus the discussion on the But For Scenario while the Actual Scenario is rather straightforward. This clear separation is blurred in the present case: EGAS has tried to incorporate asumptions in the calculation of the Actual Scenario, EMG disagrees.

1372. EMG claims that under the Actual Scenario, the present value of EMG's future cash flows is equivalent to the liquidation value of the Pipeline, which EMG estimates at USD 50 Million[1593].

1373. EGAS does not question *per se* the correctness of such estimation, were it not for a recent development: the discovery of vast gas fields in Israel and the ongoing negotiations to import gas from Israel into Egypt using EMG's pipeline. If this hypothesis were to occur, EMG's actual value would in EGAS' opinion rise to USD 752 Million[1594]. The possibility that EMG's pipeline might be used to import gas (and not to export gas, as was originally planned) is known as the "**Reverse Flow**".

1374. It is undisputed that large gas reserves have been discovered in the Tamar and Leviathan fields located in Israel. This abundance of gas in Israel contrasts with the steep decrease of available gas in Egypt.

---

[1591] USD 46,960,800 * ⅔ = USD 31,307,200.
[1592] Rounded figure. of USD 45,355,945
[1593] FTI I, p. 18.
[1594] EGAS' submission on reverse flow of 18 May 2015 ["**R₁₊₂ S RF**"], para. 85.

1375. This situation led the Egyptian government to issue Decree no. 2848 of 2012, which permits private companies to import gas and to sell it in the domestic market[1595].

Dolphinus

1376. According to a press release of 19 October 2014[1596], Delek Group (the owners of Tamar and Leviathan fields) signed a letter of intent [the "**Letter of Intent**"] with Dolphinus Holding Limited ["**Dolphinus**"] in which it was agreed that both parties would carry out negotiations on an agreement for the supply of natural gas from the Tamar fields to Egypt.

1377. A second press release was issued on 18 March 2015 by the Delek Group, indicating that it had signed a binding agreement with Dolphinus for the sale of Israeli gas, which is to be resold in Egypt[1597] [the "**Press Release**"]. The Press Release mentions that the transportation of gas will be via the existing gas pipeline operated by EMG. EMG however denies any involvement in the proposed Reverse Flow operation and avers that on 22 April 2015 it was approached for the first time by Dolphinus with an offer to take part in the deal[1598].

1378. The question is whether the above facts provide convincing evidence of the likelihood that EMG's pipeline will be used in Reverse Flow. EGAS maintains that this is so, while EMG denies it.

## A. **EGAS' position**

1379. The above facts are proof that reverse flow is being planned. And there are no reasons why EMG would or could not be part of that deal:

- EMG does not require special authorisations: EMG's role in the transaction would be limited to providing a tolling service; the importer of gas will be Dolphinus and it is for Dolphinus to obtain the necessary licences[1599];

- Limited cost of adapting the pipeline: given that the pipeline has been maintained until recently and, according to Mr. Al Sakka's statements, the pipeline is intact[1600], the cost of adapting it for reverse flow would be small

---

[1595] Doc. R$_{1+2}$-700.
[1596] Doc. R$_{1+2}$-677.
[1597] Doc. R$_{1+2}$-681.
[1598] Doc. C-417.
[1599] R$_{1+2}$ S RF, para. 25.
[1600] R$_{1+2}$ S RF, para. 33.

(approximately USD 4 Million)[1601] and EMG would have no problem in reinstating the sub-lease for the receiving terminal at Ashkelon[1602];

- <u>Reverse flow is not contingent on settlement</u>: it is not right to say that the Egyptian government will not consider importing gas from Israel until all arbitrations are settled; this allegation runs counter to the fact that Decree no. 2848 of 2012 already allows private companies to import gas to Egypt[1603].

- JWC has assessed the total value of the opportunity for reverse flow to EMG in a range of USD 753 Million to 1.614 Billion[1604].

1380. Furthermore, English law requires a person who has suffered loss as a result of a breach of contract to take all reasonable steps to mitigate the loss[1605]. If EMG chooses not to take the opportunity to be part of the reverse flow deal, it will be failing in its duty to mitigate its alleged losses and forfeiting its right to claim them[1606].

## B.   EMG's position

1381. EMG disagrees with EGAS for a number of reasons:

- <u>Reverse Flow was highly unlikely at valuation date</u>: according to English law, damages cannot be quantified using hindsight, but are to be assessed at the date of breach (except where contractual rights are subject a contingency which materialises after the breach[1607]); but EGAS has offered no evidence that reverse flow was contemplated by anyone at the date of termination[1608] and no reasonable observer would have viewed reverse flow as likely, given that the regulatory framework for such activity was inexistent in either country and there had been no expression of interest by either party[1609].

- <u>Reverse Flow is today nothing but a remote opportunity</u>: the terms of the Reverse Flow are entirely undefined[1610] and even if the deal were to materialise, it is contingent upon the decisions of third parties – such as the owners of the receiving terminal in Ashkelon – whose intentions are unknown[1611]; and after contacting EMG in late April 2015, Dolphinus

---

[1601] $R_{1+2}$ S RF, para. 35.
[1602] $R_{1+2}$ S RF, para. 37.
[1603] $R_{1+2}$ S RF, para. 39.
[1604] $R_{1+2}$ S RF, para. 62. Based on JWC VIII.
[1605] $R_{1+2}$ S RF, para. 52.
[1606] $R_{1+2}$ S RF, para. 59.
[1607] Claimant's submission on reverse flow of 22 July 2015["C S RF"], para. 16.
[1608] C S RF, para. 8.
[1609] C S RF, para. 10.
[1610] C S RF, para. 25.
[1611] C S RF, para. 26.

offered no information about itself and declined to do so after EMG's enquiries[1612].

- Under English law EMG is not required to risk funds to mitigate: since June 2013 EMG has ceased maintenance activities[1613]; in order to be in a position to transport gas in reverse flow, EMG would need to invest funds first in surveying and pigging the pipeline, then in the adaptation to reverse flow, and probably in the replacement of damaged components. But EMG is not required to take steps beyond its financial capabilities[1614], which are limited given that it has had no revenue in more than three years[1615] and has an outstanding liability of more than USD 160 Million under its loan agreement[1616].

## C.   The offer

1382. EMG has made an offer to EGAS: since EMG is convinced that its pipeline is worth no more than USD 50 Million, it is willing to convey all of its rights to the pipeline and associated facilities to EGAS, on payment of USD 50 Million, in addition to all other amounts awarded to EMG[1617]. EMG requests the Tribunal to incorporate the offer in the dispositive of the Tribunal's award, expressly requiring that EGAS elect within 90 days from the award to take the pipeline and make the corresponding payments[1618].

1383. The Tribunal decided to give EGAS right away the opportunity to comment on the offer made by EMG[1619].

1384. EGAS is of the opinion that such offer does not deserve any credence from the Tribunal:

- If EMG genuinely considered its pipeline to be worth only USD 50 Million, the offer would be unconditional[1620];

- The conditions attached to the offer are not appropriate, fair or acceptable, as they would require EGAS to waive any recourse against the potential award[1621].

---

[1612] C S RF, para. 29.
[1613] C S RF, para. 31.
[1614] C S RF, para. 43.
[1615] C S RF, para. 45.
[1616] C S RF, para. 46.
[1617] C S RF, para. 57.
[1618] C S RF, para. 57.
[1619] A-73.
[1620] R$_{142}$ 109, p. 2.
[1621] R$_{142}$ 109, p. 2.

1385. EGAS further objects to the incorporation of the offer into the dispositive of the Tribunal's award because such relief should have been reflected in the Terms of Reference – which they did not[1622].

1386. The Tribunal understands that EGAS has decided not to accept the offer, and consequently there is no need to incorporate it into the dispositive section of the Award.

### D.    The Tribunal's decision

1387. The Tribunal will first analyse the evidence before it, to assess the current likelihood of Reverse Flow through EMG's pipeline and will come to the conclusion that such a possibility seems remote (**a.**). Finally, the Tribunal will establish EMG's value in the Actual Scenario (**b.**).

### a.    Proven facts

1388. EGAS has requested that the Tribunal significantly increases EMG's enterprise value in the Actual Scenario, on account of the possibility that EMG's pipeline be used in Reverse Flow mode. It is undisputed that this possibility exists – the question rather is: is this possibility likely or remote? The Tribunal is of the opinion that the evidence marshalled by EGAS is insufficient to prove that the probability of reverse flow is likely:

### (i)    No Certainty that an Agreement for the Export of Gas will Materialise

1389. There is no evidence that any party has entered into an enforceable and binding agreement for the export of gas from Israel to Egypt.

1390. The most relevant document produced in this arbitration is the Press Release dated 18 March 2015 from the Delek Group – the owners of the Tamar field – which acknowledges that a contract, subject to a significant number of preconditions, has been signed with Dolphinus[1623].

1391. According to the information contained in the Press Release, Dolphinus commits to sell surplus gas to the Delek Group, which has no obligation to purchase minimum volume, at prices similar to other export gas contracts.

1392. But the Press Release makes clear that the contract is subject to important preconditions, such as obtaining the required regulatory authorisations both in Israel and in Egypt, and signing a transportation agreement with EMG enabling the gas to be piped via EMG's pipeline: the Press Release includes a specific warning that there is no certainty that the contract will materialise in whole or in

---

[1622] $R_{1+2}$ 109, p. 3.
[1623] Doc. $R_{1+2}$-681.

part, due to various factors, including the fact that the preconditions are not yet met.

1393. The Tribunal concludes, in view of the above, that there is insufficient evidence to establish that, for the time being, a binding and enforceable agreement for the expert of gas from Israel to Egypt exists.

(ii)   <u>No evidence of binding transportation agreement with EMG</u>

1394. For Reverse Flow to turn into reality, EMG must have authorised the use of its pipeline for the transportation of gas into Egypt.

1395. There is no evidence that such an agreement exists. The Letter of Intent acknowledges that no such agreement exists ("several contingent conditions, including [...] an arrival at an arrangement between the Buyer and EMG that will allow the Buyer to transport the gas through the EMG Pipeline").

1396. The only evidence produced in this arbitration are two letters from Dolphinus to EMG, dated 22 April 2015[1624] and 21 May 2015[1625].

<u>First letter</u>

1397. The 22 April 2015 letter seems to be the first contact between the hypothetical buyer of gas and EMG. This letter is:

- A mere invitation to negotiate: "Dolphinus would have the honor to invite EMG [...] for direct negotiations";

- No firm proposal is discussed: "[...] invite EMG [...] for direct negotiations to discuss the possibility of cooperating in transferring the gas between [...] Ashkelon to Al Arish [...]".

1398. It is striking that Dolphinus, who requires EMG's consent for the deal with Delek Group to materialise, took more than six months after it had signed the Letter of Intent for its first approach to EMG. And when it finally did, the terms used are vague and non-specific.

1399. There are further remarkable issues to be found in the letter:

- It is signed by a Dr. Alaa Arafa, who does not disclose his position or relationship with Dolphinus Holding Company;

---

[1624] Doc. C-417.
[1625] Doc. $R_{142}$-722.

- All future correspondence is to be addressed solely to Messrs. Bragantini and Velutto, who are located in Milan, and are presumably, external lawyers;

- EGPC is also copied in the letter.

Second letter

1400. In its second letter, dated 21 May 2015, Dolphinus extolls the virtues of the business opportunity offered to EMG, assures EMG that all steps are being taken to obtain the necessary governmental approvals and urges EMG to sign a non-disclosure agreement. In the letter Dolphinus offers to engage in negotiations with the purpose of submitting an offer to rent (or lease with option to buy) and manage EMG's transmission facilities and pipeline, in exchange for an annual flat fee, for an initial term of ten years.

1401. The Tribunal concludes that there is evidence of Dolphinus approaching EMG to commence negotiations regarding the use of the pipeline, but there is no proof that EMG is receptive and that negotiations are indeed taking place, let alone that a binding transportation agreement has been concluded.

1402. In conclusion, EGAS' case that EMG's value be increased by the value of its pipeline being used in Reverse Flow mode is not substantiated. No evidence has been marshalled to show that there is a reasonable probability that EMG's pipeline can and will be used in Reverse Flow to export gas from Israel to Egypt.

### b.   EMG's value in the Actual Scenario

1403. In view of the above, the Tribunal will not take into consideration a possible Reverse Flow trading, when assessing EMG's value in the Actual Scenario. So, the question is: what is EMG's enterprise value under the current circumstances?

1404. FTI has proposed that EMG's value in the Actual Scenario be measured as its liquidation value, which according to EMG is no more than USD 50 Million[1626]. EGAS did not take issue with such assessment until its submission on Reverse Flow, where it criticises that the liquidation value was accepted by FTI without investigation or independent verification[1627].

1405. The Tribunal does not share EGAS' criticism: FTI's professional opinion is that EMG's value in the Actual Scenario amounts to USD 50 Million; the expert assumes responsibility for the reasonableness of the calculation, and in the absence of any other alternative valuation, the Tribunal has no reason to reject the expert's opinion.

---

[1626] FTI I, pp. 18 and 87.
[1627] $R_{1+2}$ S RF, para. 47.

1406. The Tribunal also notes that EGAS has failed to make an alternative calculation of EMG's value in the Actual Scenario.

1407. In view of the evidence before it, the Tribunal assesses that EMG's value in the Actual Scenario at USD 50 Million.

1408. The Tribunal will thus, deduct USD 50 Million from EMG's value in the But For Scenario as of the date EGAS repudiated the Tripartite Agreement; for the purposes of quantum, this is 30 April 2012.

**4.3   DISCOUNT RATE AND VALUATION DATE**

**A.   The experts' opinion**

1409. FTI discounts all free cash flows to 31 May 2009[1628], in its opinion the correct valuation date; the discount rate used is EMG's WACC, as calculated by the expert[1629]:

|  |  |  |
|---|---|---|
| Cost of equity | Risk-free rate | 3.0% |
|  | Market risk premium | 6.0% |
|  | Beta | 0.62 |
|  | Country risk premium | 4.4% |
|  | Total | 11.1% |
| Cost of debt | Risk-free rate | 3.0% |
|  | Spread | 2.0% |
|  | Country-risk premium | 2.9% |
|  | Total | 8.0% |
|  | Tax | 25% |
|  | Total after tax | 6.0% |
| WACC | Debt/(Debt+Equity) | 30% |
|  | Total | 9.56% |

1410. JWC in general agrees with FTI's approach, except for the country risk premium, on which the experts disagree[1630]:

1411. FTI explains that it has taken into account that EMG's operations combine those of a gas transmission company and a gas merchant and therefore, its level of risk should lie somewhere between that of a pure transmission company and that of a gas merchant; and since its activities cover two countries, it is exposed to two country risks. The premiums for each country risk should be weighted at 50%, and not added, because EMG is not exposed to the full country risks of both Egypt and Israel, but has limited exposure only to certain of the risks typically reflected

---

[1628] FTI II, Appendix 3, postFA.
[1629] FTI II, Appendix 3, 2012 WACC.
[1630] JWC I, p. 68. Doc. H 24, slide 21.

in the country risk premium[1631]; for example the fact that EMG sells in Israel saves it from Egyptian risks of regulation on end user prices[1632].

1412. The 50% weighted average of Egypt's and Israel's country risk is 4.4%[1633].

1413. JWC is of the contrary view: EMG should bear the full risk of both economies, because EMG faces independent risks in both countries and therefore the risk factor should be added and not averaged[1634]. The expert opines that EMG's project has a higher exposure to a specific, enhanced risk than a typical business, and therefore adequate adjustment needs to be made in the assessment of the country risk[1635]. Furthermore, other valuations of EMG used 15.42%, 13.86% and 10 to 12% as discount rates, and therefore JWC concludes that the appropriate rate should be 13.3%[1636].

## B.   The Tribunal's decision

### a.   Discount rate

1414. The Tribunal partially agrees with JWC that a weighted average of Egypt's and Israel's country risks does not fully reflect the actual risk involved in a transaction between two countries which have been at war, and in a long term gas deal which sought the reconciliation between former enemies.

1415. The Tribunal, however, is not persuaded that such enhanced risk is best represented by the sum of the entire country risks of Egypt and Israel. The simple fact that EMG's business is carried out between those two countries does not merit the addition of both country risks. *Reductio ad absurdum*: if JWC's suggestion were followed generally, investors in a large multinational company with business in more than ten countries, where each country shows a 3% risk premium, would be requiring a return on their investment of at least 30% only to cover the country risk.

1416. The Tribunal finds that the proper approach is twofold:

- The first step would imply the weighing of Egypt's and Israel' country risk premium in a certain proportion; in the absence of evidence showing that the specific risks borne by EMG in Egypt exceed those assumed in Israel, the Tribunal accepts the 50%/50% split suggested by FTI, which results in 4.4%;

---

[1631] FTI II, para. 222.
[1632] FTI II, para. 223.
[1633] FTI I, p. 88.
[1634] JWC I, para. 218.
[1635] JWC V, para. 285.
[1636] JWC I, para. 222.

- This wighted average would reflect the country risk of a gas sale between two ordinary countries; it does not reflect the increased risk due to the historic relationship between Egypt and Israel; to do so the Tribunal will add a specific mark-up; the Tribunal, taking into consideration the country risks of Egypt and Israel, finds that a reasonable estimate of the mark up is approximately 80% of the weighted country risk of Egypt and Israel, *i.e.* 3,50%

1417. The aggregated country risk, hence, results in a spread of 7.9%. And the WACC is, thus, as follows:

| | | |
|---|---|---|
| Cost of equity | Risk-free rate | 3.0% |
| | Market risk premium | 6.0% |
| | Beta | 0.62 |
| | Country risk premium | 7.9% |
| | Total | 14.6% |
| Cost of debt | Risk-free rate | 3.0% |
| | Spread | 2.0% |
| | Country-risk premium | 2.9% |
| | Total | 8.0% |
| | Tax | 25% |
| | Total after tax | 6.0% |
| WACC | Debt/(Debt+Equity) | 30% |
| | Total | 12% |

b. **Valuation date**

1418. The Tribunal does not agree with the valuation date chosen by FTI, 31 May 2009.

1419. The Tribunal is endeavoring to establish the proper compensation due to EMG as a consequence of EGAS' repudiation of the Tripartite Agreement. And EGAS' main act of repudiation was the wrongful termination of the GSPA, which occurred on 18 April 2012. For convenience purposes in the calculations, the Tribunal has already determined that the valuation date shall be the end of the month in which the repudiation occurred, i.e. on 30 April 2012. As already indicated, for convenience the Tribunal will approach the assessment of damages on the basis that it occurred at the end of the month.

\* \* \*

1420. The Tribunal has discounted the cash flows calculated in the table contained in para. 1365 *supra*, with the correction that the proper cash flow for 2012 should be USD 31,307,200 (as explained in para. 1370 *supra*), at the annual discount rate of 12%, to the correct valuation date, 30 April 2012.

1421. The Tribunal has first brought all cash flows back to 31 December 2012 (amounts in USD):

| Year | Free Cash Flows | Discount Factor 12% | Discounted Cash Flow (in USD) at 31 December 2012 |
|---|---|---|---|
| 2012 | 31.307.200 | 1,0000000 | 31.307.200 |
| 2013 | 46.960.800 | 1,1200000 | 41.929.286 |
| 2014 | 46.960.800 | 1,2544000 | 37.436.862 |
| 2015 | 46.960.800 | 1,4049280 | 33.425.770 |
| 2016 | 46.960.800 | 1,5735194 | 29.844.437 |
| 2017 | 46.960.800 | 1,7623417 | 26.646.819 |
| 2018 | 46.960.800 | 1,9738227 | 23.791.803 |
| 2019 | 46.960.800 | 2,2106814 | 21.242.681 |
| 2020 | 46.960.800 | 2,4759632 | 18.966.679 |
| 2021 | 46.552.802 | 2,7730788 | 16.787.407 |
| 2022 | 45.962.861 | 3,1058482 | 14.798.811 |
| 2023 | 22.677.853 | 3,2869208 | 6.899.422 |
| TOTAL | | | 303.077.177 |

1422. Once that all cash flows have been discounted to 31 December 2012, the resulting amount is USD 303,077,177. which has to be brought back to 30 April 2012, the correct valuation date. This is done by dividing the amount by the following discount factor: $(1+0.12)^\wedge(245/366^{[1637]})$. The result is USD 280,935,579.

1423. The Tribunal must now deduct EMG's present value under the Actual Scenario, which is USD 50 Million[1638]. The net amount of USD 230,935,579 will be the compensation due for the Tripartite Repudiatory Breach.

5.   CLARIFICATION: SHORTFALL COMPENSATION DEDUCTION

1424. The Tribunal has already determined that it has no jurisdiction to adjudicate the claim for Balance of Payments and that this claim cannot be part of the compensation to which EMG is entitled due to the Tripartite Delivery Breaches.

1425. The decision to disregard EMG's claim for the Balance of Payments has an impact on FTI's calculation of the total loss claimed, because the Balance of Payments was linked to a deduction for Daily and Monthly Shortfall Compensation: FTI explained that since the Balance of Payments already took

---

[1637] Number of days lapsed between 30 April and 31 December 2012 in proportion to the days in 2012 – a leap year.
[1638] See para. 1408 *supra*.

into consideration the credit for Daily and Monthly Shortfalls[1639], it was necessary to deduct Daily and Monthly Shortfall Compensations to avoid double recovery.

1426. Since the Tribunal has dismissed the Balance of Payments claim for lack of jurisdiction, there is no possibility of double recovery, and the deduction for Daily and Monthly Shortfall Compensations has become unnecessary.

## 6. CONCLUSION

1427. In summary, the Arbitral Tribunal awards EMG the following compensations:

- Indemnification for EGAS' Tripartite Delivery Breaches: the Tribunal awards EMG USD 57,357,135, as compensation for EGAS' delivery failures between 1 February 2011 through 30 April 2012 and EGAS' failure to act as a RPPO during the same period.

- Indemnification for EGAS' Tripartite Repudiatory Breaches: the Tribunal awards EMG USD 230,935,579 (USD 280,935,579 minus 50,000,000) for the reduction in the value of EMG's business as of 30 April 2012.

1428. The aggregate of the above amounts is below USD 660.1 Million, which is EMG's claim for total losses attributable to the Tripartite Agreement, pre-tax[1640].

1429. The Tribunal notes that the amount awarded as compensation for EGAS' Tripartite Repudiatory Breaches, USD 230,935,579 is reasonably close to JWC' assessment of the book value of EMG's pipeline: USD 275.9 Million[1641]. JWC suggested that its preferred methodology for determining EMG's damages was based on its book value. The Tribunal does not agree for the reasons stated above[1642]. The Tribunal, however, finds that the book value is a convenient yardstick to double ckeck that the amount awarded is whithin a margin of reasonability: the compensation that EMG is being awarded for the fact that it will not be reselling gas to IEC until 2023, is (roughly) equivalent to the value of the investment made to build EMG's pipeline (net of depreciation).

## 7. RELIEF REGARDING TAXES

1430. EMG has requested the Tribunal to:

- Declare that the award of damages and interest should be made net of applicable Egyptian taxes[1643];

---

[1639] FTI I, p. 71.
[1640] FTI II, p. 13.
[1641] FTI/JWC, p. 3.
[1642] See para. 1356 *supra*.
[1643] C PHB, para. 178(e).

- Order EGAS to indemnify Claimant should Egypt impose any tax on the Award[1644].

## 7.1 THE PARTIES' POSITION

1431. EMG argues that the DCF model applied to calculate EMG' loss in the But For Scenario already reduces the cash flows by the applicable corporate tax in Egypt. Taxation of an eventual award as corporate income in Egypt would result in a double taxation of the same revenue[1645].

1432. EGAS replies that EMG has not proven that the reductions in the cash flows adequately reflect the tax burden that EMG would have borne in Egypt[1646]. And neither has EMG attempted to describe the tax liabilities it wishes to be indemnified for – the request is unworkably broad[1647].

## 7.2 THE TRIBUNAL'S DECISION

1433. EMG requests the Tribunal to declare that the amounts awarded to EMG should be net of taxes and to order EGAS to indemnify Claimant should Egypt impose any tax on the Award. EGAS disagrees.

1434. The Tribunal dismisses the request.

1435. The Award will order EGAS to pay certain amounts to EMG as compensation for damage suffered, plus interest. There are two possible types of taxes, which could be levied on the amounts awarded: direct taxes on EMG's income and indirect taxes on the payment ordered.

### A. Direct taxes

1436. EMG is an Egyptian company, resident for tax purposes in Egypt and subject to the tax regime provided for by Egypt's tax law. EMG's income may be subject to direct taxation in Egypt. The amounts awarded in this procedure may or may not form part of EMG's taxable income and they may or not be off-set with losses suffered by EMG. The Tribunal has not been briefed on any of these details and consequently cannot decide on the issue.

1437. Furthermore, the Tribunal is not prepared to grant a blanket indemnification in favour of EMG, because the Tribunal is not convinced that the principle of full compensation necessarily implies that a party ordered to pay an amount is additionally obliged to fully indemnify the recipient for any direct tax liability generated by the receipt of such compensation. The creditor's direct tax situation

---

[1644] C PHB, para. 178(f).
[1645] C FS M, para. 322.
[1646] $R_{1+2}$ SS M, para. 840.
[1647] $R_{1+2}$ SS M, para. 841.

is influenced by a number of subjective factors, outside the control of the defaulting party, and it does not seem reasonable nor equitable to shift this burden to the defaulting party.

1438. The Claimant has drawn the Tribunal's attention to the fact that the DCF model, which is the basis for the calculation of EMG's compensation for the Tripartite Repudiatory Breach, includes the effect of taxation. This assertion is correct: the compensation is calculated by comparing EMG's cash flows in a But For Scenario with the cash flows in the Actual Scenario. Both scenarios must provide a fair estimation of how reality could have evolved and how it actually did evolve. If cash flows in any of the two scenarios are subject to taxation, such tax must be taken into account. This is the solution followed by the Tribunal in the DCF model:

- the interest part of the WACC was reduced by the effect of taxation, because interest is a tax deductible expense;

- and EMG's cash flows were reduced by the impact of EMG's direct tax on income.

1439. But the fact that the value of EMG's business is calculated on the basis of a DCF model, and that the model factors in tax savings and tax payments, is unrelated to EMG's direct tax liability for the income generated by the compensation. EMG's argument to the contrary is a clear *non sequitur*[1648].

1440. Furthermore, the argument has no bearing whatsoever with regard to EMG's compensation for Tripartite Delivery Breaches. In the calculation of this loss of profit no taxation is factored in – nor should it be.

**B.  Indirect taxes**

1441. There is no evidence in the file showing that the payment by EGAS in favour of EMG of amounts awarded in this arbitration will result in the accrual of any indirect taxation (be it VAT, sales tax, withholding tax or any other indirect tax). In the absence of any indication that such a tax will be levied, and of the actual impact it may have on EMG (e.g. a withholding tax can in certain circumstances be deducted from EMG's tax bill) the Tribunal sides with EGAS and dismisses EMG's request for a blanket cover of all hypothetical indirect taxes.

---

[1648] *Contra Phillips Petroleum Company Venezuela Limited (Bermuda) and ConocoPhillips Petrozuata B.V. v. Petroleos de Venezuela, S.A*, (ICC Case No. 16848/JRF/CA), Award of 17 September 2012, Doc. CLA-45, para. 313, which unconvincingly argues that there is a relationship between the taxes incorporated into a DCF model, and the obligation of the debtor to assume the creditor's tax liability. An example clarifies the point: the fact that a seller and a buyer of a certain company establish the price through a DCF model, which incorporates the company's tax liabilities and savings, does not imply that additionally the buyer is under an obligation to indemnify the seller for the effect of direct taxation on the capital gains realised.

1442. <u>In conclusion,</u> the Tribunal dismisses EMG's request to declare that the amounts awarded to EMG should be net of taxes and to order EGAS to indemnify Claimant should Egypt impose any tax on the Award.

# XV.   QUANTUM (III): IEC'S COMPENSATION

1443. Historically, natural gas never figured among Israel's main energy sources; but the situation changed in the first decade of this century when Israel redefined its energy policy and decided to rely heavily on gas for its electricity generation – 58 of the 60 power generation units operated by IEC[1649] (Israel's State owned utility) eventually were fueled by gas and only two[1650] by coal.

1444. The reason for this change of policy was that between 2002 and 2005 Israel (and IEC) obtained access to two significant gas sources:

-   Yam Tethys gas, sourced from a gas field in Israel owned by the Delek Group; the contract with IEC dates back to 25 June 2002[1651], and provides for delivery of 1.7 BCM annually[1652];

-   Egyptian gas: in 2005 Egypt and Israel signed the MoU and IEC executed with EGAS and EMG the Tripartite Agreement and the On-Sale Agreement, guaranteeing a supply of 2.125 BCM of gas per year[1653].

1445. Supply of Egyptian gas began in July 2008, once the "Peace Pipeline" had been completed, but EGAS was never able to deliver in full the quantities of gas nominated by EMG for delivery to IEC. The shortfalls of Egyptian gas were covered by additional deliveries of Yam Tethys gas[1654].

1446. IEC's over reliance on Yam Tethys led to its premature depletion and as of 2011 IEC's contractual entitlement to acquire gas from Yam Tethys had to be reduced by half[1655]. IEC was, thus, constrained to use other fuels like coal, fuel oil and gasoil as a substitute of natural gas, although these alternatives were more expensive[1656]. IEC submits in this arbitration claims for the additional fuel costs incurred as a consequence of EGAS' failure to deliver.

Tamar and Leviathan

1447. In the meantime, a new field of gas off-shore from Israel's coasts, the Tamar field, was found. On 14 March 2012 IEC entered into a 15 year agreement for the

---

[1649] Aronovich WS, para. 24.
[1650] Orot Rabin and Rutenberg.
[1651] Doc. R3-61.
[1652] Schedule B to Ronai WS.
[1653] Schedule A to Ronai WS.
[1654] R3 FS M, para. 100.
[1655] R3 FS M, para. 101.
[1656] R3 FS M, para. 102.

supply of natural gas from the Tamar field ["**Tamar Contract**"][1657]. In 2013 – earlier than expected – Tamar gas came on stream, and the new field was capable of supplying the shortfalls in Egyptian gas[1658]. The availability of Tamar gas reduced IEC's need to resort to more expensive and dirtier fuels; and consequently, IEC's claims against EGAS for additional fuel costs were reduced significantly from 2013 onwards; but Tamar gas is, for the time being, more expensive than Egyptian gas and so additional fuel costs continue to be incurred (albeit at a reduced rate)[1659].

1448. Gas discoveries in Israel have not stopped; in 2010 the huge Leviathan gas field, with an estimated reserve of 535 BCM, was found[1660]. It is however unknown when Leviathan gas will become available and what the commercial terms are likely to be[1661].

IEC's claims for damages

1449. EGAS has committed two breaches vis-à-vis IEC:

- The Tripartite Delivery Breaches, which extended from the commencement of deliveries in July 2008 through the last gas nomination made on 12 May 2012[1662];

- The Tripartite Repudiatory Breach, which EGAS committed on 18 April 2012, the day in which it repudiated the Tripartite Agreement[1663].

1450. IEC now seeks to be indemnified in respect of the damage caused by these two Breaches. According to Nera, IEC's quantum expert, the damage suffered by IEC arises from two sources:

- In the absence of agreed deliveries of gas from EGAS, IEC had to resort to the purchase of alternative, more expensive types of fuel and thus incurred additional costs [the "**Additional Costs**" or the "**Additional Fuel Costs**"] plus

- Other costs associated with the purchase and use of alternative fuels, which Nera views as ultimately caused by EGAS' delivery failures [the "**Other Costs**"]; such costs include: additional turbine maintenance costs, costs of chartering a vessel for offshore LNG facilities, cost of chartering storage facilities, demurrage costs and costs for cancellation of two LNG cargos.

---

[1657] R₃ FS M, para. 114.
[1658] R₃ FS M, para. 114.
[1659] R₃ FS M, para. 114.
[1660] JWC I, para. 36.
[1661] R₃ FS M, para. 114.
[1662] See para. 1244 *supra*.
[1663] See para. 1203 *supra*.

1451. In Section **2.** of this chapter the Tribunal will explain the methodology underlying the calculation of compensation made by Nera, IEC's expert, and the criticism made by JWC, the counter-experts retained by EGAS. In Section **3.** the Tribunal will set out its decision. Issues relating to capitalisation and discounting rate will be dealt with separately in Section **4.**

1452. But before doing that, the Tribunal will address a number of legal arguments submitted by EGAS (**1.**), which may have an impact on the correct calculation of the compensation.

## 1.   LEGAL ARGUMENTS

1453. EGAS' basic contention is that IEC is not entitled to any compensation because it has suffered no harm: any Additional Fuel Costs it may have incurred were compensated by an increase in the electricity tariff, authorised by the Israeli electricity supervisor, PUA, and passed on to Israeli consumers as price increases for electricity (**1.1.**).

1454. Additionally, EGAS argues that IEC cannot claim compensation for any delivery failure prior to February 2011 (the first alleged *force majeure* event) (**1.2.**). If the Tribunal were to award any compensation, EGAS avers that the damages sought do not meet the required standards of foreseeability, remoteness and proof (**1.3.**).

## 1.1   PASS THROUGH

### A.   **EGAS' position**

1455. In response to IEC's claims for Additional Fuel Costs, EGAS avers that IEC has sustained no loss, because PUA is required to set tariffs on the basis of recognised costs, and so IEC's replacement fuel costs have and will continue to be passed on to consumers through higher electricity tariffs.

1456. EGAS adds that as a principle of English law, a claimant must take all reasonable steps to mitigate any loss, which it might otherwise suffer as a result of a breach of contract, and cannot recover damages which it could have avoided[1664]. In this case, IEC successfully mitigated its loss by successfully petitioning PUA to raise the electricity tariff prices paid by Israeli consumers in an amount equal to the Additional Fuel Costs and Other Costs[1665].

1457. If IEC were to receive a compensation to reflect such increased costs, that would constitute a gratuitous windfall which should not be permitted[1666].

---

[1664] R$_{1+2}$ SS M, para. 1017.
[1665] R$_{1+2}$ SS M, para. 1018.
[1666] R$_{1+2}$ SS M para. 940. Reliance is placed on *Wertheim v Chicoutimi Pulp Co.* [1911] AC 380 ["*Wertheim*"], submitted as Doc. RL$_{1+2}$-101, p. 308.

1458. Alternatively, EGAS says that the recovery of Additional Costs through tariff increases should be taken into account in the assessment of damages, in accordance with the principles of the *British Westinghouse* case[1667]. And no exception to such principles applies, as IEC's tariff increases are the direct result of action it took to mitigate the alleged breach, with the gain it received being both the intended and actual outcome of petitioning the PUA to increase the tariff – no collateral benefit exists[1668], the gains that IEC realised not being akin to the receipt of a gratuitous benefit from a third party[1669]. IEC's petitioning of PUA to increase the tariff was carried out immediately after EGAS' breach[1670], and in the ordinary course of its business[1671]; there is no doubt that it was an act of mitigation[1672].

Cartel litigation

1459. As a final argument, EGAS avers that other areas of English law confirm that IEC cannot be awarded damages for losses that have been passed on to consumers; for example in cartel litigation: a retailer will not be able to claim damages from a manufacturer for price-fixing, if the retailer has suffered no recoverable loss because the price that it has charged to its customers already included the additional cost[1673].

## B.    IEC's position

1460. IEC argues that PUA's decision to raise prices is irrelevant for deciding whether IEC has suffered a loss as a result of replacement fuel costs caused by EGAS' failure to deliver gas, because the tariff rise is a *res inter alios acta*: it is not the result of any step taken by IEC to mitigate losses; it is a benefit under the pre-existing statutory regime governing the relationship between PUA and IEC; the raising of tariffs and the sale of electricity to consumers is an independent transaction from the purchase of replacement fuels[1674]. EGAS is wrong to suggest that the increase in tariffs was not extraneous to the breach of contract because here the breach merely provided the occasion for the benefit to be provided[1675].

1461. The *British Westinghouse* case invoked by EGAS does not really assist its argument because the decision dealt with a situation in which, through the course of its own actions to mitigate its loss, the innocent party managed to extinguish

---

[1667] *British Westinghouse Co. v Underground Railway* [1912] AC 673 ["*British Westinghouse*"], submitted as Doc. RL$_{1+2}$–49.
[1668] R$_{1+2}$ PHB, para. 346.
[1669] R$_{1+2}$ SS M, para. 950.
[1670] R$_{1+2}$ SS M, para. 952.
[1671] R$_{1+2}$ SS M, para. 951
[1672] R$_{1+2}$ SS M, para. 951
[1673] R$_{1+2}$ SS M, para. 958.
[1674] R$_3$ PHB, para. 177.
[1675] R$_3$ PHB, para. 183.

those losses entirely[1676]. But *Treitel* and *Chitty* both acknowledge that the *British Westinghouse* case implies that damages will not be reduced by reason of benefits arising from third parties such as insurance, compensation under another contract, etc.[1677].

1462. IEC does not agree with EGAS' position under English competition law and maintains that in any event (IEC's claim is not a competition claim[1678]) there is no authority[1679]. Furthermore, other Common Law jurisdictions, such as the U.S. and Canadian Courts have rejected the passing on defence[1680].

1463. IEC's position is that in this case EGAS has caused IEC to incur into massive replacement fuel costs; but the people who have suffered the loss are the Israeli people who have no action against EGAS. English law will strive to ensure that a loss suffered does not fall into a "black hole" and so, where there is a "right" there should also be a "remedy" and the result that IEC was prevented from presenting a claim would not accord with any common sense view of justice.

## C.   The Tribunal's decision

1464. The Tribunal notes that, although the parties have treated this issue as a legal matter, it is clear that they have different views as to the facts:

- On the one hand EGAS treats it as common ground that IEC's replacement fuel costs have been and will continue to be passed on[1681];

- On the other hand, IEC has emphasised that PUA is likely to seek to recoup the Additional Costs through future tariff adjustments[1682]. This point was supported by Mr. Kay, the head of the finance division at IEC[1683]:

  > "Furthermore, if and to the extent that IEC makes any recovery in this arbitration for the significant financial loss which it has suffered, I have little doubt that the PUA will seek to recover the entirety of the increases in tariff from IEC by consequent reductions in tariff over a corresponding period or perhaps with immediate effect".

1465. Mr. Kay was not required to attend to submit to cross-examination. The Tribunal recognises that his evidence is not unchallenged. Nevertheless, the Tribunal takes the view that EGAS has failed to established that IEC would be placed by a substantial award of damages in a better position than that in which it would have

---

[1676] R₃ PHB, para. 174.
[1677] R₃ PHB, para. 176.
[1678] R₃ PHB, para. 189.
[1679] R₃ PHB, para. 187.
[1680] R₃ PHB, para. 188.
[1681] R₁₊₂ PHB para. 344.
[1682] R₃ PHB at para. 166(h); Transcript, 15 May 2014, p. 2502, line 21.
[1683] Doc. R₃-106. Kay WS, para. 51.

been had the contract been performed. Nor has it been made out that IEC would thereby receive a windfall or any "gain". On the contrary, PUA is likely to off-set any hypothetical amount awarded by lowering the electricity tariffs.

1466. But even if *arguendo* one were to assume that there would be such a gain, the Tribunal is still not persuaded by EGAS. The Tribunal concurs with IEC that the starting point is that English law strives to avoid the result that a loss which has been sustained falls into a "black hole". The applicable test was set out by Viscount Haldane in the *British Westinghouse* case[1684]:

> "The subsequent transaction, if to be taken into account, must be one arising out of the consequences of the breach and in the ordinary course of business. This distinguishes such cases from a quite different class illustrated by *Bradburn v Great Western Ry. Co.*, where it was held that, in an action for injuries caused by the defendants' negligence, a sum received by the plaintiff on a policy for insurance against accident could not be taken into account in reduction of damages. The reason of the decision was that it was not the accident, but a contract wholly independent of the relation between the plaintiff and the defendant, which gave the plaintiff his advantage".

1467. To the Tribunal, the relevant aspects of the PUA tariff adjustment arrangement which are compelling are as follows:

- As with an insurance policy, the relationship between IEC and PUA is wholly independent of the contract between IEC and EGAS;

- The fact that PUA made a tariff adjustment in IEC's favour can hardly be said to have been in the ordinary course of business of IEC as a consumer of gas;

- This was not a case where IEC's efforts in mitigation of loss had the effect of removing the loss itself as in the *British Westinghouse* and *Wertheim* cases themselves; rather, the loss remained but was transferred, at least temporarily, to the Israeli consumer.

1468. In these circumstances, even if it were found that IEC sustained a windfall, the Tribunal would nevertheless hold that the windfall does not fall to be taken into account in the assessment of damages.

---

[1684] *British Westinghouse*, p. 690.

## 1.2   NO COMPENSATION FOR JULY 2008 – JANUARY 2011

### A.   EGAS' position

1469. EGAS bases its defence on two arguments:

- Under the On-Sale Agreement IEC is only entitled to obtain Shortfall Compensation from EMG, it cannot now claim Additional Costs (**a.**);

- Alternatively, if IEC could claim Additional Costs, such claim would be restricted to the period after May 2009, because claims for alleged delivery failures prior to that date were settled between EGAS and EMG (**b.**).

### a.   Shortfall Compensation: exclusive regime

1470. In EGAS' view, any claim under the Tripartite Agreement is subject to the same limitations on liability as claims under the On-Sale Agreement; the reason being that the Tripartite Agreement was not meant to be a mechanism to circumvent any restrictions or limitations on any claim for breach of contract, which IEC might have against EMG under the On-Sale Agreement[1685].

1471. Consequently, EGAS' liability to IEC in respect of any claim for damages for non-delivery cannot be any greater than EMG's liability to IEC under the On-Sale Agreement[1686]. Such liability is limited, among other provisions, by Art. 14.2 and Art. 3.11: the total compensation IEC can obtain for delivery failures is limited to Shortfall Compensation (Arts. 3.6 and 3.7 of the On-Sale Agreement)[1687].

1472. EGAS recalls an argument already made when addressing EMG's claims for historical loss of profit: EMG was compensated for delivery shortfalls under the GSPA in due course; if thus follows that IEC cannot claim compensation for the same period[1688]. If EGAS is held responsible during that period, its liability is limited to outstanding Shortfall Compensation due under the On-Sale Agreement[1689].

---

[1685] R<sub>1+2</sub> SupS, para. 34.
[1686] R<sub>1+2</sub> FS M, para. 702.
[1687] R<sub>1+2</sub> FS M, para. 719 and R<sub>1+2</sub> SS M, para. 999.
[1688] R<sub>1+2</sub> SS, para. 889.
[1689] R<sub>1+2</sub> SS M, para. 998.

### b.    Settlement

1473. As a second argument, EGAS avers[1690] that any claims relating to the CY1 were settled: EGAS and EMG signed a Release of Claims accompanying the First Amendment to the GSPA on 31 May 2009, which relieved those parties from

> "any liability for breach or alleged breach pursuant to the GSPA which may have occurred during the period up to the First Amendment Effective Date".

1474. EGAS argues that any claim under the Tripartite Agreement requires first a finding that EGAS breached its obligations to EMG under the GSPA; the fact that there can be no liability under the GSPA before 31 May 2009 precludes any claim by IEC under the Tripartite Agreement prior to that date[1691].

### B.    IEC's position

1475. IEC maintains that it is entitled to such compensation, because it has not waived its right to claim it (**a.**) and because its claim is not subject to any liability limitations contained in the On-Sale Agreement (**b.**).

### a.    No waiver

1476. The fact that IEC did not file any claim against EGAS prior to January 2012 for non-deliveries in the 2008 – 2011 period does not constitute a waiver.

1477. Pursuant to Art. 12 of the Tripartite Agreement no waiver is effective, unless set forth in a written instrument duly executed by the Parties; and in this case, there was none: IEC has therefore not waived its entitlement to claim damages for the earlier period[1692].

### b.    On-Sale exclusion clauses not applicable

1478. EGAS wishes to rely on Art. 14.2 of the On-Sale Agreement, which allegedly limits compensation for delivery failures to Hourly and Daily Shortfall compensation, pursuant to Arts. 3.6 and 3.7 of the On-Sale Agreement.

1479. IEC replies that EGAS is not a party to the On-Sale Agreement, and that IEC is not suing EGAS under the On-Sale Agreement, but under the Tripartite Agreement, for breaches of Arts. 1 and 2 – any possible liability limitation clauses contained in the On-Sale Agreement are thus irrelevant; the relevant contract is

---

[1690] R$_{1+2}$ SS M, para. 884.
[1691] R$_{1+2}$ SS M, para. 885.
[1692] R$_3$ SS M, para. 45.

the Tripartite Agreement, which contains no exclusion clauses or any limitation on liability[1693].

## C.   The Tribunal's decision

1480. The Tribunal must establish whether IEC has waived its right to claim damages or is estopped from doing so (**a.**). If the answer is no, it will turn to the next issue, whether IEC's remedies for delivery failures are limited to Shortfall Compensation (**b.**). If the answer is in the negative, the Tribunal will decide whether the claim for damages for the period July 2008 – May 2009 must be dismissed, because EMG and EGAS had settled all their claims arising from that period (**c.**).

### a.   Possible waiver

1481. It appears that EGAS seeks to rely upon an argument of estoppel by representation.

1482. In order to succeed on such a plea, EGAS would have to establish not only a representation to the effect that IEC would advance no claims against it for the relevant period but also:

- Reliance: proof that, as a matter of fact, EGAS relied upon such a representation or representations; and
- Inequity: that it would be inequitable to allow IEC to resile from its representation.

1483. Although the argument was included in its First Submission[1694], the point has not been developed by EGAS or repeated, and no evidence has been called in support of the case advanced. In particular, reliance and inequity have not been established.

1484. In conclusion, the Tribunal dismisses EGAS' defence based on estoppel by representation on the footing that the requisite facts have not been established.

### b.   Shortfall Compensation

1485. The Tribunal has already determined that EGAS can validly invoke all remedies and exclusion clauses available under the On-Sale Agreement, as a defence against a claim brought against it by IEC under the Tripartite Agreement[1695]. Under Art. 1 of the Tripartite Agreement EGAS undertakes to supply a certain quantity of gas to EMG for onward delivery to IEC. But the detailed regulation of how this obligation must be complied with, and of the available defences, are

---

[1693] R₃ PHB, para. 273.
[1694] R₁₊₂ FS M, para. 5.
[1695] See paras. 443 *et seq.* and 1266 *supra*.

developed in the GSPA and in the On-Sale Agreement. For this reason, when deciding on the limitations applicable to EGAS' liability for breach of the Tripartite Agreement, the Tribunal will apply and interpret the relevant provisions of the GSPA and of the On-Sale Agreement.

1486. One of the provisions in the On-Sale Agreement that EGAS now wishes to benefit from is the Shortfall Compensation regime.

1487. The Tribunal will first analyse the terms and conditions for delivery under the On-Sale Agreement (**i.**) and then decide whether, as was resolved vis-à-vis EMG, EGAS' sole liability for Tripartite Delivery Breaches is the Shortfall Compensation provided for in the On-Sale Agreement (**ii**).

(i)     Relevant contractual provisions

1488. The Shortfall Compensation regime is contained in Art. 3 of the On-Sale Agreement[1696] and was profoundly modified in its Fifth Amendment[1697]. The following quotation reproduces the consolidated Shortfall Compensation regime after the Fifth Amendment (where appropriate, the Tribunal has regrouped provisions in order to provide a clear picture of the compensation regime for the three possible delivery failures: hourly, daily and monthly).

> "3.6 Hourly Delivery Failure
>
> 3.6.1 If, in respect of any Hour during the Supply Period, Seller fails to deliver the Properly Nominated Quantity (other an in circumstances when Seller is excused pursuant to this Agreement) ("**Hourly Delivery Failure**"), the difference between the Properly Nominated Quantity and the quantity of Gas delivered by Seller during such Hour shall be the "**Hourly Failure Quantity**". To the extent that the Hourly Failure Quantity exceeds five percent (5%) of the Properly Nominated Quantity, such excess quantity shall be multiplied by two (2) and shall be classified as "**Hourly Shortfall Gas**"; *provided that* if the Hourly Failure Quantity is equal to or greater than ten percent (10%) of the Properly Nominated Quantity, the Hourly Shortfall Gas for such Hour shall equal the Hourly Failure Quantity.
>
> 3.6.2 Hourly Shortfall Gas, which accrues in respect of any Hour where the Properly Nominated Quantity:
>
> (a) is in excess of the Hourly Maximum shall be classified as "**First Hourly Shortfall Gas**"; and
>
> (b) does not exceed the Hourly Maximum shall be classified as "**Second Hourly Shortfall Gas**"[...]
>
> 3.6.4 In respect of each Hour in which Hourly Shortfall Gas accrues, Seller shall be liable to Buyer for a sum (the "**Hourly Shortfall Compensation**") calculated as follows: (i) twenty-five percent (25%) of the applicable Contract Price multiplied by

---

[1696] Doc. R₃-40.
[1697] Doc. R₃-41.

any quantity of First Hourly Shortfall Gas, and (ii) five percent (5%) of the applicable Contract price multiplied by any quantity of Second Hourly Shortfall Gas.

3.6.5 To the extent that Buyer incurs fees or charges pursuant to its Transportation Agreement as a result of an Hourly Delivery Failure in circumstances where the Hourly Failure Quantity exceeds five percent (5%) of the Properly Nominated Quantity, Seller shall be liable to Buyer for a sum equal to those fees and charges (except to the extent it is agreed by the Parties, or determined by an Expert in accordance with Sections 3.10 and 10.9, that such fees or charges are not commercially reasonable).

3.6.6 During the Supply Period, any sums due to Buyer under this Section 3.6 shall be included in Buyer's Credit […] in the next Quarterly Statement following the Hourly Delivery Failure. […]

3.7 Daily Delivery Failure

3.7.1 To the extent that Seller fails to deliver during any Day during the Supply Period the aggregate of the Properly Nominated Quantities for such Day (other than in circumstances when Seller is excused pursuant to this Agreement) ("**Daily Delivery Failure**"), the quantity of Gas attributable to any such Daily Delivery Failure that is greater than an amount equal to two percent (2%) of the aggregate of the Properly Nominated Quantities for such Day shall be classified as "**Daily Shortfall Gas**". […]

3.13.1.(a) With respect to any quantity of Gas attributable to any Daily Delivery Failure (as defined in Section 3.7.1 of this Agreement) during any Day that is two percent (2%) or less of the Properly Nominated Quantity for such Day, Seller may notify Buyer that Seller shall make such undelivered Gas available to Buyer during one or more Days later during such Month. […] To the extent that Seller actually makes available such Gas to Buyer on any Day so notified by Seller and otherwise in accordance with the provisions of this Section 3.13.1(a), the amount of such Gas so made available shall reduce the aggregate amount of Monthly Shortfall Gas. […]

3.13.1.(b) To the extent that there is Daily Shortfall Gas (as defined in Section 3.7.1 of this Agreement) for any Day, Buyer may notify Seller of one or more Days on which Buyer would like to receive from Seller such Daily Shortfall Gas […]. Such Hourly Nominations for Gas to be delivered pursuant to this Section 3.13.(b) shall be deemed to be part of the "Properly Nominated Quantity" […]. The delivery of such Daily Shortfall Gas shall be in addition to the other delivery obligations of Seller pursuant to this Agreement. Buyer shall pay the applicable Contract Price for such Gas, and the amount of such Gas so delivered shall reduce the aggregate amount of Monthly Shortfall Gas.

3.7.3 To the extent that Buyer incurs fees and charges pursuant to the Transportation Agreement as the result of Daily Shortfall Gas, Seller shall be liable to Buyer for a sum equal to those fees and charges (the "**Daily Shortfall Compensation**"). During the Supply Period, any amounts of Daily Shortfall shall be included in Buyer's Credit […] (except to the extent it is agreed by the Parties, or determined by an Expert in accordance with Sections 3.10 and 10.9, that such fees or charges are not commercially reasonable). […]

3.13 Monthly Delivery Failure

3.13.1 To the extent that Seller Fails to deliver during any Month during the Supply Period the Properly Nominated Quantities on a Day-by-Day basis for such Month (other than in circumstances in which Seller is excused pursuant to this Agreement) ("**Monthly Delivery Failure**"), the aggregate quantity of Gas that Seller fails to deliver on a Day-by-Day basis during such Delivery Month shall be classified as "**Monthly Shortfall Gas**". […]

3.13.3 To the extent that the Monthly Shortfall Gas in any Delivery Month is greater than two percent (2%) of the aggregate Properly Nominated Quantities for such Delivery Month, in addition to any Hourly Shortfall Compensation payable pursuant to Section 3.6.4 of this Agreement and any Daily Shortfall Compensation payable pursuant to Section 3.7.3 of this Agreement with respect to such quantities, and in addition to the re-delivery obligations of Seller set forth in Section 3.13.5 of this Agreement, Buyer shall be entitled to receive an amount (the "**Monthly Shortfall Compensation**") equal to the product of (a) 45 cent (forty five United States Cents), multiplied by (b) the amount of the Monthly Shortfall Gas that is greater than two percent (2%) of the aggregate Properly Nominated Quantities for such Delivery Month (stated in MMBTU) during such Delivery Month (as reduced in accordance with Section 3.13.1 of this Agreement).

3.13.4 Buyer shall deduct any Monthly Shortfall Compensation payable by Seller pursuant to this Section 3.13 from amounts due pursuant to the Monthly Invoice […].

3.13.5 To the extent that Monthly Shortfall Gas in any Delivery Month is greater than two percent (2%) of the aggregate Properly Nominated Quantities for such Delivery Month, Seller shall be obligated to deliver such Monthly Shortfall Gas in accordance with the following procedures:

(a) Within thirty (30) days following the Delivery Month in which the Monthly Delivery Failure occurred, the Parties, acting in good faith, will agree on the delivery schedule of such Monthly Shortfall Gas; such delivery schedule shall provide for the delivery of all such Monthly Shortfall Gas within a period of 180 days following the last day of the Delivery Month during which the Monthly Delivery Failure occurred. […].

(b) The delivery of such Monthly Shortfall Gas shall be in addition to the other delivery obligations of Seller pursuant to this Agreement. Buyer shall pay no additional amounts for such Gas other than the applicable Contract Price for such Gas in effect during the Delivery Month in which the Monthly Delivery Failure occurred.

(c) To the extent that Seller makes available quantities of Monthly Shortfall Gas in accordance with the provisions of this Section 3.13.5, any Monthly Shortfall Compensation previously deducted by Buyer, or paid to Buyer by Seller, pursuant to Section 3.13.4 […] attributable to such quantities of Monthly Shortfall Gas shall be paid by Buyer to Seller, such payment to be made within thirty (30) days following the end of the Month during which such deliveries of Monthly Shortfall Gas occurred (the "**Monthly Shortfall Compensation Repayment**").

3.11 <u>Limitation on Liability</u>. Subject to Section 14.1 and Annex 2.1 the Parties agree that the amounts described in Sections 3.6 through 3.9 (inclusive) and 3.13 shall be the limit of Sellers liability to Buyer for any and all damages, losses, expenses, liabilities, costs or claims for any Hourly Delivery Failure, any Daily Delivery Failure, Monthly Delivery Failure, any Overdelivery Gas, any Hourly Excess Gas or

any other failure by Seller during the Supply Period to deliver Properly Nominated Quantities of Gas pursuant to this Agreement.

(ii)   Shortfall Compensation as a liability cap

1489. The Shortfall Compensation regime under the On-Sale Agreement reiterates the distinctive features of the shortfall compensation regime under the GSPA:

- Re-delivery gas: IEC is entitled to obtain Daily Shortfall Gas (Art. 3.13.1(a) and (b)) and Monthly Shortfall Gas (reduced by the Daily Shortfall Gas already obtained) (Art. 3.13.5);

- Monetary Compensation: in cases of delivery failure, IEC receives Hourly Shortfall Compensation (Art. 3.6.4) and Monthly Shortfall Compensation (Art. 3.13.3); this latter would only be refunded if EMG redelivered the Monthly Shortfall Gas as agreed (Art. 3.13.5.(c));

- Pass Through Penalty: if IEC incurrs in fees or charges under the Transportation Agreements as a consequence of Hourly and Daily Delivery Failures, IEC is entitled to recover these amounts from EMG (Arts. 3.6.5 and 3.7.3).

1490. There is however a significant difference between the regimes under the GSPA and the On-Sale Agreement: the GSPA lacks a provision similar to Art. 3.11 of the On-Sale Agreement, which clearly establishes that under the On-Sale Agreement the shortfall compensation operates as a limitation to Seller's liability arising from delivery failures.

1491. EGAS is thus correct when it argues that the Shortfall Compensations under Arts. 3.6, 3.7 and 3.13 of the On-Sale Agreement works as a limit to EMG's liability (and consequently also to EGAS' liability).

1492. The Tribunal consequently finds that for the period between 1 February 2011 (February being the first month when payment of Shortfall Compensation was stopped[1698]) and 30 April 2012 (the date the Tripartite Agreement was repudiated[1699]), in the absence of evidence of re-delivery gas and penalties, the compensation to which IEC is entitled for Tripartite Delivery Breaches is capped at the aggregate amount resulting from the Hourly and Monthly Shortfall

---

[1698] See para. 1045 *supra*, where the Tribunal found that IEC claimed (and, apparently, received) Shortfall Compensation from EMG until the end of January 2011.

[1699] The repudiation of the Tripartite Agreement occurred on 18 April 2012, but for convenience, the Tribunal will approach the assessment of damages on the basis that it occurred at the end of the month.

Compensation of Arts. 3.6.4 and 3.13.3 of the On-Sale Agreement[1700]. The situation is analogous to EMG's case[1701].

1493. There is still one issue to address: EGAS maintains that IEC is entitled to no damages prior to February 2011, because it was duly compensated under the Shortfall Compensation regime of the On-Sale Agreement. IEC has not denied the fact that the Shortfall Compensation regime was complied with until the end of January 2011 and, since this compensation acts as a cap to any liability for delivery failures, the Tribunal concurs with EGAS. IEC is not entitled to seek further damages for the Tripartite Delivery Breaches which occurred prior to 1 February 2011.

### c.    Settlement

1494. The Tribunal now turns to the question whether EGAS can use the settlement reached between EMG and EGAS with respect to claims which had arisen before 31 May 2009 as a defence against IEC's claim.

1495. The answer to this question is a clear no: the settlement reached is *res inter alios acta*, an agreement between EMG and EGAS, which cannot jeopardise IEC's rights and its legal standing under the Tripartite Agreement. *Reductio ad absurdum*: if EGAS and EMG, two Egyptian companies in which the first is a significant shareholder of the second, decided to settle all claims for non-delivery arising from the Tripartite Agreement, IEC would lose all protection afforded by such agreement, and the very purpose for which the Tripartite Agreement had been conceived would be rendered meaningless.

### 1.3    DAMAGES NOT FORESEEABLE OR TOO REMOTE

### A.    <u>EGAS' position</u>

1496. EGAS submits that it is entitled to benefit from another provision contained in the On-Sale Agreement: Art. 14.4.1 (a provision materially identical to Art. 19.1 of Annex 1 to the GSPA), which excludes indirect or consequential losses, i.e. those falling within the second limb of *Hadley Baxendale*[1702]: losses which do not arise naturally from the breach, but by reason only of special circumstances[1703].

1497. Respondents 1 and 2 claim that 85% of IEC's damages are related to losses caused by the fundamental deficiencies of IEC's generation system[1704] and that

---

[1700] The Daily Shortfall Compensation, has a misleading title, because it is not a Monetary Compensation as the Hourly and Monthly Shortfall Compensations, it is the penalty under the Transportation Agreement accrued as a consequence of Daily Shortfall Gas (Art. 3.7.3).
[1701] See para. 1286 *supra*.
[1702] R$_{1+2}$ FS M, para. 712.
[1703] R$_{1+2}$ SS M, para. 995.
[1704] JWC IV, para. 92.

only 15% are attributable to shortfalls of Egyptian gas[1705] (**a.**). And with respect to the remaining 15% of the loss, EGAS submits that if every head of losses is examined individually, it does not meet the remoteness and foreseeability standard (**b.**). Finally, Other Costs must be rejected for similar reasons (**c.**).

### a.      Losses caused by IEC's alleged inefficiencies

1498. EGAS does not expect IEC to be perfect, but IEC cannot claim damages which flow from

- its own failure to make the investments that a reasonable operator, when it entered into the Tripartite Agreement in 2005, would have made in order to run an efficient generation system[1706];

- or from IEC's decision not to operate on a minimum fuel cost basis[1707].

1499. EGAS' expert, JWC, identifies a number of alleged inefficiencies in IEC's operations which have increased the costs now claimed:

- <u>Lack of reserve capacity</u>[1708]: EGAS would have expected IEC to use gas storage[1709]; this failure forces IEC to respond to shortfalls in gas supply by resorting to generation capacity that runs on more costly fuels[1710].

- <u>Lack of base-load coal burning generation capacity</u>: IEC had plans to construct additional coal-fired generation capacity in 2005, because coal is the second less expensive alternative source of fuel available to IEC[1711], but it never implemented those plans; and in addition, IEC restricted the use of coal plants already in place[1712].

- <u>Lack of pumped electricity storage</u>: in 2005 Israeli regulations envisaged the development of pumped storage, which was never executed[1713].

- <u>Weak gasoil distribution system</u>: IEC's gasoil distribution system is inefficient and causes inefficient allocation of gasoil and additional costs, due inter alia to limitations imposed by third parties in transporting gasoil,

---

[1705] R$_{1+2}$ SS M, para. 1071.
[1706] R$_{1+2}$ SS M, para. 1073.
[1707] R$_{1+2}$ SS M, para. 1084.
[1708] R$_{1+2}$ SS M, para. 1074.
[1709] R$_{1+2}$ SS M, para. 1096.
[1710] R$_{1+2}$ SS M, para. 1079.
[1711] R$_{1+2}$ SS M, para. 1080.
[1712] R$_{1+2}$ SS M, para. 1084.
[1713] R$_{1+2}$ SS M, para. 1085.

which is neither foreseeable, nor attributable to the shortages in Egyptian gas supply[1714].

- <u>Inflexible gas turbines</u>: not all of IEC's turbines can be run on alternative fuels when gas is unavailable[1715].

1500. JWC adds that IEC's typical response to a shortage of a base-load fuel was to increase the use of high-cost distillate fuels and fuel oil; expensive capacity that would normally be used only in peak periods of demand has been used to meet base load demand[1716].

1501. Had IEC invested in more coal capacity, as were its plans back in 2005[1717], in JWC's opinion:

- An additional 1.2 – 2.4 GW of coal-fired capacity would have been available by 2011, which would have avoided additional diesel costs; the damage for 2011 – 2014 would have decreased to USD 1.579 Billion (with 1.2 GW)[1718] and to USD 771.5 Million (with 2.4 GW)[1719];

- Increased coal capacity would reduce the Yam Tethys gas required in 2011, which could then be used in 2012; this carry-forward would reduce damages to USD 1.022 Billion (with 1.2 GW)[1720] and to USD 456 Million (with 2.4 GW)[1721];

- IEC relied on LNG to make up for some of the shortfall in Egyptian gas, but with this additional coal capacity, LNG would not be necessary because the quantities of pipeline gas from Yam Tethys and Tamar would be enough, saving in total USD 550.1 Million in 2013 and 2014[1722];

- If LNG volumes are disregarded, the average fuel price falls to USD 1.239 Billion (with 1.2 GW) and to USD 540 Million (with 2.4 GW)[1723].

**b.    Remoteness, foreseeability and proof**

1502. EGAS argues that each of the heads of losses claimed by IEC is too remote, unforeseeable or unproven; for EGAS to be held liable, it should have been made

---

[1714] R$_{1+2}$ SS M, fn. 1368.
[1715] R$_{1+2}$ SS M, para. 1099.
[1716] JWC II, para. 62.
[1717] JWC II, para. 68.
[1718] JWC III, para. 94:
[1719] JWC III, para. 95.
[1720] JWC III, para. 104.
[1721] JWC III, para. 105.
[1722] JWC III, para. 100.
[1723] JWC III, para. 101.

aware by IEC of special circumstances, which IEC did not[1724]. And under English law the breach of contract must be the effective or dominant cause of the loss claimed, and here it is not[1725]: these additional costs are too remote from the shortages in Egyptian gas supply[1726].

1503. EGAS avers that it had no reason to suppose that substitute Israeli gas would cost IEC any more than the gas supplied under the On-Sale Agreement[1727]: EGAS was only aware at the time of entering into the Tripartite Agreement that IEC had executed a contract for the supply of gas from Yam Tethys, but there was no reason for EGAS to suppose that gas from Yam Tethys would not serve as substitute gas at the same or lower price[1728]. EGAS was not made aware that the Yam Tethys contract was limited to a maximum total of 18 BCM over 11 years and that its price was raised in July 2009[1729]. Again, these costs are not caused in an effective and dominant way by Egyptian gas' delivery failures[1730].

1504. Even if substitute fuels were considered, EGAS could not have foreseen that liquid fuels instead of coal would be used[1731], because at the time the Tripartite Agreement was entered, there was no evidence of apparent limitations on IEC's capacity to burn coal[1732], and a clear plan existed for extensive further coal-fired generation capacity. In fact, approval was given in 2002 and in 2003 and continuous development was suggested in 2004[1733].

1505. Additionally, damages cannot be awarded for future loss where the Tribunal can only speculate as to whether the losses claimed will actually be suffered[1734].

c.    **Other Costs**

1506. IEC claims damages for a series of Other Costs remotely related to EGAS' failure to deliver and for which there is no proof:

-    Cost of higher maintenance: these costs arise from the higher use of liquid fuels and from the unusual features of the maintenance contract with General Electric (notably the maintenance contract with Siemens would be unaffected by the increased use of liquid fuels) – EGAS was not made aware of this circumstance[1735]; these claims are in any event excessive and

---

[1724] R$_{1+2}$ FS M, para. 725.
[1725] R$_{1+2}$ FS M, para. 737.
[1726] R$_{1+2}$ SS M, para. 1112.
[1727] R$_{1+2}$ FS M, para. 729.
[1728] R$_{1+2}$ FS M, para. 730.
[1729] R$_{1+2}$ FS M, para. 731.
[1730] R$_{1+2}$ FS M, para. 737.
[1731] R$_{1+2}$ FS M, para. 738.
[1732] R$_{1+2}$ FS M, para. 740.
[1733] Transcript, Day 10, p. 2223.
[1734] R$_{1+2}$ FS M, para. 753.
[1735] R$_{1+2}$ FS M, para. 750.

without merit and IEC has failed to establish any legal basis for them, nor that they were attributable to shortfalls of Egyptian gas foreseeable in 2005[1736];

- Cost of chartering storage facilities: at the time of entering into the Tripartite Agreement, EGAS had no reason to suppose that IEC would use any gasoil[1737], let alone store it, and EGAS was not made aware of IEC's limited storage capacity for gasoil[1738];

- Cost of chartering a vessel for offshore LNG facilities: this cost was not within the parties' reasonable contemplation; LNG was not – as IEC accepts – an attractive or realistic option at the time of entering into the Tripartite Agreement[1739];

- Demurrage costs and costs for cancellation of two LNG cargos: these costs are completely far-fetched[1740] and IEC has not even explained why they were cancelled or demurrage costs incurred[1741].

## B.   IEC's position

### a.   Alleged inefficiencies

1507. IEC stresses that it is simply claiming to be compensated for the extra costs of replacing Egyptian gas with other fuels. These alternative fuels are those which were available to IEC with the realities of the Israeli system[1742].

1508. IEC views EGAS' position as a criticism to IEC for not having a perfect power supply and storage operation. That is totally unrealistic, because no reasonable person would expect any power supply and storage operation to be perfect[1743]. A claimant has a duty to mitigate losses, but is under no obligation to do anything otherwise than in the ordinary course of business[1744], and the law is satisfied if the party placed in a difficult situation by reason of the breach has acted reasonably in the adoption of remedial measures[1745].

1509. The unspoken assumption underlying EGAS' proposition is that IEC should have considered that EGAS was going to breach the Tripartite Agreement; when in

---

[1736] R$_{1+2}$ SS M, para. 1103.
[1737] R$_{1+2}$ FS M, para. 745.
[1738] R$_{1+2}$ FS M, para. 746.
[1739] R$_{1+2}$ FS M, para. 748.
[1740] R$_{1+2}$ SS M, para. 933.
[1741] R$_{1+2}$ SS M, para. 1104.
[1742] R$_3$ SS M, para. 258.
[1743] R$_3$ SS M, para. 287.
[1744] R$_3$ SS M, para. 265.
[1745] R$_3$ SS M, para. 267.

fact, the decisions made between 2005-2011/2012 were made on the basis that 2.2 BCM of Egyptian gas would be supplied to IEC[1746].

1510. And even if IEC had been under an obligation to "cure its inefficiencies", the duty to mitigate in English law only arises upon the breach of contract: coal-fired power plants take years to build, and it would be for the breaching party to pay for any capital costs incurred in mitigation – two factors which EGAS ignores[1747].

1511. As regards the specific numbers calculated by JWC for the alleged cost reduction which could have been achieved:

- Nera says that an increase in coal capacity was not reasonable: coal price has been low on international markets in recent years, but many government agencies are limiting the running hours of coal-fired power stations[1748]; thus any reduction in IEC's Additional Fuels Costs would only be temporary[1749]; and in any event, the proposed addition to generation capacity represents a large proportion of IEC's total generation cap and thus implies a wholesale re-design of IEC's investment strategy[1750];

- Nera further questions whether investing in gas storage reduces total costs and states that many electricity generators using gas turbines have been built around the world without the ability to use a back-up fuel[1751];

- As to Israel's reserves, Nera has adverted to typing errors in the figures given by JWC and if the correct numbers are taken, and the private sector capacities are included, Israel's pre-fault reserve margin would be 7.5% in 2014, 12.5% in 2015 and 25.4% in 2017 – levels which are comparable to the reserve margins in other markets[1752];

- The expert would agree with the principle that generators with low fuel costs and high construction costs should meet base load demand, while spare generators with higher fuel costs meet the occasional peak load demand; but this principle holds true under stable conditions, which is not the case here[1753].

---

[1746] R₃ PHB, para. 207.
[1747] R₃ PHB, para. 194.
[1748] Nera II, para. 62.
[1749] Nera II, para. 64.
[1750] Nera II, para. 60.
[1751] Nera II, para. 95.
[1752] Nera II, para. 133.
[1753] Nera II, para. 127.

### b.     Foreseeability, remoteness and proof

1512. IEC rejects EGAS' suggestions that the damages claimed were unforeseeable and too remote[1754]:

- The loss was a likely result of the breach: replacement fuel costs were a likely result of the breach[1755] – IEC is claiming the most obvious kinds of losses one would expect it to incur if it is deprived of its cheapest form of fuel for power generation;

- It is the type or kind of loss in general which has to be foreseen: the foreseeability test does not require a specific scrutiny of the quantity or costs of the replacement fuel which would be a reasonably foreseeable result of the breach. What matters is if the use of replacement fuels by itself is a reasonably foreseeable result of EGAS' failure to supply IEC with gas[1756].

1513. EGAS has produced no evidence that it knew about IEC's coal-fired power plant plans back in 2005; and even if EGAS had known that there were ministerial approvals for the coal-fired power plant (this is all there was), this did not mean that the plant would actually be built; and a reasonable person would have anticipated that there was a likely chance that the plans would change, given the shift in the developed world away from dirty coal to clean natural gas and the fact that IEC had just signed a massive natural gas deal with EGAS for the next 20 years[1757].

### C.     The Tribunal's decision

1514. EGAS wishes to rely on the exclusion clause provided for in Art. 14.4.1 On-Sale Agreement:

> "14.4.1. Notwithstanding any other provision of this Agreement, no Party shall be liable to the other Party under this Agreement in any circumstances for punitive or exemplary damages, or for any indirect or consequential loss or damage including indirect or consequential:
>
> (a) Loss of profit;
> (b) Loss of business;
> (c) Loss of production;
> (d) Loss of revenue; or
> (e) Loss of contract".

---

[1754] R₃ PHB, paras. 202 and 203.
[1755] R₃ SS M, para. 256.
[1756] R₃ SS M, para. 256.
[1757] R₃ PHB, pp. 48 and 49.

1515. IEC objects on the ground that EGAS is not a party to the On-Sale Agreement, nor are claims against EGAS brought under the On-Sale Agreement, but rather under the Tripartite Agreement.

1516. Art. 14.4.1 of the On-Sale Agreement gives rise to two questions:

1517. The first is whether EGAS can rely on such provision, given that EGAS is not a party to the On-Sale Agreement. On this issue, the Tribunal has already concluded that EGAS benefits from the remedies, defences and limitations of liability available to EMG under the On-Sale Agreement[1758].

1518. The second question is the extent of the protection afforded to EGAS by Art. 14.4.1 of the On-Sale Agreement. The purpose of EGAS' submissions is to make the point that this provision excludes losses which fall within the second limb of the rule in *Hadley v. Baxendale*: such losses are recoverable only if the potential for them was within the actual knowledge of the other party to the contract at the time it was concluded. This issue will be analysed in sub-section (**a.**) *infra*.

1519. Thereafter the Tribunal will review

- EGAS' submission that all damages incurred by IEC flow from delivery failures, but only by reason of special circumstances which were unknown to EGAS, such as IEC's inefficiencies (**b.**).

- and that future costs are not adequately proven (**c.**).

## a.   Exclusion of losses under second limb in *Hadley v. Baxendale*

1520. EGAS argues that it could not have foreseen each specific kind of cost now claimed as damages, because such costs arise out of specific circumstances unrelated to the gas delivery failure, of which EGAS was not made aware.

1521. However, that approach pre-supposes that the relevant costs do not fall within the first limb of *Hadley v Baxendale*. In taking that view, EGAS overlooks the fact that, in this area, English law is not so much concerned with specific categories of loss but rather with types or kinds of loss, as IEC correctly points out[1759]. The Tribunal finds one quotation from *Chitty on Contracts*[1760], especially enlightening[1761]:

> "[The] party who has suffered damage does not have to show that the contract-breaker ought to have contemplated, as being not unlikely, the precise detail of the

---

[1758] See paras. 446 *et seq.*para. 1513 *supra*.
[1759] R₃ PHB, paras. 253 and 254.
[1760] 31ˢᵗ Edn, paras. 26-113 (Doc. R₃-178).
[1761] Emphasis added.

> damage or the precise manner of its happening. It is enough if he should have contemplated that damage of that kind is not unlikely".

1522. Accordingly, in reviewing the particular categories of costs to which this point relates, the Tribunal is called upon to decide whether the kind of damage in question – the additional cost for the acquisition of alternative fuel – was such that EGAS would, at the date of the Tripartite Agreement, have contemplated as being not unlikely to arise in the event of breach.

1523. The Tribunal has identified three types of losses now claimed:

- additional cost of purchasing additional gas (**i.**);
- additional cost of purchasing alternative fuels (**ii.**); and
- Other Costs (**iii.**)

1524. What has to be ascertained is whether back in 2005, when the agreements were entered into, such types of losses were a reasonably likely result of a hypothetical delivery failure.

(i) <u>Additional cost of purchasing additional gas</u>

1525. EGAS' basic argument is that, since IEC had entered into an agreement to obtain gas from Yam Tethys around the same time that the Tripartite Agreement was concluded, EGAS could assume that delivery failures under the Tripartite Agreement would be compensated with such Yam Tethys gas and that the price of this Israeli gas would not be higher than the Egyptian gas.

1526. The argument is untenable.

1527. EGAS had guaranteed the supply of a considerable amount of gas (2.2 annual BCM[1762]) under a long-term (15 – 20 years) contract. It was perfectly aware that the purpose of the acquisition was to use the gas for the generation of a significant percentage of the Israeli electricity requirements. EGAS' assumption that the same generation could also be achieved by using Yam Tethys gas, at the same price as Egyptian gas is totally unrealistic. It first assumes that IEC would have duplicate sources of gas supply. If that were so, if Yam Tethys was sufficient to supply the Israeli needs, there would have been no financial interest in building the "Peace Pipeline" and entering into the GSPA/On-Sale Agreement. The very fact that the deal was entered into proves the incapacity of Yam Tethys to produce the required quantities of gas at the price agreed upon in the GSPA/On-Sale Agreement.

---

[1762] 78.268 MMBTU pursuant to Art. 3 of the Tripartite Agreement.

(ii)    Additional cost of purchasing alternative fuels

1528. EGAS avers that, at the time the Tripartite Agreement was signed, it was not foreseeable that alternative fuels would be necessary to cover EGAS' delivery failures. Such alternative fuel only became necessary because of the premature depletion of Yam Tethys, which led to governmental restrictions on the supply of Yam Tethys gas[1763].

1529. The Tribunal does not agree. In 2005 EGAS knew that Israel was a gas importing country, and this implied that its own gas resources were insufficient to meet national demand. It was also aware that IEC, Israel's only significant electricity generator, was under an obligation to generate the electricity demanded by Israel's electricity grid. EGAS could and should have expected that a failure to supply gas, which implied that IEC's gas generated power stations had to stop, would force IEC to use alternative capacity and to acquire alternative fuel, all at higher costs, to avoid a black out in the Israel electrical system.

(iii)   Other Costs

1530. IEC also requests to be indemnified for Other Costs (an item which, compared with the amounts of Additional Costs claimed is far less significant). These Other Costs comprise

-    Additional maintenance expenses of the turbines;
-    Chartering storage facilities,
-    Chartering a vessel for offshore LNG facilities, and
-    Demurrage and cancellation costs of two LNG cargos

1531. EGAS claims that all these Other Costs are far-fetched and could not have been foreseen, and that IEC has failed to explain how they relate to gas delivery failures.

1532. The Tribunal must review the particular categories of loss and decide whether the kind of damage in question was such that EGAS would, at the date the Tripartite Agreement was concluded, have contemplated as being not unlikely to arise in the event of a breach.

1533. The Tribunal concludes that the above categories of loss are the consequence of incidents related to the need to acquire alternative fuel, which EGAS could foresee as being likely to arise in case of breach of the Tripartite Agreement. EGAS' remoteness defence in respect of these heads of loss must therefore fail.

---

[1763] See para. 1446 *supra*.

### b.    IEC's alleged inefficiencies

1534. EGAS avers that 85% of IEC's claim for damages is only a consequence of IEC's own inefficiencies operating its power plants[1764], which could and should have been mitigated, had IEC invested in dual fuel turbines, increased coal-capacity as was planned, and augmented its reserve and storage capacity from the outset.

1535. In general, the Tribunal concurs with IEC that the innocent party can only be expected to adopt reasonable mitigating measures, which can be financed with readily disposable means – actions which imply a substantial modification of its operating system, or substantial financing requirements fall outside the limits of reasonableness[1765].

1536. The Tribunal is satisfied that IEC meets this test: confronted with the failure of delivery of Egyptian gas, it did not dispatch the most expensive and fuel intensive power stations to fill the gap. Instead, it used its UCOD optimised dispatch program, a sophisticated computer program designed to minimise fuel costs and optimise generation, to decide which of the alternative power stations should be dispatched, and which fuels should be used, and selected the most cost-efficient alternative.

1537. In particular:

- EGAS assumes that IEC should have made certain investments during the execution phase of the Agreements; the Tribunal however concurs with IEC that a duty to mitigate only arises after a breach has occurred and not in anticipation of it;

- EGAS' suggestions are made with hindsight, knowing that its failures to deliver gas increased in time, culminating in the repudiation of the GSPA in 2012; but as IEC correctly states, parties to a contract can only be expected to implement corrective actions consistent with the assumption that the counterparty will honour its commitments and will strive to minimise the negative impact of any breach;

- EGAS' plan to eradicate alleged inefficiencies would have required a significant investment, EGAS failing to explain how the financing for these investments would have been procured;

- As regards the alleged plans to increase coal-capacity, EGAS has not proven that in 2005 IEC had decided to build coal-fired power plants; in fact, a final

---

[1764] JWC IV, para. 92.
[1765] *McGregor on Damages.* CLA-144, para. 9-082.

decision whether to build them had not been reached, there being only a ministerial approval to build additional coal-fired capacity[1766].

1538. <u>In conclusion</u>, the duty to mitigate damages only requires IEC to adopt reasonable measures available to it; it did not – contrary to EGAS' proposition – impose an obligation to carry out significant investments in anticipation that EGAS would breach the Tripartite Agreement.

### c.    Proof of future loss

1539. EGAS suggests that all future loss claimed by IEC should be dismissed for lack of evidence.

1540. The Tribunal does not agree.

1541. The nature of any claim for future damages prevents absolute certainty of proof, but the fact that damages cannot be assessed with certainty does not relieve EGAS, as the wrongdoer, of the obligation to restore the loss caused by its default[1767]. It suffices that the damage is proven with reasonable certainty[1768].

1542. In this case, EGAS had guaranteed the supply of 2.2 BCM[1769] until, at least, 2023[1770]. EGAS, however, repudiated this commitment and decided not to comply with its supply obligation after 2012. There is more than reasonable certainty that until the end of the contractual term IEC will incur in Additional Costs to find alternative fuel to make up for the gas that it could have expected to receive. EGAS' argument is thus dismissed.

## 2.    THE EXPERTS' CALCULATIONS OF ADDITIONAL FUEL COSTS

1543. Having analysed and dismissed the different legal defences submitted by EGAS, the Tribunal must now quantify the precise damage suffered and compensation owed to IEC, caused by EGAS' Tripartite Delivery Breaches and Repudiatory Breach.

1544. According to Nera, IEC's quantum expert, the damage suffered by IEC arises from two sources:

-    In the absence of agreed deliveries of gas from EGAS, IEC had to resort to the purchase of alternative, more expensive types of fuel and thus incurred Additional Fuel Costs plus

---

[1766] FHT, Day 5, p. 992.
[1767] *McGregorMc Gregor on Damages*. RL$_{1+2}$-79, p. 326.
[1768] *Mc Gregor on Damages*. RL$_{1+2}$-79, p. 326.
[1769] 78.268 MMBTU pursuant to Art. 3 of the Tripartite Agreement.
[1770] It is disputed whether the term can presumed to be extended by another five years.

- Other Costs associated with the purchase and use of alternative fuels, which IEC views as ultimately caused by EGAS' delivery failures.

1545. The basis for Nera's calculations is that IEC is entitled to recover any Additional Fuel Costs it may have incurred as a result of EGAS' failure to deliver gas in accordance with the terms of the Tripartite Agreement. Nera compares the "**Actual Scenario**" with under and non-supply of gas, with the "**What If Scenario**" (or "But For Scenario"), which represents what would have happened in the past or would happen in the future had the Tripartite Agreement been complied with.

1546. JWC criticises a large part of the assumptions underlying Nera's calculations, but has decided not to submit alternative calculations with its own verified assumptions.

1547. Nera divides IEC's Additional Fuel Costs into tranches with varying assumptions and predictions: Past Additional Costs ["**PAC**"] (**2.1.**); Near Term Future Additional Costs ["**Near FAC**"] (**2.2.**) and Long Term Future Additional Costs ["**Long FAC**"] (**2.3.**).

## 2.1   PAC: JULY 2008 – JUNE 2013[1771]

1548. Nera's methodology consists in comparing the Actual Scenario (the costs actually incurred acquiring alternative fuel to the Egyptian gas) with the What If Scenario (the costs which IEC would have incurred had it obtained all the agreed Egyptian gas). The difference are the PAC that IEC now claims as damages incurred by the need to purchase alternative fuels to run its power plants.

### A.   Nera's assumptions

1549. Nera's calculations can be broken down into three steps:

- Creation of a "Simulated Actual Scenario": Nera does not use the actual data of IEC's fuel expenditures, but creates a simulation of those costs; the reason given by Nera for this somewhat unexpected methodological twist is that apparently this is the only correct way to compare like with like. Nera has run both scenarios (the Simulated Actual and the What If) under a optimisation-simulation program[1772], where the only different assumption is the availability of Egyptian gas, in order to isolate the effect of under-supply and non-supply of Egyptian gas on the increase of costs[1773]. If the Actual (but not the Simulated Actual Scenario) is used to calculate the PAC, the damage claim – so Nera avers – would have been increased by other factors,

---

[1771] In Nera I the historical period ran until 31 December 2012; in Nera II the historical period was extended until June 2013.
[1772] FHT, Day 2, p. 363.
[1773] Nera I, para. 65.

unrelated to the availability of Egyptian gas, because by definition, the simulated reality is always more cost efficient than reality itself, which faces unforeseen difficulties[1774].

- Creation of the "**Simulated What If Scenario**": using the same simulation program Nera establishes the cost IEC would have incurred, had EMG's gas been available. The only difference in input data between the Simulated Actual and the Simulated What If Scenario relate to the availability of Egyptian gas[1775].

- Adjustment for modelling bias: the expert observes that when the choice of optimal fuel made by the optimisation-simulation program is actually implemented, the costs incurred in reality are higher than those anticipated; this is due to the fact that real life faces unexpected inefficiencies which prevents full optimisation[1776]. This so called 'modelling bias' was estimated at 3.7%[1777], which implies that all fuel costs calculated by the optimisation-simulation program must be increased by that percentage.

1550. The optimisation-simulation program used by Nera is called UCOD (Unit Commitment Optimal Dispatch). IEC's own dispatch optimisation program:

> IEC owns a portfolio of power stations, with distinct technical characteristics[1778], which use different fuels, and achieve different levels of fuel efficiency when converting fuel into electricity. Electricity generating companies use dispatch programs, which take into account the cost of fuels, the "heat rate" and availability of each generator unit[1779], and optimise the pattern of generation and fuel consumption. IEC's programme is called "UCOD"[1780]. IEC actually uses UCOD to inform its own commercial decisions in generator planning and operation[1781] and to forecast the amount of coal, natural gas, fuel oil and gasoil to be purchased[1782].

1551. The quantities of gas which Nera inputs into UCOD are[1783]:

- IEC's deemed nominations of gas, in months where they exist, and IEC's contractual entitlement to gas from EMG elsewhere throughout the period;

- The actual quantity of gas available from Yam Tethys up to September 2011; and

---

[1774] Nera I, para. 122.
[1775] Nera I, para. 34.
[1776] Nera I, para. 122.
[1777] Nera II, para. 156.
[1778] Nera I, para. 32.
[1779] Nera I, para. 45.
[1780] Nera I, para. 32.
[1781] Nera I, para. 49.
[1782] Nudelman WS, para. 16.
[1783] Nera I, para. 66.

- IEC's full contractual entitlement to Yam Tethys gas from October 2011.

1552. IEC submits that outputs from the simulation are a reasonably accurate reflection of reality[1784].

1553. The difference between the Simulated What If Scenario and the Simulated Actual Scenario results in the following Additional Fuel Costs (expressed in USD Million, and after adjusting for modelling bias)[1785]:

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | | | | | | | 5,9 | 25,9 | 28,1 | 14,4 | 10,7 | 4,0 | 89,0 |
| 2009 | -0.2 | -0.2 | -0.2 | -0,2 | -0,1 | 0,0 | -0,4 | 0,0 | 0,0 | -0,1 | 0,1 | 0,0 | -1,3 |
| 2010 | 0,0 | -0.3 | 0.0 | 0,1 | 1,5 | 1,8 | -1,0 | 8,1 | -0,3 | -3,9 | -3,7 | -3,3 | -1,0 |
| 2011 | 0,1 | 2,3 | 12,0 | 7,4 | 22,3 | 7,9 | 76,0 | 96,0 | 58,8 | 35,3 | 78,3 | 133,7 | 530,2 |
| 2012 | 149,4 | 145,1 | 179,3 | 100,6 | 168,1 | 190,6 | 177,9 | 186,9 | 135,8 | 88,0 | 45,0 | 77,4 | 1644,3 |
| 2013 | 109,0 | 82,6 | 92,8 | 17,7 | 12,1 | 26,1 | | | | | | | 340,3 |

## B.  JWC's criticism

1554. JWC accepts that it is not feasible for IEC to produce individual invoices that directly and unambiguously relate, in both price and volume, to the PAC caused by the less-than-expected availability of Egyptian gas supply[1786]. The expert concedes that a model has to be used to calculate the "What If" quantities of fuel that would have been used had the expected quantities of Egyptian gas been available, and to compare this with the actual fuel usage using the same model[1787].

1555. JWC, however, takes issue with the following assumptions adopted by Nera:

- UCOD is not an acceptable model, because there has been no independent verification of UCOD's calculations – neither Nera nor JWC having been able to review[1788] its source code[1789], nor the specific inputs, or to download the program or to print a single result[1790]; JWC suspects that UCOD is systematically forecasting incorrectly, which undermines its reliability[1791] and that the model is based on an inefficient fuel dispatch[1792]; in fact, JWC would have chosen another program called OPED, the program used by IEC for its operational decisions which, in JWC's opinion is the best indicator of actual generator dispatch and fuel costs[1793];

---

[1784] Nera I, para. 35.
[1785] GS-2, Tables for Report, D.2.
[1786] JWC II, para. 114.
[1787] JWC II, para. 115.
[1788] EGAS PHB, para. 357.
[1789] JWC IV, para. 117.
[1790] JWC III, para. 35.
[1791] JWC II, para. 125.
[1792] JWC III, paras. 63 and 64.
[1793] JWC IV, para. 101.

- Even if a modelling bias exists, JWC is concerned about the statistical correctness of Nera's bias calculation, because there seems to be a trend in the swings in the difference, which calls into question the independence of 45 out of 54 observations; this means that the regression result would have no statistical validity[1794]; and the existence of trends casts doubts on whether those trends will remain the same over the subsequent years after the initial five year period[1795].

1556. JWC further notes that IEC is a company which operates on a cost plus basis: electricity tariffs are determined by PUA, based on IEC's costs plus a reasonable return on capital[1796]. Thus, PUA's decisions on IEC's costs should be a cap to the Additional Costs recoverable under this Award[1797].

## 2.2   NEAR FAC (JULY 2013 – JUNE 2015)

1557. Nera has, once more, relied on UCOD to estimate the Simulated Actual and the What If Scenarios for the Near FAC. This is so because UCOD is able to make predictions on future supply costs, but cannot go much further than two years into the future.

1558. There are two main differences with the calculations of the What If Scenario for PAC:

- The inputted quantities of gas are the contractual entitlement, because IEC made no nominations after termination of the Tripartite Agreement;

- Nera assumes that EMG's price will increase in 2013 from USD 4.25 to 4.7[1798].

1559. The result of subtracting the Simulated Actual from the What If Scenario, and adjusting the amounts for modelling bias, results in the following amounts of Additional Fuel Costs (expressed in USD Million)[1799]:

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 |  |  |  |  |  |  | 9,3 | 41,2 | 18,9 | 4,4 | 2,5 | 4,1 | 80,5 |
| 2014 | 11,0 | 6,1 | 1,2 | -0,5 | 3,4 | 5,9 | 20,6 | 25,6 | 15,4 | 7,3 | 1,2 | 5,5 | 103,0 |
| 2015 | 16,7 | 10,6 | 2,6 | -0,8 | 0,6 | 8,5 | - | - | - | - | - | - | 38,2 |

---

[1794] JWC II, para. 166.
[1795] JWC II, para. 169.
[1796] JWC I, paras. 258 and 259.
[1797] JWC I, para. 268.
[1798] Nera I; Additional Cost Calculation, Gas Prices.
[1799] GS-2-Tables for Report, D.2; 2013 July – December; 2014 January – December; 2015 January – June.

### 2.3 LONG FAC (JULY 2015 – JUNE 2028)

1560. The calculation of the Long FAC is premised on totally different hypothesis and methodologies, since UCOD does not produce reliable predictions for the long term future: Nera has multiplied the gas which IEC would hypothetically have drawn under the On-Sale Agreement by the difference in price between the On-Sale Agreement and a proxy for the market price of gas (**A.**) for the duration of the On-Sale Agreement (**B.**).

### A. **Price and quantity**

1561. The damage is calculated as the difference in price between the On-Sale Agreement and a proxy for the market price of gas in Israel. Nera has chosen the gas price under the Tamar Contract as the proxy. *Pro memoria*: in 2012 IEC had signed a gas supply contract for gas from the Israeli Tamar field (in addition to the entitlement under the EMG On-Sale Agreement)[1800].

1562. Nera explains that the use of the price under the Tamar Contract as a proxy is based on the PUA's decision – this is, the decision by the Israeli electricity market regulator – that it will not recognise any future costs higher than the Tamar Contract price[1801].

1563. Nera calculates the price difference as follows:

- EMG's price is presumed to increase from 4.70 USD to 5.22 USD between the third quarter of 2018 through the third quarter of 2023, and to 5.82 USD thereafter[1802];

- Tamar's price is assumed to be 5.8 USD in 2015, and rise with the U.S. inflation as per calendar year, arriving at 7.47 USD in 2028[1803], as shown in the following table.

---

[1800] See para. 1447 *supra*.
[1801] Nera I, para. 73.
[1802] In accordance with the price definition in the 5th Amendment of the On Sale Agreement, Schedule B, Annex 4, p. 32-33; Nera I, para. 166.
[1803] Nera II, p. 50, Revised Table D.7.

**Revised Table D.7**
**Price Of "Replacement Gas" From The Tamar Field ($ per MMBTU)**

| 16 | | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|
| 17 | 2015 | - | - | 5.00 | 5.00 |
| 18 | 2016 | 5.99 | 5.99 | 5.99 | 5.99 |
| 19 | 2017 | 6.20 | 6.20 | 6.20 | 6.20 |
| 20 | 2018 | 6.40 | 6.40 | 6.40 | 6.40 |
| 21 | 2019 | 6.62 | 6.62 | 6.62 | 6.62 |
| 22 | 2020 | 6.71 | 6.71 | 6.71 | 6.71 |
| 23 | 2021 | 6.80 | 6.80 | 6.80 | 6.80 |
| 24 | 2022 | 6.89 | 6.89 | 6.89 | 6.89 |
| 25 | 2023 | 6.98 | 6.98 | 6.98 | 6.98 |
| 26 | 2024 | 7.08 | 7.08 | 7.08 | 7.08 |
| 27 | 2025 | 7.17 | 7.17 | 7.17 | 7.17 |
| 28 | 2026 | 7.27 | 7.27 | 7.27 | 7.27 |
| 29 | 2027 | 7.37 | 7.37 | 7.37 | 7.37 |
| 30 | 2028 | 7.47 | 7.47 | - | - |

1564. Nera's assumptions with respect to gas quantities are based on Art. 3.2 of the On-Sale Agreement, which gives a figure of 78,286,750 MMBTU[1804]. The expert then breaks down the annual amount into equal quarterly quantities of 19,567,187 MMBTU[1805].

1565. Nera then multiplies these quantities by the price difference and obtains a figure of additional cost in each quarter. In Nera II the figure claimed is 1.4719 Billion USD[1806] (the Tribunal notes that all amounts reflect nominal values – the Tribunal will deal with discounting issues in a separate chapter).

<u>JWC's criticism</u>

1566. JWC does not accept the increases in the EMG and Tamar prices, views the assumed differences as uncertain and opines that no account is taken of potential competition in the Israeli gas market[1807]. JWC relies on a report made by an Inter-Ministerial Committee in August 2012, which recommends that only a certain portion of the Tamar gas be allowed to be exported and that pro-competition policies should be adopted[1808].

1567. In the But For Scenario, JWC thinks that there would be over-supply of gas in Israel, because Tamar and Leviathan would be competing with Egyptian's gas,

---

[1804] Nera I, para. 97. There seems to be a typographical error in this figure, the correct one being 78,268,750 MMBTU, which is the number used in the calculations. Nera I, para. 97.
[1805] Nera I, para. 165.
[1806] Nera II, p. 39GS-2-Tables for Report, Sheet D.6-D.10, Table D.8.
[1807] JWC I, para. 280.
[1808] JWC I, para. 43.

which should result in price reduction. In JWC's opinion due to competition in the Israeli market, in the 2021 price revision the price under the Tamar contract will drop below the price assumed by EMG[1809], reaching 5 USD/MMBTU and remaining constant thereafter[1810].

## B.   Duration

1568. The initial term of the On-Sale Agreement expired in 2023, but IEC had an option to extend the term by an additional five years after the initial 15 years, i.e. up to 2028.

1569. Because in the long term future scenario Egyptian gas has a low price of gas relative to the forecast prices of alternative sources, Nera presumes that IEC would exercise this option[1811].

### JWC's criticism

1570. JWC suggests that the period for future long term compensation should end by 2025, the date of expiration of EMG's project licence; given the probability of a surplus of domestic supply which will lower gas prices by then, it is unlikely that there will be interest in extending the licence[1812].

## 3.   THE TRIBUNAL'S DECISION

1571. IEC submits a request based on the Additional Fuel Costs it allegedly incurred when generating electricity, which would compensate the damage suffered as a consequence of both EGAS' Tripartite Delivery Breaches and EGAS' Tripartite Repudiatory Breach. The Tribunal will analyse the liability for each breach separately because damages for Tripartite Delivery Breaches are capped in accordance with the Shortfall Compensation regime included in the On-Sale Agreement.

1572. The first section (**3.1**) will be devoted to analysing the damages caused by the Tripartite Delivery Breaches and section (**3.2**) to the damages arising out of the Tripartite Repudiatory Breach.

## 3.1   TRIPARTITE DELIVERY BREACHES

1573. The Tribunal will first analyse Nera's damage calculation (**A.**), take a decision on the appropriate amount (**B.**) and finally apply the contractual liability cap (**C.**).

---

[1809] JWC I, p. 82, Table 9.
[1810] JWC I, p. 82.
[1811] Nera II, para. 19.
[1812] JWC I, para. 301.

### A.    Nera's calculation

1574. The Tribunal has already decided that IEC has no valid claim against EGAS for delivery shortfalls between June 2008 and January 2011, because during that period both EGAS and EMG complied with the shortfall compensation regimes and the Monetary Compensation operates as a cap to any damage which IEC can obtain for Tripartite Delivery Failures[1813].

1575. As a consequence, the relevant period begins in February 2011 and ends with the repudiation date, which for assessment purposes has been set at 30 April 2012; and the Tribunal must now determine the precise figure of Additional Costs incurred by IEC in the purchase of alternative fuel to make up for the gas which EGAS failed to deliver.

1576. IEC estimates such Additional Costs with the use of its dispatch optimisation program, UCOD – a decision which has caused much controversy in this arbitration; and on which the Tribunal must take a position (**a.**). EGAS further argues that any amount awarded for Additional Costs shall be capped at the maximum cost acknowledged by PUA (**b.**).

### a.    UCOD

1577. The Tribunal has to decide whether the use of UCOD to simulate the costs for the acquisition of fuel is appropriate.

1578. IEC basically argues that UCOD is the actual program used by IEC to optimise its decisions to purchase fuel and that the deployment of UCOD to calculate Additional Costs is as close as one can get to reality. Among other criticisms, EGAS claims that UCOD works as a "black box" and that neither EGAS' nor IEC's experts have been given the opportunity to understand the assumptions that underlie the algorithm on which UCOD makes its predictions. And EGAS has reasons to believe that such assumptions are incorrect[1814].

1579. To a large extent, the Tribunal shares EGAS' concerns: it is unclear how UCOD really works, given that the hypotheses underlying its algorithm have been developed by IEC and have not been externally verified by the counterparty's experts.

1580. IEC has made a significant effort[1815] to convince the Tribunal of UCOD's virtues as a dispatch optimisation model; to some extent they have succeeded:

---

[1813] See para. 1493 *supra.*
[1814] Doc. H-29, "Valuation evidence summary relating to IEC's claihm against EGPC and Egas", p. 23.
[1815] Including four witness statements (Aronovich WS, Nudelman WS I and II, Gurevich WS), a 20 pages long document showing the general *formulae* used for the Monte Carlo simulation, the unit commitment

- UCOD is able to forecast optimal dispatch of fuels to power generation units on the basis of future prediction of demand, unit capacity (including planned maintenance and outages and a probability of unplanned outages) and fuel availability[1816];

- UCOD calculates the cost of generation of electricity at each power generation unit based on the cost of fuel for that unit and its technical characteristics (capacity, fuel type, heat rate curves, operating system policy and start up data[1817]) and availability[1818], and an hourly projected demand curve[1819]; UCOD then "simulates the optimal dispatch of generation"[1820];

- UCOD's calculation is a three-step process: it first uses a mathematical rule to find the allocation of output among power generation units that achieves the lowest cost of fuel and meets all the demand for electricity[1821]; second, it ensures that the outputs allocated to each power generation unit in each hour do not violate system or plant level operating constraints[1822]; as a third step UCOD considers start-up and other costs associated with starting or stopping units at different times; these procedures are repeated several times over, selecting a different pattern of available capacity[1823].

1581. But the mere fact that the Tribunal is able to understand the general explanations of how UCOD works as a dispatch optimisation program, and is convinced of its virtues as such, does not turn the program into a valid damages calculation tool for an adversarial proceedings. UCOD has been programmed and developed by IEC for its needs and only IEC knows and understands the assumptions underlying the optimisation. These assumptions have not been disclosed to either Nera or JWC[1824] (and there may exist valid confidentiality reasons why disclosure has been withheld) and so, even if the overall logic in UCOD seems to be reasonable, it remains unknown how the logic is translated into the assumptions and how the final output concords with the logic and the assumptions.

1582. IEC claims that "mercifully" there is no need to understand precisely how UCOD "does the job that it does"[1825], because it is a highly complicated program[1826].

---

and the pumped storage dispatch (Doc. R$_3$-88) and a general powerpoint presentation on UCOD (Doc. R$_3$-89).

[1816] Aronovich WS, para. 28.

[1817] Nudelman WS, para. 14.

[1818] Nudelman WS, para. 14.

[1819] Nudelman WS, para. 14.

[1820] Nudelman WS, para. 9.

[1821] Gurevich WS, para. 18.

[1822] Gurevich WS, para. 20.

[1823] Gurevich WS, para. 22.

[1824] JWC III, para. 39.

[1825] FHT, Day 2, p. 359.

[1826] FHT, Day 2, p. 358.

1583. The Tribunal disagrees, because a forecasting model is only as good as the veracity of the underlying assumptions. But UCOD remains a black box and requires a leap of faith to accept the unverified calculations produced by Nera.

1584. EGAS requested the Tribunal to dismiss Nera's calculations of IEC's Pre-Tamar AC and, in view of the above, the Tribunal certainly has reservations about them.

### b.   PUA's decisions on Additional Fuel Costs

1585. EGAS has drawn the Tribunal's attention to the fact that PUA, Israel's electricity market supervisor, issued periodic decisions updating the electricity tariff in light of increases in the Additional Fuel Costs – and in EGAS' opinion these acknowledged costs should work as a cap to IEC's damages.

<u>PUA and the electricity tariff</u>

1586. PUA was created in 1996 to supervise compliance with the provisions of the Israeli Electricity Sector Law[1827]. PUA's decisions are taken by its board, which is comprised of five members nominated by the Minister of Energy & Water Resources and the Minister of Finance; the board is assisted by 50 employees and external consultants. PUA makes no profit nor does it take money from the electricity market[1828].

1587. PUA's first and foremost function is setting the electricity tariffs that will be paid by electricity consumers. The tariff is based on recognised costs, as determined by PUA, plus a fair rate of return on equity, plus an efficiency factor to promote increased productivity and economies of scale in the generation, transmission and distribution of electricity[1829].

1588. In determining the recognised costs, PUA will hear IEC and collect documentation from IEC[1830]; but PUA does not simply accept cost data from IEC, but carries out an independent estimation of the fuel quantity that IEC should use; and in so doing, PUA determines the appropriate price that should be recognised for those fuels by benchmarking against available market price data[1831]. Once PUA has determined the total amount of IEC's costs which it will recognise, that cost is broken down into individual tariffs to be paid by consumers[1832].

---

[1827] Amit WS, para. 12.
[1828] Amit WS, para. 13.
[1829] Amit WS, para. 16.
[1830] Amit WS, paras. 40 and 41.
[1831] Amit WS, para. 35.
[1832] Amit WS, para. 28.

1589. The tariff is also periodically updated to check whether IEC's basket of costs differs from PUA's predetermined formula[1833]; this process of updating is important to ensure that the tariff reflects the actual costs incurred by IEC[1834].

PUA's decisions

1590. PUA's most important decision on Pre-Tamar AC is that of 22 March 2012[1835].

1591. In this decision PUA acknowledges that since February 2011 accumulated extraordinary circumstances[1836] had created an exceptional period in which the cost of electricity generation from alternative fuels (other than natural gas) had increased sharply and would do so even more in the future – PUA recognises an increase of NIS 5.8 Billion for 2012 and NIS 1.9 Billion for 2011.

1592. Since the costs established in the March 2012 PUA decision were only an estimate, on 6 May 2013[1837] PUA issued a second decision to update the cost for 2012 increasing it to NIS 5.977[1838] Billion [together, the "**PUA Decisions**"].

PUA's letter

1593. IEC has also produced PUA's letter of 14 May 2014 [the "**PUA Letter**"], where PUA states that the Additional Fuel Costs for 2013 are USD 447 Million[1839].

1594. EGAS strongly objects to the admission of this letter to the record.

1595. The Tribunal has some sympathy with EGAS: from a legal point of view, the PUA Letter and the PUA Decisions are different instruments, which were issued for different purposes, which engage PUA's responsibility to different degrees, and which afford different probative value:

- A PUA Decision represents a formal resolution adopted by the Israeli electricity supervisor, which has a direct impact on the tariff to be paid by Israeli electricity consumers, which is formally adopted and which is open to public scrutiny and review by the Courts;

- The PUA Letter was a private response by PUA to a specific enquiry by IEC, to be used for the purposes of this arbitration ("we request to urgently

---

[1833] Amit WS, para. 31.

[1834] Amit WS, para. 30.

[1835] Doc. R$_3$-222.

[1836] PUA mentions severe disruptions in natural gas supply from Egypt to Israel and in parallel, that the production from Yam Tethys was diminishing and that the significant alternative commercial operational natural gas reservoir (Tamar) was not expected before the middle of 2013.

[1837] Doc. R$_3$-225.

[1838] 5.8 Billion plus 177 Million of surcharge for failure to update continuous rise of fuel costs (Doc. R$_3$-225, p. 1)

[1839] Doc. H-47.

receive the above date in order to enable us to present it to the arbitrators this coming Thursday"); it does not serve a public interest, is not open to scrutiny and review and simply represents PUA's statement and opinion with regard to the questions submitted by IEC.

1596. However, the Tribunal thinks that the best course is to admit the evidence, taking the points made by EGAS into account when considering what weight to give to the PUA Letter.

## B. The Tribunal's decision

1597. The Tribunal will first explain why it sides with EGAS[1840], in finding that PUA's decisions represent the best available estimate of IEC's Additional Fuel Costs (**a.**), and then it will calculate the amount of damages pursuant to PUA (**b.**).

### a. PUA's decision as an indication of the Additional Fuel Cost

1598. When Egyptian gas stopped flowing to IEC after February 2011, the electricity tariff which had been approved by PUA, and which was based on the assumption that IEC would have access to EGAS' gas at the agreed terms, became insufficient to cover the Additional Fuel Costs incurred by IEC. Given this insufficiency, PUA accepted to increase the tariff to be paid by the Israeli consumers, so that the tariff would cover the Additional Fuel Costs caused by EGAS' failure to deliver. The question before the Tribunal is whether it can use PUA's determination of IEC's Additional Fuel Costs for 2011, 2012 and 2013 as the basis for calculating the damages for the Tripartite Delivery Breaches *in lieu* of the UCOD based calculation favoured by IEC's expert.

1599. The Tribunal without hesitation prefers the determination of the Additional Fuel Costs made by PUA in its Decisions. This is for the following reasons:

- PUA is an independent governmental body, entrusted with the calculation of electricity generating costs and the determination of the electricity tariff;

- PUA makes informed decisions, based on the data provided to it by IEC and other governmental entities;

- PUA must be presumed to have expert knowledge of the Israeli electricity markets and of the costs, including fuel costs, which are recognised in the tariff; PUA has experienced staff and is advised by an advisory board;

- PUA is not only independent, it has an interest in acting impartially when calculating the actual amount of Pre-Tamar AC which is incorporated into the revised tariff: if its calculation is too conservative, IEC, Israel's State-

---

[1840] JWC I, para. 268.

owned electricity generator, will suffer losses, but if it is too expansive, the excessive Additional Costs will have to be borne by the Israeli end user through an increased tariff.

1600. The Tribunal therefore accepts that PUA, using its own methodology[1841] came up with the best available estimate of the Additional Fuel Costs incurred by IEC and caused by the non-delivery of Egyptian gas. The reliability of these numbers is proven by the fact that PUA was prepared to transfer the Additional Costs to the Israeli consumers, via an increase in tariffs.

### b.   The amount of Additional Fuel Costs

1601. Having decided to award Additional Fuel Costs in the amount determined as reasonable by PUA, the next task is to establish the precise quantification.

(i)   February – December 2011

1602. PUA stated in its Decision of 22 March 2012 that the Additional Fuel Costs incurred by IEC in the year 2011 amounted to NIS 1.9 Billion. JWC converted this amount into USD 508.63 Million at a rate of USD/NIS 0.2677[1842]. The Tribunal accepts this amount as a fair estimate of the Additional Fuel Costs incurred by IEC during the year 2011. Since the Tribunal has already established that EGAS' failure to deliver gas in the month of January 2011 was duly compensated in accordance with the contractually agreed shortfall compensation regime, the total annual amount must be reduced by 1/12, resulting in Additional Fuel Costs for the period February – December 2011 of USD 466,244,167.

(ii)   January through April 2012

1603. JWC claims that IEC's Additional Fuel Costs for 2012 should be capped at NIS 5.8 Billion, which is the amount mentioned by PUA in its 22 March 2012 Decision. The Tribunal, however, disagrees, because as explained *supra*[1843] the March Decision only provided an estimate – the final Decision was taken on 6 May 2013, which raised the total Additional Costs for alternative fuel to NIS 5.977 Billion. Converted into USD applying the same conversion rate used

---

[1841] The Tribunal acknowledges that IEC has argued that PUA uses UCOD to determine validated and adjusted the assumptions in the UCOD model (PHB, para. 231). This argument does not invalidate the Tribunal's decision to rely on PUA's estimations of the Additional Fuel Costs incurred by IEC, because: (i) there is no direct evidence that PUA actually uses UCOD – IEC did not call any PUA officer to the Hearing; (ii) even if PUA based its estimations on UCOD, it must have made its on verifications of the assumptions underlying the model; as Mr. Moshe Amit explained (Amit WS, para. 52) IEC and PUA adopted different solutions when implementing environmental limitations, which resulted in distinct fuel baskets, and this is shown by the fact that IEC is requesting a higher amount of Additional Fuel Costs that the figure estimated by PUA.
[1842] JWC I, para. 268, rounded to 508.
[1843] See para. 1592 *supra*.

by JWC, it renders a result of USD 1.6 Billion[1844]. A third of this compensation (January – April) is USD 533,347,633.

\* \* \*

1604. The Tribunal has determined IEC's Additional Fuel Costs as damages for Tripartite Delivery Breaches occurred from 1 February 2011 (the date when payments under the Shortfall Compensation regime stopped) through 30 April 2012 (the date of repudiation of the Tripartite Agreement). But the Tribunal must still determine whether those Additional Fuel Costs are caught by the contractual liability cap of Art. 3.11 of the On-Sale Agreement.

## C.    Calculation of the liability cap

1605. The Tribunal has already determined that the Hourly (**a.**) and Monthly Shortfall Compensations (**b.**) provided for in Arts. 3.6 and 3.13 of the On-Sale Agreement are, pursuant to Art. 3.11, the maximum liability amount for delivery failures[1845].

### a.    Hourly Shortfall Compensation

1606. The amounts due for Hourly Shortfall Compensation have been calculated by FTI, EMG's expert (amounts in USD)[1846]:

| Month | First Hourly Shortfall Gas (MMBtu) | Second Hourly Shortfall Gas (MMBtu) | IEC On-Sale Price (US$/MMBtu) | Hourly Shortfall Compensation under IEC On-Sale Agreement (US$) |
|---|---|---|---|---|
| *Notes* | *1* | *1* | *2* | *3* |
| feb-11 | 3.991.420 | 2.103.580 | 4,25 | 4.687.895 |
| mar-11 | 3.289.438 | 1.724.919 | 4,25 | 3.861.573 |
| abr-11 | 1.221.331 | 578.437 | 4,25 | 1.420.582 |
| may-11 | 5.379.740 | 2.835.260 | 4,25 | 6.318.467 |
| jun-11 | 1.696.493 | 3.695.512 | 4,25 | 2.587.820 |
| jul-11 | 1.772.456 | 4.131.940 | 4,25 | 2.761.272 |
| ago-11 | 3.422.000 | 3.243.000 | 4,25 | 4.325.013 |
| sep-11 | 3.375.000 | 3.075.000 | 4,25 | 4.239.375 |
| oct-11 | 1.423.441 | 4.220.151 | 4,25 | 2.409.188 |
| nov-11 | 3.166.198 | 1.317.370 | 4,25 | 3.644.027 |
| dic-11 | 6.539.508 | 1.675.492 | 4,25 | 7.304.269 |
| ene-12 | 5.781.528 | 1.395.990 | 4,25 | 6.439.522 |
| feb-12 | 5.803.465 | 1.512.932 | 4,25 | 6.487.680 |
| mar-12 | 6.327.026 | 1.638.126 | 4,25 | 7.070.567 |
| abr-12 | 6.301.080 | 1.648.920 | 4,25 | 7.045.293 |

---

[1844] USD 1,600,042,900.
[1845] See para. 1492 *supra*.
[1846] FTI II, Appendix 13, IEC Shortfall Compensation. *Pro memoria*: EMG claimed that it was entitled to this Hourly Shortfall Compensation as a pass-through.

## b. Monthly Shortfall Compensation

1607. The calculation of the Monthly Shortfall Compensation can be easily performed, based on the data provided by FTI[1847]: the monthly aggregate PNQ, the monthly aggregate delivered gas, and the monthly aggregate delivery failure[1848]:

| | PNQ (MMBtu) | DG (MMBtu) | Monthly Delivery Failure (MMBtu) |
|---|---|---|---|
| | a | b | c=a-b |
| feb-11 | 8.920.452 | 1.302.195 | 7.626.643 |
| mar-11 | 7.816.879 | 3.219.601 | 4.599.644 |
| abr-11 | 6.544.896 | 4.386.563 | 2.169.661 |
| may-11 | 8.521.741 | - | 8.521.741 |
| jun-11 | 7.023.992 | 1.326.681 | 5.697.311 |
| jul-11 | 4.426.313 | 791.768 | 3.680.935 |
| ago-11 | 7.291.949 | - | 7.291.949 |
| sep-11 | 7.057.341 | - | 7.057.341 |
| oct-11 | 7.272.851 | 1.531.398 | 5.741.454 |
| nov-11 | 8.408.348 | 2.610.081 | 5.798.266 |
| dic-11 | 8.760.335 | - | 8.760.335 |
| ene-12 | 8.272.253 | 1.086.410 | 7.185.843 |
| feb-12 | 7.461.144 | 388.417 | 7.072.727 |
| mar-12 | 7.986.111 | 262.284 | 7.723.827 |
| abr-12 | 7.765.104 | - | 7.765.104 |

1608. The Tribunal has added one simple calculation, to obtain the Monthly Shortfall Compensation pursuant to Art. 3.13.3 of the On-Sale Agreement: the Monthly Delivery Failure or Monthly Shortfall Gas has to be reduced by 2% of the PNQ ("the amount of the Monthly Shortfall Gas that is greater than 2% of the aggregate PNQ for such delivery month") and by 45 cent/MMBTU (amounts in USD):

| Month | Monthly Shortfall Compensation |
|---|---|
| feb-11 | 3.351.705 |
| mar-11 | 1.999.488 |
| abr-11 | 917.443 |
| may-11 | 3.758.088 |
| jun-11 | 2.500.574 |
| jul-11 | 1.616.584 |
| ago-11 | 3.215.750 |
| sep-11 | 3.112.287 |
| oct-11 | 2.518.198 |
| nov-11 | 2.533.545 |
| dic-11 | 3.863.308 |
| ene-12 | 3.159.179 |
| feb-12 | 3.115.577 |
| mar-12 | 3.403.847 |
| abr-12 | 3.424.411 |

---

[1847] FTI II, Appendix 13, Lost Profits IEC.
[1848] What FTI calls "Daily Delivery Failure".

\* \* \*

1609. If the Hourly and the Monthly Shortfall Compensations are added, the monthly maximum liability is (amounts in USD):

| Month | Hourly Shortfall Compensation | Monthly Shortfall Compensation | Total |
|---|---|---|---|
| | | | |
| feb-11 | 4.687.895 | 3.351.705 | 8.039.600 |
| mar-11 | 3.861.573 | 1.999.488 | 5.861.061 |
| abr-11 | 1.420.582 | 917.443 | 2.338.025 |
| may-11 | 6.318.467 | 3.758.088 | 10.076.554 |
| jun-11 | 2.587.820 | 2.500.574 | 5.088.394 |
| jul-11 | 2.761.272 | 1.616.584 | 4.377.856 |
| ago-11 | 4.325.013 | 3.215.750 | 7.540.762 |
| sep-11 | 4.239.375 | 3.112.287 | 7.351.662 |
| oct-11 | 2.409.188 | 2.518.198 | 4.927.387 |
| nov-11 | 3.644.027 | 2.533.545 | 6.177.571 |
| dic-11 | 7.304.269 | 3.863.308 | 11.167.577 |
| ene-12 | 6.439.522 | 3.159.179 | 9.598.701 |
| feb-12 | 6.487.680 | 3.115.577 | 9.603.257 |
| mar-12 | 7.070.567 | 3.403.847 | 10.474.414 |
| abr-12 | 7.045.293 | 3.424.411 | 10.469.704 |
| **Total** | | | **113.092.525** |

1610. The Tribunal notes that the yearly aggregate of the above amounts is USD 72,946,450 (February – December 2011) and USD 40,146,075 (January – April 2012) and that these figures are far below the Additional Fuel Costs estimated by PUA; this means that the damages calculated in the precedent sections are above the contractual maximum and must, therefore, be capped.

1611. <u>In summary</u>, the Arbitral Tribunal has devoted this section to establishing the compensation owed to IEC for the Tripartite Delivery Breaches. The Tribunal has first acknowledged that IEC is seeking compensation for the Additional Fuel Costs incurred. In calculating such Additional Fuel Costs the Tribunal has disregarded IEC's methodology, which was based on the optimisation program UCOD, and has favoured PUA's estimation. The Tribunal has also established that the On-Sale Agreement included a liability limitation clause, and that said liability cap is a remedy available to EGAS. The cap was equivalent to the Shortfall Compensation due under the On-Sale Agreement. The Tribunal has calculated the amount of Shortfall Compensation and applied such cap to the damages sought, which are now significantly reduced.

## 3.2   TRIPARTITE REPUDIATORY BREACH

1612. The Tribunal must now turn to the calculation of the compensation due for the other breach committed by EGAS: the repudiation of the Tripartite Agreement. As already explained when analysing the compensation due to EMG, the premises underlying the compensation for Tripartite Delivery Breaches are no longer present when assessing the indemnification due for the Tripartite Repudiatory Breach: the Shortfall Compensation which was the essence of the compensation due for delivery breaches (both in the case of EMG and of IEC) is no longer applicable because re-delivery gas – the first limb of the shortfall compensation regime[1849] – becomes impossible once the supply agreement has been repudiated.

1613. IEC has claimed damages for the repudiation of the Tripartite Agreement, quantified as the Additional Fuel Costs it has incurred and will incur. The Tribunal accepts this approach and notes that the amount obtained for Additional Fuel Costs will not be subject to a liability cap.

1614. IEC has divided the calculation of the damages owed for the Tripartite Repudiatory Breach into three distinct periods: until June 2013, July 2013 – June 2015 and July 2015 – June 2028. This division is mandated by UCOD's limitations as a long-term future forecasting tool. Since the Tribunal has chosen not to rely on UCOD, but on PUA's estimations of Additional Fuel Costs, the suggested division in time is no longer relevant. The Tribunal sees fit to differentiate between two periods – the pre-Tamar Additional Fuel Costs ["**Pre-Tamar AC**"] (May 2012 – March 2013) and the post-Tamar Additional Fuel Costs ["**Post-Tamar AC**"] (April 2013 – June 2023). This distinction is necessary because in April 2013 gas from the Tamar fields became available – an event which dramatically altered the Israeli gas market: IEC now has a domestic gas source as an alternative to Egyptian gas and, as of that point, PUA decided that it would not recognise any Additional Fuel Costs which exceeded Tamar's price.

### A.   Pre-Tamar AC

1615. Pre-Tamar AC as compensation for the Tripartite Repudiatory Breach can be divided in two sections: May – December 2012 (**a.**) and January – March 2013 (**b.**).

#### a.   May – December 2012

1616. The Tribunal has already determined that the best estimate for IEC's Additional Fuel Costs is the amount set by PUA in its decision[1850]. In its 22 March 2012

---

[1849] See para. 1489 *supra*.
[1850] See para. 1604 *supra*.

Decision, as updated in the 6 May 2013, PUA determined that the maximum amount be USD 1.6 Billion[1851].

1617. Since liability for the Tripartite Repudiatory Breach arises after the Repudiation Date, i.e. 30 April 2012, only two thirds of 2012 are relevant: USD 1.067 Billion or USD 133,333,369 each month.

1618. Consequently, IEC's Additional Fuel Costs for the remainder of 2012 after the repudiation of the Tripartite Agreement amounts to USD 1.067 Billion or USD USD 133,333,369 each month.

**b.    January – March 2013**

1619. For the year 2013 it is reasonable to assume that there should be a similar PUA decision setting the reasonable Additional Costs IEC was allowed to recover, but none has been produced in this arbitration.

1620. The only evidence of PUA's position with respect to the Additional Fuel Costs incurred by IEC between January and March 2013 is the PUA Letter, issued as an answer to IEC's inquiry, dated 11 May 2014, that PUA provide such an estimate for the purposes of this arbitration[1852]. In response, the 14 May 2014 PUA Letter states that the difference between the hypothetical supply of Egyptian gas and the fuel basket actually recognised amounts to USD 447 Million[1853]. The Tribunal accepts EGAS' criticisms with respect to the PUA Letter and decides that the estimation made by PUA in the PUA Letter cannot carry the same evidentiary weight as a formal PUA Decision[1854].

1621. The Tribunal decides that it will make its own assessment of IEC's Additional Fuel Costs in the first quarter of 2013, taking into consideration PUA's estimation of those costs as a ceiling. In making such assessment the Tribunal will calculate the average monthly amount of Additional Fuel Costs acknowledged by PUA during the years 2011 and 2012, and apply that average to the months January-March 2013.

1622. The average monthly amount of Additional Fuel Costs for 2011 and 2012 is USD 87.875 Million [(508 Million + USD 1.6 Billion)/24]. Applying this figure to the quarter January – March 2013, the result is USD 87,861,371 * 3 = USD 263,584,113.

1623. The Tribunal thus finds that IEC's Additional Fuel Costs for the first quarter of 2013 amount to USD 263,584,113 or USD 87,861,371 each month.

---

[1851] The Tribunal notes that the Pre-Tamar AC determined by PUA falls slightly below the USD 1.644.3 Billion claimed by IEC (Nera II; Table D.2).
[1852] Doc. H-46.
[1853] Doc. H-47.
[1854] See para. 1596 *supra*.

### B.    Post-Tamar AC

1624. On 14 June 2012 PUA issued a further Decision[1855] [the "**2012 PUA Decision**"]. The significance of the 2012 PUA Decision is the reason why the Tribunal has divided the Additional Fuel Costs into Pre-Tamar AC and Post-Tamar AC. The Tribunal will first explain the content of the 2012 PUA Decision and its implications (**a.**) and then take a decision on how the Post-Tamar AC should be calculated as regards price (**b.**), quantity (**c.**) and duration (**d.**).

### a.    The 2012 PUA Decision

1625. Although formally adopted in 2012, the 2012 PUA Decision does not refer to IEC's Additional Fuel Costs in 2012, but rather to the impact of IEC concluding a long-term contract for the supply of gas from the Tamar fields.

> *Pro memoria*: the contract with the Tamar partners[1856] was concluded for the annual supply of 5.13 BCM and a base price of USD 5.042/MMBTU.

1626. The 2012 PUA Decision is premised on the fact that the Tamar contract would substitute the Egyptian gas both in terms of gas volumes and contract duration, and that once Tamar gas was secured no other alternative source of fuel was required. PUA resolved that in the future the difference between the historically agreed EMG gas price and the newly established Tamar gas price[1857] would be the maximum additional cost that would be passed on to Israeli consumers:

> "[...] the PUA has hereby decided that it will not recognize a future transaction of Israeli Electric [...] at a gas price higher than the price in the [Tamar] transaction [...]".

1627. IEC accepts the relevance of the 2012 PUA Decision and has used Tamar price as a proxy for the market price for additional fuel[1858]; and EGAS and its expert do not object to this approach, but take issue with the forecast of the future evolution of EMG's and Tamar's prices made by Nera[1859].

---

[1855] Doc. R3-71.
[1856] Doc. R1+2-31. IEC's Financial Statements September 2012, p. 178.
[1857] The decision refers to the "option transaction", but both parties have acknowledged that PUA is referring to the Tamar Contract.
[1858] Nera I, para. 73.
[1859] JWC I, para. 285; Table 9 p. 82.

b. **Difference in prices**

1628. In accordance with the information provided by the Parties, the Tamar field became operational in April 2013[1860]. After that date, the Tribunal will only accept as reasonable Additional Fuel Costs incurred by IEC, the difference between

- the Tamar price (i.e. the price agreed between IEC and the owners of the Tamar field for the delivery of gas, which is the maximum price acknowledged by PUA for the purposes of calculating the tariff) and

- EMG's price under the On-Sale Agreement (i.e. the price which IEC would have paid, had EGAS not defaulted on its commitments to deliver gas),

multiplied by the nominations.

1629. The experts have discussed at length the hypothetical future evolution of Tamar's and EMG's prices. In essence:

- Nera claims that Tamar price will rise in line with U.S. inflation, as foreseen in the Tamar contract, and the contractually agreed price re-opener in 2021 will have no effect on the price; whereas EMG's price will only rise on five occasions, and will always remain below the Tamar price[1861];

- JWC criticises that Nera makes unsupported assumptions about U.S. inflation[1862] and takes no account of future competition in the Israeli gas market, due to the availability of Leviathan gas[1863]; after the 2021 price review such competition would lead Tamar's price to sink and even fall below EMG's price[1864].

1630. Who is right?

1631. There is no easy answer. The experts are walking in the realm of speculation: they are being asked not only to opine on future prices (which by itself entails a degree of speculation), but also on development of competition in a yet-inexistent Israeli gas market. JWC has devoted extensive analysis to hypothesise on the rocket-escalation of the Israeli market and Nera has employed equal efforts in undermining the credibility of such assumptions, making counter-hypotheses[1865] on how Tamar could have delayed production to contain the excess of supply, on

---

[1860] Nera II, para. 163.
[1861] Nera II, para. 18.
[1862] JWC I, para. 280.
[1863] JWC I, para. 48.
[1864] JWC I, para. 280 and Table 9, p. 82.
[1865] Nera II, para. 25.

how excess capacity would be diverted to the export market, and on how short-term sales could absorb the surplus of gas.

1632. The Tribunal does not feel comfortable taking sides: there is no certainty when Leviathan will be operative or how much gas will be available and what strategy the Tamar field owners will follow once Leviathan enters into commercial modus; it is equally uncertain whether there will be an international LNG market interested in Israel's surplus gas.

1633. In this situation the Tribunal opts for a conservative approach – and will assume that prices will remain as they are. EMG's price will not rise after July 2013 and neither will Tamar's, so that the difference between both prices will also remain static. Two arguments have led the Tribunal to preferring such solution:

- The stability of EMG's price is a cautious assumption supported by FTI, EMG's expert, who, in the projections made regarding future loss, assumes that EMG's price remains constant throughout the life of the contract;

- When PUA decided in its 2012 PUA Decision[1866] not to recognise any future costs in excess of the Tamar contract, it was impliedly accepting that the difference between the then applicable Tamar and EMG prices was a reasonable additional cost that could be passed on to the Israeli consumers.

1634. The Tamar price in 2012 was 5.042 USD/MMBTU and EMG's price was 4.25 USD/MMBTU[1867]. Hence, the Tribunal accepts for the purposes of assessment that the difference 0.792 USD/MMBTU is the rate at which IEC will incur Post-Tamar AC for the remainder of the contract.

**c.    Quantity**

1635. As a second step to determine the Post-Tamar AC, the Tribunal must multiply the 0.792 USD/MMBTU cost difference by the quantity of gas that IEC would have drawn under the On-Sale Agreement.

1636. Nera estimates the amount of gas by dividing the contractual quantity under the On-Sale Agreement in equal quarterly amounts of 19,567,188 MMBTU[1868] and JWC does not object to this approach. To the Tribunal this methodology seems reasonable.

1637. A quarterly withdrawal of 19,567,188 MMBTU multiplied by the USD 0.792/MMBTU price difference, renders a quarterly amount of damages of

---

[1866] Doc. R₃-71.
[1867] Nera I, Additional Cost Calculation, Gas Prices, EMG.
[1868] Nera I, Additional Cost Calculation.

USD 15,497,212[1869]. This quarterly amount of damages will remain constant until the end of the damages period.

1638. Which brings the Tribunal to the next question: what is the relevant time period?

**d.    Duration**

1639. The Tribunal must take a decision on the start date (**i.**) and the end date (**ii.**) of the Post-Tamar AC quantification.

(i)    Start date

1640. IEC suggests that the assessment of Post-Tamar AC, as the difference between the Tamar price and the EMG price, should only start to apply from July 2015. For the period April 2013 – June 2015 IEC's preferred solution is to use UCOD (the program being able to make estimations of costs two years ahead).

1641. The Tribunal disagrees with this approach. The availability of a UCOD calculation does not affect the binding character of the 2012 PUA Decision. If PUA has decided that the Tamar price should act as a ceiling for alternative fuel prices, the decision should be applied the moment Tamar gas became available and there is no valid ground for postponing the application until July 2015.

(ii)    End date

1642. Nera has claimed damages until June 2028, presupposing that after the expiration of the initial term in 2023, IEC would exercise its right to an extension of the term by another five years, because EMG's price would be lower than that of any alternative fuel[1870].

1643. JWC argues that a claim for the period 2025 to 2028 is wholly unrealistic, since it fails to take into account

-    the expiry of EMG's project licence in 2025 plus

-    the competition in the Israeli market that would lead IEC to achieving prices for gas supplies lower than the Egyptian gas price[1871].

Under these circumstances EGAS suggests that IEC would not have extended the term of the On-Sale Agreement by an additional five years[1872].

---

[1869] The Tribunal notes that the damages for 2013 are, thus, USD 263.6 Million for the first quarter and USD 15,497,212 each following quarter; in total: USD 310 Million, which is below USD 447 Million estimated by PUA in its 14 May 2014 letter.
[1870] Nera II, para. 19.
[1871] JWC I, para. 301.
[1872] R$_{142}$ SS M, para. 118.

1644. The Tribunal has already sided with EGAS on this point when it analysed EMG's quantum claim[1873]. The end date is, thus, 30 June 2023.

\* \* \*

1645. In conclusion, the Tribunal decides that the Post-Tamar AC amounts to USD 15,497,212 per quarter, accruing from April 2013 through June 2023, as additional compensation for EGAS' Tripartite Repudiatory Breach. Since these amounts will accrue in the future, they have to be discounted at the appropriate rate to take them back to the correct valuation date. This will be accomplished in Section 4.

### 3.3   OTHER COSTS

1646. The Tribunal must still determine the compensation due to IEC for the Other Costs incurred. These Other Costs include:

- Additional maintenance expenses of the turbines;

- Chartering storage facilities,

- Chartering a vessel for offshore LNG facilities, and

- Demurrage and cancellation costs of two LNG cargos.

### A.   **Insufficient evidence**

1647. The amounts claimed by IEC for Other Costs have not been endorsed by Nera, its quantum expert. The only evidence in the record is a significant number of documents exhibited, most of them drafted in Hebrew, lacking explanation, and two witness statements.

### a.   **Additional maintenance costs**

1648. In its First Submission, IEC claimed USD 6,642,180 increased maintenance costs for the dual fuel units running on liquid fuels[1874]. As evidence of these costs, IEC produced a witness statement from Mr. Offer Moshe Weiss, IEC's contract manager[1875], who prepared a maintenance cost workbook comparing a 'base case' (simulating the actual supply of gas) and a 'what if case' (assuming no under supply of Egyptian gas) on the basis of the figures provided by Mrs. Lena Nudelman, which in turn come from UCOD, IEC's optimisation program[1876].

---

[1873] See para. 1354 *supra*.
[1874] $R_3$ FS M, para. 127.
[1875] Doc. $R_3$-49.
[1876] Weiss WS, Doc. $R_3$-49, para. 54.

1649. For reasons already explained in para. 1583 *supra*, the Tribunal has not admitted any figures based on the unilateral use of UCOD as evidence of damages, and thus dismisses this claim for additional maintenance for insufficient evidence.

1650. In its Second Submission, IEC added further elements to its claim[1877]:

- NIS 65.1 Million in reconditioning costs: the evidence of these costs is Doc. R$_3$-192[1878] a document which is drafted in Hebrew; no translation has been furnished, and the Tribunal cannot verify its content.

- NIS 28 Million in the increased costs of desalinated water: IEC calculates the costs in Doc. R$_3$-193[1879], but the evidence is again drafted in Hebrew.

- NIS 26 Million in infrastructure: NIS 18 Million in coverting two units back to run on heavy fuel oil and NIS 8 Million in replacing a diesel pipeline at the Gezer site, as evidenced in Doc. R$_3$-194[1880]. The document is partly drafted in Hebrew, partly in English. There are five invoices from Siemens for the delivery of spare parts for the static pipes in Gezer, and a sixth invoice which is illegible. The Tribunal does not accept the amount invoiced by Siemens because there is no evidence that the replacement was not within the ordinary maintenance parameters.

- NIS 6 Million in reducing emissions: IEC introduced a de-nox and emulsion system to increase production of the units running on liquid fuel as evidenced in Doc R$_3$-195[1881]; this a document with invoices for a power augmentation fog system (USD 797,259) and for NOX water systems (USD 941,973.58, USD 363,169.40, USD 428,284.78[1882]) and for spare parts. There is no evidence linking those costs with the failure to supply gas under the On-Sale Agreement.

- NIS 3 Million in costs due to malfunctions: IEC has requested the reimbursement of costs incurred in cleaning and replacing clogged burners, and carrying out preventive examinations and inspections[1883]; but has failed to establish through expert evidence that these costs are additional to ordinary maintenance costs. In any event most document evidencing these costs are drafted in Hebrew[1884].

---

[1877] R$_3$ SS M, para. 352.

[1878] R$_3$ SS M, para. 353.

[1879] R$_3$ SS M, para. 354.

[1880] R$_3$ SS M, para. 355.

[1881] R$_3$ SS M, para. 129.

[1882] The rest of the invoices are illegible.

[1883] R$_3$ SS M, para. 357.

[1884] Doc. R$_3$-196.

### b.    Chartering storage facilities

1651. Mr. Shimshon Brokman (head of fuel management department in IEC[1885]) explained that IEC was forced to store 200,000 tonnes of gasoil, rather than 100,000 tonnes previously held; this implied a cost USD 2.6 Million in 2012 and the witness expected the costs in 2013 to be similar[1886]. Mr. Brokman supported his statements in the invoices for the "lease of containers"[1887].

1652. The Tribunal would have expected IEC to request its expert to calculate how much money was ordinarily expended for gasoil storage, in order to ascertain that the amounts now claimed are in excess of that level of expenditure, and that the increase is attributable to the breach. At face value, if the document attached as evidence is analysed[1888], it would seem that IEC is seeking payment for the entire quantity of 200,000 tonnes – which is clearly unwarranted, because IEC always held a storage reserve of gasoil[1889].

### c.    LNG shipments

1653. IEC's claim for Other Costs related to LNG shipments includes costs for the chartering of vessels, for the cancellation of shipments and also demurrage costs.

1654. The Tribunal notes that:

- Most of the chartering costs are allegedly to arise in the course of the next five years[1890], but the Tribunal finds it unlikely that further cost will arise after April 2013, when IEC's gas demand will be fully supplied by Tamar.

- There is an invoice for port cost settlement[1891], which has not been explained.

* * *

1655. For these reasons, the Tribunal has reservations as to whether the material before it supports IEC's claims in respect of the various items of Other Costs.

---

[1885] Brokman FWS, para. 1.

[1886] Brokman FWS, para. 117.

[1887] Doc. R$_3$-78.

[1888] Doc. R$_3$-78, para. 148.

[1889] The aggregate of the individual quantitiies of the containers sums up to 255,600 m/t.

[1890] Doc. R$_3$-81.

[1891] Doc. R$_3$-190 and Doc. R$_3$-191.

## B.   Avoidance of double recovery

1656. All the Other Costs relate to the acquisition of alternative fuel: the additional maintenance costs arise because of the increased used of dirtier fuel[1892], the additional storage was required to store gasoil[1893], vessels were chartered to bring LNG from offshore to Israel[1894], and some LNG cargos were cancelled or stayed longer in port, and thereby accrued cancellation or demurrage costs[1895].

1657. To avoid a double recovery, the first question which the Tribunal must address is whether these costs were already included in PUA's assessment of the Additional Fuel Costs incurred by IEC.

1658. The Tribunal has already acknowledged that PUA makes an informed decision on IEC's Additional Costs, after hearing IEC and collecting documentation from IEC and inputting the appropriate data in an optimisation program. It is reasonable to suppose that IEC inputs all the relevant data, comprising:

- All costs necessary to have the additional fuel delivered to Ashkelon, which was the delivery point under the On-Sale Agreement; if vessels were chartered to bring alternative fuel to Israel, these costs must be deemed included.

- All costs associated to the choice of one alternative fuel over others: a proper optimisation program, which forecasts the costs related to an optimised choice of alternative fuel must necessarily take into consideration all penalty costs related to the cancellation (or temporary interruption) of discarded fuels;

- All maintenance costs associated to the choice of alternative fuel: again, a proper optimisation program would take into account the operational and maintenance costs related to the use of one fuel type when forecasting the minimal cost arising out of its use, as compared to the costs of other fuels; the UCOD program developed by IEC did include these costs[1896] and it is reasonable to expect that PUA's operation of the optimisation program does, too.

1659. The Tribunal decides that the Other Costs were included in PUA's decisions on Additional Fuel Costs and therefore, the Tribunal will award no further compensation to IEC, in addition to that already granted in the previous sections.

\* \* \*

---

[1892] $R_3$ FS M, para. 127; $R_3$ SS M, para. 352.

[1893] $R_3$ FS M, para. 127.

[1894] $R_3$ FS M, para. 127.

[1895] $R_3$ SS M, para. 345.

[1896] See Doc. $R_3$-85 annexed to Nudelman WS.

1660. In conclusion, the Tribunal has already expressed its reservations about whether or not the various items of Other Costs are supported by the evidence which has been adduced. For the reasons given in this section, the Tribunal takes the view that, if it allowed such items, there would be a significant risk of double recovery.

## 4. CAPITALISATION AND DISCOUNTING

1661. The purpose of every damage valuation is to put the innocent party in the position it would have been in, had the contract been performed[1897]. The determination of this precise time when the indemnity has to be calculated, the so called, 'valuation date', is a legal question in the hands of the Tribunal, because it is for the Tribunal to decide whether and when a breach occurred.

1662. In this case, the Tribunal finds that the appropriate valuation date in order to calculate the compensation owed by EGAS to IEC is the date when EGAS repudiated the Tripartite Agreement i.e. 18 April 2012. For convenience and simplification of calculation the Tribunal will use the month end closest to 18 April 2012, i.e. 30 April 2012 [the "**Valuation Date**"]. The Tribunal treats this as the date when the contractual relationship between the parties was finally severed, and any expectation that delivery be reinstated in the future disappeared.

1663. All damages established in the previous sections are expressed in nominal terms. Additional Fuel Costs incurred before Valuation Date (i.e. between February 2011 – April 2012) will receive interest in accordance with chapter XVI *infra*, while those accruing thereafter have to be discounted at the appropriate discount rate to the Valuation Date, as explained *infra*.

## 4.1 DISCOUNT RATE: WACC

1664. Nera brings near and long term future Additional Costs to present value applying IEC's WACC as discount factor. The WACC is obtained as follows[1898]:

- Cost of equity: Nera takes the figure from a decision by PUA, which is expressed in NIS; the difficulty lies with the conversion from NIS into USD; Nera uses the difference between the exchange rate in spot and one year forward contracts to identify expected changes in the exchange rate;

- Cost of debt: Nera derives the cost from the average yield to maturity on four USD-denominated bonds issued by IEC;

- Weighting: the proportion is 1/3-2/3, which is the proportion used in PUA's calculations.

---

[1897] *McGregor on Damages*, exhibited as Doc. RL$_{1+2}$-79 and Doc. CLA-41, p. 33.
[1898] Nera I, para. 91.

1665. In Nera II the calculations are updated to reflect the cost of equity recognised by PUA in March 2013, the depreciation in the NIS as of April 2013, and the increase in the yield to maturity on IEC's debt[1899]; the result is a 8.6% WACC[1900].

1666. JWC, in general terms, agrees with the discount rate calculated by Nera, but notes that such a low risk assumption is only justified where fuel costs are passed through into tariffs[1901]. But if the Tribunal decides that IEC has a valid claim against EGAS, because its damage was not passed on to the Israeli customer through tariff increases, then JWC pleads that the appropriate discount rate is one that does not assume any regulatory matching of fuel costs to tariffs, and this would be 12%[1902].

1667. The Tribunal notes that both experts accept that the appropriate discount rate for IEC's WACC is 8.6%; but JWC argues that, if EGAS' pass-on argument is dismissed, the discount rate should increase by adding 3.4%. The Arbitral Tribunal finds JWC's argument unconvincing: it is undisputed that according to the Israeli regulation of the electricity market the tariff must be set in an amount which allows IEC to meet its reasonable fuel costs[1903]; the only question here is whether by passing on some of its costs, IEC is prevented from recovering the Additional Fuel Costs incurred in this arbitration. But the regulatory matching of fuel costs to tariffs is a premise which remains unaltered, regardless of the Tribunal's decision on the pass-on argument made by EGAS.

1668. However, as determined when establishing EMG's WACC, the Tribunal has decided to include in the country risk component a spread which represents the risk associated with this gas deal and which has been assessed at 3.5%[1904].

1669. The appropriate WACC rate is thus:

| Parameter | |
|---|---|
| **Cost of Equity** | |
| Allowed Return on Equity | 10,20% |
| Shekel-US$ Depreciation | 1,13% |
| US$ Cost of Equity | 8,97% |
| Premium | 3,50% |
| US$ Cost of Equity (+premium) | 12,47% |
| **Cost of Debt** | |
| US$ Nominal Yield | 7,09% |
| US$ Expected Inflation | 2,36% |
| US$ Cost of Debt | 4,62% |

[1899] Nera II, para. 159.
[1900] Nera II, para. 160.
[1901] JWC V, p. 5.
[1902] JWC V, p. 5.
[1903] See para. 1587 *supra*.
[1904] See paras. 1414 *et seq. supra*.

| Gearing | |
|---|---|
| Equity | 33% |
| Debt | 67% |
| **Cost of Capital** | |
| Real US$ WACC | 7,3% |
| IEC Expected Inflation | 2,35% |
| Nominal US$ WACC | 9,80% |

## 4.2   DISCOUNTING

1670. The standard discounting formula is:

$$Present\ Value = \frac{Future\ Value}{(1 + discount\ rate)^n}$$

Where *n* is the number of years lapsed between the future and the present.

1671. The future monetary flows to be discounted to Valuation Date can be broken down in three tranches:

- The first tranche is the 2012 Post-repudiation compensation owed for May – December 2012, which amounts to USD 1.0678 Billion in total or USD 133,333,369 each month (**A.**);

- The second tranche is the 2013 Pre-Tamar AC, which is the compensation owed from January – March 2013, which amounts to USD 263,584,113 in total or USD 87,861,371 each month (**B.**);

- The third tranche is the Post-Tamar AC, which is the compensation owed from April 2013 – June 2028, which amounts to USD 15,497,212 each quarter (**C.**).

## A.   May – December 2012

1672. The present value at Valuation Date, expressed in USD, is as follows:

| Month 2012[1905] | Flow | Discount[1906] | Present value at 30 April 2012[1907] |
|---|---|---|---|
| May | 133.336.908 | 1,0078212897 | 132.302.135 |
| June | 133.336.908 | 1,0157037519 | 131.275.392 |
| July | 133.336.908 | 1,0236478651 | 130.256.617 |
| August | 133.336.908 | 1,0316541116 | 129.245.749 |
| September | 133.336.908 | 1,0397229772 | 128.242.725 |
| October | 133.336.908 | 1,0478549518 | 127.247.486 |
| November | 133.336.908 | 1,0560505289 | 126.259.970 |
| December | 133.336.908 | 1,0643102060 | 125.280.118 |
| **Total** | | | **1.030.110.193** |

---

[1905] The Tribunal presumes that the flow is generated at the end of the month.
[1906] (1+0.098)^(number of months lapsed since 30 April 2012 * 1/12)
[1907] Flow divided by the discount factor.

## B.     January – March 2013

1673. The present value on the Valuation Date, expressed in USD is:

| Month 2013[1908] | Flow | Discount[1909] | Present value at 30 April 2012[1910] |
|---|---|---|---|
| January | 87.861.371 | 1,0726344844 | 81.911.753 |
| February | 87.861.371 | 1,0810238694 | 81.276.069 |
| March | 87.861.371 | 1,0894788702 | 80.645.319 |
| Total | | | 243.833.141 |

## C.     April 2013 – June 2023

1674. The Tribunal has awarded damages in an amount of USD 15,497,212 each quarter. The present value in USD is as follows:

| Period[1911] | Nominal | Discount factor[1912] | Present value at December 2012[1913] |
|---|---|---|---|
| April – June 2013 | 15.497.212 | 1,09800 | 14.114.036 |
| July – Sep. 2013 | 15.497.212 | 1,12397 | 13.787.980 |
| October – Dec. 2013 | 15.497.212 | 1,15054 | 13.469.456 |
| Jan. – March 2014 | 15.497.212 | 1,17775 | 13.158.291 |
| April – June 2014 | 15.497.212 | 1,20560 | 12.854.314 |
| July – Sep. 2014 | 15.497.212 | 1,23411 | 12.557.359 |
| October – Dec. 2014 | 15.497.212 | 1,26330 | 12.267.264 |
| Jan. – March 2015 | 15.497.212 | 1,29317 | 11.983.871 |
| April – June 2015 | 15.497.212 | 1,32375 | 11.707.025 |
| July – Sep. 2015 | 15.497.212 | 1,35506 | 11.436.575 |
| October – Dec. 2015 | 15.497.212 | 1,38710 | 11.172.372 |
| Jan. – March 2016 | 15.497.212 | 1,41990 | 10.914.273 |
| April – June 2016 | 15.497.212 | 1,45348 | 10.662.136 |
| July – Sep. 2016 | 15.497.212 | 1,48785 | 10.415.824 |
| October – Dec. 2016 | 15.497.212 | 1,52304 | 10.175.202 |
| Jan. – March 2017 | 15.497.212 | 1,55905 | 9.940.139 |
| April – June 2017 | 15.497.212 | 1,59592 | 9.710.506 |
| July – Sep. 2017 | 15.497.212 | 1,63366 | 9.486.178 |
| October – Dec. 2017 | 15.497.212 | 1,67229 | 9.267.033 |
| Jan. – March 2018 | 15.497.212 | 1,71184 | 9.052.950 |
| April – June 2018 | 15.497.212 | 1,75232 | 8.843.813 |
| July – Sep. 2018 | 15.497.212 | 1,79376 | 8.639.507 |
| October – Dec. 2018 | 15.497.212 | 1,83618 | 8.439.921 |
| Jan. – March 2019 | 15.497.212 | 1,87960 | 8.244.945 |
| April – June 2019 | 15.497.212 | 1,92405 | 8.054.474 |
| July – Sep. 2019 | 15.497.212 | 1,96955 | 7.868.403 |
| October – Dec. 2019 | 15.497.212 | 2,01613 | 7.686.631 |
| Jan. – March 2020 | 15.497.212 | 2,06380 | 7.509.058 |
| April – June 2020 | 15.497.212 | 2,11261 | 7.335.587 |
| July – Sep. 2020 | 15.497.212 | 2,16257 | 7.166.123 |
| October – Dec. 2020 | 15.497.212 | 2,21371 | 7.000.575 |
| Jan. – March 2021 | 15.497.212 | 2,26606 | 6.838.850 |
| April – June 2021 | 15.497.212 | 2,31964 | 6.680.862 |

---

[1908] The Tribunal presumes that the flow is generated at the end of the month.

[1909] (1+0.098)^(number of months lapsed since 30 April 2012 * 1/12)

[1910] Flow divided by the discount factor.

[1911] The Tribunal presumes that the flow is generated in the middle of each quarter; i.e. May, August, November, February and so forth.

[1912] (1+0.098)^(number of months lapsed since 30 April 2012 * 1/12)

[1913] Flow divided by the discount factor.

| | | | |
|---|---|---|---|
| July – Sep. 2021 | 15.497.212 | 2,37450 | 6.526.524 |
| October – Dec. 2021 | 15.497.212 | 2,43065 | 6.375.751 |
| Jan. – March 2022 | 15.497.212 | 2,48813 | 6.228.461 |
| April – June 2022 | 15.497.212 | 2,54697 | 6.084.574 |
| July – Sep. 2022 | 15.497.212 | 2,60720 | 5.944.011 |
| October – Dec. 2022 | 15.497.212 | 2,66885 | 5.806.695 |
| Jan. – March 2023 | 15.497.212 | 2,73197 | 5.672.551 |
| April – June 2023 | 15.497.212 | 2,79657 | 5.541.506 |
| TOTAL | | | 376.621.606 |

\* \* \*

1675. In conclusion, the Arbitral Tribunal finds that IEC is entitled to the following amounts expressed in USD as compensation for the Tripartite Delivery Breaches and for EGAS' failure to act as a RPPO in securing the Pipeline:

| Month | Hourly Shortfall Compensation | Monthly Shortfall Compensation | Total |
|---|---|---|---|
| | | | |
| feb-11 | 4.687.895 | 3.351.705 | **8.039.600** |
| mar-11 | 3.861.573 | 1.999.488 | **5.861.061** |
| abr-11 | 1.420.582 | 917.443 | **2.338.025** |
| may-11 | 6.318.467 | 3.758.088 | **10.076.554** |
| jun-11 | 2.587.820 | 2.500.574 | **5.088.394** |
| jul-11 | 2.761.272 | 1.616.584 | **4.377.856** |
| ago-11 | 4.325.013 | 3.215.750 | **7.540.762** |
| sep-11 | 4.239.375 | 3.112.287 | **7.351.662** |
| oct-11 | 2.409.188 | 2.518.198 | **4.927.387** |
| nov-11 | 3.644.027 | 2.533.545 | **6.177.571** |
| dic-11 | 7.304.269 | 3.863.308 | **11.167.577** |
| ene-12 | 6.439.522 | 3.159.179 | **9.598.701** |
| feb-12 | 6.487.680 | 3.115.577 | **9.603.257** |
| mar-12 | 7.070.567 | 3.403.847 | **10.474.414** |
| abr-12 | 7.045.293 | 3.424.411 | **10.469.704** |
| **Total** | | | **113.092.525** |

1676. The above amounts add up to a total of USD 113,092,525.

1677. The amounts owed for the Tripartite Repudiatory Breach are USD 1,650,564,941[1914] for the period 1 May 2012 – 30 June 2023[1915].

---

[1914] 1,030,110,193 (May – December 2012) + USD 243,833,141 (January – March 2013) + USD 376,621,606 (April 2013 – June 2023).

1678. The Tribunal will devote the next chapter of this Award to deciding on the accrual of interest on the above amounts as well as on those awarded to EMG in section XVI *infra*.

---

[1915] The Tribunal notes that the aggregate of USD 113,092,525 and USD 1,650,564,941 is far below USD 3.566 Billion claimed by IEC in respect of additional fuel costs.

# XVI.  QUANTUM (IV): INTEREST

1679. EMG has requested interest on amounts awarded[1916]:

> "Award the Claimant pre-judgment interest on all amounts payable from the relevant date of injury [...]"

> "Award the Claimant post-judgment interest on all amounts payable [...] until the award is paid in full [...]".

1680. And so has IEC[1917]:

> "an award in IEC's favour for compound interest on [...] IEC's additional fuel costs for the historical period July 2008 through June 2013 [...]"

> "an award in IEC's favour for compound interest on IEC's total claim [...]"

> "an award in IEC's favour for post-award interest at 8% per annum on any amount awarded to IEC, from the date of the award until payment, or at such rate or for such period as the Tribunal deems appropriate [...]".

## 1.  EMG'S POSITION

1681. EMG contends that neither the GSPA nor the Tripartite Agreement require the Tribunal to apply a particular interest rate to damages, and in such case, the applicable law – English law – provides an appropriate source of guidance[1918].

1682. The practice under English law is that interest be awarded from the date of loss[1919], at the rate established by the English Courts, which retain discretion, but generally award interest at a rate which broadly represents the rate at which the successful party would have had to borrow the amount recovered over the period in question; in EMG's case this would be – as reflected in its Annual Statements – 3% over the 6-month London Interbank Offered Rate (LIBOR)[1920].

1683. As regards interest once the award has been rendered, English law calls for the application of a statutory rate of 8% until payment in full, according to Art. 2 of the Judgment Debts Order[1921].

---

[1916] C PHB, para. 178 (d) and (h).
[1917] R3 PHB, para. 294 (i), (k) and (m).
[1918] C FS M, para. 307.
[1919] C FS M, para. 308.
[1920] C FS M, para. 308.
[1921] C FS M, para. 309.

1684. FTI has calculated interest applying the following formula[1922]:

$$Interest = Awarded\ amount * (1 + 3\% + 6\ month\ LIBOR\ USD)^n$$

Where $n$ is the time lapsed between the time of loss and the award measured in years.

## 2.   IEC'S POSITION

1685. In Nera I and II the expert calculated interest at the three-month US Treasury bills rate, because it was said to represent a risk-free rate[1923].

1686. In its Post-Hearing Brief, however, IEC amended the interest rate it was claiming to a rate which broadly represents the rate at which the successful party would have had to borrow the amount recovered over the period in question, the United States Bank Prime Loan Rate[1924]:

- July – September 2008: 5%;
- October 2008: 4.56%;
- November 2008: 4% ;
- December 2008: 3.61%;
- Since January 2009: a constant rate of 3.25%[1925].

1687. Post-award interest should run at the English law statutory rate of 8% until payment[1926].

## 3.   EGAS' POSITION

### 3.1   WITH RESPECT TO EMG

1688. EGAS disputes that the approach of English Courts provides an appropriate source of guidance for the Tribunal on interest rate for this award[1927], since the arbitration has no economic connection with England[1928].

1689. In any event, 3% over 6 month LIBOR is significantly higher than an award of 1% above the UK Clearing Banks' Base Lending Rate [the "**UK Base Rate**"] prevailing from time to time, that English Courts generally award in commercial cases[1929].

---

[1922] FTI I, Appendix 18, Discounted Cash Flows.
[1923] Nera I, para. 89.
[1924] PHB, para. 286.
[1925] PHB, para. 289.
[1926] PHB, para. 292.
[1927] R$_{1+2}$ SS M, para. 834.
[1928] R$_{1+2}$ SS M, para. 835.
[1929] R$_{1+2}$ SS M, para. 836.

1690. And as regards the post-award interest, the statutory rate of 8% has no bearing on the present case and has not been updated since 1993 and therefore should have no relevance in the context of current low interest rates[1930].

## 3.2   WITH RESPECT TO IEC

1691. Before IEC amended the interest rate claimed, EGAS' objection was limited to averring that there was no justification for the use of 3-month US Treasury Bill, as the applicable interest rate nor for compound interest[1931].

1692. As regards the modified interest rate, EGAS objects to this late amendment as a matter of procedure[1932]; and JWC also objects as a matter of substance[1933]:

- It is conceptually wrong to award IEC a borrowing rate, because IEC only had borrowing needs between the time fuel costs increased and the time tariffs increased as a compensation; awarding IEC interest for a longer period would be incorrect[1934];

- A risk free rate is correct, as was recognised by Nera, which indicates that no risk or uncertainty was attached to estimates of past losses[1935];

- US Prime is in any event not equivalent to UK Base Rate plus 1%: the Base Rate is the interest cost for transactions between the Bank of England and commercial banks[1936]; the equivalent rate in the US is the Federal Funds Target Rate; and in fact, rates for floating rate loans are most often quoted in relation to LIBOR, not the central bank rate; and if GBP-LIBOR plus 1% is considered to be an appropriate rate for sterling amounts (as a close approximation to UK Base Rate plus 1%), then the most direct proxy for USD amounts is USD-LIBOR plus 1%[1937].

## 4.   THE TRIBUNAL'S DECISION

1693. The Tribunal must take a number of decisions: first, whether the modification of the interest rate claimed by IEC is acceptable as a matter of procedure (**4.1.**), then the Tribunal will decide on the applicable law on the issue of interest, and determine the appropriate interest rate (**4.2.**). As a last step, the Tribunal will establish the correct quantification of interest (**4.3.**).

---

[1930] R[1+2] SS M, para. 837.
[1931] R[1+2] SS M, para. 1197.
[1932] EGAS' communication of 30 May 2014, para. 9.
[1933] 31 May 2014 Report ["**JWC VI**"].
[1934] JWC VI, p. 2.
[1935] JWC VI, p. 3.
[1936] JWC VI, p. 3.
[1937] JWC VI, p. 4.

**4.1   IEC'S MODIFICATION OF THE INTEREST RATE**

1694. EGAS claims that IEC's introduction of new claims for interest at an extremely late stage in the arbitration is abusive and EGAS reserves its rights with respect to due process[1938].

1695. The Tribunal does not fully agree with EGAS' description of the events: IEC did not introduce a new claim for interest. IEC had claimed interest since its first submission[1939]; what IEC has done is claim interest at a different rate. A change in the claimed interest rate is rather frequent occurrence in international arbitration: different currencies, different legal systems and different practices permit the application of alternative interest rates. A party's decision to change its pleadings as regards the appropriate interest rate does not imply a new claim, nor does it violate the counterparty's right to due process, provided that the counterparty is afforded the possibility to properly defend its own position.

1696. It is true that in this procedure, IEC chose to submit the adjustment to the pleaded interest rate rather late in the procedure. But the Tribunal gave EGAS the opportunity to present a specific submission on this issue and to produce expert evidence if it so wished, in order to ensure that EGAS' rights were not infringed by the late introduction[1940]. EGAS did present a 12-pages long submission contesting the appropriateness of the requested interest rate and supported its opinion on that of its expert, JWC[1941].

1697. The Tribunal confirms that EGAS had ample opportunity to express its view on the applicable interest rate and therefore dismisses EGAS' claim that the new interest rate pleaded by IEC be disregarded as a matter of procedure.

**4.2   APPLICABLE LAW**

1698. All Parties agree that the primary rule is that the Tribunal must apply the interest rate provided for in the contract; but in this case, the Tripartite Agreement does not deal with interest.

1699. In the absence of a contractual provision, EMG and IEC suggest that the Tribunal find guidance in the approach taken by English Courts applying English law – English law being the law applicable to the merits:

- Pre-award interest rate should broadly represent the rate at which the successful party would have had to borrow the amount recovered over the period in question; EMG claims that this interest rate should be USD

---

[1938] $R_{1+2}$ SI, para. 9.
[1939] See Terms of Reference, para. 82.
[1940] See A-53.
[1941] $R_{1+2}$ SI and Doc. $R_{1+2}$-671.

       LIBOR 6 months + 3%, whilst IEC holds that the rate should be United States Bank Prime Loan Rate.

-     IEC and EGAS agree that English law fixes post-award interest at 8%.

1700. EGAS sees matters differently. It suggests that, in the absence of contractual provisions, the Tribunal should have full discretion in establishing the appropriate interest rate and, if English law were relevant, then:

-     Pre-award interest rate should be 1% above UK Base Rate; the equivalent in USD being USD LIBOR plus 1%;

-     Post-award interest: the statutory English law rate has no bearing and is furthermore completely outdated.

1701. The Tribunal will first take a decision on the pre-award (**A.**) and then on post-award interest (**B.**).

## A.   <u>Pre-award</u>

### a.   **Interest rate**

1702. The Tribunal agrees with EMG and IEC that, in the absence of a contractual agreement, the Tribunal may find guidance regarding the appropriate interest rate in the law applicable to the merits, in this case, English law[1942]. The approach of the English Commercial Courts applying English law may be summarised as follows:

-     The purpose of any award is to fairly compensate the recipient of interest for being deprived of money which it should have had; this is a matter of discretion and a broad-brush approach is adopted for policy reasons[1943].

-     Determining what rate of interest will provide just compensation is usually decided by reference to the rate at which a person in the position of the recipient could have borrowed the funds of which it has been deprived[1944];

-     The Commercial Court has adopted a convention of awarding interest upon sterling compensation at UK Base Rate plus 1%[1945];

---

[1942] ICC International Court of Arbitration Bulletin, Vol. 15/No. 1, p. 43.
[1943] *Banque Keyser Ullman SA v Skandia (UK) Insurance Co. Ltd* (unreported, 11 December 1987) per Steyn J.
[1944] *Tate and Lyle Food and Distribution Ltd v GLC* [1982] 1 WLR 149 per Forbes J at 154.
[1945] *Baker v Black Sear and Baltic General Insurance Company Ltd* [1996] LRLR 355 per Staughton LJ at 360.

- That practice is only a presumption, which can be displaced if its application would be unfair to either party[1946].

1703. In relation to awards in USD, the approach of the Commercial Court is to determine and apply the rate that best suits the compensatory purpose identified. In some cases the conclusion is reached on the basis of the Judge's own appreciation. In others, the question is the subject of expert evidence. In the present case, both FTI and JWC have expressed their preferences:

- FTI argues that EMG's borrowing rate according to EMG's Annual Statements is USD LIBOR 6 months plus 3%[1947];

- JWC proposes that the proxy be USD LIBOR (for 1 month or 3 months deposits; the expert does not seem to show his preference[1948]) plus 1%[1949].

1704. The Parties agree that the Tribunal has discretion when awarding interest. Exercising its discretion in this matter, the Tribunal dismisses IEC's proposal that the rate should be United States Bank Prime Loan Rate, because such choice seems to be unsupported either in law or in judicial practice. The Tribunal prefers the approach of selecting an interest rate based on LIBOR, the London interbank deposit market, which is a universal reference for the pricing of deposits and lendings. Since all amounts awarded are expressed in USD, the appropriate base rate must be that applied from time to time to deposits in USD transacted on the London interbank deposit market. And to this USD LIBOR base rate an appropriate margin must be added, to reflect the fact that commercial borrowers like EMG and IEC must pay a premium over LIBOR.

1705. Two questions remain to be clarified:

- the appropriate maturity of the deposits (e.g. 1, 3 or 6 months) and

- the margin to be added (1% or 3%).

1706. JWC suggests USD LIBOR for one or three months plus 1%. In the Tribunal's opinion, this proposal is a combination of low interest rate (the shorter the maturity of the deposit, the lower the interest rate) and low margin, which is insufficient to fully compensate the creditor for the non-availability of the moneys owed.

---

[1946] *Shearson Lehman Hutton Inc. v Laclaime Watson & Co Ltd* [1990] 3 All ER 723 per Webster J at 732-3.
[1947] FTI, p. 72.
[1948] JWC VI, p. 5.
[1949] JWC VI, p. 4.

1707. FTI proposes six month LIBOR, which represents a higher interest rate (the longer the maturity of the deposit, the higher the interest), and also proposes a higher margin (3%).

1708. In this situation the Tribunal thinks it right to accept JWC's suggested maturity of one month deposits USD LIBOR, plus FTI's proposed margin, a combination which represents a balanced approach. The pre-award interest is thus established as USD LIBOR for one month deposits plus a margin of 3% p.a. LIBOR is a variable rate. To take account of changes in the market, the rate USD LIBOR one month deposit rate shall be recalculated on the last London business day of each month, and be applied for the next month.

1709. The Tribunal's decision is further supported by the Parties' implicit agreement. Although the Tripartite Agreement does not have an express provision on interest, both the GSPA and the On-Sale Agreement do, in identical terms: interest accrues at USD LIBOR for one month deposits plus a margin of 3% p.a.[1950].

### b.  Simple vs. compound

1710. As regards the method of calculation, IEC requests that interest compounds monthly[1951], and EMG requests interest to be compounded annually; EGAS claims that the appropriateness of compound interest has not been established[1952].

1711. The Tribunal, again, finds guidance in the interest provisions of the GSPA and the On-Sale Agreement, which provide for annual compounding.

1712. The Tribunal, thus, agrees with EMG that interest, which accrues at a variable interest rate, which is recalculated on a monthly basis, should be compounded annually, on each 31 December.

---

[1950] GSPA and On-Sale Agreement (p. 165) Annex 6 Definitions. "Agreed Interest Rate means the rate per annum equal to the one (1) Month London Interbank Offered Rate (LIBOR) rate for United States Dollar deposits as of the applicable determination date, as published by the Wall Street Journal or if not published therein, then as published by the Financial Times of London"; Art. 9.4.7 of Annex 1 to the GSPA and Art. 4.2.10 On-Sale Agreement.
[1951] R$_3$FS M, para. 128; R$_3$ PHB, para. 288.
[1952] R$_{1+2}$ SS M, para. 1197.

c.    *Dies a quo* and *dies ad quem*

1713. Preaward interest accrues from the day the loss was caused until the date of this Award.

(i)    *Dies a quo*

1714. For convenience reasons, the Tribunal decides that the monthly compensation for Tripartite Delivery Breaches[1953] (i.e. pre-repudiation compensation) shall start to accrue interest as of the last day of each month.

1715. As regards compensation for Tripartite Repudiatory Breaches (i.e. post-repudiation compensation), interest on such compensation shall accrue from Valuation Date, i.e. 30 April 2012 – the end of the month in which the repudiation of the Tripartite Agreement occurred.

(ii)    *Dies ad quem*

1716. Pre-award interest shall continue to accrue, and be capitalised annually, each 31 December, until the date of issuance of this award.

B.    **Post-award**

a.    **Interest rate**

1717. EMG and IEC claim post-award interest at a rate of a significant post-award interest rate, 8%, based on English law. EMG and IEC rely on section 17 of the Judgments Act 1838 and on the provisions of Art. 2 of the Judgment Debts (Rate of Interest) Order 1993.

1718. EGAS submits that the Judgments Act 1838 is inapplicable and that the rate introduced by the 1993 Order is out of date. EGAS goes on to submit that, in any event, the provisions relied on are inapplicable to judgments entered in currencies other than sterling. The Tribunal understands the burden of the submissions put forward on behalf of EGAS to be that, in determining what rate to apply in connection with post-award interest, the Tribunal has a general discretion.

1719. In this connection, the Tribunal thinks it right to have regard to section 49(4) of the Arbitration Act 1996, which is in the following terms:

> "(4) The Tribunal may award simple or compound interest from the date of the award (or any later date) until payment, at such rates and with such rests as it considers meets the justice of the case, on the outstanding amount of any award (including any award of interest [...] and any award as to costs)".

---

[1953] See paras. 1314, 1609 and 1610 *supra*.

1720. In the light of that provision, the Tribunal agrees with EGAS that neither the Judgments Act 1838 nor the 1993 Order has any application. For the reasons given above, the Tribunal thinks it right to exercise its discretion by order the payment of post-award interest at the same rate as for pre-award interest, that is at USD LIBOR for one month deposits plus a margin of 3% p.a.[1954].

### b.    Simple v. compounded

1721. As with the pre-award interests, the Tribunal is guided by the interest provisions of the GSPA and the On-Sale Agreement, which set forth annual compounding, and therefore, post-award interest shall be compounded annually, each 31 of December, until actual payment.

### c.    *Dies a quo* and *dies ad quem*

1722. Post-award interests shall accrue from the date of issuance of this Award until full payment.

## 4.3   QUANTIFICATION OF INTEREST

1723. The principal amounts ordered in this Award as compensation for the loss suffered and the respective time the loss arose is set forth in the following tables:

### A.    Amounts awarded to EMG

1724. The amounts awarded to EMG (in USD) as compensation for the Tripartite Delivery Breaches, and the respective *dies a quo* are[1955]:

| *Dies a quo* | Principal amount |
|---|---|
| 28 February 2011 | 4,529,891 |
| 31 March 2011 | 2,724,295 |
| 30 April 2011 | 1,263,851 |
| 31 May-2011 | 5,061,914 |
| 30 June 2011 | 3,376,243 |
| 31 July 2011 | 2,184,486 |
| 31 August 2011 | 4,331,418 |
| 30 September 2011 | 4,192,061 |
| 31 October 2011 | 3,401,235 |
| 30 November 2011 | 3,428,510 |
| 31 December 2011 | 5,203,639 |
| 31 January 2012 | 4,261,872 |
| 29 February 2012 | 4,198,869 |
| 31 March 2012 | 4,586,380 |
| 30 April 2012 | 4,612,472 |

---

[1954] The Tribunal notes that none of the Parties have pleaded interest under Swiss law; given that the Tribunal is applying the interest rate which was agreed in the GSPA and in the On-Sale Agreement, there is nothing in the decision on interest that indicates that Swiss law is contravened.

[1955] See para. 1314 *supra*.

1725. The amount awarded for Tripartite Repudiatory Breach is USD 230,935,579[1956], and interest on such amount shall accrue as of 1 May 2012, the first day after the deemed repudiation date.

## B.    Amounts awarded to IEC

1726. The amounts awarded to IEC (in USD) as compensation for the Tripartite Delivery Breaches, and the respective *dies a quo* are[1957]:

| Dies a quo | Principal amount |
|---|---|
| 28 February 2011 | 8.039.600 |
| 31 March 2011 | 5.861.061 |
| 30 April 2011 | 2.338.025 |
| 31 May-2011 | 10.076.554 |
| 30 June 2011 | 5.088.394 |
| 31 July 2011 | 4.377.856 |
| 31 August 2011 | 7.540.762 |
| 30 September 2011 | 7.351.662 |
| 31 October 2011 | 4.927.387 |
| 30 November 2011 | 6.177.571 |
| 31 December 2011 | 11.167.577 |
| 31 January 2012 | 9.598.701 |
| 29 February 2012 | 9.603.257 |
| 31 March 2012 | 10.474.414 |
| 30 April 2012 | 10.469.704 |

1727. The amount awarded for Tripartite Repudiatory Breach is USD 1,650,564,941[1958], and interest on such amount shall accrue from the Valuation Date, i.e. 30 April 2012.

---

[1956] See para. 1423 *supra*.
[1957] See para. 1610 *supra*.
[1958] See para. 1676 *supra*.

# XVII. COSTS

1728. All Parties have requested to be awarded costs.

1729. At the First Hearing[1959] and the Second Hearing[1960], the Tribunal orally instructed the Parties to submit their Statements of Costs, having provided further guidance about their content in Communication A-58[1961]. On 13 June 2014, each of the Parties submitted the details of the cost items they had incurred, both in the jurisdictional and in the merits/quantum phases of the procedure. In Communication A-72 dated 17 July 2015[1962], the Tribunal invited the Parties to submit an amended version of their statement of costs. On 24 July 2015, each of the Parties submitted an amended version of the costs they had incurred. The following subsections account for the Parties' demands.

1730. At its session of 26 November 2015 the ICC Court fixed the fees and expenses of the arbitrators and the ICC administrative expenses [the "**ICC Costs**"] pursuant to Art. 31.1 of the ICC Rules at USD 2.930.000. The Parties have paid the following amounts to cover the costs of the arbitration.

| Party | Amount paid |
|---|---|
| Claimant | USD 1.146.633[1963] |
| Respondent 2 | USD 738.370[1964] |
| Respondent 3 | USD 1.044.997[1965] |

## 1. EMG'S POSITION

1731. Throughout its submissions, EMG requested that the costs of this arbitration, including arbitrators' fees and expenses, administrative costs and legal fees, as well as all expenses incurred in connection with the dispute, be borne by Respondents 1 and 2[1966]. In its Supplemental Submission, EMG additionally asked the Tribunal to order Respondents 1 and 2 to pay all the costs and expenses

---

[1959] First Hearing, Day 10, p. 2355, para. 7-9.
[1960] Second Hearing, Day 12, p. 2840, para. 10-16 and 22-23.
[1961] A-58, para. 2.
[1962] A-72, para. 3.
[1963] See Secretariat's letter of 4 November 2015.
[1964] Secretariat's email of 4 June 2014 and letter of 4 November 2015. There was a small error in the Secretariat's letter: the aggregate amount disbursed by Respondents should read USD 1,783,367 (not 1,783,337).
[1965] Out of this total, the amount of USD 675.837 are Claimant's share of the advance on costs which Respondent 3 agreed to pay (see Secretariat's letters of 3 and 23 September 2014). There was a small error in the Secretariat's letter of 4 November 2015: the aggregate amount disbursed by Respondents should read USD 1,783,367 (not 1,783,337).
[1966] C FS J, para. 81(d); C FS M, para. 327(h); C SS J, para. 123(e); C PHB, para. 178(g).

associated with document production in this arbitration, including its reasonable legal and expert fees, and the fees and expenses of the Tribunal[1967].

1732. Specifically, EMG requests the payment by EGAS of the following costs and expenses[1968]:

### A.    Jurisdictional phase

1733. EMG is requesting EUR 941,708 and USD 362,420.35[1969] incurred in legal fees.

### B.    Merits and Quantum phase

1734. The total requested amount is EUR 4,209,323.63 and USD 1,932,838.13, which is the sum of:

- Legal fees: EUR 3,170,645.00 and USD 293,705.97[1970]

- Experts' fees: EUR 1,038,678.63 and USD 490,244.16[1971]

- Advance on costs and lodging fee: USD 1,148,888[1972].

## 2.    EGAS' POSITION

1735. Throughout its submissions, EGAS asked the Tribunal to order EMG and IEC to bear the entirety of the costs of this arbitration, including but not limited to compensation for all the arbitrators' fees and expenses, administrative costs and legal fees, and all expenses incurred by Respondents 1 and 2 in connection with the present dispute[1973].

1736. In particular, EGAS requests the payment by Claimant and Respondent 3 of the following costs and expenses[1974]:

---

[1967] C SupS, para. 89(e).
[1968] C USC, Annexes A, B, C and D.
[1969] EMG asks for EUR 941,708.00 in Freshfields Bruckhaus Deringer's legal fees, USD 298,715.50 in M. Firon & Co., Advocates and Notaries' legal fees and USD 63,704.85 in Sarwat A. Sahid Law Firm's legal fees.
[1970] EMG asks for EUR 3,170,645.00 in Freshfields Bruckhaus Deringer's legal fees, USD 135,117.37 in M. Firon & Co., Advocates and Notaries' legal fees and USD 158,588.60 in Sarwat A. Sahid Law Firm's legal fees.
[1971] These sums correspond to EUR 996,852.23 for FTI's report, EUR 41,826.40 for Global Gas Partners GmbH's report, USD 442,469.16 for Baker & O'Brien's report and USD 47,775.00 for GCA's report.
[1972] EMG has paid the ICC USD 2,255.00 for the lodging fee and USD 431,633.00 as an advance on costs. C SU SC, Annex B.
[1973] $R_{1+2}$ FS J, para. 107(e); $R_{1+2}$ FS M, para. 789(4); $R_{1+2}$ SS J, para. 123(3); $R_{1+2}$ SS M, para. 1209(4); $R_{1+2}$ PHB, para. 370(3).
[1974] $R_{1+2}$ FSC and $R_{1+2}$ USC.

### A.    Jurisdictional phase

1737. EGAS requests to be reimburse in USD 3,272,901.21, which is the sum of:

- Legal fees: USD 3,101,528

- Other costs and expenses: USD 54,020.21

- Expert fees and expenses: USD 37,353

- Advance on costs: USD 80,000

### B.    Merits and Quantum phase

1738. The total amount is USD 11,649,182.29, broken down as follows:

- Legal fees: USD 7,440,694[1975]

- Other costs and expenses: USD 304,663.51[1976]

- Expert fees and expenses: USD 3,245,454.78[1977]

- Advance on costs: USD 658,370

### 3.    IEC'S POSITION

1739. Throughout its submissions, IEC requested that EGAS and/or EMG be ordered to pay in full the costs incurred by IEC in the present arbitration, including the fees and expenses of the Tribunal, the ICC's costs, and its legal costs and expenses[1978].

1740. In particular, IEC demands the payment by Respondents 1 and 2 and/or Claimant of the following costs and expenses[1979]:

### A.    Jurisdictional phase

1741. IEC requests USD 729,415.71[1980], which is the sum of:

---

[1975] This amount corresponds to USD 7,191,316.00 submitted in $R_{1+2}$ SC and to an additional USD 249,378.00 submitted in $R_{1+2}$ USC.
[1976] This amount corresponds to USD 261,177.20 submitted in $R_{1+2}$ SC and to an additional USD 37,486.31 submitted in $R_{1+2}$ USC.
[1977] This amount corresponds to USD 2,720,503.32 submitted in $R_{1+2}$ SC and to an additional USD 524,951.46 submitted in $R_{1+2}$ USC.
[1978] $R_3$ FS M, para. 134(i); $R_3$ SS M, para. 358(k); $R_3$ PHB, para. 294(l).
[1979] $R_3$ USC.
[1980] As explained in fn. 1 of $R_3$ USC, Respondent 3 used the exchange rate of USD 1.589 to GBP 1.00 published by HM Revenue and Customs of the UK, to convert GBP into USD. For converting NIS into

- Legal fees: GBP 282,510.00 and NIS 440,000[1981]

- Other costs and expenses: GBP 20,591.82 and NIS 34,650[1982]

- Advance on costs: USD 123,043

## B. Merits and Quantum phase

1742. For the merits and quatum phase, IEC claims USD 8,314,973.89[1983], which is the sum of:

- Legal fees: GBP 3,339,859.41 and NIS 770,000.00[1984]

- Expert fees and expenses: GBP 490,529.92[1985]

- Other costs and expenses: GBP 205,917.77 and NIS 354,400[1986]

- Advance on costs: USD 1,597,831.

## 4. THE TRIBUNAL'S DECISION

1743. Art. 31 of the ICC Rules establishes that:

"The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties".

"The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings […] and the reasonable legal and other costs incurred by the parties for the arbitration".

1744. The Tribunal notes that the arbitration clause included in the Tripartite Agreement contains no guidance as regards the allocation of costs. And pursuant to Art. 31 of the ICC Rules the Tribunal may allocate in different proportions the ICC Costs

---

USD, Respondent 3 used the exchange rate of NIS 3.805 to USD 1.00 published by the US Internal Revenue Service. All amounts were rounded to two decimal points.

[1981] IEC asks for GBP 182,696.50 in Norton Rose Fulbright's legal fees as a solicitor, and for GBP 99,813.60 in One Essex Court's legal fees. It further asks for NIS 440,000.00 for its in-house counsel's management fees.

[1982] Other costs and expenses represent the total sum of GBP 10,373.35 and NIS 34,650.00 in disbursements, as well as GBP 10,218.47 in hearing and ICC administration costs.

[1983] R₃ USC, p. 2.

[1984] IEC asks for GBP 2,702,630.50 in Norton Rose Fulbright's legal fees as a solicitor, and for GBP 637,228.91 One Essex Court's legal fees. It further asks for NIS 770,000.00 for its in-house counsel's management fees.

[1985] Expert fees and expenses comprise GBP 427,499.25 in expert witness' fees and GBP 63,030.67 in external consultants' fees.

[1986] Other costs and expenses represent the total sum of GBP 182,074.71 and NIS 354,400.00 in disbursements, as well as GBP 23,843.06 in hearing and ICC administration costs.

and the reasonable legal and other costs incurred by the Parties[1987]. Under these circumstances, the Tribunal is granted ample discretion to decide on the allocation as deemed appropriate[1988].

## 4.1   LEGAL FEES

1745. The Arbitral Tribunal must decide how to allocate the reasonable legal and other costs incurred by the Parties for the arbitration [the "**Legal Fees**"]. In taking such decision, the Tribunal will take a three-steps approach: it will first decide on the proportion in which Legal Fees will be allocated (**A.**), and it shall thereafter determine the amount of Legal Fees which it considers reasonable – an important qualification included in Art. 31 of the ICC Rules (**B.**), then the Tribunal must establish the proportion in which EGAS' reasonable Legal Fees are attributable to defending each of its counterparties (**C.**), finally the Tribunal shall apply the established proportions to the reasonable Legal Fees (**D.**).

### A.   <u>Criteria for the allocation of costs</u>

1746. Absent any guidance on this point in the ICC Rules and in the arbitration clause, the Tribunal turns to the Swiss practice on this issue, Geneva being the place of arbitration[1989].

1747. A criterion often used in arbitration is the principle that the "costs follow the event", and in Switzerland (and other continental European jurisdictions) the costs are allocated <u>proportionally</u> to the outcome of the case, taking into account the <u>relative success</u> of the claims, defences and counterclaims[1990]. This implies that every partial success is a partial defeat and the overall winning party is entitled to the reimbursement of its Legal Fees as far as the success is concerned, but must contribute to the counterparties' Legal fees for the proportion of defeat.

1748. The Tribunal will analyse the degree of success of each Parties' claims in the two main areas of this arbitration, in which the Parties have broken down their Legal Fees: Jurisdictional Issues (**a.**) and Merits Issues. The Tribunal has decided to split this latter category into Liability (**b.**) and Quantum Issues (**c.**).

---

[1987] "International arbitration in Switzerland – A Handbook for Practitioners", E. Geisinger and N. Voser (Ed.), Wolters Kluwer Law & Business, 2nd Ed., 2015, p. 191.

[1988] "A Guide to the New ICC Rules of Arbitration", Y. Derains and E. Schwartz, Kluwer Law International, 1st Ed., 1998, p. 341.

[1989] In absence of agreement of the parties on the rules applicable to adjudication of costs, the Tribunal turns to the provisions of the *lex arbitri*. But given that Chapter XII of the Swiss Private International Law is silent on the issue of costs, the Tribunal deems appropriate to follow the costs rules applicable to judicial proceedings at the place of arbitration. See "Awarding Costs in International Commercial Arbitration: an Overview", M. Bühler, 22 ASA Bulletin 2/2004 (Juin), pp. 253 and 254.

[1990] "International arbitration in Switzerland – A Handbook for Practitioners", E. Geisinger and N. Voser (Ed.), Wolters Kluwer Law & Business, 2nd Ed., 2015, p. 192.

### a.   Jurisdictional issues

1749. Jurisdictional issues cover four main areas:

- Jurisdiction over GSPA Claims

- Jurisdiction over Tripartite Agreement Claims

- Admissibility of Tripartite Agreement Claims

- Unenforceability of the GSPA (and eventually, of the Tripartite Agreement) due to alleged corruption.

1750. The Tribunal notes that EGAS is the winning party as regards the jurisdictional objections to the GSPA Claims, but has lost the jurisdictional objections put forward on the remaining areas; it is also important to acknowledge that the area of EGAS' success did not affect IEC – IEC has won the three jurisdictional challenges to which it was subjected. The Tribunal has weighted the complexity of the jurisdictional objections and has decided to allocate a 25% weighting factor to each.

1751. This implies that, in view of its relative success/defeat:

- EGAS must assume 75% of EMG's Legal Fees and EMG must reimburse 25% of EGAS' Legal Fees;

- EGAS must assume 100% of IEC's Legal Fees, and IEC does not have to reimburse any part of EGAS' Legal Fees.

### b.   Liability issues

1752. The Tribunal notes that EMG's and IEC's main case was that EGAS breached its delivery obligations under the Tripartite Agreement and that it repudiated such agreement. The Tribunal has accepted both claims.

1753. EGAS must therefore reimburse EMG and IEC with 100% of their Legal Fees.

### c.   Quantum issues

1754. The Tribunal notes that EMG has claimed USD 1.5 Billion as compensation, of which only USD 288,292,714 have been awarded. The Tribunal is aware that USD 1.5 Billion is the total amount requested for GSPA Claims and that, of this amount, approximately ⅓ is attributable to Tripartite Agreement Claims. Nonetheless, for the purposes of allocating costs, the Tribunal finds that it is appropriate to measure EMG's degree of success against the total amount claimed, because EGAS has incurred legal fees in its defence against a USD 1.5 Billion claim.

1755. IEC has claimed USD 3,849,285,918 and has obtained USD 1,881,500,520.

1756. In view of the relative monetary success and the complexity of the issues debated in the merits section of the award, the Tribunal decides that:

- EGAS must assume 20% of EMG's Legal Fees and EMG must reimburse 80% of EGAS' Legal Fees;

- EGAS must assume 50% of IEC's Legal Fees and IEC must reimburse 50% of EGAS' Legal Fees.

**B.  The reasonable Legal Fees**

1757. As a second step, the Tribunal must determine the amount of Legal Fees considered reasonable:

- EMG has claimed EUR 941,708 (approximately USD 1 Million) and USD 362,420 for its defence against Jurisdictional Issues and EUR 4,209,324 (USD 4.73 Million) and USD 783,950.13[1991] for its merits and quantum claim.

- IEC has claimed USD 606,372[1992] for its defence against Jurisdictional Issues and USD 6,717,143[1993] for its merits and quantum claim.

- EGAS has claimed USD 3.2[1994] Million for its jurisdictional objections and USD 11[1995] Million for its defence against all claims.

1758. Given the similarities in the complexity of the case advanced by the Parties, the Tribunal has decided to apply a measure of parity in the respective Legal Fees:

- EMG's jurisdictional Legal Fees are reduced to USD 1.2 Million for Jurisdictional Issues and to USD 2 Million as regards liability and USD 2 Million for quantum;

- IEC's jurisdictional Legal Fees are brought down to USD 600,000 for Jurisdictional Issues and to USD 2 Million as regards liability and USD 2 Million for quantum;

- EGAS' jurisdictional Legal Fees are dimished to USD 1.2 Million for Jurisdictional Issues and to USD 4 Million as regards liability and USD 4 Million for quantum.

---

[1991] USD 1.218 Million, minus USD 433,888 advanced for ICC Costs.
[1992] USD 729,416 minus USD 123,043 advanced for ICC Costs.
[1993] USD 8,314,974 – USD 1,597,831.
[1994] USD 3.273 Million minus USD 80,000 advanced for ICC Costs.
[1995] USD 11.649 Million minus USD 658,370 advanced for ICC Costs.

### C. Apportionment of EGAS' reasonable Legal Fees

1759. EGAS has faced claims and counterclaims from two parties. And each of said parties has had a distinct degree of success in its claims. The Tribunal must, before finally allocating Legal Fees, determine the proportion in which EGAS' reasonable Legal Fees are attributable to claiming/defending against EMG and IEC.

#### a. Jurisdictional Issues

1760. As stated before, the Jurisdictional Issues put forward by EGAS cover four distinct areas: jurisdiction over GSPA Claims, over Tripartite Agreement claims, admissibility issues and the alleged unenforceability of the GSPA (and of Tripartite Agreement). In view of the complexity of each of said areas, the Tribunal has decided to attribute the following weighting factors:

- Jurisdiction over GSPA Claims: 25%

- Jurisdiction over Tripartite Agreement claims: 25%

- Admissibility of Tripartite Agreement claims: 10%

- Unenforceability of the GSPA (and eventually, of the Tripartite Agreement) due to alleged corruption: 40%

1761. The Tribunal notes that the first two areas only concern EMG, while the other two affect EMG as well as IEC. Hence, the Tribunal finds that EGAS' reasonable Legal Fees (i.e. USD 1.2 Million) should be apportioned as follows:

- EMG: 25% (jurisdiction over GSPA Claims) + 25% (jurisdiction over Tripartite Agreement Claims) + 50% [10% (admissibility of Tripartite Agreement Claims) + 40% (unenforceability due to alleged corruption)] = 75% of USD 1.2 Million = USD 900,000;

- IEC: the other 50% [10% (admissibility of Tripartite Agreement Claims) + 40% (unenforceability due to alleged corruption)] = 25% of USD 1.2 Million = USD 300,000.

#### b. Liability Issues

1762. The Tribunal thinks it fair to apportion 50% of EGAS' reasonable Legal Fees to each counterparty; i.e. USD 2 Million each.

#### c. Quantum Issues

1763. Again, the Tribunal has attributed half of EGAS' reasonable Legal Fees to each counterparty; i.e. USD 2 Million each.

**D.**    **The allocation of reasonable Legal Fees**

1764. The Tribunal will now apply the proportions in which it has decided to allocate costs to the reasonable Legal Fees:

**a.**    **Jurisdictional Issues**

1765. The Tribunal decides that:

- EMG must bear 25% of USD 900,000 = USD 225,000;

- EGAS must contribute to 75% of EMG's reasonable Legal Fees: 75% of USD 1.2 Million = USD 900,000;

- EGAS must assume 100% of IEC's reasonable Legal Fees: USD 600,000.

**b.**    **Merits Issues**

1766. The Tribunal decides that:

- EGAS must bear 100% of EMG's reasonable Legal Fees: 100% of USD 2 Million = USD 2 Million;

- EGAS must bear 100% of IEC's reasonable Legal Fees: 100% of USD 2 Million = USD 2 Million.

**c.**    **Quantum Issues**

1767. The Tribunal finds that:

- EMG must bear 80% of EGAS' reasonable Legal Fees: 80% of USD 2 Million = USD 1.6 Million;

- IEC must reimburse 50% of EGAS' reasonable Legal Fees: 50% of USD 2 Million = USD 1 Million;

- EGAS must contribute to 20% of EMG's reasonable Legal Fees: 20% of USD 2 Million = USD 0.4 Million;

- EGAS must assume 50% of IEC's reasonable Legal Fees: 50% of USD 2 Million = USD 1 Million.

\* \* \*

1768. Once the amounts due in favour of and by one party are set-off, the end result is that:

- EGAS must bear USD 1.475 Million[1996] of EMG's Legal Fees.

- EGAS must bear USD 2.6 Million[1997] of IEC's Legal Fees.

## 4.2   ICC COSTS

1769. The Tribunal must now turn to decide on the allocation of the ICC Costs. The Tribunal has ample discretion to choose what criteria to apply. Tribunals often take into consideration circumstances of the case, such as the conduct of the parties during the proceedings and whether one party has used dilatory tactics and caused additional costs[1998].

1770. The Tribunal has followed the above principles and added one more: the extent to which the structuring of the claims have contributed to the costs of the arbitration. The result is that the ICC Costs must be borne in accordance with the following proportions: EMG 30%; IEC 10%; and EGAS: 60%.

1771. Since the ICC Costs have been fixed at USD 2,930,000:

- EMG must assume USD 879,000;

- IEC must bear USD 293,000;

- EGAS must contribute with USD 1,758,000.

1772. Taking into consideration that EMG and IEC have advanced USD 1.146.633 and USD 1.044.997[1999], respectively, to cover the ICC Costs:

- EGAS must pay EMG USD 267,633[2000];

- EGAS[2001] must pay IEC USD 751,997[2002].

---

[1996] – USD 225,000 + USD 900,000 + USD 2 Million – USD 1.6 Million + USD 400,000.
[1997] USD 600,000 + USD 2 Million – USD 2 Million + USD 2 Million.
[1998] "International arbitration in Switzerland – A Handbook for Practitioners", E. Geisinger and N. Voser (Ed.), Wolters Kluwer Law & Business, 2nd Ed., 2015, p. 192.
[1999] See para. 1730 *supra*.
[2000] USD 1,146,633 – USD 879,000.
[2001] The Tribunal acknowledges that IEC has requested that EGAS and/or EMG be liable for IEC's costs of the arbitration. The Tribunal does not see how EMG has contributed to any of IEC's claims, and therefore to its costs of the arbitration, and therefore has only held EGAS liable for such costs.

## 4.3   INTEREST

1773. EMG has requested the Tribunal to award post-award interest on "all amounts payable" until the award is paid in full[2003] and IEC has formulated its request in similar terms (interest on "any amount awarded to IEC"[2004]). Part of these "amounts payable or awarded" are the ICC Costs and Legal Fees that EGAS must pay.

1774. As requested, the above amounts shall bear interest as of the date of this Award. The Tribunal has already determined that the post-award interest rate be USD LIBOR for one month deposits plus a margin of 3% p.a., to be recalculated at the end of each month, and compounded annually on 31 December, until the date of actual payment.

---

[2002] USD 1,044,997 – USD 293,000. The Tribunal notes that IEC is claiming USD 1,597,831 for the amount disbursed as advance on the ICC Costs; the Secretariat has, however, verified payment of only USD 1,044,997 (see email of 4 June 2014 and letters from the Secretariat dated 3 and 24 September and 4 November 2015 – please note that there was a error in the 4 Novmeber 2015 letter: the correct aggregate amount paid by Respondents is USD 1,783,367).

[2003] C PHB, para. 178(h).

[2004] R₃ PHB, para. 294(m).

# XVIII.   SUMMARY OF THE DECISIONS

1775. The dispute brought before the Tribunal was complex and required that the Tribunal decide on its jurisdiction and the admissibility of claims (**1.**), on the merits of the dispute (**2.**), on the quantification of liability (**3.**) and on costs (**4.**).

## 1.   JURISDICTION AND ADMISSIBILITY

1776. The Tribunal will first make a brief summary of the decisions taken (**1.1.**) and then address the prayers for relief sought by the Parties (**1.2.**)

### 1.1   SUMMARY OF THE DECISIONS

1777. EGAS objected to the Tribunal's jurisdiction to hear EMG's Claims. In fact, EMG has submitted two claims in this arbitration: GSPA Claims (i.e. claims for breach of the GSPA) and Tripartite Agreement Claims (i.e. claims for breach of the Tripartite Agreement), which require separate attention.

GSPA Claims

1778. The Tribunal first analysed its jurisdiction over the GSPA Claims. EMG maintained that its GSPA Claims could be brought either under the arbitration clause contained in Art. 14.9 of Annex 1 to the GSPA or under Art. 1 of the Tripartite Agreement. The Tribunal sided with EGAS in the construction of these provisions, and came to the decision that it lacked jurisdiction to adjudicate the GSPA Claims under any of these two provisions.

Tripartite Agreement Claims

1779. The Tribunal then moved on to analyse the scope of the Tripartite Agreement Claims – *stricto sensu*, not a jurisdictional question, because the Tribunal's jurisdiction under Art. 9 of the Tripartite Agreement was and is undisputed. The question under debate was rather whether Art. 1 of the Tripartite Agreement, which contains EGAS' obligation to deliver gas, conferred EMG any substantive rights. The Tribunal came to the conclusion that Art. 1 indeed confers EMG substantive rights: EGAS' obligation to deliver gas to EMG, originally formalised in the GSPA, was reiterated, as a repeat obligation, in the Tripartite Agreement. The Tribunal then established the scope of the repeat obligation and of the defences available to EGAS.

Admissibility Objections

1780. As a last point, the Tribunal analysed the admissibility objections submitted by EGAS and concluded that the claims over which the Tribunal has jurisdiction are

not premature[2005] and the Tripartite Agreement is not unenforceable for lack of consideration[2006].

Corruption

1781. The Tribunal devoted a specific chapter to EGAS' contention that the GSPA is illegal, void and unenforceable because its procurement and execution were tainted by corruption (under the assumption that the alleged unenforceability of the GSPA would similarly affect the Tripartite Agreement[2007]). The Arbitral Tribunal concluded that no bribery[2008] or profiteering[2009] was established.

## 1.2   RELIEF SOUGHT

### A.   Claimant's Relief

1782. The Claimant's prayer for relief reads as follows[2010]:

> "(i) DISMISS the First and Second Respondents' objections to jurisdiction and admissibility in their entirety;
>
> (ii) DECLARE that the Tribunal has jurisdiction over the Claimant's Source GSPA claims pursuant to Art. 14.9 of Annex 1 to the Source GSPA and Art. 9 of the Tripartite Agreement;
>
> (iii) DECLARE that the Tribunal has jurisdiction over the Claimant's Tripartite Agreement claims under Art. 9 of the Tripartite Agreement; and
>
> (iv) DECLARE that the Claimant's claims under the Source GSPA and the Tripartite Agreement are admissible".

1783. And the Tribunal has decided to:

- (i) Partially admit and partially dismiss EGAS' objections to jurisdiction and dismiss all admissibility objections;

- (ii) Declare that the Tribunal lacks jurisdiction over EMG's GSPA Claims pursuant to Art. 14.9 of Annex 1 to the GSPA and Art. 9 of the Tripartite Agreement;

- (iii) Declare that the Tribunal has jurisdiction over EMG's Tripartite Agreement Claims under Art. 9 of the Tripartite Agreement; and

---

[2005] See para. 461 *supra*.
[2006] See para. 469 *supra*.
[2007] See para. 558 *supra*.
[2008] See para. 590 *supra*.
[2009] See para. 582 *supra*.
[2010] C PHB, para. 178.

-     (iv) Declare that EMG's claims under the Tripartite Agreement are admissible.

## B.     Respondent 3's Relief

1784. Respondent 3 requests[2011] that the Tribunal:

> "[…] should hold that it has jurisdiction under article 9 of the Tripartite Agreement to determine the dispute raised in the Request and the Counterclaim […]".

1785. The Tribunal has decided that it has jurisdiction under Art. 9 of the Tripartite Agreement to determine the dispute raised in the Request and the Counterclaim.

## C.     Respondents 1 and 2's Relief

1786. Respondents 1 and 2 have requested that the Tribunal[2012]:

> "1. Find and declare that it has no jurisdiction over the claims submitted by EMG or IEC in this arbitration;
>
> 2. Alternatively, to the extent the Arbitral Tribunal may find it has jurisdiction to hear any of the claims submitted in this arbitration, find and declare that such claims are inadmissible and/or premature […];

1787. The Tribunal has:

-     (1.) Found that it has jurisdiction over the Tripartite Agreement Claims submitted by EMG (but not over the GSPA Claims) and over all of the Claims submitted by IEC in this arbitration. The Tribunal has also found and declares that it lacks jurisdiction over EMG's GSPA Claims.

-     (2.) Finally the Tribunal found that the Tripartite Agreement Claims submitted by EMG and all of IEC's Claims are indeed admissible and are not premature.

## 2.     MERITS

1788. The Tribunal will again make a short summary of the decisions taken in the Award (**2.1.**) and then address the specific requests submitted by the Parties (**2.2.**).

## 2.1     SUMMARY OF THE DECISIONS

1789. Claimant and Respondent 3 are claiming that EGAS committed two distinct breaches of the Tripartite Agreement: shortfalls in the supply of gas, i.e. the

---

[2011] R₃ SS J, para. 99.
[2012] EGAS SS M, para. 1209.

Tripartite Delivery Breaches, and the unlawful repudiation of such Agreement, i.e. the Tripartite Repudiatory Breach.

### A. *Force majeure*

1790. Between 5 February 2005 and 9 April 2012 the Pipeline was attacked 13 times, explosives were used to blow up the pipe or its facilities, the gas flow was interrupted while repairs were carried out, and EGAS stopped gas deliveries to EMG (and EMG to IEC). EGAS claims that the attacks on the Pipeline amounted to *force majeure* events, that the contractual requirements for that *force majeure* event to become a contractual remedy have been met, and that EGAS' failure to deliver is thereby justified[2013].

1791. The GSPA establishes two requirements for the availability of EGAS' *force majeure* defence:

- the requirement that EGAS acted as a RPPO (i.e. as a Reasonable and Prudent Pipeline Operator) and

- the so-called Avoidance Requirement: had EGAS acted as a RPPO the attacks could indeed have been mitigated or prevented[2014].

1792. After a detailed review of the evidence marshalled by the Parties, the Tribunal has come to the conclusion:

- That EGAS has failed to prove that it acted as a RPPO in preventing and mitigating the effects of the attacks; in particular, it has failed to prove that it implemented security plans, provided physical security to the pipe, deployed technological detection devices, and retained proper security forces[2015]; and

- That the evidence in the file indicates that the attacks initially against the facilities and afterwards against the pipe could have been avoided (or, at least, significantly mitigated) had EGAS acted as a RPPO and adopted the minimal standard security measures suggested by the counter-experts[2016].

1793. Consequently, the Tribunal dismissed the *force majeure* defence: EGAS' failure to perform and to deliver the contractually agreed quantities of gas cannot be excused. The Tribunal also dismissed all additional arguments and defences raised by EGAS relating to this issue[2017].

---

[2013] See para. 597 *supra*
[2014] See para. 593 *supra*
[2015] See para. 879 *supra*
[2016] See para. 890 *supra*
[2017] See para. 933 *supra.*

### B.     Merits

1794. The Tribunal was called upon to adjudicate two distinct merits issues:

- The Tripartite Repudiatory Breach, i.e. the allegation that EGAS repudiated the Tripartite Agreement, as a consequence of its wrongful termination of the GSPA, and

- The Tripartite Delivery Breaches, i.e. EGAS' breach of its delivery obligations under the Tripartite Agreement[2018].

Tripartite Repudiatory Breach

1795. In the course of 2011 – in the midst of the alleged *force majeure* events – EMG fell behind in the payment of gas invoices due to EGAS. The GSPA provides that the failure to pay invoices due for four consecutive months entitled EGAS to terminate the GSPA. On 18 April 2012 EGAS formally terminated the GSPA, arguing that EMG had failed to pay the invoices for the period January-April 2011[2019].

1796. The Tribunal, after analysing the Parties' positions, concluded that:

- EGAS' purported termination of the GSPA on 18 April 2012 was unlawful and constituted a repudiation of the Tripartite Agreement; and

- IEC and EMG were entitled to accept EGAS' repudiation and to terminate the Tripartite Agreement at common law, as IEC did by its letter dated 6 February 2013[2020].

Tripartite Delivery Breaches

1797. Thereafter the Tribunal made the following decisions with regard to the Tripartite Delivery Breaches[2021]:

- EMG's claims under Art. 1 of the Tripartite Agreement with regard to delivery failures before the date of the First Amendment and the Release of Claims (29 May 2009) have been settled as between EGAS and EMG and thus must be deemed released;

- The settlement and release, however, does not extend to IEC, whose claims under Art. 1 of the Tripartite Agreement for delivery failure since the commencement of supply remain unaffected;

---

[2018] See para. 940 *supra*.
[2019] See para. 946 *supra*.
[2020] See para. 1196 *supra*.
[2021] See para. 1237 *supra*.

- EGAS' estoppel defence and EMG's abuse claim are dismissed;

- EMG's and IEC's claim that EGAS failed to exercise reasonable endeavours to enable EMG to make available for delivery an uninterrupted supply of gas to IEC (provided for in Art. 2 of the Tripartite Agreement) is dismissed, except with regard to EGAS' failure to protect the Pipeline, which forms part of EGAS' general duties as a RPPO.

- EMG's claim that EGAS' conduct was in violation of the representations and warranties contained in Art. 7 of the Tripartite Agreement has been settled in the First Amendment and must be deemed released under the Release of Claims.

## 2.2   RELIEF SOUGHT

1798. The Tribunal will address the relief sought by each party separately:

### A.   <u>Claimant's Relief</u>

1799. Claimant has requested that the Tribunal[2022]

> "(i) DECLARE that the First and Second Respondents breached their obligations under the Source GSPA;
>
> (ii) DECLARE that the First and Second Respondents repudiated the Source GSPA, entitling the Claimant to accept that repudiation, terminate the Source GSPA, and claim full compensation under English law;
>
> (iii) DECLARE that the First and Second Respondents breached the Tripartite Agreement; and
>
> (iv) DECLARE that the First and Second Respondents repudiated the Tripartite Agreement, entitling the Claimant to accept that repudiation, terminate the Tripartite Agreement, and claim full compensation under English law".

1800. The Tribunal has decided that:

- (i and ii) The Tribunal has no jurisdiction over GSPA Claims[2023], but since the gas supply obligation formalised in the GSPA is incorporated as a repeat obligation in the Tripartite Agreement (but limited to an annual volume of 2.2 annual BCM), the Tribunal is empowered to analyse and adjudicate EGAS' compliance with the GSPA (within that supply limit) and EGAS' corresponding defences derived from the GSPA. The Tribunal performed this analysis as a condition precedent to deciding whether the Tripartite Agreement had been breached.

---

[2022] C PHB, para. 178.
[2023] See para. 461 *supra*.

- (iii) To declare that the First and Second Respondents breached the Tripartite Agreement; and

- (iv) To declare that the First and Second Respondents repudiated the Tripartite Agreement, entitling Claimant to accept that repudiation and terminate the Tripartite Agreement. The question whether Claimant is entitled to full compensation will be dealt with in the quantum section.

## B.    Respondent 3's Relief

1801. Respondent 3 has requested[2024]:

> "(a) a declaration that EGAS/EGPC are in breach of Articles 1 and/or 2 of the Tripartite Agreement for the shortfalls in supply that IEC has suffered to date;
>
> (b) a declaration that IEC has lawfully terminated the Tripartite Agreement on account of the continuing and repudiatory breaches by EGAS/EGPC of the Tripartite Agreement and/or breaches of the conditions of the Tripartite Agreement".

1802. The Tribunal accepts to make:

- (a) A declaration that EGAS/EGPC are in breach of Articles 1 and 2 of the Tripartite Agreement for the shortfalls in supply to IEC;

- (b) A declaration that IEC has lawfully terminated the Tripartite Agreement on account of the repudiatory breach by EGAS/EGPC: EGAS repudiated the GSPA by wrongfully terminating the GSPA, and this in turn caused the repudiation of the Tripartite Agreement. The question whether other breaches of the Tripartite Agreement also constituted a repudiation became moot.

## C.    Respondents 1 and 2's Relief

1803. Respondents 1 and 2's relief regarding the merits of the dispute reads as follows[2025]:

> "2. Alternatively, to the extent the Arbitral Tribunal may find it has jurisdiction to hear any of the claims submitted in this arbitration, find and declare that such claims are inadmissible and/or premature and/or fail to state a cause of action and/or unfounded".

1804. The Tribunal has accepted Claimant's and Respondent 3's claims that EGAS breached Arts. 1 and 2 of the Tripartite Agreement and that EGAS repudiated the

---

[2024] R3 PHB, para. 294.
[2025] R1+2 SS M, para. 1209.

Tripartite Agreement. Such claims do not fail to state a cause of action and are not unfounded.

**3.   QUANTUM**

1805. The Tribunal will first address Claimant's claim for compensation (**3.1.**) and then move on to Respondent 3's (**3.2.**). The Tribunal recalls that under Art. 13.3 of the GSPA, EGPC and EGAS are jointly and severally liable.

**3.1   CLAIMANT'S CLAIM FOR COMPENSATION**

1806. A summary of the Tribunal's decisions follows (**A.**). The Tribunal will thereafter analyse the relief sought (**B.**).

**A.   Summary of decisions**

1807. As a a preliminary issue, Claimant submitted a claim for off-specification gas and for the Balance of Payments allegedly owed by EGAS to EMG under the GSPA. The Tribunal decided that it lacked jurisdiction to adjudicate these claims[2026].

1808. Additionally EMG submitted two separate claims for full compensation for the two breaches committed by EGAS:

- For the Tripartite Delivery Breaches, EMG claimed the profit it failed to generate, between the First Amendment and the termination of the Tripartite Agreement, had EGAS delivered the agreed quantities of gas and had EMG resold that gas to its down-stream customers;

- For the Repudiatory Breach, the compensation demanded amounted to the lost profit which EMG would have made after termination of the Tripartite Agreement, assuming that such Agreement had still been in force, that EGAS had delivered the appropriate quantities of gas, and that EMG had supplied its down-stream customers.

Compensation for Tripartite Repudiatory Breach

1809. The compensation for this Breach was calculated as the difference between the present value of EMG's cash flows under a But For Scenario (as if EGAS had complied with its contractual obligations) and EMG's value in the Actual Scenario (as it presently is, with both the GSPA and the Tripartite Agreement terminated)[2027]. Under the But For Scenario, the Tribunal decided that EMG's present value at the date of termination (30 April 2012)[2028] is

---

[2026] See paras. 1258 and 1262 *supra*.
[2027] See para. 1323 *supra*.
[2028] See para. 1419 *supra*.

USD 230,935,579[2029] (applying a WACC of 12% as discount rate)[2030]. The Tribunal also concluded that, under an Actual Scenario, EMG's liquidation value was USD 50 Million; the Tribunal specifically dismissed the suggestion that said value be increased to take into consideration the possibility of a future reverse flow trading[2031]. The difference between both values, and the resulting compensation, amounted to USD 230,935,579[2032].

1810. The Tribunal then dismissed EMG's request that amounts be awarded net of taxes and that the Tribunal order EGAS to keep EMG indemnified should taxes on the Award be imposed[2033].

1811. Interest will accrue on the compensation, at an interest rate equal to USD LIBOR for one month deposits plus a margin of 3% p.a. [2034], to be recalculated at the end of each month, and to be compounded annually on the last day of each year[2035], from the *dies a quo*, which is 30 April 2012, until the date of actual payment[2036].

Tripartite Delivery Breaches

1812. As regards the Tripartite Delivery Breaches and EGAS' failure to act as a RPPO in securing the Pipeline, the Tribunal established that, in accordance with the Tripartite Agreement and the GSPA, EMG's compensation was restricted to the liquidated damages resulting from the Shortfall Compensation[2037]. For breaches which had occurred prior to 1 February 2011, EGAS had complied with its obligations deriving from the Shortfall Compensation regime and thus no further compensation was due[2038]; while for breaches arising thereafter, the Shortfall Compensation due amounts to USD 57,357,135[2039]. The Tribunal confirmed that these amounts were below the contractual limitation on liability[2040], and dismissed EMG's request that amounts be awarded net of taxes and that the Tribunal order EGAS to keep EMG indemnified should taxes on the Award be imposed[2041].

1813. Interest will accrue on the compensation, at an interest rate equal to USD LIBOR for one month deposits plus a margin of 3% p.a.[2042], to be recalculated at the end

---

[2029] See para. 1422 *supra*.
[2030] See para. 1416 *supra*.
[2031] See para. 1403 *supra*.
[2032] See para. 1423 *supra*.
[2033] See para. 1442 *supra*.
[2034] See para. 1715 *supra*.
[2035] See para. 1712 *supra*.
[2036] See para. 1720 *supra*.
[2037] See para. 1281 *supra*.
[2038] See para. 1286 *supra*.
[2039] See para. 1315 *supra*.
[2040] See para. 1321 *supra*.
[2041] See para. 1442 *supra*.
[2042] See para. 1708 *supra*.

of each month, and to be compounded annually on the last day of each year[2043], from the *dies a quo* set forth in the table included in para. 1724 *supra*, until the date of actual payment[2044].

## B. Claimant's Relief

1814. Claimant requested that the Tribunal[2045]:

> "(iv) DECLARE [that the Claimant is entitled to] claim full compensation under English law.
>
> (c) ORDER the First and Second Respondents to pay to the Claimant compensation of US$1,500.4 million as the principal sum due for breaches of the Source GSPA and the Tripartite Agreement and their repudiation of the Source GSPA and the Tripartite Agreement
>
> (d) AWARD the Claimant pre-judgment interest on all amounts payable from the relevant date of injury, as more specifically described in this pleading;
>
> (e) DECLARE that the award of damages and interest is made net of applicable Egyptian taxes;
>
> (f) ORDER the First and Second Respondents to indemnify the Claimant should Egypt impose tax on the Award"
>
> "(h) AWARD the Claimant post-judgement interest on all amounts payable, as more specifically described in this pleading, until the award is paid in full".

1815. The Tribunal has decided to:

- (iv) Declare that the Claimant is entitled to claim full compensation under English law for the Tripartite Repudiatory Breach and the Tripartite Delivery Breaches.

- (c) Order the First and Second Respondents to pay to the Claimant (i) USD 230,935,579 as compensation due for Tripartite Repudiatory Breach plus (ii) USD 57,357,135 as compensation due for Tripartite Delivery Breaches.

- (d and h) Award Claimant interest on the total compensation at an interest rate equal to USD LIBOR for one month deposits plus a margin of 3% p.a., to be recalculated at the end of each month, and to be compounded annually on the last day of each year from the appropriate *dies a quo* until the date of actual payment;

---

[2043] See para. 1712 *supra*.
[2044] See para. 1720 *supra*.
[2045] C PHB, para. 178.

- (e) Dismiss Claimant's claim that the award of damages and interest be made net of applicable Egyptian taxes;

- (f) Dismiss Claimant's claim that the First and Second Respondents to indemnify the Claimant should Egypt impose tax on the Award;

## 3.2   RESPONDENT 3'S CLAIM FOR COMPENSATION

1816. The Tribunal will again first summarise its decisions (**A.**) and then move to the relief sought (**B.**).

### A.   Summary of the decisions

1817. Respondent 3 requested the Tribunal that it be compensated for the past and future Additional Fuel Costs caused by the Tripartite Delivery Breaches (incurred before repudiation of the Tripartite Agreement, 30 April 2012) and the Tripartite Repudiatory Breaches (incurred thereafter). The Tribunal accepted Respondent 3's request while dismissing:

- EGAS' defences that IEC had suffered no loss, because Additional Fuel Costs had been passed through to the Israeli customers[2046], and also

- the defences based on foreseeability, remoteness[2047] and proof[2048] and duty to mitigate[2049] arguments.

The Tribunal however accepted EGAS' position that IEC's own computer program UCOD should not be used to calculate the additional costs[2050] and decided to assess the compensation due by reference to the amounts which had been accepted by PUA, the Israeli public agency which supervises the electricity market, as the additional costs which had been passed on to the Israeli electricity consumers[2051]. Compensation in any case is to be capped at the contractually agreed limit[2052].

Tripartite Delivery Breaches

1818. The amounts awarded as compensation for Tripartite Delivery Breaches and for EGAS' failure to act as a RPPO in securing the Pipeline, were USD 72,946,450 (February – December 2011) and USD 40,146,075 (January – April 2012), in total

---

[2046] See paras. 1465 and 1468 *supra*.
[2047] See paras. 1527 and 1529 *supra*.
[2048] See paras. 1541 and 1542 *supra*.
[2049] See para. 1538 *supra*.
[2050] See para. 1584 *supra*.
[2051] See para. 1600 *supra*.
[2052] See para. 1490 *supra*.

USD 113,092,525[2053]. No amounts were awarded for breaches prior to February 2011, because IEC had received Shortfall Compensation for those breaches[2054].

1819. Interest will accrue on the compensation, at an interest rate equal to USD LIBOR for one month deposits plus a margin of 3% p.a.[2055], to be recalculated at the end of each month, and to be compounded annually on the last day of each year, from the *dies a quo* set forth in the table included in para. 1726 *supra*, until the date of actual payment[2056].

<u>Tripartite Repudiatory Breaches</u>

1820. As regards the amounts due as compensation for Tripartite Repudiatory Breaches, the Tribunal made two distinct calculations (pre and post Tamar):

- The pre-Tamar compensation was established (i) for the period between May and December 2012 using PUA's determination of the 2012 additional costs[2057]; and (ii) for the first quarter of 2013 using a projection of PUA's determination[2058]. The amounts came to USD 133,333,369 per month in 2012[2059] and USD 87,861,371 per month in 2013[2060].

- The post-Tamar calculation was based on the difference in price between EMG's gas and a proxy for the Israel gas market, which the Tribunal decided – based on PUA's determinations – to be the Tamar gas price[2061]. The Tribunal established that such difference amounted to 0.792 USD/MMBTU[2062]. The price difference was to be applied to the contractually available quantity of gas, calculated on a quarterly basis[2063]. The resulting compensation was USD 15,497,212 for each quarter[2064], accruing from 1 April 2013[2065] until 30 June 2023[2066].

1821. The Tribunal then discounted the above amounts to their present value at the date of repudiation, 30 April 2012[2067], applying IEC's WACC, which was established

---

[2053] See para. 1610 *supra*.
[2054] See para. 1493 *supra*.
[2055] See para. 1714 *supra*.
[2056] See para. 1720 *supra*.
[2057] See paras. 1616 and 1617 *supra*.
[2058] See para. 1621 *supra*.
[2059] See para. 1617 *supra*.
[2060] See para. 1623 *supra*.
[2061] See para. 1627 *supra*.
[2062] See para. 1634 *supra*.
[2063] See para. 1636 *supra*.
[2064] See para. 1637 *supra*.
[2065] See para. 1641 *supra*.
[2066] See para. 1644 *supra*.
[2067] See para. 1662 *supra*.

at 9.8%.[2068]. The resulting amount for compensation for the Tripartite Repudiatory Breach was USD 1,650,564,941[2069].

1822. Interest will accrue on the compensation, at an interest rate equal to USD LIBOR for one month deposits plus a margin of 3% p.a.[2070], to be recalculated at the end of each month, and to be compounded annually on the last day of each year, from the *dies a quo*, which is 30 April 2012[2071], until the date of actual payment[2072].

1823. Respondent also asked to be reimbursed for other costs related to the acquisition of additional fuel. The Tribunal dismissed EGAS' defences relating to foreseeability and remoteness[2073], but determined that such costs were already recovered as part of the compensation for additional fuel costs already awarded[2074].

## B.  <u>Respondent 3's relief</u>

1824. Respondent 3 has requested[2075]:

> "(c) an award of damages in IEC's favour in the principal amount of US$3,566,479,895 in respect of additional fuel costs, or such other sum as the Tribunal finds appropriate;
>
> (d) an award of damages in IEC's favour in the principal amount of US$39,939,320 in respect of additional maintenance and associated costs;
>
> (e) an award of damages in IEC's favour in the principal amount of US$6,845,727 in respect of additional gasoil storage costs;
>
> (f) an award of damages in IEC's favour in the principal amount of US$211,225,376 in respect of LNG vessel charter costs;
>
> (g) an award of damages in IEC's favour for penalties for the cancellation of two LNG cargos in the principal amount of US$24,350,600;
>
> (h) an award of damages in IEC's favour for ship demurrage charges in the principal amount of US$445,000;
>
> (i) an award in IEC's favour for compound interest on the principal amount of US$2,601,612,903 (being IEC's additional fuel costs for the historical period July 2008 through June 2013) in the amount of US$105,897,235;

---

[2068] See para. 1668 *supra*.
[2069] See para. 1676 *supra*.
[2070] See para. 1708 *supra*.
[2071] See para. 1712 *supra*.
[2072] See para. 1720 *supra*.
[2073] See para. 1533 *supra*.
[2074] See para. 1659 *supra*.
[2075] R$_3$ PHB, para. 294.

(j) an award in IEC's favour for compound interest on all other principal amounts (set out at sub-paragraphs (d) to (h) above, totalling US$282,806,023) in respect of losses already incurred as at 30 June 2013, in the amount of US$2,042,982;

(k) an award in IEC's favour for compound interest on IEC's total claim from 30 June 2013 to the date of any award, accruing at a daily rate of [US]$350,038, based on Bank Prime Loan Rate published by the US Federal Reserve Bank, or such other rate or on such other basis as may be fixed by the Tribunal".

[...]

"(m) an award in IEC's favour for post-award interest at 8% per annum on any amount awarded to IEC, from the date of the award until payment, or at such rate or for such period as the Tribunal deems appropriate".

1825. And the Tribunal has decided:

- (c) To award damages in IEC's favour in the principal amount of USD 1,763,657,466 in respect of Additional Fuel Costs. This amount is the sum of USD 113,092,525 as compensation for Tripartite Delivery Breaches plus USD 1,650,564,941 as compensation for Tripartite Repudiatory Breach.

- (d-h) To dismiss IEC's claim to damages for additional maintenance costs, gasoil storage costs, LNG vessel charter costs, penalties for the cancellation of two LNG cargos or ship demurrage charges.

- (i-j and m) To award Claimant interest on the total compensation at an interest rate equal to USD LIBOR for one month deposits plus a margin of 3% p.a., to be recalculated at the end of each month, and to be compounded annually on the last day of each year from the appropriate *dies a quo* until the date of actual payment.

## 4. COSTS AND EXPENSES

### 4.1 THE PARTIES'S RELIEF

1826. The Parties' relief as regards costs is as follows:

### A. EMG's

"(g) ORDER the First and Second Respondents to pay all of the costs and expenses of this arbitration, including the Claimant's reasonable legal and expert fees, and the expenses of the Tribunal".

"(h) AWARD the Claimant post-judgement interest on all amounts payable, as more specifically described in this pleading, until the award is paid in full".

### B.   **IEC's**

"an award that EGAS/EGPC and/or EMG be liable in full for IEC's costs of the arbitration, including the fees and expenses of the Tribunal, the ICC's costs, IEC's legal costs and expenses".

"(m) an award in IEC's favour for post-award interest at 8% per annum on any amount awarded to IEC, from the date of the award until payment, or at such rate or for such period as the Tribunal deems appropriate".

### C.   **EGAS'**

"Order EMG and IEC to bear the costs of this arbitration in their entirety, including but not limited to compensation for all the arbitrators' fees and expenses, administrative costs and legal fees, and all expenses incurred by EGAS in connection with the present dispute".

## 4.2   THE TRIBUNAL'S DECISION

### A.   **Legal Fees**

1827. The Tribunal has decided that EGAS should pay (i) to EMG USD 1.475 Million for EMG's reasonable Legal Fees and (ii) to IEC USD 2.6 Million for IEC's reasonable Legal Fees[2076].

### B.   **ICC Costs**

1828. The Tribunal has also concluded that the ICC Costs, which have been fixed at USD 2,930,000 are to be split as follows[2077]:

- EMG must assume USD 879,000;

- IEC must bear USD 293,000;

- EGAS must contribute with USD 1,758,000.

1829. Taking into consideration the manner in which the parties paid the advance on costs[2078]:

- EGAS must pay EMG USD 267,633;

- EGAS must pay IEC USD 751,997.

---

[2076] See para. 1768 *supra*.
[2077] See para. 1771 *supra*.
[2078] See para. 1772 *supra*.

## C.    <u>Interest</u>

1830. The Tribunal has decided to award post-award interest on the Legal Fees and ICC Costs at an interest rate equal to USD LIBOR for one month deposits plus a margin of 3% p.a., to be recalculated at the end of each month, and to be compounded annually on the last day of each year, from the *dies a quo*, which is the date of this Award, until the date of actual payment[2079].

---

[2079] See para. 1774 *supra*.

# XIX. <u>DECISION</u>

1831. For the reasons given above, the Tribunal declares and orders the following:

<u>As regards EMG's claims</u>

1.    Declares that the Tribunal lacks jurisdiction to adjudicate EMG's GSPA Claims.

2.    Declares that the Tribunal has jurisdiction to adjudicate EMG's Tripartite Agreement Claims.

3.    Declares that EMG's Tripartite Agreement Claims are admissible and enforceable.

4.    Declares that EGPC and EGAS breached the Tripartite Agreement and committed the Tripartite Delivery Breaches and the Tripartite Repudiatory Breach.

5.    Declares that the EGPC and EGAS repudiated the Tripartite Agreement, entitling EMG to accept that repudiation, terminate the Tripartite Agreement and claim full compensation under English law.

6.    Orders EGPC and EGAS to pay to EMG (i) USD 230,935,579 as compensation due for Tripartite Repudiatory Breach plus (ii) USD 57,357,135 as compensation due for Tripartite Delivery Breaches.

7.    Orders EGPC and EGAS to pay to EMG interest on the total compensation awarded in the preceding Decision, at an interest rate p.a. equal to USD LIBOR for one month deposits plus a margin of 3%, to be recalculated at the end of each month, and to be compounded annually on the last day of each year; interest will accrue (i) for compensation due for the Tripartite Repudiatory Breach, from 30 April 2012 until the date of actual payment, and (ii) for compensation for Tripartite Delivery Breaches, from the dates and on the amounts set forth in the following table, until the date of actual payment:

| *Dies a quo* | Principal amount |
|---|---|
| 28 February 2011 | 4,529,891 |
| 31 March 2011 | 2,724,295 |
| 30 April 2011 | 1,263,851 |
| 31 May-2011 | 5,061,914 |
| 30 June 2011 | 3,376,243 |
| 31 July 2011 | 2,184,486 |
| 31 August 2011 | 4,331,418 |

| | |
|---|---|
| 30 September 2011 | 4,192,061 |
| 31 October 2011 | 3,401,235 |
| 30 November 2011 | 3,428,510 |
| 31 December 2011 | 5,203,639 |
| 31 January 2012 | 4,261,872 |
| 29 February 2012 | 4,198,869 |
| 31 March 2012 | 4,586,380 |
| 30 April 2012 | 4,612,472 |

As regards IEC's claims

8. Declares that the Tribunal has jurisdiction to adjudicate IEC's Tripartite Agreement Claims.

9. Declares that IEC's Tripartite Agreement Claims are admissible and enforceable.

10. Declares that EGPC and EGAS breached the Tripartite Agreement and incurred in the Tripartite Delivery Breaches and the Tripartite Repudiatory Breach.

11. Declares that IEC lawfully terminated the Tripartite Agreement on account of the repudiatory breach of the Tripartite Agreement committed by EGAS and EGPC.

12. Orders EGPC and EGAS to pay to IEC (i) USD 1,650,564,941 as compensation due for Tripartite Repudiatory Breach plus (ii) USD 113,092,525 as compensation due for Tripartite Delivery Breaches.

13. Orders EGPC and EGAS to pay to IEC interest on the total compensation awarded in the preceding Decision, at an interest rate p.a. equal to USD LIBOR for one month deposits plus a margin of 3%, to be recalculated at the end of each month, and to be compounded annually on the last day of each year; interest will accrue (i) for compensation due for the Tripartite Repudiatory Breach, from 30 April 2012 until the date of actual payment, and (ii) for compensation for Tripartite Delivery Breaches, from the dates and on the amounts set forth in the following table, until the date of actual payment:

| *Dies a quo* | **Principal amount** |
|---|---|
| 28 February 2011 | 8.039.600 |
| 31 March 2011 | 5.861.061 |
| 30 April 2011 | 2.338.025 |
| 31 May-2011 | 10.076.554 |
| 30 June 2011 | 5.088.394 |
| 31 July 2011 | 4.377.856 |

| | |
|---|---|
| 31 August 2011 | 7.540.762 |
| 30 September 2011 | 7.351.662 |
| 31 October 2011 | 4.927.387 |
| 30 November 2011 | 6.177.571 |
| 31 December 2011 | 11.167.577 |
| 31 January 2012 | 9.598.701 |
| 29 February 2012 | 9.603.257 |
| 31 March 2012 | 10.474.414 |
| 30 April 2012 | 10.469.704 |

As regards Legal Fees and ICC Costs

14. Orders EGPC and EGAS to pay (i) to EMG USD 1,475,000 for EMG's reasonable Legal Fees and (ii) to IEC USD 2,600,000 for IEC's reasonable Legal Fees.

15. Orders EGPC and EGAS to pay (i) to EMG USD 267,633 for ICC Costs and (ii) to IEC USD 751,997 for ICC Costs.

16. Orders EGPC and EGAS to pay to EMG and IEC interest on the Legal Fees and ICC Costs at an interest rate p.a. equal to USD LIBOR for one month deposits plus a margin of 3%, to be recalculated at the end of each month, and to be compounded annually on the last day of each year, from the *dies a quo*, which is the date of this Award, until the date of actual payment.

17. Dismisses all other prayers for relief submitted by the Parties.

Place of arbitration: Geneva, Switzerland

Date of this Award: 4 December 2015

ICC Case 18215/GZ/MHM
Award

Juán Fernández-Armesto

President

John Marrin QC

Co-arbitrator

Osman Berat Gürzumar

Co-arbitrator